**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF TODD SANDFORD PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Todd Sandford, declare under penalty of perjury:

1.      I am the Chief Operating Officer of Agera Energy, LLC ("Agera Energy") and Agera Holdings, LLC ("Agera Holdings"), and have served in such capacities since August 2018.  As such, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.      Prior to my current role, I had a 15-year career with one of North America's largest retail providers of electricity, natural gas, and home and business energy-related services. During that period of time, I held numerous leadership roles, including customer operations, finance, and sales functions, culminating in general management over two separate business units.

3.      On the date hereof (the "Petition Date"), each of the above-captioned debtors (collectively, the "Debtors") commenced a voluntary case (these "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

4.      I submit this declaration to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these Chapter 11 Cases.  I also submit this declaration in support of the first day motions[2] and applications (the "First Day Pleadings") filed by the Debtors contemporaneously herewith, by which the Debtors seek relief enabling the Debtors to continue as going concerns, operate effectively, minimize certain of the potential adverse effects of the commencement of these Chapter 11 Cases, and preserve and maximize the value of the Debtors' estates.

5.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this declaration on that basis.  I am authorized to submit this declaration on behalf of the Debtors.

6.      Parts I through III of this declaration describe the Debtors' business operations, organizational structure, and capital structure.  Part IV of this declaration describes the events leading to these Chapter 11 Cases.  Part V of this declaration sets forth the relevant facts in support of the First Day Pleadings.  Part VI of this declaration contains information required by Local Rule 1007-2.

---

[2] All references to agreements, pleadings, or other documentation or summaries thereof in this declaration are qualified in their entirety by the terms set forth in the relevant agreements, pleadings, or other documents.

## I. THE DEBTORS' BUSINESS

### A. Overview

7.       Headquartered in Briarcliff Manor, New York, the Debtors provide retail electricity and natural gas to commercial, industrial, and residential customers.  The Debtors offer their customers "energy choice"—the ability to receive electricity and natural gas commodity needs from a source other than the local utility in certain markets that have been restructured to permit retail competition, which allows customers to tailor energy supply to their specific needs.

8.       Across both electricity and natural gas supply, the Debtors service 87 distinct utility regions and provide service to approximately 35,000 customers, comprised of over 75,000 accounts in California, Connecticut, Delaware, District of Columbia, Illinois, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas and Virginia.  The deregulation process that has permitted retail competition for electricity and natural gas is briefly described below.

### B. Deregulation of Electricity and Natural Gas Markets

9.       Prior to significant legislative and industry reforms, end users of electricity or natural gas in the United States typically were obligated to purchase from their local utility a single, bundled product consisting of the generation, transmission, distribution services and the actual commodity consumed.  The local utility held a monopoly in a particular geographic region in exchange for the obligation to serve all customers, subject to state public utility commission regulation of the local utility's rates and other activities.

10.       Commencing in the 1990s, in the wake of federal efforts in the 1980s to unbundle sales of electricity and natural gas commodities from the associated transmission and transportation services and other pro-competitive measures, a number of state legislatures

3

enacted laws allowing competitive retail sales of electricity and natural gas commodities to end use customers, while at the same time preserving the local utilities' right to be compensated for transmission, transportation and distribution services and the ultimate obligation to serve captive customers. Typically referred to as state unbundling programs or retail choice programs, these states determined that it was in the best interest of consumers of electricity and natural gas to introduce competition among third party providers. Third party providers are required to be licensed in the states in which they sell electricity or natural gas, and once licensed, are authorized to compete to sell such products to end users subject to applicable state regulations.

11.     Today, approximately 28 states have at least partially deregulated electricity or natural gas markets whereby energy customers may choose between their incumbent local utility and an array of independent, competitive suppliers. The Debtors currently hold licenses to sell retail electricity in 15 states (including the District of Columbia) and retail natural gas in 12 states (including the District of Columbia).

### C.     Sales Channels

12.     As of the Petition Date, the Debtors have 56 full-time employees, after taking into account certain reductions in force that were necessary in the months leading up to these Chapter 11 Cases.

13.     Prior to the Petition Date, the Debtors utilized a variety of sales channels to sell electricity, natural gas, and related products to a diverse customer base. The Debtors' primary sales channels were as follows:

(a)     **Internal Sales Team**. The Debtors employed individuals who were part of a dedicated sales team based in their various operating regions who serviced existing customers and sought to acquire new customers.

(b)     **Broker and Agent Network**. The Debtors generated a material portion of their business through their independent network of hundreds of brokers and agents. The Debtors maintained good relationships with their broker

network, which controlled a large customer base and typically did not exclusively sell the Debtors' products. Brokers received compensation based on the monthly energy usage for customers that they brought to the Debtors. A typical broker commission structure was paid based on kilowatt hours (electricity) and dekatherms (natural gas) sold over the life of a customer contract. Brokers were generally paid based on metered consumption throughout the contract life, so long as the customer had made payment to the Debtors for the electricity and/or natural gas consumed.

14.     As of the Petition Date, the Debtors effectively ceased all new sales efforts given their severe liquidity constraints and the lack of interest from third parties in a going-concern sale, all as discussed in more detail below.

**D.      Customer Contracts**

15.     As of the Petition Date, the Debtors have approximately 35,000 customers, comprised of approximately 75,000 accounts. Approximately 75% of those accounts are commercial, with the remaining 25% being residential.

16.     Depending on the circumstances and needs of their customers, the Debtors negotiated contracts of various durations, ranging from month-to-month contracts to contracts with terms up to several years. More than half of all customers in the Debtors' existing book have been with the Debtors for more than 2.5 years (up to 6.6 years), and more than 25% of all customers have been with the Debtors for more than 4 years.

17.     The Debtors bill roughly one-half of their delivered energy volumes through a purchase of receivable ("POR") billing program. Under the POR program, (i) the local utility (*e.g.*, Con Edison) sends a bill to the customer for the transmission and transportation of electricity or natural gas as well as distribution charges, and (ii) the Debtors incorporate their charges for the commodity supplied on behalf of the customer in the same bill. The utility assumes the risk associated with actual collections of the total charge and remits a percentage of the commodity charges back to the Debtors every month, regardless of collection.

18.     For the remaining energy volumes that are not billed through a POR program, approximately 80% are billed to customers by the debtors, and approximately 20% are billed to customers by the local utility, after which the Debtors receive payment from the utility when the customer pays the utility.

## II.  THE DEBTORS' HISTORY, MANAGEMENT, AND ORGANIZATIONAL STRUCTURE

### A.     Platinum Partners Acquisition of Glacial Energy

19.     On April 10, 2014, Glacial Energy Holdings and certain of its affiliates ("Glacial") filed voluntary chapter 11 cases in the United States Bankruptcy Court for the District of Delaware.[3]  Glacial provided retail electricity and/or natural gas to customers in New York, Massachusetts, Maryland, California, Illinois, New Jersey, Pennsylvania, Texas, Ohio, Michigan, the District of Columbia, Florida, Indiana, Virginia, Rhode Island, Maine, and New Hampshire.[4]

20.     On June 18, 2014, Platinum Partners Value Arbitrage Fund L.P. ("PPVA") acquired substantially all of Glacial's retail energy assets pursuant to an asset purchase agreement authorized under Bankruptcy Code section 363 (the "Glacial Acquisition").[5]  Agera Energy was the "Designated Buyer" under the asset purchase agreement.[6]

### B.     AGH Parent's Acquisition of Agera Energy

21.     After the Glacial Acquisition, and upon information and belief, Agera Energy issued a certain amended and restated convertible promissory note in the principal amount of $600,071.23 (the "Convertible Note") to Principal Growth Strategies ("PGS").  PPVA and a

---

[3] *In re Gridway Energy Holdings, Inc.*, Case No. 14-10833 (Bankr. D. Del. April 10, 2014).

[4] *Id.* [Docket No. 10].

[5] *Id.* [Docket No. 383].

[6] *Id.* [Docket No. 846].

Platinum-operated entity indirectly became the holders of the Convertible Note through their ownership interest in PGS.[7]  The Convertible Note was convertible into 95.01% of the outstanding capital securities of Agera Holdings.  Upon information and belief, on June 9, 2016, the Convertible Note was sold to AGH Parent LLC ("AGH Parent"), which exercised its conversion right in April 2018 and, as a result, now owns 95.01% of the voting membership interests in Agera Holdings.[8]

22.     Upon information and belief, Greg E. Lindberg ("Lindberg") owns 50% of the total economic interest and 89% of the total voting interest in AGH Parent.[9]  Upon information and belief, Lindberg is also the beneficial holder of equity interests in approximately 100 independent operating companies, including the Debtors, through Lindberg-owned Eli Global LLC ("Eli Global").[10]

23.     In March 2019, Lindberg was indicted for certain acts that are wholly unrelated to the Debtors.  To my knowledge, Lindberg has had no involvement with the Debtors' day-to-day operations.  I have never met nor communicated with Lindberg.

---

[7] *In re Platinum-Beechwood Litig.*, Nos. 18-cv-6658 (JSR); 18-cv-10936 (JSR), 2019 WL 1570808, at *6 (S.D.N.Y. Apr. 11, 2019).

[8] Application for Authorization Under Section 203 of the Federal Power Act and Requests for Waivers of Filing Requirements and Confidential Treatment, FERC Docket No. EC18-56-000 at 11 (Feb. 12, 2018).

[9] Application for Authorization Under Section 203 of the Federal Power Act and Requests for Waivers of Filing Requirements and Confidential Treatment, FERC Docket No. EC18-56-000 at 9 (Feb. 12, 2018).

[10] Lindberg's website states the following about Eli Global:

> The Eli Global companies are a federation of separate, distinct portfolios, each with vision and expertise in a particular market sector.  Each portfolio contains independent, autonomous, and separately managed companies serving a broad range of diverse market sectors globally.  The independence, autonomy, and legal separation of each operating company is maximized to drive maximum management autonomy and accountability, as well as to enhance risk management and diversification.

*See https://www.greglindberg.com.*

24.     Upon AGH Parent's conversion of the Convertible Note, Geoffrey Duda, an energy industry veteran with no prior ties to Eli Global or Lindberg, was hired as the CEO of Agera Holdings and Agera Energy.  Mr. Duda then recruited me as COO and Mark Linzenbold as CFO.  Mr. Duda resigned in April 2019.

25.     Prior to the Petition Date, Stephen S. Gray was appointed as the sole manager of Debtors Agera Holdings, Agera Energy, Utility (as defined below), and Solutions (as defined below), and as the sole director of Aequitas.  Mr. Gray has no prior or current relationship with Eli Global or Lindberg.  Mr. Gray has more than forty years of experience developing and implementing restructuring and crisis management plans for public and private companies, creditors, and judicial bodies.

### C.     Current Organizational Structure

26.     Attached hereto as **Exhibit A** is an organizational structure chart of the Debtors, as of the Petition Date.

27.     Agera Holdings, a Delaware limited liability company, is a holding company with no business operations.  As mentioned above, AGH Parent holds 95.01% of Agera Holdings' capital securities.  AGH Supplemental LLC ("AGH Supplemental") holds the remaining capital securities in Agera Holdings (4.99%).[11]

28.     Utility Recovery LLC, a Delaware limited liability company ("Utility"), is a dormant entity that has no operations, assets, or liabilities.  Utility was envisioned to provide energy audit consulting services.  Utility is wholly-owned by Agera Holdings.

29.     Agera Solutions LLC, a Delaware limited liability company ("Solutions"), is a dormant entity that has no operations, assets, or liabilities.  Solutions was envisioned to increase

---

[11] Certain entities also hold preferred shares in Agera Holdings, as detailed in the Petition for Agera Holdings.

customer retention through smart home energy solutions in conjunction with third party partners. Solutions is wholly-owned by Agera Holdings.

30.     Agera Energy, a Delaware limited liability company, is an operating company that maintains contracts with customers in the states identified above in paragraph 19 for the supply of natural gas and/or electricity.  Agera Energy is wholly-owned by Agera Holdings.  BP Energy Company holds one Class B Unit in Agera Energy.

31.     energy.me midwest llc, an Illinois limited liability company ("EME"), is an operating company that maintains contracts with customers in Delaware, the District of Columbia, Illinois, Maryland, New Jersey, Ohio, and Pennsylvania for the supply of electricity. EME is wholly-owned by Agera Energy.  BP Energy Company holds one Class B Unit in EME.

32.     Aequitas Energy Inc., a Connecticut corporation ("Aequitas"), is an operating company that maintains contracts with customers in Connecticut for the supply of electricity. Aequitas is wholly-owned by Agera Energy.

33.     Briarcliff Property Group, LLC, a New York limited liability company ("Briarcliff"), owns and manages the real property used for the Debtors' headquarters in Briarcliff Manor, New York.  Agera Energy, EME, and Aequitas incur monthly rent obligations to Briarcliff.  Briarcliff leases other portions of the property to third party tenants.  Briarcliff is wholly-owned by Agera Energy.  Briarcliff is not a Debtor in these Chapter 11 Cases.

## III. CAPITAL STRUCTURE

### A.     Preferred Supplier Agreement and ISDA

34.     Agera Energy, EME, and Aequitas (collectively, the "Agera Opco Entities") and BP Energy Company ("BP") are parties to (i) that certain Preferred Supplier Agreement, dated October 2, 2015 (as amended on May 15, 2017 and February 9, 2018, the "Senior Lien Supply Agreement") and (ii) that certain ISDA Master Agreement, dated May 5, 2015 (as amended on

October 2, 2015, and together with all related confirmations, schedules, annexes, exhibits and addenda thereto, the "Senior Lien ISDA Master Agreement").  Pursuant to the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement, BP supplies electricity and natural gas to the Agera Opco Entities and engages in hedging transactions with the Agera Opco  Entities.

35.    Pursuant to that certain Pledge and Security Agreement, dated October 2, 2015, between Agera Energy and Agera Holdings, as Pledgors, and BP, as Secured Party, (i) Agera Energy pledged substantially all of its assets to BP as collateral security for Agera Energy's obligations to BP under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement, and (ii) Agera Holdings pledged its membership interests in Agera Energy to BP as collateral security for Agera Energy's obligations to BP under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement.

36.    Pursuant to that certain Pledge and Security Agreement, dated October 2, 2015, between Aequitas and Agera Energy, as Pledgors, and BP, as Secured Party, (i) Aequitas pledged substantially all of its assets to BP as collateral security for Aequitas' obligations to BP under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement, and (ii) Agera Energy pledged its membership interests in Aequitas to BP as collateral security for Aequitas' obligations to BP under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement.

37.    Pursuant to that certain Pledge and Security Agreement, dated October 2, 2015, between EME and Agera Energy, as Pledgors, and BP, as Secured Party, (i) EME pledged substantially all of its assets to BP as collateral security for EME's obligations to BP under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement, and (ii) Agera Energy

pledged its equity interests in EME to BP as collateral security for EME's obligations to BP under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement.

38.    Pursuant to that certain Personal Guaranty, dated November 20, 2018 (the "Original Lindberg Guaranty"), between Lindberg and BP, Lindberg guaranteed the obligations of the Agera Opco Entities[12] and Agera Holdings under the Senior Lien Supply Agreement and the Forbearance Agreement (as defined and discussed below), subject to an aggregate maximum liability of $51,000,000 (subject to certain potential adjustments).

39.    Pursuant to that certain Guaranty Agreement, dated November 20, 2018 (the "Original GHTG Guaranty" and, together with the Original Lindberg Guaranty, the "Original Guaranties"), between Global Health Technology Group, LLC ("GHTG") and BP, GHTG guaranteed the obligations of the Agera Opco Entities[13] and Agera Holdings under the Senior Lien Supply Agreement and the Forbearance Agreement, subject to an aggregate maximum liability of $51,000,000 (subject to certain potential adjustments).  Upon information and belief, Lindberg is the beneficial holder of equity interests in GHTG.

40.    Upon information and belief, in connection with the amendment to the Forbearance Agreement (as discussed below), the Original Guaranties were terminated and replacement guaranties (the "Replacement Guaranties") were executed in January 2019, in substantially the same form as the Original Guaranties.

41.    As of the Petition Date, the Debtors estimate that approximately $161.6 million is outstanding under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement,

---

[12] Aequitas Energy, Inc. is an "Agera Opco," as defined herein.  However, Aequitas Energy LLC (not Aequitas Energy, Inc.) is named as a guarantor in the Original Lindberg Guaranty.

[13] Aequitas Energy, Inc. is an "Agera Opco," as defined herein.  However, Aequitas Energy LLC (not Aequitas Energy, Inc.) is named as a guarantor in the Original GHTG Guaranty.

which is comprised of energy supply liabilities, mark-to-market exposure, and collateral support obligations posted by BP on behalf of the Debtors.

**B.        Second Lien Revolving Credit Facility**

42.        Agera Energy and Colorado Bankers Life Insurance Company ("Colorado"), as Lender and Agent, are parties to that certain Junior Loan and Security Agreement, dated February 15, 2018 (the "Revolving Credit Agreement"), pursuant to which Colorado agreed to make available to Agera Energy a revolving credit line in the maximum principal amount of $35,000,000.

43.        Agera Energy pledged substantially all of its assets to Colorado as collateral security for Agera Energy's obligations to Colorado under the Revolving Credit Agreement. Pursuant to that certain Second Amended and Restated Intercreditor Agreement, dated February 9, 2018, between BP, Agera Holdings, the Agera Opco Entities, and certain Subordinate Lienholders (as defined therein), the security interests granted to Colorado are subordinate in priority to the security interests granted to BP.

44.        As of the Petition Date, $35,000,000 in principal is outstanding under the Revolving Credit Facility.

**C.        Unsecured Debt**

45.        The Debtors estimate that, as of the Petition Date, approximately $82 million of general unsecured debt is outstanding, which is comprised primarily of trade claims, obligations related to REC and ACP obligations (each as defined and discussed below), and broker commission payments.

## IV. EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Legacy Issues from Prior Management

46.    The underlying retail energy business, by its nature, is a very competitive, low margin business.  The Debtors' senior management, who joined the Debtors approximately one year prior to the Petition Date, uncovered a number of structural challenges within the Debtors' business.

47.    The Debtors grew their power business significantly in the 18 month period from January 2017 through June 2018.  Most of that growth resulted from selling and onboarding customers on fixed price (as opposed to variable price) power contracts.  The size of the Debtors' power business, as measured by annualized volumes on flow, more than doubled (120%+) during this time period.  Fixed price contracts are inherently riskier than variable price contracts.  The ability to accurately price customers and properly risk-manage the customer load is critical to the ongoing commercial sustainability of any retail supplier business.

48.    Upon arrival, the new senior management team uncovered a number of challenges, including, but not limited to:

- Poor (and in some cases, no) visibility into forward margins and, consequently, poor overall financial planning and forecasting
- A significant number of customer contracts at very low and negative forward margins (uncovered only after developing visibility into forward margins and doing root cause analysis)
- A suboptimal control environment (financial, pricing, risk management, etc.)
- An overstated balance sheet

49.    Upon discovering these issues, management developed, and presented in late September 2018, a number of strategic options for Eli Global to assess, ranging from a bankruptcy filing to a turnaround plan.

50.    Eli Global ultimately committed to a turnaround plan, with full recognition of the capital necessary to fund the plan.  The Debtors' business was not expected to be profitable until 2020 given that it was straddled with the run-off of low- and negative-margin customer contracts.

51.    The Debtors were executing the turnaround plan up until the unexpected capital liquidity problems discussed below.

**B.    The Prepetition Defaults**

52.    In September 2018, the Debtors' current management identified material balance sheet issues, which led to a restatement of the Debtors' financials.  Specifically, as of August 31, 2018, there was approximately $39 million of over stated receivables, of which $37 million related to unbilled receivables.  As a result of the foregoing discovery, the Debtors suddenly found themselves in breach of the Senior Lien Supply Agreement's $16 million Tangible Net Worth covenant.

53.    After further discussions with various constituents, BP, the Agera Opco Entities, and Agera Holdings executed that certain Forbearance Agreement and Limited Waiver, dated November 20, 2018 (the "Forbearance Agreement"), pursuant to which: (i) the Agera Opco Entities and Agera Holdings acknowledged that they had breached their covenant in the Senior Lien Supply Agreement to maintain a Tangible Net Worth (as defined in the Senior Lien Supply Agreement) of at least $16 million, (ii) BP agreed to forbear from enforcing remedies under the Senior Lien Supply Agreement as a result of such breach, and (iii) Agera Holdings agreed to make additional capital contributions to Agera Energy of at least $51 million on the following schedule:

14

| Capital Contribution | Contribution Date |
|---|---|
| $5,000,000 | December 14, 2018 |
| $15,000,000 | January 4, 2019 |
| $10,000,000 | February 1, 2019 |
| $15,000,000 | June 20, 2019 |
| $6,000,000 | September 20, 2019 |

54.     Eli Global played a significant role in the discussions leading up to the Forbearance Agreement.  Specifically, Eli Global intended to provide the funding to Agera Holdings necessary to satisfy the capital contributions contemplated under the Forbearance Agreement.

55.     The $5 million capital contribution due on December 14, 2018 was satisfied on December 14, 2018.  The $15 million capital contribution due on January 4, 2019 was not satisfied.  However, a $5 million capital contribution was made on January 18, 2019.

56.     On January 25, 2019, BP, the Agera Opco Entities, and Agera Holdings executed that certain First Amendment to Forbearance Agreement and Limited Waiver, dated November 20, 2018, pursuant to which: (i) the Agera Opco Entities and Agera Holdings acknowledged that they were in breach of the Forbearance Agreement due to Agera Holdings' failure to fully fund the capital contribution payment due on January 4, 2019, and (ii) Agera Holdings agreed to the following revised forward capital contribution schedule:

| Capital Contribution | Contribution Date |
| --- | --- |
| $5,000,000 | January 18, 2019 |
| $5,000,000 | January 31, 2019 |
| $10,000,000 | February 18, 2019 |
| $5,000,000 | April 18, 2019 |
| $15,000,000 | June 20, 2019 |
| $6,000,000 | September 20, 2019 |

57.    The $5 million capital contribution due on January 31, 2019 was satisfied on January 31, 2019.  The $10 million capital contribution due on February 18, 2019 was satisfied on February 19, 2019.  The $5 million capital contribution due on April 18, 2019 was not satisfied.

58.    On April 22, 2019, BP noticed the Agera Opco Entities and Agera Holdings of their default under the Forbearance Agreement.

59.    On April 23, 2019, BP noticed the Agera Opco Entities and Agera Holdings of their failure to remit approximately $43 million due to BP under the Senior Lien Supply Agreement, due on April 22, 2019, for power delivered in March 2019, under the Senior Lien Supply Agreement.

60.    On April 26, 2019, BP noticed the Agera Opco Entities and Agera Holdings of their failure to remit approximately $3.5 million due to BP, due on April 25, 2019, for gas delivered in March 2019, under the Senior Lien Supply Agreement.

61.    On April 29, 2019, a $5 million capital contribution was made in satisfaction of the payment that was due on April 18, 2019.

62.     Upon information and belief, all of the foregoing capital contributions were made to Agera Holdings by Eli Global.

63.     On September 25, 2019, BP noticed the Agera Opco Entities of their breaches under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement, for failing to timely remit payment for power and gas invoices in the amount of $103,022,968.20, under the Senior Lien Supply Agreement and Senior Lien ISDA Master Agreement.

**C.      Loss of Funding from Eli Global**

64.     On May 9, 2019, during a triparty meeting between the Debtors, Eli Global, and BP, it became clear that Eli Global was no longer in a position to inject the requisite capital needed to support the Debtors' business.

**D.      RPS Obligations and Defaults**

65.     In certain states where the Debtors operate, the Debtors are required to satisfy renewable portfolio standards ("RPS") as a condition of their license or certification to supply energy to customers in such states.  RPS laws require a certain portion of a state's electricity consumption to be generated from renewable sources, such as wind, solar, biomass, geothermal, or hydroelectric.

66.     Energy suppliers that are required to comply with RPS obligations, such as the Debtors, must obtain a sufficient amount of renewable energy credits (often called renewable energy certificates or "RECs") during regular reporting cycles (*e.g.*, annually) with each state. RECs are created when renewable energy is generated and delivered to the grid.  Those renewable energy producers may then use the RECs to satisfy their own RPS obligations or sell the RECs they generate to other energy suppliers, such as the Debtors.

67.     Failure to comply with RPS obligations initially triggers an obligation to pay an alternative compliance payment ("ACP"), which is essentially a cash payment obligation in lieu

17

of acquiring RECs. In nearly all instances, the ACP will be more costly than had the energy supplier acquired the necessary RECs. Ultimately, an energy supplier's failure to satisfy the ACP will result in the relevant state taking regulatory enforcement action, including suspension and revocation of the supplier's license to supply energy in such state.

68.     May and June of 2019 were very critical months because the Debtors were scheduled to pay for and take delivery of a significant number of RECs to satisfy RPS obligations for the 2018 compliance year. Without additional capital contributions from Eli Global, the Debtors were forced to default on a number of REC trades, and thus were unable to satisfy certain RPS obligations.

69.     The Debtors are currently in default of their 2018 RPS obligations in Massachusetts, New Hampshire, and Rhode Island as a result of the Debtors' financial inability to acquire RECs or subsequently satisfy their ACP obligations. The Debtors will soon be in default of RPS obligations in other states. The Debtors estimate that their inability to satisfy RPS obligations in the normal course has resulted in an aggregate ACP "premium" of approximately 60%, as compared to the cost of acquiring the RECs necessary to avoid ACP obligations. As of the Petition Date, the Debtors estimate that they owe more than $72 million on account of REC and ACP obligations for the 2018 compliance year.

    i.     Massachusetts Enforcement Action

70.     On July 10, 2019, Agera Energy, LLC ("Agera Energy") received a letter from the Massachusetts Department of Energy Resources (the "MA DOER") demanding that Agera Energy immediately satisfy its ACP liability for 2018 in the amount of $41,569,223.80. The DOER stated that if it does not receive such payment, it will commence necessary steps for issuing a Notice of Non-Compliance, including the filing of a petition at the Department of

Public Utilities (the "MA DPU") recommending revocation of Agera Energy's licenses to sell electricity in Massachusetts.

71.     On August 21, 2019, the MA DOER found that Agera Energy had failed to comply with their RPS obligations for the 2018 compliance year.  The MA DOER referred the matter to the MA DPU recommending that it revoke or suspend Agera Energy's retail supplier licenses.

ii.     Rhode Island Enforcement Action

72.     On August 16, 2019, Agera Energy received a letter from the Rhode Island Public Utilities Commission (the "RI PUC") demanding that Agera Energy immediately satisfy its RPS obligations for 2018.  The RI PUC stated that if Agera Energy fails to comply by August 23, 2019, the matter would be placed on the RI PUC's August 28, 2019 Open Meeting agenda to (i) find the Debtors out of compliance with the RPS obligations for 2018, (ii) demand the full amount of the letter of credit on file, and (iii) refer the matter to the Division of Public Utilities and Carriers for revocation of the Debtors' license to operate as a nonregulated power producer in Rhode Island.

73.     On August 28, 2019, during an open meeting, the RI PUC found that Agera Energy was out of compliance with the RPS obligations for the 2018 compliance year and authorized a drawdown of the $250,000 letter of credit posted on behalf of Agera Energy with the RI PUC.  Further, the RI PUC directed the Clerk to transmit its orders to the Division of Public Utilities and Carriers (the "RI DPUC") for enforcement action against Agera Energy.

74.     On September 13, 2019, the RI DPUC issued Agera Energy a Suspension Order under which Agera Energy is prohibited from entering into new contracts or renewing existing contracts with customers in Rhode Island.  The RI DPUC is scheduled to conduct a public

hearing on October 22, 2019 to consider whether Agera Energy's license to sell energy in Rhode Island should be rescinded.

     iii.    <u>New Hampshire Enforcement Action</u>

75.    On September 17, 2019, Agera Energy received a letter from the New Hampshire Public Utilities Commission (the "<u>NH PUC</u>") demanding that Agera Energy satisfy its ACP liability for 2018 within ten days (*i.e.*, September 27, 2019).  The NH PUC stated that if it does not receive such payment, it may pursue further action, including referral of the unpaid amount for collection to the New Hampshire Department of Justice.

76.    Through a letter, dated October 2, 2019, the NH PUC ordered Agera Energy to pay the ACP liability due for 2018 in the amount of $2,231,262.00 in full within fourteen days (*i.e.*, October 16, 2019).  The NH PUC stated that if it does not receive such payment, it may pursue further actions to enforce Agera Energy's ACP payment obligation.

**E.    Pre-Petition Marketing Process**

77.    As a result of the Debtors' severe liquidity constraints and contemplated regulatory enforcement action, including potential suspension or revocation of the Debtors' license to sell electricity or natural gas in certain states, the Debtors began pursuing strategic alternatives.

78.    In May 2019, the Debtors engaged Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC (collectively, "<u>Miller Buckfire</u>") as investment banker to explore strategic alternatives, including conducting a marketing process for the sale of the Debtors, as either a going concern or an asset sale.

79.    In connection with this process, Miller Buckfire prepared marketing materials, including a Confidential Information Memorandum (the "<u>CIM</u>"), and compiled a list of potentially interested parties.

80.     Miller Buckfire contacted 207 parties, comprised of 121 strategic investors and 86 financial investors. Each party was provided with a teaser document and was invited to execute a confidentiality agreement ("NDA") with the Debtors in order to receive the CIM and access to a virtual data room.  Of the 207 parties contacted, 39 executed an NDA and received the CIM and process letter.  Twenty of those 39 parties expressed interest in further participating in the process and were provided access to a virtual data room.  Throughout this period, Miller Buckfire facilitated these parties' due diligence efforts.

81.     In June 2019, the Debtors received numerous preliminary, non-binding indications of interest (each, an "IOI").

82.     Following receipt of the IOIs, the Debtors and their advisors continued to facilitate parties' due diligence, including management meetings and providing additional diligence information.  Following these meetings, the Debtors and their advisors continued negotiations with the interested parties regarding their proposals and key terms, including timing and transaction structure.

83.     In late July 2019, the Debtors and their advisors provided certain interested parties with a draft asset purchase agreement (the "APA") and second round process letter, with a deadline to provide a binding bid and marked-up APA by August 5, 2019.

84.     On October 3, 2019, the Debtors and Exelon Generation Company, LLC ("Exelon") executed that certain Asset Purchase Agreement, pursuant to which Exelon will serve as the stalking horse bidder to acquire a significant portion of the Debtors' customer contracts for $24,750,000.00, subject to certain adjustments, under Bankruptcy Code sections 363 and 365.

85.    Contemporaneous with the filing of this declaration, the Debtors have filed a motion asking the Court to approve certain bidding procedures in connection with the Debtors' continued marketing efforts during these Chapter 11 Cases.  A summary of the proposed timeline is as follows:

| | |
|---|---|
| Bid Procedures Objection Deadline | October 14, 2019 |
| Bid Procedures Hearing | October 15, 2019 |
| Bid Deadline | October 29, 2019 |
| Sale Objection Deadline | October 29, 2019 |
| Auction (if necessary) | November 4, 2019 |
| Sale Hearing | November 5, 2019 |

## V.  FACTS RELEVANT TO FIRST DAY PLEADINGS

86.    Together with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  I have reviewed each First Day Pleading discussed below, and the facts set forth in each First Day Pleading are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

i.    ***Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n)* (the "<u>Joint Administration Motion</u>")**

87.    In the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only.  Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will affect most, if not all, of the Debtors jointly.

88.     The Debtors further seek entry of an order directing the Clerk of the Court to maintain one file and one docket for all of these Chapter 11 Cases.

89.     Joint administration of these Chapter 11 Cases will ease the administrative burden on this Court and all parties in interest.  Joint administration of these Chapter 11 Cases will not prejudice creditors or other parties in interest because joint administration is purely procedural and will not impact the parties' substantive rights.

90.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

ii.     ***Debtors' Motion for Entry of an Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures, and (B) Granting Related Relief (the "Case Management Motion")***

91.     In the Case Management Motion, the Debtors seek entry of an order (i) approving and implementing certain notice, case management, and administrative procedures, attached as **Exhibit 1** to the Case Management Motion (the "Case Management Procedures"), and (ii) granting related relief.  The Case Management Procedures, among other things, (a) establish requirements for filing and serving Court Filings, (b) delineate standards for notices of hearings and agenda letters, (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines, and (d) limit matters that are required to be heard by the Court.  To ensure that parties in interest in these Chapter 11 Cases are made aware of the Case Management Procedures, the Debtors propose to (a) serve the Case Management Procedures on the Master Service List, (b) publish the Case Management Procedures on the Debtors' restructuring website at https://cases.stretto.com/agera, and (c) make the Case Management Procedures readily available on request to the Debtors' proposed claims and noticing agent, Stretto.

92.     Given the size and complexity of these chapter 11 cases, implementing the Case Management Procedures will facilitate the fair and efficient administration of these cases and promote judicial economy.  Therefore, I believe that the relief requested in the Case Management Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

iii.    ***Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements and (II) Authorizing Debtors to File Consolidated Monthly Operating Reports* (the "<u>Schedules Motion</u>")**

93.     In the Schedules Motion, the Debtors seek an order extending the time period for the Debtors to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules</u>") by fifteen days, for a total of twenty-nine days from the Petition Date, without prejudice to the Debtors' right to apply to this Court, upon appropriate notice, for further extension(s) of the time to file the Schedules or to seek a waiver of the requirement for filing certain Schedules; and authorizing the Debtors to file their monthly operating reported required by the U.S. Department of Justice, Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, by consolidating the information required for each Debtor in one report that tracks and breaks out all of the specific information (*e.g.*, receipts, disbursements, etc.) on a debtor-by-debtor basis in each monthly operating report.

94.     Given the size and complexity of the Debtors' businesses, a significant amount of time and effort on the part of the Debtors and their advisors is required to collect, review, and assemble voluminous amounts of data.  The Debtors recognize the importance of the Schedules in these Chapter 11 Cases and intend to complete the Schedules as quickly and as accurately as possible.

95.     Based on the foregoing, I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

iv.     ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors and (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors; and (II) Authorizing the Debtors to Establish Procedures for Notifying Parties of the Commencement of These Chapter 11 Cases* (the "Consolidated Creditor Motion")**

96.     In the Consolidated Creditor Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file a consolidated list of creditors in lieu submitting separate mailing matrices for each Debtor, (ii) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors, (iii) authorizing the Debtors to establish procedures for notifying parties of the commencement of these cases.

97.     Permitting the Debtors to maintain one single consolidated list of creditors in lieu of filing separate creditor matrices for each Debtor entity is warranted under the circumstances of these Chapter 11 Cases.  Specifically, maintaining a single consolidated list of creditors will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties-in-interest and reduce the potential for duplicate mailings.

98.     The Debtors also request authority to file a consolidated list of the Debtors' 30 largest unsecured creditors.  I have been informed that Bankruptcy Rule 1007(d) requires a debtor to file a list containing information on its 20 largest unsecured creditors, excluding insiders.  I have been advised that a consolidated list of the Debtors' 30 largest unsecured creditors will be sufficient to aid in the United States Trustee's appointment of a creditors' committee.  In this context, requiring each Debtor to file a top 20 creditor list would impose an unnecessary administrative burden on the Debtors, without conferring any benefit upon the Debtors' estates or the United States Trustee.

99.     Furthermore, the Debtors request authority to establish certain procedures for providing notice to parties of the commencement of these Chapter 11 Cases and of the meeting of creditors pursuant to Bankruptcy Code section 341 (the "Notice of Commencement"). Bankruptcy Rule 2002(a) provides that the clerk, or some other person as the Court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of the meeting of creditors under Bankruptcy Code sections 341 or 1104(b). Furthermore, Bankruptcy Rule 2002 provides that notice of the order for relief shall be sent by mail to all creditors and shareholders. The Debtors request authority for their claims and noticing agent to serve by regular mail the Notice of Commencement to creditors in accordance with Bankruptcy Rule 2002. These proposed procedures will ensure that the Debtors' creditors receive prompt notice of the commencement of these Chapter 11 Cases and of the meeting of creditors.

100.    Based on the foregoing, I believe that the relief requested in the Consolidated Creditors Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

v.      ***Debtors' Application for Entry of an Order Authorizing Employment and Retention of Stretto as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date*** **(the "Claims Agent Application")**

101.    In the Claims Agent Application, the Debtors seek entry of an order appointing Stretto ("Stretto") as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors in these Chapter 11 Cases effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

102.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, it is my understanding that based

on all engagement proposals obtained and reviewed that Stretto's rates are competitive and comparable to the rates charged by their competitors for similar services. The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims Agent Application.

vi.     ***Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Continue (I) to Operate Their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and Maintain Existing Business Forms; and (II) Their Intercompany Transactions* (the "Cash Management Motion")**

103.     In the Cash Management Motion, the Debtors seek orders on an interim and final basis allowing the continued use of their existing cash management system. The Debtors use a centralized cash management system to collect funds from, and to pay expenses incurred by, their operations (the "Cash Management System"). The Cash Management System includes nineteen Debtor bank accounts, a list of which is attached to the Cash Management Motion as **Exhibit D**. The Bank Accounts are all held at JP Morgan Chase and First National Bank of Central Texas (collectively, the "Banks").

104.     The Cash Management System is integral to the operation and administration of the Debtors' businesses. In short, the Cash Management System is essential to cash inflows and outflows and the efficient execution and achievement of the Debtors' strategic business objectives and, ultimately, to maximizing the value of the Debtors' estates.

105.    The principal components of the Cash Management System are the following

accounts (collectively, the "Bank Accounts"):

(a)    Collection Accounts:  The Debtors receive payments for goods and
services in the ordinary course of business.  All collections flow into one
of six collection accounts, all of which are governed by blocked account
control agreements between the respective account holder, the Bank, and
BP Energy Company ("BP"), collectively (the "Collection Accounts").
Each day, amounts held in the Collection Accounts are swept into one of
three cash collateral accounts (the "Collateral Accounts")[14] over which BP
has control.  The funds received in the Collateral Accounts are used to pay
down certain amounts owed to BP under the Senior Lien Supply
Agreement and Senior Lien ISDA Master Agreement and fund the various
operating accounts to support the Debtors' businesses.

(b)    Operating Accounts:  In order to facilitate the timely payment of accounts
payable, the Debtors maintain four separate operating accounts
(collectively, the "Operating Accounts").  BP reviews and approves
transfers from the Collateral Accounts to the Operating Accounts.  The
Debtors send BP disbursement approval requests on Mondays and
Wednesdays on a weekly basis.

(c)    Payroll Accounts:  The Debtors maintain two accounts for payroll, from
which the Debtors' payroll is funded.

(d)    Money Market Account:  The Debtors maintain a money market account
that is a restricted account and the money in it serves as collateral for
various issued surety bonds.

(e)    Tax Account:  The Debtors maintain an account to pay taxes, held in the
name of Agera Energy Tax Account.

(f)    Checking Account:  The Debtors maintain a checking account, held in the
name of Utility Recovery LLC, which is a dormant account with
approximately $2,000 in it.

106.    Additionally, the Debtors engage in routine business relationships with certain

other Debtor and non-Debtor entities (collectively, the "Intercompany Transactions"), which

result in intercompany receivables and payables (the "Intercompany Claims").  The Debtors seek

authority to continue the Intercompany Transactions and pay Intercompany Claims in the

---

[14] Agera Energy LLC, Account No. xxxxxx5135; energy.me midwest llc, Account No. xxxxxx1500; and Aequitas
Energy LLC, Account No. xxxxxx0021.

ordinary course of business on a postpetition basis, in a manner consistent with prepetition

practice.  Discontinuing the Intercompany Transactions would unnecessarily disrupt the

accounting and Cash Management System and the Debtors' operations to the detriment of the

Debtors, their creditors, and other stakeholders.

107.    The Debtors seek a waiver of the U.S. Trustee operating guidelines for debtors in

possession to the extent they require that the Debtors close the Bank Accounts and open new

post-petition bank accounts.  If enforced in these Chapter 11 Cases, such requirements would

disrupt the Debtors' businesses, causing delays in payments to vendors, suppliers,

subcontractors, administrative creditors, employees, and others, thereby impeding the Debtors'

efforts to maximize the value of their estates.

108.    The Debtors request the authority to continue to use the Bank Accounts with the

same account numbers, styles, and business forms as the Debtors used prepetition.  The Debtors

also seek authority to open new accounts whenever needed, provided that the Debtors give the

U.S. Trustee adequate notice of such newly-opened accounts.  The Debtors represent that if the

relief requested in Cash Management Motion is granted, they will not pay, and will direct each of

the Banks not to pay, any debts incurred before the Petition Date, other than as authorized by this

Court.

109.    In connection with continuing the use of the Bank Accounts, the Debtors request

the authority to pay prepetition account-related Bank fees and charges to the extent of the

amount of the Debtors' cash held by such Bank.  The Debtors seek authority to pay the

prepetition account-related Bank fees and charges to the extent the Debtors determine, in their

good faith business judgment, that the Banks have valid setoff claims pursuant to section 553 of

the Bankruptcy Code (but only to the extent of such claims).  This will save the Debtors the time

and expense of responding to such lift stay requests and/or negotiating stipulated orders to allow the Banks to exercise setoff rights.  The Debtors further submit that such relief requested would not prejudice the interests of any other creditors or other parties-in-interest.

110.    The Debtors should be granted further relief from the U.S. Trustee operating guidelines to the extent that they require the Debtors to make all disbursements by check. Preventing the Debtors from conducting transactions by debit, wire, and other similar methods would unnecessarily disrupt the Debtors' business operations and create additional and unnecessary costs.

111.    Compelling the Debtors to adopt a new cash management system would be expensive and create unnecessary administrative problems, impeding the Debtors' ability to maximize value for their estates.  Consequently, the Debtors' ability to continue using its Cash Management System is essential and is in the best interests of the Debtors, their estates, and their stakeholders.

112.    To minimize expenses to their estates, the Debtors also request authorization to continue using all correspondence and business forms (including, but not limited to, letterheads, purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock (collectively, the "Business Forms")) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.

113.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

vii.    ***Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition Wages, Reimbursable Expenses, Benefits, and Related Items* (the "Wage Motion")**

114.    To minimize the personal hardships the Debtors' employees (the "Employees")
will suffer if prepetition employment-related obligations are not paid when due or as expected, as
well as to maintain morale during this critical time, the Debtors seek entry of an order
authorizing, but not directing, the Debtors to pay: (a) prepetition wages, salaries, commissions,
overtime pay, sick pay, vacation pay, and other accrued compensation owed to their Employees,
including independent contractors and temporary workers (the "Prepetition Wages"); (b)
unreimbursed or unpaid prepetition business expenses owed to their Employees; (c) Prepetition
Deductions (as defined below); (d) prepetition contributions to, and benefits under, Employee
benefit programs; and (e) all costs and expenses relating to the foregoing payments and
contributions, including any payments to third-party administrators, staffing agencies, or other
administrative service providers.

115.    To assist in implementing the relief requested, the Debtors further request that the
Court authorize the Debtors to honor and continue the Debtors' prepetition practices as described
in the Wage Motion in the ordinary course of business and authorize the Debtors' banks and
other financial institutions to process and honor checks and transfers related to such obligations.

### A.    Wages, Salaries, and Other Compensation

116.    The Debtors have approximately 56 Employees, located in eight (8) states,
including full-time, part-time, and temporary employees.  The Debtors also periodically retain
specialized individuals as independent contractors.  The Debtors pay Prepetition Wages on the
15th and on the last day of each month.  The Debtors estimate that, as of the Petition Date, the
total amount of Prepetition Wages that will be due and payable is approximately $232,000.00.

### B.       Prepetition Business Expenses

117.     The Debtors customarily reimburse their Employees for a variety of business

expenses incurred in the ordinary course of their business.  The Debtors estimate that, as of the

Petition Date, the total amount of prepetition business expenses that will be due and payable will

be approximately $20,000.00.

### C.       Prepetition Deductions

118.     During each applicable pay period, the Debtors routinely deduct certain amounts

from the paychecks of Employees to make payments on behalf of the Employees for or with

respect to, among other things, the Debtors' Employee benefit programs, loan repayments and

garnishments, or amounts due third parties, and on account of various federal, state, or local

income, FICA, Medicare, state disability, workers' compensation, and other taxes for remittance

to the appropriate federal, state, or local taxing authority (the "Prepetition Deductions").  The

Debtors estimate that, as of the Petition Date and before the final hearing on this Motion, the

total amount of Prepetition Deductions that will be due and payable will be approximately

$127,000.00.

### D.       Prepetition Employee Benefits

119.     The Debtors also offer or provide eligible Employees with a variety of benefits.

These benefits include, but are not limited to, medical, dental, vision, prescription drug, life,

accidental death and dismemberment, and disability insurance, and 401(k) retirement plans, as

well as COBRA medical coverage for former employees (collectively, the "Prepetition

Benefits").  The Debtors estimate that, as of the Petition Date and before the final hearing on this

Motion, the total amount of Prepetition Benefits that will be due and payable will be

approximately $40,000.00.  ADP administers the Debtors' Employee benefit programs (other

than the 401(k) plans), and the Debtors remit payment to ADP for the Debtors' Employee benefit programs.

### E.      Processing Costs

120.      In the ordinary course of business, the Debtors utilize the services of third-party administrators to whom the Debtors outsource tasks associated with the payment of compensation and benefits to Employees.  The costs of these services (the "Processing Costs") include, among other things, processing costs, the employer portion of payroll-related taxes and accrued but unpaid prepetition charges for administration of the Prepetition Benefits, such as payments owed to the Plan Administrators and ADP.  The Prepetition Processing Costs also include amounts due to the various staffing agencies for the Temporary Workers.  The Debtors estimate that, as of the Petition Date and before the final hearing on this Motion, the total amount of Prepetition Processing Costs that will be due and payable will be approximately $6,000.00.

121.      Keeping the Debtors' workforce intact is crucial to the Debtors' ongoing sale process.  Without a compensated, intact, and motivated workforce, it is highly unlikely that the Debtors will be able to maximize the value of the assets proposed to be sold to Exelon.  It is essential that the Debtors continue to honor the obligations described in the Wage Motion to ensure the continued operation of the Debtors' business and to maintain the morale of the Employees.  Any depletion of the Debtors' workforce would diminish the Debtors' prospects for a successful sale.

122.      The deductions and taxes principally represent the Employees' earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from the Employees' paychecks.  If the Debtors do not remit those amounts, the Employees may

face legal action and the Debtors may be burdened by inquiries and disputes concerning their

failure to submit legally required payments. Most, if not all, of the unremitted deductions and

taxes constitute moneys held in trust and are not property of the Debtors' bankruptcy estates.

123.    The Prepetition Wages and Prepetition Benefits represent a competitive but

reasonably limited set of policies and are necessary to retain the skilled and motivated workforce

necessary to complete the Debtors' contemplated sale process. Therefore, I believe that the relief

requested in the Wage Motion is necessary and appropriate and is in the best interests of the

Debtors' estates, creditors, and other parties in interest.

viii.    ***Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Certain Prepetition Claims of Service Providers and (II) Continue Satisfying Postpetition Obligations in the Ordinary Course of Business*** (the "__Motion to Pay__")

124.    In the Motion to Pay, the Debtors seek entry of interim and final orders (a)

authorizing, but not directing, the Debtors, to (i) make payments toward the prepetition fixed,

liquidated, and undisputed claims of Service Providers (as defined in the Motion to Pay), in an

amount up to $2.4 million on an interim basis and up to $4.3 million on a final basis; and (ii)

continue satisfying any Service Provider claims that accrue postpetition in the ordinary course of

business; and (b) authorizing the Debtors' banks and financial institutions to honor and process

prepetition checks and transfers to the Service Providers.

125.    The Debtors have closely examined the extent to which prepetition payments to

certain service providers are necessary to avoid irreparable harm. After a review of their

accounts payable and other books and records, the Debtors have identified a limited list of

service providers that provide the Debtors with natural gas, electricity, transmission, distribution

and related critical services. The Service Providers are critical to the Debtors' business

operations; namely, the supply and delivery of electricity and natural gas to the Debtors'

customers. I believe that any delay in payment to the Service Providers would put the Debtors'

most valuable assets—their customer contracts—at risk and would jeopardize the sale process

currently underway.

126.    If the Debtors do not pay the Prepetition Service Provider Claims, the Service

Providers may terminate the Debtors' ability to service their customers, and the customers will

revert to the default electric utility or natural gas local distribution company for that area. The

Debtors would then lose all of their customers in that Service Provider's area to such electric

utility or natural gas local distribution company. This, in turn, would have a severe detrimental

impact on the value realized from the Debtors' sale of their book of customer contracts.

127.    Based on the foregoing, I believe that the relief requested in the Motion to Pay is

in the best interests of the Debtors, their estates, and all parties in interest and should be

approved.

ix.    ***Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, but Not Directing, the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief*** (the "<u>Taxes Motion</u>")

128.    In the Taxes Motion, the Debtors seek the entry of interim and final orders

authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay certain

accrued and outstanding prepetition taxes, including sales and use taxes, franchise taxes, and

similar taxes and fees in an amount up to $2.3 million on an interim basis and up to $4.3 million

on a final basis, absent further order of the Court; and (b) granting related relief.

129.    The Debtors collect, incur, and pay sales taxes, use taxes, utility user taxes, gross

receipt taxes, and income taxes, and various other governmental taxes, fees, and assessments

(collectively, the "<u>Taxes and Fees</u>").[15]   The Debtors remit the Taxes and Fees to various federal,

---

[15]   The Debtors do not seek the authority to collect and remit state and federal employee-related withholding taxes by this motion. Such relief is instead requested in the *Debtors' Motion for Entry of an Order (I) Authorizing, But*

state, and local governments, including taxing authorities (collectively, the "Governmental

Authorities").

130.     Taxes and Fees are remitted and paid by the Debtors through checks and

electronic transfers that are processed through their banks and other financial institutions.  The

Debtors estimate that approximately $4.3 million in Taxes and Fees relating to the prepetition

period are or will become due and owing to the Governmental Authorities after the Petition Date

in the ordinary course.  The Debtors further estimate that approximately $2.3 million in Taxes

and Fees relating to the prepetition period are or will become due and owing to the

Governmental Authorities within 30 days after the Petition Date.

131.     The Debtors must continue to pay the Taxes and Fees to avoid potential costly

distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and

Fees could adversely affect the Debtors' estate because the Governmental Authorities could file

liens or seek to lift the automatic stay.

132.     I believe that the relief requested in the Taxes Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of

the Debtors, I respectfully submit that the Taxes Motion should be approved.

x.      ***Debtors' Motion for the Entry of an Order under Sections 105(a), 362, 365, and
        525 Of the Bankruptcy Code Enforcing and Restating the Automatic Stay, Ipso
        Facto, and Non-Discrimination Provisions* (the "Motion to Enforce")**

133.     In the Motion to Enforce, the Debtors seek entry of an order pursuant to sections

105(a), 362, 365, and 525 of the Bankruptcy Code enforcing and restating the automatic stay,

*ipso facto*, and non-discrimination provisions of the Bankruptcy Code.

---

*Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and
Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*,
filed concurrently herewith.

134.    The Debtors business operations are conducted across the country and the Debtors possess licenses from governmental units in and have creditors and counterparties to contracts in many states.  The governmental units may attempt to initiate or continue prosecuting regulatory and other proceedings against the Debtors to the detriment of the Debtors and their creditors, or take other actions in contravention of the automatic stay of Bankruptcy Code section 362 that could harm the Debtors' estates.

135.    In addition, upon learning of the Debtors' bankruptcy, counterparties to executory contracts may attempt to terminate those contracts pursuant to *ipso facto* provisions in contravention of Bankruptcy Code section 365.

136.    Finally, the governmental units that granted the Debtors their licenses may be unfamiliar with the non-discrimination provision of Bankruptcy Code section 525, which prohibits governmental units from revoking, suspending, or failing to renew a license, permit, charter, franchise, or other similar grant or to discriminate with respect to such grant against a debtor solely based on a debtor's bankrupt status or financial condition.

137.    Without the relief requested, governmental units and other creditors might attempt to take adverse actions against the Debtors with respect to their licenses or contracts.

138.    An order will make clear the impact of the automatic stay, ipso facto, and non-discrimination provisions and their applicability to creditors and other parties in interest wherever located.  I believe that the relief requested in the Ordinary-Course Professionals Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases.

xi.    ***Debtors' Motion for Entry of Interim and Final Orders (I) (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (II) (A) Approving Postpetition Supply Facility, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing*** (the "<u>**Financing Motion**</u>")

139.    In the Financing Motion, the Debtors seek entry of interim and final orders (the "<u>Financing Orders</u>") (i) (a) authorizing the use of Cash Collateral and (b) granting adequate protection to the Prepetition Secured Parties; (ii) (a) approving the Debtors' entry into the Postpetition Supply Facility and (b) granting liens and providing superpriority administrative expense claims to the Postpetition Secured Party (as defined below); (iii) modifying the automatic stay; and (iv) scheduling a Final Hearing on the Financing Motion.

## A.    <u>Summary of the Proposed Financing</u>

140.    The Proposed Financing generally contemplates (i) the sale of natural gas and electricity (the "<u>Energy</u>") on credit from the BP Energy Company (in such capacity, the "<u>Postpetition Secured Party</u>") to Agera Energy, LLC, Aequitas Energy Inc., and energy.me midwest llc (collectively, the <u>Agera Opco Entities</u>), which Energy will be sold in the ordinary course of the Debtors' businesses to the Debtors' customers; (ii) the Debtors' entry into physically- and financially- settled hedges with the Postpetition Secured Party to hedge the Debtors' exposure to fluctuations in the price of Energy in connection with the customer accounts that the Debtors' intend to sell in the In-Court Sale;[16] and (iii) the Prepetition Secured Parties consent for the Debtors to fund professional and operating expenses through the continued use of a portion of the Debtors' accounts receivable, subject to the Approved Budget and Permitted Variance (each as defined below).[17]

---

[16] The purpose of the hedges is to maximize sale proceeds to Debtors' estate by fixing the Debtors' gross margin under the accounts intended to be sold until the accounts have transferred to the successful bidder.

[17] The Proposed Financing will be implemented through, *inter alia*, that certain (i) Preferred Supplier Agreement, dated October 2, 2015, between the Agera Opco Entities and the Senior Lien Secured Party (as amended on May 15,

141.   The following is a concise statement and summary of the proposed material terms

of the Proposed Financing:[18]

| Material Term | Summary |
| --- | --- |
| **Term:** | Use of Cash Collateral:  Subject to the terms and conditions of the Interim Order, the Debtors request authorization to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earlier to occur of (i) an Event of Default (as defined herein), or (ii) entry of the Final Order, at which time the Specified Period shall be extended through the earliest to occur of (x) an Event of Default occurring after entry of the Final Order, (y) the date on which the Debtors' confirmed plan becomes effective; or (z) the date on which the RSA Term Sheet (as defined below) is terminated according to its terms; provided, however, that the Specified Period may be extended with the prior written agreement of the Senior Lien Secured Party.

Access to Postpetition Supply Facility:  Until the earlier to occur of (a) the transfer of all accounts associated with the Debtors' customer contracts to the successful bidder or other third party supplier or the return of such accounts to the applicable utility or local distribution company and (b) the expiry of the Specified Period (the "Postpetition Termination Date"), and subject to the terms and conditions set forth in the Postpetition Transaction Documents, the Postpetition Supply Facility, and the Interim Order, and to prevent immediate and irreparable harm to the Debtors' estates, the Debtors request authorization to obtain supply of Energy on credit under the Postpetition Supply Facility pursuant to the Approved Budget. |
| **Interest Rate:** | L+7.50% |
| **Credit Limit:** | The Agera Opco Entities may purchase Energy from the Postpetition |

2017 and February 9, 2018, the "Senior Lien Supply Agreement") attached to the Financing Motion as **Exhibit B-1**, as further amended by that certain Third Amendment, dated October 4, 2019, between the Agera Opco Entities and the Postpetition Secured Party, substantially in the form attached to the Financing Motion as **Exhibit B-2** (the "Postpetition PSA Amendment" and, together with the Senior Lien Supply Agreement, the "Postpetition Preferred Supplier Agreement"); (ii) ISDA Master Agreement (2002) between the Agera Opco Entities and the Senior Lien Secured Party, dated May 5, 2015 (as amended on October 2, 2015, and all related confirmations, schedules, annexes, exhibits and addenda thereto, the "Senior Lien ISDA Master Agreement") attached to the Financing Motion as **Exhibit C-1**, as further amended by that certain Second Amendment dated, October 4, 2019, between the Agera Opco Entities and the Postpetition Secured Party and that certain Base Confirmation, dated October 4, 2019, each substantially in the form attached to the Financing Motion as **Exhibit C-2** (the "Postpetition ISDA Amendments" and, together with the Senior Lien ISDA Master Agreement, the "Postpetition ISDA Master Agreement"); and (iii) the Financing Orders.

[18] This statement is qualified in its entirety by reference to the applicable provisions of the relevant Postpetition Transaction Documents and/or the Interim Financing Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the Postpetition Transaction Document or the Interim Financing Order, the provisions of the Interim Financing Order or the Postpetition Transaction Documents, as applicable, shall control.  The Debtors reserve the right to supplement the statements made herein.

| Material Term | Summary |
|---|---|
| | Secured Party on credit under the Postpetition Supply Facility so long as the Net AP Value[19] does not exceed the Maximum Amount. |
| *Events of Default:* | Along with customary events of default for a debtor in possession financing facility, the Postpetition Transaction Documents include an event of default upon the Debtors' failure to comply with certain milestones with respect to the sale and marketing of a sale of substantially all of the Debtors' assets. |
| *Approved Budget:* | The Postpetition Supply Agreement and the Interim Financing Order impose restrictions on the Debtors' operations by requiring the Debtors to comply with a detailed budget (the "Approved Budget"), subject to certain permitted variances. |
| *Postpetition Collateral:* | The "Postpetition Collateral" consists of all assets of the Debtors as of the Petition Date, including, without limitation, the Prepetition Collateral (as defined in the Interim Financing Order) and subject only to, and effective only upon, entry of the Final Financing Order, |

---

[19] The "Maximum Amount" means $17,500,000 unless otherwise agreed to by BP and the Debtors, each in its sole discretion in accordance herewith. The Maximum Amount shall be tested on a weekly basis on Thursdays for prior week ending balances. The "Net AP Value" means the amount, if any, by which (i) the AP Amount exceeds (ii) the AR Amount. The "AR Amount" means, as of any date of determination, the aggregate value of all accounts receivable owed to the Debtors by customers as of such date, plus all amounts that have accrued but have not yet become due as of such date (*i.e.* unbilled amounts) in respect of energy or gas delivered by the Debtors to or procured by the Debtors on behalf of a customer, in each case to the extent such receivable meets the following requirements: (i) such receivable is subject to no liens other than Permitted Liens, (ii) such receivable excludes any portion related to gross receipts or sales taxes or any other amount that may be deducted by a utility before payment to a Debtor, (iii) no more than 25% of such receivable is more than sixty (60) days past due (for the avoidance of doubt, the preceding requirement shall not apply to any such receivables under a purchase of receivables or consolidated billing program of the applicable utility or local distribution company in which the Debtors participate, solely to the extent that such Debtor is not in breach of any of its obligations under such purchase of receivables or consolidated billing program (or any other agreement between any Debtor and the applicable utility or local distribution company or tariff of the applicable utility or local distribution company) except for *ipso facto* breaches directly caused by the filing of the Chapter 11 Cases), (iv) such receivable does not have a payment date that is more than sixty (60) days after the date of invoice, (v) at the time of the sale giving rise to the receivable, the payor of such receivable was not in payment default for more than sixty (60) days to any Debtor, (vi) the payor of such receivable is not an Affiliate of any Debtor, and (vii) such receivable accrued in the ordinary course of business by delivery of energy or gas by or on behalf of a Debtor. The AR Amount also includes any cash in the Collateral Accounts or Deposit Accounts, cash posted to the ISOs, and BP-approved cash posted to the ISOs, utilities, pipelines, sureties, and regulatory bodies after September 1, 2019. The "AP Amount" means, as of any date of determination, all amounts owing to BP by any Debtor as of such date (other than (x) the portion of the Close-out Amount under the Senior Lien ISDA Master Agreement relating to the marked-to-market value of the transactions that have been terminated under the Senior Lien ISDA Master Agreement, but including all amounts under the Senior Lien ISDA Master Agreement relating to power or gas delivered by BP to or procured by BP on behalf of any Debtors that have not been paid by the Debtors (whether the applicable transactions were physically- or financially-settled) and other amounts that were deferred under the Senior Lien ISDA Master Agreement or the Senior Lien Supply Agreement and that have not yet been paid, and (y) any credit support or reimbursement obligations in respect of credit support provided or caused to be provided by BP on any Debtor's behalf) and all amounts that have accrued but have not yet become due as of such date in respect of energy or gas delivered by BP to or procured by BP on behalf of the Debtors (whether the applicable transactions were physically- or financially-settled). BP will determine the AP Amount in accordance with its internal practices and policies.

| Material Term | Summary |
|---|---|
| | (a) proceeds of any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents, and the proceeds thereof; and (b) the Debtors' rights under Bankruptcy Code sections 549 and 550 and the proceeds thereof. |
| *Postpetition Liens and Superpriority Claims:* | In order to secure the Postpetition Obligations (as defined in the Interim Financing Order), the Postpetition Secured Lender will be granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "Postpetition Liens") on all Postpetition Collateral pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3), and 364(d).  Subject and subordinate first to the Carve-Out and second to the Adequate Protection Liens, all Postpetition Obligations shall be an allowed superpriority administrative expense claim (the "Postpetition Superpriority Claim" and, together with the Postpetition Liens, collectively, the "Postpetition Protections") with priority in these Chapter 11 Cases under Bankruptcy Code sections 364(c)(1), 503(b), and 507(b) and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114, and, subject only to, and effective only upon, entry of the Final Financing Order, sections 506(c) and 552(b) of the Bankruptcy Code. |
| *Adequate Protection for the Prepetition Lenders:* | As adequate protection of the Prepetition Liens, the Prepetition Secured Parties will receive replacement security interests in and liens upon all Postpetition Collateral, including Avoidance Actions (the "Adequate Protection Liens"), which shall be junior only to the Postpetition Liens and the Senior Carve Out and Liens and subject to the Intercreditor Agreement. <br><br> The Senior Lien Secured Party will also receive superpriority administrative claim status, which shall be senior in priority and payment to all other obligations but subject to the Postpetition Obligations and the Carve-Out, to the extent of any diminution in value of the Senior Lien Secured Party's interests in the Prepetition Collateral and payment of all accrued and unpaid fees and disbursements, including all reasonable and documented out-of-pocket fees and expenses of counsel incurred prior to the Petition Date. <br><br> The Senior Lien Secured Party shall also receive payment of adequate protection on all prepetition obligations of the Debtors under the Senior Lien Transaction Documents, whether in respect of power, gas or otherwise, on a bi-weekly basis, beginning on October 18, 2019, in an amount equal to the amount of funds remaining in |

| Material Term | Summary |
|---|---|
| | the Collateral Accounts and Deposit Accounts after giving effect to payments required to be made under Paragraph 9(a) of the Interim Order that exceeds $10,000,000 until December 1, 2019, $8,000,000 until January 1, 2020, $6,000,000 until February 1, 2020, and $3,000,000 throughout the remainder of the Support Period (collectively, the "Excess Amount Thresholds") (which payments shall be applied first to payment of the invoices relating to postpetition power supply under the Postpetition Supply Facility, second to the payment of accrued interest on the Prepetition Senior Lien Obligations, at the applicable rate under the applicable Transaction Document, and third to the payment of the remaining Prepetition Senior Lien Obligations).  The Excess Amount Thresholds may be revised from time to time, subject to agreement by BP and the Agera Parties, each in their sole discretion in accordance herewith.  For the avoidance of doubt, the Excess Amount Thresholds shall not be less than the projected Carve Out (as defined below) levels at any time. |
| *Carve-Out:* | The Carve Out is an amount, subject to the Approved Budget and Permitted Variance, equal to the sum of: <br><br> a. all professional fees and disbursements incurred on or prior to the Carve Out Trigger Date (as defined in the Interim Financing Order) by: <br><br>   i. the professionals retained, pursuant to Bankruptcy Code sections 327 or 1103(a), including the noticing agent, by the Debtors, subject to the Approved Budget and the Permitted Variance; and <br><br>   ii. the professionals retained, pursuant to Bankruptcy Code sections 327 or 1103(a), by the unsecured creditors' committee (the "Committee"), if any, subject to the Approved Budget and the Permitted Variance; <br><br> b. all professional fees and disbursements incurred after the Carve Out Trigger Date by the professionals retained, pursuant to Bankruptcy Code sections 327 or 1103(a), by the Debtors or the Committee, in an amount not to exceed the aggregate amount of $100,000; <br><br> c. quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), including, without limitation, any interest payable thereon under 31 U.S.C. § 3717, and any fees payable to the Clerk of the Bankruptcy Court; <br><br> d. all reasonable fees and expenses incurred by a chapter 7 trustee appointed by the Court, not to exceed $10,000; <br><br> e. all fees and expenses incurred by Stephen S. Gray or Gray & Company LLC on or prior to the Carve-Out Trigger Date, not to exceed $50,000 per month, plus expenses, and up to $50,000 of fees and expenses incurred by Stephen S. Gray or Gray & Company LLC after the Carve-Out Trigger Date <br><br> f. all claims arising from any tax liability incurred in connection |

| Material Term | Summary |
|---|---|
| | with any In-Court Sale; |
| | g.  all gross receipt taxes, sales taxes, and uses taxes that relate to the Debtors' delivery of electricity or natural gas, excluding any such taxes that relate to prior period filed tax returns; |
| | h.  all payroll obligations and benefits incurred on or prior to the Carve Out Trigger Date, subject to the Approved Budget; |
| | i.  only to the extent such payments are approved by the Court upon notice and hearing, all retention and incentive payments contemplated by Debtors' key employee retention and key employee incentive programs, which total approximately $1,850,000 as of the date of this Interim Financing Order, subject to the Approved Budget, regardless of whether such employees at the time of the Carve Out Trigger Date have satisfied the applicable requirements to receive such payments; and |
| | j.  only to the extent such payments are approved by the Court upon notice and hearing, the amount of any Buyer Expense Reimbursement and any Termination Fee payable to Buyer under the Stalking Horse APA and the Bidding Procedures Order. |
| | Notwithstanding the foregoing or anything herein to the contrary, the Carve Out amount for any retained professional shall be net of any prepetition retainer amount held by such professional at the time of calculating the Carve Out amount. |
| *Stipulations:* | The Interim Financing Order contains stipulations related to the Prepetition Secured Parties by the Debtors, on behalf of all parties and entities, including stipulations that, as of the Petition Date, the Debtors were indebted and liable to the Prepetition Secured Parties under the applicable prepetition loan documents. |
| | The Debtors have represented that the Prepetition Secured Obligations (as defined in the Interim Financing Order) (i) constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no portion of the Prepetition Secured Obligations is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) is secured by valid, binding, perfected, enforceable, first- and second-priority liens and security interests over substantially all of the assets of the Debtors. The Debtors have waived any right to challenge the Prepetition Secured Obligations and the Prepetition Liens on any grounds, including those set forth above. |
| *Relief from Automatic Stay:* | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Postpetition Secured Party to exercise, upon five (5) business days' |

| Material Term | Summary |
|---|---|
| | notice to the Debtors and counsel to any Committee formed of the occurrence of an Event of Default, all rights and remedies, including, without limitation, against the Postpetition Collateral, without the need for obtaining a further order of this Court. |
| | Notwithstanding the foregoing, the Debtors may continue to use cash in accordance with the Approved Budget until five (5) business days after notice of the occurrence of an Event of Default from the Postpetition Secured to the Debtors and counsel to any Committee formed. |

### B.    Debtors' Need for Postpetition Financing

142.    Based on the Debtors' projected cash flows during the pendency of these Chapter 11 Cases, which are set forth in the Approved Budget, the Debtors do not carry sufficient Cash Collateral to sustain operations in the ordinary course of the Debtors' businesses.

143.    Indeed, prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these Chapter 11 Cases and determined that, in addition to the postpetition use of the Debtors' Cash Collateral, the Debtors would require postpetition financing to support their operational and restructuring activities.

144.    Based on that analysis, I believe that the Debtors would lack sufficient liquidity to continue operations, to the detriment of the Debtors, their employees, and other stakeholders without the financing to be provided by the Postpetition Supply Facility.

145.    Accordingly, I believe that the Postpetition Supply Facility is needed to continue operations and maximize and preserve the value of the Debtors' businesses.

### C.    No Financing Available on More Favorable Terms

146.    The Debtors and their advisors were unable to identify any financing opportunities reasonably available to the Debtors other than the Proposed Financing outlined

above because (i) the Prepetition Liens on substantially all of the Debtors' assets preclude the
Debtors from being able to secure debtor-in-possession financing on an unsecured or junior basis
and (ii) the Debtors do not have sufficient unencumbered assets to serve as collateral for senior
secured debtor-in-possession financing from a third party.

147.    The Prepetition Secured Parties have consented to the use of Cash Collateral and
the priming liens provided under the Postpetition Supply Facility in exchange for the various
forms of adequate protection described herein and in the Interim Financing Order.  However, the
Prepetition Secured Parties were unwilling to consent to priming liens provided to a third party
lender.  Further, upon information and belief, the Prepetition Secured Parties would seek
adequate protection beyond the various forms of adequate protection described herein and in the
Interim Financing Order if the Debtors requested to use their Cash Collateral on a non-
consensual basis.

148.    Accordingly, I believe that the Proposed Financing is justified by the absence of
alternative financing on superior terms, and because the Postpetition Secured Party and
Prepetition Secured Parties insisted upon the inclusion of such terms as a condition to extending
the Proposed Financing discussed herein.

### D.    Debtors' Good Faith Negotiations

149.    Based on the Debtors' and their advisors' involvement in the negotiations, I
believe that the terms and conditions of the Postpetition Transaction Documents are, under the
circumstances, reasonable, and the proceeds of the Postpetition Supply Facility will be used only
for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being
provided to any party to the Postpetition Transaction Documents other than as described in the
Financing Motion.

150.    Further, I believe that the hedging activities permitted under the Postpetition
Transaction Documents will hedge the Debtors' exposure to fluctuations in the price of Energy
in connection with the customer accounts that the Debtors' intend to sell in the In-Court Sale
and, therefore, maximize sale proceeds to Debtors' estate by fixing the Debtors' gross margin
under the accounts intended to be sold until the accounts have transferred to the successful
bidder.

151.    Based on the foregoing, I believe that the relief requested in the Financing Motion
is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and
will enable the Debtors to continue to operate their business during the Chapter 11 Cases without
disruption and that this Court should approve their entry into the Postpetition Supply Facility and
execution of the Postpetition Transaction Documents as an exercise of their sound business
judgment.

## VI. INFORMATION REQUIRED BY LOCAL RULE 1007-2

152.    It is my understanding that Local Rule 1007-2 requires certain information related
to the Debtors, which is set forth below.

153.    Local Rule 1007-2(a)(2) is not applicable to these Chapter 11 Cases because these
Chapter 11 Cases were not originally commenced as Chapter 7, Chapter 12, or Chapter 13 cases.

154.    As required under Local Rule 1007-2(a)(3), Exhibit B lists the names and
addresses of the members of, and attorneys for, any committee organized prior to the Petition
Date and a brief description of the circumstances surrounding the formation of the committee
and the date of its formation.  To the best of the Debtors' knowledge and belief, no such
committee has been organized prior to the Petition Date.

155.    As required under Local Rule 1007-2(a)(4), Exhibit C lists the following information with respect to each of the holders of the Debtors' twenty largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.  In each case, the claim amounts listed on Exhibit C are estimated and subject to verification.  In addition, the Debtors reserve the right to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

156.    As required under Local Rule 1007-2(a)(5), Exhibit D lists the holders of the five largest secured claims against the Debtors.

157.    As required under Local Rule 1007-2(a)(6), Exhibit E provides a summary of the Debtors' unaudited assets and liabilities.

158.    As required under Local Rule 1007-2(a)(7), Exhibit F provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.  As of the Petition Date, the Debtors do not have any publicly traded stock, debentures, or securities.

159.    As required under Local Rule 1007-2(a)(8), Exhibit G provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name,

address, and telephone number of each such entity and the location of the court in which any

proceeding relating thereto is pending.

160.    As required under Local Rule 1007-2(a)(9), Exhibit H provides a list of the

premises owned, leased, or held under other arrangement from which the Debtors operate their

business.

161.    As required under Local Rule 1007-2(a)(10), Exhibit I provides the location of the

Debtors' substantial assets, and the location of their books and records.

162.    As required under Local Rule 1007-2(a)(11), Exhibit J provides a list of actions

against the Debtors.

163.    As required under Local Rule 1007-2(a)(12), Exhibit K provides a list of the

names of the individuals who comprise the Debtors' existing senior management, their tenure

with the Debtors, and a brief summary of their relevant responsibilities and experience.

164.    As required under Local Rule 1007-2(b)(1)-(2), Exhibit L provides the estimated

amount to be paid to the Debtors' employees (not including officers, directors, and stockholders),

and the estimated amount, on a consolidated basis, to be paid to the Debtors' officers,

stockholders, directors, and financial and business consultants retained by the Debtors, for the

thirty (30) day period following the Petition Date.

165.    As required under Local Rule 1007-2(b)(3), Exhibit M sets forth, for the thirty

(30) day period following the Petition Date, estimated cash receipts and disbursements, net cash

gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than

professional fees, and other information relevant to the foregoing.

Dated:  October 4, 2019
     Briarcliff Manor, New York

                                   /s/ Todd Sandford
                                   Todd Sandford
                                   Chief Operating Officer

## **Exhibit A**

Organizational Structure



**Agera Exhibits to Declaration**

**Exhibit B**

To the best of the Debtor's knowledge and belief, no committee has been organized prior to the Petition Date.

**Agera Exhibits to Declaration**

**Exhibit C - 30 Largest Unsecured Creditors**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding the thirty (30) largest, unsecured claims against the Debtor, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or set off | Unsecured claim |
| Massachusetts Department of Public Utilities One South Station Boston, MA 02110 | doer.rps@state.ma.us | Alternative Compliance Payment | | | | $ 43,920,000.00 |
| Colorado Bankers Life Insurance Company 2327 Englert Drive Durham, NC 27713 | gel@eliequity.com | Subordinated Loan | | | | $ 35,699,287.63 |
| Connecticut Public Utilities Regulatory Authority 10 Franklin Square New Britain, CT 06051 | donna.devino@ct.gov | Alternative Compliance Payment | | | | $ 8,171,532.97 |
| New Jersey Board of Public Utilities 44 S Clinton Ave Trenton, NJ 08625 | Ronald.Jackson@bpu.nj.gov | Alternative Compliance Payment | | | | $ 7,196,266.42 |
| Pennsylvania Public Utilities Commission 400 North Street Keystone Bldg. Harrisburg, PA 17120 | customerservice@pennaeps.com | Alternative Compliance Payment | | | | $ 4,907,034.52 |
| New Hampshire Public Utilities Commission 21 S Fruit St #10 Concord, NH 03301 | stephen.eckberg@puc.nh.gov | Alternative Compliance Payment | | | | $ 2,009,367.08 |
| Rhode Island Public Utilities Commission 89 Jefferson Boulevard Warwick, RI 02888 | luly.massaro@puc.ri.gov | Alternative Compliance Payment | | | | $ 1,970,394.08 |
| New York State Energy Research and Development Authority 17 Columbia Circle Albany, NY 12203 | ces@nyserda.ny.gov | Alternative Compliance Payment | | | | $ 1,949,058.06 |
| California Public Utilities Commission 505 Van Ness Avenue San Francisco, CA 94102 | sarah.thomas@cpuc.ca.gov | Alternative Compliance Payment | | | | $ 1,447,516.64 |
| DeNomme,Bretton Daniel 38755 Carmel Drive Avon, OH 44011 | bdenomme@ageraenergy.com | Employee Commission | | | | $ 436,806.98 |
| TFS Energy Solutions LLC dba Tradition Energy 9 W Broad Street 9th Floor Stamford CT 06902-0000 | Brian.McDermott@TraditionEnergy.com | Channel Partner Commissions | | | | $ 190,000.98 |
| Energy Market Exchange (EMEX LLC) 11011 Richmond Ave #500 Houston, TX 77042 | commissions@emexllc.com | Channel Partner Commissions | | | | $ 162,137.86 |
| Progressive Energy Group LLC 2112 W Galena Blvd Suite 8210 Aurora, IL 60506 | shawnajazi@progressiveenergygroup.com | Channel Partner Commissions | | | | $ 160,358.91 |
| EnerNOC - RFP only 1 Marina Park Drive Boston, MA 02210 | Kyle.Mason@enernoc.com | Channel Partner Commissions | | | | $ 146,690.86 |
| Eric Wyman 111 S Morgan St Apr 620 Chicago, IL 60607 | ewyman3@gmail.com | Employee Commission | | | | $ 138,468.15 |
| CVI CleanCapital Solar 2 LLC 205 East 42nd Street New York, NY 10017 | meastwick@cleancapital.com | Accounts Payable | | | | $ 130,152.00 |
| EnerNOC Inc 1 Marina Park Drive Boston, MA 02210 | Kyle.Mason@enernoc.com | Channel Partner Commissions | | | | $ 120,579.74 |
| Richard Cooperberg 65 Margaret Ave Lawrence, NY 11559 | richiecoop22@gmail.com | Channel Partner Commissions | | | | $ 111,957.52 |
| Citizens Enterprises Corporation c/o Dunn & Wilson Attorneys at Law 480 Hampden Street Holyoke, MA 1040 | Martin@dunn-wilson.com | Forward Contract Breach | | | | $ 108,732.00 |
| TruEnergy Services LLC 3839 McKinney Ave, Suite 155-511 Dallas, TX 75204 | ken.harris@truenergy.net | Channel Partner Commissions | | | | $ 106,783.93 |
| Brian Bullock 6309 157th Street Oak Forest, IL 60452 | bbullock@ageraenergy.com | Employee Commission | | | | $ 102,497.91 |
| Teleios Commodities, LLC 2829 Technology Forest Blvd, Suite 360 The Woodlands, TX 77381 | anne@teleioscommodities.com | Accounts Payable | | | | $ 100,000.00 |
| Stanwich Energy Advisors LLC 9 Greenwich Office Park Greenwich, CT 06831 | joconnell@stanwichenergy.com | Channel Partner Commissions | | | | $ 99,560.98 |
| Affiliated Power Purchasers International LLC 2013 Northwood Drive Salisbury, MD 21801 | junderwood@appienergy.com | Channel Partner Commissions | | | | $ 95,174.80 |
| Kinect Energy Inc. 9800 NW 41st Street Miami, FL 33178 | jzbihley@kinectenergy.com | Channel Partner Commissions | | | | $ 94,351.86 |
| Kandi Perry 44 Gleason Road Princeton, MA 01541 | kaperry@ageraenergy.com | Employee Commission | | | | $ 93,880.30 |
| Lower Electric LLC 1307 Shermer Rd Northbrook, IL 60062 | ann@lowerelectric.com | Channel Partner Commissions | | | | $ 86,189.12 |
| Secure Energy Solutions LLC 515 Shaker Road East Longmeadow, MA 01028 | jcostello@sesenergy.org | Channel Partner Commissions | | | | $ 83,693.65 |
| Telco Pros Inc dba TPI Efficiency 2020 Center Street Cleveland, OH 44113 | roger.zona@tpiefficiency.com | Channel Partner Commissions | | | | $ 80,211.61 |
| United Energy Insights LLC dba United Energy Consultants LLC 190 Great Hills Dr South Orange, NJ 07079 | peter@uecnow.com | Channel Partner Commissions | | | | $ 79,515.23 |

**Agera Exhibits to Declaration**

**Exhibit D - Holders of Five (5) Largest Secured Claims Against the Debtor on a Consolidated Basis**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), to the best of the Debtor's knowledge and belief, there are no liquidated secured claims against the Debtor.

| Name of Creditor | Amount of Claim | Address | Collateral Description |
|---|---|---|---|
| BP Energy[1] | 161,582,079 | 201 Helios Way, Houston, TX 77079 (To the care of Kelly Norfleet, Haynes Boone, 1221 McKinney Street, Suite 2100, Houston, TX 77010) | All Assets |
| Colorado Bankers Life Insurance Company | 35,699,288 | 2327 Englert Dr, Durham, NC 27713 | Second-Lien on Assets |
| NEISO | 11,013,360 | 1 Sullivan Rd, Holyoke, MA, 01040 | Cash |
| NYISO | 8,000,000 | 10 Krey Blvd, Rensselaer, NY, 12144 | Cash |
| MISO | 4,125,980 | 720 City Center Drive, Carmel, IN, 46032 | Cash |

Note:
(1)    The BP Energy amount of $161,582,079 represents estimated gross exposure related to PSA, ISDA and collateral support.
(2)    Does not reflect The First National Bank of Central Texas mortgage of $4,861,753 as Briarcliff Property Group, LLC is a non-debtor.

## Agera Exhibits to Declaration

### Exhibit E - Summary of Debtor's Assets and Liabilities
As of 7/31/2019

## Assets

| | Aequitas | Agera | Energy.Me | Briarcliff [1] | Total |
|---|---|---|---|---|---|
| Cash | $ 262,886.92 | $ 3,915,438.12 | $ 588,333.21 | $ 73,162.56 | $ 4,839,820.81 |
| Accounts Receivable | (4,270,440.74) | 58,889,466.50 | 17,933,635.32 | (1,559,347.54) | 70,993,313.54 |
| Other | 7,715.80 | 16,004,922.61 | 621,085.30 | 17,152,165.04 | 33,785,888.75 |
| Intangibles, net | 4,149,826.21 | 2,286,144.42 | 8,099,907.85 | - | 14,535,878.48 |
| **Total Assets** | **149,988.19** | **81,095,971.65** | **27,242,961.68** | **15,665,980.06** | **124,154,901.58** |

## Liabilities

| | Aequitas | Agera | Energy.Me | Briarcliff [1] | Total |
|---|---|---|---|---|---|
| Accounts payable and accrued expenses | (252,595.84) | (159,132,038.93) | (7,339,634.98) | (152,944.15) | (166,877,213.90) |
| Security deposits | - | - | - | (179,907.91) | (179,907.91) |
| Fair value of derivative liabilities, net | - | (865,711.80) | - | - | (865,711.80) |
| Notes payable | - | (35,000,000.00) | - | - | (35,000,000.00) |
| Mortgage payable | - | - | - | (4,835,414.32) | (4,835,414.32) |
| **Total Liabilities** | **$ (252,595.84)** | **$ (194,997,750.73)** | **$ (7,339,634.98)** | **$ (5,168,266.38)** | **$ (207,758,247.93)** |

Notes:
1) Briarcliff is a non-debtor
2) Debtor entities Utility Recovery LLC and Agera Solutions LLC are dorminant and do not have their own balance sheets

# Agera Exhibits to Declaration

## Exhibit F - The Debtor's Securities

The Debtor does not have any publicly traded stock, debentures, or securities.

## Agera Exhibits to Declaration

### Exhibit G - Debtor's Property Not in the Debtors Possession

| Entity | Beneficiary Name | Type | State | Cash |
|---|---|---|---|---|
| Agera | BP Trading - Independent Collateral Account | Supplier | Supplier - Multi State | 5,250,000 |
| Agera | Washington International/SWISS RE | | | 1,000,000 |
| Agera | Public Service Electric & Gas (PSEG - Elec) | Utility | New Jersey | 160,000 |
| Agera | Duke Energy Ohio (Natural Gas) | Utility | Ohio | 100,000 |
| Agera | Centerpoint Energy | TDSP | Texas | 88,654 |
| Agera | NEW JERSEY NATURAL GAS | LDC | New Jersey | 75,000 |
| Agera | Iroqois Gas Transmission | Pipe | New York | 65,000 |
| Agera | AEP - Energy (TC-2) | Utility | Texas | 58,877 |
| Agera | MISO | ISO | Michigan, Illinois | 50,975 |
| Agera | Public Service Electric & Gas (PSEG - Gas) | Utility | New Jersey | 50,000 |
| Agera | ERCOT | ISO | Texas | 42,000 |
| Agera | Pacific Gas & Electric (PGE) | Utility | California | 40,000 |
| Agera | PECO | Utility | PA, NJ | 35,000 |
| Agera | NICOR (Gas) | LDC | Illinois | 34,000 |
| Agera | AEP - Energy (TC-3) | Utility | Texas | 33,291 |
| Agera | National Fuel Gas Supply | LDC | New York | 30,000 |
| Agera | CA PUC | PUC | California | 25,000 |
| Agera | Nexus Gas Transmission | LDC | Ohio | 16,000 |
| Agera | NEISO | ISO | New England | 13,360 |
| Agera | National Grid dba Boston Gas & Colonial Energy | Utility | Massachusetts | 12,500 |
| Agera | National Fuel Gas Distribution - PA | LDC | Pennsylvania | 8,500 |
| Agera | Oncor | TDSP | Texas | 8,419 |
| Agera | Empire Pipeline Inc | Pipe | New York | 8,000 |
| Agera | National Fuel Gas Distribution - NY | LDC | New York | 7,300 |
| Energy.Me | First Energy Ohio | | | 142,000 |
| Energy.Me | BP Energy Company | | | 100,000 |
| Energy.Me | MISO | | | 75,005 |
| Energy.Me | Duke Energy | | | 65,000 |
| Energy.Me | PSEG | | | 65,000 |
| Energy.Me | Atlantic City Electric | | | 25,000 |
| Energy.Me | BGE | | | 25,000 |
| Energy.Me | Delmarva MD | | | 25,000 |
| Energy.Me | PEPCO | | | 25,000 |
| Energy.Me | PEPCO | | | 25,000 |
| Energy.Me | JCPL | | | 17,800 |

| Collateral Posted September 2019 | | | | |
|---|---|---|---|---|
| Entity | Beneficiary Name | Type | State | Collateral Amount |
| Agera | ERCOT | ISO | Multiple | 2,500,000 |
| Agera | NEISO | ISO | Multiple | 11,000,000 |
| Agera | NYISO | ISO | Multiple | 8,000,000 |
| Energy.Me | MISO | ISO | Multiple | 4,000,000 |

## Agera Exhibits to Declaration

**Exhibit H - Debtor's Premises**

| Lessor and Contact Information | Address of Property | Type of Interest |
|---|---|---|
| | | |
| Agera Energy, LLC, Aequitas, Energy.Me, Agera Holdings, LLC | 555 Pleasantville Rd, Briarcliff Manor, NY 10510 | Operating Office |
| Agera Energy, LLC | 1997 Annapolis Exchange Parkway, Suite 300, Annapolis, MD 21401 | Regus Office Location |
| Agera Energy, LLC | 2000 Town Center, Suite 1900, Southfield, MI 48075 | Regus Office Location |
| Agera Energy, LLC | 2500 Plaza 5, Floor 25  Harborside Financial Center, Jersey City, NJ 07311 | Regus Office Location |
| Agera Energy, LLC | 9330 LBJ Freeway, Suite 900, Dallas, TX 75243 | Regus Office Location |
| Agera Energy, LLC | 225 Cedar Hill Street, Suite 200, Marlborough, MA 01752 | Regus Office Location |
| Agera Energy, LLC | 159 Crocker Park Blvd., Suite 400, Westlake, OH  44145 | Regus Office Location |
| Agera Holdings, LLC | 375 North Shore Drive, Suite 400, Pittsburgh, PA 15212 | Pittsburgh Office Lease |

**Agera Exhibits to Declaration**

**Exhibit I - Location of Debtor's Substantial Assets and Books and Records, and Nature and Location of Debtor's Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the location of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

| Debtor's Assets | Location |
|---|---|
| Location of Substantial Assets and Books and Records | 555 Pleasantville Rd, Briarcliff Manor, NY, 10510 |
| Colocation Data Center | Level 3 Communications<br>P.O. Box 910182, Denver, CO 80291 |
| Colocation Data Center | Cohere Communications<br>845 3rd Avenue, New York, NY, 10022 |

# Agera Exhibits to Declaration

## Exhibit J - List of Actions Against the Debtor

| Pending Litigation | Case No. | Venue |
|---|---|---|
| Lauren Carney v. Agera | 2018L4523 | Circuit Court of Cook County, IL County Dept. Law Division |
| Demco Energy LLC/ Frank DeMaio v. Agera | 19cv205 | Commonwealth of Massachusetts, Superior Court Civil Action |
| James Donnelly v. Agera | | Dedham District Court, Commonwealth of Massachusetts |
| Federal Home Loan Mortgage Corp. v. Thomas G. Bard and Shannon D. Bard and Agera Energy LLC, et al. | 201725812 | York District Court, ME |
| Hill Management Services v. Agera Energy | 224994 | Maryland Public Service Commission |

| Regulatory Proceedings | State |
|---|---|
| Rhode Island Division of Public Utilities (RIPUC) | RI |
| Massachusetts Department of Public Utilities (DPU) | MA |
| New Hampshire Public Utilities Commission (NHPUC) | NH |
| Connecticut Public Utilities Regulatory Authority's (PURA) | CT |

**Agera Exhibits to Declaration**

**Exhibit K - Senior Management**

| Senior Manager | Title | Address | Description |
|---|---|---|---|
| Mark Linzenbold | CFO | 555 Pleasantville Rd, Briarcliff Manor, NY, 10510 | Mark joined Agera Energy as its Chief Financial Officer in the early fall of 2018. As CFO, Mark leads the controllership, treasury, financing, financial planning, credit, cost accounting, human resource, risk management and real estate functions. Mark brings 20 years of diverse industry experience, including 9 year with Direct Energy, where, among various leadership roles, he served as VP of M&A with a focus on integrating acquired targets Prior to joining Direct Energy, Mark served as VP of Finance for Strategic Energy. Mark is a CPA and started his career at KPMG where he served as Senior Manager in the firms financial service practice. |
| Todd Sandford | COO | 555 Pleasantville Rd, Briarcliff Manor, NY, 10510 | Todd joined Agera Energy as its COO in early fall of 2018 and is currently CEO and COO. Prior to joining Agera Energy, Todd had an accomplished 15 year career with Centrical / Direct Energy, with numerous leadership roles including customer operations, finance and sales functions, culminating in general management over two different business units. Throughout his career with Centrica, he was directly involved with due diligence, negotiations, execution and integration of over 12 energy companies into the Centrica family. |
| Raima Jamal, Esq. | General Counsel | 555 Pleasantville Rd, Briarcliff Manor, NY, 10510 | Raima Jamal is admitted to practice law in the state of New York and currently serves as Agera's in-house counsel. Raima has prior experience in bankruptcy, government contracts, corporate and general litigation. At Agera, Raima advises on regulatory and general litigation matters, reviews and revises customer contracts and business agreements, prepares regulatory and compliance filings and manages Agera's external counsel relationships. She is a graduate of Pace University School of Law where she graduated in the top 15% of her class. |

# Agera Exhibits to Declaration

## Exhibit L - Payroll

Pursuant to Local Bankruptcy Rule 1007-2((b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, directors, stockholders and financial and business consultants retained by the Debtor for the 30-day period following the Petition Date.

|   | | |
|---|---|---|
| a | **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $ (699,966) |
| b | **Payments to Officers, Stockholders, and Directors** | $ (62,500) |
| c | **Payments to Financial and Business Consultants** | $ (1,280,781) |

*a) reflects wages, payroll taxes and benefits excluding any funds that may be approved under KEIP/KERP*

*b) reflects base wages for CEO and CFO*

*c) includes restructuring professionals, general legal, and general consulting. Figure will likely be materially less due to timing of invoices and fee applications over the intitial 30 days*

**Agera Exhibits to Declaration**

**Exhibit M - Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period

| | |
|---|---|
| Cash receipts | 44,041,938 |
| Cash Disbursements | (50,938,363) |
| Net Cash Loss | (6,896,426) |
| Uncollected Receivables | 64,752,181 |

*Includes posting of approximately $8.5 million of ISO collateral week ending 10/5*

-based on 5 week period 9/29-11/2
-Receivables estimate based on management projected net billed
and unbilled accounts receivables

| | |
|---|---|
| Beginning Cash | 18,301,820 |
| Cash Flow | (6,896,426) |
| Projected Ending Cash | 11,405,395 |