**MCDERMOTT WILL & EMERY LLP**
Timothy W. Walsh
Darren Azman
Ravi Vohra
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5615
Facsimile: (212) 547-5444

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING
PROCEDURES RELATING TO THE SALE OF THE DEBTORS' ASSETS, (B)
APPROVING STALKING HORSE ASSET PURCHASE AGREEMENT AND BID
PROTECTIONS, (C) APPROVING FORM AND MANNER OF NOTICES OF SALE,
AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,
(E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF THE
AGERA OPCO ENTITIES' ASSETS; (II)(A) APPROVING THE SALE OF THE AGERA
OPCO ENTITIES' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES AND (B) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND
(III) GRANTING RELATED RELIEF**

Agera Energy LLC and the above-captioned debtors, as debtors and debtors in possession

(collectively, the "Debtors") in these chapter 11 cases (these "Chapter 11 Cases"), hereby submit

this motion (the "Motion") pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera
Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988);
Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate
headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1 and 6006-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

Southern District of New York (the "Local Rules"), for expedited entry of an order substantially

in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving the

bidding procedures as set forth in **Exhibit 1** to the Bidding Procedures Order (the "Bidding

Procedures") for the sale of substantially all assets ("the Assets") of the Debtors, including those

Assets (the "Purchased Assets") specified in the Stalking Horse APA (as defined below), free

and clear of all liens, claims (as defined in Bankruptcy Code Section 101(5)), encumbrances,

obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever

(the "Sale"); (ii) approving (a) entry into that certain asset purchase agreement (the "Stalking

Horse APA"), dated October 3, 2019 between Exelon Generation Company, LLC (the "Stalking

Horse Bidder") and Agera Energy LLC, Aequitas Energy, Inc. and energy.me midwest llc

(collectively, the "Agera Opco Entities" or the "Sellers"), a copy of which is attached hereto as

**Exhibit B** and (b) the Termination Fee and the Buyer Expense Reimbursement (each as defined

below); (iii) approving the procedures relating to the assumption and assignment of executory

contracts; (iv) preliminarily approving the notice to each relevant non-Debtor contract

counterparty to an executory contract regarding the Debtors' potential assumption and

assignment of such contract and the amount necessary to cure any defaults thereunder; (v)

approving the form and manner of notices of the Sale, auction (the "Auction") and sale hearing

(the "Sale Hearing"); (vi) scheduling the Auction and the Sale Hearing; and (vii) granting related

relief.

The Debtors also submit this Motion for the entry of an order (the "Sale Order"): (i) approving the Sale free and clear of liens, claims, interests, and other encumbrances to the Stalking Horse Bidder or to a bidder who submits the highest or otherwise best offer for the Debtors' Assets; (ii) authorizing the assumption and assignment of certain executory contracts (the "Assigned Contracts") to the Stalking Horse Bidder or to a bidder who submits the highest or otherwise best offer for the Debtors' Assets; and (iii) granting related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Todd Sandford Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings*,[2] filed contemporaneously herewith. The Debtors further rely upon the *Declaration of Richard Klein in Support of the Debtors' Sale Motion*, attached hereto as **Exhibit C** (the "Klein Declaration"), and the *Declaration of Todd Sandford in Support of the Debtors' Sale Motion*, attached hereto as **Exhibit D**, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Debtors commenced these Chapter 11 Cases in order to pursue the sale of their Assets pursuant to Bankruptcy Code section 363 to maximize the value of their estates and the recoveries for all stakeholders.

2.    The Debtors provide retail electricity and natural gas to commercial, industrial, and residential customers. The Debtors provide customers with "energy choice"—the ability to receive electricity and natural gas needs from a source other than the local utility in certain markets that have been restructured to permit retail competition, which allows customers to tailor

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the First Day Declaration.

energy supply to their specific needs.  Across both electricity and natural gas supply, the Debtors

service 87 distinct utility regions and provide service to customers in California, Connecticut,

Delaware, District of Columbia, Illinois, Maine, Maryland, Massachusetts, New Hampshire,

New Jersey, New York, Ohio, Pennsylvania, Texas and Virginia.

   3.  The Debtors, after consulting with their advisors, explored various strategic

alternatives and ultimately determined that a sale of the Debtors' Assets would maximize value

for the benefit of all stakeholders.  In May 2019, the Debtors' management interviewed various

investment bankers, including Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC

("Miller Buckfire"), to run a prepetition sale process.  The Debtors ultimately retained Miller

Buckfire, and with Miller Buckfire's support, began the work necessary to run an extensive and

robust prepetition marketing, solicitation, and sale process over a several month period of time.

Those efforts culminated in the Stalking Horse APA.

   4.  The Stalking Horse APA provides for the Sale of the Purchased Assets for a

purchase price of $24,750,000.00, plus the assumption of certain liabilities, subject to certain

adjustments, as provided in the Stalking Horse APA.

   5.  The bulk of the Purchased Assets proposed to be sold under the Stalking Horse

APA are the Sellers' customer contracts, which the Sellers will assume and assign to the Stalking

Horse Bidder.  The Stalking Horse Bidder is a qualified competitive energy supplier in each

jurisdiction in which the Sellers operate.[3]  As described in more detail below, the size and value

of the Sellers' book of customer contracts decreases with the passage of time.  Specifically,

pending and future regulatory action against the Debtors may soon result in suspension or

revocation of the Debtors' licenses to sell energy in certain states.  In turn, the Debtors would

---

[3] A competitive retail energy supplier sells electricity and natural gas in regulated energy markets to residential, commercial and industrial end-use customers.

potentially lose all of their energy customers in such states.  The Stalking Horse APA contains a purchase price adjustment mechanism that will adjust downward for every customer contract not successfully transferred to the Stalking Horse Bidder.

6.      Given the exigencies of the Debtors' business operations and financial condition, and the milestones in the Stalking Horse APA, the Restructuring Support Agreement and the proposed cash collateral use order (the "Cash Collateral Order"), the immediate sale of the Debtors' Assets is the best possible way to maximize value for all stakeholders.

7.      The Debtors have determined, in their sound business judgment, that the proposed Sale to the Stalking Horse Bidder—subject to higher and better offers pursuant to an open auction process approved by this Court—affords the Debtors the best opportunity to maximize value for all stakeholders.

8.      Through negotiating the Stalking Horse APA, the Debtors have developed bidding and auction procedures (the "Bidding Procedures") to proceed toward the solicitation of additional bids and an Auction (if necessary) in accordance with a schedule that complies with the Stalking Horse APA and the Cash Collateral Order, as follows:

| October 14, 2019 | Deadline to Object to Bidding Procedures |
|---|---|
| October 15, 2019[4] | Bidding Procedures Hearing<br>Deadline to file and serve Sale Notice, Potential Assumption and Assignment Notice, and file Executory Contract List with the Court |
| October 29, 2019 | Bid Deadline<br>Sale Objection Deadline<br>Assumption and Assignment Objection Deadline<br>Deadline to Notify Qualified Bidders |
| November 4, 2019 | Deadline to Designate a Baseline Bid<br>Auction (if necessary) |
| November 4, 2019 | Notice of Auction Results filed with the Court (if applicable) |

---

[4] This date is subject to the Court's availability.

5

| November 4, 2019 | Debtors' Reply Deadline |
| | Adequate Assurance Objection Deadline |
| November 5, 2019 | Sale Hearing |

9.     The Bidding Procedures are reasonable and designed with the objective of generating the best value for the Debtors' Assets, while affording the Debtors maximum flexibility to execute asset sales in a quick and efficient manner.  The Debtors are confident that the Bidding Procedures and the other relief requested herein satisfy the requirements of Bankruptcy Code section 363 and will facilitate the sale of the Debtors' Assets for the best value for the benefit of all of the Debtors' stakeholders.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 363, and 365, 503, and 507, Bankruptcy Rules 2002, 6004, 6006 and 9014, Rules 6004-1 and 6006-1 of the Local Rules, and the Guidelines for the Conduct of Assets Sales promulgated by General Order M-383 of the Bankruptcy Court (the "Sale Guidelines").

## BACKGROUND

13.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

14.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

15.     No trustee, examiner, creditors' committee, or other official committee has been

appointed in these Chapter 11 Cases.

16.     The factual background regarding the Debtors, including a description of the

Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases, is

set forth in the First Day Declaration, which is incorporated herein by reference.

## NEED FOR A TIMELY SALE PROCESS

17.     The Debtors request expedited entry of the Bidding Procedures Order due to, *inter*

*alia*, (i) the daily decrease in the size and value of the Sellers' book of customer contracts; (ii)

various regulatory issues; and (iii) the Debtors' wind-down plan (each as described in more

detail below).  The Debtors believe that the Auction process and the time periods set forth in the

Bidding Procedures are reasonable and will provide parties with sufficient time and information

to submit a bid for the Debtors' Assets.  In formulating the procedures and time periods after

consulting with its various stakeholders, the Debtors balanced the need to provide adequate and

appropriate notice to parties in interest and potential purchasers with the need to quickly and

efficiently sell their Assets while they have realizable value.  Furthermore, potential bidders have

had, and will, in accordance with the Bidding Procedures, continue to have, access to the

electronic data room.

A.     The Sellers' Book of Customer Contracts

18.     The Sellers' book of customer contracts represents the single largest portion of the

Purchased Assets proposed to be sold to the Stalking Horse Bidder, yet it is also the most

volatile.  There are a number of commercial variables that may adversely impact the size and

value of the Debtors' book of customer contracts at any given moment.  For example, customers

may decide to switch energy suppliers or the contracts may terminate under their bargained-for

terms.  The Debtors would normally offset these decreases by servicing new customers or

7

renewing contracts with existing customers before they expire. However, due to the Debtors'

regulatory issues and wind-down efforts to date (each as described in more detail below), the

Debtors no longer have the infrastructure or, in some situations cannot legally, service new

customers or renew existing customers. Further, while customer attrition is part and parcel of the

Debtors' businesses, the Debtors believe that attrition may be accelerated due to the filing of

these Chapter 11 Cases.

B.      Regulatory Issues

19.     As stated in the Sandford Declaration, failure to act in an expeditious manner may

lead to regulatory action that could potentially decrease the size and value of the Sellers' book of

customer contracts. In certain states where the Debtors operate, the Debtors are required to

satisfy renewable portfolio standards ("RPS") as a condition of their license or certification to

supply energy to customers in such states. RPS laws require a certain portion of a state's

electricity consumption to be generated from renewable sources, such as wind, solar, biomass,

geothermal, or hydroelectric.

20.     Energy suppliers that are required to comply with RPS obligations, such as the

Debtors, must obtain a sufficient amount of renewable energy credits (often called renewable

energy certificates or "RECs") during regular reporting cycles (*e.g.*, annually) with each state.

RECs are created when renewable energy is generated and delivered to the grid. Those

renewable energy producers may then use the RECs to satisfy their own RPS obligations or sell

the RECs they generate to other energy suppliers, such as the Debtors.

21.     Failure to comply with RPS obligations initially triggers an obligation to pay an

alternative compliance payment ("ACP"), which is essentially a cash payment obligation in lieu

of acquiring RECs. In nearly all instances, the ACP will be more costly than had the energy

8

supplier acquired the necessary RECs.  Ultimately, an energy supplier's failure to satisfy the

ACP will result in the relevant state taking regulatory enforcement action, including suspension

and revocation of the supplier's license to supply energy in such state.

22.    It is impossible to know exactly when a state may take such regulatory

enforcement action as timing is generally not dictated by statute or regulation.  However, the

consequences of suspension or revocation of a supplier's license could result in such supplier

being unable to service new and existing customers.  Given that the Debtors' customer contracts

are their primary assets, the Debtors inability to service customers would have a significant and

irreversible impact on the Purchase Price.

23.    The Debtors are currently in default of their 2018 RPS obligations in

Massachusetts, New Hampshire, and Rhode Island as a result of the Debtors' financial inability

to acquire RECs or subsequently satisfy their ACP obligations.  The Debtors will soon be in

default of RPS obligations in other states.  The Debtors estimate that their inability to satisfy

RPS obligations in the normal course has resulted in an aggregate ACP "premium" of

approximately 60%, as compared to the cost of acquiring the RECs necessary to avoid ACP

obligations.  As of the Petition Date, the Debtors estimate that they owe more than $71 million

on account of REC and ACP obligations for the 2018 compliance year.

i.    Massachusetts Enforcement Action

24.    On July 10, 2019, Agera Energy, LLC ("Agera Energy") received a letter from

the Massachusetts Department of Energy Resources (the "MA DOER") demanding that Agera

Energy immediately satisfy its ACP liability for 2018 in the amount of $41,569,223.80.  The

DOER stated that if it does not receive such payment, it will commence necessary steps for

issuing a Notice of Non-Compliance, including the filing of a petition at the Department of

Public Utilities (the "MA DPU") recommending revocation of Agera Energy's licenses to sell

electricity in Massachusetts.

25.     On August 21, 2019, the MA DOER found that Agera Energy had failed to

comply with their RPS obligations for the 2018 compliance year.  The MA DOER referred the

matter to the MA DPU recommending that it revoke or suspend Agera Energy's retail supplier

licenses.

ii.     Rhode Island Enforcement Action

26.     On August 16, 2019, Agera Energy received a letter from the Rhode Island Public

Utilities Commission (the "RI PUC") demanding that Agera Energy immediately satisfy its RPS

obligations for 2018.  The RI PUC stated that if Agera Energy fails to comply by August 23,

2019, the matter would be placed on the RI PUC's August 28, 2019 Open Meeting agenda to (i)

find the Debtors out of compliance with the RPS obligations for 2018, (ii) demand the full

amount of the letter of credit on file, and (iii) refer the matter to the Division of Public Utilities

and Carriers for revocation of the Debtors' license to operate as a nonregulated power producer

in Rhode Island.

27.     On August 28, 2019, during an open meeting, the RI PUC found that Agera

Energy was out of compliance with the RPS obligations for the 2018 compliance year and

authorized a drawdown of the $250,000 letter of credit posted on behalf of Agera Energy with

the RI PUC.  Further, the RI PUC directed the Clerk to transmit its orders to the Division of

Public Utilities and Carriers (the "RI DPUC") for enforcement action against Agera Energy.

28.     On September 13, 2019, the RI DPUC issued Agera Energy a Suspension Order

under which Agera Energy is prohibited from entering into new contracts or renewing existing

contracts with customers in Rhode Island.  The RI DPUC is scheduled to conduct a public

hearing on October 22, 2019 to consider whether Agera Energy's license to sell energy in Rhode Island should be rescinded.

iii.    New Hampshire Enforcement Action

29.    On September 17, 2019, Agera Energy received a letter from the New Hampshire Public Utilities Commission (the "NH PUC") demanding that Agera Energy satisfy its ACP liability for 2018 within ten days (*i.e.*, September 27, 2019).  The NH PUC stated that if it does not receive such payment, it may pursue further action, including referral of the unpaid amount for collection to the New Hampshire Department of Justice.

30.    Through a letter, dated October 2, 2019, the NH PUC ordered Agera Energy to pay the ACP liability due for 2018 in the amount of $2,231,262.00 in full within fourteen days (*i.e.*, October 16, 2019).  The NH PUC stated that if it does not receive such payment, it may pursue further actions to enforce Agera Energy's ACP payment obligation.

31.    As stated in the Klein Declaration, due to the significant regulatory issues currently faced by the Debtors, the Debtors, with the advice of their professionals, determined that they could only sell their Assets to another licensed energy retailer, so as to avoid a delay in transferring the Debtors' customer contracts to a buyer.  Despite there being a limited universe of such buyers, the Debtors' Assets were extensively marketed to all buyers, both strategic and financial.  Accordingly, many, if not all, of the parties that are already licensed to supply electricity and natural gas to the Debtors' customers, and can take transfer of the Debtors' customer contracts without delay, have conducted diligence and evaluated the Debtors' business, and will not be bidding in a vacuum.  The longer the Debtors market their assets in these Chapter 11 Cases, the more likely it is that regulatory action will occur and adversely affect the value of the Debtors' Assets.

11

C.    The Debtors' Wind-Down Plan

32.    Since at least August 2019, the Debtors, in consultation with BP Energy Company

("BP"), their prepetition lender, have developed and begun implementing a wind-down plan,

which involves, *inter alia*, a reduction in the Debtors' work force.  The Debtors carefully

reviewed their staffing needs and determined that the Debtors' sales and marketing team was

largely unnecessary for the wind-down.  This was due to the fact that the Debtors will not be

servicing new customers during the wind-down and could renew existing customers with a

fraction of their sales team.

33.    The wind-down plan analyzes how long it would be required to support the

Debtors' businesses, prior to and after these Chapter 11 Cases.  Under the current wind-down

plan, the Debtors expect to stop servicing all customers by December 31, 2019.

34.    As is apparent from the events that have unfolded thus far, the Debtors find

themselves in a precarious situation.  Every day the Sale is delayed is another day the size and

value of the Debtors' book of customer contracts erodes, by regulatory action or otherwise.  The

Stalking Horse APA accounts for this risk by requiring a decrease in the Purchase Price for each

customer contract that is not transferred to the Stalking Horse Bidder.  This adjustment is made

for each contract that terminates between signing the Stalking Horse APA and Closing (as

defined in the Stalking Horse APA).  The Stalking Horse APA also recognizes, however, that the

customer contract transfer process takes time and requires the actual transfer of the customer

account on the books of the relevant electric utility or natural gas local distribution company.

Accordingly, there is the possibility of customer contracts terminating after Closing but prior to

the actual transfer to the Stalking Horse Bidder.  The Stalking Horse APA requires a further

12

reduction in the Purchase Price for each customer contract that is not transferred within 120 days

*following* Closing.

35.    The Debtors' developed the proposed Sale timeline with the intention of

mitigating, as much as possible, all of the many risks associated with the consummation of the

Sale and subsequent customer contract transfer process.

### RELIEF REQUESTED

36.    The Debtors request expedited entry of the Bidding Procedures Order,

substantially in the form attached hereto as **Exhibit A**:

> i.    authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**;
>
> ii.   approving the Sellers' entry into the Stalking Horse APA and approving the Termination Fee and the Buyer Expense Reimbursement for the Stalking Horse Bidder, in accordance with the terms and conditions set forth in the Stalking Horse APA;
>
> iii.  authorizing and approving the form of notice of the Sale, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");
>
> iv.   approving procedures for the assumption and assignment of the Potentially Assumed Contracts (as defined below) and the determination of Cure Amounts with respect thereto (collectively, the "Assumption and Assignment Procedures");
>
> v.    preliminarily approving the notice to each relevant non-Debtor contract counterparty (each, a "Contract Counterparty") to a Potentially Assumed Contract (as defined below) regarding the Debtors' potential assumption and assignment of such contract and the amount necessary to cure any defaults thereunder (the "Cure Amounts"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Potential Assumption and Assignment Notice");
>
> vi.   scheduling the Auction to be held on or prior to November 4, 2019 at 10:00 a.m. (prevailing Eastern Time);

13

      vii.     scheduling the Sale Hearing to consider approval of the proposed Sale, to be held on November 5, 2019 at 2:00 p.m. (prevailing Eastern Time); and

      viii.    granting related relief.

37.     The Debtors also request entry of the Sale Order:

      i.     approving the Sale of the Purchased Assets free and clear of liens, claims, interests, and other encumbrances to the Stalking Horse Bidder or the Sale to a bidder who submits the highest or otherwise best offer for the Debtors' Assets;

      ii.    authorizing the assumption and assignment of certain executory contracts; and

      iii.    granting related relief.

## PREPETITION MARKETING AND SALE PROCESS

38.     As described in the Klein Declaration, in May 2019, the Debtors engaged Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC (collectively, "Miller Buckfire") as investment banker to explore strategic alternatives, including conducting a marketing process for the sale of the Debtors, as either a going concern or an asset sale.

39.     In connection with this process, Miller Buckfire prepared marketing materials, including a Confidential Information Memorandum (the "CIM"), and compiled a list of potentially interested parties.

40.     Miller Buckfire contacted 207 parties, comprised of 121 strategic investors and 86 financial investors. Each party was provided with a teaser document and was invited to execute a confidentiality agreement ("NDA") with the Debtors in order to receive the CIM and access to a virtual data room. Of the 207 parties contacted, 39 executed an NDA and received the CIM and process letter. Twenty of those 39 parties expressed interest in further participating in the process and were provided access to a virtual data room. Throughout this period, Miller Buckfire facilitated these parties' due diligence efforts.

14

41.      In June 2019, the Debtors received numerous preliminary, non-binding indications of interest (each, an "IOI").

42.      Following receipt of the IOIs, the Debtors and their advisors continued to facilitate parties' due diligence, including management meetings and providing additional diligence information.  Following these meetings, the Debtors and their advisors continued negotiations with the interested parties regarding their proposals and key terms, including timing and transaction structure.

43.      In late July 2019, the Debtors and their advisors provided certain interested parties with a draft asset purchase agreement (the "APA") and second round process letter, with a deadline to provide a binding bid and marked-up APA by August 5, 2019.

44.      After extensive deliberations, significant negotiations with BP and the Stalking Horse Bidder, and multiple rounds of revisions to the Stalking Horse APA, the Debtors decided to proceed with the Stalking Horse Bidder's bid (the "Stalking Horse Bid"), as reflected in the Stalking Horse APA.

45.      The Debtors believe that completion of the sale process in the time and manner set forth herein will maximize the value of the Debtors' Assets.  The time periods set forth in the Bidding Procedures were negotiated at arms' length with the Stalking Horse Bidder as well as with BP and comply with the strict milestones imposed under the Stalking Horse APA, Restructuring Support Agreement, and the Cash Collateral Order.  Failure to adhere to the proposed time periods could jeopardize the closing of the Sale, which the Debtors believe is the best means of maximizing the value of their assets.  Thus, the Debtors have determined that pursuing the Sale in the manner and with the procedures proposed is in the best interests of the

Debtors' estates and provides interested parties with sufficient opportunity to participate under the circumstances.

## THE STALKING HORSE APA

46.    The Stalking Horse APA represents a binding bid for the Purchased Assets.  The total consideration to be realized by the Debtors is estimated at approximately $24,750,000.00 million, plus the assumption of certain liabilities, subject to certain adjustments (the "Purchase Price").

47.    The Sellers are responsible for paying any cure amounts (the "Cure Amounts") related to the Potentially Assumed Contracts.

48.    The Bidding Procedures provide for standard bid protections, such as a provision for an expense reimbursement up to a cap of 1% of the Base Price (the "Buyer Expense Reimbursement"), as a super-priority administrative expense, upon the termination of the Stalking Horse APA under certain circumstances, payable in accordance with the terms thereof. The Bidding Procedures also contemplate a termination fee (the "Termination Fee") for the Stalking Horse Bidder in an amount in cash equal to 4% of the Base Price, which shall also be afforded super-priority administrative expense status.

49.    In the event it is not the winning bidder at the Auction, as described in more detail below, the Stalking Horse Bidder has agreed that the Stalking Horse Bid shall be a Backup Bid (as defined in the Bidding Procedures) under certain conditions[5] and, as such, hold open its binding offer to purchase the Purchased Assets for a period of time after the Auction in case the winning bid at the Auction is not consummated.

---

[5] As further described in the Bidding Procedures, and notwithstanding anything herein to the contrary, the Stalking Horse Bidder shall not be obligated to serve as the Backup Bidder for anything less than all of the Purchased Assets under the Stalking Horse APA.

50.     The Stalking Horse APA also includes covenants, conditions, and termination

rights related to events in these Chapter 11 Cases.  The transactions contemplated by the Stalking

Horse APA are subject to approval by the Court and entry of the Bidding Procedures Order

within 14 days after the Petition Date and the Sale Order within 36 days after the Petition Date.

## THE BIDDING PROCEDURES

A.     Overview

51.     The Bidding Procedures are designed to promote a competitive and efficient sale

process.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids

from potential buyers that constitute the highest or otherwise best offer for the Debtors' Assets

on a schedule consistent with the deadlines under the Stalking Horse APA, Restructuring

Support Agreement, and Cash Collateral Order.  The Bidding Procedures describe, among other

things, procedures for parties to access due diligence, the manner in which bidders and bids

become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if

any), the selection and approval of the ultimately successful bidder, and the deadlines with

respect to the foregoing Bidding Procedures.  The Debtors submit that the Bidding Procedures

afford them the opportunity to pursue a sale process that will maximize the value of their estates.

52.     A description of certain key elements of the Bidding Procedures is set forth

below:[6]

       a.     Same or Better Terms.  Each bid must be an offer to purchase some or all
of the Purchased Assets, pursuant to a sale transaction that is no less
favorable to the Debtors' estates (except as to the Purchase Price and
Schedule 2.01(a) of the Stalking Horse APA), as the Debtors may
reasonably determine, in consultation with the Consultation Parties, than
the transactions contemplated in the Stalking Horse APA.  To the extent
that a bid contemplates the purchase of less than all of the Purchased

---

[6] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such
terms in this Sale Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not
otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

17

Assets, such bid will only be considered a Qualified Bid if, when added to any other bids received (other than the Stalking Horse Bid) for any Purchased Assets not included in such bid, the aggregate total purchase price of such bids is equal to or greater than (i) the Stalking Horse Bidder's bid of $24,750,000.00, plus (ii) the Termination Fee, plus (iii) the maximum possible Buyer Expense Reimbursement payable under the Stalking Horse APA, plus (iv) an additional one million dollars ($1,000,000).

b.    <u>Cancellation of the Auction</u>.  If the Debtors do not receive a Qualified Bid, the Debtors, in their sole discretion, shall (i) notify the Stalking Horse Bidder and all Potential Bidders and the Bankruptcy Court in writing that (a) the Auction is cancelled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) the Debtors shall seek authority at the Sale Hearing on to consummate the Sale in accordance with the Stalking Horse APA.  If the Debtors receive at least one (1) or more Qualified Bids in addition to the Stalking Horse Bid, the Debtors will conduct the Auction.

c.    <u>Determination and Announcement of Baseline Bid</u>.  The Debtors shall make a determination regarding (i) which bids they have determined to be Qualified Bids and (ii) the highest or best Qualified Bid for the Sellers' Assets (the "<u>Baseline Bid</u>") to serve as the starting point at the Auction.

On **November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)**, the Debtors shall file a notice designating the Baseline Bid on the Court's docket and publish such notice on the website of their claims and noticing agent and/or distribute the same at the Auction.

d.    <u>Notice of Auction Results</u>.  If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors will (a) file the Notice of Auction Results, which will, among other things, include the identity of the Successful Bidder(s) and Backup Bidder(s), (the "<u>Notice of Auction Results</u>") with the Court and cause such notice to be published on the Case Information Website, which shall contain the Successful Bidder's and Backup Bidder(s)' proposed form of adequate assurance of future performance and constitute definitive proof that the Debtors have closed the Auction.  In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall not be required to serve as the Backup Bidder for anything less than all of the Purchased Assets contemplated by the Stalking Horse APA.

B.    <u>Noticing Procedures</u>

53.    The Bidding Procedures and the Bidding Procedures Order provide the following

"<u>Noticing Procedures</u>:"

18

    a.    <u>Sale Notice.</u>  **On the date of the entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by email, first-class mail, or overnight delivery upon the following parties or, in lieu thereof, their counsel, if known: (i) the United States Trustee for the Southern District of New York; (ii) counsel to any statutory committee appointed in these Chapter 11 Cases; (iii) all entities known to have expressed an interest in a transaction with respect to the Sellers' Assets; (iv) the Internal Revenue Service; (v) all known taxing authorities to which the Debtors are subject; (vi) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest on any of the Sellers' Assets; (vii) any governmental authority known to have an interest in the Sale; (viii) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (ix) all other persons as directed by the Court (collectively, the "<u>Sale Notice Parties</u>").  On or about the same date, the Debtors shall publish the Sale Notice on the Debtors' case information website (located at <u>https://cases.stretto.com/agera</u> (the "<u>Case Information Website</u>")).**

    b.    <u>Sale Objection Deadline.</u>  **The Bidding Procedures Order establishes October 29, 2019 at 4:00 p.m. (prevailing Eastern Time) as the deadline to file and serve objections to the sale of the Purchased Assets (the "<u>Sale Objection Deadline</u>").**

    c.    <u>Bid Deadline.</u>  **The Bidding Procedures Order establishes October 29, 2019 at 4:00 p.m. (Eastern Time) as the deadline for the submission of any and all bids (the "<u>Bid Deadline</u>").**

54.     The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable.  Under the proposed timeline, there will be 25 days between the filing of this Motion and the Sale Objection Deadline and the Bid Deadline, respectively.  This period will provide parties with sufficient time to formulate bids to purchase the Debtors' Assets.  As stated above, despite there being a limited universe of licensed energy retailers, the Debtors' Assets were extensively marketed to all buyers, both strategic and financial.  Accordingly, many, if not all, of the parties that are already licensed to supply electricity and natural gas to the Debtors' customers, and can take transfer of the Debtors' customer contracts without delay, have conducted diligence and evaluated the Debtors' business, and will not be bidding in a vacuum.  In addition, potential bidders who have not previously conducted diligence on the Debtors'

business will have immediate access to, subject to the execution of an appropriate confidentiality

agreement, a substantial body of information regarding the Debtors' Assets, including

information gathered based upon specific due diligence requests of the Stalking Horse Bidder

and other prepetition bidders.

55.    The Noticing Procedures constitute adequate and reasonable notice of the key

dates and deadlines for the sale process, including, among other things, the applicable objection

deadline, the Bid Deadline and the time and location of the Auction and Sale Hearing.

Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate

and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule

2002 and Local Bankruptcy Rule 2002-1.

**Assumption and Assignment Procedures**

56.    The Assumption and Assignment Procedures will, among other things, govern the

Debtors' provision of notice to a Contract Counterparty to the Potentially Assumed Contracts

that such contracts may be assumed and assigned to a Qualified Bidder that becomes the

Successful Bidder and of the Cure Amounts the Debtors believe are necessary pursuant to

Bankruptcy Code section 365 to assume and assign such contracts.  The proposed Assumption

and Assignment Procedures are as follows:

      a.    **Executory Contract List**.

          i.    On the date of the entry of the Bidding Procedures Order, the Debtors shall file with the Court a list of executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (such contracts and any renewals or extensions thereof, the "Potentially Assumed Contracts" and such list the "Executory Contract List").

         ii.    If it is discovered that a Potentially Assumed Contract should have been included on the Executory Contract List but was not (such contract, a "Previously Omitted Contract"), or in the event that the

Debtors seek to modify a Cure Amount, the Debtors will promptly file with the Court a revised Executory Contract List.

b.    **Potential Assumption and Assignment Notice**.

i.    Simultaneously with the filing of the Executory Contract List (or any revised Executory Contract List) or as soon as reasonably practicable thereafter, the Debtors shall serve on each relevant Contract Counterparty the Potential Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**.  The Assumption and Assignment Notice shall identify (i) either specifically or generally, the Potentially Assumed Contracts proposed to be assumed and assigned, (ii) the Cure Amount, and (iii) the deadline by which any Contract Counterparty to such Potentially Assumed Contracts must file an objection to the proposed assumption and assignment of such Potentially Assumed Contract, including, without limitation, as to the applicable Cure Amount.  The Potential Assumption and Assignment Notice will also inform Contract Counterparties of the date by which the Debtors will file the Notice of Auction Results (if applicable) and the date by which Contract Counterparties must object to the ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance under the applicable Potentially Assumed Contract.

c.    **Assumption and Assignment Objections**.

i.    <u>Objection Deadline</u>.  Any Contract Counterparty may object to the proposed assumption or assignment of its Potentially Assumed Contract, the Debtors' proposed Cure Amounts, if any, (an "<u>Assumption and Assignment Objection</u>").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Contract Counterparty believes is required to cure defaults under the relevant Potentially Assumed Contract and supporting materials evidencing the same, (D) be filed by **October 29, 2019 at 4:00 p.m. (Eastern Time)** (the "<u>Assumption and Assignment Objection Deadline</u>") and (E) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and

21

shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse
Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000,
Baltimore, MD 21202 (Attn: Cecil E. Martin III;
cmartin@mcguirewoods.com), (5) counsel to BP Energy
Company, Haynes & Boone LLP, 1221 McKinney Street, Suite
2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn
Shurin; kelli.norfleet@haynesboone.com and
kathryn.shurin@haynesboone.com), and (6) any other party that
has requested notice pursuant to Bankruptcy Rule 2002
(collectively, the "Objection Notice Parties") (collectively, the
"Assumption and Assignment Objection Notice Parties").

ii.    Resolution of Assumption and Assignment Objections.  Any
Assumption and Assignment Objection regarding any Potentially
Assumed Contract, it if is ultimately designated an Assigned
Contract, will be heard at the Sale Hearing.

iii.    Failure to File Timely Assumption and Assignment Objection.  If a
Contract Counterparty fails to file with the Court and serve on the
Assumption and Assignment Objection Notice Parties a timely
Assumption and Assignment Objection, the Contract Counterparty
shall be (i) forever barred from (a) objecting to the assumption and
assignment of the Potentially Assumed Contract identified in the
Executory Contract List or (b) asserting that any conditions to the
assumption and assignment of any Potentially Assumed Contract
must be satisfied under such Potentially Assumed Contract before
such Potentially Assumed Contract may be assumed and assigned,
or that any consent required to any such assignment has not been
given, (ii) deemed to have consented to the applicable Cure
Amount, if any, and be bound to such corresponding Cure
Amount, (iii) deemed to have agreed that all defaults under the
applicable Potentially Assumed Contract arising or continuing
prior to the effective date of the assignment have been cured as a
result or precondition of the assignment, such that the neither the
Successful Bidder nor the Debtors have any liability or obligation
with respect to any default occurring or continuing prior to the
assignment, and that the applicable Contract shall remain in full
force and effect for the benefit of the Successful Bidder (and such
Contract Counterparty) in accordance with the terms of the
Potentially Assumed Contract from and after the date of the
assignment of the applicable Potentially Assumed Contract, (iv)
deemed to have waived any right to terminate the applicable
Potentially Assumed Contract or designate an early termination
date under the applicable Contract as a result of any default that

22

occurred and/or was continuing prior to the assignment date, and (v) deemed to have agreed to the terms of the Sale Order.

d. <u>Adequate Assurance Objection</u>.  Immediately after the conclusion of the Auction, if a Successful Bidder(s) other than if the Stalking Horse Bidder prevails at the Auction, the Debtors shall file with the Court, and publish on the Case Information Website, the Notice of Auction Results that identifies the Successful Bidder(s) and provides notice that the Debtors will seek to assume and assign the Potentially Assumed Contracts to the Successful Bidder(s). The Notice of Successful Bidder shall also contain the Successful Bidder(s)' and Backup Bidder(s)' proposed form of adequate assurance of future performance. Objections of any Contract Counterparty related to: (i) the identity of and ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(l)(C) or (ii) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance under the applicable Potentially Assumed Contract (an "<u>Adequate Assurance Objection</u>") must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, (D) be filed by **no later than 4:00 p.m. (Eastern Time) one (1) day prior to the Sale Hearing (the "<u>Adequate Assurance Objection Deadline</u>")** and (E) be served on the Assumption and Assignment Objection Notice Parties.

e. **<u>Reservation of Rights</u>.**  The inclusion of a Potentially Assumed Contract, or Cure Amount with respect thereto, on a Potential Assumption and Assignment Notice or the Executory Contract List shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder(s) or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims and causes of action with respect to each Potentially Assumed Contract listed on the Potential Assumption and Assignment Notice and Executory Contract List. The Debtors' inclusion of any Potentially Assumed Contract on the Potential Assumption and Assignment Notice and Executory Contract List shall not be a guarantee that such Potentially Assumed Contract ultimately will be assumed or assumed and assigned.

**<u>Extraordinary Provisions Under Local Guidelines</u>**

57.   Collectively, the Bidding Procedures and the Stalking Horse APA contain the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by General Order M-383, require to be separately disclosed:

a.  <u>Deadlines that Effectively Limit Notice</u>.  Due to the need for a timely sale process and the issues described above, the Debtors request expedited entry of the Bidding Procedures Order.  The current proposed timeline for the entry of the Bidding Procedures Order would give interested parties less than 14 days' notice of the Bidding Procedures.  Further, the identity of a Successful Bidder will not be known until shortly before the Sale Hearing; in this case, three days before the Sale Hearing.  The Debtors therefore request that the time for filing an Adequate Assurance Objection be shortened to one day before the Sale Hearing.

b.  <u>Use of Proceeds</u>.  Other than payment of the Buyer Expense Reimbursement and Termination Fee under certain circumstances as provided in the Stalking Horse APA, the Stalking Horse APA does not contemplate an allocation of sale proceeds.

c.  <u>Records Retention</u>.  As noted above, the Stalking Horse APA provides that the Stalking Horse Bidder will acquire the books and records related to the Purchased Assets.  The Stalking Horse APA grants the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records.

d.  <u>Requested Findings as to Successor Liability</u>.  The Stalking Horse APA requires that the Sale Order contain findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.

e.  <u>Requested Findings as to Fraudulent Conveyances or Transfers</u>.  The proposed Sale Order for the Stalking Horse Bidder shall contain findings of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

f.  <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>.  The Debtors seek relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

<b><u>The Relief Requested is Warranted<br>and in the Best Interests of the Debtors and Their Stakeholders</u></b>

A.  <u>The Sale of Purchased Assets</u>

58.  Ample authority exists for approval of the Sale contemplated by this Motion. Bankruptcy Code section 363 provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section,

24

have required that the sale of a debtor's assets be based upon the sound business judgment of the

debtor.  *See Official Comm. of Unsecured Creditors of LTV Aerospace Def. Co., v. LTV Corp.*

*(In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section

363(b) application must find from the evidence presented a good business reason to grant such

application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1071 (2d Cir. 1983) (same).  Once a court is satisfied that there is a sound business justification

for the proposed sale, the court must then determine whether (i) the debtor has provided

interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable,

and (iii) the purchaser is proceeding in good faith.  *Id.* at 493-94; *Polvay v. B.O. Acquisitions,*

*Inc. (In re Betty Owens Sch.)*, 1997 WL188127, at *4 (S.D.N.Y. Apr. 17, 1997).

59.    As described above and in the Klein Declaration, an orderly but expeditious sale

of the Purchased Assets is critical to preserving and realizing their value and, in turn, to

maximizing recoveries for the Debtors' economic stakeholders.  A prompt sale is also required

by the express terms of the Cash Collateral Order and the Stalking Horse APA.  Pursuing entry

into and performance under the Stalking Horse APA represents a reasonable exercise of the

Debtors' business judgment and is in the best interests of all parties.

60.    The Debtors believe that the Purchase Price under the Stalking Horse APA is fair

and reasonable, but the Court and parties in interest will be assured at the Sale Hearing, after a

diligence period and marketing by the Debtors' advisors, that the Debtors will have selected the

party with the highest or best offer for the Purchased Assets.  The Debtors' compliance with the

Bidding Procedures Order and the Bidding Procedures will provide the basis to find that any sale

of the Purchased Assets does not constitute a fraudulent transfer because the purchase price

represents reasonably equivalent value and is fair and reasonable.  It will also establish that the

Debtors and the Stalking Horse Bidder, or any other Successful Bidder, have proceeded in good faith.

B.      Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

61.     In the interest of attracting the best offer, the sale of the Purchased Assets should be free and clear of any and all liens, claims, encumbrances, and other interests in accordance with Bankruptcy Code section 363(f), with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale.  Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits the sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  *See* 11 U.S.C. § 363(f)(1)–(5).  With respect to any party asserting a lien, claim, encumbrance, or other interest against the Purchased Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in Bankruptcy Code section 363(f).

62.     Moreover, the Debtors will send the Sale Notice to any known purported prepetition lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Assets timely objects to this Sale Motion, such party shall be deemed to consent to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton,* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

26

C.    Protections as a Good Faith Purchaser

63.    Bankruptcy Code Section 363(m) protects a good faith purchaser's interest in

property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is

later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . .were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the

judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and

judgments upon which third parties rely.'"  *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*,

No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In

re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); s*ee also Allstate Ins. Co. v.

Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith

transfers of property will not be affected by the reversal or modification on appeal of an unstayed

order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day,

Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith

purchasers are protected from the reversal of a sale on appeal unless there is a stay pending

appeal").

64.    The selection of the Successful Bidder will be the product of arm's-length, good

faith negotiations in an open and competitive sale process.  Based upon the record to be made at

the Auction and the Sale Hearing, the Debtors will request a finding that the Successful Bidder is

a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m).

D.    Bidding Procedures

65.    The Bidding Procedures are specifically designed to promote what courts have

deemed to be the paramount goal of any proposed sale of property of a debtor's estate:

maximizing the value of sale proceeds received by the estate.  *See Burtch et al. v. Ganz, et al. (In*

*re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty

to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d

558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a

debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for

the purpose of enhancing competitive bidding are consistent with the fundamental goal of

maximizing value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re*

*O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures

that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of*

*Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659

(S.D.N.Y. 1992) (observing that bidding procedures "encourage bidding and . . . maximize the

value of the debtor's assets").

66.    The Bidding Procedures provide for an orderly, uniform and appropriately

competitive process through which interested parties may submit offers to purchase the Assets.

The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to

promote active bidding by interested parties and to obtain the highest or otherwise best offer

reasonably available for the Assets. Additionally, the Bidding Procedures will allow the Debtors

to conduct the Auction in a fair and transparent manner that will encourage participation by

financially capable bidders with demonstrated ability to consummate a timely Sale.

Accordingly, the Bidding Procedures should be approved because, under the circumstances, they

28

are reasonable, appropriate and in the best interests of the Debtors, their estates and all parties in interest.

E.    Buyer Expense Reimbursement and Termination Fee

67.    The Stalking Horse APA contains provisions for a Buyer Expense Reimbursement and Termination Fee, payable upon the termination of the Stalking Horse APA on certain conditions contained therein (such Buyer Expense Reimbursement and Termination Fee, together with the initial and subsequent bid increments, the "Bid Protections").

68.    Approval of expense reimbursements as an administrative expense claim as a form of bidder protection in connection with a sale of assets pursuant to Bankruptcy Code section 363 has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[7]  In this case, to ensure payment of the Buyer Expense Reimbursement and the Termination Fee, if either becomes payable pursuant to the Stalking Horse APA, the Buyer has requested and the Sellers have agreed that the Buyer Expense Reimbursement and Termination Fee shall be entitled to super-priority administrative expense status, senior to all other administrative expense claims against the Debtors' estates.  Bankruptcy courts have approved bidding incentives similar to the ones contemplated in the Stalking Horse APA under the

---

[7] *See, e.g.*, *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving breakup fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving breakup fee and expense reimbursement); *In re Bally Total Fitness of Greater New York, Inc*., Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving breakup fee and expense reimbursement); *In re G+G Retail, Inc*., Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving breakup fee and expense reimbursement); *In re Twinlab Corp., et al*., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving breakup fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al*., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving breakup fee and expense reimbursement).

"business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.

69.     The Bid Protections provided in the Stalking Horse APA meet the "business judgment rule" standard.  These protections, individually and collectively, were a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Stalking Horse APA.  The Stalking Horse Bidder is unwilling to commit to hold open its offer under the terms of the Stalking Horse APA unless assured of payment of the Buyer Expense Reimbursement and Termination Fee under the conditions set forth in the Stalking Horse APA.  The Buyer Expense Reimbursement and Termination Fee promote more competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders— and the Debtors—can rely.  The Stalking Horse Bid increases the likelihood that the price at which the Purchased Assets are sold will reflect their true worth, and the Stalking Horse Bidder is entitled to be compensated as a result.  Moreover, the Buyer Expense Reimbursement and Termination Fee are fair and reasonable in amount under the circumstances, particularly because, in the event the Buyer Expense Reimbursement and Termination Fee become payable upon the consummation of an Alternative Transaction (as defined in the Stalking Horse APA), they will be paid out of the proceeds of such Alternative Transaction.

70.     Accordingly, the Debtors submit that the Bid Protections have a sound business purpose, are fair and appropriate under the circumstances and should be approved.  The Bid Protections will not deter or chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

F.    Noticing Procedures

71.    The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed Sale, Bidding Procedures, Auction and Sale Hearing.

G.    Assumption and Assignment of Certain Executory Contracts

72.    In connection with the Sale, the Debtors will assume and assign certain executory contracts to the Stalking Horse Bidder or Successful Bidder.  Bankruptcy Code section 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under Bankruptcy Code Section 365(a). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

73.    Bankruptcy Code section 365(k) provides that assignment by the debtor to an entity of a contract "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  Pursuant to Bankruptcy Code section 365(k), the Debtors will, therefore, be relieved from any liability for any breach of a Potentially Assumed Contract occurring or arising after assignment to the Successful Bidder.  As such, the assumption of the Potentially Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

74.    The consummation of any Sale involving the assignment of a Potentially Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of Bankruptcy Code section 365.  Bankruptcy Code section 365(b)(1) requires that

31

any outstanding defaults under an executory contract to be assumed be cured or that the Debtors

provide adequate assurance that such defaults will be promptly cured.  The Debtors' assumption

and assignment of the Potentially Assumed Contracts will be contingent upon payment of the

Cure Amounts and effective only upon the closing of an applicable Sale.  As set forth above, the

Debtors propose to file with the Court and serve on each Contract Counterparty a Potential

Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of

Cure Amounts, if any, with respect to each Potentially Assumed Contract listed.  Contract

Counterparties will have a meaningful opportunity to raise any objections to the proposed

assumption of their respective contracts prior to closing of the Sale.

75.    Pursuant to Bankruptcy Code section 365(f)(2), a debtor may assign an executory

contract if "adequate assurance of future performance by the assignee of such contract or lease is

provided."  The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." *See

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J.

1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean an absolute assurance that

debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803

(Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the

required assurance will fall considerably short of an absolute guarantee of performance.").

Among other things, adequate assurance may be provided by evidencing the assignee's financial

health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph,

Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is

present when the prospective assignee of a lease has financial resources and has expressed

willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

76.     As set forth in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under any contracts proposed to be assumed.  Each affected Contract Counterparty will have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.  To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness and ability of the Successful Bidder to perform under the Assigned Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance, as required by Bankruptcy Code section 365(b)(1).  Accordingly, the Debtors request that, at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Assigned Contracts be approved.

77.     In addition, to facilitate the assumption and assignment of the Potentially Assumed Contracts, the Debtors further request that the Court find all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contract, to be unenforceable and prohibited pursuant to Bankruptcy Code section 365(f).[8]

---

[8] Bankruptcy Code section 365(f)(1) provides that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . .." 11 U.S.C. § 365(f)(1).  Bankruptcy Code section 365(f)(3) further provides that "[n]ot withstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

78.    Further, the Debtors also request that the Court find that no exceptions under

Bankruptcy Code section 365(c) apply to otherwise restrict the assignment of the Potentially

Assumed Contracts.  Bankruptcy Code Section 365(c)(1) provides a carefully crafted exception

to the broad rule that a debtor may assign an executory contract notwithstanding any applicable

law prohibiting such assignment.  Here, the Debtors are seeking to sell their Assets and assign

their executory contracts, which are primarily contracts with retail customers to whom the

Debtors supply electricity and natural gas, to the Successful Bidder(s).  While several states in

which the Debtors are seeking to assign contracts have laws and regulations restricting and/or

conditioning the assignment of electricity and natural gas supply agreements with retail or

residential customers, these regulations do not constitute "applicable law" for the purposes of

Bankruptcy Code section 365(c).  Section 365(c)(1):

> . . . acts to balance the rights of third parties who contracted with the
> debtor and whose rights may be prejudiced by having the contract
> or lease performed by an entity with which they did not enter into
> the agreement.  This right becomes paramount, under section
> 365(c)(1), where the identity of the party rendering performance
> under the contract is material to the contract, and the contract is non-
> delegable under [applicable law].

*In re Lil' Things, Inc.*, 220 B.R. 583, 591 (Bankr. N.D. Tex. 1998).

79.    The contracts that the Debtors propose to assign are not the types of contracts to

which Bankruptcy Code section 365(c)(1) typically applies, such as personal service contracts,

partnership agreements, intellectual property contracts, government contracts or franchise

agreements.  *See, e.g.*, *In re Schick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999); *In re Patient

Educ. Media, Inc.*, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997); *In re West Electronics, Inc.*, 852

F.2d 79, 83 (3d Cir. 1988); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 29 (1st Cir. 1984).  By

contrast, where the identity of the contracting parties has been found to be less critical to the

nature and performance of the agreements, courts have been more reluctant to find that

34

assignment is barred under section 365(c).  *See, e.g.*, *City of Jamestown v. James Cable Partners,*
*L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 537 (11th Cir. 1994) (city ordinance
prohibiting assignment of cable franchise without city approval was mere general prohibition
against assignment and insufficient to constitute "applicable law" under section 365(c)(1));
*Cajun Elec. Members Comm. v. Mabey (In re Cajun Elec. Power Co-Op, Inc.)*, 230 B.R. 693,
708-09 (Bankr. M.D. La. 1999) (state law that prohibited transfer of assets without majority vote
of the members of the electric cooperative did not prevent assumption and assignment of
contracts because the identity of the parties was not central to the contract).

80.     Unlike contracts such as personal services agreements, the Debtors' electricity
and natural gas supply agreements do not hinge on the identities of the parties.  As the court in
*Cajun Electric* noted, "furnishing electricity is not a personal duty."  Power and natural gas
supply agreements do not involve an intimate association among the parties or the need to
closely monitor the activities of the counter-party, and the counterparties can be replaced and
duties assigned or delegated without undermining the contract's fundamental purposes—the
supplying of electricity or natural gas.  Accordingly, the Debtors should be authorized to freely
assign the Potentially Assumed Contracts as part of the Sale.

81.     Any assumption of a Potentially Assumed Contract is an exercise of the Debtors'
sound business judgment because the transfer of such Potentially Assumed Contract is necessary
to the Debtors' ability to obtain the best value for the Sellers' Assets.  The assumption and
assignment of the Potentially Assumed Contracts will be the most critical component of the
value of any bid.  Given that consummation of the Sale is critical to the Debtors' efforts to
maximize value for their estates and stakeholders, the Debtors' assumption of Potentially

Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

82.    <u>Assumption and Assignment Procedures</u>.  As a procedural matter, "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease . . . is governed by Rule 9014." Fed. R. Bankr. P. 6006(a).  Bankruptcy Rule 9014 provides that "[i]n a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought."  The notice and hearing requirements for contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances. *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or a similar phrase to mean such notice and opportunity for hearing "as [are] appropriate in the particular circumstances.").

83.    Because of the voluminous number of Potentially Assumed Contracts and the significant cost associated with the notices, the Debtors will seek approval of the Assumption and Assignment Notice at the Sale Hearing.  All Contract Counterparties to the Potentially Assumed Customer Contracts may raise any objections to the Assumption and Assignment Procedures on or before October 30, 2019 in advance of the Sale Hearing.  The Debtors' assignment of the Potentially Assumed Contracts will also only be effective upon the closing of the proposed Sale.

84.    The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored.  Upon receipt of the Potential Assumption and Assignment Notice, the Contract Counterparties will be given the opportunity to object to the assumption and assignment of their respective contracts.  The Debtors are requesting that,

given the approximately 30,000 Potentially Assumed Contracts, they be permitted to send

Contract Counterparties the Potential Assumption and Assignment Notice attached as **Exhibit 3**

to the Bidding Procedures.  Following the entry of the Bidding Procedures Order, the Debtors

propose to send the Potential Assumption and Assignment Notice to the Contract Counterparties,

notifying those parties that the Debtors are selling the Sellers' Assets and that the Potentially

Assumed Contracts are proposed to be assigned to the Stalking Horse Bidder in connection with

the sale, and Contract Counterparties will have the opportunity to object to the Cure Amount and

assignment of their contract to the Stalking Horse Bidder or a Successful Bidder.  The Potential

Assumption and Assignment Notice will also inform Contract Counterparties of the date by

which the Debtors will file the Notice of Auction Results (if applicable) and the date by which

Contract Counterparties must object to the ability of the Stalking Horse Bidder, Successful

Bidder(s), or Backup Bidder(s) to provide adequate assurance of future performance under the

applicable Potentially Assumed Contract.  As noted above, issues pertaining to the adequate

assurance of future performance to be provided by the ultimate Successful Bidder will be

addressed at the Sale Hearing.  The Debtors submit that this procedure is fair and reasonable in

light of the costs to the estate that would be incurred by sending multiple notices to the

counterparties to the Customer Contracts, given that the counterparties will have more than

sufficient notice to object to the assignment of their applicable contracts and an opportunity to be

heard at the Sale Hearing.

85.    The Assumption and Assignment Procedures provide that any Contract

Counterparty that fails to object to the proposed assumption and assignment of any Potentially

Assumed Contract will, *inter alia*, be deemed to consent to the assumption and assignment of the

applicable Potentially Assumed Contract pursuant to Bankruptcy Code section 365,

notwithstanding any anti-assignment provision or other restriction on assignment contained in
the applicable contract.  Courts in this and other jurisdictions have routinely granted such relief.
*See, e.g.*, *In re Empire Generating Co, LLC*, Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. May
19, 2019) [Docket No. 99] (ordering that failure to object to the assignment and assumption
procedures forever bars contract counterparties from objecting to the assumption and assignment
of their contract to the successful bidder); *In re Angelica Corporation*, Case No. 17-10870 (JLG)
(Bankr. S.D.N.Y. Apr. 3, 2017) [Docket No. 137] (same); *see also Hargrave v. Twp. of
Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not
objecting to the sale motion, a creditor was deemed to consent); *Pelican Homestead v. Wooten
(In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

### WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h) and 6006(d)

86.     The Debtors request that the Court (a) find that notice of the Motion is adequate
under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the fourteen-day stay
requirements under Bankruptcy Rules 6004(h) and 6006(d).  In light of the Debtors' current
financial condition and their obligation to comply with the conditions to closing the Sale
contemplated by the Stalking Horse APA, Restructuring Support Agreement, and Cash
Collateral Order, the proposed Sale contemplated herein should be consummated as soon as
practicable to allow the Debtors to maximize value for their estates and stakeholders.
Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order and any
order authorizing the assumption and assignment of the Assigned Contracts in connection with a
Sale be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules
6004(h) and 6006(d) be waived.

## NOTICE

87.     The Debtors will provide notice of this Motion to: (a) the United States Trustee;

(b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);

(c) counsel to BP Energy Company; (d) counsel to the Stalking Horse Bidder; (e) the Internal

Revenue Service; (f) the United States Attorney for the Southern District of New York; (g) all

entities known or reasonably believed to have asserted a lien, encumbrance, claim or other

interest on any of the Sellers' Assets; (h) all entities known to have expressed an interest in a

transaction with respect to the Sellers' Assets; and (i) any party that has requested notice

pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other

or further notice is required.  The Debtors submit that, under the circumstances, no other or

further notice is required.

## NO PRIOR REQUEST

88.     No prior motion for the relief requested herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding

Procedures Order: (i) approving the Bidding Procedures as set forth in **Exhibit 1** to the Bidding

Procedures Order for the Sale of the Sellers' Assets, free and clear of all liens, claims (as defined

in Bankruptcy Code Section 101(5)), encumbrances, obligations, liabilities, contractual

commitments or interests of any kind or nature whatsoever; (ii) approving (a) the Sellers' entry

into the Stalking Horse APA, a copy of which is attached hereto as **Exhibit B** and (b) the

Termination Fee and the Buyer Expense Reimbursement; (iii) approving the procedures relating

to the assumption and assignment of executory contracts; (iv) preliminarily approving the

Assumption and Assignment Notice; (v) approving the form and manner of notices of the Sale,

Auction and Sale Hearing; (vi) scheduling the Auction and the Sale Hearing; and (vii) granting

related relief.  The Debtors also respectfully request that the Court enter the Sale Order: (i)

approving the Sale of the Purchased Assets free and clear of liens, claims, interests, and other

encumbrances to the Stalking Horse Bidder or to a bidder who submits the highest or otherwise

best offer for the Sellers' Assets; (ii) authorizing the assumption and assignment of certain

executory contracts to the Stalking Horse Bidder; and (iii) granting such other and further relief

as the Court deems appropriate.

Dated: October 4, 2019               Respectfully submitted,
      New York, NY

                           **MCDERMOTT WILL & EMERY LLP**

                           /s/ Darren Azman
                           Timothy W. Walsh
                           Darren Azman
                           Ravi Vohra
                           340 Madison Avenue
                           New York, NY 10173
                           Telephone:  (212) 547-5615
                           Facsimile:  (212) 547-5444
                           Email: dazman@mwe.com
                                 rvohra@mwe.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

## <u>Exhibit A</u>

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AGERA ENERGY LLC, *et al.*,[1] | Case No. 19-_____ (___) |
| Debtors. | (Jointly Administered) |

**ORDER (I)(A) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF DEBTORS' ASSETS, (B) APPROVING STALKING HORSE ASSET PURCHASE AGREEMENT AND BID PROTECTIONS, (C) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF THE DEBTORS' ASSETS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Sale Motion")[2] of Agera Energy, LLC and the above-captioned debtors, as debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105(a), 363, and 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), for an order (i) approving the Bidding Procedures attached hereto as **Exhibit 1**, including the Bid Protections granted to the Stalking Horse Bidder as provided in the Stalking Horse APA, attached to the Sale Motion as **Exhibit B**, (ii) the form and

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms utilized but not defined herein shall have the meanings given them in the Sale Motion, the Stalking Horse APA, or the Bidding Procedures, as applicable.

manner of notice of the Auction, Sale, and Sale Hearing, (iii) the Assumption and Assignment Procedures, and (iv) scheduling the Auction and Sale Hearing; and this Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*, dated January 31, 2012; and consideration of the Sale Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Sale Motion having been given as provided in the Sale Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and any objections to the requested relief having been withdrawn or overruled on their merits; and this Court having held a hearing to consider the relief requested in the Sale Motion as to the Bidding Procedures, Auction, and Sale (the "Hearing"); and all of the proceedings had before this Court; and this Court having reviewed the Sale Motion, the First Day Declaration, the Klein Declaration, and the Sandford Declaration; and this Court having found and determined that the relief sought in the Sale Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT**:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

B.      The Court has jurisdiction to consider the Sale Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O).  Venue of these Chapter 11 Cases and the

Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The Debtors' proposed notice of the Sale Motion, the Bidding Procedures, the

Hearing and the proposed entry of this Order are (i) appropriate and reasonably calculated to

provide all interested parties with timely and proper notice, (ii) in compliance with all applicable

requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules

and (iii) adequate and sufficient under the circumstances of these Chapter 11 Cases, and no other

or further notice is required.  A reasonable opportunity to object or be heard regarding the relief

requested in the Sale Motion (including, without limitation, with respect to the Bidding

Procedures and Bid Protections) has been afforded to all interested persons and entities,

including, but not limited to, the Sale Notice Parties.

D.      The Bidding Procedures in the form attached hereto as **Exhibit 1** are fair,

reasonable and appropriate, are designed to maximize creditor recoveries from a sale of the

Assets and permit the Debtors to comply with their obligations under the Stalking Horse APA

and the Cash Collateral Order.

E.      The Debtors have demonstrated a compelling and sound business justification for

the Court to enter this Order and thereby: (i) approve the Bidding Procedures, (ii) authorize the

Bid Protections, under the terms and conditions set forth in the Stalking Horse APA, (iii) set the

dates of the Bid Deadline, Auction (if needed), Sale Hearing and other deadlines set forth in the

Bidding Procedures, (iv) approve the Noticing Procedures and the forms of notice and (v)

approve the Assumption and Assignment Procedures and preliminarily approve the forms of

3

relevant notice.  Such compelling and sound business justification, which was set forth in the
Sale Motion, the First Day Declaration and on the record at the Hearing, are incorporated herein
by reference and, among other things, form the basis for the findings of fact and conclusions of
law set forth herein.

      F.      The Bid Protections are fair and reasonable and provide a benefit to the Debtors'
estates and stakeholders.

      G.      The Debtors and their advisors, including Miller Buckfire, engaged in a robust
and extensive marketing and sale process before the Petition Date, to solicit and develop the
highest or best offer for the Purchased Assets.

      H.      Exelon Generation Company, LLC shall act as the Stalking Horse Bidder under
the Stalking Horse APA, and be subject to higher or better offers in accordance with the Bidding
Procedures.

      I.      Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking
Horse APA as a "stalking-horse" sale agreement is in the best interests of the Debtors and the
Debtors' estates and creditors, and reflects a sound exercise of the Debtors' business judgment.
The Stalking Horse APA provides the Debtors with the opportunity to sell the Purchased Assets
in order to maximize value to all stakeholders.  Without the Stalking Horse APA, the Debtors
would likely realize a lower price for the Purchased Assets; and, therefore, the contributions of
the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the
Debtors and their estates and creditors.  The Stalking Horse APA will enable the Debtors to
secure a fair and adequate baseline price for the Debtors' Assets at the Auction and, accordingly,
will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

4

J.      The Bid Protections, including, but not limited to, the Buyer Expense

Reimbursement and Termination Fee (i) have been negotiated by the Stalking Horse Bidder and

the Debtors and their respective advisors at arms' length and in good faith and (ii) are necessary

to ensure that the Stalking Horse Bidder will continue to pursue the Stalking Horse APA and the

Sale.  The Buyer Expense Reimbursement and Termination Fee, to the extent payable under the

Stalking Horse APA, (a) (x) are an actual and necessary cost and expense of preserving the

Debtors' estates within the meaning of Bankruptcy Code section 503(b) and (y) shall be treated

as allowed super-priority administrative expense claims senior to all other administrative claims

against the Debtors' estates pursuant to Bankruptcy Code sections 105(a), 503(b), and 507(a)(2),

(b) are commensurate with the real and material benefits conferred upon the Debtors' estates by

the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the

size and nature of the Sale, the necessity to announce a sale transaction for the Purchased Assets

at the outset of these Chapter 11 Cases, and the efforts that have been and will be expended by

the Stalking Horse Bidder.  The Bid Protections, including, but not limited to, the Buyer Expense

Reimbursement and Termination Fee, are a material inducement for, and condition of, the

Stalking Horse Bidder's execution of the Stalking Horse APA.  Unless it is assured that the Bid

Protections, including, but not limited to, the Buyer Expense Reimbursement and Termination

Fee, will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate

the Sale or otherwise be bound under the Stalking Horse APA (including the obligations to

maintain its committed offer while such offer is subject to higher or better offers as contemplated

by the Bidding Procedures).

K.      The Debtors have articulated good and sufficient business reasons for this Court

to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures; (iii) the

Bid Protections, including, but not limited to, the Buyer Expense Reimbursement and

Termination Fee (to the extent payable under the Stalking Horse APA), and (iv) the form and

manner of notice of the Auction and Sale Hearing for the Sale, attached hereto as **Exhibit 2**.

L.    The Bidding Procedures were negotiated in good faith and at arms' length and are

reasonably designed to promote participation and active bidding and ensure that the highest or

best value is generated for the Purchased Assets.

M.    The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors,

as those terms are defined in Bankruptcy Code section 101, and no common identity of

incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder

and the Debtors.  The Stalking Horse Bidder and its advisors have acted in "good faith" within

the meaning of Bankruptcy Code section 363(m) in connection with the Stalking Horse Bidder's

negotiation of its Bid Protections and the Bidding Procedures and the Stalking Horse Bidder's

negotiation and entry into the Stalking Horse APA.

N.    The Assumption and Assignment Procedures are reasonable and appropriate and

consistent with Bankruptcy Code section 365 and Bankruptcy Rule 6006.  The Assumption and

Assignment Procedures have been tailored to provide an adequate opportunity for all Contract

Counterparties to the Potentially Assumed Contracts to raise any objections to the proposed

assumption and assignment or to the cure amounts.

O.    The legal and factual bases set forth in the Sale Motion establish just cause for the

relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates,

creditors, interest holders and all other parties in interest herein.

P.    The form and manner of notice to be delivered pursuant to the Noticing

Procedures (including the Sale Notice attached hereto as **Exhibit 2**) are reasonably calculated to

6

provide all interested parties with timely and proper notice of the Bidding Procedures, the

Auction, the Sale Hearing, and the Sale (including the sale of the Purchased Assets (as set forth

under the Stalking Horse APA) free and clear of any liens, claims, encumbrances, or interests

pursuant to section 363(f) of the Bankruptcy Code) (with such liens, claims, encumbrances or

interests attaching to the proceeds of any such sale with the same validity and priority as they

attached to the Purchased Assets immediately prior to Closing), and any and all objection

deadlines related thereto, and no other or further notice shall be required for the Sale Motion, the

Sale, or the assumption and assignment of the Assigned Contracts except as expressly required

herein.

   Q.  The form and manner of the Potential Assumption and Assignment Notice,

attached hereto as **Exhibit 3**, are adequately and reasonably calculated to provide due and

adequate notice concerning the Assumption and Assignment Procedures and will provide due

and adequate notice of the relief sough in the Sale Motion.  The Debtors will seek preliminary

approval of the Potential Assumption and Assignment Notice and will seek final approval of the

Potential Assumption and Assignment Notice at the Sale Hearing.

<strong>NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND</strong>

**DECREED THAT:**

   1.  The relief requested in the Sale Motion is hereby granted as set forth herein.

   2.  All objections to the Sale Motion solely as it relates to the relief requested therein

that have not been adjourned, withdrawn or resolved are overruled in all respects on the merits.

   3.  The Bidding Procedures, in substantially the form attached hereto as **Exhibit 1**,

are approved and fully incorporated into this Order, and the Debtors are authorized, but not

directed, to act in accordance therewith.  The failure to specifically include a reference to any

7

particular provision of the Bidding Procedures in this Order shall not diminish or impair the

effectiveness of such provision.

4.     Subject to final Court approval at the Sale Hearing, the Sellers are authorized to

enter into Stalking Horse APA with the Stalking Horse Bidder.

5.     The schedule of events set forth below relating to the Bidding Procedures is

hereby approved in its entirety:

| October 14, 2019 | Deadline to Object to Bidding Procedures |
|---|---|
| October 15, 2019[3] | Bidding Procedures Hearing<br>Deadline to file and serve Sale Notice, Potential Assumption and Assignment Notice, and file Executory Contract List with the Court |
| October 29, 2019 | Bid Deadline<br>Sale Objection Deadline<br>Assumption and Assignment Objection Deadline<br>Deadline to Notify Qualified Bidders |
| November 4, 2019 | Deadline to Designate a Baseline Bid<br>Auction (if necessary) |
| November 4, 2019 | Notice of Auction Results filed with the Court (if applicable) |
| November 4, 2019 | Debtors' Reply Deadline<br>Adequate Assurance Objection Deadline |
| November 5, 2019 | Sale Hearing |

6.     <u>Noticing Procedures</u>.  The Noticing Procedures as set forth in this Order and the

Sale Motion, including the form of Sale Notice attached hereto as **<u>Exhibit 2</u>**, are hereby

approved.  On the date of the entry of the Bidding Procedures Order, or as soon as reasonably

practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail upon the Sale

Notice Parties.  On or about the same date, the Debtors will publish the Sale Notice on the Case

Information Website.  Service of the Sale Notice on the Sale Notice Parties in the manner

---

[3] This date is subject to the Court's availability.

described in the Order constitutes good and sufficient notice of the Auction and the Sale Hearing. No other or further notice is required.

7.    <u>Sale Objections</u>.  Objections to the Sale must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court by no later than **October 29, 2019 at 4:00 p.m.**][4] and (d) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Ave New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III; cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet; kelli.norfleet@haynesboone.com), and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Objection Notice Parties</u>").

8.    <u>Bid Deadline</u>.  As further described in the Bidding Procedures, the Bid Deadline shall be at **5:00 p.m. on October 29, 2019**.

9.    <u>Auction</u>.  In the event the Debtors receive, on or before the Bid Deadline, at least one (1) Qualified Bid (other than the Stalking Horse Bid, which is a Qualified Bid), an Auction shall be conducted at the offices of McDermott Will & Emery LLP, 340 Madison Ave, New York, NY 10173 at **10:00 a.m. on November 4, 2019**, or such later time on such day or such other place as the Debtors shall notify all Qualified Bidder(s).  The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.

---

[4] All times set forth herein are prevailing Eastern Time.

10.    <u>Cancellation of Auction</u>. If the Debtors do not receive at least one (1) Qualified

Bid (other than the Stalking Horse Bid), the Debtors, in their sole discretion, shall (i) notify the

Stalking Horse Bidder, all Potential Bidders and the Bankruptcy Court in writing that (a) the

Auction is cancelled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority

at the Sale Hearing to consummate the Sale in accordance with the Stalking Horse APA.

11.    <u>Sale Hearing</u>. The Sale Hearing shall be held in the United States Bankruptcy

Court for the Southern District of New York, Courtroom, 300 Quarropas Street, White Plains,

NY 10601-4140, at **2:00 p.m. on November 5, 2019** or such other date and time that the Court

may later direct: *provided, however*, that the Sale Hearing may be adjourned, from time to time,

without further notice to creditors or parties in interest other than by filing a notice on the

Court's docket.

12.    <u>Stalking Horse APA and Bid Protections</u>. The form of Stalking Horse APA is

hereby approved. All of the Debtors' pre-closing obligations under the Stalking Horse APA are

authorized as set forth herein; *provided* that, for the avoidance of doubt, consummation of the

Sale contemplated by the Stalking Horse APA shall be subject to entry of the Sale Order and the

satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking

Horse APA.

13.    The Bid Protections are approved in their entirety, including, without limitation,

the Buyer Expense Reimbursement and Termination Fee payable in accordance with, and subject

to the terms of, the Stalking Horse APA, which such Buyer Expense Reimbursement shall be the

Stalking Horse Bidder's reasonable and documented expenses up to an aggregate amount of 1%

of the Base Price, and which Termination Fee shall be an amount in cash equal to 4% of the Base

Price.  Except as expressly provided for herein, no other termination payments are authorized or permitted under this Order.

14.     The Debtors are authorized and directed to pay the Buyer Expense Reimbursement and/or Termination Fee, to the extent payable under the Stalking Horse APA, without further order of this Court.  Each of the Buyer Expense Reimbursement and Termination Fee, to the extent payable under the Stalking Horse APA, shall constitute an allowed super-priority administrative expense claim senior to all other administrative expense claims against the Debtors' estates pursuant to Bankruptcy Code sections 105(a), 503(b) and 507(a)(2).

15.     No Qualified Bidder or any other person or entity, other than the Stalking Horse Bidder, shall be entitled to any Buyer Expense Reimbursement, Termination Fee, or other similar termination fee, expense reimbursement, or payment in connection with the Sale, or any other form of bid protections.

16.     <u>Assumption and Assignment Procedures</u>**.**  The assumption and assignment procedures set forth in the Sale Motion (the "<u>Assumption and Assignment Procedures</u>") are hereby approved.

17.     The form of Potential Assumption and Assignment Notice, attached hereto as **<u>Exhibit 3</u>** is approved preliminarily.  The Potential Assumption and Assignment Notice (i) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtors and (ii) is reasonably calculated to provide due, adequate and timely notice to all Contract Counterparties of (a) the potential assumption and assignment of the Potentially Assumed Contracts and rights thereunder and (b) the deadline to file objections to such assumption and assignment, the existence of any defaults, and/or adequate assurance of future performance.

11

18.     On the date of the entry of the Bidding Procedures Order, the Debtors shall file

with the Court and serve via first class mail or email on (i) all Contract Counterparties and (ii) all

parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002,

the Potential Assumption and Assignment Notice, attached hereto as **Exhibit 3** and file with the

Court, and publish on the Case Information Website, the Executory Contract List.  If it is

discovered that a Previously Omitted Contract should have been included on the Executory

Contract List but was not, or in the event that the Debtors seek to modify a Cure Amount, the

Debtors will promptly file with the Court, and publish on the Case Information Website, a

revised Executory Contract List.

19.     <u>Objection Deadlines</u>.  Any Contract Counterparty may file an objection to the

calculation of Cure Amounts with respect to the Contract Counterparty's Potentially Assumed

Contract, or to the assumption and assignment to the Successful Bidder of the Contract

Counterparty's Potentially Assumed Contract (any such objection, an "<u>Assumption and

Assignment Objection</u>").  All Assumption and Assignment Objections filed by Contract

Counterparties listed on the Executory Contract List (or any revised Executory Contract List)

filed with the Court must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy

Rules and Local Bankruptcy Rules, (c) state, with specificity, the legal and factual bases thereof,

including, if applicable, the Cure Amount the Contract Counterparty believes is required to cure

defaults under the relevant Assumed Contract, (d) be filed by **October 29, 2019 at 4:00 p.m.**

(the "<u>Assumption and Assignment Objection Deadline</u>") and (e) be served on (1) proposed

counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY

10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2)

counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee,

U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:

Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and

shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500

East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III;

cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221

McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin;

kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com), and (6) any other

party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Assumption

and Assignment Objection Notice Parties").

20.     Resolution of Assumption and Assignment Objections.  If a Contract

Counterparty files a timely Assumption and Assignment Objection by the Assumption and

Assignment Objection Deadline and such objection is not resolved among the parties prior to the

Sale Hearing, the Court will hear and determine such objection at the Sale Hearing.

21.     Failure to File Timely Assumption and Assignment Objection.  If a Contract

Counterparty fails to file with the Court and serve on the Assumption and Assignment Objection

Notice Parties a timely Assumption and Assignment Objection, the Contract Counterparty shall

be (i) forever barred from (a) objecting to the assumption and assignment of the Potentially

Assumed Contract identified in the Executory Contract List, (b) asserting that any conditions to

the assumption and assignment of any Potentially Assumed Contract must be satisfied under

such Potentially Assumed Contract before such Potentially Assumed Contract may be assumed

and assigned, or that any consent required to any such assignment has not been given, or (c)

asserting that the Stalking Horse Bidder has failed to provide adequate assurance of future

performance as contemplated under Bankruptcy Code section 365(b)(l)(C) in respect of any such

13

Potentially Assumed Contract, (ii) deemed to have consented to the applicable Cure Amount, if

any, and be bound to such corresponding Cure Amount, (iii) deemed to have agreed that all

defaults under the applicable Potentially Assumed Contract arising or continuing prior to the

effective date of the assignment have been cured as a result or precondition of the assignment,

such that the neither the Successful Bidder nor the Debtors have any liability or obligation with

respect to any default occurring or continuing prior to the assignment, and that the applicable

Contract shall remain in full force and effect for the benefit of the Successful Bidder (and such

Contract Counterparty) in accordance with the terms of the Potentially Assumed Contract from

and after the date of the assignment of the applicable Potentially Assumed Contract, (iv) deemed

to have waived any right to terminate the applicable Contract or designate an early termination

date under the applicable Contract as a result of any default that occurred and/or was continuing

prior to the assignment date, and (v) deemed to have agreed to the terms of the Sale Order.

22.    Adequate Assurance Objection.  Immediately after the conclusion of the Auction,

if a Successful Bidder other than the Stalking Horse Bidder prevails at the Auction, the Debtors

shall file with the Court, and publish on the Case Information Website, the Notice of Auction

Results that identifies the Successful Bidder and provides notice that the Debtors will seek to

assume and assign the Potentially Assumed Contracts to the Successful Bidder.  The Notice of

Successful Bidder shall also contain the Successful Bidder's and Backup Bidder(s)' proposed

form of adequate assurance of future performance.  Objections of any Contract Counterparty

related to: (i) the identity of and ability of the Successful Bidder(s) or Backup Bidder(s) to

provide adequate assurance of future performance within the meaning of Bankruptcy Code

section 365(b)(l)(C) or (ii) the ability of the Stalking Horse Bidder to provide adequate assurance

of future performance under the applicable Potentially Assumed Contract (an "Adequate

14

Assurance Objection") must (A) be in writing, (B) comply with the Bankruptcy Code,

Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual

bases thereof, (D) be filed by no later than **4:00 p.m. (Eastern Time) one (1) day prior to the**

**Sale Hearing** (the "Adequate Assurance Objection Deadline") and (E) be served on the

Assumption and Assignment Objection Notice Parties.

23.    The inclusion of a Potentially Assumed Contract, or Cure Amounts with respect

thereto, on a Potential Assumption and Assignment Notice or the Executory Contract List shall

not constitute or be deemed a determination or admission by the Debtors, the Successful

Bidder(s) or any other party in interest that such contract or lease is an executory contract or

unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their

rights, claims and causes of action with respect to each Potentially Assumed Contract listed on

the Potential Assumption and Assignment Notice and Executory Contract List.  The Debtors'

inclusion of any Potentially Assumed Contract on the Potential Assumption and Assignment

Notice and Executory Contract List shall not be a guarantee that such Potentially Assumed

Contract ultimately will be assumed or assumed and assigned.

24.    The Debtors' assumption and assignment of the Potentially Assumed Contracts to

the Successful Bidder is subject to approval of this Court and the consummation of the Sale.

Accordingly, absent the closing of such Sale, the Assigned Contracts shall not be deemed

assumed or assigned, and shall in all respects be subject to further administration under the

Bankruptcy Code.

25.    General Provisions.  Except as otherwise provided in this Order or the Bidding

Procedures, the Debtors further reserve the right as they may reasonably determine to be in the

best interests of their estates (after consultation with the Consultation Parties (as defined in the

Bidding Procedures)) to: (a) determine which bidders are Qualified Bidders; (b) determine which

bid are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best

proposal and which is the next highest or otherwise best proposal; (d) reject any bid that is (i)

inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures

or the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (e)

impose additional terms and conditions with respect to all potential bidders; (f) extend the

deadlines set forth herein; and/or (g) continue or cancel the Auction and/or Sale Hearing in open

court without further notice.

26.     All persons or entities that participate in the bidding process or the Auction shall

be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this

Court with respect to all matters related to the terms and conditions of the Assets, the Auction

and any transaction contemplated herein.

27.     This Order shall be binding on the Debtors, including any chapter 7 or chapter 11

trustee or other fiduciary appointed for the estates of the Debtors.

28.     Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h),

6006(d), 7062 or 9014) or Local Bankruptcy Rule that might otherwise delay the effectiveness of

this Order is hereby waived, and the terms and conditions of this Order shall be effective and

enforceable immediately upon its entry.

29.     The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby

satisfied or waived.

30.     The Court shall retain jurisdiction over any matters related to or arising from the

implementation or interpretation of this Order.  All matters arising from or related to the

implementation of this Order may be brought before the Court as a contested matter, without the

16

necessity of commencing an adversary proceeding.  To the extent any provisions of this Order

shall be inconsistent with the Sale Motion or the Bidding Procedures, the terms of this Order

shall control.


Dated: _____, 2019                    _____
        White Plains, New York                   THE HONORABLE ROBERT D. DRAIN
                                                  UNITED STATES BANKRUPTCY JUDGE

## <u>Exhibit 1</u>

**Proposed Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AGERA ENERGY LLC, *et al.*,[1] | Case No. 19-_____ (___) |
| Debtors. | (Jointly Administered) |

## BIDDING PROCEDURES

  The above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") in these jointly administered chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") currently pending in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") are authorized by the Court to conduct a sale of all or substantially all of the Debtors' assets.  On **October ___, 2019**, the Court entered the *Order (I)(A) Approving Bidding Procedures Relating to the Sale of Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement and Bid Protections, (C) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (D) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, (E) Scheduling Auction for, and Hearing to Approve, Sale of the Debtors' Assets and (II) Granting Related Relief*, [ECF No. ___] (the "<u>Bidding Procedures Order</u>"), pursuant to which the Court, among other things, approved these Bidding Procedures (these "<u>Bidding Procedures</u>") to be employed to solicit and evaluate bids for the purchase of all or substantially all of the Debtors' assets (the "<u>Assets</u>").

  Exelon Generation Company, LLC submitted a stalking horse bid (the "<u>Stalking Horse Bid</u>" and such bidder, the "<u>Stalking Horse Bidder</u>"), which bid is for certain of Agera Energy LLC's, Aequitas Energy, Inc.'s and energy.me midwest llc's (collectively, the "<u>Sellers</u>") assets (the "<u>Purchased Assets</u>").  The Stalking Horse Bidder has executed that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "<u>Stalking Horse APA</u>"),[2] dated as of October 3, 2019.  The Stalking Horse APA contemplates, pursuant to the terms and subject to the conditions and purchase price adjustments contained therein, the sale of the Purchased Assets to the Stalking Horse Bidder in consideration of approximately $24,750,000.00 million in cash and cash consideration, plus the assumption of the Assumed Liabilities, subject to certain adjustments.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse APA.

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.  These Bidding Procedures describe, among other things:  (i) the procedures for bidders to submit bids for the Purchased Assets; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Purchased Assets (the "Auction"); (v) the ultimate selection of the Successful Bidder (as defined below); and (vi) Bankruptcy Court approval of the sale of the Purchased Assets to the Successful Bidder at a hearing before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140 (the "Sale Hearing").

**The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties (as defined below), to modify or terminate these Bidding Procedures, to waive terms and conditions set forth herein, to extend any of the deadlines or other dates set forth herein, to adjourn the Auction and/or Sale Hearing, and/or, subject to the terms of the Stalking Horse APA, to terminate discussions with any and all prospective acquirers and investors (except for the Stalking Horse Bidder) at any time and without specifying the reasons therefor, in each case without further notice but in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order; *provided* that these Bidding Procedures may not be modified without the consent of BP Energy Company ("BP") or the Stalking Horse Bidder (such consent not to be unreasonably withheld) and *provided* that nothing herein shall authorize the Debtors to unilaterally extend any date or deadlines set forth in the Stalking Horse APA or otherwise extend or enlarge the obligations of the Stalking Horse Bidder thereunder; and it being further understood that the Bidding Procedures and the Bidding Procedures Order must be in form and substance reasonably satisfactory to BP and, pursuant to the Stalking Horse APA, the Stalking Horse Bidder.**

### Summary of Important Dates

| | |
|---|---|
| October 14, 2019 | Deadline to Object to Bidding Procedures |
| October 15, 2019[3] | Bidding Procedures Hearing<br>Deadline to file and serve Sale Notice, Potential Assumption and Assignment Notice, and file Executory Contract List with the Court |
| October 29, 2019 | Bid Deadline<br>Sale Objection Deadline<br>Assumption and Assignment Objection Deadline<br>Deadline to Notify Qualified Bidders |
| November 4, 2019 | Deadline to Designate a Baseline Bid<br>Auction (if necessary) |
| November 4, 2019 | Notice of Auction Results filed with the Court (if applicable) |

---

[3] This date is subject to the Court's availability.

2

| November 4, 2019 | Debtors' Reply Deadline |
|---|---|
| | Adequate Assurance Objection Deadline |
| November 5, 2019 | Sale Hearing |

**Any interested bidder should contact, as soon as practicable:**

Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC ("Miller Buckfire") in writing, expressing your interest in the Purchased Assets to Richard Klein and James Georgiow of Miller Buckfire (richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).

**1.    Due Diligence**

The Debtors have posted copies of all material documents related to the Debtors' business to the Debtors' confidential electronic data room (the "Data Room").  To access the Data Room, a party must submit to the Debtors or their advisors:

A.    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

B.    if practicable, a description of the nature and extent of any due diligence the interested party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and

C.    sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to determine that the interested party has the financial wherewithal to close a sale for the Purchased Assets.

An interested party that meets the above requirements to the satisfaction of the Debtors, after consultation with the Consultation Parties, shall be a "Potential Bidder."  As soon as practicable, the Debtors will provide such Potential Bidder access to the Data Room; *provided* that such access may be terminated by the Debtors in their discretion at any time for any reason whatsoever, after prior notice to, and after consultation with, the Consultation Parties, including that a Potential Bidder does not become a "Qualified Bidder" (as defined below) or these Bidding Procedures are terminated.

The Debtors shall keep the Consultation Parties reasonably informed of all interested parties that become Potential Bidders and the status of their due diligence.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate a sale transaction.  Failure by a Potential Bidder to comply with reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, after consultation with the Consultation Parties, that a bid made by such Qualified Bidder is not a Qualified Bid.

3

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be initially directed to:  (i) Richard Klein and James Georgiow of Miller Buckfire (richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).  The Debtors will simultaneously distribute to all Potential Bidders via the Data Room any additional diligence materials not previously available to other Potential Bidders.  Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtors' businesses to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth above, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors.  Further, the Debtors shall have no obligation to provide due diligence access after the Bid Deadline (as defined below) to any party that has not submitted a Qualified Bid by the Bid Deadline.

## 2.    Bid Deadline

A Potential Bidder who desires to be deemed a Qualified Bidder must deliver the Required Bid Documents (as defined below) via email (in .pdf or similar format) so as to be *actually received* on or before **October 29, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") to the following parties (the "Debtor Notice Parties"):

a.    **Debtors**.  c/o Agera Energy, LLC, 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510 (Attn: tsandford@ageraenergy.com).

b.    **Debtors' Counsel**.  McDermott Will & Emery LLP, 340 Madison Ave., New York, New York 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com).

c.    **Debtors' Investment Banker**.  Miller Buckfire, 787 7th Avenue, 5th Floor, New York, NY, 10019 (Attn: Richard Klein and James Georgiow; richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).

d.    **Counsel to BP Energy Company**.  Haynes and Boone, LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin; kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com).

The Debtors, with the consent of the Consultation Parties, and without the need for further Court approval, may extend the Bid Deadline by a reasonable period of time once or successively if the Debtors believe that such extension would further the goal of attaining the highest or otherwise best offer for the Debtors' assets.  The Debtors shall promptly notify all Potential Bidders of any such extension.

4

### 3.    Qualified Bids

Each offer, solicitation or proposal by a Potential Bidder must satisfy each of the following conditions to be deemed a "Qualified Bid," and for the Potential Bidder to be deemed a "Qualified Bidder," unless any such conditions that are not satisfied are waived by the Debtors. The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid.

### a.    Bid Requirements

All bids must include the following items (collectively, the "Required Bid Documents"):

i.    Irrevocable.  Each bid must be accompanied by an executed letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the assets identified in such bid and that such bidder agrees to serve as a Backup Bidder (as defined herein) in accordance with these Bidding Procedures.

ii.    Executed Agreement.  In both PDF and MS-WORD format, an executed copy of an asset purchase agreement (the "APA") and a copy of same that has been marked against the Stalking Horse APA, a copy of which is located in the Data Room.

iii.    Same or Better Terms.  Each bid must be an offer to purchase some or all of the Purchased Assets, pursuant to a sale transaction that is no less favorable to the Debtors' estates (except as to the Purchase Price and Schedule 2.01(a) of the Stalking Horse APA), as the Debtors may reasonably determine, in consultation with the Consultation Parties, than the transactions contemplated in the Stalking Horse APA.  To the extent that a bid contemplates the purchase of less than all of the Purchased Assets, such bid will only be considered a Qualified Bid if, when added to any other bids received (other than the Stalking Horse Bid) for any Purchased Assets not included in such bid, the aggregate total purchase price of such bids is equal to or greater than (i) the Stalking Horse Bidder's bid of $24,750,000.00, plus (ii) the Termination Fee, plus (iii) the maximum possible Buyer Expense Reimbursement payable under the Stalking Horse APA, plus (iv) an additional one million dollars ($1,000,000).

iv.    Financial Wherewithal.  Each Potential Bidder must provide written evidence acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating financial wherewithal, operational ability and corporate authorization to consummate the proposed transaction.

v.    Committed Financing.  Each Potential Bidder must provide written evidence of a firm commitment for financing to consummate the proposed transaction, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Debtors, after consultation with the Consultation Parties.

A bid will be considered only if the bid:

i       identifies the legal name of the purchaser (including any sponsor(s), if the
        purchaser is an entity formed for the purpose of consummating the
        proposed transaction);

ii      identifies the Assets the bidder seeks to purchase and identifies the cash
        purchase price, and specifies how the cash purchase price is allocated
        among the Purchased Assets;

iii     is not materially more burdensome or more conditional than the terms of
        the Stalking Horse Bid, if any, as determined by the Debtors (after
        consultation with the Consultation Parties);

iv      identifies all executory contracts and unexpired leases of which the
        Potential Bidder seeks assignment from the Debtors, if any;

v       is not conditioned on (i) obtaining financing or (ii) the outcome of
        unperformed due diligence;

vi      is not conditioned on the receipt of any third party approvals or consents
        (excluding required Court approval and required governmental, licensing
        or regulatory approval or consent, if any), including without limitation
        board of director approval;

vii     with respect to any governmental, licensing or regulatory approvals or
        consents, includes a description of all such approvals or consents that are
        required to consummate the proposed transaction (including any antitrust
        approval or clearance related to the Hart-Scott-Rodino Antitrust
        Improvements Act of 1976, as amended), together with evidence
        satisfactory to the Debtors in their sole discretion of the ability of the
        bidder to obtain such approvals or consents in a timely manner, as well as
        a description of any material contingencies or other conditions that will be
        imposed upon, or that will otherwise apply to, the obtainment or
        effectiveness of any such approvals or consents;

viii    is accompanied by a cash deposit by wire transfer to an escrow agent
        selected by the Debtors (the "Deposit Agent") in an amount equal to 10%
        of the cash purchase price set forth in connection with such bid (any such
        deposit, a "Good Faith Deposit");

ix      indicates that the bidder will not seek any transaction or break-up fee,
        expense reimbursement, or similar type of payment;

x       provides for a commitment to close as soon as practicable, but in no event
        later than the Closing would occur under the Stalking Horse APA;

xi      sets forth the representatives that are authorized to appear and act on
        behalf of the bidder in connection with the proposed transaction;

6

xii    fully discloses the identity of each entity that will be bidding for the Debtors' assets or otherwise financing such bid (including through the issuance of debt in connection with such bid), and a summary of any such financing;

xiii    indicates that the bidder waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Assets;

xiv    if the bid contemplates the assumption and assignment of any contracts or leases, includes evidence of the bidder's ability to comply with Bankruptcy Code section 365 (to the extent applicable), including providing adequate assurance of such bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the bidder (the "Adequate Assurance Information"), in a form that will permit the Debtors to disseminate immediately such evidence to the Contract Counterparties to such contracts and leases that request such Adequate Assurance Information;

xv    constitutes a good faith, *bona fide* offer to effectuate the proposed transaction; and

xvi    is received on or before the Bid Deadline (as such deadline may be extended in accordance with these Bidding Procedures).

The Debtors will determine, in consultation with the Consultation Parties, whether to entertain bids that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. The Debtors, in their sole and absolute discretion following consultation with the Consultation Parties, shall make a determination regarding whether a bid constitutes a Qualified Bid and shall notify bidders via email whether their bids have been determined to be Qualified Bids by no later than **October 29, 2019 at 5:00 p.m. (prevailing Eastern Time)**.

    **b.**    **Non-Conforming Bids**

The Debtors, after consultation with the Consultation Parties, shall have the right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above or does not include one or more Required Bid Documents. If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies following the Bid Deadline but not later than one Business Day prior to the Auction. If any bid is determined by the Debtors not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with these Bidding Procedures, the Debtors shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit.

7

### c.    Potential Bidder Representations

By submission of its bid, each Qualified Bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all due diligence regarding the Assets that are the subject of the Auction prior to making any such bids, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder(s), the asset purchase agreement(s) with such Successful Bidder(s). Without the written consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of its Qualified Bid, during the period that such Qualified Bid is required to remain irrevocable.

### d.    Distribution and Evaluation of Qualified Bids

All Qualified Bids will be considered by the Debtors; bids other than Qualified Bids will not be considered.  The Debtors may, after consultation with the Consultation Parties, evaluate bids on any grounds, including, but not limited to:

i    the amount of the purchase price, including non-cash consideration, set forth in the bid;

ii    the value to be provided to the Debtors under the bid, including the net economic effect upon the Debtors' estates;

iii    any benefit to the Debtors' bankruptcy estates from any assumption of liabilities;

iv    the transaction structure and execution risk, including conditions to and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals;

v    the anticipated timing to closing and whether such timing is consistent with the Debtors' adherence to, among other things, the Stalking Horse APA;

vi    the impact on employees and employee claims against the Debtors;

vii    the presence of any governmental, licensing, regulatory or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents;

viii    the impact on trade and other creditors; and

8

ix       any other factors the Debtors may reasonably deem relevant consistent
with their fiduciary duties.

For the avoidance of doubt, the presence of any governmental, licensing, regulatory or
other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such
approvals or consents, may be grounds for the Debtors, in their sole discretion, to determine that
such bid (i) is not a Qualified Bid or (ii) is not higher or otherwise better than any other Qualified
Bid.

In evaluating the bids, the Debtors, after consultation with the Consultation Parties, shall
also make a determination regarding which Qualified Bid(s) is the highest or best Qualified Bid
for the Purchased Assets and will therefore serve as the starting point at the Auction (the
"Baseline Bids" and, each, a "Baseline Bid").  To the extent the Baseline Bid(s) is not the
Stalking Horse Bid, the Baseline Bid(s) must collectively exceed the Stalking Horse Bidder's bid
of $24,750,000.00, plus the Termination Fee, plus the maximum possible amount of the Buyer
Expense Reimbursement, plus an additional amount of one million dollars ($1,000,000).  No
later than **October 29, 2019**, the Debtors shall distribute a detailed summary of all Qualified
Bids received by the Debtors to all Qualified Bidders (including the Stalking Horse Bidder),
including a valuation of all components of such Qualified Bids.   The Debtors shall provide a
redacted version of the full asset purchase agreements submitted by such Qualified Bidders to all
other Qualified Bidders upon request within one (1) business day of the Bid Deadline.

On or before **November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)** (the
"Designation Deadline"), the Debtors shall file a notice designating the Baseline Bid and publish
such notice on the Case Information Website (as defined below) and in the Data Room and/or
distribute the same at the Auction.  The Debtors shall also provide copies of such Baseline Bid to
all of the Qualified Bidders (including the Stalking Horse Bidder) and each of the Consultation
Parties.  To the extent the Baseline Bid(s) is not the Stalking Horse Bid, the Debtors shall also
provide to all Qualified Bidders (including the Stalking Horse Bidder) and each of the
Consultation Parties a detailed calculation of the value of the Qualified Bid(s) comprising the
Baseline Bid(s).

## 4.    Auction

### a.    Scheduled Time and Date of the Auction

One or more auctions for the Assets (the "Auction") may be held in accordance with
these Bidding Procedures and upon notice to all Qualified Bidders that have submitted Qualified
Bids.  The Auction, if held, is scheduled to be conducted at the offices of McDermott Will &
Emery LLP, 340 Madison Ave., New York, New York 10173 **on November 4, 2019 at 10:00
a.m. (prevailing Eastern Time)**, or such later time or other location as designated by the
Debtors in a notice filed on the docket of the Court and published on the Debtors' case
information website (located at **https://cases.stretto.com/agera** (the "Case Information
Website")).

If no Qualified Bid (other than the Stalking Horse Bid) is submitted by the Bid Deadline
with respect to the Assets or any lot of assets, the Debtors may, after consultation with the

9

Consultation Parties, elect to cancel the Auction with respect to such assets and, as applicable, seek approval of the transactions contemplated in the Stalking Horse Bid at the Sale Hearing (as defined below).

### b.      Participants and Attendees

Principals, representatives or agents of the Debtors, BP, the Stalking Horse Bidder, the Committee, and any Qualified Bidder that has submitted a Qualified Bid (and the legal and financial advisors to each of the foregoing) will be entitled to attend the Auction.  Any other creditor of the Debtors will be permitted to attend the Auction upon advance notice by such creditor of at least two (2) business days to the Debtor Notice Parties.  Only Qualified Bidders will be entitled to make any subsequent bids at the Auction.  Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or the sale of any of the Assets as described herein, (b) has reviewed, understands and accepts these Bidding Procedures, (c) has consented to the jurisdiction of the Court and (d) intends to consummate its Qualified Bid if it is selected as the Successful Bid.  Each Qualified Bidder participating in the Auction shall appear in person at the Auction or through a duly authorized representative.

### c.      Auction Procedures

To the extent the Baseline Bid(s) is not the Stalking Horse Bid, the Baseline Bid(s) must collectively exceed the Stalking Horse Bidder's bid of $24,750,000.00, plus the Termination Fee, plus the maximum possible amount of the Buyer Expense Reimbursement, plus an additional amount of one million dollars ($1,000,000);

Bidding at the Auction will begin with the Baseline Bid(s) and continue, in one or more rounds of bidding, so long as, during each round, at least one subsequent bid is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (an "Overbid") and (ii) the Debtors determine, in consultation with the Consultation Parties, that such Overbid or combination of Overbids is (a) for the first round, a higher or otherwise better offer than the Baseline Bid(s) (taking into account, if applicable, the Buyer Expense Reimbursement and Termination Fee for the Stalking Horse Bidder) and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid(s) (as defined below).

After the first round of bidding and between each subsequent round of bidding, the Debtors will determine, after consultation with the Consultation Parties, and announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "Leading Bid"), as well as provide a detailed calculation of the value of such Leading Bid.  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge and written confirmation of the Leading Bid.

In connection with any of its bids at the Auction, the Stalking Horse Bidder shall receive a credit equal to the aggregate of (i) the Termination Fee and (ii) the maximum possible amount of the Buyer Expense Reimbursement payable by the Debtors pursuant to the Stalking Horse APA.  Additionally, to the extent bids are submitted at the Auction for less than all of the Purchased Assets contemplated by the Stalking Horse APA, in accordance with and as permitted

10

by these Bidding Procedures, the Stalking Horse Bidder shall have the right, but not the obligation, to elect to bid on less than all of such Purchased Assets.

The Debtors, in their sole discretion and in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, including, but not limited to, bidding increments and other requirements for each round of bidding, provided that such rules are (A) not inconsistent with the order entered by the Court approving these Bidding Procedures, the Bankruptcy Code or any other order of the Court entered in connection herewith and (B) disclosed to each Qualified Bidder.

The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid(s), all subsequent bid(s), the Leading Bid(s), the Backup Bid(s) and the Successful Bid(s) (each as defined below).

### d.      Selection of Successful Bid(s)

Prior to the conclusion of the Auction, the Debtors shall (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction, (b) determine and identify, with the Consultation Parties, the highest or otherwise best offer or collection of offers (the "Successful Bid(s)"), (c) determine and identify, with the Consultation Parties, the next highest or otherwise best offer or collection of offers (the "Backup Bid(s)") and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the identity of the party or parties that submitted the Successful Bid(s) (the "Successful Bidder(s)"), the amount and other material terms of the Successful Bid(s), the identity of the party or parties that submitted the Backup Bid(s) (the "Backup Bidder(s)") and the amount and other material terms of the Backup Bid(s).  No additional bids may be considered after the Auction is closed.  If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors will (a) file a notice (such notice being the "Notice of Auction Results") on November 1, 2019, which will, among other things, include the identity of the Successful Bidder(s) and Backup Bidder(s), with the Court and cause such notice to be published on the Case Information Website, which shall contain the Successful Bidder(s)' and Backup Bidder(s)' proposed form of adequate assurance of future performance and constitute definitive proof that the Debtors have closed the Auction.

The Backup Bid shall remain open and irrevocable until the earliest to occur of (i) the Closing Date, and (ii) the release of such bid by the Debtors in writing (such date, the "Backup Bid Expiration Date").  If a transaction with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

Notwithstanding anything to the contrary set forth in these Bidding Procedures, the Stalking Horse Bidder shall not be required to serve as the Backup Bidder for anything less than all of the Purchased Assets contemplated by the Stalking Horse APA.

### 5.      Termination Fee and Buyer Expense Reimbursement

The Debtors have agreed that they must pay the Termination Fee and Buyer Expense Reimbursement (as defined in the Stalking Horse APA) to the Stalking Horse Bidder under certain conditions and circumstances as set forth in the Stalking Horse APA. Payment of the Termination Fee and Buyer Expense Reimbursement shall be governed by the Stalking Horse APA and the Bidding Procedures Order. Pursuant to the Bidding Procedures Order and the Stalking Horse APA, the Stalking Horse Bidder's claim to the Termination Fee and the Buyer Expense Reimbursement shall constitute a super-priority administrative expense claim senior to all other administrative claims against the Debtors' estates.

**6.    Consultation Parties**

The term "Consultation Parties" as used in these Bidding Procedures shall mean (i) the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases, if any (the "Creditors' Committee"), (ii) BP, and (iii) the Stalking Horse Bidder.

The Debtors shall use their reasonable best efforts to consult and confer with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

The Debtors may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; *provided*, *however*, that the Debtors may, in the exercise of their business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

**7.    The Sale Hearing**

The hearing to consider the proposed Sale Order (the "Sale Hearing") shall be held on **November 5, 2019 at 2:00 p.m. (prevailing Eastern Time)** before the Honorable Robert D. Drain in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140.

The Sale Hearing may be adjourned by the Debtors by an announcement of the adjourned date at a hearing before the Court or by filing a notice on the Court's docket. At the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid(s) and, in their sole discretion, the Backup Bid(s).

The Debtors' presentation to the Court of the Successful Bid(s) and Backup Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Court. Following the Court's entry of the Sale Order approving such bid(s), the Debtors and the Successful Bidder(s) shall proceed to consummate the transaction(s) contemplated by the Successful Bid(s). If the Debtors and the Successful

12

Bidder(s) fail to consummate the proposed transaction(s), then the Debtors shall file a notice with the Court advising of such failure. Upon the filing of such notice with the Court, the Backup Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized but not directed, in their sole discretion, to effectuate the transaction(s) with the Backup Bidder(s) subject to the terms of the Backup Bid(s) of such Backup Bidder(s) without further order of the Court. If such failure to consummate the sale is the result of a breach by the Successful Bidder(s) (such bidder(s), the "Breaching Bidder(s)") of its (their) purchase agreement(s), the Debtors reserve the right to seek all available remedies from the Breaching Bidder(s), subject to the terms of the applicable purchase agreement.

## 8.    Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders will be held in escrow by the Deposit Agent and will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to the terms of the applicable escrow agreement or pursuant to further order of the Court. The Deposit Agent will retain the Good Faith Deposits of the Successful Bidder(s) and the Backup Bidder(s) until the closing of the transaction(s) contemplated by the Successful Bid(s) or the Backup Bid(s), as applicable, in accordance with Section 4.d. above, except as otherwise ordered by the Court. The Good Faith Deposits (and all interest accrued thereon) of the other Qualified Bidders will be returned within four Business Days after the entry of the Sale Order. At the closing of the transaction contemplated by the Successful Bid(s), the Successful Bidder(s) will receive a credit in the amount of its Good Faith Deposit (plus all interest accrued thereon). All remaining Good Faith Deposits (and all interest accrued thereon) held by the Deposit Agent will be released by the Deposit Agent four Business Days after the closing of the transaction(s) contemplated by the Successful Bid(s); *provided*, the Deposit Agent will retain the Good Faith Deposit of a Breaching Bidder pending a ruling by the Court as to the amount of damages owed, if any, by such Breaching Bidder to the Debtors.

## 9.    As Is, Where Is

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except as provided in any agreement with respect to the sale or sales approved by the Court.

## 10.    Free and Clear of Any and All Interests

All of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") to the maximum extent permitted by Bankruptcy Code section 363, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests attached to the Assets immediately prior to Closing.

## 11.    Reservation of Rights of the Debtors

Except as otherwise provided in these Bidding Procedures or the Bidding Procedures Order, the Debtors reserve the right, after consultation with the Consultation Parties (if applicable), to:

13

i        determine which interested party is a Potential Bidder;

ii       determine which bidder is a Qualified Bidder;

iii      determine which bid is a Qualified Bid;

iv      determine which Qualified Bid is a Baseline Bid;

v        determine which Qualified Bid is the highest or otherwise best offer for the Assets and which is the next highest or otherwise best offer;

vi      reject any bid that the Debtors deem to be (a) inadequate or insufficient, (b) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules or (c) contrary to the best interests of the Debtors and their estates;

vii     impose additional terms and conditions with respect to all Potential Bidders;

viii    cancel the Auction;

ix      extend the deadlines set forth herein; and

x        modify these Bidding Procedures and implement additional procedural rules that the Debtors determine will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties.

Nothing in these Bidding Procedures shall require the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent that the Debtors determine, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary duties under applicable law.

14

## Exhibit 2

**Form of Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## <u>NOTICE OF SALE, BIDDING PROCEDURES, AUCTION AND SALE HEARING</u>

 **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") on October 4, 2019 (the "<u>Petition Date</u>").

 **PLEASE TAKE FURTHER NOTICE** that, on the Petition Date, the Debtors filed a motion (the "<u>Sale Motion</u>"),[2] [ECF No. __], with the Court seeking entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of substantially all of the Debtors' assets (the "<u>Sale</u>"), subject to the submission of higher or otherwise better offers in an auction process (the "<u>Auction</u>"), (b) the form and manner of notice related to the Sale and (c) procedures for the assumption and assignment of contracts and leases in connection with the Sale.

 **PLEASE TAKE FURTHER NOTICE** that a party (the "<u>Stalking Horse Bidder</u>") has already submitted a binding bid (the "<u>Stalking Horse Bid</u>") for certain of the Assets, as set forth in a certain asset purchase agreement (the "<u>Stalking Horse APA</u>"). The Stalking Horse Bid remains subject to higher and/or better offers.

 **PLEASE TAKE FURTHER NOTICE** that, on _____ ____, 2019, the Court entered an order (the "<u>Bidding Procedures Order</u>"), [ECF No. __], approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

[3] To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures.  Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

**Any interested bidder should contact, as soon as practicable:**

Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC ("Miller Buckfire") (Attn: Richard Klein and James Georgiow; richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).

## Obtaining Additional Information

Copies of the Stalking Horse APA, the Bidding Procedures Order, the Bidding Procedures, and the proposed Sale Order are available upon request to the Debtors' noticing agent, Stretto, at https://cases.stretto.com/agera.

## Important Dates and Deadlines[4]

(i)     **Bid Deadline**.  The deadline to submit a Qualified Bid is **October 29, 2019 at 5:00 p.m. (prevailing Eastern Time)**.

(ii)    **Sale Objection Deadline**.  The deadline to file an objection with the Court to the Sale, and all objections relating to the Stalking Horse Bidder, or the Sale (collectively, the "Sale Objection") is **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").

(iii)   **Auction**.  In the event that the Debtors timely receive a Qualified Bid in addition to the Stalking Horse Bid, and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction for the Assets.  The Auction, if one is held, will commence on **November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)** at the offices of McDermott Will and Emery, 340 Madison Avenue, New York, New York 10173.

(iv)    **Sale Hearing**.  A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Court on **November 5, 2019 at 2:00 p.m. (prevailing Eastern Time)**, or such other date as determined by the Court, at 300 Quarropas Street White Plains, NY 10601-4140.

## Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court by no later than **the Sale Objection Deadline** and (d) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340

---

[4] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Madison Avenue, New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III; cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin; kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com), and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any party or entity who fails to timely make an objection to the Sale on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

## NO SUCCESSOR LIABILITY

*For more information on the Debtors' business, refer to the Declaration of Todd Sandford Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration") [ECF No. __]. Upon Court approval, the Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. Accordingly, as a result of the Sale, the Successful Bidder will not be a successor to any of the Debtors by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly provided in the Purchase Agreement, for any liens, claims, encumbrances and other interests against or in any of the Debtors under any theory of law, including successor liability theories.*

[Remainder of This Page Intentionally Left Blank]

3

Dated:  October 2, 2019
          New York, NY

Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

/s/
_____
Timothy W. Walsh
Darren Azman
Ravi Vohra
340 Madison Avenue
New York, NY 10173
Telephone:  (212) 547-5615
Facsimile:  (212) 547-5444
Email: twwalsh@mwe.com
          dazman@mwe.com
          rvohra@mwe.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## <u>Exhibit 3</u>

**Form of Potential Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR**
**UNEXPIRED LEASES AND CURE AMOUNT**

      **You are receiving this Notice because you may be a retail electricity or natural gas customer of Agera Energy LLC, energy.me midwest llc (d/b/a Energy Me), or Aequitas Energy Inc. (collectively, the "Agera Opco Entities"). The Agera Opco Entities are Debtors in the above captioned chapter 11 cases (collectively, with its subsidiaries and affiliates that commenced chapter 11 cases, the "Debtors"). Please read this notice carefully as your rights may be affected by the transactions described herein.**

      If you have questions concerning this notice, please contact your sales representative or call the Agera Opco Entities' customer service center at (877) 273-7276. Residential customers with questions about their rights as a consumer of electricity under state law and regulations may contact their state regulator or residential consumer representative.

      On October 4, 2019, the Debtors filed voluntary petitions for chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Since commencing the chapter 11 cases, the Debtors have continued to operate their businesses, and have continued to provide your electricity or natural gas service, as usual. As part of their restructuring efforts, the Agera Opco Entities are seeking to sell certain of their assets (the "Assets"), which may include the Agera Opco Entities' contracts (including any renewals or extensions thereof) with customers of their retail power and natural gas businesses such as yourself (collectively, the "Customer Contracts"). The Bankruptcy Court has approved a motion filed by the Debtors to establish procedures (the "Bidding Procedures") to select a purchaser for the Assets, who will be providing you service instead of the Agera Opco Entities.

      The Agera Opco Entities have actively sought another qualified electricity and natural gas supplier to purchase their customers' contracts and provide uninterrupted service to their customers. On October 3, 2019, the Agera Opco Entities received an offer to purchase the Assets from Exelon Generation Company, LLC ("Exelon"). Your contract (and any renewals or extensions thereof) with the applicable Agera Opco Entity may be transferred to Exelon. The transfer and assignment of your contract will occur as soon as possible after the transaction

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

closes.  Additional information regarding Exelon may be obtained from counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Ave New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com).  You have a right to request that Exelon provide you with adequate assurance of future performance (*i.e.*, information that will allow you to evaluate whether Exelon will be able to deliver uninterrupted electricity or natural gas to you following the successful transfer and assignment of your Customer Contract to Exelon).

The Agera Opco Entities have established procedures to transfer their Customer Contracts to Exelon.  The procedures include a process to ensure that retail customers, such as yourself, receive notice that their Customer Contracts will be transferred and assigned to Exelon. **Exelon is a qualified competitive energy supplier[2] that has agreed to provide your electricity and natural gas service on the same rates, terms and conditions in your current customer contract with the applicable Agera Opco Entity.  Other than the change in your retail energy supplier, your electricity and natural gas service will NOT be affected by this sale.  You may have related rights as a consumer of electricity under state law and regulations (as those rights may be impacted by the Chapter 11 Cases)**.

Exelon's offer is subject to higher and better offers at an auction (the "Auction") that will take place on **November 4, 2019** if the Debtors receive at least one (1) Qualified Bid (as defined in the Bidding Procedures) other than Exelon's bid.  If a Qualified Bidder (as defined in the Bidding Procedures) other than Exelon submits the highest bid at the Auction, your Customer Contract may be assumed and assigned to such Qualified Bidder.

If a Qualified Bidder other than Exelon prevails at the Auction, the Debtors will file a Notice of Auction Results (as defined in the Bidding Procedures) with the Bankruptcy Court on **November 4, 2019**, identifying the Successful Bidder(s) and Backup Bidder(s) (as defined in the Bidding Procedures).  The Notice of Auction Results will also include the Successful Bidder(s)' and Backup Bidder(s)' proposed form of adequate assurance of future performance (*i.e.*, information that will allow you to evaluate whether the Successful Bidder(s) or Backup Bidder(s) will be able to deliver uninterrupted electricity or natural gas to you following the successful transfer and assignment of your Customer Contract to the Successful Bidder or Backup Bidder(s)).  You have a right to file an objection related to: (i) the identity of and ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance or (ii) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to your Customer Contract (an "Adequate Assurance Objection").

A schedule listing each Customer Contract (the "Executory Contract List" ) that may be transferred and assigned to Exelon was filed with the Bankruptcy Court on **October 15, 2019**. You may review or obtain a copy of the Executory Contract List by (a) visiting the Court's website at https://pcl.uscourts.gov/pcl/index.jsf for a fee, (b) the Debtors' case information website, located at https://cases.stretto.com/agera, or (c) emailing teamagera@stretto.com.  In addition, the "Cure Amounts," if any, necessary for the assumption and assignment of the

---

[2] A competitive retail energy supplier sells electricity and natural gas in regulated energy markets to residential, commercial and industrial end-use customers in your applicable state.

Customer Contracts are set forth on the Executory Contract List. ***Each Cure Amount listed on the Executory Contract List represents all liabilities of any nature that the Debtors believe they have arising under a Customer Contract prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale. If you believe your Cure Amount is listed with an incorrect amount on the Executory Contract List, you must object in accordance with the procedures described in this Notice.***

**Please be assured that there will be no interruption of service under your electricity contract as a result of this sale process. You will not need to take any action to switch to Exelon. To the extent that you receive an invoice directly from the applicable Agera Opco Entity, you will be advised of a new payment address.**

**If you do not wish to object to the transfer of your Customer Contract to Exelon, on the same rates, terms and conditions that you have already agreed to with the Agera Opco Entities, you do not need to take any action in response to this notice. As stated above, only the provider of your service will change, and you will see Exelon's name and/or logo on your bills going forward after assignment. Your service will continue on the same rates, terms and conditions in your current electric service contract. For any accounts currently invoiced by the Agera Opco Entities, you will be advised of a new payment address**. Be aware that, if you do not file an objection to the assignment of your Customer Contract, including any objection relating to the Cure Amount and the ability of Exelon to provide you with adequate assurance of future performance (an "Assumption and Assignment Objection") by **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)**, you will not be able to object to the transfer and assignment later in these Chapter 11 Cases. As noted above, you may have related rights as a consumer of electricity under state law and regulations (as those rights may be impacted by the Chapter 11 Cases).

If you object to the transfer of your Customer Contract to Exelon, your objection must (i) be in writing, (ii) be filed with the Bankruptcy Court, and (iii) be served as described below, so as to be actually received by **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "Assumption and Assignment Objection Deadline"). If you file an objection you must clearly explain the reason for your objection. All objections to the proposed assignment of your Customer Contract will be heard by the Bankruptcy Court at the Sale Hearing.

The Sale Hearing will take place before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140 on **November 5, 2019 at 2:00 p.m. (prevailing Eastern Time)**. A summary of the important dates and deadlines is below:

| | |
|---|---|
| October 15, 2019 | Deadline to file Executory Contract List and Potential Assumption and Assignment Notice |
| October 29, 2019 | Sale Objection Deadline and Assumption and Assignment Objection Deadline |
| November 4, 2019 | Notice of Auction Results (if applicable) |
| November 4, 2019 | Adequate Assurance Objection Deadline |

3

| November 5, 2019 | Sale Hearing regardless of whether the Auction is conducted |
| --- | --- |

### Filing Objections

Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount that the Contract Counterparty believes is required to cure defaults under the relevant Customer Contract, (d) be filed by no later than **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)** and (e) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III; cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin; kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com), and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

Adequate Assurance Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, (D) be filed by **no later than 4:00 p.m. (prevailing Eastern Time) on November 4, 2019** and (E) be served on the Assumption and Assignment Objection Notice Parties.

Sale Objections, if any, must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules (C) state, with specificity, the legal and factual bases thereof, (D) be filed with the Court by no later than **the Sale Objection Deadline** and (E) be served on Objection Notice Parties.

*[Remainder of this page left intentionally blank.]*

4

Dated:  October 15, 2019           **MCDERMOTT WILL & EMERY LLP**
New York, NY

                                   /s/_____

                                   Timothy W. Walsh
                                   Darren Azman
                                   Ravi Vohra
                                   340 Madison Avenue
                                   New York, NY 10173
                                   Telephone:  (212) 547-5615
                                   Facsimile:  (212) 547-5444
                                   Email: twwalsh@mwe.com
                                           dazman@mwe.com
                                           rvohra@mwe.com

                                   *Proposed Counsel to the Debtors*
                                   *and Debtors in Possession*

## Exhibit B

**Stalking Horse APA**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

dated as of

October 3, 2019

by and between

AGERA ENERGY LLC, energy.me midwest, llc, and AEQUITAS ENERGY, INC.

as Sellers,

and

EXELON GENERATION COMPANY, LLC

as Buyer

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS, RULES OF CONSTRUCTION AND ACCOUNTING TERMS....1

Section 1.01    Definitions.....................................................................................1
Section 1.02    Rules of Construction................................................................15

ARTICLE 2 PURCHASE AND SALE .............................................................................16

Section 2.01    Purchase and Sale ......................................................................16
Section 2.02    Excluded Assets .........................................................................17
Section 2.03    Assumed Liabilities....................................................................18
Section 2.04    Excluded Liabilities ...................................................................19
Section 2.05    Non-Assignable Assets ..............................................................20
Section 2.06    Deposit .......................................................................................20
Section 2.07    Purchase Price; Purchase Price Adjustment...........................22
Section 2.08    Allocation of Purchase Price .....................................................25
Section 2.09    Closing .......................................................................................25
Section 2.10    Deliveries at Closing .................................................................26

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS................................27

Section 3.01    Corporate Existence and Power .................................................27
Section 3.02    Corporate Authorization............................................................27
Section 3.03    Governmental Notice .................................................................27
Section 3.04    Non-Contravention.....................................................................28
Section 3.05    Finders' Fees ..............................................................................28
Section 3.06    Litigation....................................................................................28
Section 3.07    Taxes ..........................................................................................28
Section 3.08    Title to Purchased Assets ..........................................................29
Section 3.09    [Reserved] ..................................................................................29
Section 3.10    Contracts....................................................................................29
Section 3.11    [Reserved] ..................................................................................30
Section 3.12    [Reserved] ..................................................................................30
Section 3.13    Credit Support............................................................................30
Section 3.14    Obligations Pending Entry of Sale Order .................................31
Section 3.15    Diligence ....................................................................................31
Section 3.16    Records.......................................................................................31
Section 3.17    Regulatory Qualification ...........................................................31
Section 3.18    Representations Complete..........................................................31

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ....................................32

Section 4.01    Corporate Existence and Power .................................................33
Section 4.02    Corporate Authorization............................................................33
Section 4.03    Governmental Authorization......................................................33

i

| | | |
|---|---|---|
| Section 4.04 | Non-Contravention | 33 |
| Section 4.05 | Finders' Fees | 33 |
| Section 4.06 | Available Funds | 33 |
| Section 4.07 | Solvency | 33 |
| Section 4.08 | Litigation | 33 |
| Section 4.09 | Independent Investigation | 34 |
| Section 4.10 | Regulatory and Contractual Requirements | 34 |

ARTICLE 5 COVENANTS OF SELLERS ........................................................34

| | | |
|---|---|---|
| Section 5.01 | Access to Information; Delivery of Information | 34 |
| Section 5.02 | Data Room Access | 36 |
| Section 5.03 | Conduct of Business | 36 |
| Section 5.04 | Required Consents | 37 |
| Section 5.05 | Non-Competition | 37 |
| Section 5.06 | License to Purchased IP | 38 |
| Section 5.07 | Renewals | 39 |

ARTICLE 6 COVENANTS OF BUYER ...........................................................39

| | | |
|---|---|---|
| Section 6.01 | Access | 39 |
| Section 6.02 | Financing | 40 |
| Section 6.03 | Brokers | 40 |
| Section 6.04 | Contact | 40 |
| Section 6.05 | Use of Seller Marks | 40 |
| Section 6.06 | Existing Customers | 40 |
| Section 6.07 | Broker Payments | 41 |

ARTICLE 7 COVENANTS OF BUYER AND SELLER .........................................41

| | | |
|---|---|---|
| Section 7.01 | Efforts; Further Assurances | 41 |
| Section 7.02 | Certain Actions | 42 |
| Section 7.03 | Public Announcements | 42 |
| Section 7.04 | Seller Disclosure Schedule Supplements | 42 |
| Section 7.05 | Approvals | 43 |
| Section 7.06 | Notices of Certain Events | 43 |
| Section 7.07 | Confidentiality | 43 |
| Section 7.08 | Accounts Receivable; Prorated Costs and Expenses | 44 |
| Section 7.09 | Netting | 46 |
| Section 7.10 | Credit Support | 46 |
| Section 7.11 | Submission for Bankruptcy Court Approval | 47 |
| Section 7.12 | Overbid Procedures; Adequate Assurance | 49 |
| Section 7.13 | Expense Reimbursement and Termination Fee | 50 |
| Section 7.14 | Cure Payments | 50 |
| Section 7.15 | Rejected Contracts | 50 |
| Section 7.16 | Competing Bids | 50 |
| Section 7.17 | Customer Transition | 51 |

DM_US 161223486-35.108028.0011

Section 7.18        Post-Closing Cooperation ...................................................51
Section 7.19        Employee Matters ...............................................................52
Section 7.20        Hedges. ...............................................................................52
Section 7.21        Natural Gas Storage and Inventory. ....................................52
Section 7.22        Customer Notifications .......................................................52

ARTICLE 8 TAX MATTERS ..............................................................................53

Section 8.01        Tax Definitions. ..................................................................53
Section 8.02        Tax Cooperation; Allocation of Taxes ................................53

ARTICLE 9 CONDITIONS TO CLOSING ..........................................................54

Section 9.01        Conditions to Obligations of Buyer and Seller ...................54
Section 9.02        Conditions to Obligations of Buyer .....................................55
Section 9.03        Conditions to Obligation of Each Seller ..............................56
Section 9.04        Frustration of Closing Conditions .......................................57

ARTICLE 10 TERMINATION ............................................................................57

Section 10.01       Grounds for Termination. ....................................................57
Section 10.02       Effect of Termination ..........................................................59

ARTICLE 11 MISCELLANEOUS .......................................................................60

Section 11.01       Limited Survival of Representations and Warranties;
                    Indemnity ............................................................................60
Section 11.02       Notices. ................................................................................62
Section 11.03       Amendments and Waivers ...................................................63
Section 11.04       Expenses ..............................................................................64
Section 11.05       Successors and Assigns ........................................................64
Section 11.06       Governing Law. ...................................................................64
Section 11.07       Jurisdiction ..........................................................................64
Section 11.08       Waiver of Jury Trial ............................................................65
Section 11.09       Counterparts; Third Party Beneficiaries ..............................65
Section 11.10       Entire Agreement ................................................................65
Section 11.11       Exhibits and Schedules ........................................................65
Section 11.12       Captions ...............................................................................65
Section 11.13       Severability ..........................................................................65
Section 11.14       Time is of the Essence. ........................................................65
Section 11.15       Specific Performance ..........................................................65
Section 11.16       Waiver of Consequential Damages ......................................66

iii

# EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption Agreement |
| Exhibit B | Form of Bidding Procedures and Sale Motion |
| Exhibit C | Form of Bidding Procedures Order |
| Exhibit D | [Reserved] |
| Exhibit E | Form of Escrow Agreement |
| Exhibit F | Form of Novation Agreement |

# ANNEXES

| | |
|---|---|
| Annex 1.01 | Acceptable Renewed Contracts – Margin |
| Annex 1.02 | Acceptable Renewed Contracts – Calculation of Margin |
| Annex 2.07(b) | Purchase Price Adjustment Methodology |
| Annex 2.07(b)(vii) | Storage Values |
| Annex 5.01 | Required Customer Data |
| Annex 7.20 | Hedge Novation Dates/Contract Quantities |

# SCHEDULES

| | |
|---|---|
| Section 1.01(a) | Knowledge Persons of Sellers |
| Section 1.01(b) | Knowledge Persons of Buyer |
| Section 1.01(c) | Permitted Liens |
| Section 2.01(a) | Assigned Contracts |
| Section 2.01(h) | Hedge/Supply Contracts |
| Section 2.01(i) | Purchased IP & Licensed IP |
| Section 2.01(j) | Storage |
| Section 2.03 | Assumed Liabilities |
| Section 2.06 | Broker Payments |
| Section 3.03 | Governmental Notice |
| Section 3.05 | Finders' Fees |
| Section 3.06 | Litigation |
| Section 3.07 | Taxes |
| Section 3.10 | Contracts |
| Section 4.03 | Governmental Authorization (Buyer) |
| Section 4.04 | Non-Contravention (Buyer) |
| Section 4.08 | Litigation (Buyer) |
| Section 5.03 | Conduct of Business |
| Section 6.05 | Licensed Marks |
| Section 7.14 | Cure Payments |

iv

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*"), dated October 3, 2019 (the "*Execution Date*"), is entered into by and among Agera Energy LLC, a Delaware limited liability company ("*Agera*"), energy.me midwest llc, an Illinois limited liability company ("*energy.me*"), and Aequitas Energy, Inc., a Connecticut corporation ("*Aequitas*" and, together with Agera and energy.me, the "*Sellers*" and, each individually, a "*Seller*") and Exelon Generation Company, LLC, a Pennsylvania limited liability company (together with permitted assigns, "*Buyer*"). Sellers and Buyer are together referred to herein as the "*Parties*" and each individually as a "*Party*".

## RECITALS

A.      Sellers are engaged in the business of marketing and selling electricity and/or natural gas and/or related products and/or services to Customers in California, Connecticut, Delaware, Illinois, Massachusetts, Maryland, Maine, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas, Virginia and Washington, D.C.

B.      On or about October 4, 2019, Sellers, together with certain of their Affiliates and subsidiaries (Sellers and such Affiliates and subsidiaries, collectively, the "*Debtors*"), intend to commence voluntary cases (the "*Bankruptcy Cases*") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (White Plains) (the "*Bankruptcy Court*"), the date of commencement of the Bankruptcy Cases in the Bankruptcy Court being the "*Petition Date*".

C.      Sellers desire to sell and transfer the Purchased Assets and Assumed Liabilities to Buyer, and Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions set forth in this Agreement and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual promises herein made and the mutual benefits to be derived therefrom, and in consideration of the representations, warranties, and covenants contained herein, the Parties agree as follows:

## ARTICLE 1

## DEFINITIONS, RULES OF CONSTRUCTION AND ACCOUNTING TERMS

**Section 1.01   Definitions**.  The following terms and phrases, as used in this Agreement, have the following meanings:

"*Acceptable Renewed Contract*" means any Assigned Contract that has been extended or renewed; *provided*, in each case, that any such Assigned Contract (i) (a) was entered into in compliance with Sections 5.03 and 5.07; (b) has a corresponding Renewal Hedge relating to such Assigned Contract listed in Part 2 of Section 2.01(h) of the Seller Disclosure Schedule; and (c) (x) if renewed or extended prior to the Closing Date, such Assigned Contract has a positive net margin (determined consistently with Column R of Annex 1.02) of at least that dollar amount identified on Annex 1.01 for each applicable zone and customer class, as determined using the same methodology and value components set forth on Annex 1.02, which the Parties acknowledge are

Sellers' customary methodology and value components as used in the Ordinary Course of Business, (y) if renewed or extended on or after the Closing Date, if (A) representing a Large Customer Contract, has pricing terms for the renewal or extension that were approved by Buyer, or (B) representing a Contract other than a Large Customer Contract, has pricing terms for the renewal or extension consistent with the most recent pricing matrix provided by Buyer; or (ii) to the extent not in compliance with clauses (i)(a) through (i)(c), above, has pricing terms that are approved by Buyer in its sole discretion.

"*Account Deadline*" is defined in Section 7.17(b).

"*Account Transfer Date*" means, for any account covered by an Assigned Contract, a date that has been accepted (as evidenced by a confirmed electronic data interchange response) by the relevant electric utility or natural gas local distribution company as the date upon which responsibility for such account will transfer from a Seller to Buyer.

"*Additional Deposit*" is defined in Section 2.06(b).

"*Aequitas*" is defined in the preamble.

"*Affiliate*" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under Common Control with, such first Person; provided, that, with respect to Seller, for purposes of the first clause of the definition of "Records" and Section 5.05, 5.06, 7.07, and 7.17, "Affiliate" shall mean Agera Holdings, LLC, any of its direct or indirect subsidiaries, and any officer or director of Agera Holdings, LLC or any of its direct or indirect subsidiaries; provided, further, that all such officers and directors shall cease to be considered Affiliates of Sellers upon the earlier of (i) the Account Deadline, (ii) except with respect to Section 5.05(a)(i), the date on which any such officer or director is no longer employed with, or otherwise serving as an officer or director of, any Seller or of Agera Holdings, LLC and (ii) the date of termination of this Agreement.

"*Agera*" is defined in the preamble.

"*Agera/BP ISDA*" means that certain ISDA 2002 Master Agreement, dated as of May 5, 2015 (including all schedules, annexes, exhibits, and appendices thereto and all confirmations thereunder, in each case, as amended, restated, supplemented or otherwise modified), by and among Sellers and BP.

"*Agreement*" is defined in the preamble.

"*Allocation*" is defined in Section 2.08(a).

"*Alternative Transaction*" means a sale, assignment, transfer or other disposition, directly or indirectly, of all or a material portion of the Purchased Assets to any Person (or group of Persons), other than to Buyer or an Affiliate of Buyer.

"*Apportioned Obligations*" is defined in Section 8.02(b).

"*Assigned Contracts*" is defined in Section 2.01(a).

2

"***Assignment and Assumption Agreement***" means the Assignment and Assumption Agreement in the form set forth on <u>Exhibit A</u>.

"***Assignment Date***" means, (a) with respect to any Purchased Asset other than Assigned Contracts and Storage, the Closing Date, (b) with respect to each Assigned Contract, the date on which the account associated with such Assigned Contract is transferred to Buyer's account on the records of the applicable electric utility or natural gas local distribution company, and (c) with respect to Storage, the Assignment Date of the Assigned Contract to which such Storage relates.

"***Assignment Notice Date***" is defined in Section 7.22.

"***Assignment Notices***" is defined in Section 7.22.

"***Assumed Liabilities***" is defined in Section 2.03.

"***Attorney Work Product***" means all attorney-client privileged or attorney work product protected notes, memoranda, correspondence or similar material reflecting the legal conclusions, recommendations, privileged communications or other privileged or legally protected work product of or to attorneys, whether they be in-house or external, acting as counsel to Sellers or any of their Affiliates in matters relating to any Purchased Asset, Assumed Liability, Excluded Asset, or Excluded Liability.

"***Auction***" is defined in Section 7.12(a).

"***Backup Bidder***" has the meaning set forth in the Bidding Procedures.

"***Bankruptcy Cases***" is defined in the Recitals.

"***Bankruptcy Code***" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*.

"***Bankruptcy Court***" is defined in the Recitals.

"***Base Price***" is defined in Section 2.07(a).

"***Bid Deadline***" has the meaning set forth in the Bidding Procedures.

"***Bidding Procedures***" has the meaning set forth in the Bidding Procedures and Sale Motion.

"***Bidding Procedures and Sale Motion***" means one or more motions and notices filed in the Bankruptcy Cases by Sellers, in each case in form and substance as set forth in <u>Exhibit B</u> or as otherwise modified by Sellers, as agreed to by Buyer, in the Parties' commercially reasonable discretion (such agreement not to be unreasonably withheld or conditioned so long as such motion is not inconsistent with, and does not limit the rights of Buyer under, this Agreement), and served on creditors and parties in interest, in accordance with the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, which motion(s) seeks, among other things, (i) authority from the Bankruptcy Court for Sellers to enter into this Agreement and to consummate

3

the transactions contemplated by this Agreement and (ii) entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order as proposed therein.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court, proposed in the Bidding Procedures and Sale Motion and substantially in the form attached hereto as <u>Exhibit C</u>, or as otherwise modified by Sellers, as agreed to by Buyer, in the parties' commercially reasonable discretion (such agreement not to be unreasonably withheld or conditioned so long as such Order is not inconsistent with, and does not limit the rights of Buyer under, this Agreement), approving, among other matters, payment of the Buyer Expense Reimbursement and/or Termination Fee if and when required under this Agreement.

"***BP***" means BP Energy Company.

"***Broker Payments***" is defined in Section 2.06(b).

"***Business***" means the business that is conducted by Sellers of marketing and selling electricity and/or natural gas and/or related products and/or services to Customers in California, Connecticut, Delaware, Illinois, Massachusetts, Maryland, Maine, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas, Virginia and Washington, D.C. and performing obligations under all Contracts with brokers.

"***Business Day***" means any day other than Saturday, Sunday or a day on which United States national banks are authorized or required by Law to be closed.

"***Buyer***" is defined in the preamble.

"***Buyer Disclosure Schedule***" means the schedules setting forth certain disclosures of Buyer, or qualifications or exceptions to any of Buyer's representations or warranties set forth in Article 4, which schedules are delivered simultaneously with the execution and delivery of this Agreement.

"***Buyer Expense Reimbursement***" means the sum of the aggregate amount of Buyer's reasonable, documented out-of-pocket costs and direct expenses (including expenses of outside counsel, accountants and financial advisors) incurred by Buyer prior to termination of this Agreement in connection with or related to Buyer's evaluation, consideration, analysis, negotiation, and documentation of a possible transaction with Sellers pursuant to this Agreement or otherwise incurred in connection with, related to, or in furtherance of the Transactions, up to a maximum amount of one percent (1.0%) of the Base Price, subject to approval by the Bankruptcy Court in the Bidding Procedures Order.

"***Buyer Material Adverse Effect***" means any event, fact, circumstance, effect or occurrence that materially and adversely affects the ability of Buyer to consummate the Transactions or perform its obligations under the Transaction Agreements, taken as a whole.

"***Cash Collateral***" has the meaning ascribed to in Section 363(a) of the Bankruptcy Code.

"***Claim***" means any contest, action, claim, assessment, demand, suit, complaint, inquiry, notice of violation, hearing, arbitration, Proceeding or investigation, whether civil, criminal or

4

administrative, by or before any Governmental Body or by or against any other Person, or notice of any of the foregoing involving any Person.

"***Claim Period***" is defined in Section 2.07(c)(ii).

"***Closing***" is defined in Section 2.09.

"***Closing Date***" means the date of the Closing.

"***Closing Date Reduction***" is defined in Section 2.07(b)(iv).

"***Closing Date Value***" is defined in Section 2.07(b)(iv).

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Competing Bid***" means any bid contemplating an Alternative Transaction.

"***Confidentiality Agreement***" means that certain Confidentiality Agreement, dated June 24, 2019, by and between Buyer and Sellers.

"***Consultation Parties***" means BP and any applicable creditor's committee.

"***Contract***" means all agreements, contracts, leases, commitments or obligations (whether written or oral), including all amendments and modifications thereof; provided that any item listed on Section 2.01(a) of the Seller Disclosure Schedule will be deemed to be a Contract hereunder.

"***Contract Quantities***" is defined in Annex 7.20.

"***Control***," including corresponding meaning of the terms "***Controlled by***" and "***under Common Control with***," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"***Copyright***" means copyrights, original works of authorship, and registrations, renewals and applications therefor.

"***Counterparty***" means a party to an Assigned Contract other than a Seller.

"***Counterparty Consent***" means the consent or approval of a Counterparty to the assignment of an Assigned Contract to Buyer under this Agreement that is required under the terms of that Assigned Contract or by Law.

"***Credit Support***" means any and all guaranties, letters of credit, reimbursement agreements, bonds, deposits, prepayments amounts and other credit or contractual assurances of a comparable nature made or issued by or for the account of Sellers for the benefit of a Counterparty under the Assigned Contracts or otherwise related to the Purchased Assets or Assumed Liabilities, including without limitation any such guaranties, letters of credit, reimbursement agreements,

bonds, deposits, prepayments amounts and other credit or contractual assurances of a comparable nature made for the benefit of any ISOs, RTOs, utilities and/or local distribution companies.

"***Cure Payments***" means the amount required to be paid with respect to each Assigned Contract to cure all defaults under such Assigned Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code as determined by the Bankruptcy Court, in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Sellers and assignment to Buyer of each such Assigned Contract.

"***Customer***" means a customer or Counterparty of a Seller, whether residential, mass market, commercial, industrial, municipal, cooperative, utility, public sector or government aggregation.

"***Damages***" means any losses, damages, Liabilities, costs or expenses of any kind, including reasonable attorneys' fees and expenses.

"***Data Room***" means the following folders contained in the electronic data room maintained by Sellers for the posting of documents for review by Buyer in connection with the Transactions which is located at https://projectacorn.firmex.com: "Transaction Documents," "Financial Information," "Customer and Contract Information," "Systems," "Real Estate," "Organization Documents," "Legal," "Human Resources," "Management Resumes," "LED Product Offering," "Regulatory Permits and Licenses," "DD (Exelon)," and "Exelon / BP Shared Folder".

"***Debtors***" is defined in the Recitals.

"***Deposit***" is defined in Section 2.06(b).

"***e-mail***" is defined in Section 11.02.

"***End Date***" is defined in Section 10.01(b).

"***energy.me***" is defined in the preamble.

"***Enforceable***" means, with respect to any Contract stated to be Enforceable by or against any Person, that such Contract is a legal, valid and binding obligation enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"***Escrow Account***" is defined in Section 2.06(a).

"***Escrow Agent***" is defined in Section 2.06(a).

"***Escrow Agreement***" is defined in Section 2.06(a).

6

"*Excess Amount*" is defined in Section 7.10.

"*Excluded Assets*" is defined in Section 2.02.

"*Excluded Liabilities*" is defined in Section 2.04.

"*Excluded Territory*" means (i) the gas utility service territories of Liberty Utilities (EnergyNorth Natural Gas), National Grid (Niagara Mohawk Power Corp.), National Fuel Gas (Pennsylvania), and National Grid (Rhode Island); (ii) the electric utility service territories of UGI Corporation and Public Service Enterprise Group (PSEG) (Long Island, New York); and (iii) the following Customer classes in certain states: California (all core gas Customers on Mass Market Contracts, unless tied to a noncore commercial and industrial Customer with an active monthly average usage equal to or in excess of 20,800 therms), Maine (all electric Customers on Mass Market Contracts), New Hampshire (all electric customers on Mass Market Contracts, unless tied to a larger commercial and industrial Customer with an annual average usage equal to or in excess of 20kW, and all gas Customers), and Rhode Island (all gas and electric Customers on Mass Market Contracts, and small commercial Customers with an annual average usage of less than 500,000 Mcf for gas).

"*Execution Date*" is defined in the preamble.

"*Final Assignment Date*" means the Assignment Date last occurring hereunder, which shall be no later than one hundred twenty (120) days following the Closing Date.

"*Final Order*" means an Order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, modified or stayed, and as to which the time for appeal has expired, and as to which the deadline for filing any motion or petition for review, rehearing or certiorari has expired, and as to which no appeal, motion or petition for review, rehearing or certiorari is pending.

"*Final Purchase Price*" is defined in Section 2.07(b)(vii).

"*GAAP*" means United States generally accepted accounting principles in effect from time to time, consistently applied.

"*Gas True-Up Costs*" means, if Sellers do not transfer or cause the transfer to Buyer in accordance with this Agreement, of sufficient Storage to satisfy the greater of (i) those amounts calculated in accordance with Annex 2.07(b)(vii) in accordance with this Agreement, and (ii) those amounts required by the applicable utility, pipeline or local distribution company tariff, in each case, for each month from the Execution Date through the Final Assignment Date, the amount calculated in accordance with Annex 2.07(b)(vii) as the value.

"*Government Aggregation Contract*" means a Contract with a Governmental Body under which a Seller provides retail electricity, natural gas and/or related services to mass market and other Customers within such Governmental Body's geographic boundaries.

"*Governmental Body*" means any federal, state, county, municipal, local or foreign government or entity or any legislature, agency, bureau, branch, department, division, commission,

7

court, tribunal, magistrate, justice, arbitrator, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or any ISO or RTO or other similar recognized organization or body exercising similar powers or authority, including any state public utility commission or similar authority.

"*Guaranteed Minimum Amount*" is defined in Section 2.10(b)(i).

"*Hedges*" means any swap, option, swaption, hedge, collar, futures or similar Contract involving natural gas or electricity or any other commodities trading Contract.

"*Initial Deposit*" is defined in Section 2.06(a).

"*Initial Hedges*" is defined in Section 2.01(h).

"*Intellectual Property*" means all rights and interests arising under the Laws of the United States with respect to any of the following: (a) Marks; (b) Patents; (c) Copyrights; (d) Proprietary Information; (e) Software; and (f) all other intellectual property rights recognized under applicable Law.

"*Intercompany Arrangements*" is defined in Section 2.02(d).

"*ISO*" is defined in Section 7.10.

"*ISO/RTO Credit Requirement Adjustments*" is defined in Section 7.10

"*Key Due Diligence Files*" means the following files:  (a) the file titled "Gas Due Diligence - Updated fields - 20190625-03 Index Mapping.xlsx" contained in the Data Room within the "DD (Exelon)" folder uploaded on July 23, 2019; (b) the file titled "Electric Due Diligence - 20190725-01.xlsx" contained in the Data Room within the "DD (Exelon)" folder uploaded on July 25, 2019; (c) the file titled "Deal Tickets_cap risk.xlsx" contained in the Data Room within the "DD (Exelon) folder" uploaded on September 30, 2019; (d) the file titled "new and renewals of not wanted since 7_25 DD file.xlsx" contained in the Data Room within the "DD (Exelon) folder" uploaded on September 30, 2019; and (e) the file titled "multiple contract id on same contract.xlsx" contained in the Data Room within the "DD (Exelon) folder" uploaded on September 30, 2019.

"*Knowledge*" as applied to (a) any Seller, means that the persons listed underneath such Seller's name on Section 1.01(a) of the Seller Disclosure Schedule are actually aware of a particular fact on any particular date of determination and (b) Buyer, means that the persons listed on Section 1.01(b) of the Buyer Disclosure Schedule are actually aware of a particular fact on any particular date of determination and in the case of both (a) and (b) above, such knowledge as any such individual would have obtained after making reasonable inquiry into such fact or matter.

"*Large Customer Contract*" means an Assigned Contract under which the applicable Counterparty is expected to purchase an electric load of more than 1,000 MWh per year or a natural gas load of more than 25,000 Dth per year.

DM_US 161223486-35.108028.0011

"*Law*" means any federal, state, local, municipal or foreign (including supranational) law (including common law), statute, ordinance, rule, code, directive, ruling, regulation, judgment, Order, injunction, decree, arbitration award, agency requirement, license or Permit of any Governmental Body having or asserting jurisdiction over the Parties or any of their assets.

"*Liabilities*" means any and all liabilities and obligations of any kind and nature, whether known or unknown, express or implied, primarily or secondarily, direct or indirect, secured or unsecured, liquidated or unliquidated, absolute, accrued, contingent or otherwise and whether due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required by GAAP to be accrued on the financial statements of such Person.

"*Licensed IP*" is defined in Section 2.01(a)(i).

"*Licensed Marks*" means the Marks listed on <u>Section 6.05</u> of the Seller Disclosure Schedule.

"*Lien*" means, with respect to any property or asset, any mortgage, lien, encumbrance, pledge, charge, security interest, warrant, claim, equitable interest, option, restriction, conditional sale or other title retention device or arrangement.

"*Marks*" means trademarks, service marks, trade dress, Internet domain names, trade names, business names or any other indications of origin, and registrations and applications therefor, and the goodwill symbolized thereby.

"*Mass Market Account Value*" is defined in Section 2.07(b)(i).

"*Mass Market Contract*" means, as of any date of determination, a Contract with a Customer (except for any Government Aggregation Contracts) for the retail supply of electricity and/or natural gas and/or related services with an electric load of equal to or less than 10 MWh or a natural gas load of equal to or less than 1,000 therms, in each case during the 12-month period prior to such date of determination, or that is reasonably expected to have an electric load of equal to or less than 10 MWh or a natural gas load of equal to or less than 1,000 therms, in each case in the 12-month period immediately following such date of determination.

"*Material*" when used with respect to Buyer, means material to the ability of Buyer to consummate the Transactions or perform its obligations under the Transaction Agreements, and when used with respect to a Seller, means material to any Purchased Asset or group of Purchased Assets or any Assumed Liabilities, or material to the ability of Sellers to consummate the Transactions or perform their obligations under the Transaction Agreements.

"*Natural Gas Storage and Inventory Value*" is defined in Section 2.07(b)(vii).

"*Non-Assignable Asset*" is defined in Section 2.05.

"*Notice Party*" is defined in Section 7.22.

9

"*Order*" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Body, arbitrator, or mediator (in each case whether preliminary or final).

"*Ordinary Course Complaints*" is defined in the Seller Disclosure Schedule.

"*Ordinary Course of Business*" means the ordinary course of business of Sellers as it pertains to the Business, consistent with past practice, including with respect to continued marketing and sales efforts.

"*Organizational Documents*" means the certificate of limited partnership, limited partnership agreement, certificate of formation, limited liability company operating agreement, certificate or articles of incorporation, bylaws or similar organizational document, including any and all equity holders' agreements, voting agreements, voting trust agreements or other similar agreements or documents relating to the organization, management or operation of such entity, as applicable.

"*Party*" or "*Parties*" is defined in the preamble.

"*Patents*" means patents and applications therefor, including all reissues, divisionals, renewals, extensions, reexaminations, provisionals, continuations and continuations-in-part thereof.

"*Permit*" means any permit, license, certificate, approval, consent, notice, waiver, franchise, registration, filing, accreditation, or other similar authorization required, issued or issuable pursuant to any Law, obtained or obtainable from a Governmental Body, or by or under Contract.

"*Permitted Liens*" means: (a) generally applicable requirements under applicable Law that do not materially interfere with or materially affect the use of the respective underlying asset to which such applicable Law relates; (b) Liens reflected on <u>Section 1.01(c)</u> of the Seller Disclosure Schedule; (c) Liens for Taxes or other governmental charge or assessments not yet due and payable or, if due, being contested in good faith by appropriate proceedings, in each case that do not and will not attach to the Purchased Assets, or otherwise impact the value of the Purchased Assets, upon or following assignment thereof to Buyer hereunder; and (d) mechanics', workmen's, repairmen's, warehousemen's, carriers' or other similar Liens arising in the Ordinary Course of Business and for amounts not yet due and payable or, if due, being contested in good faith and not Material to Sellers, in each case that do not and will not attach to the Purchased Assets, or otherwise impact the value of the Purchased Assets, upon or following assignment thereof to Buyer hereunder, and (e) Liens of the Buyer.

"*Person*" means an individual, corporation, partnership, limited liability company, association, trust, an incorporated organization, or other entity or organization, including a Governmental Body and any department or agency thereof.

"*Petition Date*" is defined in the Recitals.

10

"*PJM*" is defined in Section 7.10.

"*Post-Closing Account Value*" is defined in Section 2.07(b)(v).

"*Post-Closing Account Value Change*" is defined in Section 2.07(b)(v).

"*Post-Closing Date Reduction*" is defined in Section 2.07(b)(vi).

"*Post-Closing Date Value*" is defined in Section 2.07(b)(vi).

"*Post-Closing Tax Period*" is defined in Section 8.02(b).

"*Post-Closing Valuation Date*" is defined in Section 2.07(b)(ii).

"*Pre-Closing Account Value*" is defined in Section 2.07(b)(iii).

"*Pre-Closing Account Value Change*" is defined in Section 2.07(b)(iii).

"*Pre-Closing Tax Period*" is defined in Section 8.01.

"*Pre-Closing Valuation Date*" is defined in Section 2.07(b)(ii).

"*Proceeding*" means any action, suit, demand, Claim or legal administrative, arbitration or other alternative dispute resolution proceeding, hearing or investigation, but not including the Bankruptcy Cases.

"*Proprietary Information*" means all information, practices, algorithms, specifications, data, know-how, show-how, formulae, status, plans, forecasts, trade secrets, technical information, business data including Customer lists and other Customer information (current and historical) and related knowledge, expertise, inventions, discoveries, processes, models, techniques, methods, drawings and associated data, manuals, designs, engineering work, studies including environmental studies, diligence, applications, Permits, properties, rights, Federal or state issued licenses and Permits and application materials and status including positions within any queues in the regulatory process with any state of Federal agencies, in each case irrespective as to whether such information and data is available by way of documentation, orally or in electronic format; provided, however, that Patents, Marks and Copyrights are not part of Proprietary Information.

"*Proration Period*" is defined in Section 8.02(b).

"*Purchased Assets*" is defined in Section 2.01.

"*Purchased IP*" is defined in Section 2.01(a)(i).

"*Qualified Bidder*" has the meaning set forth in the Bidding Procedures.

"*Records*" means copies of Contracts with third party brokers, Customer invoices for the 12 months prior to the Execution Date and ending on the Final Assignment Date, Customer Tax exemption certificates, and Customer lists (including telephone numbers and e-mail addresses), including all data and electronic information related to the foregoing stored or archived in any

11

server, computer, laptop, network, system, or other electronic database (including any such data or information stored in any Excluded Asset) in each case, to the extent in any Seller's possession or control (or in the possession or control of any Affiliate of any Seller), and to the extent relating to the Purchased Assets or Assumed Liabilities; provided, however, that, notwithstanding anything herein to the contrary, Buyer is not taking assignment of any Contracts with brokers; provided, further, that "Records" excludes (a) the accounting and financial books (including Tax Returns) and financial records relating to any Seller generally and Organizational Documents of any Seller and their respective Affiliates, (b) any Attorney Work Product, (c) any material that any Seller is prohibited from sharing with or transferring to Buyer by any confidentiality obligations after reasonable best efforts by Sellers to obtain consent to disclose and transfer such material to Buyer, and (d) any models, forecasts or similar documents prepared in connection with these Transactions. Notwithstanding the foregoing, it is acknowledged and agreed that Sellers shall have the right to retain their own copies of all Records solely for use in the Bankruptcy Cases and in the wind down of the Business (and subject in each case to the confidentiality provisions set forth in Section 7.07) following completion of which such copies shall be destroyed or deleted, as applicable.

"*Related Party*" is defined in Section 10.02(c).

"*Removed Account*" is defined in Section 7.17(b).

"*Renewal Hedges*" is defined in Section 5.07.

"*Required Consents*" is defined in Section 11.01(c)(iv).

"*Restructuring Support Agreement*" means that certain Binding RSA Term Sheet dated October 3, 2019 by and among BP, Sellers, Agera Holdings, LLC, Briarcliff Property Group, LLC, Utility Recovery LLC, and Agera Solutions LLC.

"*Retained Accounts Receivable*" is defined in Section 7.08(a).

"*RPS Noncompliance*" is defined in the Seller Disclosure Schedule.

"*RTO*" is defined in Section 7.10.

"*Sale Hearing*" means the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"*Sale Order*" means the order of the Bankruptcy Court, as agreed to by Buyer, in Buyer's commercially reasonable discretion (such agreement not to be unreasonably withheld or conditioned so long as such order is not inconsistent with, and does not limit the rights of Buyer under, this Agreement), which, among other things: (a) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution and delivery by Sellers of this Agreement, (ii) the performance by Sellers of their obligations under this Agreement, and (iii) the sale of the Purchased Assets from Sellers to Buyer free and clear of all Liens other than Permitted Liens on the terms set forth herein; (b) authorizes Sellers to assume and assign to Buyer the Assigned Contracts; (c) finds that Buyer is not a successor to Sellers or any of their Affiliates or subsidiaries;

12

and (d) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the full protections provided thereby.

"***Schedule Supplement***" is defined in Section 7.04.

"***Seller***" or "***Sellers***" is defined in the preamble.

"***Seller Competitive Business***" is defined in Section 5.05(a).

"***Seller Disclosure Schedule***" means the schedules setting forth certain disclosures of Sellers, or qualifications or exceptions to Sellers' representations or warranties set forth in Article 3, which schedules are delivered simultaneously with the execution and delivery of this Agreement and shall be supplemented in accordance with Section 7.04 hereof.

"***Seller Material Adverse Effect***" means any fact, change, circumstance, occurrence, effect, event, result or development that has or could reasonably be expected to have a material adverse effect on (a) Sellers' ability to consummate the Transactions or perform their obligations under any Transaction Agreement to which they are a party, (b) the value of the Purchased Assets, taken as a whole, or (c) the amount or nature of the Assumed Liabilities, taken as a whole; provided, however, that no facts, changes, circumstances, occurrences, effects, events, result or developments by themselves or when aggregated with any other facts, changes, circumstances, occurrences, effects or events, resulting from, relating to or arising out of the following shall be deemed to be or constitute a Seller Material Adverse Effect or shall be taken into account when determining whether there has been a Seller Material Adverse Effect (except, with respect to any fact, change, circumstance, occurrence, effect or event described in clauses (i), (ii), (iii) or (v)(C), to the extent that it has a disproportionate impact on the Purchased Assets or the Assumed Liabilities relative to other similarly situated electricity or gas retail businesses, but then only the extent of such disproportionate impact shall be considered for purposes of determining if a Seller Material Adverse Effect has occurred): (i) any changes in general economic (including changes in foreign exchange rates), financial or securities markets in the United States or elsewhere in the world in which Seller operates, any outbreak or escalation of hostilities, weather, climate change, acts of God, declared or undeclared acts of war or terrorism or political or regulatory conditions in the electricity or gas retail industry; (ii) any change (including any Law of any Governmental Body, ISO or RTO) or effect generally affecting the North American, national, regional, state or local fuel supply or transportation markets, or electric or natural gas generating, transmission, distribution or retail industry (or any electric or gas generating, transmission, distribution or retail system or market (or access thereto)), including prices; (iii) the seasonality of the Business; (iv) effects of public perceptions of electricity or natural gas providers generally; (v) the effect of (A) compliance with this Agreement or the announcement, pendency or consummation of the Transactions, including the identity of Buyer and its Affiliates, (B) any actions taken (or not taken) at the request of Buyer to the extent taken in accordance with the specific directions of Buyer, (C) any changes in applicable Law or GAAP or interpretation thereof or (D) any matter set forth in the Seller Disclosure Schedule as of the Execution Date; (vi) a failure of Sellers to meet any projections, forecasts or estimates (but not the underlying cause of such failure), (vii) any changes in the credit rating of Sellers (but not the underlying cause of such change); (viii) Seller filing for protection under Chapter 11 of the U.S. Bankruptcy Code or the pendency of the Bankruptcy Cases; (ix) any objections in the Bankruptcy Court to (A) this Agreement, any Transaction

13

Agreement to which a Seller is a Party or the Transactions, (B) the reorganization of the Debtors and any related plan of reorganization or disclosure statement, (C) the Bidding Procedures and Sale Motion, the Bidding Procedures Order or the Sale Order or (D) the assumption or rejection of any Assigned Contracts (but not any termination of any Contract or other adverse action taken by any Customer whether or not related thereto); and (x) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith. For the avoidance of doubt, any fact, change, circumstance, occurrence, effect, event, result or development that has been disclosed on the Seller Disclosure Schedules as of the Execution Date shall not constitute a "Seller Material Adverse Effect".

"***Settlement Fees***" is defined in Section 7.08(d).

"***Significant Contract***" means (a) any Government Aggregation Contract; (b) any Assigned Contracts pursuant to which any Seller or the applicable Counterparty spent or received $100,000.00 or more in the calendar year 2018 or is reasonably expected to spend or receive $100,000.00 or more in the calendar year 2019 or beyond; and (c) any Contract with a Customer for the retail supply of electricity and/or related services with an electric load greater than 10 MWh or a natural gas load greater than 1,000 therms, in each case during the 12-month period prior to such date of determination, or that is reasonably expected to have an electric load greater than 10 MWh or a natural gas load greater than 1,000 therms, in each case in the 12-month period immediately following such date of determination.

"***Significant Contract Account Value***" is defined in Section 2.07(b)(i).

"***Software***" means computer software programs, systems, and algorithms, including all databases, compilations, tool sets, compilers, higher level or "proprietary" languages, and related documentation and materials, statements of principles of operation and schematics, as well as any pertinent commentary, explanation, programs including compilers, workbenches, whether in source code, object code, machine readable or human readable form.

"***Storage***" is defined in Section 2.01(j).

"***Successful Bidder***" has the meaning set forth in the Bidding Procedures.

"***Tax***" is defined in Section 8.01.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement relating to Taxes, including any amended return, extension request with respect thereto and any schedule or attachment thereto.

"***Taxing Authority***" is defined in Section 8.01.

"***Termination Fee***" means an amount in cash equal to four percent (4.0%) of the Base Price.

"***Third Party***" means all Persons except the Parties.

14

"*Transaction Agreements*" means each of this Agreement, the Assignment and Assumption Agreement, the Escrow Agreement, and any other agreements, documents or certificates that may be executed and delivered by a Party or an Affiliate thereof at or in connection with the Closing.

"*Transactions*" means, collectively, the transactions contemplated by the Transaction Agreements.

"*Transfer Taxes*" is defined in Section 8.02(c).

"*Valuation Reference Date Account Value*" is defined in Section 2.07(b)(i).

**Section 1.02    Rules of Construction**.

(a)    The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement.

(b)    Unless the context of this Agreement otherwise clearly specifies or otherwise requires, (i) references to the plural include the singular, (ii) references to the singular include the plural, (iii) references to any gender include the other gender, (iv) the term "including" is not limiting and has the inclusive meaning represented by the phrase "including, without limitation," (v) the term "include" is not limiting and has the inclusive meaning represented by the phrase "include without limitation," (vi) the term "includes" is not limiting and has the inclusive meaning represented by the phrase "includes, without limitation," (vii) the terms "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, and (viii) the terms "day" and "days" mean and refer to calendar day(s).

(c)    Unless otherwise set forth herein, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules, disclosure schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and the terms herein and in effect at any given time, and (ii) a particular Law means such Law as amended, modified, supplemented or succeeded, unless the context requires otherwise. All Articles, Sections, Exhibits and Schedules referenced herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified.

(d)    If any condition to Closing contained herein has not been satisfied in any respect, the fact that there exists another condition relating to the same or similar subject matter (regardless of the relative levels of specificity) that has been satisfied shall not detract from or mitigate the fact that the first condition has not been satisfied.

15

## ARTICLE 2

## PURCHASE AND SALE

**Section 2.01    Purchase and Sale**.  Except as otherwise provided in Section 2.02, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase, acquire and accept from each applicable Seller and each Seller agrees to sell, convey, transfer, assign and deliver to Buyer on the applicable Assignment Date, free and clear of all Liens, other than Permitted Liens, all of Seller's right, title and interest in, to and under the following assets as the same shall exist on the applicable Assignment Date, in each case to the extent set forth in the Sale Order (the "***Purchased Assets***"):

(a)    all Contracts with Customers of the Business that are listed or referenced on Section 2.01(a) of the Seller Disclosure Schedule (it being understood that Buyer, at any time prior to the date that is seven (7) Business Days following the Petition Date, may direct Sellers to modify Section 2.01(a) of the Seller Disclosure Schedule by removing any Contract that corresponds to an account identified in Annex 2.07(b) as having an agreed specific account value (or aggregate agreed specific account value) of $0), all Acceptable Renewed Contracts and, to the extent Buyer elects to include such Contract on Section 2.01(a) of the Seller Disclosure Schedule prior to the entry of the Bidding Procedures Order, each new Contract entered into by a Seller with Customers of the Business (other than those with Customers located in an Excluded Territory) (each, an "***Assigned Contract***" and, together, the "***Assigned Contracts***"), but excluding any Assigned Contract that has expired (other than Acceptable Renewed Contracts) or otherwise been terminated prior to the Closing or the applicable Assignment Date in accordance with the terms hereof. Section 2.01(a) of the Seller Disclosure Schedule shall include:

(i)    a list of all Customer accounts corresponding to all Significant Contracts (other than Government Aggregation Contracts);

(ii)    a list of all Customer accounts corresponding to all Government Aggregation Contracts; and

(iii)    a list of all Customer accounts corresponding to all Mass Market Contracts.

(b)    rights to all Claims of Sellers under the Assigned Contracts to the extent relating to periods on or after the applicable Assignment Date;

(c)    all accounts receivable and other receivables arising under the Assigned Contracts to the extent relating to periods on or after the applicable Assignment Date;

(d)    claims, defenses and rights of offset or counterclaim in respect of the Purchased Assets or Assumed Liabilities to the extent relating to periods on or after the applicable Assignment Date;

(e)    all Records; provided, however, that, notwithstanding anything herein to the contrary, Buyer is not taking assignment of any Contracts with brokers;

16

(f)    all non-disclosure or confidentiality Contracts with any prospective bidder or other Person who evaluated or is evaluating any Purchased Assets or otherwise contemplated or is contemplating making a Competing Bid or that was provided any Proprietary Information relating to any Purchased Assets;

(g)    any cash deposits, guarantees, letters of credit, reimbursement agreements, bonds, prepayment amounts and other credit or contractual assurances provided by Counterparties to Seller related to the Assigned Contracts, none of which are anticipated to exist;

(h)    those Hedges and supply contracts listed in Part 1 of <u>Section 2.01(h)</u> of the Seller Disclosure Schedule (the "***Initial Hedges***") and those Renewal Hedges listed in Part 2 of <u>Section 2.01(h)</u> of the Seller Disclosure Schedule;

(i)    that proprietary Software listed in Part I of <u>Section 2.01(i)</u> of the Seller Disclosure Schedule (collectively, the "***Purchased IP***") and all of Sellers' rights, title and interest in and to that licensed Software listed in Part II of <u>Section 2.01(i)</u> of the Seller Disclosure Schedule and any derivative works or improvements thereupon (collectively, the "***Licensed IP***"); and

(j)    the natural gas storage capacity associated with the Assigned Contracts and described on <u>Section 2.01(j)</u> of the Seller Disclosure Schedule and the volume of natural gas in such capacity at the time such capacity is transferred to Buyer, as determined in accordance with <u>Annex 2.07(b)(vii)</u> and as adjusted pursuant to Section 7.04 (collectively, the "***Storage***").

**Section 2.02    Excluded Assets**.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is not purchasing any assets of Sellers other than the Purchased Assets.  For the avoidance of doubt, the Purchased Assets shall specifically exclude all of the following assets, rights, businesses, claims or properties owned by Sellers (the "***Excluded Assets***"):

(a)    all cash and credit support (in each case, except for the cash deposits and credit support described in Section 2.01(g) above), securities, accounts receivable relating to periods prior to the applicable Assignment Date (including the Retained Accounts Receivable), revenues, payments and cash equivalents and short term investments that are earned or accrued prior to the Assignment Date, including pursuant to the Assigned Contracts;

(b)    all Contracts that are not Assigned Contracts and all Assigned Contracts that expire (and are not renewed) or are terminated prior to the applicable Assignment Date;

(c)    the corporate seals, Organizational Documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Sellers, all employee-related or employee benefit-related files or records and any other books and records which Sellers are prohibited from disclosing or transferring to Buyer under applicable Law or are required by applicable Law to retain;

(d)    any Contract or arrangement of any nature in respect of any intercompany transaction between a Seller, on the one hand, and any Affiliate of such Seller, on the other hand, regardless of the subject matter of such transaction, including any contribution to capital, loan, the provision of goods or services including power, tax sharing arrangements, payment arrangements,

17

intercompany advances, services agreements, charges or balances, or the like (collectively, the "***Intercompany Arrangements***");

(e)    all rights to Claims, refunds or adjustments with respect to the Excluded Assets;

(f)    all assets attributable to or related to any employee benefit plan of a Seller and/or its Affiliates;

(g)    all telephone/facsimile number and e-mail addresses related to the Business;

(h)    all insurance policies of Sellers and all rights to applicable claims and proceeds thereunder, except to the extent set forth in Section 2.01(d);

(i)    all of Sellers' real property interests;

(j)    all Tax assets (including duty and Tax refunds and prepayments) of a Seller or its Affiliates;

(k)    all employee benefit plans sponsored or maintained by a Seller or to which a Seller has been contributing or is required to contribute;

(l)    the rights that accrue or will accrue to Sellers under the Transaction Agreements;

(m)    except for the Records, the Purchased IP and the Licensed IP, all other Intellectual Property owned, used or held by Sellers or any of their Affiliates or in which a Seller or any of its Affiliates have any interest;

(n)    any interstate natural gas transportation or storage agreement or rights held by any Seller that was not allocated to Seller by a local distribution company based on a Seller's natural gas load with such local distribution company; and

(o)    all other assets, rights, business, claims or properties to the extent not described in Section 2.01.

    **Section 2.03    Assumed Liabilities**.  Except as otherwise provided in Section 2.03 of the Buyer Disclosure Schedule, upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers agree to assign to Buyer, and Buyer agrees to assume from and after the applicable Assignment Date, in accordance with their respective terms, only the following Liabilities (the "***Assumed Liabilities***"), and no other Liabilities:

(a)    any performance obligations of Sellers first arising after the applicable Assignment Date under the Assigned Contracts to the extent relating to the period on or after the applicable Assignment Date but specifically excluding any Liability relating to or arising out of any Assigned Contract as a result of any breach of such Assigned Contracts by a Seller occurring on or prior to the Assignment Date, or any violation of Law by a Seller occurring on or prior to the Assignment Date;

18

(b)    all Liabilities arising out of any Proceeding brought after the applicable Assignment Date relating to the Purchased Assets before any Governmental Body arising out of events, facts or circumstances to the extent first occurring after the applicable Assignment Date, and not (i) constituting a mere continuation of events, facts, circumstances existing on or prior to the Assignment Date or (ii) arising out of any action or inaction or omission by Sellers or any of their Affiliates; and

(c)    any Liabilities for any Taxes for which Buyer is liable under Section 8.02 and Taxes attributable to the ownership or use of any of the Purchased Assets on or after the day following the applicable Assignment Date (except for Taxes for which any Seller is liable pursuant to Section 8.02 or Section 2.04(i)).

**Section 2.04    Excluded Liabilities**.  Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is not assuming any Liabilities other than the Assumed Liabilities (all such Liabilities other than the Assumed Liabilities being herein referred to as the "***Excluded Liabilities***"), which Excluded Liabilities shall be retained by and remain Liabilities of Sellers.  For the avoidance of doubt, the Excluded Liabilities shall include, without limitation:

(a)    Sellers' costs and expenses incurred in connection with this Agreement and the Transactions;

(b)    Sellers' Liabilities and obligations arising under this Agreement or any of the Transaction Agreements (including any amendment or supplement thereto);

(c)    any Liabilities arising out of any Proceeding relating to the Business or the Purchased Assets before any Governmental Body arising on or prior to the applicable Assignment Date or arising out of events, facts or circumstances occurring or existing on or prior to the applicable Assignment Date regardless of when such Proceeding is commenced;

(d)    any Liabilities under the Assigned Contracts (i) arising prior to the applicable Assignment Date, or (ii) arising out of any default or breach by a Seller of any Assigned Contract or Law;

(e)    any Liabilities under any Assigned Contracts that expire or are terminated on or prior to the applicable Assignment Date;

(f)    any Liabilities related to, or arising from, Non-Assignable Assets until legal title is transferred to Buyer pursuant to Section 2.05(d);

(g)    any Liabilities of Sellers to the extent relating to any Excluded Assets or any other assets other than the Purchased Assets and the ownership, operation and conduct of any business in connection therewith, including any amounts due from Sellers under or arising from any of the Intercompany Arrangements;

(h)    all indebtedness of Sellers;

(i)    any Liabilities for (i) any Taxes for which a Seller is liable under Section 8.02, (ii) Taxes attributable to the Business or the ownership or use of any of the Purchased Assets

19

with respect to a Pre-Closing Tax Period (except for Taxes for which Buyer is liable pursuant to Section 8.02) and (iii) Taxes (other than Transfer Taxes addressed by Section 8.02) imposed on a Seller or its Affiliates arising from the transactions contemplated by this Agreement;

(j)    all Liabilities with respect to any past or present brokers, employees or agents of a Seller, including all Liabilities arising under any employee plan or any previous similar plan maintained for the benefit of such employees, brokers or agents, and all Liabilities for commissions due and owing by Sellers to any brokers, agents or employees; and

(k)    all obligations to make Cure Payments.

**Section 2.05    Non-Assignable Assets**.    Notwithstanding anything in this Agreement to the contrary, to the extent that (a) the assignment of all or any portion of any Purchased Assets shall be prohibited by Law (including by Order of a Governmental Body), requires a Counterparty Consent, or advance notice to, a Counterparty (if any) or requires the consent of any other Third Party that has not been obtained as of the Closing, and which restriction, consent right or right to advance notice cannot be effectively overridden or canceled by any order of the Bankruptcy Court or any provision of the Bankruptcy Code, (b) any action is required with respect to any Assigned Contract in order to assign the applicable Assigned Contract (or any account thereunder) to Buyer's account on the records of the applicable electric utility or natural gas local distribution company, and which action or restriction cannot be effectively satisfied or eliminated by any order of the Bankruptcy Court or any provision of the Bankruptcy Code (each, a "*Non-Assignable Asset*"):

(a)    this Agreement and the Assignment and Assumption Agreement shall not constitute an assignment or transfer of title to any such Non-Assignable Asset, unless and until any applicable restrictions described above prohibiting the assignment of such Non-Assignable Asset are satisfied or waived, except to the extent set forth in this Section 2.05;

(b)    title to such Non-Assignable Asset shall not be transferred except and until provided in Section 2.05(d), and Sellers shall retain each such Non-Assignable Asset and all of the Liabilities of Sellers related to, or arising from, such Non-Assignable Asset accruing on and after the Closing, and such Liabilities shall not be considered Assumed Liabilities;

(c)    Buyer and Sellers shall continue to use reasonable best efforts, in accordance with Section 7.01, to address the applicable restriction, obtain the Required Consents or obtain a waiver of the issue impacting the ability of Sellers to assign such Non-Assignable Asset hereunder; and

(d)    title to each Non-Assignable Asset (other than any Removed Account for which an Account Transfer Date has not been established) shall automatically and without further action of the Parties be assigned pursuant to the Assignment and Assumption Agreement to Buyer upon satisfaction or waiver of the applicable restrictions affecting such Non-Assignable Asset, and all of the performance obligations of Sellers arising under such Non-Assignable Asset accruing after the date of such assignment shall constitute Assumed Liabilities as of such date other than any of such Liabilities that constitute Excluded Liabilities.

**Section 2.06    Deposit**.

20

(a)     Contemporaneously with the execution of this Agreement, or as soon as reasonably practicable after the Execution Date, Buyer shall deposit with U.S. Bank National Association (the "*Escrow Agent*"), a deposit in the amount of $2,475,000.00 (the "*Initial Deposit*"), representing ten percent (10%) of the Base Price, by wire transfer of immediately available funds for deposit into a separate escrow account (the "*Escrow Account*"), established pursuant to the escrow agreement, dated as of the Execution Date, by and among Sellers, Buyer and the Escrow Agent, in the form attached hereto as <u>Exhibit E</u> (the "*Escrow Agreement*").

(b)



(c)     If this Agreement is validly terminated by Sellers in accordance with the terms of this Agreement prior to Closing pursuant to Section 10.01(g) or Section 10.01(k), then Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to release from the Escrow Account the Initial Deposit, by wire transfer of immediately available funds to an account designated by Sellers to the Escrow Agent, to be retained by Sellers as liquidated damages (and not a penalty).  In such event, the total amount of Sellers' Damages that may result from Sellers' terminating this Agreement pursuant to Section 10.01(g) or Section 10.01(k)shall exclusively be the amount of the Initial Deposit, and Sellers' retention of the Initial Deposit shall be their sole remedy against Buyer.  In all instances where Sellers are entitled to receive the Initial Deposit due to a breach of this Agreement by Buyer, receipt of the Initial Deposit by Sellers shall be the sole and exclusive remedy of Sellers in connection with this Agreement and/or the Transactions contemplated hereby, whether damages asserted by Sellers derive from contract, tort, equity or otherwise.  For the avoidance of doubt, nothing set forth herein shall limit or restrict Sellers' rights to seek specific performance as set forth in Section 11.15 prior to any termination of this Agreement.  In all circumstances other than a termination by Sellers in accordance with Section 10.01(g) or Section 10.01(k), if this Agreement is validly terminated in accordance with the terms of this Agreement prior to Closing, then within two (2) Business Days of such termination, Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing the Escrow Agent to release all funds held in the Escrow Account, including the entire Deposit and any interest or earnings thereon, by wire transfer of immediately available funds to an account designated by Buyer to the Escrow Agent.

**Section 2.07    Purchase Price; Purchase Price Adjustment**.

(a)    Purchase Price.  The purchase price for the Purchased Assets and the assumption of the Assumed Liabilities is $24,750,000.00 (the "***Base Price***"), as adjusted pursuant to the provisions of Section 2.07(b), subject to any withholding or deduction for applicable Taxes required by applicable Law; provided, however, that Buyer shall provide Sellers with a written notice of its intention to withhold as soon as reasonably practicable prior to any such withholding, and Buyer and Sellers shall use commercially reasonable efforts to minimize any such withholding Tax.  Notwithstanding the foregoing, the Parties represent and warrant that, to their Knowledge, no withholding tax is applicable with respect to the Transactions.

(b)    Determination of Closing Date Value and Final Purchase Price.

(i)    Annex 2.07(b) lists (A) all Customer accounts corresponding to Significant Contracts (other than Government Aggregation Contracts) identified on Section 2.01(a) of the Sellers Disclosure Schedule as of the Execution Date, and, in each case, provides an agreed specific account value (the "***Significant Contract Account Value***") for each such Customer account, and (B) all Customer accounts corresponding to Mass Market Accounts and Government Aggregation Contracts identified on Section 2.01(a) of the Sellers Disclosure Schedule as of the Execution Date, and, in each case, provides an agreed specific account value (the "***Mass Market Account Value***") for each such Customer account.  The sum of the Significant Contract Account Value plus the Mass Market Account Value under this Section 2.07(b)(i) is referred to herein as the "***Valuation Reference Date Account Value***".

(ii)    The Parties shall from time to time, and upon request of Buyer or Sellers, and in any event as of the date that is two (2) Business Days prior to the Closing Date (the "***Pre-Closing Valuation Date***") and five (5) Business Days following the Account Deadline (the "***Post-Closing Valuation Date***"), (x) revise Annex 2.07(b) to remove any account therefrom that is no longer enrolled with Sellers or with regard to which Sellers or the applicable utility or local distribution company has received any request to switch or drop enrollment (other than as a result of assignment of such account to Buyer pursuant to this Agreement) or that has become a Removed Account for any reason other than by reason of the breach by Buyer of any of its representations, warranties or obligations under the Transaction Agreements or Buyer's failure to be properly licensed or enabled with the applicable utility or local distribution company in such a manner as may be required to receive assignment of any such account other than in the Excluded Service Territories and (y) update Section 2.01(h) of the Seller Disclosure Schedule in accordance with Section 7.04.

(iii)    On the Pre-Closing Valuation Date, Buyer shall prepare and deliver to Sellers a statement specifying the calculation of the Pre-Closing Account Value and Pre-Closing Account Value Changes.  Buyer shall determine the "***Pre-Closing Account Value***" based on the most recent update to Annex 2.07(b) as described above as of the Pre-Closing Valuation Date, which values will be determined solely based on the removal of accounts from such annex pursuant to clause (ii) above.  The "***Pre-Closing Account Value Change***" is the amount, if any, by which the Valuation Reference Date Account Value exceeds the Pre-Closing Account Value.

22

(iv)



  (v)  On or before the Post-Closing Valuation Date, but after the Final Assignment Date, Buyer shall prepare and deliver to Sellers a statement specifying the Post-Closing Account Value and the calculation of the Post-Closing Account Value Change.  Buyer shall determine the "***Post-Closing Account Value***" based on the update to <u>Annex 2.07(b)</u> as described above as of the Final Assignment Date, which values will be determined solely based on the removal of accounts from such annex pursuant to clause (ii) above.  The "***Post-Closing Account Value Change***" is the amount, if any, by which the Valuation Reference Date Account Value exceeds the Post-Closing Account Value.

(vi)



23



(vii)    The value of all Storage constituting Purchased Assets as of the Final Assignment Date, calculated by Buyer at the time such Storage is transferred to Buyer based on Annex 2.07(b)(vii), less all Gas True-Up Costs, if any (such value, the "***Natural Gas Storage and Inventory Value***"), which may be positive or negative, shall be added to the Post-Closing Date Value, as applicable, to obtain the "***Final Purchase Price***".

(viii)    Notwithstanding anything contained in this Section 2.07(b), in no event shall the Final Purchase Price be (A) less than the Guaranteed Minimum Amount (unless Sellers are required to pay Buyer pursuant to Section 7.10, in which case the Final Purchase Price shall be less than the Guaranteed Minimum Amount, and shall be deemed to be reduced, by the amount of such required payment); or (B) greater than the sum of the Closing Date Value plus the Natural Gas Storage and Inventory Value.

(c)    Payment of Final Purchase Price.

(i)    To the extent the Closing Date Value exceeds the Final Purchase Price, then Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to pay to Buyer, by wire transfer of immediately available funds to an account designated by Buyer to the Escrow Agent, the entire amount of such excess from the Deposit within ten (10) Business Days after the Post-Closing Valuation Date. To the extent the Final Purchase Price exceeds an amount equal to the Guaranteed Minimum Amount plus the aggregate amount of Broker Payments, then Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to pay Sellers, by wire transfer of immediately available funds to an account designated by Sellers to the Escrow Agent, the amount of such excess from the portion of the Deposit, if any, held by Escrow Agent that is not subject to pending claim(s) for Damages by Buyer under Section 11.01, within ten (10) Business Days after the end of the Claim Period.

(ii)    After making the payment described in clause (i) above, the Escrow Agent shall continue to hold the Deposit pursuant to the terms of the Escrow Agreement until the later of (A) ninety (90) days after the Final Assignment Date and (B) the resolution by Sellers and Buyer of any claim for indemnification of which Buyer has notified Sellers, in accordance with Section 11.01 (such period, the "***Claim Period***").  Notwithstanding the foregoing, on the date that is ninety (90) days after the Final Assignment Date, any remaining portion of the Deposit held by Escrow Agent which is owed to Sellers pursuant to the terms of this Agreement and not subject to a pending claim for Damages by Buyer under Section 11.01 will be released to Sellers by the Escrow Agent pursuant to a joint written direction promptly delivered to the Escrow Agent by Sellers and Buyer (which Sellers and Buyer shall be obligated to promptly deliver at such time), and promptly upon the resolution by Sellers and Buyer of any such claims, a portion of the Deposit held by Escrow Agent corresponding to the amount of the claim(s) resolved in favor of Sellers or Buyer, as applicable, will be released to the prevailing Party pursuant to the terms of this

24

Agreement by the Escrow Agent pursuant to a joint written direction promptly delivered to the Escrow Agent by Sellers and Buyer (which Sellers and Buyer shall be obligated to promptly deliver at such time).  To the extent that, following the resolution and payment of all pending claims for Damages under Section 11.01 and Section 7.10, (x) the total amount already paid to Sellers under this Agreement is less than the Final Purchase Price minus (i) all amounts paid or owing to Buyer for Damages under Section 11.01, Section 7.10 or set-off by Buyer in accordance with this Agreement, and (ii) the amount of all Broker Payments, and the remainder of the Deposit is insufficient to cover such shortfall, then Buyer will promptly pay such shortfall to Sellers by wire transfer of immediately available funds to an account designated by Sellers in writing, or (y) if  any funds remain in the Escrow Account which, pursuant to the terms of this Agreement, are not owed to Sellers, Sellers and Buyer shall deliver a joint written direction to the Escrow Agent authorizing the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time)  to release all such funds by wire transfer of immediately available funds to an account designated by Buyer to the Escrow Agent.

>    **Section 2.08    Allocation of Purchase Price**.

>    (a)    Buyer shall allocate the Final Purchase Price, as of the Closing, among the classes of assets to which the Purchased Assets and the other Transaction Agreements relate (the "*Allocation*") in accordance with section 1060 of the Code and the regulations promulgated thereunder (or any similar provision of local or state Tax law) and consistent with <u>Annex 2.07(b)</u> (as may be revised prior to the Closing Date) and shall submit the proposed Allocation to Sellers not later than one hundred eighty (180) days after Closing.  If, within sixty (60) days after the receipt of the proposed Allocation, Sellers notify Buyer in writing that Sellers disagree with the proposed Allocation, then Buyer and Sellers shall attempt in good faith to resolve their disagreement within the sixty (60) days following Sellers' notification to Buyer of such disagreement.  If Buyer and Sellers are unable to resolve their disagreement within the sixty (60) days following any such notification by Sellers, each of Buyer and Sellers may allocate the Final Purchase Price and report the sale as each of Buyer and Sellers determine in their sole discretion. If Buyer and Sellers do agree upon a final Allocation, for all Tax purposes, the Transactions shall be reported in a manner consistent with the final Allocation and the terms of the Transaction Agreements, and no Party, or any of such Party's Affiliates, shall take any position inconsistent therewith in any Tax Return (including IRS Form 8594), in any Tax refund claim, in any litigation or otherwise, unless required by applicable Law.  Each of Buyer and Sellers agree to provide the other promptly with any other information reasonably required to complete Form 8594 (and any similar forms required for state or local Tax purposes).  Each of Buyer and Sellers shall notify the other if there is an examination, audit or other proceeding regarding the Allocation determined under this Section 2.08.

>    (b)    If Buyer and Sellers agree upon a final Allocation pursuant to Section 2.08(a), not later than thirty (30) days prior to the filing of their respective Forms 8594 relating to these Transactions, each Party shall deliver to the other Party a copy of its Form 8594.

>    **Section 2.09    Closing**.  Subject to the terms and conditions of this Agreement, the closing (the "*Closing*") of the purchase and sale of the Purchased Assets to be acquired at Closing, and the assignment and assumption of the Assumed Liabilities to be assigned and assumed at Closing, if any, and the payment of any amounts required hereunder to be paid at Closing, shall take place

25

remotely by electronic delivery of documents and/or funds on or before the third (3rd) Business Day after the date upon which all of the conditions set forth in Article 9 are satisfied (or waived in writing by the Party or Parties for whose benefit such conditions exist), or at such other time or place as Buyer and Sellers may agree.  The Closing shall be effective for all purposes at 11:59 p.m., eastern prevailing time (EPT), on the Closing Date.

   **Section 2.10 Deliveries at Closing**.  In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

    (a)  Each Seller shall deliver to Buyer:

      (i)  the Assignment and Assumption Agreement duly executed by such Seller;

      (ii)  a counterpart to a notice to the Escrow Agent pursuant to the Escrow Agreement duly executed by such Seller as contemplated by Section 2.06(b);

      (iii)  an officer's certificate certifying that the conditions in Section 9.02(a), Section 9.02(b), and Section 9.02(e) have been satisfied;

      (iv)  a non-foreign affidavit for such Seller, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

      (v)  an electronic file listing all accounts referenced by applicable Assigned Contract in form and substance reasonably satisfactory to Buyer;

      (vi)  true, correct and complete copies of all Assigned Contracts (provided that a failure to provide a true, correct and complete copy of any Assigned Contract shall not be a material breach of Section 2.10, but if not received by the Assignment Date for such account, and in any event by the Final Assignment Date, then Buyer may designate such account as a Removed Account); and

      (vii)  any other documents or instruments reasonably required by Buyer to consummate the Transactions and reasonably requested of such Seller prior to the Closing Date.

    (b)  Buyer shall:

      (i)  deposit $10,250,000.00 (such amount, the "***Guaranteed Minimum Amount***"), with the Escrow Agent into a separate escrow account, established pursuant to an escrow agreement substantially in the form attached hereto as <u>Exhibit E</u> (with such changes as are mutually agreed by the parties thereto) and deliver to Sellers evidence of such deposit;

      (ii)  deliver to Sellers the Assignment and Assumption Agreement duly executed by Buyer;

26

(iii)     deliver to Sellers evidence that the Additional Deposit will be or was deposited with the Escrow Agent on the Closing Date and a counterpart to a notice to the Escrow Agent pursuant to the Escrow Agreement duly executed by Buyer as contemplated by Section 2.06(b);

(iv)     deliver to Sellers an officer's certificate certifying that the conditions in Section 9.03(a), Section 9.03(b) and Section 9.03(d) have been satisfied; and

(v)     deliver to Sellers any other documents or instruments reasonably required by Sellers to consummate the Transactions and reasonably requested of Buyer prior to the Closing Date.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller, jointly and severally, hereby represents and warrants to Buyer that, except as set forth in the Seller Disclosure Schedule or with respect to representations or warranties that speak of a specific date, the statements contained in this Article 3 are true, correct and complete as of the Execution Date, the Closing Date and each applicable Assignment Date.  Each Seller, jointly and severally, hereby represents and warrants to Buyer that those representations or warranties that speak of a specific date contained in this Article 3 are true, correct and complete as of such specific date.

**Section 3.01   Corporate Existence and Power**.  Each Seller is duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its formation and is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required, except where failure to be so qualified could not reasonably be expected to have a Seller Material Adverse Effect.

**Section 3.02   Corporate Authorization**.  Each Seller has the relevant corporate or limited liability company power and authority, as applicable, necessary to execute and deliver each Transaction Agreement to which it is a party and to perform and consummate the Transactions in accordance with the Transaction Agreements.  Subject to Bankruptcy Court approval, each Seller has taken all action necessary to authorize the execution and delivery of each Transaction Agreement to which it is a party, the performance of its respective obligations thereunder, and the consummation of the Transactions.  Each Transaction Agreement to which a Seller is a party has been duly authorized by, and has been or, with respect to any Transaction Agreements required to be executed and delivered by such Seller on the Closing Date, will be as of the Closing Date, duly executed and delivered by, and, assuming the due authorization, execution and delivery thereof by each counterparty (other than another Seller), is Enforceable against, such Seller in accordance with their respective terms.

**Section 3.03   Governmental Notice**.  Except as set forth on <u>Section 3.03</u> of the Seller Disclosure Schedule and except as otherwise rendered unnecessary as a result of any order of the Bankruptcy Court or any provision of the Bankruptcy Code, the execution, delivery and performance by each Seller of the Transaction Agreements to which it is a party and the

27

consummation of the Transactions require no material action by or in respect of, or material filing with, any Governmental Body other than any such action or filing taken or made in connection with this Agreement on or prior to Closing.

**Section 3.04    Non-Contravention**.  The execution, delivery and performance by each Seller of the Transaction Agreements to which it is a party and the consummation of the Transactions do not and will not (a) result in a violation of the Organizational Documents of such Seller, (b) violate any material applicable Law or Order, except to the extent such violation will be overridden or remedied by any order of the Bankruptcy Court or any provision of the Bankruptcy Code, or (c) result in the creation or imposition of any Lien on any Purchased Asset owned by any Seller, except for Permitted Liens.

**Section 3.05    Finders' Fees**.

(a)    Except as set forth in <u>Section 3.05</u> of the Seller Disclosure Schedule, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of any Seller or any of their respective Affiliates in connection with the Transactions.

(b)    No investment banker, broker, finder or other intermediary other than as set forth in <u>Section 3.05</u> of the Seller Disclosure Schedule is or may be entitled to any fee or commission from Buyer or any of its Affiliates in connection with the Transactions.

**Section 3.06    Litigation**.  There are no Proceedings pending or, to the Knowledge of Sellers, threatened that relate to, or could otherwise affect, any of the Purchased Assets or Assumed Liabilities, before any Governmental Body that are not stayed under section 362 of the Bankruptcy Code. Except as set forth on <u>Section 3.06</u> of the Seller Disclosure Schedule, no Proceeding has been commenced by or against any Seller that challenges or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, the consummation of the Transactions or that involves the Purchased Assets or the Assumed Liabilities.

**Section 3.07    Taxes**.  Except as set forth on <u>Section 3.07</u> of the Seller Disclosure Schedule:

(a)    Sellers have timely filed, or have caused to be timely filed, with the appropriate Taxing Authorities all income and other material Tax Returns required to be filed with respect to the Purchased Assets or the Business (taking into account any validly obtained extensions of time to file) and all such Tax Returns are true, correct and complete in all material respects. Sellers or their respective Affiliates have paid all Taxes relating to the Purchased Assets that have become due as indicated in such Tax Returns, except where such Tax is being contested in good faith as set forth on Part (a) of <u>Section 3.07</u> of the Disclosure Schedules.

(b)    All Laws relating to the payment, reporting and withholding of Taxes of or with respect to the Business or the Purchased Assets have been timely complied with and all Taxes that Sellers are (or were) required by Law to withhold or collect with respect to the Purchased Assets in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder or other Third Party have been duly withheld or collected, and have been timely paid over to the proper Taxing Authorities to the extent due and payable. Part (b) of <u>Section</u>

28

3.07 of the Seller Disclosure Schedule sets forth a list of all jurisdictions in which Sellers have filed or will file Tax Returns with respect to the Business or the Purchased Assets, and all jurisdictions in which Sellers are required to file Tax Returns with respect to the Business or the Purchased Assets.

(c)     No written claim has ever been made by any Taxing Authority in a jurisdiction where Sellers do not file Tax Returns with respect to the income or operations of the Business or ownership of Purchased Assets that any Seller is or may be subject to taxation by that jurisdiction with respect to the income or operations of the Business or ownership of the Purchased Assets. Sellers have provided to each Taxing Authority that may have jurisdiction for Taxes related to the Purchased Assets or the Business timely notice of the Transactions and provided all other notices that are required under the Bankruptcy Code to extinguish any potential tax claims any such jurisdiction may have against either the Purchased Assets or the Business, including, but not limited to, the Taxing Authorities for Washington D.C. and for the states of California, Connecticut, Delaware, Illinois, Massachusetts, Maryland, Maine, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas and Virginia. With respect to the rights and obligations, including such rights and obligations with respect to Taxes, of Sellers to sell electricity and/or natural gas to the relevant Counterparty under any of the Assigned Contracts, each Seller has received from such Counterparty a duly completed and executed exemption certificate on the appropriate state form exempting such sale by each such Seller from such state's sales, use or similar Tax. Sellers have provided true, correct and complete copies of all such exemption certificates to Buyer on or prior to the Closing Date.

(d)     No Tax allocation, Tax sharing or Tax indemnity or similar agreement or arrangement is in effect, in each case, with respect to the Purchased Assets or the Business that would, in any manner, bind, obligate or otherwise restrict Buyer.

**Section 3.08    Title to Purchased Assets**.  Sellers, collectively, have good and marketable title to the Purchased Assets, free and clear of all Liens except Permitted Liens and liens held by BP and Colorado Bankers Life Insurance Co. and, on each applicable Assignment Date, shall convey good and marketable title to the applicable Purchased Assets to Buyer free and clear of all Liens except for Permitted Liens, to the extent described and set forth in the Sale Order.

**Section 3.09    [Reserved]**.

**Section 3.10    Contracts**.  Except as disclosed in Part I of Section 3.10 of the Seller Disclosure Schedule:

(a)     true, correct and complete copies of all Assigned Contracts have been made available to Buyer;

(b)     subject to Bankruptcy Court approval, entry of the Bidding Procedures Order and Sale Order and the assumption by Sellers of the applicable Assigned Contract in accordance with the Bankruptcy Code (including satisfaction of any applicable Cure Payments) and except as a result of the commencement of the Bankruptcy Cases, the insolvency or financial condition of Sellers or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code, each Assigned Contract is a valid and binding obligation of the applicable

29

Seller, Enforceable against Seller and, to the Knowledge of Sellers, each of the other parties thereto, in accordance with its terms;

(c)     no Seller is in breach or default, and, to the Knowledge of Sellers, no other party is in breach or default, and no event or circumstance has occurred which with provision of notice or expiration of any applicable cure period would constitute a breach or default, or permit termination, modification, or acceleration, under any Assigned Contract, except as a result of the commencement of the Bankruptcy Cases, the insolvency or financial condition of Sellers or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code;

(d)     no Liability exists under any Assigned Contract other than current performance obligations thereunder in the Ordinary Course of Business;

(e)     to the Knowledge of Sellers, no Assigned Contract provides for (A) a right of first offer or right of first refusal or similar rights, or (B) provides "most favored nation" or similar status, in each case, to a Counterparty;

(f)     Part III of <u>Section 3.10</u> of the Seller Disclosure Schedule contains a true, correct and complete list of any Assigned Contract that contains any obligations of a Seller or one of their respective Affiliates to provide energy efficiency services or solutions.  True, correct and complete copies of all Assigned Contracts set forth on Part II of <u>Section 3.10</u> of the Seller Disclosure Schedule have been made available to Buyer.  No such Contracts contain any unperformed obligations of any Seller and all such Contracts are in compliance with applicable Law in all material respects;

(g)     any differences between the Mass Market Contracts and the forms of contracts contained in the folder labeled "II.  Contract Templates" within the folder labeled "Customer and Contract Information" in the Data Room, individually or in the aggregate, will not have an adverse effect that is material on such non-conforming Mass Market Contracts or their value (taken as a whole); and

(h)     In each instance where a Mass Market Contract permits a Seller to set the price to be paid by the Customer for the retail supply of electricity and/or natural gas and/or related services to such Customer, the applicable Seller has acted in a commercially reasonable manner and in accordance with the applicable Contract and Law in setting such price to be paid by the applicable Customer party to such Mass Market Contract.

**Section 3.11   [Reserved]**.

**Section 3.12   [Reserved]**.

**Section 3.13   Credit Support**.  No Seller has provided any Credit Support for the direct benefit of any Counterparty, including without limitation any Credit Support in the form of a deposit or other prepayment amount.  BP has not provided any Credit Support for the account of any Seller in the form of a deposit or other prepayment amount for the direct benefit of any Counterparty.

30

**Section 3.14    Obligations Pending Entry of Sale Order**.  Sellers acknowledge that upon entry of the Bidding Procedures Order, Buyer shall have enforceable rights to the Buyer Expense Reimbursement and the Termination Fee to the extent that either or both become due and owing pursuant to the terms of this Agreement and to all other pre-Closing benefits as set forth in this Agreement and all obligations of Sellers shall be enforceable in accordance with this Agreement. Accordingly, Sellers acknowledge and agree that, from and after the date of entry of the Bidding Procedures Order, their obligations under this Agreement are and are intended to be binding upon them for purposes of determining whether a breach has occurred under this Agreement and thus whether Buyer is entitled to the Buyer Expense Reimbursement and/or Termination Fee under Section 10.01(g) hereof.

**Section 3.15    Diligence**.  The information provided in the Key Due Diligence Files is true, correct and complete in all material respects and does not omit to state any fact necessary to make the statements therein not misleading or otherwise complete.

**Section 3.16    Records**.  Not later than the Closing Date, Sellers have made available to Buyer true, correct and complete electronic copies of the Records. Sellers have maintained the Records in accordance with good business practice and in sufficient detail to reflect accurately and fairly the transactions and the condition of the Purchased Assets.

**Section 3.17    Regulatory Qualification**.  The Transactions qualify for the waiver contained at 18 C.F.R. § 284.8(h)(1)(ii) (2019) from the capacity release regulations and policies of the Federal Energy Regulatory Commission.

**Section 3.18    Representations Complete**.  EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES IN THIS Article 3, NO SELLER IS MAKING ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE ASSIGNED CONTRACTS, THE PURCHASED ASSETS, ANY ASSETS, PROPERTY OR RIGHTS LEASED OR LICENSED THROUGH THE ASSIGNED CONTRACTS OR THE TRANSACTION AGREEMENTS OR THE BUSINESS, ASSETS OR LIABILITIES OF SELLERS. EXCEPT, IN EACH CASE, FOR FRAUD, WILLFUL MISCONDUCT, OR AS PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES THAT SELLERS HAVE NOT MADE, AND THAT SELLERS HEREBY EXPRESSLY DISCLAIM AND NEGATE, AND BUYER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE RELATING TO, AND EXCEPT, IN EACH CASE, FOR FRAUD, WILLFUL MISCONDUCT OR AS EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER HEREBY EXPRESSLY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS, CLAIMS AND CAUSES OF ACTION AGAINST SELLERS AND ANY OF THEIR RESPECTIVE AFFILIATES AND REPRESENTATIVES IN CONNECTION WITH THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO BUYER AND ITS AFFILIATES OR REPRESENTATIVES BY OR ON BEHALF OF SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES OR THEIR REPRESENTATIVES IN CONNECTION THEREWITH, INCLUDING ANY SUCH INFORMATION IN THE DATA ROOM. EXCEPT AS PROVIDED HEREIN, WITHOUT LIMITING THE FOREGOING, NO SELLER IS MAKING ANY REPRESENTATION OR WARRANTY TO BUYER WITH

31

RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE BUSINESS OR THE PURCHASED ASSETS.  WITH RESPECT TO ANY PROJECTION OR FORECAST DELIVERED ON BEHALF OF ANY SELLER TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES, BUYER ACKNOWLEDGES THAT (a) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS, (b) IT IS FAMILIAR WITH SUCH UNCERTAINTIES, (c) IT IS TAKING FULL RESPONSIBILITY FOR MAKING ITS OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL SUCH PROJECTIONS AND FORECASTS FURNISHED TO IT, AND (d) IT SHALL HAVE NO CLAIM AGAINST A SELLER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES WITH RESPECT TO ANY FORECASTS OR PROJECTIONS. EXCEPT AS PROVIDED HEREIN, BUYER ACKNOWLEDGES THAT SELLERS HAVE NOT MADE, AND SELLERS HEREBY EXPRESSLY DISCLAIM AND NEGATE, ANY COVENANT, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO ANY ASSETS OR ANY PROPERTY OR RIGHTS LEASED OR LICENSED THROUGH THE ASSIGNED CONTRACTS OR THE TRANSACTION AGREEMENTS, INCLUDING (i) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (ii) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (iii) ANY EXPRESS WARRANTY OF FREEDOM FROM COPYRIGHT, PATENT OR TRADEMARK INFRINGEMENT, (iv) ANY IMPLIED WARRANTY OF FREEDOM FROM HIDDEN DEFECTS OR OTHER DEFECTS, WHETHER KNOWN OR UNKNOWN, AND (v) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW IN EFFECT NOW OR IN THE FUTURE, IT BEING THE EXPRESS INTENTION OF SELLERS AND BUYER THAT THE FOREGOING ASSETS AND RIGHTS SHALL BE SOLD, LEASED OR LICENSED TO BUYER "AS IS," "WHERE IS," "WITH ALL FAULTS," AND IN THEIR THEN-CURRENT CONDITION AND STATE OF REPAIR, SUBJECT ONLY TO THE REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLERS MADE IN THIS AGREEMENT AND CLAIMS FOR FRAUD OR WILLFUL MISCONDUCT. BUYER REPRESENTS TO SELLERS THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS WITH RESPECT TO THE FOREGOING ASSETS AND RIGHTS AS BUYER DEEMS APPROPRIATE AND BUYER WILL ACCEPT THE TANGIBLE PROPERTY "AS IS," "WHERE IS," "WITH ALL FAULTS," AND IN THEIR THEN-CURRENT CONDITION AND STATE OF REPAIR SUBJECT ONLY TO THE REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLERS MADE IN THIS AGREEMENT AND CLAIMS FOR FRAUD OR WILLFUL MISCONDUCT.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that, except as set forth in the Buyer Disclosure Schedule or with respect to representations or warranties that speak of a specific date, the statements contained in this Article 4 are true, correct and complete as of the Execution Date and as of the Closing Date. Buyer represents and warrants to Sellers that those representations or warranties that speak of a specific date contained in this Article 4 are true, correct and complete as of such specific date.

32

**Section 4.01   Corporate Existence and Power**.   Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its organization.  Buyer is duly authorized to conduct its business and is in good standing under the Laws of the Commonwealth of Pennsylvania and each other jurisdiction where such qualification is required except where failure to be so qualified in such other jurisdiction would not have, individually or in the aggregate, a Buyer Material Adverse Effect.

**Section 4.02   Corporate Authorization**.   Buyer has the relevant entity power and authority necessary to execute and deliver each Transaction Agreement to which it is a party and to perform and consummate the Transactions.  Buyer has taken all action necessary to authorize the execution and delivery of each Transaction Agreement to which it is a party, the performance of its respective obligations thereunder, and the consummation of the Transactions.  Each Transaction Agreement to which Buyer is a party has been duly authorized by, and has been or will be duly executed, and delivered by, and, assuming the due authorization, execution and delivery thereof by each counterparty, is Enforceable against, Buyer.

**Section 4.03   Governmental Authorization**.   Except as set forth in <u>Section 4.03</u> of the Buyer Disclosure Schedule, the execution, delivery and performance by Buyer of the Transaction Agreements to which it is a party and the consummation of the Transactions require no action by or in respect of, or filing with, any Governmental Body.

**Section 4.04   Non-Contravention**.   Except as set forth in <u>Section 4.04</u> of the Buyer Disclosure Schedule, the execution, delivery and performance by Buyer of the Transaction Agreements to which it is a party and the consummation of the Transactions do not and will not (a) result in a violation of the Organizational Documents of Buyer or (b) violate any applicable Law.

**Section 4.05   Finders' Fees**.   There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer or any of its Affiliates who might be entitled to any fee or commission from Sellers or any of their Affiliates upon consummation of the Transactions.

**Section 4.06   Available Funds**.   Buyer has, or will at Closing have, access to the funds required to be provided by Buyer for the consummation of the Transactions and for the satisfaction of all of Buyer's obligations under the Transaction Agreements.  Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

**Section 4.07   Solvency**.   Buyer is solvent for all purposes under federal bankruptcy and applicable state fraudulent conveyance transfer and fraudulent conveyance Laws.  Buyer's payment of the amounts due hereunder at the Closing will not render Buyer insolvent and does not constitute a fraudulent transfer or conveyance under such Laws.

**Section 4.08   Litigation**.   Except as set forth in <u>Section 4.08</u> of the Buyer Disclosure Schedule or as otherwise subsequently disclosed in writing to Seller prior to the Closing Date, there is no Proceeding pending against, or to the Knowledge of Buyer, threatened against or affecting, Buyer before any court or arbitrator or any Governmental Body, which is reasonably

33

likely to have a Buyer Material Adverse Effect, or which seeks to prevent, enjoin, alter or materially delay the transactions contemplated by the Transaction Agreements.

Section 4.09   **Independent Investigation**.   Buyer is an experienced and knowledgeable investor in the electric power and natural gas industries that has previously expended substantial amounts in the acquisition and development of electric power assets, including sales of retail electricity and natural gas products and related services in the locations contemplated by the Assigned Contracts.   Prior to entering into this Agreement, Buyer was advised by and has relied solely on its own legal, tax and other professional counsel concerning this Agreement and the Purchased Assets and their value.   Buyer is knowledgeable of the usual and customary practices of the electric power and natural gas industries, including reliance on the advice of experts (e.g., attorneys, tax advisors, accountants and valuation specialists).   Prior to the Execution Date, Buyer has conducted due diligence on the Purchased Assets and has had access to or received, the properties, books, records and personnel of Sellers related to the Business, and it has had access to the Purchased Assets, the officers and employees of Sellers, and the books, records and files of Sellers relating to the Purchased Assets.   Without limiting any claims or remedies for fraud or willful misconduct, in making the decision to enter into this Agreement and consummate the Transactions, Buyer has relied solely on the basis of its own independent due diligence investigation of the Purchased Assets, upon the representations and warranties in Article 3 and upon the covenants of Sellers in Article 5 and otherwise in this Agreement and the other Transaction Agreements, and not on any other representations, warranties or covenants of Sellers or any other Person.

Section 4.10   **Regulatory and Contractual Requirements**.   Buyer has all Permits required by applicable Law to perform the obligations of the applicable Seller under each Assigned Contract.   There are no Proceedings pending, or to the Knowledge of Buyer, threatened that would reasonably be expected to result in a Buyer Material Adverse Effect.   Each such Permit is in full force and effect in accordance with its terms and no outstanding written notice of a material violation, revocation, cancellation, or termination of any such Permit has been received by Buyer that would be reasonably expected to result in a Buyer Material Adverse Effect.   There is no Proceeding pending or, to the Knowledge of Buyer, threatened that seeks the revocation, cancellation or termination of any such Permit, and Buyer is in compliance with all such Permits, except in each case that for such Proceeding or non-compliance that would not reasonably be expected to result in a Buyer Material Adverse Effect.   Buyer is enabled with each electric utility or natural gas local distribution company that serves the accounts under each Assigned Contract.

## ARTICLE 5

## COVENANTS OF SELLERS

Section 5.01   **Access to Information; Delivery of Information**.

(a)      From the Execution Date through the Closing Date, each Seller shall respond to reasonable requests of Buyer and its representatives (including its legal advisors, financing sources, financial advisors and accountants) for access, during normal business hours and upon reasonable advance notice, to the properties, books, Records and personnel of such Seller related to the Purchased Assets or the Assumed Liabilities; provided, however, that in no event

34

shall a Seller be obligated to provide (i) access or information that would be in violation of applicable Law, (ii) bids, letters of intent, expressions of interest, or other proposals received from others in respect of the Business or in connection with the Transactions or otherwise, and information and analyses relating to such communications, (iii) any information that constitutes Attorney Work Product or that would violate any legal privilege available to such Seller or any of its Affiliates relating to such information or would cause such Seller or any of its Affiliates to breach a confidentiality obligation to which it is bound; provided, however, that such Seller and its Affiliates have used reasonable best efforts to obtain any necessary Third Party consents to such inspection or disclosure, or (iv) personnel records of such Seller or any of its Affiliates relating to individual performance or evaluation records, medical histories or other information the disclosure of which is prohibited by applicable Law. In connection with such access, Buyer's representatives shall cooperate with Sellers' representatives and shall use their reasonable best efforts to minimize any disruption of the Sellers' Business.  During such applicable period, Buyer shall abide by the terms of the Confidentiality Agreement and any rules of conduct reasonably imposed by such Seller or its Affiliates, as the case may be, with respect to such access and any information furnished to them or their representatives pursuant to this Section 5.01(a).

(b)     On or before the date that is ten (10) Business Days after the Execution Date, Sellers shall deliver to Buyer an electronic file containing the information set forth in Annex 5.01 for each Assigned Contract and the account(s) related thereto.  For a period beginning on the date such information is initially provided to Buyer pursuant to this Section 5.01(b) until the Final Assignment Date, Sellers shall provide to Buyer an updated list of all remaining active Customers under Assigned Contracts on at least a weekly basis and shall respond promptly (but in any event, within two (2) Business Days) to Buyer's requests related to such information.

(c)     On and after the Execution Date through the Final Assignment Date and for a period of one (1) year thereafter or until its discontinuation of its existence, whichever is shorter, but in any event not less than ninety (90) days after the Final Assignment Date, Sellers shall respond to reasonable requests of Buyer and its representatives (including its legal advisors and accountants) for additional access, during normal business hours and upon reasonable advance notice, to journal entries, account reconciliations and all other accounting records of Sellers relating to the Purchased Assets and the Assumed Liabilities; provided, however, that in no event shall any Seller be obligated to provide (i) access or information in violation of applicable Law or (ii) any information that constitutes Attorney Work Product or that would violate any privilege available to such Seller or any of its Affiliates relating to such information or would cause such Seller or any of its Affiliates to breach a confidentiality obligation to which it is bound; provided, however, that such Seller and its Affiliates have used reasonable best efforts to obtain any necessary Third Party consents to such inspection or disclosure.  In connection with such access, Buyer's representatives shall cooperate with the Sellers' representatives and shall use reasonable best efforts to minimize any disruption of the Sellers' Business.  Buyer shall abide by the terms of the Confidentiality Agreement and any rules of conduct reasonably imposed by each Seller or its Affiliates, as the case may be, with respect to such access and any information furnished to them or their representatives pursuant to this Section 5.01(c).

(d)     On or prior to the Closing Date, Sellers shall deliver to Buyer the Records and an electronic copy of all items contained in the Data Room.  Prior to the Execution Date, Sellers provided Buyer with a true, correct and complete statement of (i) the identity of each broker

35

with which each Seller is currently in a contractual relationship with regard to any Assigned Contract, (ii) all amounts owed to such broker for each of the three months prior to the Execution Date, and (iii) a good faith estimate of amounts that would (but for the Bankruptcy Cases) become payable to such broker for the period between the Execution Date and the Final Assignment Date. Prior to the Closing Date, Sellers shall update such statement.

**Section 5.02    Data Room Access**.    Sellers agree to provide and maintain access (including the ability to download files) for Buyer to the Data Room at all times until the Account Deadline and not to make any changes to the Data Room except as expressly contemplated by this Agreement.  Sellers shall take all actions reasonably necessary to permit Buyer and Sellers to, as of the Account Deadline (or otherwise shortly after the Final Assignment Date) and prior to the Data Room being taken down or otherwise deleted, each upload a copy of the Data Room, including all updated versions of the final Seller Disclosure Schedules and Annexes, onto a USB flash drive, compact disc or other data storage device.  Sellers agree to provide Buyer with notice prior to taking down or otherwise deleting the Data Room.

**Section 5.03    Conduct of Business**.

Except (a) as otherwise expressly contemplated by this Agreement, (b) as disclosed on Section 5.03 of the Seller Disclosure Schedule, (c) for any limitations imposed on Sellers as a result of their status as debtors-in-possession in the Bankruptcy Cases, including the exercise of their respective fiduciary duties to maximize the value of their respective estates and provided, however, that, Sellers' obligations under this Section 5.03 shall be subject to any limitations on their ability to perform such covenants pursuant to the Bankruptcy Code, including each Seller's ability to pay amounts relating to the period prior to the Petition Date and the impact of Sellers' filing for bankruptcy with respect to any Contract to which any Seller is a party or (d) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), during the period from the Execution Date to and through each applicable Assignment Date (including the Final Assignment Date), each Seller agrees that it shall not take any of the following actions (as each pertains to or is related to the Purchased Assets or the Assumed Liabilities):

(i)    make any material modification, amendment or extension to any Assigned Contract, in each case other than in the Ordinary Course of Business, or terminate any Assigned Contract (excluding any expiration of such Contract in accordance with its terms or any termination other than by exercise of any termination right of Seller);

(ii)    cancel, terminate, fail to file to renew, materially amend, modify or change any Permit (except for an extension);

(iii)    fail to timely pay each Seller's employees all wages owed to such Persons;

(iv)    sell, assign, transfer, convey, license or dispose of any Purchased Assets or incur any Liens on any Purchased Assets (other than Permitted Liens) or allow any Purchased Assets to become subject to any Lien (other than Permitted Liens or a Lien to be released in connection with the Closing);

36

(v)      materially change the credit or risk policies used by Sellers in the origination of any Assigned Contracts;

(vi)      take any action that would monetize or accelerate the collection of receivables relating to the post-Assignment Date period;

(vii)      settle or resolve any pending or threatened Proceeding, unless such settlement or resolution creates no current or future Liability or Lien with respect to the Purchased Assets; or

(viii)      agree, authorize or commit to do or engage in any of the foregoing or take, or agree, or authorize or commit to take, any action that could result in any of the conditions to the Closing set forth in Article 9 not being satisfied.

**Section 5.04    Required Consents**.  Sellers shall use reasonable best efforts to obtain the Required Consents on or prior to the Final Assignment Date; provided, however, that (x) no Seller will be obligated to make any effort to obtain any Required Consent that is not necessary to be obtained as a result of the operation of Section 365 of the Bankruptcy Code, any other applicable Law, or any order of the Bankruptcy Court or other court of competent jurisdiction and (y) in carrying out its obligations under this Section 5.04, no Seller shall be obligated to (1) provide any financial accommodation or other consideration of any nature to any Person to facilitate obtaining any Required Consent, (2) agree to any restrictions on its ability to operate the Business or any Purchased Assets or hold or exercise ownership over any Purchased Assets, or (3) initiate any Proceedings to obtain any such Required Consent.  Nothing in this Section 5.04 shall limit or otherwise modify the Parties' obligations pursuant to Section 5.02.

**Section 5.05    Non-Competition**.

(a)      Each Seller agrees that, for a period of four (4) years following the Closing Date, no Seller shall, and, for a period of two (2) years following the Closing Date, shall cause its Affiliates not to, directly or indirectly (i) solicit, hire, employ, or attempt to solicit, hire or employ, any customer or employee of a Seller or any Person who is or was an existing customer or employee of Seller as of the Execution Date, or with respect to Affiliates, shall cause such Affiliates not to make a Competing Bid, or (ii) engage (whether through any partnership of which it is a member, through any trust in which it is a beneficiary or trustee or through a corporation or other entity in which it has any interest, legal or equitable, or in any other capacity whatsoever), or participate or plan or prepare to engage or participate in the Business or in a business that competes with the Business as it operates as of the Execution Date, including, with respect to any Seller only, the ownership and/or operation of a business or energy services company offering agency or brokerage services (the "***Seller Competitive Business***") in the specific states in which any Seller conducts the Business as of the Execution Date.  Notwithstanding the preceding sentence, nothing in this Section 5.05 shall prohibit any Seller or any of its respective Affiliates from (i) acquiring or holding not more than five percent (5%) of the outstanding equity securities of any Person whose equity securities are listed on a national securities exchange, quoted on the NASDAQ, national or capital markets and whose business activities would otherwise constitute a Seller Competitive Business, (ii) operating its business as currently conducted, including engaging in all activities in furtherance thereof so long as such activities do not constitute the entry into any

37

line of business that is a Seller Competitive Business, or (iii) complying with applicable Law; provided, that each Seller hereby agrees not to share with or transfer, sell or otherwise assign any of such Seller's sales personnel if their job functions relate materially to the Business, in each case, prior to the Closing, or Intellectual Property owned by such Seller that is primarily related to the Business (including its Marks or other related assets) to any Affiliate or Third Party that is engaged in a Seller Competitive Business.  Nothing in this Section 5.05(a) shall apply to or limit the business conducted by any entity acquired by an Affiliate of a Seller or any entity that acquires an Affiliate of a Seller.

(b)    Each of the undertakings in Section 5.05(a) is given to Buyer and to each of its Affiliates.  Sellers acknowledge that it is an entirely independent restriction and is no greater than is reasonably necessary to protect the interests of Buyer and its Affiliates.  If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 5.05 is invalid or unenforceable, the Parties agree that such court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

(c)    Sellers agree that the covenants in this Section 5.05 are reasonable and an integral part of the inducement of Buyer to purchase the Purchased Assets and that Buyer shall be entitled to seek injunctive relief (without the requirement to post bond) in addition to all other legal and equitable rights and remedies available to it in connection with any breach or threatened breach by such individual of any provision of this Section 5.05.

**Section 5.06    License to Purchased IP**.  For a period from the Closing Date until two (2) years following the confirmation by the Bankruptcy Court of Sellers' Chapter 11 plan Buyer hereby grants to Sellers a non-transferrable, non-sublicensable, non-exclusive, royalty-free right and license to use only the object code form of the Purchased IP solely for use in (i) the wind down of the Business, (ii) the transfer of any account associated with an Assigned Contract to Buyer's account with the applicable electric utility or natural gas local distribution company, or (iii) otherwise performing in accordance with this Agreement; provided, however, that if the litigation trust established in the Bankruptcy Cases has not expired on such two (2) year anniversary of the Bankruptcy Court's confirmation of Sellers' Chapter 11 plan, upon the prior written consent of Buyer (not to be unreasonably withheld), the foregoing license shall be extended for an additional one (1) year period; provided, further, that (x) Buyer shall not be required to grant such one (1) year extension more than two (2) times; and (y) Sellers shall not be entitled to any such extension in the event Buyer reasonably determines that any Seller is using, or, since the Closing Date, has used the Purchased IP in a manner inconsistent with the license granted herein.  At all times Sellers shall not, and shall cause their Affiliates to not, (a) use the Purchased IP in any manner, or engage in any other act or omission, that is intended to or would reasonably be expected to tarnish, degrade or disparage the Purchased IP, or that is intended to harm the value of the Purchased IP, (b) register or file applications in any jurisdiction for any intellectual property rights with regard to the Purchased IP or any Intellectual Property which includes any portion of such Purchased IP, (c) contest the ownership or validity of any of the Purchased IP, (d) reproduce, republish, display,

38

duplicate, distribute, copy, transmit, sell, modify, or otherwise exploit the Purchased IP or its object code form, except as expressly provided for in this Section 5.06, or (e) reverse engineer, disassemble, decompile, modify, translate or create derivative works of or improvements to the Purchased IP or its object code form.

Section 5.07   Renewals.   Each Seller shall, throughout the period from the Execution Date to and through each applicable Assignment Date (including the Final Assignment Date), (a) enter into Hedges with respect to all renewed or extended Assigned Contracts consistent with and reflecting those components of the Initial Hedges as set forth on Part 1 of Section 2.01(h) of the Seller Disclosure Schedule, (b) consult with Buyer regarding the entry into Hedges with respect to all renewed or extended Assigned Contracts (and, to the extent Buyer does not object to such Hedges, such Hedges shall be added as a "*Renewal Hedge*" to Part 2 of Section 2.01(h) of the Seller Disclosure Schedule), (c) enter into a separate Renewal Hedge for each renewal of a Large Customer Contract and enter into a separate Renewal Hedge each time, as and when, Sellers renew or extend Assigned Contracts (other than Large Customer Contracts) under which the Counterparties thereto are expected to purchase, in the aggregate, (i) more than 1,000 MWh of electric load per year, with respect to power, and (ii) more than 25,000 Dth of natural gas load per year, with respect to natural gas, and (d) use reasonable best efforts to enter into Acceptable Renewed Contracts with regard to each Assigned Contract which comes up for renewal or extension on or prior to the Account Deadline.

## ARTICLE 6

## COVENANTS OF BUYER

Section 6.01   Access.   After the Closing Date and for a period of one hundred and eighty (180) days thereafter, Buyer will, during normal business hours and upon reasonable advance notice, afford Sellers and their respective agents reasonable access to its properties, books, records and employees relating to the Purchased Assets to the extent necessary to permit Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or third-party litigation); provided, however, that any such access by a Seller shall not unreasonably interfere with the conduct of the business of Buyer; and, provided further, that in no event shall Buyer be obligated to provide (i) access or information that would be in violation of applicable Law; (ii) any information that constitutes attorney work product or that would, if disclosed, violate any privilege available to Buyer or any of its Affiliates relating to such information, or would cause Buyer or any of its Affiliates to breach a confidentiality obligation to which it is bound, provided, that Buyer and its Affiliates have used reasonable best efforts to obtain any necessary Third Party consents to such inspection or disclosure; or (iii) personnel records of Buyer or any of its Affiliates relating to individual performance or evaluation records, medical histories or other information disclosure of which is prohibited by applicable Law. During such applicable period, Sellers shall abide by the terms of the Confidentiality Agreement and any rules of conduct reasonably imposed by Buyer or its Affiliates, as the case may be, with respect to such access and any information furnished to them or their representatives pursuant to this Section 6.01.

DM_US 161223486-35.108028.0011

**Section 6.02    Financing**.  Buyer agrees and acknowledges that Buyer's obligations under this Agreement, including its obligation to effect the Closing, are not dependent on Buyer obtaining any financing.

**Section 6.03    Brokers**.  Buyer will act in good faith to negotiate arrangements with each broker that has, or could have, outstanding commissions owed to it with respect to any Assigned Contracts for the periods following the applicable Assignment Date in order to ensure that such broker is fairly compensated under new or existing arrangements with Buyer.  Except for the Broker Payments, Buyer has no obligation hereunder to pay any outstanding commissions owed by a Seller to any broker, or otherwise cure any such defaults or satisfy any Liabilities with respect to any broker.

**Section 6.04    Contact**.  Prior to the Closing, without the prior written consent of Sellers (such consent not to be unreasonably withheld, conditioned or delayed), Buyer shall not contact any employees or independent contractors of Sellers (or any other Debtor) or any suppliers to, or Customers or other constituencies of the Business, except as contemplated by this Agreement or as Buyer would in the ordinary course of business of Buyer consistent with past practice.

**Section 6.05    Use of Seller Marks**.  Buyer hereby acknowledges that no Seller is conveying ownership rights or granting Buyer or any Affiliate of Buyer a license to use any of such Seller's or its Affiliates' Marks except as specifically provided in this Section 6.05 and Buyer expressly acknowledges and confirms that as between Sellers and Buyer, Sellers shall exclusively own all right, title and interest in and to all of their Marks (including the Licensed Marks) and Sellers retain the right to use all such Marks without restriction.  Each Seller hereby grants to Buyer a perpetual, royalty-free, worldwide, transferrable, non-exclusive right and license to use the Licensed Marks such that Buyer may maintain any existing use of the Licensed Marks on the Purchased Assets without any expansion or material change and may use or reference the Licensed Marks in communications with Customers or Governmental Bodies with regard to the Transactions or as otherwise required by Law.  Without the written consent of the applicable Seller, neither Buyer nor its Affiliates shall use any of the Licensed Marks in connection with any promotions after the Closing and neither Buyer nor any of its Affiliates shall affix any of the Licensed Marks or any colorable imitations thereof on any publications, signage, letterhead, invoices, stationery, business cards, marketing materials, website content or other materials that are created or produced after the Closing.  At all times Buyer shall not, and shall cause its Affiliates not to, (a) use the Licensed Marks in any manner, or engage in any other act or omission, that is intended to or would reasonably be expected to tarnish, degrade or disparage the Licensed Marks, or that is intended to harm the value, reputation or distinctiveness of or the applicable Seller's goodwill in, the Licensed Marks; (b) register or file applications to register in any jurisdiction any trademark, service mark, trade dress, trade name, domain name, social media user name or other identifier of source or origin that consists of, incorporates or is a similar variation, derivation, modification or acronym of, the Licensed Marks; or (c) contest the ownership or validity of any of the Licensed Marks.  Notwithstanding the foregoing, no license shall be necessary with respect to, and Buyer shall not be required to remove any Licensed Mark that appears on, any Purchased Asset.

**Section 6.06    Existing Customers**.  From and after the Execution Date until the applicable Assignment Date with respect to a Customer, without the prior written consent of

40

Sellers, neither Buyer nor any of its Affiliates will provide any confidential Customer data of any Seller provided to Buyer pursuant to this Agreement to any of Buyer's or its Affiliates' employees in sales functions in order to solicit any Customers.  Notwithstanding anything to the contrary herein and for the sake of clarity, nothing in this Section 6.06 or otherwise in this Agreement shall prevent Buyer or any of its Affiliates from entering into one or more transactions with Customers to the extent not constituting a breach of this Section 6.06.

Section 6.07  **Broker Payments**.  Promptly following the date that is sixty (60) days after the Account Deadline, if Buyer has not paid or arranged to pay all Broker Payments, Buyer shall pay an amount, if any, equal to $1,000,000 less all amounts of Broker Payments paid or arranged to be paid by wire transfer of immediately available funds to an account designated by Sellers in writing.

## ARTICLE 7

## COVENANTS OF BUYER AND SELLER

Section 7.01  **Efforts; Further Assurances**.  Subject to the terms and conditions of this Agreement, each Party shall use its reasonable best efforts to promptly take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions as promptly as practicable.  The Parties shall execute and deliver, or cause to be executed and delivered, such other documents, certificates, agreements and other writings as may be reasonably necessary after the Closing to implement expeditiously the Transactions.  Without limiting the foregoing, if Buyer receives any of the Excluded Assets, Buyer shall promptly return or cause the return of such Excluded Assets to Sellers for no additional consideration.  Without limiting the rights of Buyer hereunder, if a Seller retains any of the Purchased Assets, such Seller shall promptly transfer or cause to be transferred such Purchased Assets to Buyer for no additional consideration.  Buyer hereby acknowledges that Bankruptcy Court approval may be required in order to consummate the Closing, and if such approval is required then Sellers shall seek such approval, and Buyer acknowledges that Sellers' obligation to consummate the Closing shall be subject to the receipt of such approval.  Notwithstanding the foregoing, Sellers acknowledge that pending entry of the Bidding Procedures Order and until this Agreement is validly terminated, each Seller is and intends to be obligated under this Section 7.01 to use its reasonable best efforts to promptly take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to either (a) prosecute the Bidding Procedures and Sale Motion to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and Sale Order and close the Transactions as expeditiously as possible within the timeframe provided in the Bidding Procedures Order, or (b) exercise their fiduciary out as provided in Section 10.01(h).  Notwithstanding anything to the contrary under this Agreement or any other Transaction Agreement, no Seller shall have any obligation under any Transaction Agreement to pay any broker commissions or other amounts owing to brokers or, subject to Sellers' obligations under Section 11.01(c)(ii), to retire any renewable energy credits, make any alternate compliance payments, or otherwise satisfy any state renewable portfolio standards or renewable energy standards (however defined), it being agreed and acknowledged that any refusal of Seller to take any such action may nonetheless constitute or give rise to (individually or in the aggregate) a Seller Material Adverse Effect.

41

**Section 7.02    Certain Actions**.  Subject to Section 7.01 and Section 5.04, the Parties shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Body is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Contracts, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

**Section 7.03    Public Announcements**.  No Party will issue any press release or make any public statement with respect to this Agreement or the Transactions without the prior written consent of the other Party, except for any press releases or public statements the making of which are advisable by each Party's legal counsel or required by applicable Law, any listing agreement with any national securities exchange, or in connection with any pleadings or other documents that may be filed by any Party in the Bankruptcy Cases; provided, however, that the Parties will mutually agree on a press release to be issued with respect to the Transactions on the Petition Date and the Closing Date.

**Section 7.04    Seller Disclosure Schedule Supplements**.  Sellers shall promptly upon Buyer's request, as and when provided under any Annex to this Agreement, in the case of clauses (i), (iv) and (v) below, on the Final Assignment Date, and otherwise from time to time prior to the Closing, by written notice to Buyer, (i) amend the list of Assigned Contracts on Section 2.01(a) of the Seller Disclosure Schedule to reflect all Assigned Contracts as of such date (inclusive of all (x) new Assigned Contracts that Buyer has elected to be listed on Section 2.01(a) of the Seller Disclosure Schedule and (y) Acceptable Renewed Contracts) and update any Customer identification numbers set forth on Annex 2.07(b) with respect to any Assigned Contracts to reflect the entering into of an Acceptable Renewed Contract with respect to such Assigned Contract, as well as to remove Assigned Contracts that have expired or otherwise terminated after the Execution Date), (ii) amend Section 7.14 of the Seller Disclosure Schedule in accordance with Section 7.14, (iii) amend the Seller Disclosure Schedule with a corresponding reference to be added in this Agreement to disclose any matter hereafter first arising after the Execution Date that, if existing or occurring at the Execution Date, would have been required to be set forth or described in the Seller Disclosure Schedule or that is otherwise necessary to correct any information in the Seller Disclosure Schedule that has been rendered inaccurate thereby, (iv) amend Part 2 of Section 2.01(h) of the Seller Disclosure Schedule following the Closing to add all Renewal Hedges and (v) provide and update the natural gas storage and capacity allocations, inventory balances and other items in accordance with Annex 2.07(b)(vii) (each, a "***Schedule Supplement***"); provided, however, that Sellers shall promptly provide any Schedule Supplement no later than seven (7) Business Days after the discovery by any Seller of any matter requiring a Schedule Supplement and in any case at least two (2) Business Days prior to the Closing Date and five (5) Business Days following the Account Deadline.  No Schedule Supplement provided pursuant to clause (iii) of this Section 7.04 will be deemed to have amended the Seller Disclosure Schedule, altered any specific account value set forth for any Customer account on Annex 2.07(b), cured any breach of any representation, warranty or covenant or affect any right or remedy of the Buyer under this Agreement, including for purposes of any indemnification or other remedies or termination rights contained or provided in this Agreement or for determining whether or not any condition precedent to Closing for the benefit of Buyer set forth in Article 9 has been satisfied.

42

**Section 7.05    Approvals**.  Each Party shall use its reasonable best efforts to obtain all authorizations, consents, actions, Orders, and approvals of, and to give all notices to and make all filings with, all Governmental Bodies and third parties that are, may be or become necessary for its execution and delivery of, and the performance of its obligations under, this Agreement and the consummation of the Transactions and will cooperate fully with the other Party in promptly seeking to obtain all such authorizations, consents, actions, Orders, and approvals, giving such notices, and making such filings.

**Section 7.06    Notices of Certain Events**.  Without limiting the Parties' representations or warranties in this Agreement, Sellers, on the one hand, and Buyer, on the other hand, shall promptly notify the other of:

(a)    any notice or other communication received from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b)    any notice or other communication received from any Governmental Body in connection with the Transactions or relating to any of the Purchased Assets or the Assumed Liabilities;

(c)    any material breach discovered by such Party, or of which such Party becomes aware, of its representations, warranties or covenants contained in this Agreement or any of the other Transaction Agreements; and

(d)    any Proceedings commenced relating to any of the Purchased Assets or the Assumed Liabilities of which it receives notice, except for any Proceedings in the Bankruptcy Cases, including any adversary proceeding; and

(e)    any other fact, circumstance or event, the existence or occurrence of which such Party acquires Knowledge, (i) which in any manner challenges or seeks to prevent, enjoin, materially alter or materially delay the Transactions, (ii) has resulted in, or would reasonably be expected to result in, a material breach of a representation or warranty made by the notifying Party hereunder or (iii) has resulted in, or would be reasonably expected to result in the failure of any condition set forth in Article 9 to be satisfied.

**Section 7.07    Confidentiality**.

(a)    From and after the Closing, each Seller shall, and shall cause its Affiliates to, hold, and shall cause its or their respective representatives to hold, in confidence, and not to use for any purpose, any Proprietary Information or other confidential information, whether written or oral, with respect to the Purchased Assets, except (i) to the extent that such information is or becomes generally available to or known by the public without a breach by such Seller or any of its Affiliates of the restrictions contained in this Agreement or (ii) as required in connection with any Law, rule, regulation, judicial or administrative Proceedings or as required or requested by any Governmental Body, or self-regulatory authority having appropriate jurisdiction.  The foregoing confidentiality and non-use provisions shall survive the Closing for a period of three (3) years following the Closing Date.

43

(b)       Each Seller and Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect until the earlier of Closing or the termination date provided therein and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement; provided, however, that, and for clarity purposes, following the Closing, the foregoing restrictions will not apply to Buyer's use of documents, Records, data and information concerning the Purchased Assets or the Assumed Liabilities; provided, further, that should Closing occur, the Confidentiality Agreement shall terminate and be of no further force or effect.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 7.07 shall nonetheless continue in full force and effect.

### Section 7.08    Accounts Receivable; Prorated Costs and Expenses.

(a)       Prior to the applicable Assignment Date, each Seller shall perform all of its obligations under each Assigned Contract in accordance with its terms.  On, from and after the applicable Assignment Date, (i) each Seller shall be exclusively entitled to collect all amounts due and payable under the Assigned Contracts that are allocable or attributable to goods delivered and services performed prior to the applicable Assignment Date (the "***Retained Accounts Receivable***"), and (ii) Buyer shall be exclusively entitled to receive and collect on its own behalf all amounts due and payable under the Assigned Contracts that are allocable or attributable to goods delivered and services performed on, from and after the applicable Assignment Date.

(b)       In order to effect Section 7.08(a), with respect to payments received from and after the applicable Assignment Date, Buyer and Sellers shall permit and cause each payment received from a Customer to be applied first, against the invoice, if any, indicated by the Customer; second, if the amount of the payment equals the amount reflected on any outstanding invoice, against such invoice; third, in accordance with the Customer's expressed intent, after contacting a Customer as to substantially matching invoice numbers or amounts; and thereafter, if received within ninety (90) days after the applicable Assignment Date, to Sellers to relieve Retained Accounts Receivable applicable to such Customer, but not create a credit balance, and for payments received on or after ninety (90) days following the applicable Assignment Date, to Buyer.

(c)       If a Seller or Buyer, as the case may be, receives any amount which, pursuant to this Section 7.08, is the property of the Buyer or a Seller, as applicable, (as determined during the reconciliation of the Retained Accounts Receivable and collections under Assigned Contracts as described in Section 7.08(a) above), the amount shall be held in trust for the benefit of the appropriate Party and the receiving Party shall forward such remaining amounts to the other Party by electronic funds transfer within ten (10) Business Days after the determination that such amount is the property of the other Party hereunder.  Each Party will have the right to audit the other Party's books and records at reasonable times during normal business hours, and at such first Party's expense, to ensure compliance with this Section 7.08(c), provided, however, that no Party shall be permitted to exercise such audit rights more than twice.

(d)       The Parties acknowledge that ongoing ordinary course dealings with gas or electric utility or local distribution companies, suppliers, Customers and other relationship partners from time to time result in adjustments to balances owing to and from the various parties due to

44

delivery imbalances and reconciliations, over-delivery or under-delivery of commodity, reconciliation of estimated meter reads, correction of meter reads or similar circumstances, including volume or dollar adjustments attributable to an Assigned Contract that are charged or credited by an electric or natural gas distribution company or ISO ("***Settlement Fees***"). Any such amounts that relate to Assigned Contracts with respect to periods of time prior to the applicable Assignment Date shall be charged or credited to the appropriate Seller and shall, in turn, be charged or credited by the applicable Seller to the Customer under such Assigned Contract in accordance with the terms thereof and applicable Law. If a Seller fails to timely pay any such amounts charged to such Seller, Buyer may pay such amounts and such Seller shall promptly reimburse Buyer the amount of any such payments and indemnify Buyer for any costs incurred in connection therewith. If a Seller fails to promptly credit any amounts to be credited to a Customer, Buyer may issue a credit to such Customer for such amounts and the applicable Seller shall promptly reimburse Buyer the amount of any such payments and indemnify Buyer for any costs incurred in connection therewith. If such amounts to be credited to a Customer are received by Buyer, Buyer may credit such amounts to Customer directly. Any amounts so charged to a Customer shall be a Retained Accounts Receivable to the extent relating to periods prior to the Assignment Date, unless relating to Settlement Fees actually paid by Buyer. Any such amounts so credited to a Customer shall first be applied against any Retained Accounts Receivable of, and reduce the amount of the accounts receivable with respect to, such Customer and any amounts remaining shall be promptly paid by the applicable Seller to Buyer. Buyer may set-off any unpaid claims or other amounts charged or owed but not paid by a Seller pursuant to this Section 7.08 from the Deposit, in either case, if available, and if Buyer elects to set-off any such claims or amounts from the Deposit, Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to pay Buyer all amounts to which it is entitled from the Deposit. The Parties shall cooperate with each other in their efforts to rectify any imbalances that may exist and to avoid or diminish the imposition of Settlement Fees, acting in the ordinary course of business. All claims for payment under this Section 7.08(d), including documentation of the Settlement Fees due or paid, must be made to the other Party within ninety (90) days after the Final Assignment Date. Within fifteen (15) days following the date occurring ninety (90) days following the Final Assignment Date, Buyer shall prepare and deliver to Sellers a statement showing the Settlement Fees attributable to each Party and the net amount of Settlement Fees due to, or owed by, Sellers after taking into account any prior payments. Subject to the immediately following sentence, the Party owing the net amount shall pay it to the applicable other Party within ten (10) days of demand. Sellers will have thirty (30) days to conduct an audit of the records of Buyer pertaining to such Settlement Fees during regular business hours of Buyer, any Settlement Fees arising from the audit will be added to the statement, and the applicable Party owing the net amount (taking into account any prior payments) shall pay it to the other applicable Party within ten (10) days after completion of the audit.

(e)    For purposes of this Section 7.08 and otherwise as set forth herein, if applicable, revenues, costs, expenses and other amounts shall be prorated on a Purchased Asset by Purchased Asset basis. The proration will be based on actual volumes and contract prices for the days before and after the applicable Assignment Date, if that information is available and otherwise based on the number of days of the pending billing cycle and applicable Contract price (with respect to Assigned Contracts) or price determined pursuant to Section 2.07(b)(vii) (with respect to Storage) which precede the applicable Assignment Date and the number of days of such cycle

45

and applicable price which include and follow such date; provided, however, that the Parties may agree to alternative proration methods as to all or a portion of the Purchased Assets and with respect to the types of amounts to be prorated.

(f)    Sellers reserve all Claims against Customers and Third Parties with respect to the Assigned Contracts that accrued prior to the applicable Assignment Date, whether discovered before or after such date.

**Section 7.09    Netting**.  All payment obligations of a Seller that are asserted in good faith as due and owing to Buyer, or of Buyer to any Seller, with respect or to (i) charges from ISOs or (ii) accounts receivable, may be netted against payment obligations of the other that are due and owing the first Party or Parties at the time such payment is due or, in the case of payment obligations of a Seller that are owed to Buyer, set-off from the Deposit, if available, provided that such netting shall only apply within the category of obligations described in each of clauses (i) and (ii) above. If Buyer elects to set-off any obligations from the Deposit, Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to pay Buyer all amounts to which it is entitled from the Deposit.

**Section 7.10    Credit Support**.  Sellers agree to maintain, and cause BP to maintain, in full force and effect all existing Credit Support and other Credit Support requirements of the applicable beneficiaries thereof (other than any additional amounts required to be posted by a public utility commission or similar governing authority after the Effective Date) through the applicable Assignment Date; provided, however, that Sellers' obligations under this Section 7.10 shall terminate on the day immediately following the Final Assignment Date with respect to all Credit Support other than Credit Support relating to Removed Accounts that Sellers have an obligation to transfer to Buyer after the Final Assignment Date under Section 7.17(b); provided further that Sellers shall have no obligation (nor any obligation to cause BP) to replenish any Credit Support that is drawn upon; provided further that, in the event Sellers breach any provision of this Section 7.10 and/or in the event any existing Credit Support is drawn upon, and in connection therewith, the beneficiary of such Credit Support (including but not limited to any electric or natural gas distribution company, any independent system operator ("**ISO**") or regional transmission organization ("**RTO**") or any public utility commission or similar governing authority) takes any action to cause any of the accounts corresponding to any Assigned Contracts to be returned to default service at the applicable utility or distribution company, Sellers shall use commercially reasonable efforts to take all actions permitted by the Bankruptcy Court or any provision of the Bankruptcy Code to seek and cause the transfer and sale on an expedited basis of such Assigned Contracts and related accounts to Buyer. Notwithstanding anything herein to the contrary, nothing herein shall prohibit or restrict BP from transferring any financial responsibility (including Credit Support obligations) that BP currently has in respect of the load of any Seller to PJM Interconnection LLC (or any of their successors or any Affiliate thereof) ("**PJM**") to the applicable Seller, and in connection with such transfer the applicable Seller shall be permitted to post to PJM the Credit Support required by PJM (which for the avoidance of doubt may be a fixed amount) and once posted, Sellers shall be required to maintain such Credit Support in accordance with this Section 7.10 (subject to the provisos set forth above).  Notwithstanding anything herein to the contrary, if any Seller fails to maintain its status in compliance and good standing with any ISO or RTO or fails (or fails to cause BP) to comply with any Credit Support related requirements

46

of any ISO or RTO, including by not replenishing any Credit Support posted to any ISO or RTO that is drawn, by failing to timely maintain or provide any Credit Support or additional Credit Support required by any ISO or RTO, or by withdrawing any Credit Support required by any ISO or RTO, and (x) such failure results, directly or indirectly, in any Assigned Contracts or any accounts associated with any Assigned Contracts not being transferred to Buyer on or before the Final Assignment Date, and (y) the amount of (i) the adjustments under Section 2.07(b) and Annex 2.07(b) and other Damages for which Buyer is entitled to indemnification under Section 11.01, in each case associated with the failure of such accounts to transfer to Buyer (collectively, the "***ISO/RTO Credit Requirement Adjustments***"), if any, plus (ii) the lesser of (A) all other adjustments (other than ISO/RTO Credit Requirement Adjustments) pursuant to the provisions of Section 2.07(b), plus the aggregate amount of any and all Damages for which Buyer is entitled to indemnification under Section 11.01 (other than those associated with ISO/RTO Credit Requirement Adjustments) and (B) the Deposit (without giving effect to any reductions thereto), would exceed, in aggregate, the amount of the Deposit (without giving effect to any reductions thereto) (such excess amount, the "***Excess Amount***"), Sellers and Buyer shall promptly deliver a joint written direction (or multiple joint written directions) to the Escrow Agent (which direction(s) Sellers and Buyer shall be obligated promptly to deliver at such time) authorizing the Escrow Agent to release to Buyer from the Guaranteed Minimum Amount (but, for the avoidance of doubt, not the Deposit) an amount equal to the Excess Amount, which Guaranteed Minimum Amount shall remain in escrow until such time pursuant to the terms of this Agreement. For the avoidance of doubt, amounts calculated under clause (y) above up to the Deposit amount shall be paid to Buyer in accordance with Section 2.07(c) or Section 11.01, as applicable. On the Final Assignment Date, the portion of Guaranteed Minimum Amount that is not subject to a pending claim for Damages by Buyer under this Section 7.10 will be released to Sellers by the Escrow Agent pursuant to a joint written direction promptly delivered to the Escrow Agent by Sellers and Buyer (which Sellers and Buyer shall be obligated promptly to deliver at such time), and promptly upon the resolution by Sellers and Buyer of any such claim for Damages under this Section 7.10, the portion of such Guaranteed Minimum Amount corresponding to the amount of the claim resolved in favor of Sellers or Buyer, as applicable, will be released to the prevailing Party by the Escrow Agent pursuant to a joint written direction promptly delivered to the Escrow Agent by Sellers and Buyer (which Sellers and Buyer shall be obligated promptly to deliver at such time).

### Section 7.11    Submission for Bankruptcy Court Approval.

(a)    No later than the close of business on the third (3rd) Business Day following the Petition Date, Sellers shall file the Bidding Procedures and Sale Motion. The Parties shall use their respective reasonable best efforts and the Sellers shall require the other Debtors to use their respective reasonable best efforts to have (i) the Bankruptcy Court enter the Bidding Procedures Order as promptly as practicable after the filing of the Bidding Procedures and Sale Motion, (ii) the Auction commence at least two (2) days prior to the Sale Hearing, and (iii) the Bankruptcy Court enter the Sale Order as promptly as practicable after the completion of the Auction but, in any event, no later than seventy (70) days following the Petition Date. Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Liens on the Purchased Assets and all non-debtor parties to the Assigned Contracts, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as

47

Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings or other proceedings in the Bankruptcy Court relating to this Agreement or the Transactions.  Sellers shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be in form and substance acceptable to Buyer in its commercially reasonable discretion and submitted to Buyer prior to their filing with the Bankruptcy Court to provide Buyer a reasonable opportunity to review and comment, and Sellers shall use reasonable best efforts to incorporate Buyer's reasonable comments related to such filing.

(b)      A list of the Assigned Contracts shall be filed as an exhibit to the Bidding Procedures and Sale Motion (or, if required by the Bankruptcy Court, a motion to assume and assign the Assigned Contracts), and shall be described in sufficient detail to provide adequate notice to the Counterparties to such Assigned Contracts.  Such exhibit shall set forth the applicable Cure Payment, if any, for each Assigned Contract as reasonably estimated in good faith by Sellers.  Sellers shall, upon the written request of Buyer, file amendments to Section 2.01(a) of the Seller Disclosure Schedule and Annex 2.07(b) prior to the Closing, as such may be modified pursuant to the terms of this Agreement or to add any Assigned Contracts that have been inadvertently omitted prior to the Closing Date.

(c)      Sellers and Buyer shall consult with one another regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order; provided, however, that, Sellers shall not be required to consult with Buyer with respect to any pleadings relating to a Competing Bid.  Sellers shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that any Seller has in its possession (or receives) pertaining to the Bidding Procedures and Sale Motion, the Bidding Procedures Order, the Sale Order or any other order related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel.

(d)      If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, Sellers and Buyer (provided that Buyer has been able to obtain standing in any such proceeding) shall use their reasonable best efforts, and Sellers shall require the other Debtors to use their respective reasonable best efforts, to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)      Sellers and Buyer acknowledge that this Agreement and the Transactions are subject to entry of the Bidding Procedures Order and that the obligation to consummate the Closing is subject to entry of the Sale Order.  If there is any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern; provided, however, that nothing in this Section 7.11 shall limit the rights of Buyer hereunder if any Bidding Procedures Order or any Sale Order does not comply with the terms of this Agreement or this Agreement provides additional or different rights to Buyer.

48

**Section 7.12    Overbid Procedures; Adequate Assurance**.

(a)    Sellers and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption of the Assumed Liabilities are subject to higher and/or better bids and Bankruptcy Court approval.  Buyer acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Purchased Assets to prospective bidders, entertaining higher and/or better offers from such prospective bidders, and, if that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "*Auction*") in accordance with the Bidding Procedures Order.

(b)    The Bidding Procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order.  Buyer acknowledges that Sellers and their representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.  Notwithstanding the foregoing, following the closing of an Auction, should an Auction occur, Sellers shall not initiate contact with, solicit, or encourage proposals from any Person with respect to an Alternative Transaction.

(c)    Following the closing of an Auction, should an Auction occur, Sellers, in consultation with the Consultation Parties, shall request that the Bankruptcy Court approve a sale of the Purchased Assets to the highest Qualified Bidder or the Successful Bidder and, if the Successful Bidder fails to close, a sale of the Purchased Assets to the second highest Qualified Bidder or the Backup Bidder. The Backup Bidder shall be legally obligated to close the transaction, as if such Backup Bidder had been the Successful Bidder. No bidder other than the Successful Bidder and Backup Bidder shall be bound to close the Transactions. If both the Successful Bidder and the Backup Bidder fail to close, Sellers, in their sole discretion, may conduct a new auction sale to the extent there is any buyer willing to be a bidder at such auction.  Notwithstanding the foregoing, to the extent Buyer is designated as the Backup Bidder, its obligations as a Backup Bidder hereunder are subject to its right to terminate this Agreement pursuant to Section 10.01(e)(iv).

(d)    Prior to the Sale Hearing, Buyer shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts. Buyer agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's representatives available to testify before the Bankruptcy Court.

(e)    Sellers and Buyer agree, and the Bidding Procedures and Sale Motion shall reflect the fact that, the provisions of this Agreement, including this Section 7.12 and Section 7.13, are reasonable, were a material inducement to Buyer, and were reasonably relied upon by Buyer in deciding, to enter into this Agreement, and are designed to achieve the highest or otherwise best price for the Purchased Assets.

49

**Section 7.13    Expense Reimbursement and Termination Fee**.

(a)    Sellers shall, subject to approval by the Bankruptcy Court in the Bidding Procedures Order and without the requirement of any notice or demand from Buyer, pay the Buyer Expense Reimbursement in cash to Buyer within five (5) Business Days if this Agreement is terminated pursuant to Section 10.01(b), Section 10.01(d)(i), Section 10.01(e), Section 10.01(f), Section 10.01(h) or by Buyer pursuant to Section 10.01(g) or Section 10.01(l).

(b)    Sellers shall, subject to approval by the Bankruptcy Court in the Bidding Procedures Order and without the requirement of any notice or demand from Buyer, pay the Termination Fee in cash to Buyer within five (5) Business Days if this Agreement is terminated pursuant to Section 10.01(b), Section 10.01(d)(i), Section 10.01(e), Section 10.01(f)(i), Section 10.01(f)(iv), Section 10.01(h) or by Buyer pursuant to Section 10.01(g) or Section 10.01(l), or upon Bankruptcy Court approval of the Successful Bidder in the event that a bidder other than Buyer is the Successful Bidder at the Auction (unless Buyer is the Backup Bidder, in which event the Termination Fee shall be payable by Sellers to Buyer within the sooner to occur of five (5) Business Days after the closing of the sale of the Purchased Assets to such Successful Bidder or the End Date.)

(c)    Subject to approval of the Bidding Procedures Order by the Bankruptcy Court, the claim of Buyer in respect of the Buyer Expense Reimbursement and the Termination Fee shall each constitute an allowed super-priority administrative expense claim against Sellers in the Bankruptcy Cases pursuant to Sections 503 and 507(b) of the Bankruptcy Code.

**Section 7.14    Cure Payments**.  Section 7.14 of the Seller Disclosure Schedule sets forth Sellers' good faith estimate, as of the Execution Date, of all Cure Payments.  Sellers shall provide an update to Section 7.14 of the Seller Disclosure Schedule no later than five (5) days prior to the anticipated Sale Hearing.  Subject to entry of the Sale Order, Sellers shall, on or prior to the applicable Assignment Date, pay, or cause to be paid, the Cure Payments and cure any and all other defaults and breaches under the Assigned Contracts so that such Assigned Contracts may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.  Sellers shall promptly take such actions as are reasonably necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of such Assigned Contracts.  For the avoidance of doubt, Buyer shall not be responsible for curing any non-monetary defaults under the Assigned Contracts, nor shall Buyer be required to pay any Cure Payments.  Notwithstanding any other provision of this Agreement, in the event Seller fails to pay, or cause to be paid, any Cure Payment, Buyer's sole remedy shall be to remove such Assigned Contract from Part I or Part II of Annex 2.07(b) and to designate such Assigned Contract as a Removed Contract to be treated in accordance with Section 7.17(c).

**Section 7.15    Rejected Contracts**.    Sellers shall not reject any Contract that is an Assigned Contract in the Bankruptcy Cases or any other bankruptcy proceeding following the Execution Date without the prior written consent of the Buyer; provided, however, that Sellers shall not be restricted from rejecting any Contract that is an Excluded Asset.

**Section 7.16    Competing Bids**.  Sellers shall (a) promptly notify Buyer if Sellers receive any Competing Bid after the Execution Date and (b) keep Buyer reasonably informed with respect

50

to the status of the foregoing without breaching any Law, fiduciary duty or duty of confidentiality owed to any Person, or waiving any legal or similar privileges.  Within one (1) Business Day of the Bid Deadline, Sellers will inform Buyer as to whether or not there will be an Auction.

**Section 7.17    Customer Transition**.

(a)      Each Party shall use reasonable best efforts, and cause their Affiliates and representatives to use reasonable best efforts, to cause the Assignment Date for each Assigned Contract to occur on or as promptly as practicable after the Closing Date.

(b)      If (i) the Assignment Date has not occurred for any reason with respect to any account under an Assigned Contract by the one hundred and twentieth (120th) day after the Closing Date (the "***Account Deadline***") and an Account Transfer Date has not been established for such account by the Account Deadline, or (ii) Seller has not delivered to Buyer a true, correct and complete copy of an Assigned Contract with respect to any account and Buyer desires to remove such Assigned Contract from Annex 2.07(b), as applicable, in each case, such account shall be deemed to be a "***Removed Account***" and shall cease to be considered part of an Assigned Contract for all purposes under this Agreement. If there is no longer any account associated with an Assigned Contract, then such Assigned Contract and any related Storage shall become Excluded Assets. In no event shall Sellers have any obligation to maintain a Removed Account after the Account Deadline, and Buyer acknowledges and agrees that Sellers may take all steps to terminate a Removed Account in its sole discretion at any time after the Account Deadline, including terminating the Assigned Contract governing such Removed Account; provided, however, that each Seller's obligations hereunder to maintain and transfer a Removed Account shall continue after the Account Deadline and until the consummation of any Chapter 11 plan for Sellers to the extent (A) the failure to achieve the Assignment Date with respect to such account by the Account Deadline was due to Seller's failure to perform in accordance with the terms of this Agreement, (B) promptly upon becoming aware of such failure, Buyer notified the Seller with specificity of such failure and the specific action required by this Agreement that Buyer was requesting the Seller to perform, (C) the Seller could take such requested action through the exercise of reasonable best efforts, and (D) the Seller failed to exercise such reasonable best efforts to do so.

(c)      From the Closing Date until the Final Assignment Date, on at least a bi-weekly basis (and otherwise upon the reasonable request of a Seller) Buyer shall provide to Sellers an updated list of the Account Transfer Dates for each account associated with an Assigned Contract and, for those that have not yet received an Account Transfer Date, a status report of the where such account is in the transfer process.

(d)      Both Parties shall agree to a form of notice regarding Sellers' Bankruptcy Cases and the transition of Sellers' customer accounts to be sent to the brokers to which Sellers are engaged in a form and substance that is reasonably acceptable to both Parties.

**Section 7.18    Post-Closing Cooperation**.  From and after the Closing, the Parties shall, and shall cause their respective Affiliates and representatives to, cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and

51

(c) do such other acts and things, all as any Party may reasonably request for the purpose of carrying out the transactions contemplated hereby.

**Section 7.19    Employee Matters**.  The Parties hereby agree that Buyer or one of its Affiliates may (in its sole discretion) offer at-will employment to any employee or former employee of a Seller or other Debtor and no Seller shall interfere with or impede Buyer's attempts to employ such Person; provided, however, that neither Buyer nor any of its Affiliates shall make any offer of employment to any of Sellers' employees that Sellers have informed Buyer in writing are subject to any incentive or retention plan offered by Sellers for employment that will begin before the earlier of (a) the date of retention under the applicable incentive or retention plan, or (b) the effective date of any Chapter 11 plan for the Sellers.  The Parties hereby agree that Buyer is not assuming any Liabilities with respect to any past or present brokers, employees or agents of a Seller and, except to the extent Buyer expressly agrees to take any actions with regard to a particular employee or former employee in any new arrangements made by Buyer and such Person, Buyer shall have no obligation to any Seller with regard to this Section 7.19 or to any employee or former employee of any Seller or other Debtor.

**Section 7.20    Hedges.**  On the dates required pursuant to Annex 7.20, Sellers and Buyer shall enter into novation agreements in the forms attached hereto as Exhibit F-1 or Exhibit F-2, as applicable, to cause the volumes under the Hedges listed on Section 2.01(h) of the Seller Disclosure Schedule to be novated from Sellers to Buyer in an amount equal to the Contract Quantities (determined pursuant to Annex 7.20).  BP shall be a third-party beneficiary of this Section 7.20 and shall have all of the rights, benefits and privileges of a third-party beneficiary, including an independent right of action to enforce such rights, benefits and privileges directly, without the consent or joinder of the Parties or any other Person.

**Section 7.21    Natural Gas Storage and Inventory.**  Each Party shall use commercially reasonable efforts to take all actions and execute all documents on or prior to the Final Assignment Date to transfer the Storage associated with the Assigned Contracts in the amounts provided in this Agreement, in each case in accordance with applicable local distribution utility tariffs and applicable Law.

**Section 7.22    Customer Notifications**.  As soon as reasonably practicable following the entry of the Sale Order, the Notice Party (as defined below) shall prepare and deliver all notices and/or consent solicitations, if any, in connection with the Transactions (the "***Assignment Notices***") to all Customers, Governmental Bodies and other Persons, in each case as required by and in accordance with all Assigned Contracts and applicable Laws, as may be modified by any order of the Bankruptcy Court or any provision of the Bankruptcy Code (the date on which such notice are sent being the "***Assignment Notice Date***").  The "***Notice Party***" shall be (i) if the Assignment Notice is required to be executed or delivered by a Seller or jointly by Buyer and a Seller, then Sellers, and (ii) if the Assignment Notice is required only to be executed or delivered by Buyer, then Buyer.  At a reasonable time prior to the Assignment Notice Date, the Notice Party shall provide the other Party (Sellers or Buyer as applicable) with forms of such Assignment Notices and a reasonable opportunity to review and comment on the form of such Assignment Notices.  The Notice Party will incorporate the other Party's comments therein and Sellers and Buyer shall coordinate the process for sending out such Assignment Notices on the Assignment Notice Date.  Notwithstanding anything to the contrary contained in this Agreement, the applicable

52

Notice Party shall bear the costs and expenses incurred in preparing, reviewing and delivering the applicable Assignment Notices. Any Customer notifications required by Law or Assigned Contract to be sent after the applicable Assignment Date shall be the responsibility of Buyer at Buyer's sole cost and expense. For the avoidance of doubt, the Sellers' obligations to deliver the Assignment Notices required by this Section 5.02 are separate and apart from Sellers' obligations to deliver the Potential Assumption and Assignment Notice (in form and substance acceptable to Buyer) pursuant to and as defined in the Bidding Procedures Order.

## ARTICLE 8

## TAX MATTERS

**Section 8.01   Tax Definitions**.  The following terms, as used herein, have the following meanings:

"***Pre-Closing Tax Period***" means (i) any tax period ending before the Assignment Date, and (ii) with respect to a tax period that commences before but ends on or after the Assignment Date, the portion of such period up to but not including the Assignment Date.

"***Tax***" means any tax, governmental fee, duty, levy or other like assessment or charge of any kind whatsoever (including all U.S. federal, state, local foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, commercial activities, transfer, sales, use, value added, occupation, escheat, property, excise, severance, payments or fees in lieu of taxes, payments pursuant to a tax increment financing or similar agreement, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other similar governmental charges (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Body (a "***Taxing Authority***") responsible for the imposition of any such tax, and any liability for such amounts as a result of applicable Law or a contractual obligation to indemnify any Person (other than a contractual obligation the primary purpose of which does not relate to Taxes that was entered into in the Ordinary Course of Business).

**Section 8.02   Tax Cooperation; Allocation of Taxes**.

(a)     Sellers and Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Sellers and Buyer shall each retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six (6) years following the Closing Date. Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets.

(b)     All Taxes levied, due or owing with respect to the Purchased Assets (collectively, the "***Apportioned Obligations***") for a taxable period which includes (but does not

DM_US 161223486-35.108028.0011

end on) the applicable Assignment Date (the "***Proration Period***") shall be apportioned between Sellers and Buyer based on the number of days of such taxable period for each Taxing Authority included in the Pre-Closing Tax Period and the number of days of such taxable period beginning on the day following the Assignment Date (with respect to any such taxable period, the "***Post-Closing Tax Period***"). If the precise amount of any Apportioned Obligation cannot be ascertained Assignment Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  Sellers shall be liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period.  To the extent any Taxing Authority imposes on Sellers a Tax attributable to a Post-Closing Tax Period, Sellers shall be entitled to a reimbursement as described in Section 8.02(d).

(c)    All excise, sales, use, local, value added, VAT, stamp duty, registration stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and fees (collectively, "***Transfer Taxes***") incurred in connection with the Transactions shall be borne equally, by Buyer and Seller.  Buyer shall furnish Sellers with any valid exemption certifications and other similar documentation.  Sellers shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, subject to Buyer's review and reasonable comment, and, if required by applicable Law, Buyer will join in the execution of any such Tax Returns and other documentation.

(d)    Apportioned Obligations and Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law.  The paying party shall be entitled to reimbursement from the non-paying party to the extent provided in Section 8.02(b) or Section 8.02(c), as the case may be.  Upon payment of any such Apportioned Obligation or Transfer Tax, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under Section 8.02(b) or Section 8.02(c), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying Party shall make such reimbursement promptly but in no event later than thirty (30) days after the presentation of such statement.  Any payment not made within such time shall bear interest at the annual rate of 10% for each day until paid.

## ARTICLE 9

## CONDITIONS TO CLOSING

**Section 9.01   Conditions to Obligations of Buyer and Seller**.  The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction, on or before the Closing, of the following condition unless waived in writing by each of the Parties:

(a)    There must not be issued and in effect, or any Proceeding by a Governmental Body seeking, any Order restraining or prohibiting the Transactions or any material portion thereof.

54

**Section 9.02   Conditions to Obligations of Buyer**.   The obligation of Buyer to consummate the Closing is subject to the satisfaction, on or before the Closing, of each of the following further conditions unless waived in writing by Buyer:

(a)   Sellers shall have performed in all material respects the covenants and agreements contained in this Agreement that are required to be performed by it prior to the Closing Date.

(b)   (i) Each of the representations and warranties of Sellers set forth in Section 3.01, Section 3.02, Section 3.03, Section 3.04, Section 3.05(b) and Section 3.08 (excluding a breach of Section 3.08 to the extent relating solely to Contract(s) for which an adjustment to the Base Price has been or will be made under Section 2.07(b)), shall be true and correct in all respects on and as of the Execution Date and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), and (ii) all of the other representations and warranties of Seller set forth in Article 3 shall be true and correct (without giving effect to any "materiality" or "Seller Material Adverse Effect" or similar qualifier) on and as of the Execution Date and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), except for such failures of such representations and warranties to be true and correct in the aggregate which would not, when aggregated with all Damages incurred or reasonably anticipated to be incurred by Buyer for which Seller would owe an obligation to indemnify Buyer pursuant to Section 11.01, have a Seller Material Adverse Effect.  For purposes of the foregoing clause (ii), a Seller Material Adverse Effect shall be deemed not to exist or to have occurred with respect to breaches of any representations or warranties in Article 3, unless the aggregate Damages arising from such breaches combined with any Damages incurred or reasonably anticipated to be incurred by Buyer for which Seller would owe an obligation to indemnify Buyer pursuant to Section 11.01, exceeds the Deposit.

(c)   Buyer shall have received a certificate from an authorized officer of each Seller, dated the Closing Date, to the effect that, to the best of such officer's actual knowledge, the conditions set forth in Section 9.02(a), Section 9.02(b) and Section 9.02(e) have been satisfied.

(d)   The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order and such orders shall each be a Final Order (unless such Final Order requirement is waived by Buyer in its sole discretion).

(e)   The Restructuring Support Agreement shall be in full force and effect.

(f)   Sellers' authorization to use the Cash Collateral remains in place.

(g)   The Closing Date Value shall not be less than the sum of the (i) Guaranteed Minimum Amount and (ii) the aggregate amount of Broker Payments.

(h)   The Bankruptcy Court shall have entered one or more orders (which may be the Sale Order), in form and substance reasonably satisfactory to Buyer, approving the

55

assumption and assignment of the Assigned Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code and such order(s) shall be a Final Order (unless such Final Order requirement is waived by the Buyer in its sole discretion).

(i)    Sellers shall have delivered, or caused to be delivered, all items required to be delivered, or caused to be delivered, by them pursuant to Section 2.10 in accordance with Section 2.10.

(j)    From the date of this Agreement, there shall not have occurred and be continuing any Seller Material Adverse Effect; provided, however, that a Seller Material Adverse Effect shall not be deemed to have occurred under clauses (b) or (c) of the definition of "Seller Material Adverse Effect" unless the applicable fact, change, circumstance, occurrence, effect, event, result or development could reasonably be anticipated to cause the Final Purchase Price to be less than the Guaranteed Minimum Amount if the floor set forth in Section 2.07(b)(viii)(A) did not exist.

(k)    Sellers and BP have entered into confirmations under the Agera/BP ISDA evidencing each of the Hedges listed in Section 2.01(h) of the Seller Disclosure Schedule.

**Section 9.03   Conditions to Obligation of Each Seller**.  The obligation of Sellers to consummate the Closing is subject to the satisfaction, on or before the Closing, of each of the following further conditions unless waived in writing by each Seller:

(a)    Buyer shall have performed in all material respects the covenants and agreements contained in this Agreement that are required to be performed by it prior to the Closing Date.

(b)    (i) Each of the representations and warranties of Buyer set forth in Section 4.01, Section 4.02 and Section 4.05, shall be true and correct in all respects on and as of the Execution Date and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, and (ii) all of the other representations and warranties of Buyer set forth in Article 4 shall be true and correct on and as of the Execution Date and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), except for such failures of such representations and warranties to be true and correct which would not, in the aggregate, have a Buyer Material Adverse Effect.

(c)    Sellers shall have received a certificate from an authorized officer of Buyer, dated the Closing Date, to the effect that, to the best of such officer's actual knowledge, the conditions set forth in Section 9.03(a), Section 9.03(b) and Section 9.03(d) have been satisfied.

(d)    From the date of this Agreement, there shall not have occurred and be continuing any Buyer Material Adverse Effect.

56

(e)      Buyer shall have delivered, or caused to be delivered, all items required to be delivered by it pursuant to Section 2.10 in accordance with Section 2.10, in form and substance reasonably satisfactory to Sellers.

**Section 9.04    Frustration of Closing Conditions**. Neither any Seller nor Buyer may rely on the failure of any condition set forth in Section 9.01, Section 9.02, or Section 9.03 as the case may be, if such failure was primarily caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE 10

## TERMINATION

**Section 10.01  Grounds for Termination**.  This Agreement may be terminated at any time prior to the Closing only:

(a)      by mutual written agreement of Sellers and Buyer;

(b)      by either Buyer, on the one hand, or Sellers, on the other hand: (i) if the Closing has not occurred on or before one hundred (100) days following the Petition Date (the "***End Date***") and (ii) the terminating Party shall not have breached in any material respect any of its obligations under this Agreement, including but not limited to (in the case of Sellers) the obligation to prosecute the Bidding Procedures and Sale Motion and obtain a Sale Order, that would give rise to a failure of a condition to Closing set forth in Article 9;

(c)      by either Buyer or Sellers if (i) a Law shall have been enacted, entered or promulgated prohibiting the consummation of the Transactions or (ii) an Order (other than an Order of the Bankruptcy Court denying approval of the Bidding Procedures Order or the Sale Order) shall have been entered permanently restraining, enjoining or otherwise prohibiting the consummation of the Transactions, and such Order shall have become a Final Order and the Party seeking to terminate this Agreement pursuant to this Section 10.01(c)(ii) shall have used reasonable best efforts to remove such Order; provided, however, that the Party desiring to terminate this Agreement pursuant to this Section 10.01(c) shall not have breached in any material respect any of its obligations under this Agreement, including but not limited to (in the case of Sellers) the obligation to prosecute the Bidding Procedures and Sale Motion and obtain a Sale Order, resulting in a failure of a condition to Closing set forth in Article 9;

(d)      (i) by Buyer if any of the conditions set forth in Section 9.01 or Section 9.02 have not been satisfied as of the End Date or if the satisfaction of such a condition is or becomes impossible (other than through the failure by Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the End Date; or (ii) by Sellers, if any of the conditions set forth in Section 9.01 or Section 9.03 have not been satisfied as of the End Date or if the satisfaction of such a condition is or becomes impossible (other than through the failure of Sellers to comply with its obligations under this Agreement, including but not limited to their obligations to prosecute the Bidding Procedures and Sale Motion and obtain a Sale Order) and Sellers have not waived such condition on or before the End Date;

57

(e)      by Buyer, on the one hand, or Sellers, on the other hand, if (i) the Bankruptcy Court approves an Alternative Transaction and Buyer is not the Backup Bidder, (ii) Buyer is not the Successful Bidder or the Backup Bidder at the Auction, (iii) Buyer is the Backup Bidder at the Auction and closing occurs with the Successful Bidder, (iv) Buyer is the Backup Bidder and the Alternative Transaction does not close by the End Date, (v) the Bankruptcy Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or (vi) an order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or the Sale Order and such order becomes a Final Order;

(f)      by Buyer if (i) any Seller (A) withdraws the Bidding Procedures and Sale Motion or publicly announces its intention to withdraw the Bidding Procedures and Sale Motion, (B) refuses or fails to diligently prosecute the Bidding Procedures and Sale Motion, (C) moves to voluntarily dismiss the Bankruptcy Cases or (D) moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, (ii) the Bankruptcy Court shall not have issued the Bidding Procedures Order on or prior to twenty-eight (28) days following the Petition Date, or such order shall have been vacated or reversed at any time, (iii) the Auction, if applicable, has not occurred within 69 days following the Petition Date, or (iv) the Bankruptcy Court shall not have issued the Sale Order on or prior to seventy (70) days following the Petition Date, or such order shall have been vacated or reversed at any time without the prior written consent of Buyer; provided, however, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 10.01(f)(iv) if Buyer's failure to perform any of obligations under this Agreement has contributed to the issuance of any such judgment;

(g)      by Sellers, on the one hand, or Buyer, on the other hand, upon written notice given to the other Party (or Parties), if the other Party (or Parties) shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Article 9 of this Agreement and (ii) cannot be cured within ten (10) Business Days after the non-breaching Party notifies the breaching Party of such breach or failure;

(h)      by Sellers if they, or the board of directors of any Seller, determines, in consultation with outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or the board's fiduciary obligations under applicable Law, including to pursue an Alternative Transaction and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with the terms hereof).  Sellers retain the right to pursue any transaction that, in Sellers' business judgment, will maximize the value of its estate;

(i)      by Sellers if the Deposit is not timely paid by Buyer in accordance with Section 2.06;

(j)      by Buyer if any Seller has delivered a Schedule Supplement which relates to any event, development or occurrence which would constitute a breach of a representation or warranty of a Seller contained in Article 3 such that the closing condition in Section 9.02(b) cannot be satisfied; provided, however, that Buyer shall not have the right to terminate this Agreement

58

pursuant to this Section 10.01(j) if Buyer does not elect to terminate this Agreement pursuant to this Section 10.01(j) within ten (10) Business Days of receipt of the applicable Schedule Supplement;

(k)     by Sellers, if (i) all conditions set forth in Section 9.01 and Section 9.02 have been satisfied, (ii) all conditions set forth in Section 9.03 have been satisfied, or waived by Sellers, (iii) Sellers by written notice shall have made demand on Buyer to close and the Closing shall not have been consummated within five (5) Business Days after delivery of such notice, and (iv) Sellers stood ready, willing and able to consummate the Closing at all times during such five (5) Business Day period; and

(l)     by Buyer, if (i) all conditions set forth in Section 9.01 and Section 9.03 have been satisfied, (ii) all conditions set forth in Section 9.02 have been satisfied, or waived by Buyer, (iii) Buyer by written notice shall have made demand on Buyer to close and the Closing shall not have been consummated within five (5) Business Days after delivery of such notice, and (iv) Buyer stood ready, willing and able to consummate the Closing at all times during such three (3) Business Day period.

**Section 10.02  Effect of Termination**.

(a)     In the event of termination of this Agreement by Sellers or Buyer pursuant to the terms of Section 10.01, written notice thereof shall forthwith be given to the other Party (or Parties), specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void and of no further force and effect (other than the provisions of Section 2.06 (Deposit), Section 7.03 (Public Announcements), Section 7.07 (Confidentiality), Section 7.13 (Expense Reimbursement and Termination Fee), this Article 10 (Termination) and Article 11 (Miscellaneous), all of which shall survive termination of this Agreement), and there shall be no Liability on the part of Sellers or Buyer or their respective Affiliates or representatives except under such enumerated Sections; provided, however, that subject to the damage limitations of Section 2.06(c) with respect to Buyer and Section 10.02(b) with respect to Sellers, nothing herein shall relieve a Party from any Liability for any breach of this Agreement prior to such termination.

(b)     Subject in all respects to the Bidding Procedures Order, Sellers shall pay to Buyer the Buyer Expense Reimbursement and/or the Termination Fee, to the extent applicable, by wire transfer of immediately available funds if this Agreement is terminated and the Buyer Expense Reimbursement and/or Termination Fee are payable by Sellers in connection with such termination pursuant to the terms of Section 7.13; provided, however, that under no circumstances shall Sellers be obligated to pay the Buyer Expense Reimbursement or the Termination Fee more than once. Notwithstanding anything herein, upon payment by Sellers of the Buyer Expense Reimbursement and/or the Termination Fee pursuant to this Section 10.02(b) and, if applicable, the return of the Deposit pursuant to Section 2.06, except in the case of fraud or willful misconduct, Buyer shall be precluded from any other remedy against Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any recovery, judgment or damages of any kind against Sellers in connection with this Agreement, the other Transaction Agreements or the Transactions.

59

(c)    The Parties acknowledge and agree that upon any termination of this Agreement, payment of the Buyer Expense Reimbursement and/or Termination Fee shall constitute liquidated damages (and not a penalty) and together with the return of the Deposit pursuant to Section 2.06 shall, except in the case of fraud or willful misconduct, be deemed to be the sole and exclusive remedy of Buyer and any other Person against Sellers in connection with this Agreement and the Transactions, and Sellers' former, current or future equity holders, controlling persons, directors, officers, employees, agents, managers, shareholders, Affiliates or assignees and any and all former, current or future equity holders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, shareholders, Affiliates or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assign of any of the foregoing, and each Affiliate, officer, director, employee, controlling person, advisor, agent, attorney or representatives of any such Person (each, a "***Related Party***" and, collectively, the "***Related Parties***"), and no Related Party of Sellers shall have any other Liability for any or all damages suffered or incurred by Buyer or any other Person in connection with this Agreement (and the termination hereof), the Transactions (and the abandonment thereof) or any matter forming the basis for such termination, and, upon termination of this Agreement and payment of the Termination Fee, the Buyer Expense Reimbursement and the return of the Deposit to Buyer hereunder, in each case as applicable, under such circumstances, neither Buyer nor any other Person shall be entitled to bring or maintain any other Proceeding against Sellers or any Related Party and none of Sellers nor any Related Party shall have any further liability or obligation to Buyer arising out of this Agreement or any of the Transactions or any matters forming the basis for such termination. The Parties acknowledge and agree that (i) the agreements contained in this Section 10.02(c) are an integral part of this Agreement and the Transactions and (ii) in light of the difficulty of accurately determining actual damages with respect to the foregoing, the right to any such payment of the Termination Fee and/or Buyer Expense Reimbursement constitutes a reasonable estimate of the damages that will compensate Buyer in the circumstances in which such fees are payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions. Notwithstanding the foregoing, nothing set forth herein shall limit or restrict either Party's rights set forth in Section 11.15 prior to any termination of this Agreement.

## ARTICLE 11

## MISCELLANEOUS

### Section 11.01 Limited Survival of Representations and Warranties; Indemnity.

(a)    <u>Limited Survival of Representations</u>. The representations and warranties set forth in this Agreement or in any certificate delivered hereunder, and each covenant to the extent requiring performance prior to the Closing Date, shall terminate effective as of immediately prior to the Closing Date such that no claim for a breach of any such representation, warranty or covenant may be brought after the Final Assignment Date; provided, however that (i) the representations and warranties of Seller contained in Article 3 shall survive for a period of ninety (90) days following the Final Assignment Date and provided further that Damages available to Buyer relating to the breach of any representation or warranties in Article 3 with respect to any

60

Purchased Asset shall be limited to an aggregate amount equal to the Deposit, and (ii) all covenants and agreements set forth herein that contemplate or may involve actions to be taken or obligations in effect on or after the Closing shall survive the Closing in accordance with its terms until fully performed.

(b)    Indemnification Claims; Establishing Damages. Buyer may deliver to Sellers notice of a claim for indemnification pursuant to Section 11.01(c) below, in accordance with Section 11.01(d), and Buyer may set-off any unpaid claims or other Damages arising from any such breach from the Deposit as set forth in Buyer's notice to Sellers and, if Buyer elects to set-off any such claims or amounts, Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to pay Buyer all amounts that Buyer requests from the Deposit within five (5) Business Days of the later of (i) Sellers' receipt of Buyer's notice of such claim and Buyer's request for disbursement from the Escrow Agent, and (ii) if Sellers deliver a written dispute notice to Buyer within ten (10) Business Days of receipt of Buyer's claim for indemnification, disputing such claim in reasonable detail, the resolution of any such disputes detailed in the applicable dispute notice amongst Sellers and Buyer as to the amount of such Damages. For purposes of establishing the amount of any Damages arising from a breach of any representation or warranty in Article 3 or of any covenant or agreement set forth herein as such breach relates to the value of any Assigned Contract, Sellers and Buyer acknowledge and agree that Buyer shall not be entitled to Damages under this Section 11.01 based on any Assigned Contract not being transferred to Buyer for any reason if the amount required to be paid by Buyer hereunder was reduced by the applicable value included in the Post-Closing Account Value pursuant to Section 2.07. For purposes of this Section 11.01, each representation, warranty, covenant and agreement made by any Seller in this Agreement shall be considered without giving effect to (i) any materiality qualification (including "Material Adverse Effect", "material", "in any material respect", or similar terms or expressions), (ii) any knowledge qualification set forth therein, including "to Sellers' Knowledge", "to the knowledge of" or similar qualifiers, both for purposes of determining whether such representation, warranty, covenant or agreement has been breached and for purposes of determining the amount of any Damages arising out of, related to or in connection therewith, and (iii) with respect to the covenants set forth in Section 5.03, clauses (b), (c) and (d) of the first paragraph of that section.

(c)    Indemnification by Sellers. Sellers agree to indemnify Buyer for Damages incurred by Buyer to the extent arising out of, related to, or in connection with, any of the following:

(i)    Any breach of any representation or warranty of Sellers contained in Article 3 or any breach of any covenant or agreement of Sellers set forth in this Agreement that contemplates or may involve actions to be taken or obligations in effect on or after the Closing.

(ii)    Any Seller having failed to be in compliance with (i) any applicable Laws that relate to the Business or that otherwise affect the Purchased Assets or Assumed Liabilities, including the RPS Noncompliance, or (ii) any rules, filing and reporting requirements applicable to the marketing and sales at retail of natural gas and electric power in the jurisdictions in which such Seller engages in the marketing and sale at retail of natural gas or electric power.

61

(iii)    Any Seller failing to hold any Permit required by applicable Law to conduct the Business or failing to be in compliance with any requirements of such Permits.

(iv)    In respect of any Assigned Contract, any Seller failing to obtain any consent, approval, notice, novation, authorization, or other action by any Person as a result of the execution, delivery and performance of the Transaction (that is not otherwise excused by any order of the Bankruptcy Court or any provision of the Bankruptcy Code), without giving effect to Section 2.05 hereof (the "*Required Consents*").

(v)    All Proceedings identified on <u>Section 3.06</u> of the Seller Disclosure Schedule, including all Ordinary Course Complaints.

(vi)    Any failure to provide fully executed copies, including unsigned final versions of those executed via electronic or digital signature or "click-through" acceptance, of all Significant Contracts.

(d)    <u>Indemnification Procedures</u>. At any time prior to the date which is ninety (90) days following the Final Assignment Date, whenever a claim shall arise for indemnification under this Article 11, Buyer shall promptly provide written notice of such claim to Sellers; provided that the failure to provide notice shall not limit or impair Buyer's claim provided it is received prior to ninety (90) days following the Final Assignment Date. Sellers shall have no right or obligation to assume the defense of Buyer in connection with any claim giving rise to indemnity hereunder resulting from or arising out of any action by a Person who is not a Party to this Agreement. Buyer shall select and retain counsel reasonably satisfactory to Seller and may defend, compromise or settle such claim in its sole and absolute discretion, and all costs, expenses, judgments, awards, settlements and other amounts related thereto shall be deducted from the Deposit and paid to Buyer, and Sellers and Buyer shall deliver a joint written direction to the Escrow Agent (which Sellers and Buyer shall be obligated to promptly deliver at such time) authorizing and directing the Escrow Agent to pay all such costs, expenses, judgments, awards, settlements and other amounts at the direction of Buyer from the amounts in the Escrow Account.

(e)    <u>Limitations on Indemnity Obligations</u>. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to indemnify Buyer under this Section in an aggregate amount greater than the remainder of the Deposit, after taking into account all reductions to the Deposit for adjustments pursuant to the provisions of Section 2.07(b), except as provided in Section 7.10.

**Section 11.02 Notices**.  Any notice or other communication from any Seller to Buyer or Buyer to any Seller shall be made in writing in the English language and shall be (a) delivered by hand or sent by a nationally or internationally recognized courier to the address of the Party set forth below, (b) sent by electronic mail ("*e-mail*") transmission to the e-mail address set forth below, which e-mail transmission shall request receipt of such e-mail transmission. All notices and communications shall be deemed received upon: (a) actual receipt thereof by the addressee or actual delivery thereof to the appropriate address; or (b) in the case of an e-mail transmission, the sender receiving electronic confirmation of receipt of such e-mail transmission:

if to Buyer, to:

DM_US 161223486-35.108028.0011

Exelon Generation Company, LLC
10 South Dearborn Street, 49th Floor
Chicago, IL 60603
Attn:  Nadim A. Kazi, Deputy General Counsel
Tel: 312-394-7143
e-mail: Nadim.Kazi@exeloncorp.com

with a copy to (such copy not to constitute notice):

Exelon Generation Company, LLC
1310 Point Street, 8th Floor
Baltimore, Maryland 21231
Attn: Legal Department
e-mail: Nina.Jezic@constellation.com

and

McGuireWoods LLP
500 East Pratt Street, Suite 1000
Baltimore, MD 21202
Attn:  Cecil E. Martin, III, Esquire
Tel: 410-659-4419
e-mail: cmartin@mcguirewoods.com

if to Seller, to:

Agera Energy LLC
555 Pleasantville Road, Ste. 107
Briarcliff Manor, NY 10510
Attention: Mark Linzenbold, Chief Financial Officer
Tel: 800-692-4372
e-mail: mlinzenbold@ageraenergy.com

with a copy to (such copy not to constitute notice):

McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
Attn: Darren Azman
Tel: 212-547-5615
e-mail: dazman@mwe.com

**Section 11.03  Amendments and Waivers**.

(a)      Any provision of this Agreement or of any other Transaction Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement or such other Transaction

63

Agreement, as the case may be, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)       No failure or delay by any Party in exercising any right, power or privilege hereunder or under any of the other Transaction Agreements shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided or provided in any of the other Transaction Agreements shall be cumulative and not exclusive of any rights or remedies provided by Law.

**Section 11.04  Expenses**.  All costs and expenses incurred in connection with negotiating, preparing and executing the Transaction Agreements shall be paid by the Party incurring such cost or expense.

**Section 11.05  Successors and Assigns**.  The provisions of the Transaction Agreements to which Buyer or any Seller are a party shall be binding upon and inure to the benefit of such Party hereto and thereto and their respective successors and permitted assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement or under any of the other Transaction Agreements without the consent of each other Parties hereto and thereto.  Notwithstanding the foregoing, Buyer may, without Sellers' consents, assign its rights, interests and obligations hereunder to one or more Affiliate(s) of Buyer; provided, that no such assignment by Buyer shall relieve Buyer of its obligations and Liabilities hereunder.

**Section 11.06  Governing  Law**.    THIS  AGREEMENT  SHALL  BE  CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF  LAWS  THAT  WOULD  DIRECT  APPLICATION  OF  ANOTHER  JURISDICTION'S LAWS.

**Section 11.07  Jurisdiction**.  Except as otherwise expressly provided in this Agreement or any of the other Transaction Agreements, and without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes arising out of or in connection with this Agreement or the Transactions or disputes relating hereto and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such proceeding; provided, however, that if the Bankruptcy Cases are closed, any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the other Transaction Agreements or the Transactions shall be brought in a federal court located in the State of New York and that any cause of action arising out of this Agreement or any of the other Transaction Agreements shall be deemed to have arisen from a transaction of business in the State of New York, and each of the Parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding which is brought in any such court has been brought in an inconvenient

64

forum. Process in any such Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

**Section 11.08 Waiver of Jury Trial**.   THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 11.09 Counterparts; Third Party Beneficiaries**.  This Agreement and the other Transaction Agreements may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto and thereto were upon the same instrument. This Agreement and the other Transaction Agreements shall become effective when each Party hereto or thereto shall have received a counterpart hereof or thereof signed by the other Parties hereto or thereto.  Delivery of the signature pages to this Agreement by electronic means, including facsimile and pdf by e-mail, shall be as effective as the delivery of original signatures.  Except as explicitly provided herein or therein, no provision of this Agreement or of any of the other Transaction Agreements is intended to confer upon any Person other than the Parties hereto or thereto any rights or remedies hereunder or thereunder.

**Section 11.10 Entire Agreement**.  This Agreement and the other Transaction Agreements constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement, except for the Confidentiality Agreement, which remains in full force and effect in accordance with its terms and which applies to this Agreement, the Transaction Agreements and the Transactions.

**Section 11.11 Exhibits and Schedules**.  All Exhibits and Schedules hereto, or documents expressly incorporated into this Agreement, are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

**Section 11.12 Captions**.  The captions herein and in the other Transaction Agreements are included for convenience of reference only and shall be ignored in the construction or interpretation hereof or thereof.

**Section 11.13 Severability**.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, however, that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Body or arbitrator not to be enforceable in accordance with its terms, the Parties agree that such Governmental Body or arbitrator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

**Section 11.14 Time is of the Essence**.  With regard to all dates and time periods set forth or referred to in this Agreement or the Transaction Agreements, time is of the essence.

**Section 11.15 Specific Performance**.  Each Party acknowledges and agrees that the other Party would be damaged irreparably if any provision of this Agreement is not performed in

65

accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Parties will be entitled to obtain an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court or any other court specified in Section 11.07 without the need to post a bond or other security, subject to Section 11.06, and Section 11.08, in addition to any other remedy to which it may be entitled, at law or in equity.

**Section 11.16 Waiver of Consequential Damages**. IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY OR ANY OF ITS AFFILIATES FOR SPECIAL, PUNITIVE, INDIRECT, EXEMPLARY, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING LOSS OF PROFITS (TO THE EXTENT SUCH LOSS OF PROFITS DOES NOT CONSTITUTE DIRECT DAMAGES), ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT; PROVIDED, HOWEVER, THAT SUCH LIMITATION OF LIABILITY SHALL NOT APPLY (I) TO FRAUD OR THE GROSS NEGLIGENCE, INTENTIONAL MISREPRESENTATION OR WILLFUL MISCONDUCT OF A PARTY, AND (II) WITH RESPECT TO THIRD PARTY CLAIMS, THE AMOUNT OF ANY SPECIAL, PUNITIVE, INDIRECT, EXEMPLARY, OR CONSEQUENTIAL DAMAGES INCLUDING IN ANY SUCH THIRD PARTY CLAIM, WHICH SHALL BE DEEMED TO BE DIRECT DAMAGES FOR PURPOSES OF THIS SECTION 11.16. THE PARTIES INTEND THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THIS PROVISION SHALL APPLY EVEN IN THE EVENT OF THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE), STRICT LIABILITY, OR BREACH OF CONTRACT OF THE BENEFICIARY THEREOF AND WHETHER ASSERTED IN CONTRACT, IN WARRANTY, IN TORT, BY STATUTE OR OTHERWISE.

*[SIGNATURE PAGE FOLLOWS]*

66

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLER:**

Agera Energy LLC

By: _____
Name: Mark Linzenbold
Title:   Chief Financial Officer

energy.me midwest llc

By: _____
Name: Mark Linzenbold
Title:   Chief Financial Officer

Aequitas Energy Inc.

By: _____
Name: Mark Linzenbold
Title:   Chief Financial Officer

[Asset Purchase Agreement Signature Page]

**BUYER:**

Exelon Generation Company, LLC

By: _____
    Name: Mark Huston
    Title: President,
    Constellation Retail

**BUYER:**

Exelon Generation Company, LLC

By: _____
          Name: Mark Huston
          Title:   President,
          Constellation Retail

[Asset Purchase Agreement Signature Page]

*EXHIBIT A*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated [●], 2019 (this "***Agreement***"), is by and among Agera Energy LLC ("***Agera***"), a Delaware limited liability company, energy.me midwest llc, an Illinois limited liability company ("***energy.me***"), and Aequitas Energy, Inc., a Connecticut corporation ("***Aequitas***" and, together with Agera and energy.me, "***Assignors***") and Exelon Generation Company, LLC, a Pennsylvania limited liability company ("***Assignee***", and, together with Assignor, the "***Parties***," and each individually, a "***Party***").

## RECITALS

A.    Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of [●], 2019 (the "***Asset Purchase Agreement***"), pursuant to which Assignee has agreed to purchase the Purchased Assets and assume the Assumed Liabilities pursuant to the terms of the Asset Purchase Agreement; and

B.    In accordance with the terms of the Asset Purchase Agreement, Assignors and Assignee have agreed to enter into this Agreement, providing for (a) Assignors' sale, conveyance, grant, assignment, transfer and delivery to Assignee of all of Assignors' rights, title and interests in, under and to the Purchased Assets, including without limitation the Assigned Contracts referenced on Schedule A hereto,[1] (b) Assignee's acceptance of such sale, conveyance, grant, assignment, transfer and delivery of the Purchased Assets and (c) Assignee's assumption of all of the Assumed Liabilities, in each case on and subject to the terms of the Asset Purchase Agreement.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.    **Definitions**.  Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Asset Purchase Agreement.

2.    **Assignment**.  Assignors hereby, as of 12:01 a.m. eastern prevailing time on each applicable Assignment Date, sell, convey, grant, assign, transfer, and deliver to Assignee as of the applicable Assignment Date, all of their rights, title and interests in, under and to the Purchased Assets free and clear of all Liens, other than Permitted Liens, in accordance with and subject to the terms and conditions of the Asset Purchase Agreement (such assignments contemplated being collectively the "***Assignment***").

3.    **Acceptance and Assumption**.  Assignee hereby, as of 12:01 a.m. eastern prevailing time on each applicable Assignment Date, (a) purchases, acquires and accepts the sale, conveyance, grant, assignment, transfer and delivery of Assignor's right, title and interest in, under and to the Purchased Assets and (b) assumes the Assumed Liabilities in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, including Section 2.03 thereof.

---

[1] NTD:  To include the Contracts listed on Section 2.01(a) of the Seller Disclosure Schedule.

4.      **Parties in Interest**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.      **Terms of Asset Purchase Agreement**.  The scope, nature, and extent of the Assumed Liabilities are expressly set forth in the Asset Purchase Agreement.  Nothing contained herein will itself change, amend, extend, or alter (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever.  This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement, and the Asset Purchase Agreement is not merged into this instrument.  If any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement will govern.

6.      **Other Provisions**.  The provisions of Article 11 of the Asset Purchase Agreement are hereby incorporated into this Agreement, *mutatis mutandis*.

[*Signature Page Follows*]

2

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**ASSIGNORS:**

Agera Energy LLC

By:    _____
       Name:  Mark Linzenbold
       Title:   Chief Financial Officer

energy.me midwest llc

By:    _____
       Name:  Mark Linzenbold
       Title:   Chief Financial Officer

Aequitas Energy Inc.

By:    _____
       Name:  Mark Linzenbold
       Title:   Chief Financial Officer

[Signature Page to Assignment and Assumption Agreement]

**ASSIGNEE:**


Exelon Generation Company, LLC


By: _____
Name:
Title:

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT B**

<u>Form of Bidding Procedures and Sale Motion</u>

**MCDERMOTT WILL & EMERY LLP**
Timothy W. Walsh
Darren Azman
Ravi Vohra
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5615
Facsimile: (212) 547-5444

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING STALKING HORSE ASSET PURCHASE AGREEMENT AND BID PROTECTIONS, (C) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION AND SALE HEARING, (D) APPROVING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF THE AGERA OPCO ENTITIES' ASSETS; (II)(A) APPROVING THE SALE OF THE AGERA OPCO ENTITIES' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (III) GRANTING RELATED RELIEF**

Agera Energy LLC and the above-captioned debtors, as debtors and debtors in possession

(collectively, the "Debtors") in these chapter 11 cases (these "Chapter 11 Cases"), hereby submit

this motion (the "Motion") pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1 and 6006-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

Southern District of New York (the "Local Rules"), for expedited entry of an order substantially

in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving the

bidding procedures as set forth in **Exhibit 1** to the Bidding Procedures Order (the "Bidding

Procedures") for the sale of substantially all assets ("the Assets") of the Debtors, including those

Assets (the "Purchased Assets") specified in the Stalking Horse APA (as defined below), free

and clear of all liens, claims (as defined in Bankruptcy Code Section 101(5)), encumbrances,

obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever

(the "Sale"); (ii) approving (a) entry into that certain asset purchase agreement (the "Stalking

Horse APA"), dated October 3, 2019 between Exelon Generation Company, LLC (the "Stalking

Horse Bidder") and Agera Energy LLC, Aequitas Energy, Inc. and energy.me midwest llc

(collectively, the "Agera Opco Entities" or the "Sellers"), a copy of which is attached hereto as

**Exhibit B** and (b) the Termination Fee and the Buyer Expense Reimbursement (each as defined

below); (iii) approving the procedures relating to the assumption and assignment of executory

contracts; (iv) preliminarily approving the notice to each relevant non-Debtor contract

counterparty to an executory contract regarding the Debtors' potential assumption and

assignment of such contract and the amount necessary to cure any defaults thereunder; (v)

approving the form and manner of notices of the Sale, auction (the "Auction") and sale hearing

(the "Sale Hearing"); (vi) scheduling the Auction and the Sale Hearing; and (vii) granting related

relief.

2

The Debtors also submit this Motion for the entry of an order (the "Sale Order"): (i) approving the Sale free and clear of liens, claims, interests, and other encumbrances to the Stalking Horse Bidder or to a bidder who submits the highest or otherwise best offer for the Debtors' Assets; (ii) authorizing the assumption and assignment of certain executory contracts (the "Assigned Contracts") to the Stalking Horse Bidder or to a bidder who submits the highest or otherwise best offer for the Debtors' Assets; and (iii) granting related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Todd Sandford Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings*,[2] filed contemporaneously herewith.  The Debtors further rely upon the *Declaration of Richard Klein in Support of the Debtors' Sale Motion*, attached hereto as **Exhibit C** (the "Klein Declaration"), and the *Declaration of Todd Sandford in Support of the Debtors' Sale Motion*, attached hereto as **Exhibit D**, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.       The Debtors commenced these Chapter 11 Cases in order to pursue the sale of their Assets pursuant to Bankruptcy Code section 363 to maximize the value of their estates and the recoveries for all stakeholders.

2.       The Debtors provide retail electricity and natural gas to commercial, industrial, and residential customers.  The Debtors provide customers with "energy choice"—the ability to receive electricity and natural gas needs from a source other than the local utility in certain markets that have been restructured to permit retail competition, which allows customers to tailor

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the First Day Declaration.

3

energy supply to their specific needs.  Across both electricity and natural gas supply, the Debtors

service 87 distinct utility regions and provide service to customers in California, Connecticut,

Delaware, District of Columbia, Illinois, Maine, Maryland, Massachusetts, New Hampshire,

New Jersey, New York, Ohio, Pennsylvania, Texas and Virginia.

3.      The Debtors, after consulting with their advisors, explored various strategic

alternatives and ultimately determined that a sale of the Debtors' Assets would maximize value

for the benefit of all stakeholders.  In May 2019, the Debtors' management interviewed various

investment bankers, including Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC

("Miller Buckfire"), to run a prepetition sale process.  The Debtors ultimately retained Miller

Buckfire, and with Miller Buckfire's support, began the work necessary to run an extensive and

robust prepetition marketing, solicitation, and sale process over a several month period of time.

Those efforts culminated in the Stalking Horse APA.

4.      The Stalking Horse APA provides for the Sale of the Purchased Assets for a

purchase price of $24,750,000.00, plus the assumption of certain liabilities, subject to certain

adjustments, as provided in the Stalking Horse APA.

5.      The bulk of the Purchased Assets proposed to be sold under the Stalking Horse

APA are the Sellers' customer contracts, which the Sellers will assume and assign to the Stalking

Horse Bidder.  The Stalking Horse Bidder is a qualified competitive energy supplier in each

jurisdiction in which the Sellers operate.[3]  As described in more detail below, the size and value

of the Sellers' book of customer contracts decreases with the passage of time.  Specifically,

pending and future regulatory action against the Debtors may soon result in suspension or

revocation of the Debtors' licenses to sell energy in certain states.  In turn, the Debtors would

---

[3] A competitive retail energy supplier sells electricity and natural gas in regulated energy markets to residential, commercial and industrial end-use customers.

4

potentially lose all of their energy customers in such states.  The Stalking Horse APA contains a purchase price adjustment mechanism that will adjust downward for every customer contract not successfully transferred to the Stalking Horse Bidder.

6.      Given the exigencies of the Debtors' business operations and financial condition, and the milestones in the Stalking Horse APA, the Restructuring Support Agreement and the proposed cash collateral use order (the "Cash Collateral Order"), the immediate sale of the Debtors' Assets is the best possible way to maximize value for all stakeholders.

7.      The Debtors have determined, in their sound business judgment, that the proposed Sale to the Stalking Horse Bidder—subject to higher and better offers pursuant to an open auction process approved by this Court—affords the Debtors the best opportunity to maximize value for all stakeholders.

8.      Through negotiating the Stalking Horse APA, the Debtors have developed bidding and auction procedures (the "Bidding Procedures") to proceed toward the solicitation of additional bids and an Auction (if necessary) in accordance with a schedule that complies with the Stalking Horse APA and the Cash Collateral Order, as follows:

| October 14, 2019 | Deadline to Object to Bidding Procedures |
| --- | --- |
| October 15,[4] 2019 | Bidding Procedures Hearing<br>Deadline to file and serve Sale Notice, Potential Assumption and Assignment Notice, and file Executory Contract List with the Court |
| October 29, 2019 | Bid Deadline<br>Sale Objection Deadline<br>Assumption and Assignment Objection Deadline<br>Deadline to Notify Qualified Bidders |
| November 4, 2019 | Deadline to Designate a Baseline Bid<br>Auction (if necessary) |
| November 4, 2019 | Notice of Auction Results filed with the Court (if applicable) |

---

[4] This date is subject to the Court's availability.

5

| November 4, 2019 | Debtors' Reply Deadline<br>Adequate Assurance Objection Deadline |
| November 5, 2019 | Sale Hearing |

9.      The Bidding Procedures are reasonable and designed with the objective of generating the best value for the Debtors' Assets, while affording the Debtors maximum flexibility to execute asset sales in a quick and efficient manner.  The Debtors are confident that the Bidding Procedures and the other relief requested herein satisfy the requirements of Bankruptcy Code section 363 and will facilitate the sale of the Debtors' Assets for the best value for the benefit of all of the Debtors' stakeholders.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 363, and 365, 503, and 507, Bankruptcy Rules 2002, 6004, 6006 and 9014, Rules 6004-1 and 6006-1 of the Local Rules, and the Guidelines for the Conduct of Assets Sales promulgated by General Order M-383 of the Bankruptcy Court (the "Sale Guidelines").

## BACKGROUND

13.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

14.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6

15.     No trustee, examiner, creditors' committee, or other official committee has been

appointed in these Chapter 11 Cases.

16.     The factual background regarding the Debtors, including a description of the

Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases, is

set forth in the First Day Declaration, which is incorporated herein by reference.

**NEED FOR A TIMELY SALE PROCESS**

17.     The Debtors request expedited entry of the Bidding Procedures Order due to, *inter

alia*, (i) the daily decrease in the size and value of the Sellers' book of customer contracts; (ii)

various regulatory issues; and (iii) the Debtors' wind-down plan (each as described in more

detail below).  The Debtors believe that the Auction process and the time periods set forth in the

Bidding Procedures are reasonable and will provide parties with sufficient time and information

to submit a bid for the Debtors' Assets.  In formulating the procedures and time periods after

consulting with its various stakeholders, the Debtors balanced the need to provide adequate and

appropriate notice to parties in interest and potential purchasers with the need to quickly and

efficiently sell their Assets while they have realizable value.  Furthermore, potential bidders have

had, and will, in accordance with the Bidding Procedures, continue to have, access to the

electronic data room.

A.     The Sellers' Book of Customer Contracts

18.     The Sellers' book of customer contracts represents the single largest portion of the

Purchased Assets proposed to be sold to the Stalking Horse Bidder, yet it is also the most

volatile.  There are a number of commercial variables that may adversely impact the size and

value of the Debtors' book of customer contracts at any given moment.  For example, customers

may decide to switch energy suppliers or the contracts may terminate under their bargained-for

terms.  The Debtors would normally offset these decreases by servicing new customers or

7

renewing contracts with existing customers before they expire. However, due to the Debtors'

regulatory issues and wind-down efforts to date (each as described in more detail below), the

Debtors no longer have the infrastructure or, in some situations cannot legally, service new

customers or renew existing customers. Further, while customer attrition is part and parcel of the

Debtors' businesses, the Debtors believe that attrition may be accelerated due to the filing of

these Chapter 11 Cases.

        B.      Regulatory Issues

        19.      As stated in the Sandford Declaration, failure to act in an expeditious manner may

lead to regulatory action that could potentially decrease the size and value of the Sellers' book of

customer contracts. In certain states where the Debtors operate, the Debtors are required to

satisfy renewable portfolio standards ("RPS") as a condition of their license or certification to

supply energy to customers in such states. RPS laws require a certain portion of a state's

electricity consumption to be generated from renewable sources, such as wind, solar, biomass,

geothermal, or hydroelectric.

        20.      Energy suppliers that are required to comply with RPS obligations, such as the

Debtors, must obtain a sufficient amount of renewable energy credits (often called renewable

energy certificates or "RECs") during regular reporting cycles (*e.g.*, annually) with each state.

RECs are created when renewable energy is generated and delivered to the grid. Those

renewable energy producers may then use the RECs to satisfy their own RPS obligations or sell

the RECs they generate to other energy suppliers, such as the Debtors.

        21.      Failure to comply with RPS obligations initially triggers an obligation to pay an

alternative compliance payment ("ACP"), which is essentially a cash payment obligation in lieu

of acquiring RECs. In nearly all instances, the ACP will be more costly than had the energy

8

supplier acquired the necessary RECs.  Ultimately, an energy supplier's failure to satisfy the

ACP will result in the relevant state taking regulatory enforcement action, including suspension

and revocation of the supplier's license to supply energy in such state.

22.    It is impossible to know exactly when a state may take such regulatory

enforcement action as timing is generally not dictated by statute or regulation.  However, the

consequences of suspension or revocation of a supplier's license could result in such supplier

being unable to service new and existing customers.  Given that the Debtors' customer contracts

are their primary assets, the Debtors inability to service customers would have a significant and

irreversible impact on the Purchase Price.

23.    The Debtors are currently in default of their 2018 RPS obligations in

Massachusetts, New Hampshire, and Rhode Island as a result of the Debtors' financial inability

to acquire RECs or subsequently satisfy their ACP obligations.  The Debtors will soon be in

default of RPS obligations in other states.  The Debtors estimate that their inability to satisfy

RPS obligations in the normal course has resulted in an aggregate ACP "premium" of

approximately 60%, as compared to the cost of acquiring the RECs necessary to avoid ACP

obligations.  As of the Petition Date, the Debtors estimate that they owe more than $71 million

on account of REC and ACP obligations for the 2018 compliance year.

i.    Massachusetts Enforcement Action

24.    On July 10, 2019, Agera Energy, LLC ("Agera Energy") received a letter from

the Massachusetts Department of Energy Resources (the "MA DOER") demanding that Agera

Energy immediately satisfy its ACP liability for 2018 in the amount of $41,569,223.80.  The

DOER stated that if it does not receive such payment, it will commence necessary steps for

issuing a Notice of Non-Compliance, including the filing of a petition at the Department of

9

Public Utilities (the "MA DPU") recommending revocation of Agera Energy's licenses to sell

electricity in Massachusetts.

25.       On August 21, 2019, the MA DOER found that Agera Energy had failed to

comply with their RPS obligations for the 2018 compliance year.  The MA DOER referred the

matter to the MA DPU recommending that it revoke or suspend Agera Energy's retail supplier

licenses.

ii.       Rhode Island Enforcement Action

26.       On August 16, 2019, Agera Energy received a letter from the Rhode Island Public

Utilities Commission (the "RI PUC") demanding that Agera Energy immediately satisfy its RPS

obligations for 2018.  The RI PUC stated that if Agera Energy fails to comply by August 23,

2019, the matter would be placed on the RI PUC's August 28, 2019 Open Meeting agenda to (i)

find the Debtors out of compliance with the RPS obligations for 2018, (ii) demand the full

amount of the letter of credit on file, and (iii) refer the matter to the Division of Public Utilities

and Carriers for revocation of the Debtors' license to operate as a nonregulated power producer

in Rhode Island.

27.       On August 28, 2019, during an open meeting, the RI PUC found that Agera

Energy was out of compliance with the RPS obligations for the 2018 compliance year and

authorized a drawdown of the $250,000 letter of credit posted on behalf of Agera Energy with

the RI PUC.  Further, the RI PUC directed the Clerk to transmit its orders to the Division of

Public Utilities and Carriers (the "RI DPUC") for enforcement action against Agera Energy.

28.       On September 13, 2019, the RI DPUC issued Agera Energy a Suspension Order

under which Agera Energy is prohibited from entering into new contracts or renewing existing

contracts with customers in Rhode Island.  The RI DPUC is scheduled to conduct a public

hearing on October 22, 2019 to consider whether Agera Energy's license to sell energy in Rhode Island should be rescinded.

        iii.        <u>New Hampshire Enforcement Action</u>

29.      On September 17, 2019, Agera Energy received a letter from the New Hampshire Public Utilities Commission (the "<u>NH PUC</u>") demanding that Agera Energy satisfy its ACP liability for 2018 within ten days (*i.e.*, September 27, 2019). The NH PUC stated that if it does not receive such payment, it may pursue further action, including referral of the unpaid amount for collection to the New Hampshire Department of Justice.

30.      Through a letter, dated October 2, 2019, the NH PUC ordered Agera Energy to pay the ACP liability due for 2018 in the amount of $2,231,262.00 in full within fourteen days (*i.e.*, October 16, 2019). The NH PUC stated that if it does not receive such payment, it may pursue further actions to enforce Agera Energy's ACP payment obligation.

31.      As stated in the Klein Declaration, due to the significant regulatory issues currently faced by the Debtors, the Debtors, with the advice of their professionals, determined that they could only sell their Assets to another licensed energy retailer, so as to avoid a delay in transferring the Debtors' customer contracts to a buyer. Despite there being a limited universe of such buyers, the Debtors' Assets were extensively marketed to all buyers, both strategic and financial. Accordingly, many, if not all, of the parties that are already licensed to supply electricity and natural gas to the Debtors' customers, and can take transfer of the Debtors' customer contracts without delay, have conducted diligence and evaluated the Debtors' business, and will not be bidding in a vacuum. The longer the Debtors market their assets in these Chapter 11 Cases, the more likely it is that regulatory action will occur and adversely affect the value of the Debtors' Assets.

C.     The Debtors' Wind-Down Plan

32.     Since at least August 2019, the Debtors, in consultation with BP Energy Company

("BP"), their prepetition lender, have developed and begun implementing a wind-down plan,

which involves, *inter alia*, a reduction in the Debtors' work force.  The Debtors carefully

reviewed their staffing needs and determined that the Debtors' sales and marketing team was

largely unnecessary for the wind-down.  This was due to the fact that the Debtors will not be

servicing new customers during the wind-down and could renew existing customers with a

fraction of their sales team.

33.     The wind-down plan analyzes how long it would be required to support the

Debtors' businesses, prior to and after these Chapter 11 Cases.  Under the current wind-down

plan, the Debtors expect to stop servicing all customers by December 31, 2019.

34.     As is apparent from the events that have unfolded thus far, the Debtors find

themselves in a precarious situation.  Every day the Sale is delayed is another day the size and

value of the Debtors' book of customer contracts erodes, by regulatory action or otherwise.  The

Stalking Horse APA accounts for this risk by requiring a decrease in the Purchase Price for each

customer contract that is not transferred to the Stalking Horse Bidder.  This adjustment is made

for each contract that terminates between signing the Stalking Horse APA and Closing (as

defined in the Stalking Horse APA).  The Stalking Horse APA also recognizes, however, that the

customer contract transfer process takes time and requires the actual transfer of the customer

account on the books of the relevant electric utility or natural gas local distribution company.

Accordingly, there is the possibility of customer contracts terminating after Closing but prior to

the actual transfer to the Stalking Horse Bidder.  The Stalking Horse APA requires a further

12

reduction in the Purchase Price for each customer contract that is not transferred within 120 days *following* Closing.

35.     The Debtors' developed the proposed Sale timeline with the intention of mitigating, as much as possible, all of the many risks associated with the consummation of the Sale and subsequent customer contract transfer process.

## RELIEF REQUESTED

36.     The Debtors request expedited entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**:

i.      authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**;

ii.     approving the Sellers' entry into the Stalking Horse APA and approving the Termination Fee and the Buyer Expense Reimbursement for the Stalking Horse Bidder, in accordance with the terms and conditions set forth in the Stalking Horse APA;

iii.    authorizing and approving the form of notice of the Sale, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");

iv.     approving procedures for the assumption and assignment of the Potentially Assumed Contracts (as defined below) and the determination of Cure Amounts with respect thereto (collectively, the "Assumption and Assignment Procedures");

v.      preliminarily approving the notice to each relevant non-Debtor contract counterparty (each, a "Contract Counterparty") to a Potentially Assumed Contract (as defined below) regarding the Debtors' potential assumption and assignment of such contract and the amount necessary to cure any defaults thereunder (the "Cure Amounts"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Potential Assumption and Assignment Notice");

vi.     scheduling the Auction to be held on or prior to November 4, 2019 at 10:00 a.m. (prevailing Eastern Time);

13

> vii.   scheduling the Sale Hearing to consider approval of the proposed
> Sale, to be held on November 5, 2019 at 2:00 p.m. (prevailing
> Eastern Time); and
>
> viii.   granting related relief.

37.   The Debtors also request entry of the Sale Order:

> i.   approving the Sale of the Purchased Assets free and clear of liens,
> claims, interests, and other encumbrances to the Stalking Horse
> Bidder or the Sale to a bidder who submits the highest or otherwise
> best offer for the Debtors' Assets;
>
> ii.   authorizing the assumption and assignment of certain executory
> contracts; and
>
> iii.   granting related relief.

## PREPETITION MARKETING AND SALE PROCESS

38.   As described in the Klein Declaration, in May 2019, the Debtors engaged Stifel,

Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC (collectively, "Miller Buckfire") as

investment banker to explore strategic alternatives, including conducting a marketing process for

the sale of the Debtors, as either a going concern or an asset sale.

39.   In connection with this process, Miller Buckfire prepared marketing materials,

including a Confidential Information Memorandum (the "CIM"), and compiled a list of

potentially interested parties.

40.   Miller Buckfire contacted 207 parties, comprised of 121 strategic investors and 86

financial investors.  Each party was provided with a teaser document and was invited to execute

a confidentiality agreement ("NDA") with the Debtors in order to receive the CIM and access to

a virtual data room.  Of the 207 parties contacted, 39 executed an NDA and received the CIM

and process letter.  Twenty of those 39 parties expressed interest in further participating in the

process and were provided access to a virtual data room.  Throughout this period, Miller

Buckfire facilitated these parties' due diligence efforts.

14

41.     In June 2019, the Debtors received numerous preliminary, non-binding indications of interest (each, an "IOI").

42.     Following receipt of the IOIs, the Debtors and their advisors continued to facilitate parties' due diligence, including management meetings and providing additional diligence information. Following these meetings, the Debtors and their advisors continued negotiations with the interested parties regarding their proposals and key terms, including timing and transaction structure.

43.     In late July 2019, the Debtors and their advisors provided certain interested parties with a draft asset purchase agreement (the "APA") and second round process letter, with a deadline to provide a binding bid and marked-up APA by August 5, 2019.

44.     After extensive deliberations, significant negotiations with BP and the Stalking Horse Bidder, and multiple rounds of revisions to the Stalking Horse APA, the Debtors decided to proceed with the Stalking Horse Bidder's bid (the "Stalking Horse Bid"), as reflected in the Stalking Horse APA.

45.     The Debtors believe that completion of the sale process in the time and manner set forth herein will maximize the value of the Debtors' Assets. The time periods set forth in the Bidding Procedures were negotiated at arms' length with the Stalking Horse Bidder as well as with BP and comply with the strict milestones imposed under the Stalking Horse APA, Restructuring Support Agreement, and the Cash Collateral Order. Failure to adhere to the proposed time periods could jeopardize the closing of the Sale, which the Debtors believe is the best means of maximizing the value of their assets. Thus, the Debtors have determined that pursuing the Sale in the manner and with the procedures proposed is in the best interests of the

15

Debtors' estates and provides interested parties with sufficient opportunity to participate under the circumstances.

## THE STALKING HORSE APA

46.     The Stalking Horse APA represents a binding bid for the Purchased Assets.  The total consideration to be realized by the Debtors is estimated at approximately $24,750,000.00 million, plus the assumption of certain liabilities, subject to certain adjustments (the "Purchase Price").

47.     The Sellers are responsible for paying any cure amounts (the "Cure Amounts") related to the Potentially Assumed Contracts.

48.     The Bidding Procedures provide for standard bid protections, such as a provision for an expense reimbursement up to a cap of 1% of the Base Price (the "Buyer Expense Reimbursement"), as a super-priority administrative expense, upon the termination of the Stalking Horse APA under certain circumstances, payable in accordance with the terms thereof. The Bidding Procedures also contemplate a termination fee (the "Termination Fee") for the Stalking Horse Bidder in an amount in cash equal to 4% of the Base Price, which shall also be afforded super-priority administrative expense status.

49.     In the event it is not the winning bidder at the Auction, as described in more detail below, the Stalking Horse Bidder has agreed that the Stalking Horse Bid shall be a Backup Bid (as defined in the Bidding Procedures) under certain conditions[5] and, as such, hold open its binding offer to purchase the Purchased Assets for a period of time after the Auction in case the winning bid at the Auction is not consummated.

---

[5] As further described in the Bidding Procedures, and notwithstanding anything herein to the contrary, the Stalking Horse Bidder shall not be obligated to serve as the Backup Bidder for anything less than all of the Purchased Assets under the Stalking Horse APA.

16

50.    The Stalking Horse APA also includes covenants, conditions, and termination

rights related to events in these Chapter 11 Cases.  The transactions contemplated by the Stalking

Horse APA are subject to approval by the Court and entry of the Bidding Procedures Order

within 14 days after the Petition Date and the Sale Order within 36 days after the Petition Date.

## THE BIDDING PROCEDURES

A.    <u>Overview</u>

51.    The Bidding Procedures are designed to promote a competitive and efficient sale

process.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids

from potential buyers that constitute the highest or otherwise best offer for the Debtors' Assets

on a schedule consistent with the deadlines under the Stalking Horse APA, Restructuring

Support Agreement, and Cash Collateral Order.  The Bidding Procedures describe, among other

things, procedures for parties to access due diligence, the manner in which bidders and bids

become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if

any), the selection and approval of the ultimately successful bidder, and the deadlines with

respect to the foregoing Bidding Procedures.  The Debtors submit that the Bidding Procedures

afford them the opportunity to pursue a sale process that will maximize the value of their estates.

52.    A description of certain key elements of the Bidding Procedures is set forth

below:[6]

      a.    <u>Same or Better Terms</u>.  Each bid must be an offer to purchase some or all
of the Purchased Assets, pursuant to a sale transaction that is no less
favorable to the Debtors' estates (except as to the Purchase Price and
Schedule 2.01(a) of the Stalking Horse APA), as the Debtors may
reasonably determine, in consultation with the Consultation Parties, than
the transactions contemplated in the Stalking Horse APA.  To the extent
that a bid contemplates the purchase of less than all of the Purchased

---

[6] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Sale Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

17

Assets, such bid will only be considered a Qualified Bid if, when added to any other bids received (other than the Stalking Horse Bid) for any Purchased Assets not included in such bid, the aggregate total purchase price of such bids is equal to or greater than (i) the Stalking Horse Bidder's bid of $24,750,000.00, plus (ii) the Termination Fee, plus (iii) the maximum possible Buyer Expense Reimbursement payable under the Stalking Horse APA, plus (iv) an additional one million dollars ($1,000,000).

b.   Cancellation of the Auction.  If the Debtors do not receive a Qualified Bid, the Debtors, in their sole discretion, shall (i) notify the Stalking Horse Bidder and all Potential Bidders and the Bankruptcy Court in writing that (a) the Auction is cancelled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) the Debtors shall seek authority at the Sale Hearing on to consummate the Sale in accordance with the Stalking Horse APA.  If the Debtors receive at least one (1) or more Qualified Bids in addition to the Stalking Horse Bid, the Debtors will conduct the Auction.

c.   Determination and Announcement of Baseline Bid.  The Debtors shall make a determination regarding (i) which bids they have determined to be Qualified Bids and (ii) the highest or best Qualified Bid for the Sellers' Assets (the "Baseline Bid") to serve as the starting point at the Auction.

**On November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)**, the Debtors shall file a notice designating the Baseline Bid on the Court's docket and publish such notice on the website of their claims and noticing agent and/or distribute the same at the Auction.

d.   Notice of Auction Results.  If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors will (a) file the Notice of Auction Results, which will, among other things, include the identity of the Successful Bidder(s) and Backup Bidder(s), (the "Notice of Auction Results") with the Court and cause such notice to be published on the Case Information Website, which shall contain the Successful Bidder's and Backup Bidder(s)' proposed form of adequate assurance of future performance and constitute definitive proof that the Debtors have closed the Auction.  In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall not be required to serve as the Backup Bidder for anything less than all of the Purchased Assets contemplated by the Stalking Horse APA.

B.   Noticing Procedures

53.   The Bidding Procedures and the Bidding Procedures Order provide the following

"Noticing Procedures:"

a.   Sale Notice.  **On the date of the entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by email, first-class mail, or overnight delivery upon the following parties or, in lieu thereof, their counsel, if known: (i) the United States Trustee for the Southern District of New York; (ii) counsel to any statutory committee appointed in these Chapter 11 Cases; (iii) all entities known to have expressed an interest in a transaction with respect to the Sellers' Assets; (iv) the Internal Revenue Service; (v) all known taxing authorities to which the Debtors are subject; (vi) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest on any of the Sellers' Assets; (vii) any governmental authority known to have an interest in the Sale; (viii) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (ix) all other persons as directed by the Court (collectively, the "Sale Notice Parties").  On or about the same date, the Debtors shall publish the Sale Notice on the Debtors' case information website (located at https://cases.stretto.com/agera (the "Case Information Website")).**

b.   Sale Objection Deadline.  **The Bidding Procedures Order establishes October 29, 2019 at 4:00 p.m. (prevailing Eastern Time) as the deadline to file and serve objections to the sale of the Purchased Assets (the "Sale Objection Deadline").**

c.   Bid Deadline.  **The Bidding Procedures Order establishes October 29, 2019 at 4:00 p.m. (Eastern Time) as the deadline for the submission of any and all bids (the "Bid Deadline").**

54.     The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable.  Under the proposed timeline, there will be 25 days between the filing of this Motion and the Sale Objection Deadline and the Bid Deadline, respectively.  This period will provide parties with sufficient time to formulate bids to purchase the Debtors' Assets.  As stated above, despite there being a limited universe of licensed energy retailers, the Debtors' Assets were extensively marketed to all buyers, both strategic and financial.  Accordingly, many, if not all, of the parties that are already licensed to supply electricity and natural gas to the Debtors' customers, and can take transfer of the Debtors' customer contracts without delay, have conducted diligence and evaluated the Debtors' business, and will not be bidding in a vacuum. In addition, potential bidders who have not previously conducted diligence on the Debtors'

19

business will have immediate access to, subject to the execution of an appropriate confidentiality

agreement, a substantial body of information regarding the Debtors' Assets, including

information gathered based upon specific due diligence requests of the Stalking Horse Bidder

and other prepetition bidders.

55.     The Noticing Procedures constitute adequate and reasonable notice of the key

dates and deadlines for the sale process, including, among other things, the applicable objection

deadline, the Bid Deadline and the time and location of the Auction and Sale Hearing.

Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate

and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule

2002 and Local Bankruptcy Rule 2002-1.

<b><u>Assumption and Assignment Procedures</u></b>

56.     The Assumption and Assignment Procedures will, among other things, govern the

Debtors' provision of notice to a Contract Counterparty to the Potentially Assumed Contracts

that such contracts may be assumed and assigned to a Qualified Bidder that becomes the

Successful Bidder and of the Cure Amounts the Debtors believe are necessary pursuant to

Bankruptcy Code section 365 to assume and assign such contracts.  The proposed Assumption

and Assignment Procedures are as follows:

a.     **<u>Executory Contract List</u>**.

   i.     On the date of the entry of the Bidding Procedures Order, the
   Debtors shall file with the Court a list of executory contracts and
   unexpired leases that may be assumed and assigned in connection
   with the Sale (such contracts and any renewals or extensions
   thereof, the "<u>Potentially Assumed Contracts</u>" and such list the
   "<u>Executory Contract List</u>").

   ii.     If it is discovered that a Potentially Assumed Contract should have
   been included on the Executory Contract List but was not (such
   contract, a "<u>Previously Omitted Contract</u>"), or in the event that the

20

Debtors seek to modify a Cure Amount, the Debtors will promptly file with the Court a revised Executory Contract List.

b.    **Potential Assumption and Assignment Notice**.

    i.    Simultaneously with the filing of the Executory Contract List (or any revised Executory Contract List) or as soon as reasonably practicable thereafter, the Debtors shall serve on each relevant Contract Counterparty the Potential Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**.  The Assumption and Assignment Notice shall identify (i) either specifically or generally, the Potentially Assumed Contracts proposed to be assumed and assigned, (ii) the Cure Amount, and (iii) the deadline by which any Contract Counterparty to such Potentially Assumed Contracts must file an objection to the proposed assumption and assignment of such Potentially Assumed Contract, including, without limitation, as to the applicable Cure Amount.  The Potential Assumption and Assignment Notice will also inform Contract Counterparties of the date by which the Debtors will file the Notice of Auction Results (if applicable) and the date by which Contract Counterparties must object to the ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance under the applicable Potentially Assumed Contract.

c.    **Assumption and Assignment Objections**.

    i.    Objection Deadline.  Any Contract Counterparty may object to the proposed assumption or assignment of its Potentially Assumed Contract, the Debtors' proposed Cure Amounts, if any, (an "Assumption and Assignment Objection").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Contract Counterparty believes is required to cure defaults under the relevant Potentially Assumed Contract and supporting materials evidencing the same, (D) be filed by **October 29, 2019 at 4:00 p.m. (Eastern Time)** (the "Assumption and Assignment Objection Deadline") and (E) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and

21

shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse
Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000,
Baltimore, MD 21202 (Attn: Cecil E. Martin III;
cmartin@mcguirewoods.com), (5) counsel to BP Energy
Company, Haynes & Boone LLP, 1221 McKinney Street, Suite
2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn
Shurin; kelli.norfleet@haynesboone.com and
kathryn.shurin@haynesboone.com), and (6) any other party that
has requested notice pursuant to Bankruptcy Rule 2002
(collectively, the "<u>Objection Notice Parties</u>") (collectively, the
"<u>Assumption and Assignment Objection Notice Parties</u>").

ii.    <u>Resolution of Assumption and Assignment Objections</u>.  Any
Assumption and Assignment Objection regarding any Potentially
Assumed Contract, it if is ultimately designated an Assigned
Contract, will be heard at the Sale Hearing.

iii.   <u>Failure to File Timely Assumption and Assignment Objection</u>.  If a
Contract Counterparty fails to file with the Court and serve on the
Assumption and Assignment Objection Notice Parties a timely
Assumption and Assignment Objection, the Contract Counterparty
shall be (i) forever barred from (a) objecting to the assumption and
assignment of the Potentially Assumed Contract identified in the
Executory Contract List or (b) asserting that any conditions to the
assumption and assignment of any Potentially Assumed Contract
must be satisfied under such Potentially Assumed Contract before
such Potentially Assumed Contract may be assumed and assigned,
or that any consent required to any such assignment has not been
given, (ii) deemed to have consented to the applicable Cure
Amount, if any, and be bound to such corresponding Cure
Amount, (iii) deemed to have agreed that all defaults under the
applicable Potentially Assumed Contract arising or continuing
prior to the effective date of the assignment have been cured as a
result or precondition of the assignment, such that the neither the
Successful Bidder nor the Debtors have any liability or obligation
with respect to any default occurring or continuing prior to the
assignment, and that the applicable Contract shall remain in full
force and effect for the benefit of the Successful Bidder (and such
Contract Counterparty) in accordance with the terms of the
Potentially Assumed Contract from and after the date of the
assignment of the applicable Potentially Assumed Contract, (iv)
deemed to have waived any right to terminate the applicable
Potentially Assumed Contract or designate an early termination
date under the applicable Contract as a result of any default that

22

occurred and/or was continuing prior to the assignment date, and (v) deemed to have agreed to the terms of the Sale Order.

d.   <u>Adequate Assurance Objection</u>.  Immediately after the conclusion of the Auction, if a Successful Bidder(s) other than if the Stalking Horse Bidder prevails at the Auction, the Debtors shall file with the Court, and publish on the Case Information Website, the Notice of Auction Results that identifies the Successful Bidder(s) and provides notice that the Debtors will seek to assume and assign the Potentially Assumed Contracts to the Successful Bidder(s). The Notice of Successful Bidder shall also contain the Successful Bidder(s)' and Backup Bidder(s)' proposed form of adequate assurance of future performance.  Objections of any Contract Counterparty related to: (i) the identity of and ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(l)(C) or (ii) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance under the applicable Potentially Assumed Contract (an "<u>Adequate Assurance Objection</u>") must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, (D) be filed by **no later than 4:00 p.m. (Eastern Time) one (1) day prior to the Sale Hearing (the "Adequate Assurance Objection Deadline")** and (E) be served on the Assumption and Assignment Objection Notice Parties.

e.   **Reservation of Rights.**  The inclusion of a Potentially Assumed Contract, or Cure Amount with respect thereto, on a Potential Assumption and Assignment Notice or the Executory Contract List shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder(s) or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims and causes of action with respect to each Potentially Assumed Contract listed on the Potential Assumption and Assignment Notice and Executory Contract List.  The Debtors' inclusion of any Potentially Assumed Contract on the Potential Assumption and Assignment Notice and Executory Contract List shall not be a guarantee that such Potentially Assumed Contract ultimately will be assumed or assumed and assigned.

## Extraordinary Provisions Under Local Guidelines

57.   Collectively, the Bidding Procedures and the Stalking Horse APA contain the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by General Order M-383, require to be separately disclosed:

23

a.    <u>Deadlines that Effectively Limit Notice</u>.  Due to the need for a timely sale process and the issues described above, the Debtors request expedited entry of the Bidding Procedures Order.  The current proposed timeline for the entry of the Bidding Procedures Order would give interested parties less than 14 days' notice of the Bidding Procedures.  Further, the identity of a Successful Bidder will not be known until shortly before the Sale Hearing; in this case, three days before the Sale Hearing.  The Debtors therefore request that the time for filing an Adequate Assurance Objection be shortened to one day before the Sale Hearing.

b.    <u>Use of Proceeds</u>.  Other than payment of the Buyer Expense Reimbursement and Termination Fee under certain circumstances as provided in the Stalking Horse APA, the Stalking Horse APA does not contemplate an allocation of sale proceeds.

c.    <u>Records Retention</u>.  As noted above, the Stalking Horse APA provides that the Stalking Horse Bidder will acquire the books and records related to the Purchased Assets.  The Stalking Horse APA grants the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records.

d.    <u>Requested Findings as to Successor Liability</u>.  The Stalking Horse APA requires that the Sale Order contain findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.

e.    <u>Requested Findings as to Fraudulent Conveyances or Transfers</u>.  The proposed Sale Order for the Stalking Horse Bidder shall contain findings of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

f.    <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>.  The Debtors seek relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

<b><u>The Relief Requested is Warranted<br>and in the Best Interests of the Debtors and Their Stakeholders</u></b>

A.    <u>The Sale of Purchased Assets</u>

58.    Ample authority exists for approval of the Sale contemplated by this Motion.  Bankruptcy Code section 363 provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section,

24

have required that the sale of a debtor's assets be based upon the sound business judgment of the

debtor.  *See Official Comm. of Unsecured Creditors of LTV Aerospace Def. Co., v. LTV Corp.*

*(In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section

363(b) application must find from the evidence presented a good business reason to grant such

application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1071 (2d Cir. 1983) (same).  Once a court is satisfied that there is a sound business justification

for the proposed sale, the court must then determine whether (i) the debtor has provided

interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable,

and (iii) the purchaser is proceeding in good faith.  *Id.* at 493-94; *Polvay v. B.O. Acquisitions,*

*Inc. (In re Betty Owens Sch.)*, 1997 WL188127, at *4 (S.D.N.Y. Apr. 17, 1997).

59.    As described above and in the Klein Declaration, an orderly but expeditious sale

of the Purchased Assets is critical to preserving and realizing their value and, in turn, to

maximizing recoveries for the Debtors' economic stakeholders.  A prompt sale is also required

by the express terms of the Cash Collateral Order and the Stalking Horse APA.  Pursuing entry

into and performance under the Stalking Horse APA represents a reasonable exercise of the

Debtors' business judgment and is in the best interests of all parties.

60.    The Debtors believe that the Purchase Price under the Stalking Horse APA is fair

and reasonable, but the Court and parties in interest will be assured at the Sale Hearing, after a

diligence period and marketing by the Debtors' advisors, that the Debtors will have selected the

party with the highest or best offer for the Purchased Assets.  The Debtors' compliance with the

Bidding Procedures Order and the Bidding Procedures will provide the basis to find that any sale

of the Purchased Assets does not constitute a fraudulent transfer because the purchase price

represents reasonably equivalent value and is fair and reasonable.  It will also establish that the

25

Debtors and the Stalking Horse Bidder, or any other Successful Bidder, have proceeded in good faith.

B.    Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

61.    In the interest of attracting the best offer, the sale of the Purchased Assets should be free and clear of any and all liens, claims, encumbrances, and other interests in accordance with Bankruptcy Code section 363(f), with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale.  Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits the sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  *See* 11 U.S.C. § 363(f)(1)–(5).  With respect to any party asserting a lien, claim, encumbrance, or other interest against the Purchased Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in Bankruptcy Code section 363(f).

62.    Moreover, the Debtors will send the Sale Notice to any known purported prepetition lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Assets timely objects to this Sale Motion, such party shall be deemed to consent to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton,* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

26

C.      Protections as a Good Faith Purchaser

63.     Bankruptcy Code Section 363(m) protects a good faith purchaser's interest in

property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is

later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . .were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the

judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and

judgments upon which third parties rely.'"  *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*,

No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In

re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); s*ee also Allstate Ins. Co. v.

Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith

transfers of property will not be affected by the reversal or modification on appeal of an unstayed

order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day,

Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith

purchasers are protected from the reversal of a sale on appeal unless there is a stay pending

appeal").

64.     The selection of the Successful Bidder will be the product of arm's-length, good

faith negotiations in an open and competitive sale process.  Based upon the record to be made at

the Auction and the Sale Hearing, the Debtors will request a finding that the Successful Bidder is

a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m).

D.     Bidding Procedures

65.     The Bidding Procedures are specifically designed to promote what courts have

deemed to be the paramount goal of any proposed sale of property of a debtor's estate:

maximizing the value of sale proceeds received by the estate.  *See Burtch et al. v. Ganz, et al. (In*

*re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty

to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d

558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a

debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for

the purpose of enhancing competitive bidding are consistent with the fundamental goal of

maximizing value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re*

*O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures

that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of*

*Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659

(S.D.N.Y. 1992) (observing that bidding procedures "encourage bidding and . . . maximize the

value of the debtor's assets").

66.     The Bidding Procedures provide for an orderly, uniform and appropriately

competitive process through which interested parties may submit offers to purchase the Assets.

The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to

promote active bidding by interested parties and to obtain the highest or otherwise best offer

reasonably available for the Assets. Additionally, the Bidding Procedures will allow the Debtors

to conduct the Auction in a fair and transparent manner that will encourage participation by

financially capable bidders with demonstrated ability to consummate a timely Sale.

Accordingly, the Bidding Procedures should be approved because, under the circumstances, they

28

are reasonable, appropriate and in the best interests of the Debtors, their estates and all parties in interest.

E.    Buyer Expense Reimbursement and Termination Fee

67.    The Stalking Horse APA contains provisions for a Buyer Expense Reimbursement and Termination Fee, payable upon the termination of the Stalking Horse APA on certain conditions contained therein (such Buyer Expense Reimbursement and Termination Fee, together with the initial and subsequent bid increments, the "Bid Protections").

68.    Approval of expense reimbursements as an administrative expense claim as a form of bidder protection in connection with a sale of assets pursuant to Bankruptcy Code section 363 has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[7]  In this case, to ensure payment of the Buyer Expense Reimbursement and the Termination Fee, if either becomes payable pursuant to the Stalking Horse APA, the Buyer has requested and the Sellers have agreed that the Buyer Expense Reimbursement and Termination Fee shall be entitled to super-priority administrative expense status, senior to all other administrative expense claims against the Debtors' estates.  Bankruptcy courts have approved bidding incentives similar to the ones contemplated in the Stalking Horse APA under the

---

[7] *See, e.g.*, *In re Lehman Bros. Holdings Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving breakup fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.*, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving breakup fee and expense reimbursement); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving breakup fee and expense reimbursement); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving breakup fee and expense reimbursement); *In re Twinlab Corp., et al.*, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving breakup fee and expense reimbursement); *In re Adelphia Business Solutions, Inc., et al.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving breakup fee and expense reimbursement).

"business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.

69.     The Bid Protections provided in the Stalking Horse APA meet the "business judgment rule" standard.  These protections, individually and collectively, were a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Stalking Horse APA.  The Stalking Horse Bidder is unwilling to commit to hold open its offer under the terms of the Stalking Horse APA unless assured of payment of the Buyer Expense Reimbursement and Termination Fee under the conditions set forth in the Stalking Horse APA.  The Buyer Expense Reimbursement and Termination Fee promote more competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders— and the Debtors—can rely.  The Stalking Horse Bid increases the likelihood that the price at which the Purchased Assets are sold will reflect their true worth, and the Stalking Horse Bidder is entitled to be compensated as a result.  Moreover, the Buyer Expense Reimbursement and Termination Fee are fair and reasonable in amount under the circumstances, particularly because, in the event the Buyer Expense Reimbursement and Termination Fee become payable upon the consummation of an Alternative Transaction (as defined in the Stalking Horse APA), they will be paid out of the proceeds of such Alternative Transaction.

70.     Accordingly, the Debtors submit that the Bid Protections have a sound business purpose, are fair and appropriate under the circumstances and should be approved.  The Bid Protections will not deter or chill bidding, are reasonable, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

F.      Noticing Procedures

71.     The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed Sale, Bidding Procedures, Auction and Sale Hearing.

G.      Assumption and Assignment of Certain Executory Contracts

72.     In connection with the Sale, the Debtors will assume and assign certain executory contracts to the Stalking Horse Bidder or Successful Bidder.  Bankruptcy Code section 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under Bankruptcy Code Section 365(a). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

73.     Bankruptcy Code section 365(k) provides that assignment by the debtor to an entity of a contract "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  Pursuant to Bankruptcy Code section 365(k), the Debtors will, therefore, be relieved from any liability for any breach of a Potentially Assumed Contract occurring or arising after assignment to the Successful Bidder.  As such, the assumption of the Potentially Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

74.     The consummation of any Sale involving the assignment of a Potentially Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of Bankruptcy Code section 365.  Bankruptcy Code section 365(b)(1) requires that

31

any outstanding defaults under an executory contract to be assumed be cured or that the Debtors

provide adequate assurance that such defaults will be promptly cured.  The Debtors' assumption

and assignment of the Potentially Assumed Contracts will be contingent upon payment of the

Cure Amounts and effective only upon the closing of an applicable Sale.  As set forth above, the

Debtors propose to file with the Court and serve on each Contract Counterparty a Potential

Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of

Cure Amounts, if any, with respect to each Potentially Assumed Contract listed.  Contract

Counterparties will have a meaningful opportunity to raise any objections to the proposed

assumption of their respective contracts prior to closing of the Sale.

75.    Pursuant to Bankruptcy Code section 365(f)(2), a debtor may assign an executory

contract if "adequate assurance of future performance by the assignee of such contract or lease is

provided."  The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." *See

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J.

1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean an absolute assurance that

debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803

(Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the

required assurance will fall considerably short of an absolute guarantee of performance.").

Among other things, adequate assurance may be provided by evidencing the assignee's financial

health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph,

Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is

present when the prospective assignee of a lease has financial resources and has expressed

willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

76.    As set forth in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under any contracts proposed to be assumed.  Each affected Contract Counterparty will have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.  To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness and ability of the Successful Bidder to perform under the Assigned Contracts.  The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance, as required by Bankruptcy Code section 365(b)(1).  Accordingly, the Debtors request that, at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Assigned Contracts be approved.

77.    In addition, to facilitate the assumption and assignment of the Potentially Assumed Contracts, the Debtors further request that the Court find all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contract, to be unenforceable and prohibited pursuant to Bankruptcy Code section 365(f).[8]

---

[8] Bankruptcy Code section 365(f)(1) provides that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . .." 11 U.S.C. § 365(f)(1).  Bankruptcy Code section 365(f)(3) further provides that "[n]ot withstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

78.     Further, the Debtors also request that the Court find that no exceptions under

Bankruptcy Code section 365(c) apply to otherwise restrict the assignment of the Potentially

Assumed Contracts.  Bankruptcy Code Section 365(c)(1) provides a carefully crafted exception

to the broad rule that a debtor may assign an executory contract notwithstanding any applicable

law prohibiting such assignment.  Here, the Debtors are seeking to sell their Assets and assign

their executory contracts, which are primarily contracts with retail customers to whom the

Debtors supply electricity and natural gas, to the Successful Bidder(s).  While several states in

which the Debtors are seeking to assign contracts have laws and regulations restricting and/or

conditioning the assignment of electricity and natural gas supply agreements with retail or

residential customers, these regulations do not constitute "applicable law" for the purposes of

Bankruptcy Code section 365(c).  Section 365(c)(1):

> . . . acts to balance the rights of third parties who contracted with the
> debtor and whose rights may be prejudiced by having the contract
> or lease performed by an entity with which they did not enter into
> the agreement.  This right becomes paramount, under section
> 365(c)(1), where the identity of the party rendering performance
> under the contract is material to the contract, and the contract is non-
> delegable under [applicable law].

*In re Lil' Things, Inc.*, 220 B.R. 583, 591 (Bankr. N.D. Tex. 1998).

79.     The contracts that the Debtors propose to assign are not the types of contracts to

which Bankruptcy Code section 365(c)(1) typically applies, such as personal service contracts,

partnership agreements, intellectual property contracts, government contracts or franchise

agreements.  *See, e.g.*, *In re Schick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999); *In re Patient*

*Educ. Media, Inc.*, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997); *In re West Electronics, Inc.*, 852

F.2d 79, 83 (3d Cir. 1988); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 29 (1st Cir. 1984).  By

contrast, where the identity of the contracting parties has been found to be less critical to the

nature and performance of the agreements, courts have been more reluctant to find that

34

assignment is barred under section 365(c).  *See, e.g.*, *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.)*, 27 F.3d 534, 537 (11th Cir. 1994) (city ordinance prohibiting assignment of cable franchise without city approval was mere general prohibition against assignment and insufficient to constitute "applicable law" under section 365(c)(1)); *Cajun Elec. Members Comm. v. Mabey (In re Cajun Elec. Power Co-Op, Inc.)*, 230 B.R. 693, 708-09 (Bankr. M.D. La. 1999) (state law that prohibited transfer of assets without majority vote of the members of the electric cooperative did not prevent assumption and assignment of contracts because the identity of the parties was not central to the contract).

80.     Unlike contracts such as personal services agreements, the Debtors' electricity and natural gas supply agreements do not hinge on the identities of the parties.  As the court in *Cajun Electric* noted, "furnishing electricity is not a personal duty."  Power and natural gas supply agreements do not involve an intimate association among the parties or the need to closely monitor the activities of the counter-party, and the counterparties can be replaced and duties assigned or delegated without undermining the contract's fundamental purposes—the supplying of electricity or natural gas.  Accordingly, the Debtors should be authorized to freely assign the Potentially Assumed Contracts as part of the Sale.

81.     Any assumption of a Potentially Assumed Contract is an exercise of the Debtors' sound business judgment because the transfer of such Potentially Assumed Contract is necessary to the Debtors' ability to obtain the best value for the Sellers' Assets.  The assumption and assignment of the Potentially Assumed Contracts will be the most critical component of the value of any bid.  Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Potentially

35

Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

82.     <u>Assumption and Assignment Procedures</u>.  As a procedural matter, "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease . . . is governed by Rule 9014." Fed. R. Bankr. P. 6006(a).  Bankruptcy Rule 9014 provides that "[i]n a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought."  The notice and hearing requirements for contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances. *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or a similar phrase to mean such notice and opportunity for hearing "as [are] appropriate in the particular circumstances.").

83.     Because of the voluminous number of Potentially Assumed Contracts and the significant cost associated with the notices, the Debtors will seek approval of the Assumption and Assignment Notice at the Sale Hearing.  All Contract Counterparties to the Potentially Assumed Customer Contracts may raise any objections to the Assumption and Assignment Procedures on or before October 30, 2019 in advance of the Sale Hearing.  The Debtors' assignment of the Potentially Assumed Contracts will also only be effective upon the closing of the proposed Sale.

84.     The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored.  Upon receipt of the Potential Assumption and Assignment Notice, the Contract Counterparties will be given the opportunity to object to the assumption and assignment of their respective contracts.  The Debtors are requesting that,

36

given the approximately 30,000 Potentially Assumed Contracts, they be permitted to send

Contract Counterparties the Potential Assumption and Assignment Notice attached as **Exhibit 3**

to the Bidding Procedures.  Following the entry of the Bidding Procedures Order, the Debtors

propose to send the Potential Assumption and Assignment Notice to the Contract Counterparties,

notifying those parties that the Debtors are selling the Sellers' Assets and that the Potentially

Assumed Contracts are proposed to be assigned to the Stalking Horse Bidder in connection with

the sale, and Contract Counterparties will have the opportunity to object to the Cure Amount and

assignment of their contract to the Stalking Horse Bidder or a Successful Bidder.  The Potential

Assumption and Assignment Notice will also inform Contract Counterparties of the date by

which the Debtors will file the Notice of Auction Results (if applicable) and the date by which

Contract Counterparties must object to the ability of the Stalking Horse Bidder, Successful

Bidder(s), or Backup Bidder(s) to provide adequate assurance of future performance under the

applicable Potentially Assumed Contract.  As noted above, issues pertaining to the adequate

assurance of future performance to be provided by the ultimate Successful Bidder will be

addressed at the Sale Hearing.  The Debtors submit that this procedure is fair and reasonable in

light of the costs to the estate that would be incurred by sending multiple notices to the

counterparties to the Customer Contracts, given that the counterparties will have more than

sufficient notice to object to the assignment of their applicable contracts and an opportunity to be

heard at the Sale Hearing.

85.    The Assumption and Assignment Procedures provide that any Contract

Counterparty that fails to object to the proposed assumption and assignment of any Potentially

Assumed Contract will, *inter alia*, be deemed to consent to the assumption and assignment of the

applicable Potentially Assumed Contract pursuant to Bankruptcy Code section 365,

37

notwithstanding any anti-assignment provision or other restriction on assignment contained in

the applicable contract.  Courts in this and other jurisdictions have routinely granted such relief.

*See, e.g.*, *In re Empire Generating Co, LLC*, Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. May

19, 2019) [Docket No. 99] (ordering that failure to object to the assignment and assumption

procedures forever bars contract counterparties from objecting to the assumption and assignment

of their contract to the successful bidder); *In re Angelica Corporation*, Case No. 17-10870 (JLG)

(Bankr. S.D.N.Y. Apr. 3, 2017) [Docket No. 137] (same); *see also Hargrave v. Twp. of

Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not

objecting to the sale motion, a creditor was deemed to consent); *Pelican Homestead v. Wooten

(In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

### **WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h) and 6006(d)**

86.     The Debtors request that the Court (a) find that notice of the Motion is adequate

under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the fourteen-day stay

requirements under Bankruptcy Rules 6004(h) and 6006(d).  In light of the Debtors' current

financial condition and their obligation to comply with the conditions to closing the Sale

contemplated by the Stalking Horse APA, Restructuring Support Agreement, and Cash

Collateral Order, the proposed Sale contemplated herein should be consummated as soon as

practicable to allow the Debtors to maximize value for their estates and stakeholders.

Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order and any

order authorizing the assumption and assignment of the Assigned Contracts in connection with a

Sale be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules

6004(h) and 6006(d) be waived.

38

## NOTICE

87.     The Debtors will provide notice of this Motion to: (a) the United States Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to BP Energy Company; (d) counsel to the Stalking Horse Bidder; (e) the Internal Revenue Service; (f) the United States Attorney for the Southern District of New York; (g) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest on any of the Sellers' Assets; (h) all entities known to have expressed an interest in a transaction with respect to the Sellers' Assets; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.  The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

88.     No prior motion for the relief requested herein has been made to this or any other court.

39

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding

Procedures Order: (i) approving the Bidding Procedures as set forth in **Exhibit 1** to the Bidding

Procedures Order for the Sale of the Sellers' Assets, free and clear of all liens, claims (as defined

in Bankruptcy Code Section 101(5)), encumbrances, obligations, liabilities, contractual

commitments or interests of any kind or nature whatsoever; (ii) approving (a) the Sellers' entry

into the Stalking Horse APA, a copy of which is attached hereto as **Exhibit B** and (b) the

Termination Fee and the Buyer Expense Reimbursement; (iii) approving the procedures relating

to the assumption and assignment of executory contracts; (iv) preliminarily approving the

Assumption and Assignment Notice; (v) approving the form and manner of notices of the Sale,

Auction and Sale Hearing; (vi) scheduling the Auction and the Sale Hearing; and (vii) granting

related relief.  The Debtors also respectfully request that the Court enter the Sale Order: (i)

approving the Sale of the Purchased Assets free and clear of liens, claims, interests, and other

encumbrances to the Stalking Horse Bidder or to a bidder who submits the highest or otherwise

best offer for the Sellers' Assets; (ii) authorizing the assumption and assignment of certain

executory contracts to the Stalking Horse Bidder; and (iii) granting such other and further relief

as the Court deems appropriate.

Dated: October 4, 2019         Respectfully submitted,
     New York, NY

                        **MCDERMOTT WILL & EMERY LLP**

                        /s/ Darren Azman
                        Timothy W. Walsh
                        Darren Azman
                        Ravi Vohra
                        340 Madison Avenue
                        New York, NY 10173
                        Telephone:  (212) 547-5615
                        Facsimile:  (212) 547-5444
                        Email: dazman@mwe.com
                               rvohra@mwe.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

41

# EXHIBIT C

Form of Bidding Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I)(A) APPROVING BIDDING PROCEDURES RELATING TO THE SALE
OF DEBTORS' ASSETS, (B) APPROVING STALKING HORSE ASSET PURCHASE
AGREEMENT AND BID PROTECTIONS, (C) APPROVING FORM AND MANNER
OF NOTICES OF SALE, AUCTION AND SALE HEARING, (D) APPROVING
PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS, (E) SCHEDULING AUCTION FOR, AND
HEARING TO APPROVE, SALE OF THE DEBTORS' ASSETS AND (II) GRANTING
RELATED RELIEF**

Upon the motion (the "Sale Motion")[2] of Agera Energy, LLC and the above-captioned

debtors, as debtors and debtors in possession (collectively, the "Debtors") in these chapter 11

cases (the "Chapter 11 Cases"), pursuant to sections 105(a), 363, and 365, 503, and 507 of title

11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York (the "Local Rules"), for an order (i) approving the Bidding Procedures attached

hereto as **Exhibit 1**, including the Bid Protections granted to the Stalking Horse Bidder as

provided in the Stalking Horse APA, attached to the Sale Motion as **Exhibit B**, (ii) the form and

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms utilized but not defined herein shall have the meanings given them in the Sale Motion, the Stalking Horse APA, or the Bidding Procedures, as applicable.

manner of notice of the Auction, Sale, and Sale Hearing, (iii) the Assumption and Assignment

Procedures, and (iv) scheduling the Auction and Sale Hearing; and this Court having jurisdiction

to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference*, dated January 31, 2012; and

consideration of the Sale Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and notice of the Sale Motion having been given as provided in the Sale

Motion, and such notice having been adequate and appropriate under the circumstances; and it

appearing that no other or further notice need be provided; and any objections to the requested

relief having been withdrawn or overruled on their merits; and this Court having held a hearing

to consider the relief requested in the Sale Motion as to the Bidding Procedures, Auction, and

Sale (the "Hearing"); and all of the proceedings had before this Court; and this Court having

reviewed the Sale Motion, the First Day Declaration, the Klein Declaration, and the Sandford

Declaration; and this Court having found and determined that the relief sought in the Sale

Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest,

and that the legal and factual bases set forth in the Sale Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY**

**FOUND AND DETERMINED THAT**:

A.    The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings

of fact constitute conclusions of law, and to the extent that any of the following conclusions of

law constitute findings of fact, they are adopted as such.

B.      The Court has jurisdiction to consider the Sale Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O).  Venue of these Chapter 11 Cases and the

Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The Debtors' proposed notice of the Sale Motion, the Bidding Procedures, the

Hearing and the proposed entry of this Order are (i) appropriate and reasonably calculated to

provide all interested parties with timely and proper notice, (ii) in compliance with all applicable

requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules

and (iii) adequate and sufficient under the circumstances of these Chapter 11 Cases, and no other

or further notice is required.  A reasonable opportunity to object or be heard regarding the relief

requested in the Sale Motion (including, without limitation, with respect to the Bidding

Procedures and Bid Protections) has been afforded to all interested persons and entities,

including, but not limited to, the Sale Notice Parties.

D.      The Bidding Procedures in the form attached hereto as **Exhibit 1** are fair,

reasonable and appropriate, are designed to maximize creditor recoveries from a sale of the

Assets and permit the Debtors to comply with their obligations under the Stalking Horse APA

and the Cash Collateral Order.

E.      The Debtors have demonstrated a compelling and sound business justification for

the Court to enter this Order and thereby: (i) approve the Bidding Procedures, (ii) authorize the

Bid Protections, under the terms and conditions set forth in the Stalking Horse APA, (iii) set the

dates of the Bid Deadline, Auction (if needed), Sale Hearing and other deadlines set forth in the

Bidding Procedures, (iv) approve the Noticing Procedures and the forms of notice and (v)

approve the Assumption and Assignment Procedures and preliminarily approve the forms of

3

relevant notice.  Such compelling and sound business justification, which was set forth in the

Sale Motion, the First Day Declaration and on the record at the Hearing, are incorporated herein

by reference and, among other things, form the basis for the findings of fact and conclusions of

law set forth herein.

F.      The Bid Protections are fair and reasonable and provide a benefit to the Debtors'

estates and stakeholders.

G.      The Debtors and their advisors, including Miller Buckfire, engaged in a robust

and extensive marketing and sale process before the Petition Date, to solicit and develop the

highest or best offer for the Purchased Assets.

H.      Exelon Generation Company, LLC shall act as the Stalking Horse Bidder under

the Stalking Horse APA, and be subject to higher or better offers in accordance with the Bidding

Procedures.

I.      Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking

Horse APA as a "stalking-horse" sale agreement is in the best interests of the Debtors and the

Debtors' estates and creditors, and reflects a sound exercise of the Debtors' business judgment.

The Stalking Horse APA provides the Debtors with the opportunity to sell the Purchased Assets

in order to maximize value to all stakeholders.  Without the Stalking Horse APA, the Debtors

would likely realize a lower price for the Purchased Assets; and, therefore, the contributions of

the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the

Debtors and their estates and creditors.  The Stalking Horse APA will enable the Debtors to

secure a fair and adequate baseline price for the Debtors' Assets at the Auction and, accordingly,

will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

J.     The Bid Protections, including, but not limited to, the Buyer Expense

Reimbursement and Termination Fee (i) have been negotiated by the Stalking Horse Bidder and

the Debtors and their respective advisors at arms' length and in good faith and (ii) are necessary

to ensure that the Stalking Horse Bidder will continue to pursue the Stalking Horse APA and the

Sale.  The Buyer Expense Reimbursement and Termination Fee, to the extent payable under the

Stalking Horse APA, (a) (x) are an actual and necessary cost and expense of preserving the

Debtors' estates within the meaning of Bankruptcy Code section 503(b) and (y) shall be treated

as allowed super-priority administrative expense claims senior to all other administrative claims

against the Debtors' estates pursuant to Bankruptcy Code sections 105(a), 503(b), and 507(a)(2),

(b) are commensurate with the real and material benefits conferred upon the Debtors' estates by

the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the

size and nature of the Sale, the necessity to announce a sale transaction for the Purchased Assets

at the outset of these Chapter 11 Cases, and the efforts that have been and will be expended by

the Stalking Horse Bidder.  The Bid Protections, including, but not limited to, the Buyer Expense

Reimbursement and Termination Fee, are a material inducement for, and condition of, the

Stalking Horse Bidder's execution of the Stalking Horse APA.  Unless it is assured that the Bid

Protections, including, but not limited to, the Buyer Expense Reimbursement and Termination

Fee, will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate

the Sale or otherwise be bound under the Stalking Horse APA (including the obligations to

maintain its committed offer while such offer is subject to higher or better offers as contemplated

by the Bidding Procedures).

K.     The Debtors have articulated good and sufficient business reasons for this Court

to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures; (iii) the

5

Bid Protections, including, but not limited to, the Buyer Expense Reimbursement and

Termination Fee (to the extent payable under the Stalking Horse APA), and (iv) the form and

manner of notice of the Auction and Sale Hearing for the Sale, attached hereto as **Exhibit 2**.

L.    The Bidding Procedures were negotiated in good faith and at arms' length and are

reasonably designed to promote participation and active bidding and ensure that the highest or

best value is generated for the Purchased Assets.

M.    The Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors,

as those terms are defined in Bankruptcy Code section 101, and no common identity of

incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder

and the Debtors.  The Stalking Horse Bidder and its advisors have acted in "good faith" within

the meaning of Bankruptcy Code section 363(m) in connection with the Stalking Horse Bidder's

negotiation of its Bid Protections and the Bidding Procedures and the Stalking Horse Bidder's

negotiation and entry into the Stalking Horse APA.

N.    The Assumption and Assignment Procedures are reasonable and appropriate and

consistent with Bankruptcy Code section 365 and Bankruptcy Rule 6006.  The Assumption and

Assignment Procedures have been tailored to provide an adequate opportunity for all Contract

Counterparties to the Potentially Assumed Contracts to raise any objections to the proposed

assumption and assignment or to the cure amounts.

O.    The legal and factual bases set forth in the Sale Motion establish just cause for the

relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates,

creditors, interest holders and all other parties in interest herein.

P.    The form and manner of notice to be delivered pursuant to the Noticing

Procedures (including the Sale Notice attached hereto as **Exhibit 2**) are reasonably calculated to

provide all interested parties with timely and proper notice of the Bidding Procedures, the

Auction, the Sale Hearing, and the Sale (including the sale of the Purchased Assets (as set forth

under the Stalking Horse APA) free and clear of any liens, claims, encumbrances, or interests

pursuant to section 363(f) of the Bankruptcy Code) (with such liens, claims, encumbrances or

interests attaching to the proceeds of any such sale with the same validity and priority as they

attached to the Purchased Assets immediately prior to Closing), and any and all objection

deadlines related thereto, and no other or further notice shall be required for the Sale Motion, the

Sale, or the assumption and assignment of the Assigned Contracts except as expressly required

herein.

Q.    The form and manner of the Potential Assumption and Assignment Notice,

attached hereto as **Exhibit 3**, are adequately and reasonably calculated to provide due and

adequate notice concerning the Assumption and Assignment Procedures and will provide due

and adequate notice of the relief sough in the Sale Motion.  The Debtors will seek preliminary

approval of the Potential Assumption and Assignment Notice and will seek final approval of the

Potential Assumption and Assignment Notice at the Sale Hearing.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED THAT:**

1.    The relief requested in the Sale Motion is hereby granted as set forth herein.

2.    All objections to the Sale Motion solely as it relates to the relief requested therein

that have not been adjourned, withdrawn or resolved are overruled in all respects on the merits.

3.    The Bidding Procedures, in substantially the form attached hereto as **Exhibit 1**,

are approved and fully incorporated into this Order, and the Debtors are authorized, but not

directed, to act in accordance therewith.  The failure to specifically include a reference to any

7

particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

4.      Subject to final Court approval at the Sale Hearing, the Sellers are authorized to enter into Stalking Horse APA with the Stalking Horse Bidder.

5.      The schedule of events set forth below relating to the Bidding Procedures is hereby approved in its entirety:

| | |
|---|---|
| October 14, 2019 | Deadline to Object to Bidding Procedures |
| October 15,[3] 2019 | Bidding Procedures Hearing<br>Deadline to file and serve Sale Notice, Potential Assumption and Assignment Notice, and file Executory Contract List with the Court |
| October 29, 2019 | Bid Deadline<br>Sale Objection Deadline<br>Assumption and Assignment Objection Deadline<br>Deadline to Notify Qualified Bidders |
| November 4, 2019 | Deadline to Designate a Baseline Bid<br>Auction (if necessary) |
| November 4, 2019 | Notice of Auction Results filed with the Court (if applicable) |
| November 4, 2019 | Debtors' Reply Deadline<br>Adequate Assurance Objection Deadline |
| November 5, 2019 | Sale Hearing |

6.      <u>Noticing Procedures</u>.  The Noticing Procedures as set forth in this Order and the Sale Motion, including the form of Sale Notice attached hereto as **<u>Exhibit 2</u>**, are hereby approved.  On the date of the entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail upon the Sale Notice Parties.  On or about the same date, the Debtors will publish the Sale Notice on the Case Information Website.  Service of the Sale Notice on the Sale Notice Parties in the manner

---

[3] This date is subject to the Court's availability.

8

described in the Order constitutes good and sufficient notice of the Auction and the Sale Hearing. No other or further notice is required.

7.      <u>Sale Objections</u>.  Objections to the Sale must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court by no later than **October 29, 2019 at 4:00 p.m.**][4] and (d) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Ave New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014, (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III; cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet; kelli.norfleet@haynesboone.com), and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Objection Notice Parties</u>").

8.      <u>Bid Deadline</u>.  As further described in the Bidding Procedures, the Bid Deadline shall be at **5:00 p.m. on October 29, 2019**.

9.      <u>Auction</u>.  In the event the Debtors receive, on or before the Bid Deadline, at least one (1) Qualified Bid (other than the Stalking Horse Bid, which is a Qualified Bid), an Auction shall be conducted at the offices of McDermott Will & Emery LLP, 340 Madison Ave, New York, NY 10173 at **10:00 a.m. on November 4, 2019**, or such later time on such day or such other place as the Debtors shall notify all Qualified Bidder(s).  The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.

---

[4] All times set forth herein are prevailing Eastern Time.

10.    <u>Cancellation of Auction</u>.  If the Debtors do not receive at least one (1) Qualified

Bid (other than the Stalking Horse Bid), the Debtors, in their sole discretion, shall (i) notify the

Stalking Horse Bidder, all Potential Bidders and the Bankruptcy Court in writing that (a) the

Auction is cancelled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority

at the Sale Hearing to consummate the Sale in accordance with the Stalking Horse APA.

11.    <u>Sale Hearing</u>.  The Sale Hearing shall be held in the United States Bankruptcy

Court for the Southern District of New York, Courtroom, 300 Quarropas Street, White Plains,

NY 10601-4140, at **2:00 p.m. on November 5, 2019** or such other date and time that the Court

may later direct: *provided, however*, that the Sale Hearing may be adjourned, from time to time,

without further notice to creditors or parties in interest other than by filing a notice on the

Court's docket.

12.    <u>Stalking Horse APA and Bid Protections</u>.  The form of Stalking Horse APA is

hereby approved.  All of the Debtors' pre-closing obligations under the Stalking Horse APA are

authorized as set forth herein; *provided* that, for the avoidance of doubt, consummation of the

Sale contemplated by the Stalking Horse APA shall be subject to entry of the Sale Order and the

satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking

Horse APA.

13.    The Bid Protections are approved in their entirety, including, without limitation,

the Buyer Expense Reimbursement and Termination Fee payable in accordance with, and subject

to the terms of, the Stalking Horse APA, which such Buyer Expense Reimbursement shall be the

Stalking Horse Bidder's reasonable and documented expenses up to an aggregate amount of 1%

of the Base Price, and which Termination Fee shall be an amount in cash equal to 4% of the Base

10

Price.  Except as expressly provided for herein, no other termination payments are authorized or permitted under this Order.

14.     The Debtors are authorized and directed to pay the Buyer Expense Reimbursement and/or Termination Fee, to the extent payable under the Stalking Horse APA, without further order of this Court.  Each of the Buyer Expense Reimbursement and Termination Fee, to the extent payable under the Stalking Horse APA, shall constitute an allowed super-priority administrative expense claim senior to all other administrative expense claims against the Debtors' estates pursuant to Bankruptcy Code sections 105(a), 503(b) and 507(a)(2).

15.     No Qualified Bidder or any other person or entity, other than the Stalking Horse Bidder, shall be entitled to any Buyer Expense Reimbursement, Termination Fee, or other similar termination fee, expense reimbursement, or payment in connection with the Sale, or any other form of bid protections.

16.     Assumption and Assignment Procedures.  The assumption and assignment procedures set forth in the Sale Motion (the "Assumption and Assignment Procedures") are hereby approved.

17.     The form of Potential Assumption and Assignment Notice, attached hereto as **Exhibit 3** is approved preliminarily.  The Potential Assumption and Assignment Notice (i) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtors and (ii) is reasonably calculated to provide due, adequate and timely notice to all Contract Counterparties of (a) the potential assumption and assignment of the Potentially Assumed Contracts and rights thereunder and (b) the deadline to file objections to such assumption and assignment, the existence of any defaults, and/or adequate assurance of future performance.

11

18.     On the date of the entry of the Bidding Procedures Order, the Debtors shall file

with the Court and serve via first class mail or email on (i) all Contract Counterparties and (ii) all

parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002,

the Potential Assumption and Assignment Notice, attached hereto as **Exhibit 3** and file with the

Court, and publish on the Case Information Website, the Executory Contract List.  If it is

discovered that a Previously Omitted Contract should have been included on the Executory

Contract List but was not, or in the event that the Debtors seek to modify a Cure Amount, the

Debtors will promptly file with the Court, and publish on the Case Information Website, a

revised Executory Contract List.

19.     <u>Objection Deadlines</u>.  Any Contract Counterparty may file an objection to the

calculation of Cure Amounts with respect to the Contract Counterparty's Potentially Assumed

Contract, or to the assumption and assignment to the Successful Bidder of the Contract

Counterparty's Potentially Assumed Contract (any such objection, an "<u>Assumption and

Assignment Objection</u>").  All Assumption and Assignment Objections filed by Contract

Counterparties listed on the Executory Contract List (or any revised Executory Contract List)

filed with the Court must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy

Rules and Local Bankruptcy Rules, (c) state, with specificity, the legal and factual bases thereof,

including, if applicable, the Cure Amount the Contract Counterparty believes is required to cure

defaults under the relevant Assumed Contract, (d) be filed by **October 29, 2019 at 4:00 p.m.**

(the "<u>Assumption and Assignment Objection Deadline</u>") and (e) be served on (1) proposed

counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY

10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2)

counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee,

12

U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn:

Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and

shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500

East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III;

cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221

McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin;

kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com), and (6) any other

party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Assumption

and Assignment Objection Notice Parties").

20.    Resolution of Assumption and Assignment Objections.  If a Contract

Counterparty files a timely Assumption and Assignment Objection by the Assumption and

Assignment Objection Deadline and such objection is not resolved among the parties prior to the

Sale Hearing, the Court will hear and determine such objection at the Sale Hearing.

21.    Failure to File Timely Assumption and Assignment Objection.  If a Contract

Counterparty fails to file with the Court and serve on the Assumption and Assignment Objection

Notice Parties a timely Assumption and Assignment Objection, the Contract Counterparty shall

be (i) forever barred from (a) objecting to the assumption and assignment of the Potentially

Assumed Contract identified in the Executory Contract List, (b) asserting that any conditions to

the assumption and assignment of any Potentially Assumed Contract must be satisfied under

such Potentially Assumed Contract before such Potentially Assumed Contract may be assumed

and assigned, or that any consent required to any such assignment has not been given, or (c)

asserting that the Stalking Horse Bidder has failed to provide adequate assurance of future

performance as contemplated under Bankruptcy Code section 365(b)(l)(C) in respect of any such

Potentially Assumed Contract, (ii) deemed to have consented to the applicable Cure Amount, if any, and be bound to such corresponding Cure Amount, (iii) deemed to have agreed that all defaults under the applicable Potentially Assumed Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the neither the Successful Bidder nor the Debtors have any liability or obligation with respect to any default occurring or continuing prior to the assignment, and that the applicable Contract shall remain in full force and effect for the benefit of the Successful Bidder (and such Contract Counterparty) in accordance with the terms of the Potentially Assumed Contract from and after the date of the assignment of the applicable Potentially Assumed Contract, (iv) deemed to have waived any right to terminate the applicable Contract or designate an early termination date under the applicable Contract as a result of any default that occurred and/or was continuing prior to the assignment date, and (v) deemed to have agreed to the terms of the Sale Order.

22.    <u>Adequate Assurance Objection</u>.  Immediately after the conclusion of the Auction, if a Successful Bidder other than the Stalking Horse Bidder prevails at the Auction, the Debtors shall file with the Court, and publish on the Case Information Website, the Notice of Auction Results that identifies the Successful Bidder and provides notice that the Debtors will seek to assume and assign the Potentially Assumed Contracts to the Successful Bidder.  The Notice of Successful Bidder shall also contain the Successful Bidder's and Backup Bidder(s)' proposed form of adequate assurance of future performance.  Objections of any Contract Counterparty related to: (i) the identity of and ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(l)(C) or (ii) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance under the applicable Potentially Assumed Contract (an "<u>Adequate</u>

14

Assurance Objection") must (A) be in writing, (B) comply with the Bankruptcy Code,

Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual

bases thereof, (D) be filed by no later than **4:00 p.m. (Eastern Time) one (1) day prior to the**

**Sale Hearing** (the "Adequate Assurance Objection Deadline") and (E) be served on the

Assumption and Assignment Objection Notice Parties.

23.     The inclusion of a Potentially Assumed Contract, or Cure Amounts with respect

thereto, on a Potential Assumption and Assignment Notice or the Executory Contract List shall

not constitute or be deemed a determination or admission by the Debtors, the Successful

Bidder(s) or any other party in interest that such contract or lease is an executory contract or

unexpired lease within the meaning of the Bankruptcy Code.  The Debtors reserve all of their

rights, claims and causes of action with respect to each Potentially Assumed Contract listed on

the Potential Assumption and Assignment Notice and Executory Contract List.  The Debtors'

inclusion of any Potentially Assumed Contract on the Potential Assumption and Assignment

Notice and Executory Contract List shall not be a guarantee that such Potentially Assumed

Contract ultimately will be assumed or assumed and assigned.

24.     The Debtors' assumption and assignment of the Potentially Assumed Contracts to

the Successful Bidder is subject to approval of this Court and the consummation of the Sale.

Accordingly, absent the closing of such Sale, the Assigned Contracts shall not be deemed

assumed or assigned, and shall in all respects be subject to further administration under the

Bankruptcy Code.

25.     General Provisions.  Except as otherwise provided in this Order or the Bidding

Procedures, the Debtors further reserve the right as they may reasonably determine to be in the

best interests of their estates (after consultation with the Consultation Parties (as defined in the

15

Bidding Procedures)) to: (a) determine which bidders are Qualified Bidders; (b) determine which

bid are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best

proposal and which is the next highest or otherwise best proposal; (d) reject any bid that is (i)

inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures

or the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (e)

impose additional terms and conditions with respect to all potential bidders; (f) extend the

deadlines set forth herein; and/or (g) continue or cancel the Auction and/or Sale Hearing in open

court without further notice.

26.    All persons or entities that participate in the bidding process or the Auction shall

be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this

Court with respect to all matters related to the terms and conditions of the Assets, the Auction

and any transaction contemplated herein.

27.    This Order shall be binding on the Debtors, including any chapter 7 or chapter 11

trustee or other fiduciary appointed for the estates of the Debtors.

28.    Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h),

6006(d), 7062 or 9014) or Local Bankruptcy Rule that might otherwise delay the effectiveness of

this Order is hereby waived, and the terms and conditions of this Order shall be effective and

enforceable immediately upon its entry.

29.    The requirements set forth in Local Rules 6004-1, 9006-1, and 9013-1 are hereby

satisfied or waived.

30.    The Court shall retain jurisdiction over any matters related to or arising from the

implementation or interpretation of this Order.  All matters arising from or related to the

implementation of this Order may be brought before the Court as a contested matter, without the

16

necessity of commencing an adversary proceeding.  To the extent any provisions of this Order

shall be inconsistent with the Sale Motion or the Bidding Procedures, the terms of this Order

shall control.


Dated: _____, 2019
　　　　White Plains, New York　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　THE HONORABLE ROBERT D. DRAIN
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Proposed Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## BIDDING PROCEDURES

      The above captioned debtors and debtors in possession (collectively, the "Debtors") in these jointly administered chapter 11 cases (collectively, the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Court") are authorized by the Court to conduct a sale of all or substantially all of the Debtors' assets. On **October ___, 2019**, the Court entered the *Order (I)(A) Approving Bidding Procedures Relating to the Sale of Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement and Bid Protections, (C) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (D) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, (E) Scheduling Auction for, and Hearing to Approve, Sale of the Debtors' Assets and (II) Granting Related Relief*, [ECF No. ___] (the "Bidding Procedures Order"), pursuant to which the Court, among other things, approved these Bidding Procedures (these "Bidding Procedures") to be employed to solicit and evaluate bids for the purchase of all or substantially all of the Debtors' assets (the "Assets").

      Exelon Generation Company, LLC submitted a stalking horse bid (the "Stalking Horse Bid" and such bidder, the "Stalking Horse Bidder"), which bid is for certain of Agera Energy LLC's, Aequitas Energy, Inc.'s and energy.me midwest llc's (collectively, the "Sellers") assets (the "Purchased Assets"). The Stalking Horse Bidder has executed that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Stalking Horse APA"),[2] dated as of October 3, 2019. The Stalking Horse APA contemplates, pursuant to the terms and subject to the conditions and purchase price adjustments contained therein, the sale of the Purchased Assets to the Stalking Horse Bidder in consideration of approximately $24,750,000.00 million in cash and cash consideration, plus the assumption of the Assumed Liabilities, subject to certain adjustments.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse APA.

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures. These Bidding Procedures describe, among other things: (i) the procedures for bidders to submit bids for the Purchased Assets; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Purchased Assets (the "Auction"); (v) the ultimate selection of the Successful Bidder (as defined below); and (vi) Bankruptcy Court approval of the sale of the Purchased Assets to the Successful Bidder at a hearing before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140 (the "Sale Hearing").

**The Debtors reserve the right, in their discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties (as defined below), to modify or terminate these Bidding Procedures, to waive terms and conditions set forth herein, to extend any of the deadlines or other dates set forth herein, to adjourn the Auction and/or Sale Hearing, and/or, subject to the terms of the Stalking Horse APA, to terminate discussions with any and all prospective acquirers and investors (except for the Stalking Horse Bidder) at any time and without specifying the reasons therefor, in each case without further notice but in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order; *provided* that these Bidding Procedures may not be modified without the consent of BP Energy Company ("BP") or the Stalking Horse Bidder (such consent not to be unreasonably withheld) and *provided* that nothing herein shall authorize the Debtors to unilaterally extend any date or deadlines set forth in the Stalking Horse APA or otherwise extend or enlarge the obligations of the Stalking Horse Bidder thereunder; and it being further understood that the Bidding Procedures and the Bidding Procedures Order must be in form and substance reasonably satisfactory to BP and, pursuant to the Stalking Horse APA, the Stalking Horse Bidder.**

### Summary of Important Dates

| | |
|---|---|
| October 14, 2019 | Deadline to Object to Bidding Procedures |
| October 15,[3] 2019 | Bidding Procedures Hearing<br>Deadline to file and serve Sale Notice, Potential Assumption and Assignment Notice, and file Executory Contract List with the Court |
| October 29, 2019 | Bid Deadline<br>Sale Objection Deadline<br>Assumption and Assignment Objection Deadline<br>Deadline to Notify Qualified Bidders |
| November 4, 2019 | Deadline to Designate a Baseline Bid<br>Auction (if necessary) |
| November 4, 2019 | Notice of Auction Results filed with the Court (if applicable) |

---

[3] This date is subject to the Court's availability.

2

| November 4, 2019 | Debtors' Reply Deadline |
| | Adequate Assurance Objection Deadline |
| November 5, 2019 | Sale Hearing |

**Any interested bidder should contact, as soon as practicable:**

Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC ("Miller Buckfire") in writing, expressing your interest in the Purchased Assets to Richard Klein and James Georgiow of Miller Buckfire (richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).

## 1.   Due Diligence

The Debtors have posted copies of all material documents related to the Debtors' business to the Debtors' confidential electronic data room (the "Data Room").  To access the Data Room, a party must submit to the Debtors or their advisors:

A.    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

B.    if practicable, a description of the nature and extent of any due diligence the interested party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and

C.    sufficient information, as reasonably determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties, to determine that the interested party has the financial wherewithal to close a sale for the Purchased Assets.

An interested party that meets the above requirements to the satisfaction of the Debtors, after consultation with the Consultation Parties, shall be a "Potential Bidder."  As soon as practicable, the Debtors will provide such Potential Bidder access to the Data Room; *provided* that such access may be terminated by the Debtors in their discretion at any time for any reason whatsoever, after prior notice to, and after consultation with, the Consultation Parties, including that a Potential Bidder does not become a "Qualified Bidder" (as defined below) or these Bidding Procedures are terminated.

The Debtors shall keep the Consultation Parties reasonably informed of all interested parties that become Potential Bidders and the status of their due diligence.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate a sale transaction.  Failure by a Potential Bidder to comply with reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, after consultation with the Consultation Parties, that a bid made by such Qualified Bidder is not a Qualified Bid.

3

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be initially directed to:  (i) Richard Klein and James Georgiow of Miller Buckfire (richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).  The Debtors will simultaneously distribute to all Potential Bidders via the Data Room any additional diligence materials not previously available to other Potential Bidders.  Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtors' businesses to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth above, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors.  Further, the Debtors shall have no obligation to provide due diligence access after the Bid Deadline (as defined below) to any party that has not submitted a Qualified Bid by the Bid Deadline.

## 2.    Bid Deadline

A Potential Bidder who desires to be deemed a Qualified Bidder must deliver the Required Bid Documents (as defined below) via email (in .pdf or similar format) so as to be *actually received* on or before **October 29, 2019 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") to the following parties (the "Debtor Notice Parties"):

a.    **Debtors**.  c/o Agera Energy, LLC, 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510 (Attn: tsandford@ageraenergy.com).

b.    **Debtors' Counsel**.  McDermott Will & Emery LLP, 340 Madison Ave., New York, New York 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com).

c.    **Debtors' Investment Banker**.  Miller Buckfire, 787 7th Avenue, 5th Floor, New York, NY, 10019 (Attn: Richard Klein and James Georgiow; richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).

d.    **Counsel to BP Energy Company**.  Haynes and Boone, LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin; kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com).

The Debtors, with the consent of the Consultation Parties, and without the need for further Court approval, may extend the Bid Deadline by a reasonable period of time once or successively if the Debtors believe that such extension would further the goal of attaining the highest or otherwise best offer for the Debtors' assets.  The Debtors shall promptly notify all Potential Bidders of any such extension.

4

### 3.    <u>Qualified Bids</u>

Each offer, solicitation or proposal by a Potential Bidder must satisfy each of the following conditions to be deemed a "<u>Qualified Bid</u>," and for the Potential Bidder to be deemed a "<u>Qualified Bidder</u>," unless any such conditions that are not satisfied are waived by the Debtors. The Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid.

#### a.    **Bid Requirements**

All bids must include the following items (collectively, the "<u>Required Bid Documents</u>"):

i.    <u>Irrevocable</u>.  Each bid must be accompanied by an executed letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the assets identified in such bid and that such bidder agrees to serve as a Backup Bidder (as defined herein) in accordance with these Bidding Procedures.

ii.    <u>Executed Agreement</u>.  In both PDF and MS-WORD format, an executed copy of an asset purchase agreement (the "<u>APA</u>") and a copy of same that has been marked against the Stalking Horse APA, a copy of which is located in the Data Room.

iii.    <u>Same or Better Terms</u>.  Each bid must be an offer to purchase some or all of the Purchased Assets, pursuant to a sale transaction that is no less favorable to the Debtors' estates (except as to the Purchase Price and Schedule 2.01(a) of the Stalking Horse APA), as the Debtors may reasonably determine, in consultation with the Consultation Parties, than the transactions contemplated in the Stalking Horse APA.  To the extent that a bid contemplates the purchase of less than all of the Purchased Assets, such bid will only be considered a Qualified Bid if, when added to any other bids received (other than the Stalking Horse Bid) for any Purchased Assets not included in such bid, the aggregate total purchase price of such bids is equal to or greater than (i) the Stalking Horse Bidder's bid of $24,750,000.00, plus (ii) the Termination Fee, plus (iii) the maximum possible Buyer Expense Reimbursement payable under the Stalking Horse APA, plus (iv) an additional one million dollars ($1,000,000).

iv.    <u>Financial Wherewithal</u>.  Each Potential Bidder must provide written evidence acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating financial wherewithal, operational ability and corporate authorization to consummate the proposed transaction.

v.    <u>Committed Financing</u>.  Each Potential Bidder must provide written evidence of a firm commitment for financing to consummate the proposed transaction, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Debtors, after consultation with the Consultation Parties.

A bid will be considered only if the bid:

5

i        identifies the legal name of the purchaser (including any sponsor(s), if the purchaser is an entity formed for the purpose of consummating the proposed transaction);

ii       identifies the Assets the bidder seeks to purchase and identifies the cash purchase price, and specifies how the cash purchase price is allocated among the Purchased Assets;

iii      is not materially more burdensome or more conditional than the terms of the Stalking Horse Bid, if any, as determined by the Debtors (after consultation with the Consultation Parties);

iv      identifies all executory contracts and unexpired leases of which the Potential Bidder seeks assignment from the Debtors, if any;

v       is not conditioned on (i) obtaining financing or (ii) the outcome of unperformed due diligence;

vi      is not conditioned on the receipt of any third party approvals or consents (excluding required Court approval and required governmental, licensing or regulatory approval or consent, if any), including without limitation board of director approval;

vii     with respect to any governmental, licensing or regulatory approvals or consents, includes a description of all such approvals or consents that are required to consummate the proposed transaction (including any antitrust approval or clearance related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors in their sole discretion of the ability of the bidder to obtain such approvals or consents in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

viii    is accompanied by a cash deposit by wire transfer to an escrow agent selected by the Debtors (the "Deposit Agent") in an amount equal to 10% of the cash purchase price set forth in connection with such bid (any such deposit, a "Good Faith Deposit");

ix      indicates that the bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment;

x       provides for a commitment to close as soon as practicable, but in no event later than the Closing would occur under the Stalking Horse APA;

xi      sets forth the representatives that are authorized to appear and act on behalf of the bidder in connection with the proposed transaction;

xii    fully discloses the identity of each entity that will be bidding for the Debtors' assets or otherwise financing such bid (including through the issuance of debt in connection with such bid), and a summary of any such financing;

xiii    indicates that the bidder waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Assets;

xiv    if the bid contemplates the assumption and assignment of any contracts or leases, includes evidence of the bidder's ability to comply with Bankruptcy Code section 365 (to the extent applicable), including providing adequate assurance of such bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to the bidder (the "Adequate Assurance Information"), in a form that will permit the Debtors to disseminate immediately such evidence to the Contract Counterparties to such contracts and leases that request such Adequate Assurance Information;

xv    constitutes a good faith, *bona fide* offer to effectuate the proposed transaction; and

xvi    is received on or before the Bid Deadline (as such deadline may be extended in accordance with these Bidding Procedures).

The Debtors will determine, in consultation with the Consultation Parties, whether to entertain bids that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. The Debtors, in their sole and absolute discretion following consultation with the Consultation Parties, shall make a determination regarding whether a bid constitutes a Qualified Bid and shall notify bidders via email whether their bids have been determined to be Qualified Bids by no later than **October 29, 2019 at 5:00 p.m. (prevailing Eastern Time)**.

   b.    **Non-Conforming Bids**

The Debtors, after consultation with the Consultation Parties, shall have the right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above or does not include one or more Required Bid Documents. If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies following the Bid Deadline but not later than one Business Day prior to the Auction. If any bid is determined by the Debtors not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with these Bidding Procedures, the Debtors shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit.

### c.    Potential Bidder Representations

By submission of its bid, each Qualified Bidder shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all due diligence regarding the Assets that are the subject of the Auction prior to making any such bids, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder(s), the asset purchase agreement(s) with such Successful Bidder(s). Without the written consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of its Qualified Bid, during the period that such Qualified Bid is required to remain irrevocable.

### d.    Distribution and Evaluation of Qualified Bids

All Qualified Bids will be considered by the Debtors; bids other than Qualified Bids will not be considered.  The Debtors may, after consultation with the Consultation Parties, evaluate bids on any grounds, including, but not limited to:

| | |
|---|---|
| i | the amount of the purchase price, including non-cash consideration, set forth in the bid; |
| ii | the value to be provided to the Debtors under the bid, including the net economic effect upon the Debtors' estates; |
| iii | any benefit to the Debtors' bankruptcy estates from any assumption of liabilities; |
| iv | the transaction structure and execution risk, including conditions to and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals; |
| v | the anticipated timing to closing and whether such timing is consistent with the Debtors' adherence to, among other things, the Stalking Horse APA; |
| vi | the impact on employees and employee claims against the Debtors; |
| vii | the presence of any governmental, licensing, regulatory or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents; |
| viii | the impact on trade and other creditors; and |

8

ix      any other factors the Debtors may reasonably deem relevant consistent with their fiduciary duties.

For the avoidance of doubt, the presence of any governmental, licensing, regulatory or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents, may be grounds for the Debtors, in their sole discretion, to determine that such bid (i) is not a Qualified Bid or (ii) is not higher or otherwise better than any other Qualified Bid.

In evaluating the bids, the Debtors, after consultation with the Consultation Parties, shall also make a determination regarding which Qualified Bid(s) is the highest or best Qualified Bid for the Purchased Assets and will therefore serve as the starting point at the Auction (the "Baseline Bids" and, each, a "Baseline Bid").  To the extent the Baseline Bid(s) is not the Stalking Horse Bid, the Baseline Bid(s) must collectively exceed the Stalking Horse Bidder's bid of $24,750,000.00, plus the Termination Fee, plus the maximum possible amount of the Buyer Expense Reimbursement, plus an additional amount of one million dollars ($1,000,000).  No later than **October 29, 2019**, the Debtors shall distribute a detailed summary of all Qualified Bids received by the Debtors to all Qualified Bidders (including the Stalking Horse Bidder), including a valuation of all components of such Qualified Bids.  The Debtors shall provide a redacted version of the full asset purchase agreements submitted by such Qualified Bidders to all other Qualified Bidders upon request within one (1) business day of the Bid Deadline.

On or before **November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)** (the "Designation Deadline"), the Debtors shall file a notice designating the Baseline Bid and publish such notice on the Case Information Website (as defined below) and in the Data Room and/or distribute the same at the Auction.  The Debtors shall also provide copies of such Baseline Bid to all of the Qualified Bidders (including the Stalking Horse Bidder) and each of the Consultation Parties.  To the extent the Baseline Bid(s) is not the Stalking Horse Bid, the Debtors shall also provide to all Qualified Bidders (including the Stalking Horse Bidder) and each of the Consultation Parties a detailed calculation of the value of the Qualified Bid(s) comprising the Baseline Bid(s).

### 4.      Auction

#### a.      Scheduled Time and Date of the Auction

One or more auctions for the Assets (the "Auction") may be held in accordance with these Bidding Procedures and upon notice to all Qualified Bidders that have submitted Qualified Bids.  The Auction, if held, is scheduled to be conducted at the offices of McDermott Will & Emery LLP, 340 Madison Ave., New York, New York 10173 **on November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)**, or such later time or other location as designated by the Debtors in a notice filed on the docket of the Court and published on the Debtors' case information website (located at **https://cases.stretto.com/agera** (the "Case Information Website")).

If no Qualified Bid (other than the Stalking Horse Bid) is submitted by the Bid Deadline with respect to the Assets or any lot of assets, the Debtors may, after consultation with the

9

Consultation Parties, elect to cancel the Auction with respect to such assets and, as applicable, seek approval of the transactions contemplated in the Stalking Horse Bid at the Sale Hearing (as defined below).

### b.        Participants and Attendees

Principals, representatives or agents of the Debtors, BP, the Stalking Horse Bidder, the Committee, and any Qualified Bidder that has submitted a Qualified Bid (and the legal and financial advisors to each of the foregoing) will be entitled to attend the Auction.  Any other creditor of the Debtors will be permitted to attend the Auction upon advance notice by such creditor of at least two (2) business days to the Debtor Notice Parties.  Only Qualified Bidders will be entitled to make any subsequent bids at the Auction.  Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or the sale of any of the Assets as described herein, (b) has reviewed, understands and accepts these Bidding Procedures, (c) has consented to the jurisdiction of the Court and (d) intends to consummate its Qualified Bid if it is selected as the Successful Bid.  Each Qualified Bidder participating in the Auction shall appear in person at the Auction or through a duly authorized representative.

### c.        Auction Procedures

To the extent the Baseline Bid(s) is not the Stalking Horse Bid, the Baseline Bid(s) must collectively exceed the Stalking Horse Bidder's bid of $24,750,000.00, plus the Termination Fee, plus the maximum possible amount of the Buyer Expense Reimbursement, plus an additional amount of one million dollars ($1,000,000);

Bidding at the Auction will begin with the Baseline Bid(s) and continue, in one or more rounds of bidding, so long as, during each round, at least one subsequent bid is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (an "Overbid") and (ii) the Debtors determine, in consultation with the Consultation Parties, that such Overbid or combination of Overbids is (a) for the first round, a higher or otherwise better offer than the Baseline Bid(s) (taking into account, if applicable, the Buyer Expense Reimbursement and Termination Fee for the Stalking Horse Bidder) and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid(s) (as defined below).

After the first round of bidding and between each subsequent round of bidding, the Debtors will determine, after consultation with the Consultation Parties, and announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "Leading Bid"), as well as provide a detailed calculation of the value of such Leading Bid.  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge and written confirmation of the Leading Bid.

In connection with any of its bids at the Auction, the Stalking Horse Bidder shall receive a credit equal to the aggregate of (i) the Termination Fee and (ii) the maximum possible amount of the Buyer Expense Reimbursement payable by the Debtors pursuant to the Stalking Horse APA.  Additionally, to the extent bids are submitted at the Auction for less than all of the Purchased Assets contemplated by the Stalking Horse APA, in accordance with and as permitted

10

by these Bidding Procedures, the Stalking Horse Bidder shall have the right, but not the obligation, to elect to bid on less than all of such Purchased Assets.

The Debtors, in their sole discretion and in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, including, but not limited to, bidding increments and other requirements for each round of bidding, provided that such rules are (A) not inconsistent with the order entered by the Court approving these Bidding Procedures, the Bankruptcy Code or any other order of the Court entered in connection herewith and (B) disclosed to each Qualified Bidder.

The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Baseline Bid(s), all subsequent bid(s), the Leading Bid(s), the Backup Bid(s) and the Successful Bid(s) (each as defined below).

### d.    Selection of Successful Bid(s)

Prior to the conclusion of the Auction, the Debtors shall (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction, (b) determine and identify, with the Consultation Parties, the highest or otherwise best offer or collection of offers (the "Successful Bid(s)"), (c) determine and identify, with the Consultation Parties, the next highest or otherwise best offer or collection of offers (the "Backup Bid(s)") and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the identity of the party or parties that submitted the Successful Bid(s) (the "Successful Bidder(s)"), the amount and other material terms of the Successful Bid(s), the identity of the party or parties that submitted the Backup Bid(s) (the "Backup Bidder(s)") and the amount and other material terms of the Backup Bid(s).  No additional bids may be considered after the Auction is closed.  If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors will (a) file a notice (such notice being the "Notice of Auction Results") on November 1, 2019, which will, among other things, include the identity of the Successful Bidder(s) and Backup Bidder(s), with the Court and cause such notice to be published on the Case Information Website, which shall contain the Successful Bidder(s)' and Backup Bidder(s)' proposed form of adequate assurance of future performance and constitute definitive proof that the Debtors have closed the Auction.

The Backup Bid shall remain open and irrevocable until the earliest to occur of (i) the Closing Date, and (ii) the release of such bid by the Debtors in writing (such date, the "Backup Bid Expiration Date").  If a transaction with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid.

Notwithstanding anything to the contrary set forth in these Bidding Procedures, the Stalking Horse Bidder shall not be required to serve as the Backup Bidder for anything less than all of the Purchased Assets contemplated by the Stalking Horse APA.

### 5.    Termination Fee and Buyer Expense Reimbursement

11

The Debtors have agreed that they must pay the Termination Fee and Buyer Expense Reimbursement (as defined in the Stalking Horse APA) to the Stalking Horse Bidder under certain conditions and circumstances as set forth in the Stalking Horse APA.  Payment of the Termination Fee and Buyer Expense Reimbursement shall be governed by the Stalking Horse APA and the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order and the Stalking Horse APA, the Stalking Horse Bidder's claim to the Termination Fee and the Buyer Expense Reimbursement shall constitute a super-priority administrative expense claim senior to all other administrative claims against the Debtors' estates.

## 6.    Consultation Parties

The term "Consultation Parties" as used in these Bidding Procedures shall mean (i) the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases, if any (the "Creditors' Committee"), (ii) BP, and (iii) the Stalking Horse Bidder.

The Debtors shall use their reasonable best efforts to consult and confer with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest.  For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

The Debtors may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; *provided*, *however*, that the Debtors may, in the exercise of their business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

## 7.    The Sale Hearing

The hearing to consider the proposed Sale Order (the "Sale Hearing") shall be held on **November 5, 2019 at 2:00 p.m. (prevailing Eastern Time)** before the Honorable Robert D. Drain in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140.

The Sale Hearing may be adjourned by the Debtors by an announcement of the adjourned date at a hearing before the Court or by filing a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid(s) and, in their sole discretion, the Backup Bid(s).

The Debtors' presentation to the Court of the Successful Bid(s) and Backup Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Court.  Following the Court's entry of the Sale Order approving such bid(s), the Debtors and the Successful Bidder(s) shall proceed to consummate the transaction(s) contemplated by the Successful Bid(s).  If the Debtors and the Successful

12

Bidder(s) fail to consummate the proposed transaction(s), then the Debtors shall file a notice with the Court advising of such failure. Upon the filing of such notice with the Court, the Backup Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized but not directed, in their sole discretion, to effectuate the transaction(s) with the Backup Bidder(s) subject to the terms of the Backup Bid(s) of such Backup Bidder(s) without further order of the Court. If such failure to consummate the sale is the result of a breach by the Successful Bidder(s) (such bidder(s), the "Breaching Bidder(s)") of its (their) purchase agreement(s), the Debtors reserve the right to seek all available remedies from the Breaching Bidder(s), subject to the terms of the applicable purchase agreement.

### 8.    Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders will be held in escrow by the Deposit Agent and will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to the terms of the applicable escrow agreement or pursuant to further order of the Court. The Deposit Agent will retain the Good Faith Deposits of the Successful Bidder(s) and the Backup Bidder(s) until the closing of the transaction(s) contemplated by the Successful Bid(s) or the Backup Bid(s), as applicable, in accordance with Section 4.d. above, except as otherwise ordered by the Court. The Good Faith Deposits (and all interest accrued thereon) of the other Qualified Bidders will be returned within four Business Days after the entry of the Sale Order. At the closing of the transaction contemplated by the Successful Bid(s), the Successful Bidder(s) will receive a credit in the amount of its Good Faith Deposit (plus all interest accrued thereon). All remaining Good Faith Deposits (and all interest accrued thereon) held by the Deposit Agent will be released by the Deposit Agent four Business Days after the closing of the transaction(s) contemplated by the Successful Bid(s); *provided*, the Deposit Agent will retain the Good Faith Deposit of a Breaching Bidder pending a ruling by the Court as to the amount of damages owed, if any, by such Breaching Bidder to the Debtors.

### 9.    As Is, Where Is

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except as provided in any agreement with respect to the sale or sales approved by the Court.

### 10.    Free and Clear of Any and All Interests

All of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") to the maximum extent permitted by Bankruptcy Code section 363, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests attached to the Assets immediately prior to Closing.

### 11.    Reservation of Rights of the Debtors

Except as otherwise provided in these Bidding Procedures or the Bidding Procedures Order, the Debtors reserve the right, after consultation with the Consultation Parties (if applicable), to:

13

| i | determine which interested party is a Potential Bidder; |
|---|---|
| ii | determine which bidder is a Qualified Bidder; |
| iii | determine which bid is a Qualified Bid; |
| iv | determine which Qualified Bid is a Baseline Bid; |
| v | determine which Qualified Bid is the highest or otherwise best offer for the Assets and which is the next highest or otherwise best offer; |
| vi | reject any bid that the Debtors deem to be (a) inadequate or insufficient, (b) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules or (c) contrary to the best interests of the Debtors and their estates; |
| vii | impose additional terms and conditions with respect to all Potential Bidders; |
| viii | cancel the Auction; |
| ix | extend the deadlines set forth herein; and |
| x | modify these Bidding Procedures and implement additional procedural rules that the Debtors determine will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties. |

Nothing in these Bidding Procedures shall require the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent that the Debtors determine, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary duties under applicable law.

## Exhibit 2

**Form of Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION AND SALE HEARING

      **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") on October 4, 2019 (the "Petition Date").

      **PLEASE TAKE FURTHER NOTICE** that, on the Petition Date, the Debtors filed a motion (the "Sale Motion"),[2] [ECF No. __], with the Court seeking entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of substantially all of the Debtors' assets (the "Sale"), subject to the submission of higher or otherwise better offers in an auction process (the "Auction"), (b) the form and manner of notice related to the Sale and (c) procedures for the assumption and assignment of contracts and leases in connection with the Sale.

      **PLEASE TAKE FURTHER NOTICE** that a party (the "Stalking Horse Bidder") has already submitted a binding bid (the "Stalking Horse Bid") for certain of the Assets, as set forth in a certain asset purchase agreement (the "Stalking Horse APA"). The Stalking Horse Bid remains subject to higher and/or better offers.

      **PLEASE TAKE FURTHER NOTICE** that, on _____ ____, 2019, the Court entered an order (the "Bidding Procedures Order"), [ECF No. __], approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

[3] To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

**Any interested bidder should contact, as soon as practicable:**

Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC ("Miller Buckfire") (Attn: Richard Klein and James Georgiow; richard.klein@millerbuckfire.com and jgeorgiow@stifel.com).

## Obtaining Additional Information

Copies of the Stalking Horse APA, the Bidding Procedures Order, the Bidding Procedures, and the proposed Sale Order are available upon request to the Debtors' noticing agent, Stretto, at https://cases.stretto.com/agera.

## Important Dates and Deadlines[4]

(i)  **Bid Deadline**. The deadline to submit a Qualified Bid is **October 29, 2019 at 5:00 p.m. (prevailing Eastern Time)**.

(ii)  **Sale Objection Deadline**. The deadline to file an objection with the Court to the Sale, and all objections relating to the Stalking Horse Bidder, or the Sale (collectively, the "Sale Objection") is **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").

(iii)  **Auction**. In the event that the Debtors timely receive a Qualified Bid in addition to the Stalking Horse Bid, and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction for the Assets. The Auction, if one is held, will commence on **November 4, 2019 at 10:00 a.m. (prevailing Eastern Time)** at the offices of McDermott Will and Emery, 340 Madison Avenue, New York, New York 10173.

(iv)  **Sale Hearing**. A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Court on **November 5, 2019 at 2:00 p.m. (prevailing Eastern Time)**, or such other date as determined by the Court, at 300 Quarropas Street White Plains, NY 10601-4140.

## Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court by no later than **the Sale Objection Deadline** and (d) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340

---

[4] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Madison Avenue, New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III; cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin; kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com), and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any party or entity who fails to timely make an objection to the Sale on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.*

## NO SUCCESSOR LIABILITY

*For more information on the Debtors' business, refer to the Declaration of Todd Sandford Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration") [ECF No. __]. Upon Court approval, the Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. Accordingly, as a result of the Sale, the Successful Bidder will not be a successor to any of the Debtors by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly provided in the Purchase Agreement, for any liens, claims, encumbrances and other interests against or in any of the Debtors under any theory of law, including successor liability theories.*

[Remainder of This Page Intentionally Left Blank]

3

Dated:  October 2, 2019
         New York, NY

Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

/s/ _____
Timothy W. Walsh
Darren Azman
Ravi Vohra
340 Madison Avenue
New York, NY 10173
Telephone:  (212) 547-5615
Facsimile:  (212) 547-5444
Email: twwalsh@mwe.com
        dazman@mwe.com
        rvohra@mwe.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

4

## **<u>Exhibit 3</u>**

**Form of Potential Assumption and Assignment Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR
UNEXPIRED LEASES AND CURE AMOUNT**

      **You are receiving this Notice because you may be a retail electricity or natural gas customer of Agera Energy LLC, energy.me midwest llc (d/b/a Energy Me), or Aequitas Energy Inc. (collectively, the "Agera Opco Entities"). The Agera Opco Entities are Debtors in the above captioned chapter 11 cases (collectively, with its subsidiaries and affiliates that commenced chapter 11 cases, the "Debtors"). Please read this notice carefully as your rights may be affected by the transactions described herein.**

      If you have questions concerning this notice, please contact your sales representative or call the Agera Opco Entities' customer service center at (877) 273-7276. Residential customers with questions about their rights as a consumer of electricity under state law and regulations may contact their state regulator or residential consumer representative.

      On October 4, 2019, the Debtors filed voluntary petitions for chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Since commencing the chapter 11 cases, the Debtors have continued to operate their businesses, and have continued to provide your electricity or natural gas service, as usual. As part of their restructuring efforts, the Agera Opco Entities are seeking to sell certain of their assets (the "Assets"), which may include the Agera Opco Entities' contracts (including any renewals or extensions thereof) with customers of their retail power and natural gas businesses such as yourself (collectively, the "Customer Contracts"). The Bankruptcy Court has approved a motion filed by the Debtors to establish procedures (the "Bidding Procedures") to select a purchaser for the Assets, who will be providing you service instead of the Agera Opco Entities.

      The Agera Opco Entities have actively sought another qualified electricity and natural gas supplier to purchase their customers' contracts and provide uninterrupted service to their customers. On October 3, 2019, the Agera Opco Entities received an offer to purchase the Assets from Exelon Generation Company, LLC ("Exelon"). Your contract (and any renewals or extensions thereof) with the applicable Agera Opco Entity may be transferred to Exelon. The transfer and assignment of your contract will occur as soon as possible after the transaction

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

closes.  Additional information regarding Exelon may be obtained from counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Ave New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com).  You have a right to request that Exelon provide you with adequate assurance of future performance (*i.e.*, information that will allow you to evaluate whether Exelon will be able to deliver uninterrupted electricity or natural gas to you following the successful transfer and assignment of your Customer Contract to Exelon).

The Agera Opco Entities have established procedures to transfer their Customer Contracts to Exelon.  The procedures include a process to ensure that retail customers, such as yourself, receive notice that their Customer Contracts will be transferred and assigned to Exelon.  **Exelon is a qualified competitive energy supplier[2] that has agreed to provide your electricity and natural gas service on the same rates, terms and conditions in your current customer contract with the applicable Agera Opco Entity.  Other than the change in your retail energy supplier, your electricity and natural gas service will NOT be affected by this sale.  You may have related rights as a consumer of electricity under state law and regulations (as those rights may be impacted by the Chapter 11 Cases)**.

Exelon's offer is subject to higher and better offers at an auction (the "Auction") that will take place on **November 4, 2019** if the Debtors receive at least one (1) Qualified Bid (as defined in the Bidding Procedures) other than Exelon's bid.  If a Qualified Bidder (as defined in the Bidding Procedures) other than Exelon submits the highest bid at the Auction, your Customer Contract may be assumed and assigned to such Qualified Bidder.

If a Qualified Bidder other than Exelon prevails at the Auction, the Debtors will file a Notice of Auction Results (as defined in the Bidding Procedures) with the Bankruptcy Court on **November 4, 2019**, identifying the Successful Bidder(s) and Backup Bidder(s) (as defined in the Bidding Procedures).  The Notice of Auction Results will also include the Successful Bidder(s)' and Backup Bidder(s)' proposed form of adequate assurance of future performance (*i.e.*, information that will allow you to evaluate whether the Successful Bidder(s) or Backup Bidder(s) will be able to deliver uninterrupted electricity or natural gas to you following the successful transfer and assignment of your Customer Contract to the Successful Bidder or Backup Bidder(s)).  You have a right to file an objection related to: (i) the identity of and ability of the Successful Bidder(s) or Backup Bidder(s) to provide adequate assurance of future performance or (ii) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to your Customer Contract (an "Adequate Assurance Objection").

A schedule listing each Customer Contract (the "Executory Contract List" ) that may be transferred and assigned to Exelon was filed with the Bankruptcy Court on **October 15, 2019**.  You may review or obtain a copy of the Executory Contract List by (a) visiting the Court's website at https://pcl.uscourts.gov/pcl/index.jsf for a fee, (b) the Debtors' case information website, located at https://cases.stretto.com/agera, or (c) emailing teamagera@stretto.com.  In addition, the "Cure Amounts," if any, necessary for the assumption and assignment of the

---

[2] A competitive retail energy supplier sells electricity and natural gas in regulated energy markets to residential, commercial and industrial end-use customers in your applicable state.

Customer Contracts are set forth on the Executory Contract List.  ***Each Cure Amount listed on the Executory Contract List represents all liabilities of any nature that the Debtors believe they have arising under a Customer Contract prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale.  If you believe your Cure Amount is listed with an incorrect amount on the Executory Contract List, you must object in accordance with the procedures described in this Notice.***

**Please be assured that there will be no interruption of service under your electricity contract as a result of this sale process.  You will not need to take any action to switch to Exelon.  To the extent that you receive an invoice directly from the applicable Agera Opco Entity, you will be advised of a new payment address.**

**If you do not wish to object to the transfer of your Customer Contract to Exelon, on the same rates, terms and conditions that you have already agreed to with the Agera Opco Entities, you do not need to take any action in response to this notice.  As stated above, only the provider of your service will change, and you will see Exelon's name and/or logo on your bills going forward after assignment.  Your service will continue on the same rates, terms and conditions in your current electric service contract.  For any accounts currently invoiced by the Agera Opco Entities, you will be advised of a new payment address**.  Be aware that, if you do not file an objection to the assignment of your Customer Contract, including any objection relating to the Cure Amount and the ability of Exelon to provide you with adequate assurance of future performance (an "<u>Assumption and Assignment Objection</u>") by **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)**, you will not be able to object to the transfer and assignment later in these Chapter 11 Cases.  As noted above, you may have related rights as a consumer of electricity under state law and regulations (as those rights may be impacted by the Chapter 11 Cases).

If you object to the transfer of your Customer Contract to Exelon, your objection must (i) be in writing, (ii) be filed with the Bankruptcy Court, and (iii) be served as described below, so as to be actually received by **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Assumption and Assignment Objection Deadline</u>").  If you file an objection you must clearly explain the reason for your objection.  All objections to the proposed assignment of your Customer Contract will be heard by the Bankruptcy Court at the Sale Hearing.

The Sale Hearing will take place before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street White Plains, NY 10601-4140 on **November 5, 2019 at 2:00 p.m. (prevailing Eastern Time)**.  A summary of the important dates and deadlines is below:

| | |
|---|---|
| October 15, 2019 | Deadline to file Executory Contract List and Potential Assumption and Assignment Notice |
| October 29, 2019 | Sale Objection Deadline and Assumption and Assignment Objection Deadline |
| November 4, 2019 | Notice of Auction Results (if applicable) |
| November 4, 2019 | Adequate Assurance Objection Deadline |

3

| November 5, 2019 | Sale Hearing regardless of whether the Auction is conducted |
|---|---|

### Filing Objections

Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount that the Contract Counterparty believes is required to cure defaults under the relevant Customer Contract, (d) be filed by no later than **October 29, 2019 at 4:00 p.m. (prevailing Eastern Time)** and (e) be served on (1) proposed counsel to the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY 10173 (Attn: Darren Azman and Ravi Vohra; dazman@mwe.com and rvohra@mwe.com), (2) counsel to any statutory committee appointed in these Chapter 11 Cases, (3) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Shannon Scott, Esq.; andrea.b.schwartz@usdoj.gov and shannon.scott2@usdoj.gov), (4) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 500 East Pratt Street, Suite 1000, Baltimore, MD 21202 (Attn: Cecil E. Martin III; cmartin@mcguirewoods.com), (5) counsel to BP Energy Company, Haynes & Boone LLP, 1221 McKinney Street, Suite 2100, Houston, TX 77010 (Attn: Kelli S. Norfleet and Kathryn Shurin; kelli.norfleet@haynesboone.com and kathryn.shurin@haynesboone.com), and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

Adequate Assurance Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, (D) be filed by **no later than 4:00 p.m. (prevailing Eastern Time) on November 4, 2019** and (E) be served on the Assumption and Assignment Objection Notice Parties.

Sale Objections, if any, must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules (C) state, with specificity, the legal and factual bases thereof, (D) be filed with the Court by no later than **the Sale Objection Deadline** and (E) be served on Objection Notice Parties.

[*Remainder of this page left intentionally blank.*]

4

Dated:  October 15, 2019
New York, NY

**MCDERMOTT WILL & EMERY LLP**

/s/
_____
Timothy W. Walsh
Darren Azman
Ravi Vohra
340 Madison Avenue
New York, NY 10173
Telephone:  (212) 547-5615
Facsimile:  (212) 547-5444
Email:  twwalsh@mwe.com
        dazman@mwe.com
        rvohra@mwe.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

5

## Exhibit B

**Stalking Horse APA**

## **<u>Exhibit C</u>**

**Klein Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF RICHARD KLEIN IN SUPPORT OF THE**
**DEBTORS' SALE MOTION**

I, Richard Klein, declare under penalty of perjury as follows.

**Introduction**[2]

1.      I am a Managing Director at Miller Buckfire & Co., LLC ("Miller Buckfire"),
which together with Stifel, Nicolaus & Co., Inc., a U.S. broker-dealer and investment banking
subsidiary of Stifel Financial Corp. (collectively, "Miller Buckfire"), is the proposed investment
banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in
these chapter 11 cases (the "Chapter 11 Cases").  Miller Buckfire was engaged in early May
2019 by the Debtors to serve as their investment banker to lead the Debtors' prepetition sale and
marketing process.

2.      Miller Buckfire's professionals have extensive experience in providing financial
advisory and investment banking services to financially distressed companies and to creditors,
equity holders, and other constituencies in reorganization proceedings and complex financial
restructurings, both in- and out-of-court.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera
Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988);
Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate
headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings set forth in the Motion.

3.      I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement and Bid Protections, (C) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (D) Approving Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, (E) Scheduling Auction for, and Hearing to Approve, Sale of the Agera Opco Entities' Assets; (II)(A) Approving the Sale of the Agera Opco Entities' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* (the "Motion"),[3] filed contemporaneously herewith.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations in consultation with other members of the Miller Buckfire team, financial affairs, prior restructuring initiatives, and/or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration on their behalf.

## The Prepetition Marketing Process

4.      In May 2019, the Debtors engaged Miller Buckfire as investment banker to explore strategic alternatives, including conducting a marketing process for the sale of the Debtors, as either a going concern or an asset sale.

---

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

5.      In connection with this process, Miller Buckfire prepared marketing materials, including a Confidential Information Memorandum (the "CIM"), and compiled a list of potentially interested parties.

6.      Miller Buckfire contacted 207 parties, comprised of 121 strategic investors and 86 financial investors. Each party was provided with a teaser document and was invited to execute a confidentiality agreement ("NDA") with the Debtors in order to receive the CIM and access to a virtual data room.  Of the 207 parties contacted, 39 executed an NDA and received the CIM and process letter.  Twenty of those 39 parties expressed interest in further participating in the process and were provided access to a virtual data room.  Throughout this period, Miller Buckfire facilitated these parties' due diligence efforts.

7.      In June 2019, the Debtors received numerous preliminary, non-binding indications of interest (each, an "IOI").

8.      Following receipt of the IOIs, the Debtors and their advisors continued to facilitate parties' due diligence, including management meetings and providing additional diligence information.  Following these meetings, the Debtors and their advisors continued negotiations with the interested parties regarding their proposals and key terms, including timing and transaction structure.

9.      In late July 2019, the Debtors and their advisors provided certain interested parties with a draft asset purchase agreement (the "APA") and second round process letter, with a deadline to provide a binding bid and marked-up APA by August 5, 2019.

10.      On October 3, 2019, the Debtors and Exelon Generation Company, LLC (the "Stalking Horse Bidder") executed that certain Asset Purchase Agreement, pursuant to which the

Stalking Horse Bidder will acquire a significant portion of the Debtors' customer contracts for $24,750,000.00, subject to certain adjustments, under Bankruptcy Code sections 363 and 365.

11.      Based on my knowledge of and experience with the prepetition marketing process and the extensive, arm's-length, and good-faith negotiations between the parties, I believe entry into the Stalking Horse APA and entry of the Bidding Procedures Order is in the best interests of the estates and best positions the Debtors to maximize value.  The Debtors are committed to achieving the highest or otherwise best bid for the Acquired Assets by re-marketing those assets pursuant to the Bidding Procedures, and, if necessary, conducting an Auction for the Acquired Assets as well as any additional assets of the Debtors.

12.      The Stalking Horse Bidder provides a floor above which other bidders can bid. Additionally, the structure of the Stalking Horse Bidder's transaction is conducive to competing bids.

13.      To my knowledge, there was no fraud or collusion between the Stalking Horse Bidder and the Debtors or between the Stalking Horse Bidder and other bidders, nor any attempt to take grossly unfair advantage of other bidders, during the prepetition marketing process. Moreover, I understand that all parties were represented by competent counsel and were in arms-length bargaining positions.

## There is a Sound Business Purpose for the Bidding Procedures

14.      The Debtors and their advisors worked diligently to develop the bidding procedures attached as **Exhibit 1** to **Exhibit A** of the Motion (the "Bidding Procedures").  The Bidding Procedures are designed to ensure that a process is put in place that will maximize recoveries for creditors and other stakeholders.  With these goals in mind, I believe that the Bidding Procedures set forth an appropriate process to test the value of the Debtors' Assets within the proposed timeframe outlined in the Stalking Horse APA.  The fairness and

4

reasonableness of the consideration to be paid by the Stalking Horse Bidder or another successful

bidder for the Acquired Assets ultimately will be demonstrated by further market exposure and

an open and fair Auction.

15.     To the extent that any potential bidder has not previously conducted diligence,

such bidder will have access to the information regarding the Debtors' Assets contained in the

data room, subject to the execution of an appropriate confidentiality agreement.

16.     I believe the marketing process to date and the proposed Bidding Procedures will

give all potential purchasers sufficient time to create and submit bids.  No potential purchaser has

communicated to the Debtors or to Miller Buckfire that it did not have sufficient time to make an

offer, either pre- or post-petition.

17.     As such, I believe the Bidding Procedures:  (a) provide adequate time for

interested parties to conduct due diligence and construct and submit informed competing bids;

(b) help ensure that the Debtors are maximizing the value of the estates while working towards

the efficient completion of the Chapter 11 Cases in a timely manner; and (c) provide the Debtors'

sale process with finality.  BP supports this process and has conditioned the use of cash collateral

on the timeline set forth in the Bidding Procedures.

**The Need for a Timely Sale Process**

18.     As explained in more detail in the *Declaration of Todd Sandford in Support of the*

*Debtors' Sale Motion,* due to the significant regulatory issues currently faced by the Debtors, the

Debtors, with the advice of their professionals, determined that they could only sell their Assets

to another licensed energy retailer, so as to avoid a delay in transferring the Debtors' customer

contracts to a buyer.  This also meant that the universe of buyers was smaller than if the Debtors

had been pursuing a sale with any interested buyer.  I believe the Debtors' Assets have been

extensively marketed to such a universe of buyers in recent months.  Accordingly, many, if not

5

all, of the parties that are already licensed to supply electricity and natural gas to the Debtors'

customers, and can take the Debtors' customer contracts without delay, likely already have

conducted diligence, evaluated the Debtors' business, and will not be bidding in a vacuum.  I

believe the longer the Debtors market their assets in these Chapter 11 Cases, the more likely it is

that regulatory action will adversely affect the value of the Debtors' Assets.

### There Is a Sound Business Purpose for Bid Protections

19.    The Stalking Horse Bidder is unwilling to commit to hold open its offer under the

terms of the Stalking Horse APA unless assured of payment of the Bid Protections under the

conditions set forth in the Stalking Horse APA.  I believe that the Buyer Expense

Reimbursement and Termination Fee promote more competitive bidding by inducing the

Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders—

and the Debtors—can rely.

20.    The $24,750,000.00 consideration (subject to post-closing adjustments) in the

Stalking Horse APA provides significant value to the Debtors' estates and will be used to repay

obligations of the Debtors as approved by the Court.  The Stalking Horse Bidder also provided

significant value to the Debtors by allowing them to file these Chapter 11 Cases with a bid in

place.  I believe filing with a bid in place increases the likelihood that the price at which the

Purchased Assets are sold will reflect their true worth, and the Stalking Horse Bidder is entitled

to be compensated as a result..

21.    In exchange for the aforementioned value that the Stalking Horse Bidder is

providing to the sale process, the Debtors ultimately agreed to grant the Stalking Horse Bidder

the Bid Protections.  I believe that the Bid Protections were the product of good faith, arm's-

length negotiations amongst the parties, with the Debtors at all times acting in the interest of

their estates and consistent with their fiduciary duties.  The Bid Protections were heavily

negotiated, scrutinized by the Debtors' professionals, and vetted by outside advisors, as well as discussed and reviewed with BP, who ultimately supported the Bid Protections.

22.     In particular, the Debtors agreed to a $990,000.00 Termination Fee, equal to 4% of the Purchase Price, payable upon certain termination events set forth in the Stalking Horse APA. The Stalking Horse Bidder insisted that the fee receive superpriority administrative claim status. I believe the Termination Fee is reasonable and appropriate under the circumstances.

23.     Additionally, the Debtors agreed to the Buyer Expense Reimburse up to $247,500.00 in reasonable and documented costs and out-of-pocket expenses of the Stalking Horse Bidder, equal to 1% of the Purchase Price, payable upon certain termination events set forth in the Stalking Horse APA. I believe the Buyer Expense Reimbursement is reasonable and appropriate under the circumstances.

24.     The Bidding Procedures also include value-maximizing bid mechanics. Specifically, the Bidding Procedures require Qualified Bidders to make a cash deposit and submit overbids, which I believe are reasonable and appropriate in the circumstances of these chapter 11 cases and consistent with market practice.   Each Bid must include a cash deposit in an amount equal to 10% of the aggregate purchase price of the Bid.  In addition to the deposit, each Bid or Collective Partial Bid submitted must (i) exceed the Purchase Price by the Termination Fee and Expense Reimbursement, plus an initial overbid amount of $1,000,000, in cash, cash equivalents, or such other consideration and (ii) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid.  I believe the deposit and overbid features are reasonable and appropriate under the circumstances.

25.     Moreover, I understand that the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment.  The Stalking Horse Bidder has

expended, and will continue to expend, time and resources negotiating, drafting, and performing pre-acquisition planning activities necessitated by the sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. I believe that the Bid Protections are necessary to induce the Stalking Horse Bidder's bid, and if the Court does not approve the Bid Protections, there is significant risk that the Stalking Horse Bidder will elect not to serve as the "stalking horse," to the detriment of the Debtors' estates. In my experience, stalking horse bidders almost always demand similar protections in exchange for the value of acting as the stalking horse. Accordingly, I believe the Bid Protections have a sound business purpose, are fair and appropriate under the circumstances, and will not deter or chill bidding, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

## Conclusion

26.     Based on my experience and my personal knowledge of the Debtors' commercial circumstances and the prepetition marketing process, I believe that expedite approval of the Bidding Procedures will achieve the highest or otherwise best bid for the Purchased Assets and the remainder of the Debtors' assets, and that the Bid Protections were necessary to induce a stalking horse bid for the Purchased Assets, which will ultimately maximize value to the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 4, 2019                    /s/ Richard Klein
                                          Richard Klein
                                          Managing Director

## Exhibit D

**Sandford Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— )
                                                )
In re:                                          )          Chapter 11
                                                )
AGERA ENERGY LLC, *et al.*,[1]                  )          Case No. 19-_____ (___)
                                                )
                         Debtors.               )          (Joint Administration Requested)
———————————————————— )

## DECLARATION OF TODD SANDFORD IN SUPPORT OF THE DEBTORS' SALE MOTION

I, Todd Sandford, declare under penalty of perjury as follows.

### Introduction[2]

1.      I am the Chief Operating Officer of Agera Energy, LLC and Agera Holdings, LLC, and have served in such capacities since August 2018.  As such, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.      Prior to my current role with the Debtors, I had a 15-year career with one of North America's largest retail providers of electricity, natural gas, and home and business energy-related services.  During that period of time, I held numerous leadership roles, including customer operations, finance, and sales functions, culminating in general management over two separate business units.

3.      I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement and Bid*

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

*Protections, (C) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (D)*

*Approving Procedures Relating to the Assumption and Assignment of Certain Executory*

*Contracts, (E) Scheduling Auction for, and Hearing to Approve, Sale of the Agera Opco Entities'*

*Assets; (II)(A) Approving the Sale of the Agera Opco Entities' Assets Free and Clear of All*

*Liens, Claims, Interests and Encumbrances and (B) Authorizing the Assumption and Assignment*

*of Certain Executory Contracts; and (III) Granting Related Relief* (the "Motion"), filed

contemporaneously herewith.  Except as otherwise indicated herein, all facts set forth in this

Declaration are based upon my personal knowledge, my discussions with other members of the

Debtors' management team and the Debtors' advisors, my review of relevant documents and

information concerning the Debtors' operations, financial affairs, and/or my opinions based upon

my experience and knowledge.  If called as a witness, I could and would testify competently to

the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration

on their behalf.

### The Need for a Timely Sale Process

4.      As explained in the Motion, the Debtors request expedited entry of the Bidding

Procedures Order.  I believe that failure to adhere to the proposed time periods for the Sale could

jeopardize the closing of the Sale, which the Debtors believe is the best means of maximizing the

value of their Assets.  The Debtors request expedited entry of the Bidding Procedures Order due

to, *inter alia*, (i) the daily decrease in the size and value of the Sellers' book of customer

contracts as described in more detail below; (ii) various regulatory issues; and (iii) the Debtors'

wind-down process.

A.      The Sellers' Book of Customer Contracts

5.      The Sellers' book of customer contracts represents the single largest portion of the

Purchased Assets proposed to be sold to the Stalking Horse Bidder, yet it is also the most

2

volatile.  There are a number of commercial variables that may adversely impact the size and

value of the Debtors' book of customer contracts at any given moment.  For example, customers

may decide to switch energy suppliers or the contracts may terminate under their bargained-for

terms.  The Debtors would normally offset these decreases by servicing new customers or

renewing contracts with existing customers before they expire.  However, due to the Debtors'

regulatory issues and wind-down efforts to date (each as described in more detail below), the

Debtors no longer have the infrastructure or, in some situations cannot legally, service new

customers or renew existing customers.  Further, while customer attrition is part and parcel of the

Debtors' businesses, the Debtors believe that attrition may be accelerated due to the filing of

these Chapter 11 Cases.

> B.    Regulatory Issues

6.    In certain states where the Debtors operate, the Debtors are required to satisfy

renewable portfolio standards ("RPS") as a condition of their license or certification to supply

energy to customers in such states.  RPS laws require a certain portion of a state's electricity

consumption to be generated from renewable sources, such as wind, solar, biomass, geothermal,

or hydroelectric.

7.    Energy suppliers that are required to comply with RPS obligations, such as the

Debtors, must obtain a sufficient amount of renewable energy credits (often called renewable

energy certificates or "RECs") during regular reporting cycles (*e.g.*, annually) with each state.

RECs are created when renewable energy is generated and delivered to the grid.  Those

renewable energy producers may then use the RECs to satisfy their own RPS obligations or sell

the RECs they generate to other energy suppliers, such as the Debtors.

8.      Failure to comply with RPS obligations initially triggers an obligation to pay an alternative compliance payment ("ACP"), which is essentially a cash payment obligation in lieu of acquiring RECs.  In nearly all instances, the ACP will be more costly than had the energy supplier acquired the necessary RECs.  Ultimately, an energy supplier's failure to satisfy the ACP will result in the relevant state taking regulatory enforcement action, including suspension and revocation of the supplier's license to supply energy in such state.

9.      It is impossible to know exactly when a state may take such regulatory enforcement action as timing is generally not dictated by statute or regulation.  However, the consequences of suspension or revocation of a supplier's license could result in such supplier being unable to service new and existing customers.  Given that the Debtors' customer contracts are their primary assets, the Debtors inability to service customers would have a significant and irreversible impact on the Purchase Price.

10.      The Debtors are currently in default of their 2018 RPS obligations in Massachusetts, New Hampshire, and Rhode Island as a result of the Debtors' financial inability to acquire RECs or subsequently satisfy their ACP obligations.  The Debtors will soon be in default of RPS obligations in other states.  The Debtors estimate that their inability to satisfy RPS obligations in the normal course has resulted in an aggregate ACP "premium" of approximately 60%, as compared to the cost of acquiring the RECs necessary to avoid ACP obligations.  As of the Petition Date, the Debtors estimate that they owe more than $71 million on account of REC and ACP obligations for the 2018 compliance year.

            i.      Massachusetts Enforcement Action

11.      On July 10, 2019, Agera Energy, LLC ("Agera Energy") received a letter from the Massachusetts Department of Energy Resources (the "MA DOER") demanding that Agera

4

Energy immediately satisfy its ACP liability for 2018 in the amount of $41,569,223.80.  The

DOER stated that if it does not receive such payment, it will commence necessary steps for

issuing a Notice of Non-Compliance, including the filing of a petition at the Department of

Public Utilities (the "MA DPU") recommending revocation of Agera Energy's licenses to sell

electricity in Massachusetts.

12.     On August 21, 2019, the MA DOER found that Agera Energy had failed to

comply with their RPS obligations for the 2018 compliance year.  The MA DOER referred the

matter to the MA DPU recommending that it revoke or suspend Agera Energy's retail supplier

licenses.

ii.     Rhode Island Enforcement Action

13.     On August 16, 2019, Agera Energy received a letter from the Rhode Island Public

Utilities Commission (the "RI PUC") demanding that Agera Energy immediately satisfy its RPS

obligations for 2018.  The RI PUC stated that if Agera Energy fails to comply by August 23,

2019, the matter would be placed on the RI PUC's August 28, 2019 Open Meeting agenda to (i)

find the Debtors out of compliance with the RPS obligations for 2018, (ii) demand the full

amount of the letter of credit on file, and (iii) refer the matter to the Division of Public Utilities

and Carriers for revocation of the Debtors' license to operate as a nonregulated power producer

in Rhode Island.

14.     On August 28, 2019, during an open meeting, the RI PUC found that Agera

Energy was out of compliance with the RPS obligations for the 2018 compliance year and

authorized a drawdown of the $250,000 letter of credit posted on behalf of Agera Energy with

the RI PUC.  Further, the RI PUC directed the Clerk to transmit its orders to the Division of

Public Utilities and Carriers (the "RI DPUC") for enforcement action against Agera Energy.

15.     On September 13, 2019, the RI DPUC issued Agera Energy a Suspension Order

under which Agera Energy is prohibited from entering into new contracts or renewing existing

contracts with customers in Rhode Island.  The RI DPUC is scheduled to conduct a public

hearing on October 22, 2019 to consider whether Agera Energy's license to sell energy in Rhode

Island should be rescinded.

iii.     New Hampshire Enforcement Action

16.     On September 17, 2019, Agera Energy received a letter from the New Hampshire

Public Utilities Commission (the "NH PUC") demanding that Agera Energy satisfy its ACP

liability for 2018 within ten days (*i.e.*, September 27, 2019).  The NH PUC stated that if it does

not receive such payment, it may pursue further action, including referral of the unpaid amount

for collection to the New Hampshire Department of Justice.

17.     Through a letter, dated October 2, 2019, the NH PUC ordered Agera Energy to

pay the ACP liability due for 2018 in the amount of $2,231,262.00 in full within fourteen days

(*i.e.*, October 16, 2019).  The NH PUC stated that if it does not receive such payment, it may

pursue further actions to enforce Agera Energy's ACP payment obligation.

C.     The Debtors' Wind-Down Plan

18.     Since at least August 2019, the Debtors, in consultation with BP Energy Company

("BP"), their prepetition lender, have developed and begun implementing a wind-down plan,

which involves, *inter alia*, a reduction in the Debtors' work force.  The Debtors carefully

reviewed their staffing needs and determined that the Debtors' sales and marketing team was

largely unnecessary for the wind-down.  This was due to the fact that the Debtors will not be

servicing new customers during the wind-down and could renew existing customers with a

fraction of their sales team.

19.     The wind-down plan analyzes how long it would be required to support the Debtors' businesses, prior to and after these Chapter 11 Cases.  Under the current wind-down plan, the Debtors expect to stop servicing all customers by December 31, 2019.

20.     As is apparent from the events that have unfolded thus far, the Debtors find themselves in a precarious situation.  Every day the Sale is delayed is another day the size and value of the Debtors' book of customer contracts erodes, by regulatory action or otherwise.  The Stalking Horse APA accounts for this risk by requiring a decrease in the Purchase Price for each customer contract that is not transferred to the Stalking Horse Bidder.  This adjustment is made for each contract that terminates between signing the Stalking Horse APA and Closing (as defined in the Stalking Horse APA).  The Stalking Horse APA also recognizes, however, that the customer contract transfer process takes time and requires the actual transfer of the customer account on the books of the relevant electric utility or natural gas local distribution company.  Accordingly, there is the possibility of customer contracts terminating after Closing but prior to the actual transfer to the Stalking Horse Bidder.  The Stalking Horse APA requires a further reduction in the Purchase Price for each customer contract that is not transferred within 120 days *following* Closing.

21.     The Debtors' developed the proposed Sale timeline with the intention of mitigating, as much as possible, all of the many risks associated with the consummation of the Sale and subsequent customer contract transfer process.

## Conclusion

22.     Based on my experience and my personal knowledge of the Debtors' commercial circumstances and the prepetition marketing process, I believe that expedited approval of the Bidding Procedures will achieve the highest or otherwise best bid for the Purchased Assets and the remainder of the Debtors' assets.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Dated:  October 4, 2019                    /s/ Todd Sandford
                                          Todd Sandford
                                          Chief Operating Officer

**EXHIBIT D**

<u>RESERVED</u>

**EXHIBIT E**

Form of Escrow Agreement

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT**, dated as of October 3, 2019 ("Agreement"), is by and among Exelon Generation Company, LLC, a Pennsylvania limited liability company (together with its permitted assigns "Depositor"), Agera Energy LLC, a Delaware limited liability company ("Agera"), energy.me midwest llc, an Illinois limited liability company ("energy.me"), Aequitas Energy, Inc., a Connecticut corporation ("Aequitas" and, together with Agera and energy.me, the "Recipients"), and U.S. Bank National Association, a national banking association, as escrow agent hereunder ("Escrow Agent").  Depositor and Recipients may collectively be referred to herein as the "Parties".

## BACKGROUND

A.  The Parties have entered into an Asset Purchase Agreement, dated as of the date hereof (the "Underlying Agreement") whereby Recipients have agreed to (i) sell to Depositor the Purchased Assets (as defined in the Underlying Agreement) and (ii) transfer to Depositor the Assumed Liabilities (as defined in the Underlying Agreement), in each case upon the terms and conditions set forth in the Underlying Agreement and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code (as defined in the Underlying Agreement).  The Underlying Agreement provides that Depositor shall deposit on behalf of Recipients certain funds in a segregated escrow account to be held by Escrow Agent under certain terms and conditions set forth herein.

B.  Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and any earnings thereon in accordance with the terms of this Agreement.

C.  Depositor and Recipients have appointed the Representatives (as defined below) to represent them for all purposes relating to the Escrow Funds and this Agreement.

D.  Depositor and Recipients acknowledge that (i) Escrow Agent is not a party to and has no duties or obligations under the Underlying Agreement, (ii) all references in this Agreement to the Underlying Agreement are solely for the convenience of Depositor and Recipients, and (iii) Escrow Agent shall have no implied duties beyond the express duties set forth in this Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      Definitions.  The following terms shall have the following meanings when used herein:

"Business Day" shall mean any day, other than a Saturday, Sunday or legal holiday, on which Escrow Agent at its location identified in Section 15 is open to the public for general banking purposes.

"Depositor Representative" shall mean each person so designated on Schedule C hereto or any

other person so designated in a writing signed by Depositor and delivered to Escrow Agent and a Recipients Representative in accordance with Section 15.

"<u>Escrow Account</u>" shall have the meaning set forth in Section 3(a).

"<u>Escrow Funds</u>" shall have the meaning set forth in Section 3(b).

"<u>Executive Officers</u>" shall have the meaning set forth in Section 10(h).

"<u>FDIC</u>" shall have the meaning set forth in Section 7.

"<u>Final Order</u>" shall mean a final and nonappealable order of a court of competent jurisdiction (an "<u>Order</u>"), which Order is delivered to Escrow Agent accompanied by a written instruction from Depositor or Recipients given to effectuate such Order and confirming that such Order is final, nonappealable and issued by a court of competent jurisdiction, and Escrow Agent shall be entitled to conclusively rely upon any such confirmation and instruction and shall have no responsibility to review the Order to which such confirmation and instruction refers.

"<u>Indemnified Party</u>" shall have the meaning set forth in Section 11.

"<u>IRS</u>" shall have the meaning set forth in Section 4(d).

"<u>Joint Written Direction</u>" shall mean a written direction executed by a Depositor Representative and a Recipients Representative, delivered to Escrow Agent in accordance with Section 15 and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Agreement.

"<u>Losses</u>" shall have the meaning set forth in Section 11.

"<u>Recipients Representative</u>" shall mean each person so designated on Schedule C hereto or any other person so designated in a writing signed by all Recipients and delivered to Escrow Agent and a Depositor Representative in accordance with Section 15.

"<u>Representatives</u>" shall mean the Depositor Representatives and the Recipients Representatives.

2.      <u>Appointment of and Acceptance by Escrow Agent</u>.  Depositor and Recipients hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the deposits contemplated in Section 3(a), agrees to hold, invest and disburse the Escrow Funds in accordance with this Agreement.

3.      <u>Deposit of Escrow Funds</u>.

(a)      On or as soon as reasonably practicable after the date hereof, Depositor shall deliver, or shall cause to be delivered, to the Escrow Agent a deposit in the amount of $2,475,000.00 to be held in an account at Escrow Agent entitled "216037000 Exelon Generation Escrow" having ABA No. 091000022, Account No. 104793255431 (the "<u>Escrow Account</u>").

2

(b)     If the Closing (as defined in the Underlying Agreement) occurs, then, on the Closing Date (as defined in the Underlying Agreement), Depositor shall deliver, or shall cause to be delivered the Additional Deposit (as defined in Section 2.06(b) of the Underlying Agreement) to be held in the Escrow Account.  The collected funds deposited into the Escrow Account pursuant to Sections 3(a) and 3(b) hereof, as the amount of such funds are increased by any earnings, interest and gains on and proceeds from the investment or reinvestment thereof, are referred to as the "Escrow Funds".

(c)     The Escrow Funds shall remain uninvested except as provided in Section 7.

4.     Disbursements of Escrow Funds.

(a)     Escrow Agent shall disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with, (i) a Joint Written Direction substantially in the form of Attachment 1 hereto and received by Escrow Agent as set forth in Section 15, and (ii) a Final Order directing that all or any part of the Escrow Funds be disbursed or paid to Depositor or Recipients or finding that Depositor or Recipients are entitled to such Escrow Funds.  Such Joint Written Direction shall contain complete payment instructions, including funds transfer instructions or an address to which a check shall be sent.

(b)     Depositor and Recipients each agree that the Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Recipients:

Bank Name: JPMorgan Chase Bank
Bank Address: JPMorgan Chase Bank
            171 W. 57th Street
            New York, NY 10019
ABA No.: 021000021
Account Name:  Agera Energy LLC
Account No.: 770835135

(c)     Depositor and Recipients each agrees that the Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Depositor:

Bank Name: Bank of America, N.A
Bank Address: Bank of America, N.A.
            Attn:  Sharon Hamm
            901 Main St.
            Dallas, TX 75202
ABA No.: 071000039
Account Name:  Exelon Generation Co. LLC
Account No.: 5800392176

(d)     Prior to any disbursement, Escrow Agent must receive reasonable identifying

3

information regarding the funds recipient so that Escrow Agent may comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal Revenue Service ("IRS") Form W-9 or Form W-8, as applicable.  All disbursements of Escrow Funds will be subject to the fees and claims of Escrow Agent and the Indemnified Parties pursuant to Section 11 and Section 12.

(e)    Depositor and Recipients may each deliver written notice to Escrow Agent in accordance with Section 15 changing their respective funds transfer instructions, which notice shall be effective only upon receipt by Escrow Agent and after Escrow Agent has had a reasonable time to act upon such notice.

5.    <u>Suspension of Performance; Disbursement into Court</u>.  If, at any time, (a) a dispute exists with respect to any obligation of Escrow Agent hereunder, (b) Escrow Agent is unable to determine, to Escrow Agent's good faith satisfaction, Escrow Agent's proper actions with respect to its obligations hereunder, or (c) the Representatives have not, within 30 days of receipt of a notice of resignation, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

(i)    suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Agreement until such dispute or uncertainty shall be resolved to the good faith satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed.

(ii)    petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction, in any venue convenient to Escrow Agent, for instructions with respect to such dispute or uncertainty and, to the extent required or permitted by law and subject to Section 12(b), pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds.

Escrow Agent shall have no liability to Depositor or Recipients for suspension of performance or disbursement into court in accordance with this Section 5, specifically including any liability or claimed liability that may arise due to any delay in any other action required or requested of Escrow Agent.

6.    [reserved]

7.    <u>Investment of Funds</u>.  Based upon Depositor's and Recipients' prior review of investment alternatives, in the absence of further specific joint written direction to the contrary at any time that an investment decision must be made, Escrow Agent is directed to invest and reinvest the Escrow Funds in the investment identified in Schedule A. If applicable, Depositor and Recipients acknowledge receipt from Escrow Agent of a current copy of the prospectus for the investment identified in Schedule A.  Depositor and Recipients may deliver to Escrow Agent a joint written direction changing the investment of the Escrow Funds, upon which direction Escrow Agent shall conclusively rely without inquiry or investigation; provided, however, that Depositor and Recipients warrant that no investment or reinvestment direction shall be given except in the

4

following: (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United States of America; (b) U.S. dollar denominated deposit accounts and certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which are either (i) insured by the Federal Deposit Insurance Corporation ("FDIC") up to FDIC limits, or (ii) with domestic commercial banks which have a rating on their short-term certificates of deposit on the date of purchase of at least "A-1" by S&P or "P-1" by Moody's (ratings on holding companies are not considered as the rating of the bank); or (c) money market funds, including funds managed by Escrow Agent or any of its affiliates; provided further, however, that Escrow Agent will not be directed to invest in investments that Escrow Agent determines are not consistent with Escrow Agent's policies or practices. Depositor and Recipients recognize and agree that Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of Escrow Funds or the purchase or disposition of any investment and the Escrow Agent shall not have any liability for any loss in an investment made pursuant to the terms of this Agreement. Escrow Agent has no responsibility whatsoever to determine the market or other value of any investment and makes no representation or warranty as to the accuracy of any such valuations. To the extent applicable regulations grant rights to receive brokerage confirmations for certain security transactions, Depositor and Recipients waive receipt of such confirmations.

All investments shall be made in the name of Escrow Agent. Escrow Agent may, without notice to Depositor and Recipients, sell or liquidate any of the foregoing investments at any time for any disbursement of Escrow Funds permitted or required hereunder and shall not be liable for any loss, cost or penalty resulting from any sale or liquidation of any such investment. All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds. With respect to any Escrow Funds or investment instruction received by Escrow Agent after 11:00 a.m., U.S. Central Time, Escrow Agent shall not be required to invest applicable funds until the next Business Day. Receipt of the Escrow Funds and investment and reinvestment of the Escrow Funds shall be confirmed by Escrow Agent by an account statement. Failure to inform Escrow Agent in writing of any error or omission in any such account statement within 90 days after receipt shall conclusively be deemed confirmation and approval by Depositor and Recipients of such account statement.

8.    <u>Tax Reporting</u>. Escrow Agent shall have no responsibility for the tax consequences of this Agreement and Depositor and Recipients shall consult with independent counsel concerning any and all tax matters. Except as otherwise provided herein, Depositor and Recipients jointly and severally agree to (a) assume all obligations imposed now or hereafter by any applicable tax law or regulation with respect to payments or performance under this Agreement and (b) request and direct the Escrow Agent in writing with respect to withholding and other taxes, assessments or other governmental charges, and advise the Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations. Except as otherwise agreed by Escrow Agent in writing, Escrow Agent has no tax reporting or withholding obligation except with respect to Form 1099-B reporting on payments of gross proceeds under Internal Revenue Code Section 6045 and Form 1099 and Form 1042-S reporting with respect to investment income earned on the Escrow Funds, if any. To the extent that U.S. federal imputed interest regulations apply, Depositor and Recipients shall, no later than 5 Business Days after the date of this Agreement, so inform the Escrow Agent, provide the Escrow

5

Agent with all imputed interest calculations and direct the Escrow Agent to disburse imputed interest amounts as Depositor and Recipients deem appropriate.  The Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information. Depositor and Recipients shall provide Escrow Agent a properly completed IRS Form W-9 or Form W-8, as applicable, for each payee.  If requested tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the United States Internal Revenue Code and related regulations. Depositor and Recipients have determined that any interest or income on Escrow Funds shall be reported on an accrual basis and deemed to be for the account of Recipients.

9.    <u>Resignation or Removal of Escrow Agent</u>.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving 30 days' prior written notice to Depositor and Recipients specifying a date when such resignation shall take effect and, after the date of such resignation notice, notwithstanding any other provision of this Agreement, Escrow Agent's sole obligation will be to hold the Escrow Funds pending appointment of a successor Escrow Agent.  Similarly, Escrow Agent may be removed at any time by Depositor and Recipients giving at least 30 days' prior written notice to Escrow Agent specifying the date when such removal shall take effect.  If Depositor and Recipients fail to jointly appoint a successor Escrow Agent prior to the effective date of such resignation or removal, Escrow Agent may petition a court of competent jurisdiction to appoint a successor escrow agent, and all costs and expenses related to such petition shall be paid jointly and severally by Depositor and Recipients. The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to or incurred by the retiring Escrow Agent, if any, in connection with Escrow Agent's petition to a court of competent jurisdiction to appoint a successor escrow agent pursuant to this Section 9.  After any retiring Escrow Agent's resignation or removal, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Agreement.

10.    <u>Duties and Liability of Escrow Agent</u>.

(a)    Escrow Agent undertakes to perform only such duties as are expressly set forth herein and Agent's permissive rights shall not be construed as duties. Escrow Agent shall have no liability under and no duties shall be implied. Escrow Agent has no fiduciary or discretionary duties of any kind.  Escrow Agent has no duty to inquire as to the provisions of any document other than this Agreement, including without limitation the Underlying Agreement and any other agreement between any of the parties hereto or any other persons even though reference thereto may be made herein and whether or not a copy of such document has been provided to Escrow Agent.  Escrow Agent's sole responsibility shall be for the safekeeping of the Escrow Funds in accordance with Escrow Agent's customary practices and disbursement thereof in accordance with the terms of this Agreement. Escrow Agent shall not be responsible for or have any duty to make any calculations under this Agreement, or to determine when any calculation required under the provisions of this Agreement should be made, how it should be made or what it should be, or to confirm or verify any such calculation.  Escrow Agent shall not be charged with knowledge or

notice of any fact or circumstance not specifically set forth herein.  This Agreement shall terminate upon the distribution of all the Escrow Funds pursuant to any applicable provision of this Agreement, and Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Agreement or the Escrow Funds.

(b)    Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines, which determination is not subject to appeal, that Escrow Agent's fraud, gross negligence or willful misconduct or material breach of this Agreement was the cause of any loss to Depositor or Recipients. Escrow Agent may retain and act hereunder through agents.

(c)    Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent believes to be genuine and to have been signed or presented by the person or parties purporting to sign the same.  In no event shall Escrow Agent be liable for (i) acting in accordance with or conclusively relying upon any instruction, notice, demand, certificate or document believed by Escrow Agent to have been created by or on behalf of Depositor or Recipients or (ii) incidental, indirect, special, consequential or punitive damages or penalties of any kind (including, but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action.

(d)    Escrow Agent shall not be responsible for delays or failures in performance resulting from acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, attacks or intrusions, power failures, earthquakes or any other circumstance beyond its control.  Escrow Agent shall not be obligated to take any legal action relating to the Escrow Funds, this Agreement or the Underlying Agreement or to appear in, prosecute or defend any such legal action or to take any other action that in Escrow Agent's sole judgment may expose it to potential expense or liability.  Depositor and Recipients are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  Escrow Agent shall have no liability to Depositor or Recipients, their respective heirs, legal representatives, successors and assigns, or any other party, should any of the Escrow Funds escheat by operation of law.

(e)    Escrow Agent may consult, at Depositor's and Recipients' cost, legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving this Agreement, and will incur no liability and must be fully indemnified from any liability whatsoever when acting in good faith in accordance with the advice of such counsel.  Depositor and Recipients agree, severally and not jointly, to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request relating to its duties hereunder. When any action is provided for herein to be done on or by a specified date that falls on a day other than a Business Day, such action may be performed on the next ensuing Business Day.

(f)    If any portion of the Escrow Funds is at any time attached, garnished or levied upon, or otherwise subject to any writ, order, decree or process of any court, or in case disbursement of

7

Escrow Funds is stayed or enjoined by any court order, Escrow Agent is authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders, decrees or process so entered or issued, including but not limited to those which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction; and if Escrow Agent relies upon or complies with any such writ, order, decree or process, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even if such order is reversed, modified, annulled, set aside or vacated.

(g)      Escrow Agent and any stockholder, director, officer or employee of Escrow Agent may buy, sell and deal in any of the securities of any other party hereto and contract and lend money to any other party hereto and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for any other party hereto or for any other person or entity.

(h)      In the event instructions, including funds transfer instructions, address change or change in contact information are given to Escrow Agent (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, Escrow Agent shall seek confirmation of such instructions by telephone call-back to any person designated by the instructing party on Schedule C hereto, and Escrow Agent may rely upon the confirmation of anyone purporting to be a person so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes.  If Escrow Agent is unable to contact any of the designated representatives identified in Schedule C, Escrow Agent is hereby authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to any one or more of Depositor's or Recipients' executive officers ("Executive Officers"), as the case may be, which shall include the titles of Chief Executive Officer, President and Vice President, as Escrow Agent may select.  Such Executive Officer shall deliver to Escrow Agent a fully executed incumbency certificate, and Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer.  Depositor and Recipients agree that Escrow Agent may at its option record any telephone calls made pursuant to this Section 10(h).  Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Depositor or Recipients to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank so designated.  Depositor and Recipients acknowledge that these security procedures are commercially reasonable.

11.      Indemnification of Escrow Agent.  Depositor and Recipients, jointly and severally, shall indemnify and hold harmless Escrow Agent and each director, officer, employee and affiliate of Escrow Agent (each, an "Indemnified Party") upon demand against any and all claims (whether asserted by Depositor, Recipients or any other person or entity and whether or not valid), actions, proceedings, losses, damages, liabilities, penalties, costs and expenses of any kind or nature (including without limitation reasonable attorneys' fees, costs and expenses) (collectively, "Losses") arising from this Agreement or Escrow Agent's actions hereunder, except to the extent such Losses are finally determined by a court of competent jurisdiction, which determination is not subject to appeal, to have been caused by the fraud, gross negligence or willful misconduct of

8

such Indemnified Party. Depositor and Recipients further agree, jointly and severally, to indemnify each Indemnified Party for all costs, including without limitation reasonable attorneys' fees, incurred by such Indemnified Party relating to the enforcement of Depositor's and Recipients' obligations hereunder.  The Parties agree, solely as between themselves, that any obligation for indemnification under this Section 11 shall be borne by the Party (or in the case of Recipients, the Parties) determined by a court of competent jurisdiction to be responsible for causing the Losses against which the Indemnified Party is entitled to indemnification or, if no such determination is made, then one-half by Recipients, collectively, and one-half by Depositor.  The obligations of Depositor and Recipients under this Section shall survive any termination of this Agreement and the resignation or removal of Escrow Agent.

12.    Compensation of Escrow Agent.

(a)    Fees and Expenses.    Depositor and Recipients jointly and severally agree to compensate Escrow Agent upon demand for its services hereunder in accordance with Schedule B attached hereto, provided that Depositor and Recipients further agree, solely as between themselves, that such compensation (or reimbursement of expenses, as the case may be) shall be paid one-half by Recipients, collectively, and one-half by Depositor.  The obligations of Depositor and Recipients under this Section shall survive any termination of this Agreement and the resignation or removal of Escrow Agent.

(b)    Security and Offset.    Depositor and Recipients hereby grant to Escrow Agent and the other Indemnified Parties a right of offset against and deduct from the Escrow Funds with respect to any compensation or reimbursement due by Depositor to any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds are insufficient to cover such compensation and reimbursement, Depositor and Recipients shall promptly pay such amounts upon receipt of an itemized invoice.

13.    Representations and Warranties.    Depositor and each of the Recipients each respectively make the following representations and warranties to Escrow Agent:

(a)    it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms.

(b)    each of the applicable persons designated on Schedule C attached hereto has been duly appointed to act as its authorized representative hereunder and individually has full power and authority on its behalf to execute and deliver any instruction or direction, to amend, modify or waive any provision of this Agreement and to take any and all other actions as its authorized representative under this Agreement and no change in designation of such authorized representatives shall be effective until written notice of such change is delivered to each other party to this Agreement pursuant to Section 15 and Escrow Agent has had reasonable time to act upon it.

(c)    the execution, delivery and performance of this Agreement by Escrow Agent does not and will not violate any applicable law or regulation and no printed or other material in any

9

language, including any prospectus, notice, report, and promotional material that mentions "U.S. Bank" or any of its affiliates by name or the rights, powers, or duties of Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of Escrow Agent.

(d)     it will not claim any immunity from jurisdiction of any court, suit or legal process, whether from service of notice, injunction, attachment, execution or enforcement of any judgment or otherwise.

(e)     there is no security interest in the cash fund or any part thereof; no financing statement under the Uniform Commercial Code is on file in any jurisdiction claiming a security interest in or describing (whether specifically or generally) the Escrow Funds or any part thereof.

14.     <u>Identifying Information</u>.  To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a trust or other legal entity, Escrow Agent requires documentation to verify its formation and existence as a legal entity.  Escrow Agent may require financial statements, licenses or identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.  Depositor and Recipients agree to provide all information requested by Escrow Agent relating to any legislation or regulation to which Escrow Agent is subject, in a timely manner. Escrow Agent's appointment and acceptance of its duties under this Agreement is contingent upon verification of all regulatory requirements applicable to Depositor, Recipients and any of their permitted assigns, including successful completion of a final background check. These conditions include, without limitation, requirements under the USA PATRIOT Act, the USA FREEDOM Act, the Bank Secrecy Act, and the U.S. Department of the Treasury Office of Foreign Assets Control. If these conditions are not met, Escrow Agent may at its option promptly terminate this Agreement in whole or in part, or refuse any otherwise permitted assignment by Depositor or Recipients, without any liability or incurring any additional costs.

15.     <u>Notices</u>.  All notices, approvals, consents, requests and other communications hereunder shall be in writing (provided that any communication sent to Escrow Agent hereunder must be in the form of a manually signed document or electronic copy thereof), in English, and shall be delivered (a) by personal delivery, or (b) by national overnight courier service, or (c) by certified or registered mail, return receipt requested, or (d) via facsimile transmission, with confirmed receipt or (e) via email by way of a PDF attachment thereto. Notice shall be effective upon receipt except for notice via email, which shall be effective only when the recipient, by return email or notice delivered by other method provided for in this Section, acknowledges having received that email (with an automatically generated receipt or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Such notices shall be sent to the applicable party or parties at the address specified below:

If to any Recipient or Recipients Representative:

Agera Energy LLC

10

555 Pleasantville Road, S-107
Briarcliff Manor, NY 10510
<u>Attention</u>: Raima Jamal
Fax No: (914) 206-3812
Email: <u>rjamal@ageraenergy.com</u>

with a copy to (such copy not to constitute notice):

McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
<u>Attention</u>:  Darren Azman
Fax No.:  (212) 547-5444
Email: <u>dazman@mwe.com</u>

If to Depositor or Depositor Representative:

Exelon Generation Company, LLC
10 South Dearborn Street, 49th Floor
Chicago, IL 60603
<u>Attention</u>:  Nadim A. Kazi, Deputy General Counsel
Fax No.: (312) 494-4462
Email:  <u>Nadim.Kazi@exeloncorp.com</u>

with a copy to (such copy not to constitute notice):

Exelon Generation Company, LLC
1310 Point Street, 8th Floor
Baltimore, MD 21231
<u>Attention</u>:  Legal Department, Nina Jezic
Fax No.: (410) 470-2600
Email:  <u>Nina.Jezic@constellation.com</u>

and

McGuireWoods LLP
500 East Pratt Street, Suite 1000
Baltimore, MD 21202
<u>Attention</u>:  Cecil E. Martin, III, Esquire
Fax No.: (410) 659-4535
Email: <u>cmartin@mcguirewoods.com</u>

If to Escrow Agent, at:

U.S. Bank National Association, as Escrow Agent

11

ATTN:        Kathleen Connelly
                Global Corporate Trust Services
Address:     950 17th Street, Denver CO 80202
Telephone:  303-585-4591
Facsimile:   303-585-4530
E-mail:       kathleen.connelly@usbank.com

and to:

U.S. Bank National Association
ATTN:        Kristie Thao-Pha
Trust Finance Management
111 E Fillmore Ave, St Paul MN 55107
Telephone:  651-466-6095
Facsimile:   651-312-2599
E-mail:       kristie.thaopha@usbank.com

or to such other address as each party may designate for itself by like notice and unless otherwise provided herein shall be deemed to have been given on the date received. Depositor and Recipients agree to assume all risks arising out of the use of electronic methods to submit instructions and directions to Escrow Agent, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

      16.    <u>Amendment and Assignment</u>. None of the terms or conditions of this Agreement may be changed, waived, modified, discharged, terminated or varied in any manner whatsoever unless in writing duly signed by each party to this Agreement. No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. No party may assign this Agreement or any of its rights or obligations hereunder without the written consent of the other parties, provided that if Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this Agreement) to another entity, the successor or transferee entity without any further act shall be the successor Escrow Agent.

      17.    <u>Governing Law, Jurisdiction and Venue</u>. This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of laws principles thereof that would require the application of any other laws. Each of the parties hereto irrevocably (a) consents to the exclusive jurisdiction and venue of the state and federal courts in the State of New York, located in the County of New York in connection with any matter arising out of this Agreement, (b) waives any objection to such jurisdiction or venue (c) agrees not to commence any legal proceedings related hereto except in such courts (d) consents to and agrees to accept service of process to vest personal jurisdiction over it in any such courts made as set forth in Section 15 and (e) waives any right to trial by jury in any action in connection with this Agreement.

12

18.    <u>Entire Agreement, No Third-Party Beneficiaries.</u>  This Agreement constitutes the entire agreement between the signatory parties hereto relating to the holding, investment and disbursement of Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to Escrow Funds.  This Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.  To the extent any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. The Section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Agreement.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than the signatory parties hereto and the Indemnified Parties any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

[Signature Pages Follow]

13

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**ESCROW AGENT:**

U.S. Bank National Association

By: _____
    Name: _____
    Title: _____

[Escrow Agreement Signature Page]

**RECIPIENTS:**

Agera Energy LLC

By:    _____
       Name: _____
       Title: _____

energy.me midwest llc

By:    _____
       Name: _____
       Title: _____

Aequitas Energy, Inc.

By:    _____
       Name: _____
       Title: _____

[Escrow Agreement Signature Page]

**BUYER:**

Exelon Generation Company, LLC

By: _____
      Name:  Elisabeth Graham
      Title:   Treasurer

[Escrow Agreement Signature Page]

**SCHEDULE A**

**U.S. BANK NATIONAL ASSOCIATION**
**Investment Authorization Form**

**U.S. BANK MONEY MARKET DEPOSIT ACCOUNT**

**<u>Description and Terms</u>**

The U.S. Bank Money Market Deposit Account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank.  Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366).  This method applies a daily periodic rate to the principal balance in the account each day.  Interest is accrued daily and credited monthly to the account.  Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as agent for its Corporate Trust customers.  U.S. Bank's Corporate Trust Services Escrow Group performs all account deposits and withdrawals. Deposit accounts are FDIC insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

U.S. BANK IS NOT REQUIRED TO REGISTER AS A MUNICIPAL ADVISOR WITH THE SECURITIES AND EXCHANGE COMMISSION FOR PURPOSES OF COMPLYING WITH THE DODD-FRANK WALL STREET REFORM & CONSUMER PROTECTION ACT.  INVESTMENT ADVICE, IF NEEDED, SHOULD BE OBTAINED FROM YOUR FINANCIAL ADVISOR.

**<u>Automatic Authorization</u>**

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Deposit Account.  The customer(s) confirm that the U.S. Bank Money Market Deposit Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

# SCHEDULE B

## Schedule of Fees for Services as Escrow Agent

**For**

| | | |
|---|---|---|
| 01010 | **Acceptance Fee** | Waived |
| | The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a one-time fee, payable at closing. | |
| | U.S. Bank Corporate Trust Services reserves the right to refer any or all escrow documents for legal review before execution. Legal fees (billed on an hourly basis) and expenses for this service will be billed to, and paid by, the customer. If appropriate and upon request by the customer, U.S. Bank Corporate Trust Services will provide advance estimates of these legal fees. | |
| 04480 I | **Escrow Agent,** One-Time fee for the standard escrow agent services associated with the administration of the account. Administration fees are payable in advance. | $2,500.00 |

### *Taxes*

#### *Direct Out of Pocket Expenses*
Reimbursement of expenses associated with the performance of our duties, including but not limited to publications, legal counsel after the initial close, travel expenses and filing fees.

At Cost

#### *Extraordinary Services*
Extraordinary services are duties or responsibilities of an unusual nature, including termination, but not provided for in the governing documents or otherwise set forth in this schedule. A reasonable charge will be assessed based on the nature of the service and the responsibility involved. At our option, these charges will be billed at a flat fee or at our hourly rate then in effect.

Account approval is subject to review and qualification. Fees are subject to change at our discretion and upon written notice. Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof are part of your agreement. Finalization of the transaction constitutes agreement to the above fee schedule, including agreement to any subsequent changes upon proper written notice. In the event your transaction is not finalized, any related out-of-pocket expenses will be billed to you directly. Absent your written instructions to sweep or otherwise invest, all sums in your account will remain uninvested and no accrued interest or other compensation will be credited to the account. Payment of fees constitutes acceptance of the terms and conditions set forth.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.
For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

**SCHEDULE C**

Each of the following person(s) is a **Depositor Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Depositor's behalf (only one signature required):

| Paul Lehmbeck | | 312-394-4134 |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| Sandeep Menon | | 312-394-8018 |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

If only one person is identified above, the following person is authorized for call-back confirmations:

| | |
|---|---|
| Name | Telephone Number |

Each of the following person(s) is a **Recipients Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Recipients' behalf (only one signature required):

| Mark Linzenbold | | 412-728-1580 |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

| | | |
|---|---|---|
| Name | Specimen signature | Telephone No. |

If only one person is identified above, the following person is authorized for call-back confirmations:

| Todd Sandford | 412-235-8707 |
|---|---|
| Name | Telephone Number |

**ATTACHMENT 1**

**FORM OF JOINT WRITTEN DIRECTION**

**[To be completed as needed]**


U.S. Bank National Association, as Escrow Agent
ATTN:  Global Corporate Trust Services
Address:           _____


RE:  ESCROW AGREEMENT made and entered into as of [      ] by and among [            ] ("Depositor"), [       ] ("Recipient") and U.S. Bank National Association, in its capacity as escrow agent (the "Escrow Agent").

Pursuant to Section 4 of the above-referenced Escrow Agreement, Depositor and Recipients hereby instruct Escrow Agent to disburse the amount of [$_____] from the Escrow Account to [Depositor][Recipient],  as provided below:

     Depositor                         Recipient

     Bank Name:    _____    Bank Name: _____
     Bank Address: _____    Bank Address: _____
     ABA No.:          _____    ABA No. _____
     Account Name: _____    Account Name:  _____
     Account No.:   _____    Account No.: _____


**[Depositor]**
By: _____
Name:
Date: _____


**[Recipient]**
By: _____
Name:
Date: _____

**EXHIBIT F**

Form of Novation Agreement

DM_US 161223486-35.108028.0011



International Swaps and Derivatives Association, Inc.

# NOVATION AGREEMENT

dated as of [        ] among:

BP Energy Company (the "**Remaining Party**"), Agera Energy LLC, energy.me midwest, llc, and Aequitas Energy Inc. (collectively, the "**Transferors**")

AND

Exelon Generation Company LLC (the "**Transferee**").

The Transferors and the Remaining Party have entered into one or more Transactions (each an "**Old Transaction**"), each evidenced by a Confirmation (an "**Old Confirmation**") subject to an ISDA Master Agreement dated as of May 5, 2015 (as amended by that certain Second Amended and Restated Schedule to the 2002 Master Agreement dated October [3], 2019 among the Remaining Party and the Transferors, the "**Old Agreement**")].

The Remaining Party and the Transferee have entered into, as applicable, an ISDA Master Agreement dated as of January 1, 2002 (as applicable, the "**New Agreement**").

With effect from and including the effective date of [____] (the "**Novation Date**") the Transferors wish to transfer by novation to the Transferee, and the Transferee wishes to accept the transfer by novation of, all the rights, liabilities, duties and obligations of the Transferors under and in respect of the contract quantities at the delivery points and for the duration specified in the Annex A attached hereto (the "**Transferring Quantities**"), with the effect that the Remaining Party and the Transferee enter into a new transaction (each a "**New Transaction**") between them having terms identical to those of each Old Transaction but only to the extent of the Transferring Quantities, as more particularly described below.

The Remaining Party wishes to accept the Transferee as its sole counterparty with respect to the New Transactions.

The Transferors and the Remaining Party wish to have released and discharged, as a result and to the extent of the transfer described above (but only to the extent of the Transferring Quantities), their respective obligations under and in respect of the Old Transactions.

Accordingly, the parties agree as follows: ---

**1.    Definitions.**

Terms defined in the Old Agreement are used herein as so defined, unless otherwise provided herein.

**2.    Transfer, Release, Discharge and Undertakings.**

With effect from and including the Novation Date and in consideration of the mutual representations, warranties and covenants contained in this Novation Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties):

    (a)    the Remaining Party and the Transferors are each released and discharged from further obligations to each other with respect to each Old Transaction to the extent of the Transferring Quantities and their

respective rights against each other thereunder are cancelled in respect of the Transferring Quantities, provided that such release and discharge shall not affect any rights, liabilities or obligations of the Remaining Party or the Transferors with respect to payments or other obligations due and payable or due to be performed on or prior to the Novation Date, and all such payments and obligations shall be paid or performed by the Remaining Party or the Transferors in accordance with the terms of the Old Transaction;

(b)     in respect of each New Transaction, the Remaining Party and the Transferee each undertake liabilities and obligations towards the other and acquire rights against each other identical in their terms to each corresponding Old Transaction to the extent of the Transferring Quantities (and, for the avoidance of doubt, as if the Transferee were the Transferors and with the Remaining Party remaining the Remaining Party, save for any rights, liabilities or obligations of the Remaining Party or the Transferors with respect to payments or other obligations due and payable or due to be performed on or prior to the Novation Date); and

(c)     each New Transaction shall be governed by and form part of the New Agreement and the Transferee and the Remaining Party shall enter into a Confirmation substantially in the form of the form confirmation attached hereto as Annex B specifying the terms of each New Transaction; provided, however, that any failure of either the Transferee or the Remaining Party to enter into such Confirmations shall not affect the rights and obligations of the Transferors pursuant to this Novation Agreement.


3.  **Representations and Warranties.**

(a)     On the date of this Novation Agreement and on the Novation Date:

(i)     Each of the parties makes to each of the other parties those representations and warranties set forth in Section 3(a) of the 2002 ISDA Master Agreement with references in such Section to "this Agreement" or "any Credit Support Document" being deemed references to this Novation Agreement alone.

(ii)    The Remaining Party and the Transferors each makes to the other, and the Remaining Party and the Transferee each makes to the other, the representation set forth in Section 3(b) of the 2002 ISDA Master Agreement, in each case with respect to the Old Agreement or the New Agreement, as the case may be, and taking into account the parties entering into and performing their obligations under this Novation Agreement.

(iii)   Each of the Transferors and the Remaining Party represents and warrants to each other and to the Transferee that:

(A)]    it has made no prior transfer (whether by way of security or otherwise) of the Old Agreement or any interest or obligation in or under the Old Agreement or in respect of any Old Transaction; and

(B)     as of the Novation Date, all obligations of the Transferors and the Remaining Party under each Old Transaction required to be performed on or before the Novation Date have been fulfilled.

(b)     The Transferors make no representation or warranty and do not assume any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any New Transaction or the New Agreement or any documents relating thereto and assumes no responsibility for the condition,

3

financial or otherwise, of the Remaining Party, the Transferee or any other person or for the performance and observance by the Remaining Party, the Transferee or any other person of any of its obligations under any New Transaction or the New Agreement or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

4.    **Counterparts.**

This Novation Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

5.    **Costs and Expenses.**

The parties will each pay their own costs and expenses (including legal fees) incurred in connection with this Novation Agreement and as a result of the negotiation, preparation and execution of this Novation Agreement.

6.    **Amendments.**

No amendment, modification or waiver in respect of this Novation Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

7.    (a)    **Governing Law.**

This Novation Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the conflict of laws provisions thereof.

(b)    **Jurisdiction.**

With respect to any suit, action or proceedings related to this Agreement ("**Proceedings**"), each Party irrevocably:

(i)    Submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City.

(ii)    Waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives and claim that such Proceedings have been brough in an inconvenient forum and further waives the right to object with respect to such Proceedings, and that such courts does not have any jurisdictions over such party.

Confidential

4

IN WITNESS WHEREOF the parties have executed this Novation Agreement on the respective dates specified below with effect from and including each Novation Date.

………………………………………
(Name of Remaining Party)

By: …………………………………..
    Name:

    Title:

    Execution Date:

…………………………………………
(Name of Transferor)

By: …………………………………..
    Name:

    Title:

    Execution Date:

………………………………………
(Name of Transferor)

By: …………………………………..
    Name:

    Title:

    Execution Date:

…………………………………………
(Name of Transferor)

By: …………………………………..
    Name:

    Title:

    Execution Date:

…………………………………..
(Name of Transferee)

By: ………………………………………
    Name:

    Title:

    Execution Date:

5

---

**[ANNEX A]**


**[Contract Quantities]**

**[ANNEX B]**

**[Form Confirmations]**

Doc Version: 1



**Date:**

**To:**

**Address:**

**Attention:**

**Facsimile:**

**Phone:**

**Email Address:**

**RE:**                        Power, PWR FINANCIAL SWAP - Cash Settled

**Reference:**

**ICE TradeVault USI/UTI:**

**Broker:**

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between BP ENERGY COMPANY and _____ (the "Counterparty") on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other written communication with respect to the Transaction described below and evidences a complete binding agreement between you and us as to the terms of the Transaction described below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

The definitions and provisions contained in the 2005 ISDA Commodity Definitions (the "Commodity Definitions") (as published by the International Swaps and Derivatives Association, Inc.) are incorporated into this Confirmation. In the event of any inconsistency between the Commodity Definitions and this Confirmation, this Confirmation will govern for purposes of this Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation or the Commodity Definitions shall have the respective meanings assigned in the Agreement.

This Confirmation supplements, forms a part of and is subject to the ISDA Master Agreement dated as 01/01/2002 as amended and supplemented from time to time (the "Agreement") between you and us. All provision contained in the Agreement govern this Confirmation except as expressly modified below.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

Trade Date:                16 July 2019

Buyer:                    BP ENERGY COMPANY

Seller:                    EXELON GENERATION COMPANY, LLC

Confidential

Effective Date:

Termination Date:

Commodity:                          POWER

Payment Date(s):                    10 Business Days after the last price necessary for settlement is determined for each applicable Calculation Period.

Calculation Period(s):              From and including [From Date], to and including [To Date]

Business Day:                       New York, New York

Calculation Agent:                  Per the Agreement

Total Notional Quantity:            _____ MW

Notional Quantity per               (see below)
Calculation Period / UOM:

Settlement Periods(s):

   Applicable Days:                 (see below)

**Fixed Amount Details:**

Fixed Price Payer:                  BP ENERGY COMPANY

Fixed Price:                        USD _____ per MW / Hourly

**Floating Amount Details:**

Floating Price Payer:

Floating Price:                     USD { ISO Zone DA / RT} per MW / Hourly

Pricing Date(s):                    (see below)

| Application Days | Notional Quantity per Calculation Period / UOM |
|---|---|
|  | ___MW / Hourly |
|  | _____MW / Hourly |

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within two (2) Business Days by promptly signing in the space provided below and faxing the signed copy to BP ENERGY COMPANY, attention to Confirmations Department, to facsimile number (281) 227-8470. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction as against you. This facsimile shall be the only Confirmation documentation in respect of this Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

Confidential

Please return all confirmations to the BP Confirmation Department by:

Fax -        (281) 227-8470

email -      NAGPconfirmations@bp.com


**BP ENERGY COMPANY**                               **BUYER**

By: _____        By:_____

Date: _____        Date: _____

Confidential

Doc Version: 1



**Date:**

**To:**

**Address:**

**Attention:**

**Facsimile:**

**Phone:**

**Email Address:**

**RE:**                          Gas, OTC Fixed/Float Swap - Cash Settled

**Reference:**

**ICE TradeVault USI/UTI:**

**Broker:**

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between BP Energy Company and _____ (the "Counterparty") on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other written communication with respect to the Transaction described below and evidences a complete binding agreement between you and us as to the terms of the Transaction described below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

The definitions and provisions contained in the 2005 ISDA Commodity Definitions (the "Commodity Definitions") (as published by the International Swaps and Derivatives Association, Inc.) are incorporated into this Confirmation. In the event of any inconsistency between the Commodity Definitions and this Confirmation, this Confirmation will govern for purposes of this Transaction. Capitalized terms used in this Confirmation and not defined in this Confirmation or the Commodity Definitions shall have the respective meanings assigned in the Agreement.

This Confirmation supplements, forms a part of and is subject to the ISDA Master Agreement dated as _____ as amended and supplemented from time to time (the "Agreement") between you and us. All provision contained in the Agreement govern this Confirmation except as expressly modified below.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

Trade Date:

Buyer:

Seller:

Confidential

Effective Date:

Termination Date:

Commodity:              Natural Gas

Payment Date(s):       5 Business Days after the last price necessary for settlement is determined for each applicable Calculation Period.

Calculation Period(s):     Each calendar month from and including the Effective Date, to and including the Termination Date

Business Day:          New York, New York

Calculation Agent:      Per the Agreement

Total Notional Quantity:     _____ MMBTU

Notional Quantity per    (see below)
Calculation Period / UOM:

**Fixed Amount Details:**

Fixed Price Payer:

Fixed Price:            USD _____ per MMBTU / Monthly

**Floating Amount Details:**

Floating Price Payer:

Floating Price:         USD {NYMEX Final Settlement} per MMBTU / Monthly

Pricing Date(s):        (see below)

| Pricing Date | Notional Quantity per Calculation Period / UOM |
|---|---|
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |
| | MMBTU / Monthly |

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within two (2) Business Days by promptly signing in the space provided below and faxing the signed copy to BP Energy Company, attention to Confirmations Department, to facsimile number (281) 227-8470. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction as against you. This facsimile shall be the only Confirmation documentation in respect of this Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

Confidential

Please return all confirmations to the BP Confirmation Department by:

Fax -      (281) 227-8470

email -    NAGPconfirmations@bp.com

**BP Energy Company**

By: _____          By: _____

Date: _____          Date: _____

Page 3 of 3

## NOVATION AGREEMENT

dated as of among:

BP Energy Company (the "**Remaining Party**"), Agera Energy LLC, energy.me midwest, llc, and Aequitas Energy Inc. (collectively, the "**Transferors**")

AND

Exelon Generation Company, LLC (the "**Transferee**")

The Transferors and the Remaining Party have entered into one or more Transactions (each an "**Old Transaction**"), each evidenced by a Confirmation (an "**Old Confirmation**") subject to an ISDA Master Agreement dated as of May 5, 2015 (as amended by that certain Second Amended and Restated Schedule to the 2002 Master Agreement dated October [3], 2019 among the Remaining Party and the Transferors, the "**Old Agreement**").

The Remaining Party and the Transferee have entered into a Master Power Purchase and Sale Agreement dated as of May 24, 2006 (the "**New Agreement**").

With effect from and including the effective date of [    ] (the "**Novation Date)**, the Transferors wish to transfer by novation to the Transferee, and the Transferee wishes to accept the transfer by novation of, all the rights, liabilities, duties and obligations of the Transferors under and in respect of the contract quantities at the delivery points and for the duration specified in the Annex A attached hereto (the "**Transferring Quantities**"), with the effect that the Remaining Party and the Transferee enter into a new transaction (each a "**New Transaction**") between them having terms identical to those of each Old Transaction but only to the extent of the Transferring Quantities, as more particularly described below.

The Remaining Party wishes to accept the Transferee as its sole counterparty with respect to the New Transactions.

The Transferors and the Remaining Party wish to have released and discharged, as a result and to the extent of the transfer described above (but only to the extent of the Transferring Quantities), their respective obligations under and in respect of the Old Transactions.

Accordingly, the parties agree as follows: ---

## 1.  **Definitions.**

Terms defined in the Old Agreement are used herein as so defined, unless otherwise provided herein.

1

## 2.  Transfer, Release, Discharge and Undertakings.

With effect from and including the Novation Date and in consideration of the mutual representations, warranties and covenants contained in this Novation Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties):

(a)  the Remaining Party and the Transferors are each released and discharged from further obligations to each other with respect to each Old Transaction to the extent of the Transferring Quantities and their respective rights against each other thereunder are cancelled in respect of the Transferring Quantities, provided that such release and discharge shall not affect any rights, liabilities, or obligations of the Remaining Party or the Transferors with respect to payments or other obligations due and payable or due to be performed on or prior to the Novation Date, and all such payments, deliveries and obligations shall be paid or performed by the Remaining Party or the Transferors in accordance with the terms of the Old Transaction;

(b)  in respect of each New Transaction, the Remaining Party and the Transferee each undertake liabilities and obligations towards the other and acquire rights against each other identical in their terms to each corresponding Old Transaction to the extent of the Transferring Quantities (and, for the avoidance of doubt, as if the Transferee were the Transferors and with the Remaining Party remaining the Remaining Party, save for any rights, liabilities or obligations of the Remaining Party or the Transferors with respect to payments, deliveries or other obligations due and payable or due to be delivered or performed on or prior to the Novation Date); and

(c)  each New Transaction shall be governed by and form part of the New Agreement and the Transferee and the Remaining Party shall enter into a Confirmation substantially in the form of the form confirmation attached hereto as Annex B specifying the terms of each New Transaction; provided, however, that any failure of either the Transferee or the Remaining Party to enter into such Confirmation shall not affect the rights and obligations of the Transferors pursuant to this Novation Agreement.

## 3.  Representations and Warranties.

(a)  On the date of this Novation Agreement and on the Novation Date:

(i)  Each of the parties makes to each of the other parties those representations and warranties set forth in Sections 10.2(i) through (iv) of the New Agreement with references in such Section to "this Agreement" or "Master Agreement" being deemed references to this Novation Agreement alone.

(ii)  The Remaining Party and the Transferors each makes to the other, and the Remaining Party and the Transferee each makes to the other, the representations set forth in [Section [___] of the [agreement]], each case with

2

respect to the Old Agreement or the New Agreement, as the case may be, and taking into account the parties entering into and performing their obligations under this Novation Agreement.

(iii)    Each of the Transferors and the Remaining Party represents and warrants to each other and to the Transferee that:

(i)    it has made no prior transfer (whether by way of security or otherwise) of the Old Agreement or any interest or obligation in or under the Old Agreement in respect of any Old Transaction; and,

(ii)    as of the Novation Date, all obligations of the Transferors and the Remaining Party under each Old Transaction required to be performed on or before the Novation Date have been fulfilled.

(b)    The Transferors make no representation or warranty and do not assume any responsibility with respect to the legality, validity, effectiveness, adequacy, or enforceability of any New Transaction or the New Agreement or any documents relating thereto and assumes no responsibility for the condition, financial or otherwise, of the Remaining Party, the Transferee, or any other person or for the performance and observance by the Remaining Party, the Transferee, or any other person of any of its obligations under any New Transaction or the New Agreement or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

## 4.  Counterparts.

This Novation Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

## 5.  Costs and Expenses.

The parties will each pay their own costs and expenses (including legal fees) incurred in connection with this Novation Agreement and as a result of the negotiation, preparation and execution of this Novation Agreement.

## 6.  Amendments.

No amendment, modification or waiver in respect of this Novation Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

## 7.  (a) Governing Law.

3

This Novation Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the conflict of laws provisions thereof.

(b) **Jurisdiction.**

With respect to any suit, action or proceeding related to this Agreement ("**Proceedings**"), each party irrevocably:

(i)     Submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City.

(ii)    Waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives and claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object with respect to such Proceedings, and that such courts does not have any jurisdictions over such party.

[Signature Page Follows]

4

IN WITNESS WHEREOF the parties have executed this Novation Agreement on the respective dates specified below with effect from and including each Novation Date.

……………………………………………                                      ………………………………………………….
     (Name of Remaining Party)                                                      (Name of Transferor)

By: ………………………………….                                      By: …………………………………...
     Name:                                                                                                Name:

     Title:                                                                                                  Title:

     Execution Date:                                                                             Execution Date:

……………………………………………                                      ………………………………………………….
     (Name of Transferor)                                                                     (Name of Transferor)

By: ………………………………….                                      By: …………………………………...
     Name:                                                                                                Name:

     Title:                                                                                                  Title:

     Execution Date:                                                                             Execution Date:

……………………………………..
     (Name of Transferee)

By: ……………………………………
     Name:

     Title:

     Execution Date:

5

# ANNEX A

**[Transferring Quantities]**

Confidential

# ANNEX B

**[Form of Confirmation]**

7

Doc Version: 1



## POWER FORWARD CONFIRMATION

**Seller**                      **Buyer**                           **Trade Date:**
BP ENERGY COMPANY                                                   **BP Deal Num:**
                                                                    **Commodity:**      Power
201 Helios Way                                                      **Product:**        Electricity
Houston, TX 77079                                                   **Contract Num:**
                                                                    **Contract Date:**
                                **Phone:**                          **Service Level:**  Firm - LD

**Fax:**      (281) 227-8470    **Fax:**
                                **Email:**
**Rep:**                        **Rep:**
**Broker:**

| | |
|---|---|
| **Delivery Point:** | |
| **Price (contract price) / UOM:** | _____ USD / MW |
| **Start Date:** | |
| **End Date:** | |
| **Settlement:** | For each hour of each Calculation Period, Buyer shall pay Seller the product of the Price and the Contract Quantity. |

| Calculation Period<br>(Period of Delivery) | Quantity UOM / Hour | Total Quantity UOM |
|---|---|---|
| | ____MW | _____ MWH |

| |
|---|
| **Special Conditions:** |
| |

EEI Agreement, referenced above, which the Parties are signatories to, and which agreement is incorporated herein by reference. In the event that the parties have not yet executed a Master Agreement, this transaction shall be subject to the Master Power Purchase & Sale Agreement (Edison Electric Institute Version 2.1 -- modified 4/25/00) (default elections applying), and upon the execution of a Master Agreement between the parties, this transaction shall be merged into and governed by such executed Master Agreement.

Please confirm the foregoing correctly sets forth the terms of our agreement with respect to this Transaction by signing in the space provided below and returning a copy of the executed confirmation within five (5) business days of receipt. Failure to respond by providing a signed copy of this Transaction Confirmation or an objection to any specific terms to which the counterparty does not agree will be deemed acceptance of the terms hereof.

Confidential

Please return all confirmations to the BP Confirmation Department by:

Fax -        (281) 227-8470

email -      NAGPconfirmations@bp.com

**BP ENERGY COMPANY**                                        **BUYER**

By: _____          By:_____

Date: _____          Date: _____

Confidential

*Final (as of Execution Date (10.03.19))*

## SELLER DISCLOSURE SCHEDULE

This disclosure schedule ("***Disclosure Schedule***") is being furnished by Agera Energy LLC, a Delaware limited liability company ("***Agera***"), energy.me midwest llc, an Illinois limited liability company ("***energy.me***"), and Aequitas Energy, Inc., a Connecticut corporation ("***Aequitas***" and, together with Agera and energy.me, the "***Sellers***" and, each individually, a "***Seller***") to Exelon Generation Company, LLC, a Pennsylvania limited liability company (together with permitted assigns, "***Buyer***") in connection with the execution and delivery of that certain Asset Purchase Agreement dated as of October 3, 2019 (the "***Purchase Agreement***"), by and among the Sellers and Buyer.  Unless the context otherwise requires, all capitalized terms used in this Disclosure Schedule shall have the respective meanings assigned to them in the Purchase Agreement.

The inclusion of any information in this Disclosure Schedule shall not be deemed an admission or acknowledgment, in and of itself and solely by virtue of the inclusion of such information in this Disclosure Schedule, that such information is required to be listed in this Disclosure Schedule or that such items are material to Sellers or the Purchased Assets. The headings, if any, of the individual sections of this Disclosure Schedule are inserted for convenience only and shall not be deemed to constitute a part thereof or a part of the Purchase Agreement. The disclosure of an item in one section of this Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is readily apparent on the face of such item, notwithstanding the presence or absence of an appropriate section of this Disclosure Schedule with respect to such other representations or warranties or the presence or absence of a reference thereto in this Disclosure Schedule.

This Disclosure Schedule and the information and disclosures contained in this Disclosure Schedule are intended only to qualify and limit the representations, warranties and covenants of the Company contained in the Purchase Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants.  Where the terms of a Contract or other disclosure item have been summarized or described in this Disclosure Schedule, such summary or description does not purport to be a complete statement of the material terms of such Contract or other item. Document summaries herein are provided solely for convenience and merely supplement the disclosure provided in such documents.

Section 1.01(a)
Knowledge Persons of Seller

For Agera Energy LLC:    Todd Sandford
Mark Linzenbold

For energy.me midwest llc:    Todd Sandford
Mark Linzenbold

For Aequitas Energy, Inc.    Todd Sandford
Mark Linzenbold

2

Section 1.01(c)
Permitted Liens

None.

Sellers note that certain purchase of receivables programs or similar arrangements may permit liens or the grant of security interests in favor of the applicable electric utility company or local distribution company, but to the Knowledge of Seller, no such lien or security interest has been perfected and no UCC-1 is on file recording any such lien or security interest.

3

Section 2.01(a)
Assigned Contracts

4

Section 2.01(h)
Hedge/Supply Contracts



Section 2.01(i)
Purchased IP & Licensed IP

Part I:

All of Sellers' rights, title and interest in that certain proprietary software program, including ownership of the source code thereto, known as WATTS.

All of Agera's rights and interest in those certain "work for hire" items identified in that certain License Agreement entered into by and between Agera and FSC LLC, effective as of September 27, 2019 (the "**_KITT License_**").

Part II:

All of the rights and interests licensed to Agera under the KITT License.

6

Section 2.01(j)
Storage

7

Section 2.06
Broker Payments

DM_US 161660156-13.108028.0011



9



10

DM_US 161660156-13.108028.0011



11

Section 3.03
Governmental Notice

The following states have certain statutory requirements that notice be provided to the applicable public utility commission or similar regulatory authority for such state ("***PUCs***"):

- District of Columbia
- Delaware
- Maryland
- New Hampshire
- New York
- Ohio
- Texas

Separately, Sellers intend to send informal and/or courtesy notices to all other PUCs having jurisdiction with respect to Customers.

DM_US 161660156-13.108028.0011

Section 3.05
Finders' Fees

Sellers and their respective Affiliates owe certain fees and/or commissions to Stifel Financial Corp. and Miller Buckfire & Co. which shall be paid by Sellers and their respective Affiliates in full and shall not be paid by Buyer or any of its Affiliates.

13

Section 3.06
Litigation

| Pending Litigation | Case No. | Venue | Notes: |
|---|---|---|---|
| Lauren Carney v. Agera Energy, et al. | 2018L4523 | Circuit Court of Cook County, IL County Dept. Law Division | Pending - Plaintiff is a terminated sales employee that sued Agera for alleged unpaid commissions related to certain customer contracts. Plaintiff was given leave to amend her complaint to add additional parties. Agera's answer to plaintiff's amended complaint is due 10/3/19 |
| Demco Energy LLC/ Frank DeMaio v. Agera Energy | 19cv205 | Commonwealth of Massachusetts, Superior Court Civil Action | Pending - Answer due 10/8/19 |
| James Donnelly v. Agera Energy | | Dedham District Court, Commonwealth of Massachusetts | Pending - Answer filed 7/31/19; Discovery Pending |
| Federal Home Loan Mortgage Corp. v. Thomas G. Bard and Shannon D. Bard and Agera Energy LLC, et al. | 201725812 | York District Court, ME | Pending - Answer not yet filed |
| Deborah J. Caruso, Chapter 7 Trustee of the Bankruptcy Estates of ITT Educational Services, Inc., ESI Service Corp., and Daniel Webster College, Inc. v. Agera Energy LLC | ITT Bankruptcy Case No. 16-07207-JMC; Adversary Proceeding No. 18-50168 | United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division | Preference action filed against Agera in September 2018 by the Chapter 7 trustee in connection with ITT's Chapter 7 bankruptcy filing; Agera will be entering into a settlement agreement with the trustee to settle the preference against Agera and to allow Agera to file an adminitrative claim for post-petition energy services provided to ITT. |
| **Anticipated Litigation** | | | |
| Agera Holdings LLC ("Agera") has filed (or may soon file) a complaint against Sunwave Holdings USA, Inc. ("Sunwave") seeking injunctive relief as a result of acts taken by Sunwave in violation of a non-solicitation and non-hire clause contained in a June 14, 2019 non-disclosure agreement (the 'Agreement'). Agera required, and Sunwave agreed to, the Agreement as part of a process to gain access to confidential information and the employee base of Agera, solely for the purpose of assessing a potential transaction between the parties. Rather than use the access for its intended purpose, Sunwave now employs four ex-Agera employees solicited and hired since the signing of the Agreement less than four months ago, threatening irreparable harm to Agera's ongoing operations. | | | |
| Agera Holdings LLC ("Agera") has filed (or may soon file) a complaint against certain former employees who violated their non-competition agreements with Agera. | | | |

| Pending Regulatory Matters/ Proceedings with the PUCs | Docket No. | PUC | Notes: |
|---|---|---|---|
| PURA Investigation into Supplier Practices RE: Next Cycle Rate Violations - Amnesty Program Customer Refunds | 18-12-22 | Connecticut Public Utilities Regulatory Authority | Self-report of next cycle rate violations; Agera and Aeq opted into the amnesty program proposing customer refunds; Revised amnesty plan submitted 9/17/19. |

14

| Hill Management Services, Inc. v. Agera Energy LLC | ML. No. 224994 | Maryland Public Service Commission / Public Utility Law Judge Division | Current gas customer filed a formal complaint against Agera for damages arising from an alleged breach of contract. |
| PURA Supplier Interoggatories issued to Agera and Aequitas | 14-10-05/ 12-06-20 | Connecticut Public Utilities Regulatory Authority | Interogatories issued to Agera regarding Agera's access to capital; answer filed on 6/11/19; no further inquiry by CTPURA |
| RI PUC Suspension Order Issued to Agera for failure to meet RPS obligations | D-96-6/ D-19-26 | Rhode Island Public Utilities Commission | Last day to comply by paying ACP was 8/23/19 as per the RIPUC; Public meeting regarding Agera's non-compliance and RIPUC's ability to draw on Agera's financial security was held on 8/27/19; Agera's RI retail supplier license suspended by the RIPUC on 9/13/19 and Agera's financial security drawn upon; Next hearing regarding Agera's supplier license is on October 22, 2019 |
| MA finding of non-compliance with RPS/ACP obligations | CS-121 | Massachussets DOER/ MA DPU | Received MA DOER's Notice of Non-Compliance with 2018 ACP obligations on 8/21/19; action pending |
| NH Non-Compliance with RPS/ACP obligations | 18-172 | New Hampshire Public Utilities Commission | Meeting with NHPUC on 9/3; Secretarial letter issued by NHPUC on 9/17/19 regarding past due 2018 ACP obligations and demanding payment; Second secretarial letter issued by NHPUC on 10/2/19 ordering payment of the ACP obligations. |
| CA citation for Failure to File Month-Ahead System Resource Adequacy Compliance Filing | Citation E-4195-0067 | California Public Utilities Commission | Notice of citation received 10/1/19. |
|  |  |  |  |

| **Other Potential Regulatory Issues (no formal proceedings initiated):** |
| NJ License Gas/ Electric - License renewal applications submitted several months prior but still pending action despite expiration date passing. |
| MA License Gas/ Electric - License renewal applications submitted but pending action. |
| Sellers have been and will be unable to meet certain renewable portfolio standard (RPS) and similar obligations pertaining to the acquisition of renewable energy credits or provision of funds in lieu thereof as required by certain state regulatory authorities and/or counterparties.  This may lead to additional regulatory or other adversary proceedings. |
|  |
| **Other** |
| Agera Energy received an initial complaint from the Consumer Protection Division of the Office of the Attorney General in Illinois on July 25, 2019 filed by a broker, Scott Heiman of Bright Energy Partners, regarding alleged late commission payments.  The initial letter was responded to on 8/12/19.  Sellers received a follow-up letter dated 9/4/19 in response with additional questions regarding payment of commissions. |
| Sellers have also received Counterparty complaints in the Ordinary Course of Business (collectively, the "**Ordinary Course Complaints**"). |

15

Section 3.07
Taxes



DM_US 161660156-13.108028.0011

| Company | State | Jurisdiction | Form | Tax Type |
|---------|-------|--------------|------|----------|
| Agera | | | | |
| | California | | BOE-401-A2 | Sales |
| | California | | BOE-501-EU | Sales |
| | | ALAMEDA COUNTY OF | UUT Remittance form | UUT |
| | | ALBANY CITY OF | UUT Remittance form | UUT |
| | | ARCADIA CITY OF | UUT Remittance form | UUT |
| | | BENICIA CITY OF | UUT Remittance form | UUT |
| | | BERKELEY CITY OF | UUT Remittance form | UUT |
| | | CERES CITY OF | UUT Remittance form | UUT |
| | | CHICO CITY OF | UUT Remittance form | UUT |
| | | CITRUS HEIGHTS CITY OF | UUT Remittance form | UUT |
| | | COVINA CITY OF | UUT Remittance form | UUT |
| | | DALY CITY CITY OF | UUT Remittance form | UUT |
| | | EAST PALO ALTO CITY OF | UUT Remittance form | UUT |
| | | EL CERRITO CITY OF | UUT Remittance form | UUT |
| | | ELK GROVE CITY OF | UUT Remittance form | UUT |
| | | EMERYVILLE CITY OF | UUT Remittance form | UUT |
| | | FAIRFIELD CITY OF | UUT Remittance form | UUT |
| | | HAWTHORNE CITY OF | UUT Remittance form | UUT |
| | | HAYWARD CITY OF | UUT Remittance form | UUT |
| | | HERCULES CITY OF | UUT Remittance form | UUT |
| | | HERMOSA BEACH CITY OF | UUT Remittance form | UUT |
| | | HUNTINGTON PARK CITY OF | UUT Remittance form | UUT |
| | | INGLEWOOD CITY OF | UUT Remittance form | UUT |
| | | IRVINE CITY OF | UUT Remittance form | UUT |
| | | LONG BEACH CITY OF | UUT Remittance form | UUT |
| | | LOS ANGELES COUNTY OF | UUT Remittance form | UUT |
| | | MODESTO CITY OF | UUT Remittance form | UUT |
| | | MONTEREY CITY OF | UUT Remittance form | UUT |
| | | NEWARK CITY OF | UUT Remittance form | UUT |
| | | NORWALK CITY OF | UUT Remittance form | UUT |
| | | OAKLAND CITY OF | UUT Remittance form | UUT |
| | | PALM SPRINGS CITY OF | UUT Remittance form | UUT |
| | | PIEDMONT CITY OF | UUT Remittance form | UUT |
| | | PORT HUENEME CITY OF | UUT Remittance form | UUT |
| | | PORTERVILLE CITY OF | UUT Remittance form | UUT |
| | | RANCHO CORDOVA CITY OF | UUT Remittance form | UUT |
| | | REDWOOD CITY CITY OF | UUT Remittance form | UUT |
| | | RIALTO CITY OF | UUT Remittance form | UUT |

17

| Company | State | Jurisdiction | Form | Tax Type |
|---|---|---|---|---|
| | | RICHMOND CITY OF | UUT Remittance form | UUT |
| | | SACRAMENTO CITY OF | UUT Remittance form | UUT |
| | | SACRAMENTO COUNTY OF | UUT Remittance form | UUT |
| | | SALINAS CITY OF | UUT Remittance form | UUT |
| | | SAN BERNARDINO CITY OF | UUT Remittance form | UUT |
| | | SAN FRANCISCO CITY AND COUNTY OF | UUT Remittance form | UUT |
| | | SAN JOSE CITY OF | UUT Remittance form | UUT |
| | | SAN LEANDRO CITY OF | UUT Remittance form | UUT |
| | | SAN LUIS OBISPO CITY OF | UUT Remittance form | UUT |
| | | SAN PABLO CITY OF | UUT Remittance form | UUT |
| | | SANTA ANA CITY OF | UUT Remittance form | UUT |
| | | SANTA BARBARA CITY OF | UUT Remittance form | UUT |
| | | SANTA CRUZ CITY OF | UUT Remittance form | UUT |
| | | SANTA ROSA CITY OF | UUT Remittance form | UUT |
| | | SCOTTS VALLEY CITY OF | UUT Remittance form | UUT |
| | | SOLEDAD CITY OF | UUT Remittance form | UUT |
| | | STOCKTON CITY OF | UUT Remittance form | UUT |
| | | STOCKTON CITY OF | UUT Remittance form | UUT |
| | | VALLEJO CITY OF | UUT Remittance form | UUT |
| | | WINTERS CITY OF | UUT Remittance form | UUT |
| | | | | |
| | Connecticut | | OS-114 | Sales |
| | District of Columbia | | FR-800M | Sales |
| | Delaware | | LM1  9410 | Sales |
| | Georgia | | ST-3 | Sales |
| | Illinois | | RG-1 | Sales |
| | Illinois | | RPU-13 | Sales |
| | Maine | | Sale & Use | Sales |
| | Maryland | | Form 202 (Bfile) | Sales |
| | Massachusetts | | ST-9 | Sales |
| | New Jersey | | ST-50 | Sales |
| | New Jersey | | ST-51 | Sales |
| | New York: | | ST-810 | Sales |
| | New York: | | TR-682-N | Sales |
| | | AIRMONT CITY OF | UUT Remittance form | UUT |
| | | ALBANY CITY OF | UUT Remittance form | UUT |
| | | ALTAMONT CITY OF | UUT Remittance form | UUT |
| | | AMITYVILLE CITY OF | UUT Remittance form | UUT |
| | | AMSTERDAM CITY OF | UUT Remittance form | UUT |

18

| Company | State | Jurisdiction | Form | Tax Type |
|---------|-------|--------------|------|----------|
| | | ARDSLEY CITY OF | UUT Remittance form | UUT |
| | | AUBURN CITY OF | UUT Remittance form | UUT |
| | | BABYLON CITY OF | UUT Remittance form | UUT |
| | | BALLSTON SPA CITY OF | UUT Remittance form | UUT |
| | | BATAVIA CITY OF | UUT Remittance form | UUT |
| | | BAYVILLE CITY OF | UUT Remittance form | UUT |
| | | BEACON CITY OF | UUT Remittance form | UUT |
| | | BELLPORT CITY OF | UUT Remittance form | UUT |
| | | BINGHAMTON CITY OF | UUT Remittance form | UUT |
| | | BLASDELL CITY OF | UUT Remittance form | UUT |
| | | BRIARCLIFF MANOR CITY OF | UUT Remittance form | UUT |
| | | BRIGHTWATERS CITY OF | UUT Remittance form | UUT |
| | | BRONXVILLE CITY OF | UUT Remittance form | UUT |
| | | BUFFALO CITY OF | UUT Remittance form | UUT |
| | | CALEDONIA CITY OF | UUT Remittance form | UUT |
| | | CANAJOHARIE CITY OF | UUT Remittance form | UUT |
| | | CANANDAIGUA CITY OF | UUT Remittance form | UUT |
| | | CANASTOTA CITY OF | UUT Remittance form | UUT |
| | | CATSKILL VILLAGE OF | UUT Remittance form | UUT |
| | | CHESTER CITY OF | UUT Remittance form | UUT |
| | | CHESTNUT RIDGE CITY OF | UUT Remittance form | UUT |
| | | CLAYTON CITY OF | UUT Remittance form | UUT |
| | | COBLESKILL CITY OF | UUT Remittance form | UUT |
| | | COHOES CITY OF | UUT Remittance form | UUT |
| | | COLONIE CITY OF | UUT Remittance form | UUT |
| | | CORTLAND CITY OF | UUT Remittance form | UUT |
| | | CROTON ON HUDSON CITY OF | UUT Remittance form | UUT |
| | | DEPEW CITY OF | UUT Remittance form | UUT |
| | | DOBBS FERRY CITY OF | UUT Remittance form | UUT |
| | | DRYDEN CITY OF | UUT Remittance form | UUT |
| | | DUNKIRK CITY OF | UUT Remittance form | UUT |
| | | EAST AURORA CITY OF | UUT Remittance form | UUT |
| | | EAST HAMPTON CITY OF | UUT Remittance form | UUT |
| | | EAST ROCKAWAY CITY OF | UUT Remittance form | UUT |
| | | EAST SYRACUSE CITY OF | UUT Remittance form | UUT |
| | | ELLENVILLE CITY OF | UUT Remittance form | UUT |
| | | ELMIRA CITY OF | UUT Remittance form | UUT |
| | | ELMSFORD CITY OF | UUT Remittance form | UUT |
| | | FARMINGDALE CITY OF | UUT Remittance form | UUT |

19

| Company | State | Jurisdiction | Form | Tax Type |
|---------|-------|--------------|------|----------|
| | | FISHKILL CITY OF | UUT Remittance form | UUT |
| | | FLORAL PARK CITY OF | UUT Remittance form | UUT |
| | | FORT ANN CITY OF | UUT Remittance form | UUT |
| | | FORT EDWARD CITY OF | UUT Remittance form | UUT |
| | | FORT PLAIN CITY OF | UUT Remittance form | UUT |
| | | FREDONIA CITY OF | UUT Remittance form | UUT |
| | | FREEPORT CITY OF | UUT Remittance form | UUT |
| | | FULTON CITY OF | UUT Remittance form | UUT |
| | | GARDEN CITY CITY OF | UUT Remittance form | UUT |
| | | GLEN COVE CITY OF | UUT Remittance form | UUT |
| | | GLENS FALLS CITY OF | UUT Remittance form | UUT |
| | | GLOVERSVILLE CITY OF | UUT Remittance form | UUT |
| | | GOSHEN VILLAGE OF | UUT Remittance form | UUT |
| | | GOSHEN CITY OF | UUT Remittance form | UUT |
| | | GRANDVIEW ON HUDSON CITY OF | UUT Remittance form | UUT |
| | | GREAT NECK CITY OF | UUT Remittance form | UUT |
| | | GREAT NECK ESTATES CITY OF | UUT Remittance form | UUT |
| | | GREAT NECK PLAZA CITY OF | UUT Remittance form | UUT |
| | | GREENWICH CITY OF | UUT Remittance form | UUT |
| | | GREENWOOD LAKE CITY OF | UUT Remittance form | UUT |
| | | HAMBURG CITY OF | UUT Remittance form | UUT |
| | | HARRISON CITY OF | UUT Remittance form | UUT |
| | | HASTINGS ON HUDSON CITY OF | UUT Remittance form | UUT |
| | | HAVERSTRAW CITY OF | UUT Remittance form | UUT |
| | | HEMPSTEAD CITY OF | UUT Remittance form | UUT |
| | | HERKIMER CITY OF | UUT Remittance form | UUT |
| | | HIGHLAND FALLS CITY OF | UUT Remittance form | UUT |
| | | HILLBURN CITY OF | UUT Remittance form | UUT |
| | | HOOSICK FALLS CITY OF | UUT Remittance form | UUT |
| | | HUDSON CITY OF | UUT Remittance form | UUT |
| | | HUDSON FALLS CITY OF | UUT Remittance form | UUT |
| | | INTERLAKEN CITY OF | UUT Remittance form | UUT |
| | | IRVINGTON CITY OF | UUT Remittance form | UUT |
| | | ITHACA CITY OF | UUT Remittance form | UUT |
| | | JOHNSTOWN CITY OF | UUT Remittance form | UUT |
| | | KASER CITY OF | UUT Remittance form | UUT |
| | | KENMORE CITY OF | UUT Remittance form | UUT |
| | | KINGSTON CITY OF | UUT Remittance form | UUT |
| | | KIRYAS JOEL CITY OF | UUT Remittance form | UUT |

20

| Company | State | Jurisdiction | Form | Tax Type |
|---------|-------|--------------|------|----------|
|  |  | LAKE GEORGE CITY OF | UUT Remittance form | UUT |
|  |  | LAKE GROVE CITY OF | UUT Remittance form | UUT |
|  |  | LANCASTER CITY OF | UUT Remittance form | UUT |
|  |  | LARCHMONT CITY OF | UUT Remittance form | UUT |
|  |  | LAWRENCE CITY OF | UUT Remittance form | UUT |
|  |  | LEWISTON CITY OF | UUT Remittance form | UUT |
|  |  | LINDENHURST CITY OF | UUT Remittance form | UUT |
|  |  | LITTLE FALLS CITY | UUT Remittance form | UUT |
|  |  | LIVERPOOL CITY OF | UUT Remittance form | UUT |
|  |  | LOCKPORT CITY OF | UUT Remittance form | UUT |
|  |  | LONG BEACH CITY OF | UUT Remittance form | UUT |
|  |  | LOWVILLE CITY OF | UUT Remittance form | UUT |
|  |  | LYNBROOK CITY OF | UUT Remittance form | UUT |
|  |  | MALVERNE CITY OF | UUT Remittance form | UUT |
|  |  | MAMARONECK CITY OF | UUT Remittance form | UUT |
|  |  | MANLIUS CITY OF | UUT Remittance form | UUT |
|  |  | MASSAPEQUA PARK CITY OF | UUT Remittance form | UUT |
|  |  | MATINECOCK CITY OF | UUT Remittance form | UUT |
|  |  | MEDINA CITY OF | UUT Remittance form | UUT |
|  |  | MIDDLEBURGH CITY OF | UUT Remittance form | UUT |
|  |  | MIDDLETOWN CITY OF | UUT Remittance form | UUT |
|  |  | MINEOLA CITY OF | UUT Remittance form | UUT |
|  |  | MONROE CITY OF | UUT Remittance form | UUT |
|  |  | MONTEBELLO CITY OF | UUT Remittance form | UUT |
|  |  | MONTICELLO CITY OF | UUT Remittance form | UUT |
|  |  | MOUNT KISCO CITY OF | UUT Remittance form | UUT |
|  |  | MOUNT VERNON CITY OF | UUT Remittance form | UUT |
|  |  | NEW HEMPSTEAD CITY OF | UUT Remittance form | UUT |
|  |  | NEW HYDE PARK CITY OF | UUT Remittance form | UUT |
|  |  | NEW PALTZ CITY OF | UUT Remittance form | UUT |
|  |  | NEW ROCHELLE CITY OF | UUT Remittance form | UUT |
|  |  | NEW SQUARE CITY OF | UUT Remittance form | UUT |
|  |  | NEW YORK CITY OF | NYC-UXS | UUT |
|  |  | NEWBURGH CITY OF | UUT Remittance form | UUT |
|  |  | NIAGARA FALLS CITY OF | UUT Remittance form | UUT |
|  |  | NORTH COLLINS CITY OF | UUT Remittance form | UUT |
|  |  | NORTH HILLS CITY OF | UUT Remittance form | UUT |
|  |  | NORTH TONAWANDA CITY OF | UUT Remittance form | UUT |
|  |  | NORTHPORT CITY OF | UUT Remittance form | UUT |

21

| Company | State | Jurisdiction | Form | Tax Type |
|---------|-------|--------------|------|----------|
| | | NORWOOD CITY OF | UUT Remittance form | UUT |
| | | NYACK CITY OF | UUT Remittance form | UUT |
| | | OGDENSBURG CITY OF | UUT Remittance form | UUT |
| | | OLEAN CITY OF | UUT Remittance form | UUT |
| | | ONEIDA CITY OF | UUT Remittance form | UUT |
| | | OSSINING CITY OF | UUT Remittance form | UUT |
| | | OSWEGO CITY OF | UUT Remittance form | UUT |
| | | PATCHOGUE CITY OF | UUT Remittance form | UUT |
| | | PEEKSKILL CITY OF | UUT Remittance form | UUT |
| | | PELHAM CITY OF | UUT Remittance form | UUT |
| | | PELHAM MANOR CITY OF | UUT Remittance form | UUT |
| | | PHILMONT CITY OF | UUT Remittance form | UUT |
| | | PIERMONT CITY OF | UUT Remittance form | UUT |
| | | PLEASANTVILLE CITY OF | UUT Remittance form | UUT |
| | | POLAND CITY OF | UUT Remittance form | UUT |
| | | POMONA CITY OF | UUT Remittance form | UUT |
| | | PORT CHESTER CITY OF | UUT Remittance form | UUT |
| | | PORT JEFFERSON CITY OF | UUT Remittance form | UUT |
| | | PORT JERVIS CITY OF | UUT Remittance form | UUT |
| | | PORT WASHINGTON NORTH CITY OF | UUT Remittance form | UUT |
| | | POTSDAM CITY OF | UUT Remittance form | UUT |
| | | POUGHKEEPSIE CITY OF | UUT Remittance form | UUT |
| | | RENSSELAER CITY OF | UUT Remittance form | UUT |
| | | RICHVILLE CITY OF | UUT Remittance form | UUT |
| | | ROCHESTER CITY OF | UUT Remittance form | UUT |
| | | ROCKVILLE CENTRE CITY OF | UUT Remittance form | UUT |
| | | ROME CITY OF | UUT Remittance form | UUT |
| | | RYE BROOK CITY OF | UUT Remittance form | UUT |
| | | RYE CITY OF | UUT Remittance form | UUT |
| | | SAG HARBOR CITY OF | UUT Remittance form | UUT |
| | | SAINT JOHNSVILLE CITY OF | UUT Remittance form | UUT |
| | | SANDS POINT CITY OF | UUT Remittance form | UUT |
| | | SARATOGA SPRINGS CITY OF | UUT Remittance form | UUT |
| | | SCARSDALE CITY OF | UUT Remittance form | UUT |
| | | SCHAGHTICOKE CITY OF | UUT Remittance form | UUT |
| | | SCHENECTADY CITY OF | UUT Remittance form | UUT |
| | | SCHOHARIE CITY OF | UUT Remittance form | UUT |
| | | SCOTIA CITY OF | UUT Remittance form | UUT |
| | | SEA CLIFF CITY OF | UUT Remittance form | UUT |

DM_US 161660156-13.108028.0011

| Company | State | Jurisdiction | Form | Tax Type |
|---------|-------|--------------|------|----------|
| | | SHARON SPRINGS CITY OF | UUT Remittance form | UUT |
| | | SILVER CREEK CITY OF | UUT Remittance form | UUT |
| | | SKANEATELES CITY OF | UUT Remittance form | UUT |
| | | SLEEPY HOLLOW CITY OF | UUT Remittance form | UUT |
| | | SLOATSBURG CITY OF | UUT Remittance form | UUT |
| | | SOUTH GLENS FALLS CITY OF | UUT Remittance form | UUT |
| | | SOUTHAMPTON CITY OF | UUT Remittance form | UUT |
| | | SOUTH NYACK CITY OF | UUT Remittance form | UUT |
| | | SPECULATOR CITY OF | UUT Remittance form | UUT |
| | | SPRING VALLEY CITY OF | UUT Remittance form | UUT |
| | | SPRINGVILLE CITY OF | UUT Remittance form | UUT |
| | | SUFFERN CITY OF | UUT Remittance form | UUT |
| | | SYRACUSE CITY OF | UUT Remittance form | UUT |
| | | TARRYTOWN CITY OF | UUT Remittance form | UUT |
| | | THE BRANCH CITY OF | UUT Remittance form | UUT |
| | | TONAWANDA CITY OF | UUT Remittance form | UUT |
| | | TROY CITY OF | UUT Remittance form | UUT |
| | | TUCKAHOE CITY OF | UUT Remittance form | UUT |
| | | TULLY CITY OF | UUT Remittance form | UUT |
| | | UPPER NYACK CITY OF | UUT Remittance form | UUT |
| | | UTICA CITY OF | UUT Remittance form | UUT |
| | | VALLEY STREAM CITY OF | UUT Remittance form | UUT |
| | | VOORHEESVILLE CITY OF | UUT Remittance form | UUT |
| | | WADDINGTON TOWN OF | UUT Remittance form | UUT |
| | | WAPPINGERS FALLS CITY OF | UUT Remittance form | UUT |
| | | WARWICK CITY OF | UUT Remittance form | UUT |
| | | WASHINGTONVILLE CITY OF | UUT Remittance form | UUT |
| | | WATERTOWN CITY OF | UUT Remittance form | UUT |
| | | WATERVLIET CITY OF | UUT Remittance form | UUT |
| | | WELLSVILLE CITY OF | UUT Remittance form | UUT |
| | | WESLEY HILLS CITY OF | UUT Remittance form | UUT |
| | | WEST HAVERSTRAW CITY OF | UUT Remittance form | UUT |
| | | WESTBURY CITY OF | UUT Remittance form | UUT |
| | | WESTHAMPTON BEACH CITY OF | UUT Remittance form | UUT |
| | | WHITE PLAINS CITY OF | UUT Remittance form | UUT |
| | | WILLIAMSVILLE CITY OF | UUT Remittance form | UUT |
| | | WILLISTON PARK CITY OF | UUT Remittance form | UUT |
| | | YONKERS CITY OF | UUT Remittance form | UUT |
| | | | | |

23

| Company | State | Jurisdiction | Form | Tax Type |
|---|---|---|---|---|
| | Ohio | | UST-1 | Sales |
| | Ohio | | Accelerated payment on UST-1 | Sales |
| | Ohio | | CAT 1 | Sales |
| | Pennsylvania | | PA-3 (Return and Payment) | Sales |
| | Pennsylvania | | AST ( Accelerated Payment) | Sales |
| | Pennsylvania | | RCT 112 | GRT |
| | Pennsylvania | | REV-423 | GRT |
| | Pennsylvania | | REV-426 | GRT |
| | Rhode Island | | T-72/ Payment | Sales |
| | Rhode Island | | T72 | Sales |
| | Rhode Island | | T204R | Sales |
| | Rhode Island | | T-204 | Sales |
| | Texas | | 01-922 | Sales |
| | Texas (GRT) | | 20-103 | GRT |
| | Texas (GRAT) | | 20-106 | GRT |
| | Virginia | | | |
| | | | | |
| Energy.Me | | | | |
| | Delaware | | LM_1 | Sales |
| | District of Columbia | | FR-800M | Sales |
| | Maryland | | 202- (bfile) | Sales |
| | New Jersey | | ST-50 EN | Sales |
| | New Jersey | | ST-51 (EFT) | Sales |
| | Ohio | | UST-1 | Sales |
| | Ohio | | CAT | Sales |
| | Pennsylvania | | PA-3 (Return and Payment) | Sales |
| | Pennsylvania | | AST ( Accelerated Payment) | Sales |
| | Pennsylvania  (GRT) | | RCT 112 | GRT |
| | Pennsylvania | | REV-423 | GRT |
| | Pennsylvania | | REV-426 | GRT |
| Aequitas | | | | |
| | Connecticut | | OS-114 | Sales |

24

Section 3.10
Significant Contracts

Part I: Any Exceptions to the following representations regarding Significant Contracts:

a.  Copies or standard templates of all written Significant Contracts have been made available to Buyer. For certain Significant Contracts, only form agreements have been provided. To the extent they exist, actual signed agreements for Significant Contracts will be provided prior to Closing. To the extent Significant Contracts are only evident based on electronic acceptance, copies of unsigned execution versions, if they exist, will be provided prior to Closing.

b.  None.

c.  Sellers have been unable to meet certain renewable portfolio standard (RPS) and similar obligations pertaining to the acquisition of renewable energy credits or provision of funds in lieu thereof as required by certain state regulatory authorities and/or Counterparties ("***RPS Noncompliance***"). During the Ordinary Course of Business, Customer Counterparties may be late in making timely payment under the terms of their Contracts; Sellers will typically terminate Contracts for non-payment if Customer has been delinquent for 35 days or more, depending on the size, profitability and creditworthiness of Customer's Contract.

d.  See (c.) above.

e.  None.

f.  See (c.) above).

g.  None.

h.  None.

Part II: List of any Assigned Contracts involving energy efficiency services or solutions

25

| ISO | Zone | State | Owning Company | Customer # | EDC | contract_id | contract_term | contract_start | End_Date | gkey |
|---|---|---|---|---|---|---|---|---|---|---|
| PJM | COMED | IL | Agera | 35657625 | Commonwealth Edison | 3004441 | 42 | 10/17/2016 | 4/17/2020 | 1504771 |
| MISO | AMIL.CIPS | IL | Agera | 35663725 | Ameren - CIPS | 3183601 | 42 | 3/3/2017 | 9/3/2020 | 2196791 |
| ISONE | .Z.WCMASS | MA | Agera | 35813865 | National Grid (Mass Electric) | 6025171 | 42 | 3/19/2018 | 10/14/2021 | 6062471 |
| ISONE | .Z.WCMASS | MA | Agera | 35822889 | National Grid (Mass Electric) | 6112231 | 42 | 4/4/2018 | 10/4/2021 | 6348141 |
| PJM | JCPL | NJ | Agera | 35686755 | Jersey Central Power & Light | 5673061 | 25 | 1/3/2018 | 2/3/2020 | 3054081 |
| NYISO | N.Y.C. | NY | Agera | 35669666 | Con Edison | 6008351 | 42 | 2/1/2018 | 8/1/2021 | 2291401 |
| NYISO | N.Y.C. | NY | Agera | 35669666 | Con Edison | 6008351 | 42 | 3/5/2018 | 9/5/2021 | 2291411 |
| PJM | METED | PA | Agera | 35686754 | Metropolitan Edison Company | 2854331 | 42 | 8/3/2016 | 2/2/2020 | 3054031 |
| PJM | METED | PA | Agera | 35686754 | Metropolitan Edison Company | 2854331 | 42 | 8/3/2016 | 2/2/2020 | 3054041 |
| PJM | METED | PA | Agera | 35686754 | Metropolitan Edison Company | 2854331 | 42 | 8/3/2016 | 2/2/2020 | 3054051 |
| PJM | METED | PA | Agera | 35686754 | Metropolitan Edison Company | 2854331 | 42 | 8/3/2016 | 2/2/2020 | 3054061 |
| PJM | METED | PA | Agera | 35686754 | Metropolitan Edison Company | 2854331 | 42 | 8/4/2016 | 2/3/2020 | 3054071 |

26

Section 5.03
Conduct of Business

Sellers' reasonable best efforts used to renew Assigned Contracts will necessarily be only such efforts of which Sellers will be capable in light of the diminution of Sellers' internal and external sales forces resulting from their financial condition; provided, that Sellers make reasonable best efforts to devote the full business time of not less than two sales persons to renewing Assigned Contracts in accordance with the Purchase Agreement.

27

Section 6.05
Licensed Marks

AGERA

AGERA ENERGY

ENERGY.ME

AEQUITAS

AEQUITAS ENERGY

GLACIAL ENERGY (including Glacial Energy with a geographic descriptor, *e.g.,* Glacial
Energy of New England)

28

Section 7.14
Cure Payments

None.

DM_US 161660156-13.108028.0011

Annex 1.01
Acceptable Renewed Contracts – Margin

30

Annex 1.02
Acceptable Renewed Contracts – Calculation of Margin

31

DM_US 161660156-13.108028.0011

Annex 2.07(b)
Purchase Price Adjustment Methodology

DM_US 161660156-13.108028.0011

Annex 2.07(b)(vii)
Storage Values

The file with a file number 3 titled "20190928 Annex 2.07(b)(vii) (Natural Gas Storage and Inventory Value) vF.xlsx" contained in the Data Room within the "Execution Version" folder within the broader "Exelon / BP Shared Folder" folder which was uploaded on October 2, 2019 is hereby incorporated by reference.

33

Annex 5.01
Required Customer Data

34

Annex 7.20
Hedge Novation Dates / Contract Quantities



35



36

DM_US 161660156-13.108028.0011

37

*Final*

## BUYER DISCLOSURE SCHEDULE

These disclosure schedules (collectively, the "***Buyer Disclosure Schedule***") are furnished in connection with the execution and delivery of that certain Asset Purchase Agreement, dated as of October 3, 2019 (the "***Agreement***"), by and among Agera Energy LLC, a Delaware limited liability company ("***Agera***"), energy.me midwest llc, an Illinois limited liability company ("***energy.me***"), and Aequitas Energy, Inc., a Connecticut corporation ("***Aequitas***" and, together with Agera and energy.me, the "***Sellers***" and, each individually, a "***Seller***") and Exelon Generation Company, LLC, a Pennsylvania limited liability company (together with permitted assigns, "***Buyer***"). Sellers and Buyer are together referred to herein as the "***Parties***" and each individually as a "***Party***".

This Buyer Disclosure Schedule is incorporated and made a part of the Agreement as if set forth in full therein. Any capitalized terms used in this Buyer Disclosure Schedule but not otherwise defined herein shall have the meanings set forth in the Agreement. Unless otherwise provided, references to any "Section(s) of the Buyer Disclosure Schedule" refer to the corresponding sections comprising this Buyer Disclosure Schedule and references to "Article(s)" and "Section(s)" refer to the corresponding article(s) and section(s) of the Agreement. Except for Sections 1.01(b) and 2.03 of this Buyer Disclosure Schedule, any reference in a particular section of this Buyer Disclosure Schedule shall be deemed to be an exception to (or, as applicable, a disclosure for the purposes of) such representations and warranties of Buyer that are contained in the corresponding Section of the Agreement. Notwithstanding any provision of the Agreement or anything to the contrary contained in this Buyer Disclosure Schedule, the information and disclosures contained in any section or subsection of this Buyer Disclosure Schedule shall be deemed to be disclosed with respect to, and qualify, any representation or warranty of Buyer to which the relevance of such information and disclosure is readily apparent on the face of such disclosure. The reference to or listing, description, disclosure or other inclusion of any item or other matter, including, without limitation, any change, violation, breach, debt, obligation or liability or possible or potential breach or violation of any agreement or Law or regulation, in this Buyer Disclosure Schedule:

1.     is disclosed solely for purposes of the Agreement, and no information contained herein or therein shall be deemed to be or construed as an admission or suggestion by any Party to any Third Party of any matter whatsoever, including, without limitation, that such item or matter constitutes a violation of, breach or default under, any Contract;

2.     may include certain items and information solely for informational purposes for convenience of Buyer and does not, unless otherwise specified herein or in the Agreement, constitute an admission by Buyer, or otherwise imply, that such matter is required to be disclosed or is or is not material for the purposes of the Agreement, gives or does not give rise to a Buyer Material Adverse Effect or is or is not outside the ordinary course of business;

3.     with respect to the enforceability of agreements with Third Parties, the existence or non-existence of Third Party rights, the absence of breaches or defaults by Third Parties, or similar matters or statements, is intended only to allocate rights and risks among the Parties

1

and is not intended to be admissions against interests, give rise to any inference or proof of accuracy, be admissible against any Party by any Person who is not a party to the Agreement or give rise to any claim or benefit to any Person who is not a party to the Agreement;

4.    is not and shall not be construed as an admission or indication that such matter actually constitutes noncompliance with, or a violation of, any Law, Permit, Contract or other topic to which such disclosure applies; and

5.    does not waive any attorney-client privilege associated with such item or information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

**SECTION 1.01(b)**

**KNOWLEDGE PERSONS OF BUYER**

John Paffenbarger – Director, Corporate Development

## SECTION 2.03

## ASSUMED LIABILITIES

None.

## SECTION 4.03

## GOVERNMENTAL AUTHORIZATION (BUYER)

None.

**SECTION 4.04**

**NON-CONTRAVENTION (BUYER)**

None.

**SECTION 4.08**

**LITIGATION (BUYER)**

None.

## **Exhibit C**

**Klein Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF RICHARD KLEIN IN SUPPORT OF THE**
**DEBTORS' SALE MOTION**

I, Richard Klein, declare under penalty of perjury as follows.

**Introduction[2]**

1.      I am a Managing Director at Miller Buckfire & Co., LLC ("Miller Buckfire"), which together with Stifel, Nicolaus & Co., Inc., a U.S. broker-dealer and investment banking subsidiary of Stifel Financial Corp. (collectively, "Miller Buckfire"), is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases").  Miller Buckfire was engaged in early May 2019 by the Debtors to serve as their investment banker to lead the Debtors' prepetition sale and marketing process.

2.      Miller Buckfire's professionals have extensive experience in providing financial advisory and investment banking services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in- and out-of-court.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings set forth in the Motion.

3.       I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement and Bid Protections, (C) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (D) Approving Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, (E) Scheduling Auction for, and Hearing to Approve, Sale of the Agera Opco Entities' Assets; (II)(A) Approving the Sale of the Agera Opco Entities' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* (the "Motion"),[3] filed contemporaneously herewith.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations in consultation with other members of the Miller Buckfire team, financial affairs, prior restructuring initiatives, and/or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration on their behalf.

## The Prepetition Marketing Process

4.       In May 2019, the Debtors engaged Miller Buckfire as investment banker to explore strategic alternatives, including conducting a marketing process for the sale of the Debtors, as either a going concern or an asset sale.

---

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

2

5.      In connection with this process, Miller Buckfire prepared marketing materials, including a Confidential Information Memorandum (the "CIM"), and compiled a list of potentially interested parties.

6.      Miller Buckfire contacted 207 parties, comprised of 121 strategic investors and 86 financial investors. Each party was provided with a teaser document and was invited to execute a confidentiality agreement ("NDA") with the Debtors in order to receive the CIM and access to a virtual data room.  Of the 207 parties contacted, 39 executed an NDA and received the CIM and process letter.  Twenty of those 39 parties expressed interest in further participating in the process and were provided access to a virtual data room.  Throughout this period, Miller Buckfire facilitated these parties' due diligence efforts.

7.      In June 2019, the Debtors received numerous preliminary, non-binding indications of interest (each, an "IOI").

8.      Following receipt of the IOIs, the Debtors and their advisors continued to facilitate parties' due diligence, including management meetings and providing additional diligence information.  Following these meetings, the Debtors and their advisors continued negotiations with the interested parties regarding their proposals and key terms, including timing and transaction structure.

9.      In late July 2019, the Debtors and their advisors provided certain interested parties with a draft asset purchase agreement (the "APA") and second round process letter, with a deadline to provide a binding bid and marked-up APA by August 5, 2019.

10.      On October 3, 2019, the Debtors and Exelon Generation Company, LLC (the "Stalking Horse Bidder") executed that certain Asset Purchase Agreement, pursuant to which the

Stalking Horse Bidder will acquire a significant portion of the Debtors' customer contracts for $24,750,000.00, subject to certain adjustments, under Bankruptcy Code sections 363 and 365.

11.     Based on my knowledge of and experience with the prepetition marketing process and the extensive, arm's-length, and good-faith negotiations between the parties, I believe entry into the Stalking Horse APA and entry of the Bidding Procedures Order is in the best interests of the estates and best positions the Debtors to maximize value.  The Debtors are committed to achieving the highest or otherwise best bid for the Acquired Assets by re-marketing those assets pursuant to the Bidding Procedures, and, if necessary, conducting an Auction for the Acquired Assets as well as any additional assets of the Debtors.

12.     The Stalking Horse Bidder provides a floor above which other bidders can bid. Additionally, the structure of the Stalking Horse Bidder's transaction is conducive to competing bids.

13.     To my knowledge, there was no fraud or collusion between the Stalking Horse Bidder and the Debtors or between the Stalking Horse Bidder and other bidders, nor any attempt to take grossly unfair advantage of other bidders, during the prepetition marketing process. Moreover, I understand that all parties were represented by competent counsel and were in arms-length bargaining positions.

### There is a Sound Business Purpose for the Bidding Procedures

14.     The Debtors and their advisors worked diligently to develop the bidding procedures attached as **Exhibit 1** to **Exhibit A** of the Motion (the "Bidding Procedures").  The Bidding Procedures are designed to ensure that a process is put in place that will maximize recoveries for creditors and other stakeholders.  With these goals in mind, I believe that the Bidding Procedures set forth an appropriate process to test the value of the Debtors' Assets within the proposed timeframe outlined in the Stalking Horse APA.  The fairness and

4

reasonableness of the consideration to be paid by the Stalking Horse Bidder or another successful bidder for the Acquired Assets ultimately will be demonstrated by further market exposure and an open and fair Auction.

15.     To the extent that any potential bidder has not previously conducted diligence, such bidder will have access to the information regarding the Debtors' Assets contained in the data room, subject to the execution of an appropriate confidentiality agreement.

16.     I believe the marketing process to date and the proposed Bidding Procedures will give all potential purchasers sufficient time to create and submit bids.  No potential purchaser has communicated to the Debtors or to Miller Buckfire that it did not have sufficient time to make an offer, either pre- or post-petition.

17.     As such, I believe the Bidding Procedures:  (a) provide adequate time for interested parties to conduct due diligence and construct and submit informed competing bids; (b) help ensure that the Debtors are maximizing the value of the estates while working towards the efficient completion of the Chapter 11 Cases in a timely manner; and (c) provide the Debtors' sale process with finality.  BP supports this process and has conditioned the use of cash collateral on the timeline set forth in the Bidding Procedures.

**The Need for a Timely Sale Process**

18.     As explained in more detail in the *Declaration of Todd Sandford in Support of the Debtors' Sale Motion,* due to the significant regulatory issues currently faced by the Debtors, the Debtors, with the advice of their professionals, determined that they could only sell their Assets to another licensed energy retailer, so as to avoid a delay in transferring the Debtors' customer contracts to a buyer.  This also meant that the universe of buyers was smaller than if the Debtors had been pursuing a sale with any interested buyer.  I believe the Debtors' Assets have been extensively marketed to such a universe of buyers in recent months.  Accordingly, many, if not

all, of the parties that are already licensed to supply electricity and natural gas to the Debtors'

customers, and can take the Debtors' customer contracts without delay, likely already have

conducted diligence, evaluated the Debtors' business, and will not be bidding in a vacuum.  I

believe the longer the Debtors market their assets in these Chapter 11 Cases, the more likely it is

that regulatory action will adversely affect the value of the Debtors' Assets.

### There Is a Sound Business Purpose for Bid Protections

19.    The Stalking Horse Bidder is unwilling to commit to hold open its offer under the

terms of the Stalking Horse APA unless assured of payment of the Bid Protections under the

conditions set forth in the Stalking Horse APA.  I believe that the Buyer Expense

Reimbursement and Termination Fee promote more competitive bidding by inducing the

Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders—

and the Debtors—can rely.

20.    The $24,750,000.00 consideration (subject to post-closing adjustments) in the

Stalking Horse APA provides significant value to the Debtors' estates and will be used to repay

obligations of the Debtors as approved by the Court.  The Stalking Horse Bidder also provided

significant value to the Debtors by allowing them to file these Chapter 11 Cases with a bid in

place.  I believe filing with a bid in place increases the likelihood that the price at which the

Purchased Assets are sold will reflect their true worth, and the Stalking Horse Bidder is entitled

to be compensated as a result..

21.    In exchange for the aforementioned value that the Stalking Horse Bidder is

providing to the sale process, the Debtors ultimately agreed to grant the Stalking Horse Bidder

the Bid Protections.  I believe that the Bid Protections were the product of good faith, arm's-

length negotiations amongst the parties, with the Debtors at all times acting in the interest of

their estates and consistent with their fiduciary duties.  The Bid Protections were heavily

6

negotiated, scrutinized by the Debtors' professionals, and vetted by outside advisors, as well as discussed and reviewed with BP, who ultimately supported the Bid Protections.

22.     In particular, the Debtors agreed to a $990,000.00 Termination Fee, equal to 4% of the Purchase Price, payable upon certain termination events set forth in the Stalking Horse APA.  The Stalking Horse Bidder insisted that the fee receive superpriority administrative claim status.  I believe the Termination Fee is reasonable and appropriate under the circumstances.

23.     Additionally, the Debtors agreed to the Buyer Expense Reimburse up to $247,500.00 in reasonable and documented costs and out-of-pocket expenses of the Stalking Horse Bidder, equal to 1% of the Purchase Price, payable upon certain termination events set forth in the Stalking Horse APA.  I believe the Buyer Expense Reimbursement is reasonable and appropriate under the circumstances.

24.     The Bidding Procedures also include value-maximizing bid mechanics. Specifically, the Bidding Procedures require Qualified Bidders to make a cash deposit and submit overbids, which I believe are reasonable and appropriate in the circumstances of these chapter 11 cases and consistent with market practice.   Each Bid must include a cash deposit in an amount equal to 10% of the aggregate purchase price of the Bid.  In addition to the deposit, each Bid or Collective Partial Bid submitted must (i) exceed the Purchase Price by the Termination Fee and Expense Reimbursement, plus an initial overbid amount of $1,000,000, in cash, cash equivalents, or such other consideration and (ii) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid.  I believe the deposit and overbid features are reasonable and appropriate under the circumstances.

25.     Moreover, I understand that the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment.  The Stalking Horse Bidder has

expended, and will continue to expend, time and resources negotiating, drafting, and performing pre-acquisition planning activities necessitated by the sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. I believe that the Bid Protections are necessary to induce the Stalking Horse Bidder's bid, and if the Court does not approve the Bid Protections, there is significant risk that the Stalking Horse Bidder will elect not to serve as the "stalking horse," to the detriment of the Debtors' estates. In my experience, stalking horse bidders almost always demand similar protections in exchange for the value of acting as the stalking horse. Accordingly, I believe the Bid Protections have a sound business purpose, are fair and appropriate under the circumstances, and will not deter or chill bidding, and their availability to the Debtors will enable the Debtors to maximize the value of their estates.

## Conclusion

26.     Based on my experience and my personal knowledge of the Debtors' commercial circumstances and the prepetition marketing process, I believe that expedite approval of the Bidding Procedures will achieve the highest or otherwise best bid for the Purchased Assets and the remainder of the Debtors' assets, and that the Bid Protections were necessary to induce a stalking horse bid for the Purchased Assets, which will ultimately maximize value to the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 4, 2019                    /s/ Richard Klein
                                          Richard Klein
                                          Managing Director

8

**<u>Exhibit D</u>**

**Sandford Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
In re:                                                    )        Chapter 11
                                                           )
AGERA ENERGY LLC, *et al.*,[1]                )        Case No. 19-_____ (___)
                                                           )
                              Debtors.            )        (Joint Administration Requested)
———————————————————————— )

## DECLARATION OF TODD SANDFORD IN SUPPORT OF THE DEBTORS' SALE MOTION

I, Todd Sandford, declare under penalty of perjury as follows.

### Introduction[2]

1.        I am the Chief Operating Officer of Agera Energy, LLC and Agera Holdings, LLC, and have served in such capacities since August 2018.  As such, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.        Prior to my current role with the Debtors, I had a 15-year career with one of North America's largest retail providers of electricity, natural gas, and home and business energy-related services.  During that period of time, I held numerous leadership roles, including customer operations, finance, and sales functions, culminating in general management over two separate business units.

3.        I submit this declaration (the "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Approving Stalking Horse Asset Purchase Agreement and Bid*

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

*Protections, (C) Approving Form and Manner of Notices of Sale, Auction and Sale Hearing, (D)*

*Approving Procedures Relating to the Assumption and Assignment of Certain Executory*

*Contracts, (E) Scheduling Auction for, and Hearing to Approve, Sale of the Agera Opco Entities'*

*Assets; (II)(A) Approving the Sale of the Agera Opco Entities' Assets Free and Clear of All*

*Liens, Claims, Interests and Encumbrances and (B) Authorizing the Assumption and Assignment*

*of Certain Executory Contracts; and (III) Granting Related Relief* (the "<u>Motion</u>"), filed

contemporaneously herewith.  Except as otherwise indicated herein, all facts set forth in this

Declaration are based upon my personal knowledge, my discussions with other members of the

Debtors' management team and the Debtors' advisors, my review of relevant documents and

information concerning the Debtors' operations, financial affairs, and/or my opinions based upon

my experience and knowledge.  If called as a witness, I could and would testify competently to

the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration

on their behalf.

<b><u>The Need for a Timely Sale Process</u></b>

4.      As explained in the Motion, the Debtors request expedited entry of the Bidding

Procedures Order.  I believe that failure to adhere to the proposed time periods for the Sale could

jeopardize the closing of the Sale, which the Debtors believe is the best means of maximizing the

value of their Assets.  The Debtors request expedited entry of the Bidding Procedures Order due

to, *inter alia*, (i) the daily decrease in the size and value of the Sellers' book of customer

contracts as described in more detail below; (ii) various regulatory issues; and (iii) the Debtors'

wind-down process.

A.      <u>The Sellers' Book of Customer Contracts</u>

5.      The Sellers' book of customer contracts represents the single largest portion of the

Purchased Assets proposed to be sold to the Stalking Horse Bidder, yet it is also the most

2

volatile.  There are a number of commercial variables that may adversely impact the size and

value of the Debtors' book of customer contracts at any given moment.  For example, customers

may decide to switch energy suppliers or the contracts may terminate under their bargained-for

terms.  The Debtors would normally offset these decreases by servicing new customers or

renewing contracts with existing customers before they expire.  However, due to the Debtors'

regulatory issues and wind-down efforts to date (each as described in more detail below), the

Debtors no longer have the infrastructure or, in some situations cannot legally, service new

customers or renew existing customers.  Further, while customer attrition is part and parcel of the

Debtors' businesses, the Debtors believe that attrition may be accelerated due to the filing of

these Chapter 11 Cases.

       B.      <u>Regulatory Issues</u>

       6.      In certain states where the Debtors operate, the Debtors are required to satisfy

renewable portfolio standards ("<u>RPS</u>") as a condition of their license or certification to supply

energy to customers in such states.  RPS laws require a certain portion of a state's electricity

consumption to be generated from renewable sources, such as wind, solar, biomass, geothermal,

or hydroelectric.

       7.      Energy suppliers that are required to comply with RPS obligations, such as the

Debtors, must obtain a sufficient amount of renewable energy credits (often called renewable

energy certificates or "<u>RECs</u>") during regular reporting cycles (*e.g.*, annually) with each state.

RECs are created when renewable energy is generated and delivered to the grid.  Those

renewable energy producers may then use the RECs to satisfy their own RPS obligations or sell

the RECs they generate to other energy suppliers, such as the Debtors.

3

8.    Failure to comply with RPS obligations initially triggers an obligation to pay an alternative compliance payment ("ACP"), which is essentially a cash payment obligation in lieu of acquiring RECs.  In nearly all instances, the ACP will be more costly than had the energy supplier acquired the necessary RECs.  Ultimately, an energy supplier's failure to satisfy the ACP will result in the relevant state taking regulatory enforcement action, including suspension and revocation of the supplier's license to supply energy in such state.

9.    It is impossible to know exactly when a state may take such regulatory enforcement action as timing is generally not dictated by statute or regulation.  However, the consequences of suspension or revocation of a supplier's license could result in such supplier being unable to service new and existing customers.  Given that the Debtors' customer contracts are their primary assets, the Debtors inability to service customers would have a significant and irreversible impact on the Purchase Price.

10.    The Debtors are currently in default of their 2018 RPS obligations in Massachusetts, New Hampshire, and Rhode Island as a result of the Debtors' financial inability to acquire RECs or subsequently satisfy their ACP obligations.  The Debtors will soon be in default of RPS obligations in other states.  The Debtors estimate that their inability to satisfy RPS obligations in the normal course has resulted in an aggregate ACP "premium" of approximately 60%, as compared to the cost of acquiring the RECs necessary to avoid ACP obligations.  As of the Petition Date, the Debtors estimate that they owe more than $71 million on account of REC and ACP obligations for the 2018 compliance year.

i.    Massachusetts Enforcement Action

11.    On July 10, 2019, Agera Energy, LLC ("Agera Energy") received a letter from the Massachusetts Department of Energy Resources (the "MA DOER") demanding that Agera

4

Energy immediately satisfy its ACP liability for 2018 in the amount of $41,569,223.80.  The

DOER stated that if it does not receive such payment, it will commence necessary steps for

issuing a Notice of Non-Compliance, including the filing of a petition at the Department of

Public Utilities (the "MA DPU") recommending revocation of Agera Energy's licenses to sell

electricity in Massachusetts.

12.     On August 21, 2019, the MA DOER found that Agera Energy had failed to

comply with their RPS obligations for the 2018 compliance year.  The MA DOER referred the

matter to the MA DPU recommending that it revoke or suspend Agera Energy's retail supplier

licenses.

ii.     Rhode Island Enforcement Action

13.     On August 16, 2019, Agera Energy received a letter from the Rhode Island Public

Utilities Commission (the "RI PUC") demanding that Agera Energy immediately satisfy its RPS

obligations for 2018.  The RI PUC stated that if Agera Energy fails to comply by August 23,

2019, the matter would be placed on the RI PUC's August 28, 2019 Open Meeting agenda to (i)

find the Debtors out of compliance with the RPS obligations for 2018, (ii) demand the full

amount of the letter of credit on file, and (iii) refer the matter to the Division of Public Utilities

and Carriers for revocation of the Debtors' license to operate as a nonregulated power producer

in Rhode Island.

14.     On August 28, 2019, during an open meeting, the RI PUC found that Agera

Energy was out of compliance with the RPS obligations for the 2018 compliance year and

authorized a drawdown of the $250,000 letter of credit posted on behalf of Agera Energy with

the RI PUC.  Further, the RI PUC directed the Clerk to transmit its orders to the Division of

Public Utilities and Carriers (the "RI DPUC") for enforcement action against Agera Energy.

5

15.      On September 13, 2019, the RI DPUC issued Agera Energy a Suspension Order under which Agera Energy is prohibited from entering into new contracts or renewing existing contracts with customers in Rhode Island.  The RI DPUC is scheduled to conduct a public hearing on October 22, 2019 to consider whether Agera Energy's license to sell energy in Rhode Island should be rescinded.

iii.      New Hampshire Enforcement Action

16.      On September 17, 2019, Agera Energy received a letter from the New Hampshire Public Utilities Commission (the "NH PUC") demanding that Agera Energy satisfy its ACP liability for 2018 within ten days (*i.e.*, September 27, 2019).  The NH PUC stated that if it does not receive such payment, it may pursue further action, including referral of the unpaid amount for collection to the New Hampshire Department of Justice.

17.      Through a letter, dated October 2, 2019, the NH PUC ordered Agera Energy to pay the ACP liability due for 2018 in the amount of $2,231,262.00 in full within fourteen days (*i.e.*, October 16, 2019).  The NH PUC stated that if it does not receive such payment, it may pursue further actions to enforce Agera Energy's ACP payment obligation.

C.      The Debtors' Wind-Down Plan

18.      Since at least August 2019, the Debtors, in consultation with BP Energy Company ("BP"), their prepetition lender, have developed and begun implementing a wind-down plan, which involves, *inter alia*, a reduction in the Debtors' work force.  The Debtors carefully reviewed their staffing needs and determined that the Debtors' sales and marketing team was largely unnecessary for the wind-down.  This was due to the fact that the Debtors will not be servicing new customers during the wind-down and could renew existing customers with a fraction of their sales team.

6

19.     The wind-down plan analyzes how long it would be required to support the Debtors' businesses, prior to and after these Chapter 11 Cases.  Under the current wind-down plan, the Debtors expect to stop servicing all customers by December 31, 2019.

20.     As is apparent from the events that have unfolded thus far, the Debtors find themselves in a precarious situation.  Every day the Sale is delayed is another day the size and value of the Debtors' book of customer contracts erodes, by regulatory action or otherwise.  The Stalking Horse APA accounts for this risk by requiring a decrease in the Purchase Price for each customer contract that is not transferred to the Stalking Horse Bidder.  This adjustment is made for each contract that terminates between signing the Stalking Horse APA and Closing (as defined in the Stalking Horse APA).  The Stalking Horse APA also recognizes, however, that the customer contract transfer process takes time and requires the actual transfer of the customer account on the books of the relevant electric utility or natural gas local distribution company.  Accordingly, there is the possibility of customer contracts terminating after Closing but prior to the actual transfer to the Stalking Horse Bidder.  The Stalking Horse APA requires a further reduction in the Purchase Price for each customer contract that is not transferred within 120 days *following* Closing.

21.     The Debtors' developed the proposed Sale timeline with the intention of mitigating, as much as possible, all of the many risks associated with the consummation of the Sale and subsequent customer contract transfer process.

## Conclusion

22.     Based on my experience and my personal knowledge of the Debtors' commercial circumstances and the prepetition marketing process, I believe that expedited approval of the Bidding Procedures will achieve the highest or otherwise best bid for the Purchased Assets and the remainder of the Debtors' assets.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Dated:  October 4, 2019            /s/ Todd Sandford
                                             Todd Sandford
                                             Chief Operating Officer