**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers, Esq.
The Grace Building
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

*Proposed Counsel to the Official Committee of Unsecured*
*Creditors of Agera Energy, LLC, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AGERA ENERGY LLC, ET AL., | : | Case No. 19-23802 (RDD) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) (A)
AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE
PROTECTION, (II) (A) APPROVING POSTPETITION SUPPLY FACILITY, (B)
GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, AND
(IV) SCHEDULING A FINAL HEARING**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors in possession (the "Debtors"), by and through its undersigned proposed

counsel, Kilpatrick Townsend & Stockton LLP, hereby files this objection (the "Objection") to the

Debtors' *Motion for Entry of Interim and Final Orders (I) (A) Authorizing Use of Cash Collateral,*

*(B) Granting Adequate Protection, (II) (A) Approving Postpetition Supply Facility, (B) Granting*

*Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic*

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

*Stay, and (IV) Scheduling a Final Hearing* (the "DIP Motion") [Docket No. 13].[2]  In support of

this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The postpetition facility described in the DIP Motion (the "DIP Facility") is a thinly

veiled attempt by the Debtors to lock in the proposed restructuring set forth in their ***postpetition***

RSA,[3] which, if the Debtors have their way, will effectuate a quick sale of a significant portion of

the Debtors' assets and require that the Debtors pursue a plan of liquidation that will, among other

things, provide unsecured creditors owed, according to the Debtors, approximately $82 million,[4]

with their *pro rata* share of only 10% of the interests in a woefully underfunded Litigation Trust,

which trust is comprised with not-yet identified causes of action.   Meanwhile, BP—the Senior

Lien Secured Party and Proposed DIP lender—is slated to reap, among other things, (i) all

remaining cash held by the Debtors (after accounting for amounts necessary to fund obligations

under the Debtors' plan); (ii) all proceeds from the In-Court Sale; (iii) all proceeds from the sale

of any other collateral; (iv) 90% of the interests in the Litigation Trust[5]; and (v) 100% of the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or the *Declaration of Todd Sandford Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [Docket No. 3], as applicable.

[3] Pursuant to the *Debtors' Motion for Entry of an Order Authorizing and Directing Assumption of the Amended Restructuring Support Agreement Term Sheet* [Docket No. 71], the Debtors are seeking to ***assume*** the (postpetition) Amended and Restated Binding Restructuring Support Agreement (the "RSA") dated October 11, 2019.  The RSA is by and among BP, the Debtors, and non-debtor Briarcliff Property Group, LLC ("Briarcliff" and collectively with BP and the Debtors, the "RSA Parties").

[4] First Day Declaration ¶ 45.  This amount does not include rejection damages, which may be substantial.

[5] The provision in the RSA that provides BP with 90% of the interests in causes of action (necessarily unencumbered assets) that comprise the Litigation Trust is *per se* inappropriate because it cannot be that BP's deficiency claim could total 90% of the general unsecured claims pool, which is estimated to total $82 million.  *Id.* at ¶ 45.  If that were the case, BP's deficiency claim would need to total approximately $800 million. That calculation does not hold water.

US2008 16107053 11

proceeds related to the Debtors' rights for the return of credit support posted by the Debtors to any independent system operator, regional transmission operator, utility, local distribution company, state public utility commission or similar governing body.

2.      As if that were not enough, BP also proposes to use the DIP Facility to, among other things, (i) encumber all previously unencumbered property including (a) proceeds of avoidance actions; (b) commercial tort claims; (c) causes of action against the Debtors' directors and officers; and (d) ***assets encumbered by the Prepetition Secured Parties' prepetition liens that are subsequently avoided***; (ii) use proceeds of the Debtors' accounts receivable to pay down its prepetition secured indebtedness prior to plan confirmation; (iii) acquire a second lien on a valuable real property asset of non-debtor Briarcliff that may have equity value of potentially $15 million[6]; (iv) receive payment of all BP's professional fees and expenses including in respect of its prepetition secured claim; (v) potentially receive payment of an excessive and atypical DIP fee totaling $6 million; (vi) lock these cases into overly restrictive milestones; and (vii) obtain a marshaling waiver and waivers under sections 506(c) and 552(b) of the Bankruptcy Code.  All of this relief, if granted, would be overreaching, unnecessary and unduly prejudicial to unsecured creditors.  Indeed, unless the one-sided Interim Order (and presumably Final Order)[7] is modified to address the issues and objections raised herein, entry of the Final Order may deprive unsecured creditors of substantial unencumbered value less than one month after the commencement of these chapter 11 cases.

---

[6] This value could be available for unsecured creditors through substantive consolidation, a fraudulent conveyance claim or otherwise depending on the facts, which the Committee has not yet had the ability to investigate.

[7] As of the filing of this Objection, a proposed Final Order has not been provided to the Committee.  The Committee understands that the Debtors and BP seek entry of a Final Order in substantially the same form as the Interim Order.

US2008 16107053 11

3.      If the foregoing were not enough, the RSA Parties' pre-negotiated restructuring scheme inextricably ties the DIP Facility to the RSA so that they each contain, among other things, value-destructive cross-defaults.  For example, if the Debtors attempt to exercise the fiduciary out under the RSA, such action would trigger an event of default under the RSA which, in turn, triggers a default under the DIP Facility.  Similarly, if the Debtors file for approval or otherwise support any plan, sale or other transaction that is inconsistent with the RSA, that would also trigger an event of default under both the RSA and the DIP Facility.  With this structure in place, approval of the DIP Facility would render the restructuring set forth in the RSA a *fait accompli.*  Moreover, without any creditor support for the RSA beyond BP, prosecution of the RSA will likely lead to protracted and costly litigation to the detriment of all stakeholders.

4.      Prior to filing the Objection, the Committee engaged in negotiations with the Debtors and BP in an attempt to resolve the Committee's issues with the Final Order.  While such negotiations hopefully remain ongoing, the parties were not able to agree to the form of a Final Order, necessitating the filing of this Objection.

## **BACKGROUND**

5.      On October 4, 2019 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

6.      Also on the Petition Date, the Debtors filed the DIP Motion.

7.      On October 8, 2019, the Court entered its *Interim Order (I) (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (II) (A) Approving Postpetition Supply Facility, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (III)*

4

*Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* (the "Interim Order") [Docket No. 47].

8.      On October 11, 2019, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for Region 2 (the "U.S. Trustee") appointed three creditors to serve on the Committee in connection with these chapter 11 cases [Docket No. 61].   The members of the Committee are: (i) Satori Energy Solutions, LLC; (ii) EMEX, LLC; and (iii) Richard Cooperberg.

9.      On October 11, 2019, the Committee selected Kilpatrick Townsend & Stockton LLP and Dundon Advisers LLC as its counsel and financial advisor, respectively.

## OBJECTION

10.     Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral." *Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP 1992); *see also In re Ames Dep't Stores*, *Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).   As a result, courts are hesitant to approve financing terms that are considered harmful to an estate and its creditors. *See, e.g., Ames*, 115 B.R. at 40 (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").   Thus, while certain favorable terms may be permitted as a reasonable exercise of a debtor's business judgment, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender. *See, e.g., Ames*, 115 B.R. at 38 (citing *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the

US2008 16107053 11

terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor).

11.     The Interim Order, and presumably the Final Order, includes a number of provisions that (i) prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtors, and the Committee, (ii) unjustifiably benefits BP and the other Prepetition Secured Parties at the expense of the Debtors' unsecured creditors, and (iii) are likely to give BP undue control over these chapter 11 cases.

## I.     The DIP Liens and Superpriority Claims and Adequate Protection Liens and Claims Should Not Encumber Previously Unencumbered Assets

12.     The Committee objects to the Postpetition Secured Party being granted any DIP liens and superpriority claims on previously unencumbered assets including proceeds of avoidance actions, commercial tort claims, claims under the Debtors' D&O insurance policies to the extent such claims are unencumbered, and the proceeds or product of the foregoing.  Similarly, the Committee also objects to the Prepetition Secured Parties being granted any adequate protection liens and claims on the aforementioned unencumbered assets.

13.     With respect to the proposed liens and claims on avoidance proceeds, such relief is fundamentally at odds with the unique purposes served by avoidance actions. Avoidance actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.*), 226 F.3d 237, 244 (3d Cir. 2000), *rev'd en banc on other grounds*, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (noting that "the purpose of [section] 547 is to ensure fair distribution between

US2008 16107053 11

creditors, while the purpose of [section] 548 is to protect the estate itself for the benefit of all creditors."); *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786-87 (Bankr. S.D. N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover payments made as preferential transfers).

14.     The Debtors have not provided any justification for the extraordinary grant of liens on avoidance proceeds, or for the potential payment of superpriority claims with the proceeds of avoidance actions.  To the contrary, there is no justification for the Court to grant the Postpetition Secured Party a lien on avoidance proceeds.  Accordingly, avoidance proceeds should be wholly excluded from the DIP collateral and reserved for the benefit of the Debtors' unsecured creditors.

15.     With respect to any DIP liens and superpriority claims or adequate protection liens and claims against the Debtors' D&O insurance policies, commercial tort claims, and other claims under the Debtors' insurance policies, those assets represent one of the only, ***if not the only***, sources of recovery for unsecured creditors.  Indeed, if the Court did not approve the DIP Facility and these cases converted, such assets would be available for a chapter 7 trustee to pursue for the benefit of ***all*** unsecured creditors, not just one allegedly secured creditor.  This is especially true where, as here, the plan of liquidation described in the RSA, which as discussed above is inextricably tied to the DIP Facility, proposes to provide unsecured creditors with a 10% interest in a Litigation Trust with unspecified causes of action and only $25,000 of seed funding.  Against that backdrop, it is inappropriate for BP to encumber the estates' remaining value, if any, that would otherwise be distributable to unsecured creditors.

7

## II.     The Cross-Default Provisions Give the Postpetition Secured Party Undue Control Over These Cases

16.     Should the Debtors determine that an alternative restructuring proposal is in the best interest of the estates and terminate the RSA, the Postpetition Secured Party may (i) declare an event of default under the DIP Facility immediately, without notice, application or motion, hearing before or order of the Court, (ii) terminate the Preferred Supplier Agreement, and (iii) exercise all rights and remedies under the Interim Order and applicable non-bankruptcy law, including collecting and applying any proceeds of the Postpetition Collateral or the Prepetition Collateral, without further notice or order from the Court. *See* Interim Order ¶¶ 20, 21.  Similarly, if the Debtors (i) file for approval or otherwise support a plan or other transaction that is inconsistent with the RSA; (ii) file any of the Definitive Documents, which include, among other documents, the Plan, disclosure statement, and confirmation order, with terms and conditions materially inconsistent with the RSA; or (iii) fail to comply with an obligation set forth in the Wind-Down Plan (as defined in the RSA), the Postpetition Secured Party may terminate the RSA and the DIP Facility. *Id.* at ¶ 20.   Accordingly, any termination of the RSA and as a result, the DIP Facility—even if consistent with the exercise of the Debtors' fiduciary duties—would result in dire consequences for these estates and their stakeholders.

17.     Equally as troubling is that if an Event of Default occurs under the DIP Facility, the Postpetition Secured Party, after giving only five (5) business days' notice, has the right to terminate the Postpetition Supply Agreement. *Id.*  This right, which did not likely exist outside the context of the DIP Facility, is extraordinary and gives the Postpetition Secured Party undue control over the Debtors and these chapter 11 cases in general.

18.     For these reasons, the Court should deny the DIP Motion to the extent that (i) the DIP Facility provides cross-defaults with the RSA and effectively nullifies the Debtors' fiduciary

out;[8] and (ii) an Event of Default under the DIP Facility permits BP to terminate the Postpetition

Supply Agreement.

### III.    The DIP Facility Should Not Facilitate the Granting of Any Liens on Briarcliff's Assets

19.    The Committee objects to any attempt by the Debtors to utilize the DIP Facility or

the Final Order to provide BP with a lien on Briarcliff's assets including, among other things, the

real property located at 555 Pleasantville Road, Briarcliff Manor, NY 10510 (the "Briarcliff

Property"), which, upon information and belief, could be worth as much as $15 million or more.

Although the proposed encumbrance of the Real Property is not referenced in the Interim Order or

the DIP Motion, a review of the Preferred Supplier Agreement reveals that the term "Security

Documents" is being amended to contemplate the granting of a lien on the assets and property of

Briarcliff, thereby including the Briarcliff Property.  *See* PSA § 1.1.

20.    Put simply, BP should not be permitted to utilize the DIP Facility as a means to

encumber the Briarcliff Property (or Briarcliff's other assets).    Indeed, the Committee believes

the equity value in the Briarcliff Property may be available for unsecured creditors through

substantive consolidation, a fraudulent conveyance claim or otherwise.   As the Committee was

formed only two weeks ago, the Committee has not yet had an opportunity to investigate the

underlying facts.   Accordingly, any liens on the Briarcliff Property are inappropriate at this time.

Relatedly, it should not be an event of default if the Briarcliff Property is not sold by December

31, 2019, and as a result, paragraph 20(x) needs to be stricken from the Final Order.

### IV.    The Proposed Adequate Protection Package is Unwarranted

21.    The Interim Order (and presumably the Final Order) provides an overly generous

---

[8] At a minimum, in the event a DIP default is triggered as a result of the Debtors exercising their fiduciary out, the Postpetition Secured Party's exercise of remedies should not extend beyond the ability to terminate lending.

US2008 16107053 11

adequate protection package for the Senior Lien Secured Party in the form of: (i) cash payments (the "Adequate Protection Cash Payments") in an amount equal to funds remaining in the Debtors' Collateral Accounts and Deposit Accounts during certain measurement dates after giving effect to payment of invoices relating the Postpetition Supply Facility, including postpetition interest related thereto (collectively, "Excess Threshold Amounts"); and (ii) payments of all reasonable and documented fees, out-of-pocket expenses, and disbursements incurred by the Senior Lien Secured Party.  *See* Interim Order ¶¶ 9(b), 24.  With respect to the Adequate Protection Cash Payments, such payments will be applied *first* to payments on account of the Postpetition Supply Agreement, *second* to the payment of accrued interest on the Prepetition Senior Lien Obligations, and *third* to the payment of the remaining Prepetition Senior Lien Obligations.[9]  The Committee believes that over the first thirteen (13) weeks of these cases, the Adequate Protection Cash Payments to the Senior Lien Secured Party could total as much as approximately $24 million.

22.     The Committee objects to utilizing the Adequate Protection Cash Payments to pay down any principal amounts related to the Prepetition Senior Lien Obligations, which would have the effect of soaking up the Debtors' remaining liquidity.  Indeed, the proposed repayment of principal is highly unusual and unwarranted.  Furthermore, such a provision would in essence create a stealth "roll-up" as the Debtors' excess cash on a given day may be used to pay down the Prepetition Senior Lien Obligations, but then the DIP Facility is borrowed again later.  In addition, any modifications to the Excess Amount Thresholds must be subject to the Committee's consent so as to create a proper checks and balances system regarding the calculation of the Adequate Protection Cash Payments.

---

[9] BP's counsel has advised the Committee's counsel that it is not BP's intent for the DIP Facility to elevate prepetition obligations under the Preferred Supplier Agreement to postpetition obligations or DIP Obligations.  Out of an abundance of caution, to the extent BP seeks such relief at the final hearing on the DIP Motion, the Committee objects to any such relief.

US2008 16107053 11

23.    The Committee also objects to the Junior Adequate Protection Liens to the extent such liens are not limited to the value of the Junior Lien Secured Party's interest in the Debtors' property, if any.  As currently drafted, paragraph 4(b) of the Interim Order does not contain any such limitation and considering that Junior Lien Secured Party Obligations are likely fully undersecured, it should.

24.    For these reasons, the Committee requests that the Final Order (i) prohibit the Adequate Protection Cash Payments from being used to pay down any principal amounts related to Prepetition Senior Lien Obligations; (ii) condition any modifications of the Excess Amount Thresholds on obtaining written consent from the Committee; and (iii) limit the Junior Adequate Protection Liens to the extent of such party's interest in the Debtors' property.

## V.    The Challenge Period and Related Terms Constrain the Committee's Ability to Appropriately Discharge its Fiduciary Duties

25.    The DIP Facility contains substantial constraints on the ability of the Committee to discharge its fiduciary duties.  Specifically, the terms of the Interim Order limit the time during which the Committee may investigate the alleged liens and claims of the Senior Lien Secured Party,[10] file a motion to obtain standing, obtain the requisite standing, and commence a challenge to only sixty (60) calendar days after the appointment of the Committee (the "Challenge Period").[11] Considering the speed at which these cases are progressing and what the Debtors intend to accomplish in such a short timeframe (i.e., close the In-Court sale within sixty (60) days of the

---

[10] The Challenge Period and related limitations including, among other things, the Challenge Budget (as defined below), do not apply to the liens of the Junior Lien Secured Party as well as any claims or causes of action against such party.

[11] The Committee was appointed on October 11, 2019.  *See* Notice of Appointment of Committee of Unsecured Creditors [Docket No. 61].  Sixty (60) calendar days from the appointment of the Committee is December 10, 2019.  *See* Interim Order ¶ 27.

US2008 16107053 11

Petition Date), the proposed 60-day Challenge Period is unworkable. The Committee has not even had the ability to review the Debtors' schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"), which are not due to be filed until November 2, 2019. Yet, the Debtors propose that the Committee's Challenge Period expire on December 10, 2019, approximately only forty (40) days from the filing of the Schedules.

26.    In addition, the Challenge Period applies not only to the liens and claims of the Senior Lien Secured Party (the "Prepetition Lien Matters"), but also any claims or causes of action that may be asserted *against* the Senior Lien Secured Party (the "Prepetition Claim and CoA Matters"). Given that the Final Order will include a broad sweeping plan-like release of the Senior Lien Secured Party, the Committee, the only estate fiduciary who will have not granted such a release, must have a reasonable amount of time to investigate whether such a release is appropriate or whether there are viable claims or causes of action against such party. *See* Interim Order ¶ 26.

27.    The Committee also objects to the requirement that it obtain standing prior to the expiration of the Challenge Period if it wishes to pursue a challenge. *See* Interim Order ¶ 27. The process by which the Committee may obtain standing to pursue such a cause of action could take a lengthy amount of time. As such, and given the proposed case milestones and thin investigation budget for the Committee, the Committee should not be required to expend the time and expense necessary to obtain standing prior to commencing a challenge. Indeed, courts have previously approved financing agreements that grant standing to creditors' committees without the need for a standing motion. *See, e.g.*, *In re AOG Entertainment, Inc.*, No. 16-11090 (Bankr. S.D.N.Y. July 27, 2016); *In re Phoenix Payment Sys., Inc.*, No. 14-11848 (Bankr. D. Del. Sept. 3, 2014); *In re Quebecor World (USA) Inc.*, No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) ¶ 21; *In re Dana Corp.*,

US2008 16107053 11

Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) ¶ 25.[12]

28.     To add insult to injury, the proposed budget to (i) investigate the Prepetition Lien Matters and the Prepetition Claim and CoA Matters; and (ii) if appropriate, obtain standing to commence a challenge, is currently set at only $25,000 (the "Investigation Fund"). Interim Order ¶ 28. The imposition of such a small Investigation Fund clearly seeks to shield the Senior Lien Secured Party, who is also the Postpetition Secured Party, by unduly limiting the resources available to the Committee to investigate potential claims against such party. Therefore, the Committee requests that the Investigation Fund be increased to $100,000. In addition, the language contained at paragraph 28 of the Interim Order providing that any amounts in excess of the Investigation Fund shall not be allowed, treated, or payable as an administrative expense must be stricken. Not only does such a provision seeks to predetermine a hypothetical administrative expense claim in the Debtors' favor, but it is also without support under the Bankruptcy Code, and seeks to curtail the Committee's ability to discharge its fiduciary duties.

29.     Based on the foregoing, the Committee requests that the Final Order be revised such that: (i) the Challenge Period for the Prepetition Lien Matters be increased to ninety (90) days from the appointment of the Committee; (ii) the Challenge Period for the Prepetition Claim and CoA Matters be through and until the later of (a) ninety (90) days from the appointment of the Committee; and (b) the hearing to confirm a chapter 11 plan; (iii) the Investigation Fund be increased to $100,000; (iv) the Committee be granted automatic standing to commence a Challenge or, alternatively, that upon the filing of a standing motion, the Challenge Period be automatically tolled until three (3) business days after this Court rules on such motion; and (v) any

---

[12] In the event the Committee is required to obtain standing, the Challenge Period should be automatically tolled upon the filing of a standing motion until three (3) business days after this Court rules on such motion.

US2008 16107053 11

language preemptively determining the treatment of fees in excess of the Investigation Fund be stricken in its entirety.

### VI.    Certain of the DIP Milestones Must be Extended by at Least Thirty (30) Days

30.    Pursuant to the milestones set forth in the Interim Order:

- within thirty-one (31) days of the Petition Date, the Debtors shall have obtained entry of the Final DIP Order;

- within thirty-two (32) days of the Petition Date, the Debtors shall have obtained entry of an order approving the In-Court Sale (the "Sale Order Milestone");

- within sixty (60) days of the Petition Date, the closing of the In-Court Sale shall have occurred (the "Sale Consummation Milestone"); and

- within 135 days of the Petition Date, the Debtors shall have filed a motion seeking the combined approval of the disclosure statement and confirmation of the Debtors' chapter 11 plan of liquidation that is consistent with the RSA Term Sheet.

See Interim Order ¶ 20(b).  Similarly, the RSA also requires that the Debtors obtain entry of an order assuming the RSA within thirty-two (32) days of the Petition Date (the "RSA Milestone"). RSA p. 4.

31.    The Committee, which was formed only two weeks ago, should have an opportunity to, among other things, independently test the market for interest in the Debtors' assets; understand and analyze the Debtors' go-forward business plan; investigate the Prepetition Secured Parties' alleged liens and claims; determine the propriety of the proposed releases set forth in the RSA; analyze the claims and causes of action against the parties that are carved out from the releases described in the RSA[13]; and understand the prepetition negotiations and analyses regarding entry into the RSA.  While the Committee is comfortable with the Debtors' revised

---

[13] The RSA provides that the Released Parties shall not include Eli Global, Greg Lindberg or Global Health Technology Group, LLC.  RSA p. 8.

bidding procedures, as negotiated by the Committee following its objection to same, the Committee has **not** signed off on the proposed sale to the Stalking Horse Bidder and may very well have objections to such sale.[14]    As such, and given that any sale issues the Committee may raise will not necessarily be resolved prior to the final hearing on the DIP Motion, the Committee requests that the Sale Order Milestone and the Sale Closing Milestone be extended by at least thirty (30) days. [15]    For the avoidance of doubt, the Committee is not currently requesting that the In-Court Sale be adjourned, but rather, that the case milestones be extended so as to provide the estate fiduciaries with more time to consummate the best sale transaction possible.

### VII.    The Waivers of Sections 506(c) and 552(b) of the Bankruptcy Code and Related Provisions are Unwarranted and Not Supported by the Record

32.    The Debtors are seeking a waiver of the estates' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code, as well as a marshaling waiver and a waiver of the estates' right under section 552(b) of the Bankruptcy Code.  These waivers are inappropriate at this time, and in any event, not justified by the record.

33.    The Interim Order provides that the Debtors will seek a declaration in the Final Order that neither the Postpetition Collateral nor Prepetition Collateral shall be subject to any surcharge pursuant to section 506(c) of the Bankruptcy Code.  *See* Interim Order ¶ 30.  Section 506(c) of the Bankruptcy Code is a rule of fundamental fairness for all parties in interest and provides that secured creditors shall share the burden of satisfying administrative expenses where funds are expended for the purpose of preserving and selling their collateral.  Section 506(c)

---

[14] The deadline to object to the In-Court Sale is November 1, 2019.

[15] The RSA Milestone was removed from the Interim Order at the Court's request.  October 4, 2019 Hrg. Tr. 65:17-68:9.  In the event the RSA Milestone is contained in the proposed Final Order, the Committee reserves the right to object to such milestone as inappropriate or, at a minimum, seek an extension of the RSA Milestone.

US2008 16107053 11

ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries. *See, e.g.*, *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (stating, "section 506(c) is designed to prevent a windfall to the secured creditor"); *In re Kohl*, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009). As such, the Debtors' unilateral waiver of Bankruptcy Code section 506(c) would eliminate necessary protections of the Debtors' estates and foist the costs of monetizing the Prepetition Secured Parties' collateral onto unsecured creditors.

34.    By waiving the estates' section 506(c) rights, the Debtors are agreeing to pay for any and all expenses associated with the preservation and disposition of the collateral of the Postpetition Secured Party and the Prepetition Secured Parties. Here, such a waiver is highly inappropriate given that these cases are being run as a vehicle for the benefit of the Senior Lien Secured Party. Indeed, if these cases proceed according to the RSA as currently proposed, the Senior Lien Secured Party will collect approximately $24 million on account of the Adequate Protection Cash Payments over the first thirteen (13) weeks of these chapter 11 cases, receive 90% of the beneficiary interests in the Litigation Trust, receive a second lien on the Briarcliff Property, and benefit from broad sweeping releases. Courts have routinely rejected similar surcharge waivers under these circumstances. *See In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors."); *see also* Transcript of Hearing at 20-21, *In re Mortgage Lenders Network USA, Inc.,* No. 07-10146 (PJW) (Bankr. D. Del. Mar. 27, 2007) [Docket No. 346]; Transcript of Hearing at 212-13, *In re Energy Future Holdings Corp.,* No. 14-10979 (CSS) (Bankr. D. Del. June 5, 2014) [Docket No. 3927]; *Hartford Fire Ins. Co. v.*

16

*Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998).

35.    While the Committee suspects that the Debtors are hopeful (or perhaps cautiously optimistic) that the budget captures all of the expenses that will be incurred in the administration of these cases, there can be no assurance at this early juncture that the administrative expenses of these cases will be paid by the Debtors in the ordinary course.  Furthermore, if an event of default is called under the DIP Facility, the budgeted amounts (be they payments to vendors, employees, or service providers) that were incurred and not paid at such time could remain unpaid.  For these reasons, the Court should not approve a section 506(c) waiver at this time.

36.    The Debtors' willingness to also waive their rights under section 552(b) of the Bankruptcy Code is, at best, premature.  *See* Interim Order ¶ 35.  The Court should also not permit a section 552(b) waiver before allowing parties in interest – including the Committee – to properly examine the "equities of the case."  S*ee Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying request for 552(b) waiver as premature because factual record was not fully developed).  If unencumbered assets are used to increase the value of the secured creditors' collateral, unsecured creditors should be able to argue that such value inures to them, and not to secured creditors.  *See In re Metaldyne*, No. 09-13412 (MG) 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact . . . and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make"); *see also In re iGPS Co. LLC*, No. 13-11459 (KG) 2013 WL 4777667, at *5 (Bankr. D. Del. July 1, 2013) (no waiver of the "equities of the case" exception with respect to creditors committee).  In the alternative, any section 552(b) waiver should be subject in all respects to the Committee's challenge rights.

37.     The Debtors also should also not waive any rights with respect to the doctrine of marshaling.  *See* Interim Order ¶ 34.  Such favorable treatment, which would enable the Senior Lien Secured Party and the Postpetition Secured Party to "cherry pick" the collateral they want to liquidate most expeditiously, is unwarranted under the circumstances of these cases where the Postpetition Secured Party proposes to, among other things, encumbered previously unencumbered assets.  This is especially true where, as here, the Postpetition Secured Party is seeking to encumber, among other previously unencumbered assets, avoidance proceeds, commercial tort claims, and D&O causes of action at the outset of these chapter 11 cases. Accordingly, marshalling rights should be preserved for the Committee.  *See, e.g.*, *In re Newcorn Enters. Ltd.*, 287 B.R. 744, 750 (Bankr. E.D. Mo. 2002) (granting unsecured creditors' committee derivative standing to bring marshaling claim against secured lender, and thereby increase payout to unsecured creditors, where debtor refused to do so); *Official Comm. Of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("[S]tanding in the shoes of the debtor in possession, the Committee can assert [marshaling] claim.").

### VIII.   The Proposed Early Termination Fee is Excessive

38.     In the context of this atypical DIP Facility which effectuates a third amendment to the Preferred Supplier Agreement by and among the Debtors and BP, the proposed early termination fee (the "Early Termination Fee") contained in the Preferred Supplier Agreement is highly atypical and excessive.  Specifically, the Early Termination Fee provides that if the Preferred Supplier Agreement is terminated prior to October 31, 2021, the Debtors will be obligated to pay BP $6 million dollars.  *See* PSA § 12.2(c)(ii).  The RSA and DIP milestones contemplate termination well before this date.  *See* RSA p. 4, Interim DIP Order ¶ 20(b).  With

this fee alone, ***the cost of the proposed financing could be as high as 34%***. It is self-evident that the Early Termination Fee, which is for a DIP facility that furthers the pre-negotiated agenda of effectuating the restructuring set forth in the RSA, is excessive, atypical, and insulting from the perspective of unsecured creditors who are slated to receive a "TBD" recovery, if any. At a bare minimum, the Early Termination Fee, if triggered, must not constitute an administrative claim (superpriority or otherwise) and instead be deemed a prepetition claim. Similarly, the amended Preferred Supplier Agreement cannot be a backdoor in elevating prepetition obligations to DIP obligations.

### IX. The Committee's Professional Fee Budget is Wholly Inadequate

39.    Pursuant to the Approved Budget, the Committee's professionals (both counsel and financial advisor) are each limited to $162,500 for the period from October 2019 through and including March 2020. To put this amount in perspective, the Debtors' lead counsel is budgeted $1.615 million through that same period. That would mean the professional fee budget for the Committee's counsel is approximately 10% of what is budgeted for the Debtors' lead counsel. In fact, the proposed case cap for ***each*** of the Debtors' proposed ordinary course professionals is approximately three and a half times more ($600,000) than the budgeted amount for the Committee's counsel. Even the Debtors' claims agent is budgeted approximately four times more ($642,000) than the Committee's counsel. The Debtors' financial advisor is also budgeted approximately six times more ($937,557) than the Committee's financial advisor. In comparing the aggregate budgeted amounts for the Committee's counsel and financial advisor with the Debtors' counsel and financial advisor, the Debtors are budgeted approximately ***eight times more*** than the Committee ($325,000 vs. $2,552,557). And this comparison does not include the Debtors' twelve (12) ordinary course professionals or the Debtors' investment banker, Miller Buckfire.

US2008 16107053 11

40.    Based on the foregoing, it is clear that the proposed budget for the Committee's professional fee budget is unreasonable.  The Committee requests that its professional fee budget be increased to $1.5 million for all Committee professionals, which is commensurate with the substantial work to be done (and done already) in these cases.[16]

## X.    Other Objectionable Provisions in the Interim Order

41.    The Committee also objects to the provisions referenced below and requests that the Final Order be amended accordingly.  The Committee notes that by objecting to these provisions in bullet point format, the Committee is by no means suggesting that these objections are either technical or minor in nature.

- Information Rights.  The Committee should receive the same reporting at the same time as the Postpetition Secured Party.  *See* Interim Order ¶ 4.

- Right to Seek Additional Adequate Protection.  The ability of the Prepetition Secured Parties to request further or alternative forms of adequate protection must be subject to Court approval. *Id.* at ¶ 4(h).

- Credit Bid.  Language needs to be added to the Final Order providing that if the alleged liens of the Postpetition Secured Party or the Senior Lien Secured Party are successfully challenged and such party purchases assets of the Debtors by way of a credit bid, such party must pay cash to the estates in the amount of the credit bid.  In addition, the Final Order must include language that the ability to credit bid is without prejudice to the Committee's right to object to any credit bid under section 363(k) of the Bankruptcy Code.  *See* Interim Order ¶ 5.

- Material Modifications.  The notice period for modifications of the Maximum Amount should be increased to three business days. *Id.* at ¶ 14.

- Adjustment of Maximum Amount.  The Maximum Amount should not be increased or decreased without the written consent of the Committee or Court order. *Id.* at ¶ 14.

- Technical Events of Default.  Certain of the proposed Events of Default are technical in nature (i.e., failure to provide access to books and records; failure to timely provide an AR report) and should be subject to an appropriate cure period. *Id.* at ¶¶ 20(c), 20(r).

---

[16] The proposed professional fee budget is a carve-out under the DIP and not a cap on administrative claims, but unfortunately this may be a distinction without a difference.

- <u>Remedies Notice Period</u>. The Committee needs to be provided with contemporaneous notice of an Event of Default. Furthermore the Final Order should include a provision that during the Remedies Notice Period, the Committee may seek relief from the Court on an emergency basis to prevent the Senior Lien Secured Party or Postpetition Secured Party from exercising its remedies for cause shown (i.e., the Committee should not be limited to a showing that an Event of Default has not occurred).. *Id.* at ¶ 21.

- <u>Section 364(e) Good Faith Finding</u>. The good faith finding in favor of the Postpetition Secured Party needs to be subject to the Committee's challenge rights. *Id.* at ¶ 22.

- <u>Professional Fees</u>. In the event the U.S. Trustee or the Committee timely objects to an invoice from the Postpetition Secured Party or the Senior Lien Secured Party, then only the undisputed portion of the invoice should be paid pending a resolution or Court ruling regarding the disputed amount. *Id.* at ¶ 24.

- <u>Carve Out</u>. The Carve Out must be modified as follows: (i) reasonable and documented Committee member expenses should be included in the Carve Out (for the avoidance of doubt, such amounts do not include fees for a Committee member's outside counsel); (ii) the Carve Out escrow accounts should not be subject to any liens in favor of BP or any other party; (iii) amounts related to the KEIP or KERP should not be part of the Carve Out if the applicable employee metrics have not been satisfied by the Carve Out Trigger Date; and (iv) the language contained at paragraph 25(c) must be modified as it arguably requires that the Carve Out first be paid from unencumbered assets, which could take years to liquidate. *Id.* at ¶ 25.

- <u>Release</u>. The proposed release in favor of Released Parties needs a carve out for claims for gross negligence. *Id.* at ¶ 26.

- <u>Use of Proceeds/Carve-Out</u>. The Interim Order prohibits the use of DIP proceeds, Cash Collateral, or Carve-Out funds in connection with: (i) "preventing, hindering, or delaying the . . . enforcement or realization upon . . . the Postpetition Collateral or the Prepetition Collateral once an Event of Default has occurred;" and (ii) objecting, challenging, or contesting . . . any of the Postpetition Obligations, the Postpetition Liens, the Postpetition Collateral, the Prepetition Senior Lien Obligations, the Prepetition Senior Liens or the Prepetition Collateral . . . or any other rights or interest of any of the Postpetition Secured Party or the Senior Lien Secured Party." *Id.* at ¶ 28. The Final Order should include an overarching provision providing that nothing in the order shall limit the use of DIP proceeds, Cash Collateral or the Carve Out with respect to fees and expenses incurred by the Committee in contesting the DIP Motion prior to entry of the Final Order, contesting the Disclosure Statement, Plan, or credit bid, or any other action adverse to the Postpetition Secured Party or the Prepetition Secured Parties other than investigating or asserting a challenge.

- <u>Claim for Diminution</u>. The Final Order needs to make clear that (i) "Diminution" is defined as "any diminution in value of its interests in the Prepetition Collateral under the

Bankruptcy Code;"[17] and (ii) should any of the Prepetition Secured Parties believe they have a claim for Diminution, they must properly assert and file a claim for same.

## XI.    Other Objectionable Provisions in the Preferred Supplier Agreement

42.    The Committee also objects to the provisions in the Preferred Supplier Agreement referenced below and requests that as a condition to approval of the DIP Motion, the Preferred Supplier Agreement be revised accordingly.

- Lending Obligations Subject to RSA.  The provision in the Preferred Supplier Agreement providing that the continuing obligations of BP are subject to entry and enforceability of the RSA must be stricken.  PSA, Art. 4, PSA § 5.1

- Release of PSA-Related Claims.  The proposed release of all claims related to the PSA must be stricken.  PSA, Section 8.

- Liens on the Briarcliff Property.  As discussed above, the term "Security Documents" needs to remove the contemplated liens on the assets of Briarcliff including, among other things, the Briarcliff Property.

## RESERVATION OF RIGHTS

43.    The Committee reserves its respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections during any further hearing on the DIP Motion.

*[Remainder of Page Intentionally Left Blank]*

---

[17] The Interim Order defines "Diminution" as the diminution in value of its interests in the Prepetition Collateral under "applicable law". *Id.* at ¶ G.

US2008 16107053 11

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) condition entry of

an order approving the DIP Motion on a final basis on modifications consistent with this Objection;

and (ii) grant such other and further relief as the Court deems just and proper.

Dated: November 1, 2019                    Respectfully submitted,

                                           **KILPATRICK TOWNSEND &
                                           STOCKTON LLP**

                                           */s/ Todd C. Meyers*
                                           Todd C. Meyers
                                           The Grace Building
                                           1114 Avenue of the Americas
                                           New York, NY 10036-7703
                                           Telephone: (212) 775-8700
                                           Facsimile:  (212) 775-8800
                                           Email:  tmeyers@kilpatricktownsend.com

                                           -and-

                                           Colin M. Bernardino
                                           1100 Peachtree Street
                                           Suite 2800
                                           Atlanta, Georgia 30309
                                           Telephone:  (404) 815-6500
                                           Facsimile:  (404) 541-6421
                                           Email:  cbernardino@kilpatricktownsend.com

                                           *Proposed Counsel for the Official Committee
                                           of Unsecured Creditors of Agera Energy LLC, et al.*

US2008 16107053 11