**McDermott Will & Emery LLP**
Timothy W. Walsh
Darren Azman
Evan Belosa
Ravi Vohra
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AGERA ENERGY LLC, *et al.*,[1] | ) | Case No. 19-23802 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| AGERA ENERGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Proc. No. 19-_____ (RDD) |
| | ) | |
| SUNWAVE USA HOLDINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT OF AGERA ENERGY LLC FOR DAMAGES
## AND INJUNCTIVE RELIEF AGAINST SUNWAVE USA HOLDINGS, INC.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Agera Energy LLC (8122); Agera Holdings, LLC (3335); energy.me midwest llc (9484); Aequitas Energy, Inc. (7988); Utility Recovery LLC (4351); and Agera Solutions LLC (8749). The location of the Debtors' corporate headquarters and the service address for all Debtors is 555 Pleasantville Road, S-107, Briarcliff Manor, NY 10510.

Agera Energy LLC ("Agera" or the "Plaintiff"), by and through its undersigned attorneys, hereby brings suit against defendant Sunwave USA Holdings, Inc. (the "Defendant" or "Sunwave") as follows:

## NATURE OF THIS ACTION

1.      This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference arising from the improper business practices of Sunwave, in violation of a written non-disclosure agreement dated June 13, 2019 (the "Agreement"), between debtor Agera and the Defendant.  A true and correct copy of the Agreement is appended hereto as **Exhibit A**.

2.      Agera required, and Sunwave agreed to, the Agreement as part of a process to gain access to confidential information of Agera for the purpose of assessing a potential transaction between the parties.  To protect its interests, Agera insisted on, and Defendant agreed to, a broad non-solicitation and non-hire of Agera employees (collectively, the "Non-Solicitation Clause").

3.      In spite of the Non-Solicitation Clause, the Defendant solicited and hired at least four of Agera's employees. Each of these employees was, upon information and belief, solicited and hired subsequent to the signing of the Agreement.

4.      Upon learning of the Defendant's efforts to hire employees in breach of the Agreement, counsel to Agera sent a letter to Sunwave on September 24, 2019, attached hereto as **Exhibit B**, warning that Sunwave's conduct violated the Agreement.  On October 3, 2019, Sunwave, through counsel, sent a response, attached hereto as **Exhibit C**, to Agera's letter and stated that Sunwave's CEO Steven C. Laker ("Laker") neither solicited anyone from Agera nor violated the Agreement.

2

5.      The resulting damage to Agera is potentially staggering.  At a time when Agera is most vulnerable and must ensure that it retain its customers and the valuable employees who service them, Sunwave's actions threaten the potential loss of millions of dollars of revenue and profits.  Some of the damage is done, yet it can and should be first stopped by injunctive action, and thereafter undone by virtue of an award of compensatory and, with respect to the tortious conduct to be proven at trial, punitive damages commensurate with the unlawful conduct in which Sunwave has engaged.

6.      Upon information and belief, Sunwave is engaged in continuing efforts to hire Agera's employees in violation of the Agreement.  Unless Sunwave is immediately restrained from violating the Agreement, Agera will suffer immediate and irreparable injury through the continued loss of its customers and employees, which (i) threatens its enterprise value and impacts its ongoing sale efforts, (ii) affects its ability to maintain the human capital needed to sustain its business while it finalizes a sale, and (iii) erodes the knowledge base and skill set of Agera's sales and trading teams.

## PARTIES, JURISDICTION AND VENUE

7.      The Plaintiff is a Delaware limited liability company with its headquarters in Briarcliff Manor, New York.

8.      Upon information and belief, the Defendant is a Delaware corporation with its headquarters in Boston, Massachusetts.

9.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 105, and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.

10.      This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).

11.      The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order by the Bankruptcy Court in connection with this action to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.      Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises in or relates to these chapter 11 cases.

13.      New York law governs this dispute pursuant to the terms of the Agreement.  *See* **Exhibit A** at 5.

## **GENERAL ALLEGATIONS**

A.      **Agera's Business and the Agreement**

14.      Agera provides retail electricity and natural gas to commercial, industrial, and residential customers.  Agera services distinct utility regions—87 as of October 4, 2019 (the "Petition Date")—and provides services to customers—approximately 35,000 as of the Petition Date.  As of the Petition Date, approximately 75% of these accounts were commercial and 25% were residential.

15.      Agera reaches those customers through a variety of sales channels, including an internal sales team.  Agera employs various individuals who are part of a dedicated sales team based in their various operating regions who service existing customers and seek to acquire new customers, both directly and through third party sales channels.

4

16.     Sunwave markets itself as a supplier of electric generation services to thousands

of homeowners and business consumers across North America.

17.     In May 2019, Agera engaged Stifel, Nicolaus & Co., Inc. and Miller Buckfire &

Co., LLC (collectively, "Miller Buckfire") as investment banker to explore strategic alternatives,

including conducting a marketing process for the sale of Agera, as either a going concern or an

asset sale.

18.     Miller Buckfire contacted 207 parties, comprised of 121 strategic investors and 86

financial investors. Each party was provided with a teaser document and was invited to execute a

confidentiality agreement, much like the Agreement, in order to receive a confidential

information memorandum and access to a virtual data room.  Twenty parties showed sufficient

interest in further participating in the process and were provided access to the virtual data room.

Sunwave was one such party.

19.     Sunwave signed the Agreement on June 13, 2019.  Laker, Sunwave's CEO and a

former Agera executive, signed on behalf of Sunwave.

20.     To protect itself from the loss of its employee base, Agera required, and Sunwave

agreed to, a non-solicitation and non-hire provision (collectively, the "Non-Solicitation Clause")

which states as follows:

> In consideration of the Evaluation Material being furnished to you,
> you agree that, without the prior written consent of the Company,
> for a period of two years from the date hereof you will not, directly
> or indirectly, (i) solicit any person or employee whom you know or
> have a reasonable basis to know is an employee of the Company; or
> (ii) solicit for employment or employ any person employed by the
> Company with whom you had contact or who became known to you
> during your evaluation of the Company; provided, however, that the
> foregoing provision will not prevent you from employing any such
> person who contacts you on his or her own initiative without any
> direct or indirect solicitation by or encouragement from you, and
> provided further that general advertisements and other similar broad

5

> forms of solicitation shall not constitute direct or indirect solicitation
> hereunder.

*Id.* at 4.

21.     The Non-Solicitation Clause thus contains two separate and distinct provisions. Sunwave is prohibited both from soliciting any Agera employee and from soliciting or employing any Agera employee with whom Sunwave had contact or who became known to Sunwave as part of the evaluation process.  The prohibitions address both direct and indirect actions.

22.     To enforce its rights, the Agreement provides that Agera is "entitled to equitable relief, including injunction and specific performance, as a remedy for" the Defendant's breach of this Agreement.  *Id.* at 5.

23.     Sunwave did not object to nor negotiate the terms of the Non-Solicitation Clause.

24.     The Non-Solicitation Clause was and is critical to Agera.  Agera was well aware that its experienced personnel, in particular its sales personnel, were the lifeblood of its business. Agera thus knew that if any proposed transaction was not consummated, it needed to protect its personnel from being picked off by a potential buyer.

25.     Sunwave's signature on the Agreement indicated it was interested in a possible transaction with Agera and was willing to agree to the Non-Solicitation Clause as a cost of exploring such a transaction.

26.     After Sunwave executed the Agreement, Agera began sharing confidential information about its business with Sunwave.  Sunwave accordingly accessed the virtual data room, but thereinafter declined to submit an indication of interest or otherwise make a formal offer.

B.      **Sunwave's Breaches of the Agreement**

27.      Despite the clear language of the Agreement, Sunwave has hired no fewer than four Agera employees since June 13, 2019.

28.      Sunwave's pilfered employees include: Agera office manager Jenna Christy, Hydrocarbon Accountant Anna Angelova, and Business Development Managers Tom DeFeudis and Kandi Perry.

29.      DeFeudis and Perry each resigned on September 5, 2019, and upon information and belief, began working for Sunwave immediately thereinafter.

30.      Angelova resigned from her full-time employment on August 31, 2019, remaining with Agera as a part-time employee. She has since, upon information and belief, been employed part-time at Sunwave.

31.      Christy resigned on August 23, 2019, and upon information and belief, began working for Sunwave immediately thereafter.

32.      As salespeople, DeFeudis and Perry had access to and responsibility for a book of Agera customers. Since DeFeudis and Perry resigned, 212 accounts associated with DeFeudis and Perry dropped from Agera's book of business.

33.      While each of the individual employees are key members of Agera, each of DeFeudis and Perry are key conduits to Agera clientele. While each is subject to a non-solicitation agreement of clients by virtue of their employment with Agera, Sunwave's solicitation and hire of these individuals, in direct violation of the Agreement, signals a clear intent to pursue Agera clientele aggressively.

7

34.     Upon information and belief, none of the four individual employees were solicited by Sunwave prior to the signing of the Agreement.  Each of the four was thereafter solicited and hired by Sunwave.

35.     Sunwave was given access to a virtual data room which contained information about Agera's business and clientele.  Agera provided that access to Sunwave, a competitor, assuming in good faith that Sunwave would abide by the terms of the Agreement.  Sunwave is now wrongfully exploiting that information by soliciting and hiring Agera's employee base in violation of the Non-Solicitation Clause.

36.     Unless Sunwave is stopped at once from soliciting and hiring Agera's employees, Agera will suffer immediate, irreparable harm through the continued loss of its employees, which (i) threatens its enterprise value and impacts its ongoing sale efforts, (ii) affects its ability to maintain the human capital needed to sustain its business while it finalizes a sale, and (iii) erodes the knowledge base and skill set of Agera's sales and trading teams.

## **FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT**

37.     Agera repeats and re-alleges paragraphs 1 through 35.

38.     The Agreement is a valid and enforceable contract.

39.     Agera has performed all of the obligations required of it under the Agreement.

40.     Sunwave has materially breached the Non-Solicitation Clause by, *inter alia*, soliciting for employment and hiring away from Agera employees of Agera, in each case prior to the end of the two-year non-solicitation, non-hire period set forth in the Agreement.

41.     As a result of the breaches of the Agreement, Agera has suffered damages in an amount to be determined at trial, plus interest.

## SECOND CLAIM FOR RELIEF – BREACH OF GOOD FAITH AND FAIR DEALING

42.     Agera repeats and re-alleges paragraphs 1 through 40.

43.     Sunwave breached the covenant of good faith and fair dealing that inures in every contract under New York law.

44.     Sunwave's solicitation and employment of Agera employees was in bad faith, as was its access of the data room information for any purpose other than reviewing and evaluating a possible transaction.

45.     Sunwave's actions were designed to circumvent the Non-Solicitation Clause and to deprive Agera of the benefit of its bargain under the Agreement.

46.     As a result of Sunwave's breach, Agera has suffered damages in an amount to be determined at trial, plus interest.

## THIRD CLAIM FOR RELIEF – INJUNCTIVE RELIEF

47.     Agera repeats and re-alleges paragraphs 1 through 45.

48.     Agera will suffer serious and irreparable injury if an injunction is not granted against Sunwave in that it will continue to (a) directly and indirectly solicit for employment, interfere with, and endeavor to entice away Agera employees, and (b) hire Agera employees.

49.     Given the significant harm that will be suffered by Agera if an injunction is not granted compared to the lack of prejudice to Sunwave if the injunction is granted, the equities tip in Agera's favor.

50.     Agera has no adequate remedy at law.

51.     Agera is entitled to a permanent injunction (a) enjoining and restraining Sunwave or any person or entity acting on its behalf from directly or indirectly soliciting for employment, interfering with, or endeavoring to entice away from Agera any person who Sunwave knows or

9

has reasonable basis to know is an employee of Agera or was an employee of Agera subsequent

to the June 13, 2019 execution of the Agreement for a period of two years from June 13, 2019,

(b) enjoining and restraining Sunwave or any person or entity acting on its behalf from directly

or indirectly soliciting for employment or employing any person who is employed by Agera or

was employed by Agera subsequent to the June 13, 2019 execution of the Agreement and with

whom Sunwave had contact or who became known to Sunwave during its evaluation of Agera

for a period of two years from June 13, 2019, and (c) directing Sunwave or any person or entity

acting on its behalf to withdraw any outstanding offers of employment to any individual detailed

in (b).

## FOURTH CLAIM FOR RELIEF – TORTIOUS INTERFERENCE WITH CURRENT AND PROSPECTIVE BUSINESS RELATIONS

52.     Agera repeats and re-alleges paragraphs 1 through 50.

53.     Agera has had longstanding relationships with its retail and residential customers.

Accordingly, Agera had a reasonable expectation of continued business with such customers.

54.     The Defendant has interfered with Agera's reasonable expectation of continued

business through wrongful means (*i.e.*, breaching the Agreement) to hire Agera employees who

maintain relationships with significant Agera customers.

55.     The Defendant's actions have caused or threaten to cause irreparable harm to

Agera, including, but not limited to, the injury to its goodwill, reputation, customer relationships,

competitive advantage, revenues and profits, which are impossible to accurately and fully

calculate.

56.     As such, Agera is entitled to preliminary and permanent injunctive relief.   Agera

is also entitled to damages, in an amount to be determined at trial, including the Defendant's

profit obtained through its tortious interference, and Agera's losses sustained as a result thereof, as well as attorney's fees and costs.

57.    Agera is also entitled to punitive damages in that the Defendant's conduct was willful, wanton and malicious.

## **PRAYER FOR RELIEF**

WHEREFORE, Agera respectfully requests that the Court:

a.      Enter a judgment in favor of Agera and against the Defendant on all claims alleged in this Complaint;

b.      Award money damages in favor of Agera and against the Defendant in an amount commensurate with the harm inflicted on Agera by the Defendant's actions;

c.      Grant a permanent injunction: (a) enjoining and restraining the Defendant, or any person or entity acting on its behalf, for a period of two years from June 13, 2019, from directly and indirectly soliciting any person or employee who the Defendant knows or has reasonable basis to know is an employee of Agera or who was an employee of Agera subsequent to the execution of the June 13, 2019 Agreement, (b) enjoining and restraining the Defendant, or any person or entity acting on its behalf, for a period of two years from June 13, 2019, from directly and indirectly soliciting for employment or employing any person who is employed by Agera or was employed by Agera subsequent to the execution of the June 13, 2019 Agreement and with whom the Defendant had contact or who became known to the Defendant during its evaluation of Agera, and (c) directing the Defendant to withdraw any outstanding offers of employment to any individual detailed in subparagraph (b);

d.      Award attorney's fees and punitive damages; and

e.      Award such other and further relief as is deemed just and proper.

12

Dated:  November 8, 2019
      New York, NY

Respectfully submitted,

**MCDERMOTT WILL & EMERY LLP**

/s/ Darren Azman
Timothy W. Walsh
Darren Azman
Evan Belosa
Ravi Vohra
340 Madison Avenue
New York, NY 10173
Telephone:  (212) 547-5615
Facsimile:  (212) 547-5444
Email: dazman@mwe.com
     ebelosa@mwe.com
     rvohra@mwe.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

## Exhibit A

Agreement

June 13, 2019

**PERSONAL AND CONFIDENTIAL**

Sunwave USA Holdings Inc
100 Cambridge Street, 14th Floor
Boston, MA 02114

       Attention:     Legal

Ladies and Gentlemen:

       In connection with your consideration of a possible transaction (a "Possible Transaction") with Project Acorn and/or its subsidiaries or affiliates (collectively, with such subsidiaries or affiliates, the "Company"), the Company is prepared to make available to you certain information concerning the business, operations and assets of the Company. As a condition to such information being furnished to you and your present or prospective directors, officers, employees, agents or advisors (including without limitation, attorneys, accountants, consultants, bankers and financial advisors) (collectively, "Representatives"), you agree to treat any information concerning the Company (whether prepared by the Company, its advisors or otherwise and irrespective of the form of communication) which is furnished to you or to your Representatives by or on behalf of the Company (herein collectively referred to as the "Evaluation Material") in accordance with the provisions of this letter agreement.

       The Term "Evaluation Material" shall be deemed to include information furnished to you orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential." The term "Evaluation Material" also includes all notes, analyses, compilations, studies, interpretations or other documents prepared by you or your Representatives which contain, reflect or are based upon, in whole or in part, the information furnished to you or your Representatives pursuant hereto. The term "Evaluation Material" does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by you or your Representatives, (ii) was within your possession prior to its being furnished to you by or on behalf of the Company pursuant hereto, or (iii) becomes available to you on a non-confidential basis from a source other than the Company or any of its Representatives; provided that with respect to clauses (ii) and (iii) above, the source of such information was not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information.

       You hereby agree that you and your Representatives shall use the Evaluation Material solely for the purpose of evaluating a Possible Transaction between

1

the Company and you and not for the purpose of competing with the Company. You further agree that the Evaluation Material will be kept confidential and that you and your Representatives will not disclose any of the Evaluation Material in any manner whatsoever; provided, however, that (i) you may make any disclosure of such information to which the Company gives its prior written consent and (ii) any such information may be disclosed to your Representatives who need to know such information for the purpose of evaluating a Possible Transaction with the Company and who agree to keep such information confidential and who are provided with a copy of this letter agreement and agree to be bound by the terms hereof to the same extent as if they were parties hereto. In any event, you shall be responsible for any breach of this letter agreement by any of your Representatives from prohibited or unauthorized disclosure or use of the Evaluation Material.

In addition, you agree that, without the prior written consent of the Company, you and your Representatives will not disclose to any person the fact that the Evaluation Material has been made available to you, that discussions or negotiations are taking place concerning a Possible Transaction involving the Company or any of the terms, conditions or other facts with respect thereto (including the status thereof), unless such disclosure is required by law and then only with as much prior written notice to the Company as is practical under the circumstances and only to the extent required by law. You further agree not to contact any employees of the Company regarding a Possible Transaction or the Evaluation Material without the Company's prior consent and that all communications regarding a Possible Transaction with the Company, requests for additional information and questions regarding procedures with respect to a Possible Transaction will be first submitted or directed to Stifel, Nicolaus & Company, Incorporated ("Stifel") and not to the Company or its affiliates, directors, officers, employees, managers, and agents (the "Company Representatives"). The term "person" as used in this letter agreement shall be broadly interpreted to include the media and any corporation, partnership, group, individual or other entity.

In addition, you agree not to contact or communicate with any supplier, distributor, lender, creditor, or customer regarding the Company, the Evaluation Material or a Possible Transaction without the prior written consent of the Company, it being agreed that contacts and communications with suppliers, distributors or customers in the ordinary course of business and unrelated to the Possible Transaction shall not be prohibited.

Notwithstanding anything herein to the contrary and in order to comply with Internal Revenue Service Regulations, you and the Company (and each affiliate and person acting on behalf of any such party) agree that each party to a Possible Transaction contemplated hereby (and each employee, representative, and other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such party or such person relating to such tax treatment

and tax structure.  This authorization is not intended to permit disclosure of any other information including (without limitation) (i) any portion of any materials to the extent not related to the tax treatment or tax structure of the transaction, (ii) the identities of participants or potential participants in the transaction, (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial information is related to the tax treatment or tax structure of the transaction), or (v) any other term or detail not relevant to the tax treatment or the tax structure of the transaction.

In the event that you or any of your Representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Evaluation Material, you shall provide the Company with prompt written notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this letter agreement.  In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions hereof, you agree to (i) furnish only that portion of the Evaluation Material for which the Company has waived compliance or for which you are advised by written opinion of counsel, reasonably satisfactory to the Company, is legally required and (ii) exercise your best efforts to obtain assurance that the Evaluation Material will be accorded such confidential treatment.

If you decide that you do not wish to proceed with a transaction with the Company you will promptly inform the Company of that decision.  In that case, or at any time upon the request of the Company for any reason, you will and will cause your Representatives to promptly deliver to the Company all documents (and all copies thereof) furnished to you or your Representatives by or on behalf of the Company pursuant hereto.  In the event of such a decision or request, all other Evaluation Material prepared by you or your Representatives shall be destroyed and no copy thereof shall be retained and, upon request, you shall certify in writing to the Company that such action has been taken.  Notwithstanding the return or destruction of the Evaluation Material, you and your Representatives will continue to be bound by your obligations of confidentiality and other obligations hereunder for a period of three years from the date of this letter agreement.

The Company retains the right to determine, in its discretion, what information, properties, personnel and other Evaluation Material the Company will make available to you.  Although the Company has endeavored to include in the Evaluation Material information which the Company believes to be relevant for the purpose of your evaluation of a Possible Transaction with the Company, you acknowledge that none of the Company, Company Representatives, Stifel nor any of its affiliates, directors, officers, employees, managers, or agents (the "Stifel Representatives") makes any express or implied representation or warranty as to the accuracy or completeness of the Evaluation Material.  You agree that none of the Company, Company Representatives, Stifel, nor Stifel Representatives shall have any liability to you or to any of your

Representatives relating to or resulting from the use of the Evaluation Material. You also agree that you are not entitled to rely on the accuracy or completeness of the Evaluation Material and that you will be entitled to rely solely on such representations and warranties as may be included in any definitive agreement with respect to a Possible Transaction between the Company and you, subject to such limitations and restrictions as may be contained therein. You further agree that, if you determine to engage in a Possible Transaction with the Company, your determination will be based solely on the terms of such definitive agreement and on your own investigation, analysis and assessment of the Company and the transaction.

In consideration of the Evaluation Material being furnished to you, you agree that, without the prior written consent of the Company, for a period of two years from the date hereof you will not, directly or indirectly, (i) solicit any person or employee whom you know or have a reasonable basis to know is an employee of the Company; or (ii) solicit for employment or employ any person employed by the Company with whom you had contact or who became known to you during your evaluation of the Company; provided, however, that the foregoing provision will not prevent you from employing any such person who contacts you on his or her own initiative without any direct or indirect solicitation by or encouragement from you, and provided further that general advertisements and other similar broad forms of solicitation shall not constitute direct or indirect solicitation hereunder.

You agree that unless and until a definitive agreement regarding a Possible Transaction between the Company and you has been executed, neither the Company nor you will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this letter agreement except for the matters specifically agreed to herein and you hereby waive, in advance, any claims (including breach of contract) in connection with any Possible Transaction with the Company unless and until you shall have entered into a final definitive agreement. You also acknowledge and agree that (i) Stifel and Stifel Representatives may conduct the process that may or may not result in a transaction with the Company in such manner as Stifel, in its sole discretion, may determine (including, without limitation, negotiating and entering into a final definitive agreement with any third party without notice to you) and (ii) Stifel reserves the right to change (in its sole discretion, at any time and without notice to you) the procedures relating to the Company's and your consideration of the Possible Transaction (including, without limitation, terminating all further discussions with you and requesting that you return all Evaluation Material to the Company). You hereby confirm that you are not acting as a broker for or representative of any person and are considering a Possible Transaction with the Company only for your own account. You further acknowledge and agree that the Company reserves the right, in its sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to a Possible Transaction between the Company and you, and to terminate discussions and negotiations with you at any time.

You acknowledge that you and your Representatives are aware that the United States securities laws prohibit any person who has material non-public

information about a company from purchasing or selling securities of such company, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

The Company reserves the right to assign all of its rights, powers and privileges under this letter agreement, including without limitation, the right to enforce all of the terms of this letter agreement.

It is understood and agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this letter agreement by you or any of your Representatives and that the Company shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach by you of this letter agreement, but shall be in addition to all other remedies available at law or equity to the Company.

The terms and provisions of this letter agreement are solely for the benefit of the Company, Stifel and you and their respective successors, assigns, heirs and personal representatives, and no other person shall acquire or have any right by virtue of this letter agreement. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to such state's principles of conflicts of laws.

This letter agreement may be waived, amended or modified only by an instrument in writing signed by the party against which such waiver, amendment or modification is sought to be enforced.

Please confirm your agreement with the foregoing by signing and returning one copy of this letter to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

STIFEL, NICOLAUS & COMPANY, INCORPORATED
on behalf of: Project Acorn

By: _____
    Name: James Georgiow
    Title: Managing Director

Accepted and agreed as of
the date first written above:

SUNWAVE USA HOLDINGS INC.

By: _Steven C Laker_____
    Name:  Steven C Laker
    Title:  CEO

## **Exhibit B**

Agera Letter



mwe.com

Evan Belosa
Attorney at Law
ebelosa@mwe.com
+1 212 547 5869

September 24, 2019

**BY FEDERAL EXPRESS**

Steven Laker
Chief Executive Officer
Sunwave USA Holdings, Inc.
100 Cambridge Street, 14th Floor

Boston, MA 02114

**Re:    Obligations to Agera Holdings LLC**

Dear Mr. Laker:

This firm is legal counsel to Agera Holdings, LLC ("Agera") its parents, subsidiaries and affiliates (hereinafter collectively referred to as "Agera"),

As you recall, on behalf of Sunwave US Holdings, Inc. ("Sunwave"), you signed an agreement dated June 13, 2019 with Agera in connection with Sunwave's consideration of a possible transaction (the "NDA").  In connection with that transaction, Agera made certain information concerning Agera's business, operations, assets, and employees available to Sunwave.

To protect itself from raiding of its employee base, Agera required, and Sunwave agreed to, a nonsolicitation provision which states as follows:

> In consideration of the Evaluation material being furnished to you, you agree that, without the prior written consent of the Company, for a period of two years from the date hereof you will not, directly or indirectly, (i) solicit any person or employee whom you know or have a reasonable basis to know is an employee of the Company; or (ii) solicit for employment or employ any person employed by the Company with whom you had contact or who became known to you during your evaluation of the Company; provided, however, that the foregoing provision will not prevent you from employment any such person who contacts you on his or her own initiative without any direct or indirect solicitation by or encouragement from you, and provided further that general advertisements and other similar broad forms of solicitation shall not constitute direct or indirect solicitation hereunder.

I am appending the NDA for your reference.

Steven Laker
September 24, 2019
Page 2

Agera has recently learned that no fewer than four former employees--- Tom DeFeudis, Anna Agelova, Jenna Christy, and Kandi Perry- are now employed by Sunwave. Agera has strong reason to believe that Sunwave has solicited, both directly and indirectly, then-current Agera employees to resign their employment and take employment with Sunwave. The solicitation and/or hire of Agera employees constitutes a material breach of the NDA entitling Agera to both injunctive relief and monetary damages.

To avoid litigation, Agera requires that Sunwave (a) disclose all current or then-current Agera employees either directly or indirectly solicited by Sunwave subsequent to the execution of the NDA; (b) identify the dates and methods of solicitation for each such communication identified in response to question (a); and (c) agree in writing to abide by the terms of the NDA including, without limitation, by ceasing to solicit Agera employees and/or employ any Agera employees with whom Sunwave or its personnel became aware of or had contact with subsequent to signing the NDA. Agera requires a full response by no later than September 26 at 3 p.m. eastern standard time.

While we are hopeful that this matter can be resolved without litigation, please be advised that Sunwave should preserve any and all documents, electronic data, metadata, computer files, telephone recordings, emails, text messages, and/or any other materials that directly or indirectly concern or relate to the issues in this letter.

Agera reserves all rights to pursue all necessary and appropriate remedies. This letter is not a waiver of any rights maintained by Agera.

Sincerely,

Evan Belosa

cc:    Darren Azman, Esq.
cc:    Raima Jamal, Esq.

2

June 13, 2019

**PERSONAL AND CONFIDENTIAL**

Sunwave USA Holdings Inc
100 Cambridge Street, 14th Floor
Boston, MA 02114

       Attention:    Legal

Ladies and Gentlemen:

       In connection with your consideration of a possible transaction (a "Possible Transaction") with Project Acorn and/or its subsidiaries or affiliates (collectively, with such subsidiaries or affiliates, the "Company"), the Company is prepared to make available to you certain information concerning the business, operations and assets of the Company. As a condition to such information being furnished to you and your present or prospective directors, officers, employees, agents or advisors (including without limitation, attorneys, accountants, consultants, bankers and financial advisors) (collectively, "Representatives"), you agree to treat any information concerning the Company (whether prepared by the Company, its advisors or otherwise and irrespective of the form of communication) which is furnished to you or to your Representatives by or on behalf of the Company (herein collectively referred to as the "Evaluation Material") in accordance with the provisions of this letter agreement.

       The Term "Evaluation Material" shall be deemed to include information furnished to you orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential." The term "Evaluation Material" also includes all notes, analyses, compilations, studies, interpretations or other documents prepared by you or your Representatives which contain, reflect or are based upon, in whole or in part, the information furnished to you or your Representatives pursuant hereto. The term "Evaluation Material" does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by you or your Representatives, (ii) was within your possession prior to its being furnished to you by or on behalf of the Company pursuant hereto, or (iii) becomes available to you on a non-confidential basis from a source other than the Company or any of its Representatives; provided that with respect to clauses (ii) and (iii) above, the source of such information was not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information.

       You hereby agree that you and your Representatives shall use the Evaluation Material solely for the purpose of evaluating a Possible Transaction between

1

the Company and you and not for the purpose of competing with the Company.  You further agree that the Evaluation Material will be kept confidential and that you and your Representatives will not disclose any of the Evaluation Material in any manner whatsoever; provided, however, that (i) you may make any disclosure of such information to which the Company gives its prior written consent and (ii) any such information may be disclosed to your Representatives who need to know such information for the purpose of evaluating a Possible Transaction with the Company and who agree to keep such information confidential and who are provided with a copy of this letter agreement and agree to be bound by the terms hereof to the same extent as if they were parties hereto.  In any event, you shall be responsible for any breach of this letter agreement by any of your Representatives from prohibited or unauthorized disclosure or use of the Evaluation Material.

In addition, you agree that, without the prior written consent of the Company, you and your Representatives will not disclose to any person the fact that the Evaluation Material has been made available to you, that discussions or negotiations are taking place concerning a Possible Transaction involving the Company or any of the terms, conditions or other facts with respect thereto (including the status thereof), unless such disclosure is required by law and then only with as much prior written notice to the Company as is practical under the circumstances and only to the extent required by law. You further agree not to contact any employees of the Company regarding a Possible Transaction or the Evaluation Material without the Company's prior consent and that all communications regarding a Possible Transaction with the Company, requests for additional information and questions regarding procedures with respect to a Possible Transaction will be first submitted or directed to Stifel, Nicolaus & Company, Incorporated ("Stifel") and not to the Company or its affiliates, directors, officers, employees, managers, and agents (the "Company Representatives").  The term "person" as used in this letter agreement shall be broadly interpreted to include the media and any corporation, partnership, group, individual or other entity.

In addition, you agree not to contact or communicate with any supplier, distributor, lender, creditor, or customer regarding the Company, the Evaluation Material or a Possible Transaction without the prior written consent of the Company, it being agreed that contacts and communications with suppliers, distributors or customers in the ordinary course of business and unrelated to the Possible Transaction shall not be prohibited.

Notwithstanding anything herein to the contrary and in order to comply with Internal Revenue Service Regulations, you and the Company (and each affiliate and person acting on behalf of any such party) agree that each party to a Possible Transaction contemplated hereby (and each employee, representative, and other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such party or such person relating to such tax treatment

Page 3

and tax structure. This authorization is not intended to permit disclosure of any other information including (without limitation) (i) any portion of any materials to the extent not related to the tax treatment or tax structure of the transaction, (ii) the identities of participants or potential participants in the transaction, (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial information is related to the tax treatment or tax structure of the transaction), or (v) any other term or detail not relevant to the tax treatment or the tax structure of the transaction.

In the event that you or any of your Representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Evaluation Material, you shall provide the Company with prompt written notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this letter agreement. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions hereof, you agree to (i) furnish only that portion of the Evaluation Material for which the Company has waived compliance or for which you are advised by written opinion of counsel, reasonably satisfactory to the Company, is legally required and (ii) exercise your best efforts to obtain assurance that the Evaluation Material will be accorded such confidential treatment.

If you decide that you do not wish to proceed with a transaction with the Company you will promptly inform the Company of that decision. In that case, or at any time upon the request of the Company for any reason, you will and will cause your Representatives to promptly deliver to the Company all documents (and all copies thereof) furnished to you or your Representatives by or on behalf of the Company pursuant hereto. In the event of such a decision or request, all other Evaluation Material prepared by you or your Representatives shall be destroyed and no copy thereof shall be retained and, upon request, you shall certify in writing to the Company that such action has been taken. Notwithstanding the return or destruction of the Evaluation Material, you and your Representatives will continue to be bound by your obligations of confidentiality and other obligations hereunder for a period of three years from the date of this letter agreement.

The Company retains the right to determine, in its discretion, what information, properties, personnel and other Evaluation Material the Company will make available to you. Although the Company has endeavored to include in the Evaluation Material information which the Company believes to be relevant for the purpose of your evaluation of a Possible Transaction with the Company, you acknowledge that none of the Company, Company Representatives, Stifel nor any of its affiliates, directors, officers, employees, managers, or agents (the "Stifel Representatives") makes any express or implied representation or warranty as to the accuracy or completeness of the Evaluation Material. You agree that none of the Company, Company Representatives, Stifel, nor Stifel Representatives shall have any liability to you or to any of your

Page 4

Representatives relating to or resulting from the use of the Evaluation Material. You also agree that you are not entitled to rely on the accuracy or completeness of the Evaluation Material and that you will be entitled to rely solely on such representations and warranties as may be included in any definitive agreement with respect to a Possible Transaction between the Company and you, subject to such limitations and restrictions as may be contained therein. You further agree that, if you determine to engage in a Possible Transaction with the Company, your determination will be based solely on the terms of such definitive agreement and on your own investigation, analysis and assessment of the Company and the transaction.

In consideration of the Evaluation Material being furnished to you, you agree that, without the prior written consent of the Company, for a period of two years from the date hereof you will not, directly or indirectly, (i) solicit any person or employee whom you know or have a reasonable basis to know is an employee of the Company; or (ii) solicit for employment or employ any person employed by the Company with whom you had contact or who became known to you during your evaluation of the Company; provided, however, that the foregoing provision will not prevent you from employing any such person who contacts you on his or her own initiative without any direct or indirect solicitation by or encouragement from you, and provided further that general advertisements and other similar broad forms of solicitation shall not constitute direct or indirect solicitation hereunder.

You agree that unless and until a definitive agreement regarding a Possible Transaction between the Company and you has been executed, neither the Company nor you will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this letter agreement except for the matters specifically agreed to herein and you hereby waive, in advance, any claims (including breach of contract) in connection with any Possible Transaction with the Company unless and until you shall have entered into a final definitive agreement. You also acknowledge and agree that (i) Stifel and Stifel Representatives may conduct the process that may or may not result in a transaction with the Company in such manner as Stifel, in its sole discretion, may determine (including, without limitation, negotiating and entering into a final definitive agreement with any third party without notice to you) and (ii) Stifel reserves the right to change (in its sole discretion, at any time and without notice to you) the procedures relating to the Company's and your consideration of the Possible Transaction (including, without limitation, terminating all further discussions with you and requesting that you return all Evaluation Material to the Company). You hereby confirm that you are not acting as a broker for or representative of any person and are considering a Possible Transaction with the Company only for your own account. You further acknowledge and agree that the Company reserves the right, in its sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to a Possible Transaction between the Company and you, and to terminate discussions and negotiations with you at any time.

You acknowledge that you and your Representatives are aware that the United States securities laws prohibit any person who has material non-public

Page 5

information about a company from purchasing or selling securities of such company, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

The Company reserves the right to assign all of its rights, powers and privileges under this letter agreement, including without limitation, the right to enforce all of the terms of this letter agreement.

It is understood and agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this letter agreement by you or any of your Representatives and that the Company shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach by you of this letter agreement, but shall be in addition to all other remedies available at law or equity to the Company.

The terms and provisions of this letter agreement are solely for the benefit of the Company, Stifel and you and their respective successors, assigns, heirs and personal representatives, and no other person shall acquire or have any right by virtue of this letter agreement. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to such state's principles of conflicts of laws.

This letter agreement may be waived, amended or modified only by an instrument in writing signed by the party against which such waiver, amendment or modification is sought to be enforced.

Please confirm your agreement with the foregoing by signing and returning one copy of this letter to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

STIFEL, NICOLAUS & COMPANY, INCORPORATED
on behalf of: Project Acorn

By: _____
Name: James Georgiow
Title: Managing Director

Page 6

Accepted and agreed as of
the date first written above:

SUNWAVE USA HOLDINGS INC.

By: _Steven C Laker_
    Name:  Steven C Laker
    Title:   CEO

## **Exhibit C**

Sunwave Letter

# LAWRENCE R. GELBER

### ATTORNEY AT LAW

**THE VANDERBILT PLAZA**
**34 PLAZA STREET – SUITE 1107**
**BROOKLYN, NEW YORK 11238**

Phone: (718) 638 2383
GelberLaw@aol.com
www.GelberLaw.net

Fax: (718) 857 9339
Cell: (917) 992 3596

Thursday, October 03, 2019

By electronic mail
ebelosa@mwe.com
Evan Belosa, Esq.
McDermott, Will & Emery
340 Madison Avenue
New York, New York 10173-1922

Re:    Steven Laker

Dear Mr. Belosa:

I represent Sunwave USA Holdings, Inc. and am in receipt of your letter to Steven Laker dated September 24, 2019.

As I advised you via my letter dated September 18, 2019, Mr. Laker did not solicit anyone from Agera.  Accordingly, the answer to your request for a list is: none.

Mr. Laker did not violate the NDA.

Mr. Laker reserves all rights.

Thank you.

Very truly yours,

*Lawrence R. Gelber*

Lawrence R. Gelber