## Exhibit C

Postpetition ISDA Master Agreement

**EXECUTION COPY**



# ISDA

International Swap Dealers Association, Inc.

## AMENDMENT

### Dated as of October 2, 2015

### to the

## ISDA MASTER AGREEMENT

dated as of May 5, 2015

between

| **BP Energy Company** | and | **Agera Energy LLC** |
|---|---|---|
| **("Party A")** | | **("Party B")** |

The parties have previously entered into the 2002 ISDA Master Agreement ("Agreement") and have now agreed to amend the Agreement by the terms of this Amendment (this "Amendment").

The specific modifications that the parties wish to incorporate in the Agreement are set forth below. All capitalized terms used in this Amendment will have the same meaning and definition as those used in the Agreement.

**WITNESSETH:**

WHEREAS, Party A and Party B are parties to the Agreement and wish to amend the Agreement to (i) include energy.me midwest llc and Aequitas Energy Inc. as parties to the Agreement, and

NOW, THEREFORE, in consideration of the mutual agreements contained in this Amendment, the parties hereby agree as follows:

1.    *Amendment of the Agreement:*

On the ISDA Schedule to the Agreement, energy.me midwest llc and Aequitas Energy Inc. shall be added to and included in the definition of "Party B".

2.    *Representations*:

Each party represents to the other party in respect of the Agreement and Schedule, as amended pursuant to the Amendment, that all representations made by it in the Agreement are true and accurate as of the date of this Amendment.

3.    *Miscellaneous:*

(a)    *Entire Agreement: Restatement*.

(i)    This Amendment constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

(ii)    Except for any amendment to the Agreement made pursuant to this Amendment, all terms and conditions of the Agreement will continue in full force and effect in accordance with its provisions on the date of and ultimately prior to this Amendment. References to the Agreement or to the Schedule will be to the Agreement or to the Schedule, as amended by this Amendment.

(b)    *Amendments.* No amendment, modification or waiver in respect of the matters contemplated by this Amendment will be effective unless made in accordance with the terms of the Agreement.

(c)    *Counterparts*. This Amendment may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(d)    *Headings*.    The headings used in this Amendment are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting the Amendment.

(e)    *Governing Law*. This Amendment will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.

Party A
**BP ENERGY COMPANY**

By: _____
Name: _____
Title: _____
Date: _____

Party B
**AGERA ENERGY LLC**

By: _____
Name: Michael Nordlicht
Title: General Counsel
Date: October 2, 2015

**ENERGY.ME MIDWEST LLC**

By: _____
Name: Kerry Cassidy
Title: Chief Executive Officer
Date: October 2, 2015

**AEQUITAS ENERGY INC.**

By: _____
Name:  Michael Nordlicht
Title: General Counsel
Date: October 2, 2015

*Signature Page to Amendment to ISDA Master Agreement*

Party A
**BP ENERGY COMPANY**

By:_____
Name:_____
Title:_____
Date:_____

Party B
**AGERA ENERGY LLC**

By:_____
Name: Michael Nordlicht
Title: General Counsel
Date: October 2, 2015

**ENERGY.ME MIDWEST LLC**

By:_____
Name: Kerry Cassidy
Title: Chief Executive Officer
Date: October 2, 2015

**AEQUITAS ENERGY INC.**

By:_____
Name:  Michael Nordlicht
Title: General Counsel
Date: October 2, 2015

*Signature Page to Amendment to ISDA Master Agreement*



# ISDA®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of May 5, 2015

## BP ENERGY COMPANY. and AGERA ENERGY LLC

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting of Payments.* If on any date amounts would otherwise be payable:—

(i)     in the same currency; and

(ii)     in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

(i)     *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)     promptly notify the other party ("Y") of such requirement;

(2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

**ISDA® 2002**

(4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)  *Liability.* If:—

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

## 3.    Representations

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)  *Basic Representations.*

(i)  *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

ISDA® 2002

(iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e) *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f) *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g) *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4. Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) *Furnish Specified Information.* It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i) any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii) any other documents specified in the Schedule or any Confirmation; and

4

**ISDA® 2002**

(iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply With Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.     Events of Default and Termination Events**

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)     *Breach of Agreement; Repudiation of Agreement.*

(1)     Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)     the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

**ISDA® 2002**

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)   *Credit Support Default.*

(1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)   *Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)   *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)   defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)   defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)   defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)   disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

**ISDA® 2002**

(vi)   *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

    (1)      a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

    (2)      a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)   *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

    (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

           **ISDA® 2002**

(viii)  *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

(1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

(2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

(i)  *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

(1)  for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)  *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

(1)  the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

8                                          ISDA® 2002

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)    such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)    *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)    X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

9

ISDA® 2002

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)    any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)    X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Hierarchy of Events.*

(i)    An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)    Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)    If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)    *Deferral of Payments and Deliveries During Waiting Period.* If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)    the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)    if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)    *Inability of Head or Home Office to Perform Obligations of Branch.* If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

ISDA® 2002

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

**6.     Early Termination; Close-Out Netting**

(a)     ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     ***Right to Terminate Following Termination Event.***

(i)     ***Notice.*** If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)     ***Transfer to Avoid Termination Event.*** If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     ***Two Affected Parties.*** If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

**ISDA® 2002**

(iv)   *Right to Terminate.*

(1)   If:—

(A)   a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(B)   a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(2)   If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

(A)   Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions. Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

(B)   An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)   *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

12                                                      **ISDA® 2002**

(d)    *Calculations; Payment Date.*

    (i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

    (ii)    *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

    (i)    *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

    (ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

        (1)    *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

        (2)    *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

ISDA® 2002

(3)    *Mid-Market Events.* If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

(A)    if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

(B)    in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Adjustment for Illegality or Force Majeure Event.* The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)    *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)    *Set-Off.* Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

ISDA® 2002

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

7.    Transfer

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)    *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

16                                                          ISDA® 2002

(h)    *Interest and Compensation.*

   (i)    ***Prior to Early Termination.*** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

      (1)    *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

      (2)    *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

      (3)    *Interest on Deferred Payments.* If:—

         (A)    a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

         (B)    a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

         (C)    a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

**ISDA® 2002**

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)    *Compensation for Deferred Deliveries.* If:—

(A)    a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)    a delivery is deferred pursuant to Section 5(d); or

(C)    a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(e), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)    *Early Termination.* Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)    *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)    *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)    *Interest Calculation.* Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

18                                            ISDA® 2002

**10.     Offices; Multibranch Parties**

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)      If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)      The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction. Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.     Expenses**

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.     Notices**

(a)      *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

      (i)      if in writing and delivered in person or by courier, on the date it is delivered;

      (ii)      if sent by telex, on the date the recipient's answerback is received;

      (iii)      if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

      (iv)      if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

      (v)      if sent by electronic messaging system, on the date it is received; or

**ISDA® 2002**

(vi)     if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

**13.     Governing Law and Jurisdiction**

(a)     *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

    (i)     submits:—

        (1)     if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

        (2)     if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

    (ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

    (iii)     agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

ISDA® 2002

**14.    Definitions**

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)    in respect of the determination of an Unpaid Amount:—

    (i)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

    (iii)    in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

    (iv)    in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:—

    (i)    for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

        (1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

        (2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

        (3)    in all other cases, the Applicable Deferral Rate; and

21                                                          **ISDA® 2002**

(ii)    for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

(1)    if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)    if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)    if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)    in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:—

(a)    for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)    for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)    for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

*"Automatic Early Termination"* has the meaning specified in Section 6(a).

*"Burdened Party"* has the meaning specified in Section 5(b)(iv).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"Close-out Amount"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)      quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)      information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)      application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

**ISDA® 2002**

(2)     application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

**ISDA® 2002**

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii). *"Multiple*

*Transaction Payment Netting"* has the meaning specified in Section 2(c). *"Non-affected*

*Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

**ISDA® 2002**

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

**ISDA® 2002**

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

*"Termination Currency"* means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Threshold Amount"* means the amount, if any, specified as such in the Schedule.

*"Transaction"* has the meaning specified in the preamble.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

**ISDA® 2002**

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

*"Waiting Period"* means:—

(a)    in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)    in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BP ENERGY COMPANY**
(Name of Party)

**AGERA ENERGY LLC**
(Name of Party)

By: ...............................................
    Name: Kirk Resewehr
    Title: Attorney-in-Fact
    Date: 5/8/2015

By: ...............................................
    Name: Michael Nordlicht
    Title: Authorized Signer
    Date: 5/7/2015

ISDA® 2002

EXECUTION COPY

# AMENDED AND RESTATED SCHEDULE

## to the

## 2002 Master Agreement

### dated effective as of October 2, 2015

by and among

| BP Energy Company ("BPEC or Party A"), a corporation incorporated under the3 State laws of Delaware | Agera Energy LLC ("Agera"), a limited liability incorporated under the State laws of Delaware; |
|---|---|
| | energy.me midwest llc ("energy.me"), a limited liability incorporated under the State laws of Illinois; and |
| | Aequitas Energy Inc. ("Aequitas"), a corporation incorporated under the State laws of Connecticut (Agera, energy.me and Aequitas are individually and collectively referred to as "Party B") |

### Part 1 - Termination Provisions

Party A and Agera entered into a 2002 ISDA Master Agreement ("Master Agreement") including any schedules or annexes thereto (including the Credit Support Annex), dated May 5, 2015 (collectively the "Original Agreement"). Party A and Party B desire to amend and restate the Original Agreement and hereby agree as follows, amending and restating in its entirety the Original Agreement. The Amended and Restated Original Agreement is referred to collectively as the "Agreement". Each of Party A and Party B may be referred to herein individually as a "Party" or collectively as "Parties".

In this Agreement:

(a)     *"Specified Entity"* means:

in relation to Party A and in relation to Party B, for the purpose of:

| | |
|---|---|
| Section 5(a)(v): | Not Applicable |
| Section 5(a)(vi): | Not Applicable |
| Section 5(a)(vii): | Not Applicable |
| Section 5(b)(v): | Not Applicable |

(b)     *"Specified Transaction"* has the meaning given to it in Section 14 of the Agreement.

(c)     The *"Cross Default"* provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(v) will apply to Party A and will apply to Party B.

(e)    The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)    *"Termination Currency"* means United States Dollars.

(g)    *Additional Termination Event* will not apply to Party A and will not apply to Party B.

(h)    "**Additional Events of Default**" Section 5(a) shall be amended by adding the following as Section 5(a)(ix):

"(ix)    With respect to Party B, if an "Event of Default" has occurred and is continuing under the PSA and after giving effect to Section 18.1(c) thereof if applicable, the Seller has the right to take action under Section 18.1(i), 18.1(ii) or 18.1(iii) of the PSA."

"PSA" means the fully executed Preferred Supplier Agreement dated October 2, 2015 by and between Party A and Party B."

## Part 2 - Tax Representations

(a)    *Payer Tax Representation:* For the purpose of Section 3(e), Party A and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice, application or official interpretation of any relevant governmental revenue authority, of any Relevant Jurisdiction or under any applicable tax treaty between the Relevant Jurisdictions to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

(i)    the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)    the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    *Payee Tax Representations:* For the purpose of Section 3(f) of this Agreement, Party A and Party B each make the representation(s) specified below:

(1) For the purpose of Section 3(f) of this Agreement, Party A represents that (i) it is a corporation organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 36-3421804.

(2) For the purpose of Section 3(f) of this Agreement, Agera represents that (i) it is a Limited Liability Company organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 46-5028122;

(3) For the purpose of Section 3(f) of this Agreement, energy.me represents that (i) it is a Limited Liability Company organized and existing under the laws of the State of Illinois, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 45-1599484;

(4) For the purpose of Section 3(f) of this Agreement, Aequitas represents that (i) it is a corporation organized and existing under the laws of the State of Connecticut, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 45-5257988;

**Part 3 – Agreement to Deliver Documents**

Each party agrees to deliver the following documents as applicable:

(a)      For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | Applicable tax withholding documentation as required per Section 4(a). | Upon execution of this Agreement. |

(b)      For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A | A certified copy of the resolution of the Board of Directors of Party A or its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement. | Yes |
| Party A | Certification of the authenticity of the signature of Party A's signatory certified by Party A's Company Secretary. | Upon execution of this Agreement. | Yes |
| Party A | Most recent annual audited financial statements of Party A's Credit Support Provider. | Upon written request, unless publicly available through EDGAR or some other source. | Yes |
| Party A | The guaranty of its Credit Support Provider. | Upon the execution of this Agreement. | No |
| Party B | A certified copy of the resolution of the Board of Directors of the Credit Support Provider of Party B or its relevant committee, authorizing the Credit Support Provider of Party B to guarantee the obligations of Party B hereunder and to execute | Upon execution of this Agreement. | Yes |

32

| | | | |
|---|---|---|---|
| | and deliver the guaranty and incumbency certificate. | | |
| Party B | Certification of the authenticity of the signature of Party B's signatory certified by Party B's Company Secretary. | Upon execution of this Agreement. | Yes |
| Party B | Most recent annual audited financial statements of Party B or its Credit Support Provider, (if applicable). | Upon written request, unless publicly available through EDGAR or some other source. | Yes |
| Party B | The Canadian Trade Reporting Representation Letter and Dodd-Frank related documentation. | Upon the execution of this Agreement. | No |

## Part 4 - Miscellaneous

(a)     ***Addresses for Notices.***  For the purpose of Section 12(a) of this Agreement:

Address for **Confirmations** to Party A:

> Address:         BP Energy Company
> 201 Helios Way
> Houston, Texas 77079

> Attention:      Confirmation Department

> Facsimile No.:  281-227-8470
> Telephone No.: 713-323-1866

Address for other **notices** or communications to Party A (other than Confirmations):

> Address:         BP Energy Company
> 201 Helios Way
> Houston, Texas 77079

> Attention:      Contract Services

> Facsimile No.:  713-323-0203
> Telephone No.: 713-323-2000

Address for **Invoices** to Party A:

> Address:         BP Energy Company
> 201 Helios Way
> Houston, Texas 77079

Attention:        Risk Accounting

Facsimile No.:  713-323-5935
Telephone No.: 713-323-4919

Wire Payment Instructions:

For the Account of: BP Energy Company
JP Morgan Chase Bank, NY
ABA:  021-000021
Acct No.:  910-2-548097
New York, NY 10081-6000

Address for **Confirmations** to Agera:

Address:        Agera Energy LLC
                555 Pleasantville Rd, S107
                Briarcliff Manor, NY 10510

Attention:      Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:      Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

Additional Copies: finance@ageraenergy.com; supply@ageraenergy.com

Address for other **notices** or communications to Agera (other than Confirmations):

Address:        555 Pleasantville Rd, S107
                Briarcliff Manor, NY 10510

Attention:      Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:      Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

34

Additional Copies: legal@ageraenergy.com; supply@ageraenergy.com

Address for **Invoices** to Agera:

| | |
|---|---|
| Address: | 555 Pleasantville Rd, S107 |
| | Briarcliff Manor, NY 10510 |

Attention:     Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:     Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

Additional Copies: finance@ageraenergy.com; supply@ageraenergy.com

Wire Payment Instructions for Agera:

Bank: First National Bank of Central Texas
ABA:  111903245
Acct No.: 40038762
City/State/Zip Waco TX 76710

Address for **Confirmations** to energy.me:

| | |
|---|---|
| | energy.me midwest llc |
| Address: | 555 Pleasantville Rd, S107 |
| | Briarcliff Manor, NY 10510 |

Attention:     Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:     Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

Additional Copies: finance@ageraenergy.com; supply@ageraenergy.com

Address for other **notices** or communications to energy.me (other than Confirmations):

| | |
|---|---|
| Address: | 555 Pleasantville Rd, S107 |
| | Briarcliff Manor, NY 10510 |

| | |
|---|---|
| Attention: | Michael Nordlicht |

Facsimile No.: 888-721-5019
Telephone No.: 914-236-1406

With copy to:

| | |
|---|---|
| Attention: | Phil Spillane |

Facsimile No.: 888-721-5019
Telephone No.: 914-236-1420

Additional Copies: legal@ageraenergy.com; supply@ageraenergy.com

Address for **Invoices** to energy.me:

| | |
|---|---|
| Address: | 555 Pleasantville Rd, S107 |
| | Briarcliff Manor, NY 10510 |

| | |
|---|---|
| Attention: | Michael Nordlicht |

Facsimile No.: 888-721-5019
Telephone No.: 914-236-1406

With copy to:

| | |
|---|---|
| Attention: | Phil Spillane |

Facsimile No.: 888-721-5019
Telephone No.: 914-236-1420

Additional Copies: finance@ageraenergy.com; supply@ageraenergy.com

Wire Payment Instructions for energy.me:

| | |
|---|---|
| Bank: | JPMorgan Chase Bank, N.A. |
| ABA No.: | 021000021 |
| Acct. No.: | 139511500 |
| City/State/Zip: | Chicago, IL  60607 |

Address for **Confirmations** to Aequitas:

| | |
|---|---|
| | Aequitas Energy Inc. |
| Address: | 555 Pleasantville Rd, S107 |
| | Briarcliff Manor, NY 10510 |

Attention:        Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:        Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

Additional Copies: finance@ageraenergy.com; supply@ageraenergy.com

Address for other **notices** or communications to Aequitas (other than Confirmations):

Address:        555 Pleasantville Rd, S107
                Briarcliff Manor, NY 10510

Attention:        Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:        Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

Additional Copies: legal@ageraenergy.com; supply@ageraenergy.com

Address for **Invoices** to Aequitas:

Address:        555 Pleasantville Rd, S107
                Briarcliff Manor, NY 10510

Attention:        Michael Nordlicht

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1406

With copy to:

Attention:        Phil Spillane

Facsimile No.:  888-721-5019
Telephone No.: 914-236-1420

Additional Copies: finance@ageraenergy.com; supply@ageraenergy.com

Wire Payment Instructions for Aequitas:

|  |  |
|---|---|
| Bank: | First National Bank of Texas |
| ABA: | 111903245 |
| Acct No.: | 40038739 |
| City/State/Zip: | Waco, TX 76710 |

(b)   ***Process Agent.*** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not Applicable

Party B appoints as its Process Agent: Not Applicable

(c)   ***Offices.*** The provisions of Section 10(a) will apply to this Agreement.

(d)   ***Multibranch Party.*** For the purpose of Section 10(b) of this Agreement:

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e)   ***Calculation Agent.*** The Calculation Agent is Party A, with any calculation or determination made by Party A in such capacity to be binding and conclusive absent manifest error.

(f)   ***Credit Support Document.*** Details of any Credit Support Document:

With respect to Party A and Party B, the Credit Support Annex as modified by Paragraph 13, the terms and conditions of which are incorporated into, and constitute an integral part of, this Agreement.

With respect to Party A, the guaranty of its Credit Support Provider.

With respect to Party B, not applicable.

(g)   ***Credit Support Provider.***

Credit Support Provider means in relation to Party A, BP Corporation North America Inc., an Indiana corporation.

Credit Support Provider means in relation to Party B, not applicable.

(h)   ***Governing Law.*** This Agreement will be governed by and construed in accordance with New York law, without reference to its choice of law doctrine other than Section 5-1401 of the New York General Obligations Law.

(i)   ***Jurisdiction.*** Section 13(b) of the Agreement is hereby amended by (i) deleting the word "non-exclusive" appearing in paragraph (i)(1) and (i)(2) thereof and substituting therefor

the word "exclusive" and (ii) deleting Section 13(b)(ii) and substituting therefor the following sentence:

"Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction if (A) the courts of the State of New York or the United States District Court located in the Borough of Manhattan in New York City lacks jurisdiction over the parties or the subject matter of the Proceedings or declines to accept the Proceedings on the grounds of lacking such jurisdiction; (B) the Proceedings are commenced by a party for the purpose of enforcing against the other party's property, assets or estate any decision or judgment rendered by any court in which Proceedings may be brought as provided hereunder; (C) the Proceedings are commenced to appeal any such court's decision or judgment to any higher court with competent appellate jurisdiction over that court's decisions or judgments if that higher court is located outside the State of New York or Borough of Manhattan, such as a federal court of appeals or the U.S. Supreme Court; or (D) any suit, action or proceeding has been commenced in another jurisdiction by or against the other party or against its property, assets or estate (including, without limitation, any suit, action or proceeding described in Section 5(a)(vii)(4) of this Agreement), and, in order to exercise or protect its rights, interests or remedies under this Agreement, the party (1) joins, files a claim, or takes any other action, in any such suit, action or proceeding, or (2) otherwise commences any Proceeding in that other jurisdiction as the result of that other suit, action or proceeding having commenced in that other jurisdiction."

(j)     ***Netting of Payments.***  "Multiple Transaction Payment Netting" will apply for the purpose of Section 2(c) of this Agreement to all Transactions.

(k)     ***"Affiliate"*** will have the meaning specified in Section 14 of this Agreement.

(l)     ***"Absence of Litigation".***

(a) Section 3(c) is amended by the inclusion of the word "adversely" before the word "affect" in the third line.

(b) For the purpose of Section 3(c):

***"Specified Entity"*** means in relation to Party A, Not Applicable.
***"Specified Entity"*** means in relation to Party B, Not Applicable.

(m)     ***No Agency.***  The provisions of Section 3(g) will apply to Party A and will apply to Party B.

(n)     ***Additional Representation.***  Will apply. For the purpose of Section 3 of this Agreement, the following will each constitute an Additional Representation (which representations will be deemed to be repeated by each party, as appropriate, on each date on which a Transaction is entered into):

(i)     ***Eligible Commercial Entity.***  It constitutes an "eligible commercial entity" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(ii)     ***Eligible Contract Participant.***  It constitutes an "eligible contract participant" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(iii)    ***Swap Agreement.***  This Agreement and any Transaction entered into hereunder constitutes a "swap agreement" within the meaning of the United States Bankruptcy Code (11 USC Sec. 101(53B) (2000)).

(iv)    ***Line of Business.***   It has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(v)    ***Relationship Between the Parties.***   In connection with the negotiation of, the entering into, and the confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, and each Transaction: (i) it is acting as principal (and not as agent or in any other capacity, fiduciary or otherwise); (ii) the other party is not acting as a fiduciary or financial or investment advisor for it; (iii) it is not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth in this Agreement and in such Credit Support Document; (iv) the other party has not given to it (directly or indirectly through any other person) any advice, counsel, assurance, guaranty, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document, or such Transaction; (v) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary, and not upon any view expressed by the other party; (vi) all trading decisions have been the result of arm's length negotiations between the parties; and (vii) it is entering into this Agreement, such Credit Support Document, and such Transaction with a full understanding of all of the risks hereof and thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(o)    ***Recording of Telephone Conversations.*** To the extent permitted by applicable law, each party: (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain prior to entering into any Transaction any necessary consent of, and give any necessary notice of such recording to, its relevant personnel, (iii) agrees that recordings may be submitted in evidence in any Proceedings, and (iv) acknowledges to the other party and consents that such other party may from time to time and without further notice (A) retain electronic transmissions (including telephone conversations, e-mail and instant messaging between the parties' respective representatives in connection with the Agreement, any potential Transaction and any Transaction or other commercial matters between the parties) on central and local databases for their respective legitimate purposes, and (B) monitor electronic transmissions through their internal and external networks for purposes of security and compliance with applicable laws, regulations and internal policies for their legitimate business purposes. Each party further agrees that it will indemnify, defend and hold the other party harmless from any and all damages, losses, claims, liabilities, judgments, costs and expenses, including but not limited to reasonable attorney's fees and costs of court arising directly or indirectly from or out of such party's failure to obtain any consent necessary from a party's trading, marketing and other relevant personnel, agents or representatives or such party's failure to give any notice required to such individuals.

**Part 5 - Other Provisions**

(a)  **General Conditions.** Section 2(a)(ii) shall be amended by the deletion of the final sentence thereof and the addition of the following in substitution therefor: "The parties agree that all payments under this Agreement shall be made by wire transfer of immediately available funds to the party receiving payment, at the account specified by such party."

(b)  **Limitation on Condition Precedent.** With respect to any Transaction entered into under this Agreement, Section 2(a)(iii) of this Agreement is hereby amended by adding the following phrase at the end of clause (1) immediately before the last comma of such phrase:

"(provided, however, that in relation to any Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than ten (10) days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i))."

(c)  **Change of Account.** Section 2(b) of this Agreement is hereby amended by the insertion of the following at the end thereof after the word "change":

", provided that if such new account shall not be in the same jurisdiction having the same power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amounts and shall not receive less as a result of such change than would have been the case if such change had not taken place."

(d)  **Deduction or Withholding for Tax.** Section 2(d)(i)(4) is amended by the addition of "; or" at the end of sub-paragraph (B) and the addition of a new sub-paragraph (C) as follows:

"(C) Y refusing to supply any form or document under Section 4(a)(iii) on grounds of material prejudice to its legal or commercial position."

(e)  **Representations.** The opening paragraph of Section 3 is amended by replacing "in the case of the representations in Section 3(f)" with "in the case of the representations in Sections 3(f) and 3(h)(iv)" and adding the following new sub-section 3(h):

"(h)     **Dodd Frank Representations.**

(i)     **Hedging Transactions.** Unless otherwise noted in the applicable Confirmation for any Transaction, such Transaction constitutes for Party B a bona fide hedging transaction as defined in CFTC Regulation 1.3(z) (17 C.F.R. § 1.3(z)).

(ii)     **End User Clearing Exemption.** If with respect to any Transaction Party B has elected an exemption from the clearing requirement under Section 2(h)(7)(A) of the CEA, then as of the date of the execution of such Transaction (and not as of the date of this Agreement) (1) it is not a "financial entity" as

41

defined in Section 2(h)(7)(C)(i) of the CEA, subject to certain exceptions in Sections 2(h)(7)(C)(ii), 2(h)(7)(C)(iii) and 2(h)(7)(D) of the CEA; (2) it is using such Transaction to hedge or mitigate commercial risk; (3) it has reported the information required to be submitted under 17 C.F.R. § 50.50(b)(1)(iii) in an annual filing made no more than 365 days prior to the Trade Date of such Transaction, pursuant to 17 C.F.R. § 50.50(b)(2), and (4) to the extent it is required to do so under Section 2(j) of the CEA and 17 C.F.R. § 50.50(b)(1)(iii)(D)(2), it has obtained all necessary approvals by the appropriate committee (or equivalent body) of its board of directors to rely on the exception to the clearing requirement under Section 2(h)(7)(A) of the CEA.

(iii)    ***Special Entity Status***.  Party B is not a federal agency, state agency, city, county, municipality or other political subdivision of a state, or any instrumentality, department or entity established thereby, or any other Special Entity as defined by the CFTC Regulation 23.401(c).

(iv)    ***DF Protocols***.  Each of the parties hereby agrees to enter into additional reasonable documentation or modify existing documentation between the parties to satisfy the requirements imposed upon one or both of the parties by the Dodd-Frank Wall Street Reform and Consumer Protection Act, the CEA and/or CFTC Regulations thereunder, including, upon reasonable request, adhering to or entering into such other protocols, suggested amendments, market conventions and other contractual provisions published by ISDA from time to time and intended to enhance one or both party's compliance with the CEA, the Dodd-Frank Wall Street Reform and Consumer Protection Act, CFTC Regulations and other applicable laws, or to facilitate the orderly processing of Transactions."

(f)    ***Tax Event***.  Section 5(b)(iii) shall be amended by the addition of  "or (C)" after the words "or (B)" at the end of the last line.

(g)    ***Set off***.  Section 6(f) is deleted in its entirety and replaced with the following:

"*Set-off*.  Without affecting or prejudicing the provisions of this Agreement requiring the calculation and payment of certain net payment amounts on Scheduled Settlement Dates, all payments will be made without Set-off or counterclaim; provided, however, that any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer") in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the sole option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X")  (and without prior Notice to the Defaulting Party or the Affected Party, as the case may be),  will be reduced by its setoff against any other amounts payable by the Payee to the Payer (whether arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation (collectively "Other Amounts").  Additionally, the set-off rights under this section include but are not limited to the following: (i) any Early Termination Amount against any Posted Credit Support held by a party relating to the Agreement; (ii) any Early Termination Amount against any amount(s) (including any excess collateral, security or credit support) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Early Termination Amount owed to the Non-defaulting Party against any amount(s) (including any excess collateral, security or credit

support) owed by the Non-defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; (iv) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party to the Non-defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party or its Affiliates to the Non-defaulting Party under any other agreement or arrangement.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate subject to the relevant party accounting to the other when the obligation is ascertained.

To the extent that Other Amounts or any other sums otherwise owed by the Non-defaulting Party's Affiliate to the Defaulting Party, have been setoff by the Non-defaulting Party pursuant to this Section 6(f), the Non-defaulting Party's Affiliate shall not be liable to, and shall be released by, the Defaulting Party; provided further that the Defaulting Party shall be forever estopped from asserting that the Non-defaulting Party's Affiliate owes the Other Amounts or other sums to the Defaulting Party. The obligations of the Non-defaulting Party, the Non-defaulting Party's Affiliates, the Defaulting Party and the Defaulting Party's Affiliates under this Agreement or otherwise in respect of such Other Amounts or other sums shall be deemed satisfied and discharged to the extent of any such setoff. For this purpose, the Other Amounts or other sums subject to the setoff may be converted at the applicable prevailing exchange rate into U.S. Dollars by the Non-defaulting Party. The Non-defaulting Party will give the Defaulting Party notice of any setoff effected under this section provided that failure to give such notice shall not affect the validity of the setoff. Nothing in this paragraph shall be deemed to create a charge or other security interest. "Setoff" as used herein means setoff, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the Non-defaulting Party is entitled or subject to (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, the Non-defaulting Party."

(h)    ***Counterparts and Confirmations***.

(i)    Section 9(e)(i) shall be amended by deleting the words "and by electronic messaging system"; and

(ii)    The second and third sentences of Section 9(e)(ii) shall be deleted and replaced by the following:

"Any Transaction may be effectuated in an EDI transmission or telephone conversation or other electronic means of communication with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such Transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Party A (the "***Confirming Party***") will promptly send a Confirmation to Party B to confirm a telephonic transaction by any reasonable means, including, without limitation, by facsimile, hand delivery, courier, or certified United States mail (return receipt requested) within three Business Days of a Transaction, provided

that the failure to send a Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Confirmation as the identification and authentication of Confirming Party. If the Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation/transmission conditions), which modify or supplement the Transaction or the terms of this Master Agreement (e.g., Force Majeure, arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to this Section 9(e)(ii) but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any Transaction agreed to by the parties. If Party A's Confirmation is materially different from Party B's understanding of the Transaction, Party B shall notify the Confirming Party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless Party B has previously sent a Confirmation to the Confirming Party. The failure of Party B to so notify the Confirming Party in writing by the Confirm Deadline constitutes Party B's agreement to the terms of the Transaction described in the Confirming Party's Confirmation. If there are any material differences between timely sent Confirmations governing the same Transaction, or if Party B has timely objected to the terms of the Confirming Party's Confirmation, such Transaction remains valid and the parties remain legally bound thereby, however, both parties shall in good faith attempt to resolve such differences. Once such material differences are resolved, the Confirming Party shall transmit a written Confirmation to Party B, and such written Confirmation shall be accepted (or disputed) pursuant to the provisions of this Section 9(e)(ii). The provisions of this Section 9(e)(ii) may be repeated as many times as necessary to produce a written Confirmation that is accepted or deemed accepted by Party B. In the event of a conflict among the terms of (i) a binding Confirmation pursuant to this Section 9(e)(ii), (ii) the oral agreement of the parties (which may be evidenced by a recording of such transaction, oral testimony, data in a computer system, trade tickets, and/or notes), and (iii) this Master Agreement, the terms of the items shall govern in the priority listed in this sentence.

"*Confirm Deadline*" shall mean the earlier of (1) 5:00 p.m. in Party B's time zone on the fifth New York Business Day following the New York Business Day a Confirmation is received by Party B; provided, if the Confirmation is received after 5:00 p.m. in Party B's time zone, it shall be deemed received at the opening of the next New York Business Day, or (2) on and after the effective date of the confirmation rules set forth in CFTC Regulation 23.501, such earlier time as is set forth in the compliance schedule in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c). "*New York Business Day*" shall mean any day except for a Saturday, Sunday or a day on which the Federal Reserve Bank of New York is closed.

Notwithstanding the provisions of Section 12(a)(iii) of the Agreement, a written Confirmation and any other writing related to or in response to a written Confirmation shall be deemed delivered to the receiving party (i) when actually received by the receiving party or (ii) with respect to a written Confirmation and other writing delivered by facsimile, when the sending party's facsimile machine indicates by an electronic or written facsimile log that the receiving party's facsimile machine received such written Confirmation.

44

Party A shall not be required to maintain or retain a paper-based version of the written Confirmation delivered to Party B. In addition to a paper-based version of the written Confirmation delivered to Party B, the following shall constitute a "written Confirmation" for all purposes of this Agreement: (i) an electronic image of a paper-based version of the written Confirmation, and (ii) data in Party A's computer system.

Any document generated by the parties with respect to a Transaction, including this Agreement, may be imaged and stored electronically ("*Imaged Documents*"). Imaged Documents may be introduced as evidence in any proceeding as if such were original business records and neither party shall contest the admissibility of Imaged Documents as evidence in any proceeding."

(iii)    Notwithstanding the foregoing, the Confirming Party will endeavour to send the Confirmation to the other Party as soon as technologically practicable, but in any event will endeavour to do so in accordance with the compliance schedule set forth in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c).

(i)    *Notices*. The wording of Section 12(a)(iii) shall be replaced in its entirety by the following:

"if sent by facsimile transmission, on receipt by the sender of a valid transmission report."

(j)    ***ISDA Definitions and Inconsistency***.

(i)    This Agreement, each Confirmation and each Transaction between the parties are subject to the 2005 ISDA Commodity Definitions as published by the International Swaps and Derivatives Association, Inc., ("the Definitions"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof. The provisions of the Definitions are incorporated by reference and shall be deemed a part of this Agreement, except that sub-annexes B to I inclusive shall not apply.

(ii)    In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of any Credit Support Document and the Definitions, the Credit Support Document will prevail. Subject to Section 1(b) of this Agreement, in the event of any inconsistency between the provisions of any Confirmation and this Agreement or the Definitions, the Confirmation will prevail for the purpose of the relevant Transaction.

(k)    ***Market Disruption Events; Additional Market Disruption Events***.

(i)    The "Market Disruption Events" specified in Section 7.4(c) of the Definitions shall apply; and

(ii)    "Additional Market Disruption Events" shall apply only if specified in the relevant Confirmation.

(l)    ***Disruption Fallbacks***.

The "Disruption Fallbacks" specified in Section 7.5(c) of the Definitions shall apply, except that:

(i)     "Fallback Reference Price" shall not apply;

(ii)    for the purposes of Section 7.6 of the Definitions, the Maximum Days of Disruption will be five (5) Commodity Business Days; and

(iii)   "Reference Dealers" means, with respect to any transaction for which the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four independent leading dealers selected in good faith and jointly agreed upon by the parties satisfying all the criteria that the parties apply generally at the time of deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to this Transaction. Such dealers will be appointed to make a determination of the Commodity-Reference Price, taking into consideration the latest available quotation for the Commodity-Reference Price and any other information that in good faith they deem relevant. If the parties have not agreed upon the appointment of the dealers on or before the sixth Commodity Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, or if a determination of the relevant Commodity-Reference Price cannot be obtained from at least four dealers, the next applicable Disruption Fallback will apply to the Transaction.

(m)   *Severability.* In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavour, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(n)   *Payment Date During Transfer Period.* If the parties are required by Section 6(b)(ii) to make efforts to transfer certain obligations under this Agreement in connection with a Termination Event, and a Payment Date (as defined in the related Confirmation) will occur under the relevant Affected Transaction during the period specified in Section 6(b) for those efforts, then the payment(s) due to be made on that Payment Date shall be postponed until the earlier of (i) the Local Business Day following the day on which a transfer is effected in consequence of such efforts; (ii) the Local Business Day following the day on which such period ends, if an Early Termination Date is not designated by a party on such day; and (iii) the Early Termination Date for the relevant Affected Transaction, with such postponed payment(s) then being treated as Unpaid Amounts. In either case, the postponed payment(s) shall bear interest (before as well as after judgment) at the Applicable Deferral Rate from (and including) such Payment Date to (but excluding) the date of actual payment.

(o)   *Termination Payments by Non-defaulting Party.* Notwithstanding the provisions of Sections 6(d) and 6(e) of the Agreement, if there is a Defaulting Party, the obligations of the Non-defaulting Party to pay to the Defaulting Party any amount under Section 6(e) shall not arise until, and shall be subject to the conditions precedent that, the Non-defaulting Party shall have received confirmation satisfactory to it in its sole discretion

46

that (i) all Transactions are terminated in accordance with Section 6(c), and (ii) all obligations (contingent or absolute, matured or unmatured) of the Defaulting Party and any Affiliate of the Defaulting Party to make any payment to the Non-defaulting Party or any Affiliate of the Non-defaulting Party shall have been fully and finally performed; and provided, further, that if under the foregoing provisions it is determined that the Non-defaulting Party is to make a payment to the Defaulting Party, there shall be deducted from the amount of such payment all amounts which the Defaulting Party may be obligated to pay under Section 11.

(p)    *Confidentiality.*  The contents of this Agreement and all other documents relating to this Agreement, and any information (including any financial information) made available by one party or its Credit Support Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either party) without the prior written consent of the other party, except for such information (i) as may become generally available to the public, (ii) as may be necessary to enforce this Agreement or implement any Transaction hereunder, (iii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iv) as may be necessary to comply with a regulatory agency's reporting requirements, including but not limited to gas cost recovery proceedings; (v) as may be delivered to such third party for the sole purpose of calculating a published index; (vi) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing party or its Credit Support Provider in making such disclosure, or (vii) as may be furnished to the disclosing party's Affiliates, and to each of such person's auditors, attorneys, advisors, lenders, monitors or prospective purchasers of all or substantially all of a party's assets or any of its rights under this Agreement, provided such persons are required to keep the information that is disclosed in confidence.  Notwithstanding the foregoing, (i) if information would be permitted to be disclosed pursuant to DF Supplement Section 2.13, then such disclosure shall be permitted under any other applicable confidentiality provision or agreement, and (ii) information may be disclosed to any regulatory agency (including any governmental authority, swap data repository or other like agency or entity) as a party may determine is advisable in accordance with such party's reporting policies and procedures.  Any confidential information received by a party may be used by such party and, to the extent disclosure is not restricted hereunder, may be disclosed and used by such permitted recipients, including in each case use by persons acting in a structuring, sales or trading capacity.  With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the expiration or termination of this Agreement, provided, however, that with respect to information provided with respect to a Transaction, this obligation shall only survive for a period of one (1) year following the expiration or termination of such Transaction.

(q)    ***LIMITATION OF LIABILITY.  NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR PUNITIVE, EXEMPLARY, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE OR STRICT LIABILITY) TO ANY OTHER PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT OR THE OBLIGATION TO PAY ANY AMOUNT REQUIRED PURSUANT TO SECTION 6(e) OF THIS AGREEMENT.  IF AND TO THE EXTENT ANY***

**PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.**

(r)     *Definitions.*  Section 14 shall be amended to add the following definitions:

*"EDI"* shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of a Transaction.

"**Specified Transaction**"  shall be amended by adding "renewable energy certificates" after the words "emission allowances".

(s)     *2002 Master Agreement Protocol.*  The parties agree that, with effect from the date of this Agreement, the terms of each Annex to the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association Inc. on July 15, 2003, (the "Protocol") shall apply to this Agreement as if the parties had adhered to the Protocol without amendment.

(t)     **WAIVER OF RIGHT TO TRIAL BY JURY.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(u)     *Right to Clear and Choose DCO.*  Notwithstanding anything in DF Supplement Section 2.24, if a Transaction is subject to mandatory clearing requirements under Section 2(h) of the CEA, and the party other than BP Energy Company fails to designate a DCO in connection with the execution of the Transaction, then BP Energy Company may select a DCO to which the other party has transaction rights to be the DCO for such Transaction on behalf of such other party.

(v)     Agera's CFTC Interim Compliant Identifier ("CICI") is 5493001EC1BRJMR5LR84.

(w)     energy.me's    CFTC    Interim    Compliant    Identifier    ("CICI")    is 549300QQZTUEL8GAA162.

(x)     Aequitas  Energy  Inc.'s  CFTC  Interim  Compliant  Identifier  ("CICI")  is 5493001DR8JDUWZBE084.

(y)     *Withholding Tax Imposed on Payments to Non-US Counterparties Under the United States Foreign Account Tax Compliance Act.*  "Tax" as used in Part 2(a) of this Schedule (Payer Tax Representation) and "Indemnifiable Tax" as defined in Section 14 of this Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a *"FATCA Withholding Tax"*).  For the avoidance of doubt, a FATCA

48

Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of this Agreement.

## Part 6. Physically Settled Power Transactions

(a) **ISDA North American Power Annex**. The North American Power Annex to the ISDA Master Agreement published by ISDA (attached hereto as Attachment A), as amended, supplemented, replaced or modified from time to time, (the "Power Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physically settled power, except as otherwise specifically provided in the relevant Confirmation. The Commodity Definitions are incorporated in this Power Annex for all purposes. All terms used in this Part 6 that are not otherwise defined shall have the meanings given to them in the Power Annex.

(b) The following shall amend and replace clause (j) of the Power Annex:

### (j) Elective Provisions

1. (a)(ii) _X_ Applicability of Part 6 to Outstanding Power Transactions. If not checked, not applicable.

2. (a)(iii) _X_ Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions. If not checked, not applicable.

3. (c) _X_ Accelerated Payment Damages. If not checked, not applicable.

4. (d)(ii): **Timeliness of Payment**

   |       |          |
   | ----- | -------- |
   | ___   | Option A |
   | _X_   | Option B |

   If neither is checked, Option B shall be deemed to apply.

5. (h)(i): **Wholesale Power Tariffs**

   _X_          Party A Electric Tariff. FERC Electric Tariff Accepted by FERC: 02/18/14    Effective Date: 12/21/2013    Docket Number ER14-779

___X___          **Agera Energy LLC**: FERC Electric Tariff.
Tariff/Date/Docket:    Agera Energy LLC – Docket
Nos.    ER14-2472-000    and    ER14-2472-001/
September 30, 2014; **energy.me midwest llc**: FERC
Electric    Tariff:    Docket    No.    ER15-1721-000,
Effective Date July 15, 2015  and **Aequitas Energy
Inc.**:  FERC Electric Tariff:  Accepted by FERC:
06/20/12 Effective Date: 08/07/12 Docket Number
ER12-2065-001

If not checked, not applicable.

6.   (h)(ii) __ Applicability of Severability provision.  If not checked, not applicable.

7.   (h)(iii)_X_  Applicability of FERC Standard of Review and Certain Covenants
and Waivers.  If not checked, not applicable.


(c)      **Notice Information for Power Transactions.**

| Name: ("*BP Energy Company*" or  "*Party A*") | Name: ("*Agera Energy LLC*" or "*Party B*") |
|---|---|
| **All Notices:** | **All Notices:** |
| Street: 201 Helios Way | Street: 555 Pleasantville Rd Suite 107 |
| City:    Houston, Texas | City:  Briarcliff Manor |
| Zip:      77079 | Zip: 10510 |
| Attn:    Contract Services - Power | Attn:  Phil Spillane |
| Phone:      713-323-2000 | Phone: 914-236-1420 |
| Facsimile: 713-323-0203 | Facsimile: 888-721-5019 |
| Duns:      62-527-5755 | Duns:  Not Applicable |
| Federal Tax ID Number: 36-3421804 | Federal Tax ID Number:  46-5028122 |
| **Invoices:** | **Invoices:** |
| Attn:      Power Accounting | Attn:  Accounts Payable |
| Phone:      713-323-1041 | Phone: 9142055835 |
| Facsimile: 713-323-7457 | Facsimile: 888-272-3761 |
| **Confirmations:** | **Confirmations: ATTN POWER SUPPLY** |
| Attn:      Confirmations - Power | Attn: Phil Spillane |
| Phone:      713-323-3806 | Phone: 914-236-1420 |
| Facsimile:    281-227-8470 | Facsimile:  888-721-5019 |
| **Scheduling:** | **Scheduling:** |
| Attn:      Scheduling | Attn:  Andrew Luscz |
| Phone:      713-323-5262 | Phone:  914-205-5851 |
| Facsimile:  713-323-7909 | Facsimile:  888-721-5019 |
| **Payments:** | **Payments:** |
| Attn:      Power Accounting | Attn:  Accounts Payable |
| Phone:      713-323-1041 | Phone:  914-205-5835 |
| Facsimile:  713-323-7457 | Facsimile:  888-721-5019 |
| **Wire Transfer:** | **Wire Transfer:** |
| BNK:    JPMorgan Chase Bank, NA | BNK:  First National Bank of Central Texas |
| New York, NY 10081-6000 | ABA:  111903245 |
| ABA:    021-000021 | ACCT:  40038762 |

| | |
|---|---|
| ACCT: 826078354 | |
| **Credit and Collections:**<br>Attn:       Credit - Power<br>Phone:      713-323-4927<br>Facsimile:  713-323-7459 | **Credit and Collections:**<br>Attn:  Ryan Booth<br>Phone:<br>Facsimile:  888-721-5019 |
| **With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:**<br><br>Attn:       Head of Credit<br>Phone:      713-323-4899<br>Facsimile:  713-323-7459; and<br><br>Attn:       Legal-Power<br>Phone:      713-323-3735<br>Facsimile:  713-323-7472 | **With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:**<br><br>Attn:  VP Finance Mike Olowin<br>Phone:  914-205-5831<br>Facsimile:<br><br>Attn: General Counsel – Michael Nordlicht<br>Phone: 914-236-1406 |
| | |
| | **Name:  ("*energy.me midwest llc*" or "*Party B*")**<br>**All Notices:**<br>Street:  555 Pleasantville Rd Suite 107<br>City:  Briarcliff Manor<br>Zip:  10510<br>Attn:  Phil Spillane<br>Phone:  914-236-1420<br>Facsimile: 888-721-5019<br>Duns:  Not Applicable<br>Federal Tax ID Number:  45-1599484 |
| | **Invoices:**<br>Attn:  Accounts Payable<br>Phone:  9142055835<br>Facsimile:  888-272-3761 |
| | **Confirmations:  ATTN POWER SUPPLY**<br>Attn:  Phil Spillane<br>Phone:  914-236-1420<br>Facsimile:  888-721-5019 |
| | **Scheduling:**<br>Attn:  Andrew Luscz<br>Phone:  914-205-5851<br>Facsimile:  888-721-5019 |
| | **Payments:**<br>Attn:  Accounts Payable<br>Phone:  914-205-5835<br>Facsimile:  888-721-5019 |
| | **Wire Transfer:**<br>BNK:  JPMorgan Chase Bank, N.A.<br>ABA:  021000021<br>ACCT:  139511500 |
| | **Credit and Collections:** |

| | |
|---|---|
| | Attn:  Ryan Booth<br>Phone:<br>Facsimile:  888-721-5019 |
| | **With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:**<br><br>Attn:  VP Finance Mike Olowin<br>Phone:  914-205-5831<br>Facsimile:<br><br>Attn: General Counsel – Michael Nordlicht<br>Phone: 914-236-1406 |
| | |
| | |
| | Name:  (*"Aequitas Energy Inc."* or *"Party B"*)<br>**All Notices:**<br>Street:  555 Pleasantville Rd Suite 107<br>City:  Briarcliff Manor<br>Zip:  10510<br>Attn:  Phil Spillane<br>Phone:  914-236-1420<br>Facsimile:  888-721-5019<br>Duns:  Not Applicable<br>Federal Tax ID Number:  45-5257988 |
| | **Invoices:**<br>Attn:  Accounts Payable<br>Phone:  914-205-5835<br>Facsimile:  888-272-3761 |
| | **Confirmations:  ATTN POWER SUPPLY**<br>Attn:  Phil Spillane<br>Phone:  914-236-1420<br>Facsimile:  888-721-5019 |
| | **Scheduling:**<br>Attn:  Andrew Luscz<br>Phone:  914-205-5851<br>Facsimile:  888-721-5019 |
| | **Payments:**<br>Attn:  Accounts Payable<br>Phone:  914-205-5835<br>Facsimile:  888-721-5019 |
| | **Wire Transfer:**<br>BNK:  First National Bank of Central Texas<br>ABA:  111903245<br>ACCT:  40038739 |
| | **Credit and Collections:**<br>Attn:  Ryan Booth |

|  | Phone:<br>Facsimile:  888-721-5019 |
|  | **With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:**<br><br>Attn:  VP Finance Mike Olowin<br>Phone: 914-205-5831<br>Facsimile:<br><br>Attn: General Counsel – Michael Nordlicht<br>Phone: 914-236-1406 |

(d)     **Additional Provisions to this Power Annex.**

1.      Clause (a)(ii) is amended by inserting the phrase "under any EEI Master Power Purchase and Sale Agreement or WSPP Agreement" immediately after the word "outstanding" and before the parenthetical in the first (1st) sentence therein.

2.      Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (1st) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement.  If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.      Clause (b)(ii) shall be amended by adding the following at the end thereof:

"With respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in the Electric Reliability Council of Texas ("ERCOT") region, the following shall apply, notwithstanding any other Scheduling deadlines in the ERCOT Nodal Protocols:

(A) Definitions:     "DRUC Schedule Deadline" means the time at which ERCOT is required to start the DRUC process relating to such day of delivery.

"HRUC Schedule Deadline" means the time at which ERCOT is required to start an HRUC process relating to such hour of delivery.

"First HRUC Schedule Deadline" means the HRUC Schedule Deadline which immediately follows the time at

53

which the Parties entered into the Transaction and which occurs after the start of the next clock hour.

(B)  HRUC Scheduling Requirement: Buyer and Seller shall Schedule each hour's deliveries of the Product with ERCOT prior to the First HRUC Schedule Deadline unless the time at which the Transaction was entered into is less than thirty (30) minutes prior to the start of the next clock hour, in which case the HRUC Schedule Deadline immediately following the First HRUC Schedule Deadline shall be the applicable scheduling deadline."

(C)  DRUC Scheduling Requirement:  If a Transaction is entered into prior to that day's DRUC Schedule Deadline, Buyer and Seller shall Schedule such day's deliveries of the Product with ERCOT prior to that day's DRUC Schedule Deadline."

4.      Clause (c)(i) shall be relabelled (c)(i)(a) and a new clause (c)(i)(b) shall be added to deal with Seller Failure with respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in ERCOT:

"(c)(i)(b) Seller Failure in ERCOT for Firm (LD) Transactions and Firm (No Force Majeure) Transactions. If Seller fails to schedule and/or deliver all or part of the Product pursuant to a Transaction, and such failure is not excused under the terms of the Product or by Buyer's failure to perform, then Seller shall pay Buyer, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in the Elective Provisions of the ISDA Power Annex, within five (5) Business Days of invoice receipt, (i) an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Contract Price from the Replacement Price and (ii) an amount equal to the ERCOT charges incurred by Buyer, if any, as a result of Seller's failure to Schedule a Firm (LD) or Firm (No Force Majeure) Transaction in the ERCOT region prior to any applicable DRUC Schedule Deadline or HRUC Schedule Deadline under clause (b)(ii). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount."

5.      Clause (c)(ii) shall be relabelled (c)(ii)(a) and a new clause (c)(ii)(b) shall be added to deal with Buyer Failure with respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in ERCOT:

"(c)(ii)(b) Buyer Failure in ERCOT for Firm (LD) Transactions and Firm (No Force Majeure) Transactions. If Buyer fails to schedule and/or receive all or part of the Product pursuant to a Transaction and such failure is not excused under the terms of the Product or by Seller's failure to perform, then Buyer shall pay Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in the Elective Provisions of the ISDA Power Annex, within five (5) Business Days of invoice receipt, (i) an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Sales Price from the Contract Price; and (ii) an amount equal to the ERCOT charges incurred by Seller, if any, as a result of Buyer's failure to Schedule a Firm (LD) or Firm (No Force Majeure) Transaction prior to any applicable DRUC Schedule Deadline or HRUC Schedule Deadline

under clause (b)(ii). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount."

6.    The following provisions shall be added as new clauses (c)(iv) and (c)(v) herein:

"**(iv)    *Mitigation*.**  Each party has a duty to mitigate damages provided under this Power Annex and will use commercially reasonable efforts to minimize any damages it may incur resulting from the other party's performance or nonperformance under any Power Transaction.

**(v)    *Exclusivity*.**  So long as any failure of Seller to schedule or deliver, or any failure of Buyer to schedule or receive, the Product hereunder does not constitute or result in an Event of Default under this Agreement, the remedies specified in this clause (c) of the Power Annex shall be the exclusive remedies available to Buyer to schedule or receive the Product hereunder, and no other liability under any theory of law or equity shall attach in connection with such failure."

7.    Clause (d)(iv) is amended by deleting the word "outstanding" in the second (2nd) line therein and replacing it with the word "Outstanding".

8.    Clause (e) is amended by deleting from the second paragraph the second sentence and all those sentences following in such paragraph.

9.    Clause (h)(iii) is deleted in its entirety and replaced with the following provision:

"**(iii)    *FERC Standard of Review; Certain Covenants and Waivers*.**  If elected under (j) as being applicable:

(a)    Absent the agreement of all parties to the proposed change, the standard of review for changes to any rate, charge, classification, term or condition of this Agreement, whether proposed by a party (to the extent that any waiver in clause (h)(iii) below is unenforceable or ineffective as to such party), a non-party or FERC acting *sua sponte*, shall solely be the "public interest" application of the "just and reasonable" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) and clarified by Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish 128 S.Ct. 2733 (2008) (the "Mobile-Sierra doctrine").

(b)    Standard of Review for ERCOT Transactions.  Absent the agreement of all parties to the proposed change, the standard of review for changes to any portion of this Agreement with respect to any Transaction entered into hereunder having a Delivery Point in the Electric Reliability Council of Texas, whether proposed by a party (to the extent that any waiver in clause (h)(iii)(c) below is unenforceable or ineffective as to such Party), a non-party, or the Public Utility Commission of Texas ("PUC") acting *sua sponte*, shall be the "public interest" standard of review set forth in High Plains Natural Gas Co. v. Railroad Commission, Tex. Civ. App. - Austin 1971, writ ref'd n.r.e.

55

(c)      In addition, and notwithstanding the foregoing (h)(iii)(a) and (b), to the fullest extent permitted by applicable law, each party, for itself and its successors and assigns, hereby expressly and irrevocably waives any rights it can or may have, now or in the future, whether under §§ 205 and/or 206 of the Federal Power Act or otherwise, to seek to obtain from FERC or PUC by any means, directly or indirectly (through complaint, investigation or otherwise), and each hereby covenants and agrees not at any time to seek to so obtain, an order from FERC or PUC changing any section of this Agreement specifying the rate, charge, classification, or other  term or condition agreed to by the parties, it being the express intent of the parties that, to the fullest extent permitted by applicable law, neither party shall unilaterally seek to obtain from FERC or PUC any relief changing the rate, charge, classification, or other term or  condition of this Agreement, notwithstanding any subsequent changes in applicable law or market conditions that may occur.  In the event it were to be determined that applicable law precludes the parties from waiving their rights to seek changes from FERC to their market-based power sales contracts (including entering into covenants not to do so) then this clause (h)(iii)(c) shall not apply, provided that, consistent with the foregoing clauses (h)(iii)(a) and (b), neither party shall seek any such changes except solely under the "public interest" application of the "just and reasonable" standard of review and otherwise as set forth in the foregoing clauses (h)(iii)(a) and (b).

(d)      The parties agree that in the event that any portion of this clause (h)(iii) is determined to be invalid, illegal or unenforceable for any reason, the provisions of clauses (h)(iii)(a) and (b) shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law."

10.      Clause (i)(ii) of this Power Annex is deleted in its entirety and replaced with the following provision:

"(ii)      Events of Default:  Sections 5(a)(i) and 5(a)(ii).

(A)      Section 5(a)(i).  With respect to all Power Transactions, the words "or delivery" in the second line of Section 5(a)(i) of this Agreement are hereby deleted.

(B)      Section 5(a)(ii)(1).  With respect to all Power Transactions, (i) the words "or delivery" in the second line of Section 5(a)(ii)(1) are hereby deleted, and (ii) the words "or to deliver or receive the Product, the exclusive remedy for which is provided for in clause (c) of the Power Annex" are hereby added at the end of the parenthetical of Section 5(a)(ii)(1) of this Agreement.

11.      Clause (i)(iii) is deleted in its entirety and shall not otherwise apply to any Power Transactions under this Agreement.

12.      The following definition shall be added to clause (i)(iv):

""Claims" means with respect to Power Transactions all third party claims or actions, threatened or filed and, whether groundless, false, fraudulent or

56

otherwise, that directly or indirectly relate to the subject matter of an indemnity, and the resulting losses, damages, expenses, attorneys' fees and court costs, whether incurred by settlement or otherwise, and whether such claims or actions are threatened or filed prior to or after the termination of this Agreement."

13. The definition of "Force Majeure" in clause (i)(iv) herein is amended as follows:

   a. The following provision is inserted after the word "hereunder" in subsection (ii) therein:

   "or to obtain the Product at a more advantageous price or under more advantageous terms and conditions."

   b. The following provision is inserted after the phrase "Contract Price" in subsection (iv) therein:

   "or under more advantageous terms to a third party purchaser."

14. The definition of "Replacement Price" in clause (i)(iv) herein is amended by inserting "for delivery" in the second line after the text "at the Delivery Point".

15. The definition of "Sales price" is amended to delete the phrase "at the Delivery Point" from the second line.

16. <u>Illegality and Tax Event</u>. With respect to any Power Transaction entered into under this Agreement, Sections 5(b)(i) and 5(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Power Transaction.

17. <u>Additional Representations</u>. With respect to any Power Transaction entered into under this Agreement, the following representations shall apply with respect to each party:

   a. <u>UCC Applicable</u>. Notwithstanding the laws of the State of New York to the contrary, the parties represent and agree that (i) each Product is a "good" as such term is defined in the Uniform Commercial Code of the State of New York, and (ii) all of the provisions of the Uniform Commercial Code of the State of New York shall apply to this Agreement and all Transactions.

   b. <u>Utility Disclaimer</u>. Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and further agrees that the other party is not a provider of last resort.

18. <u>Other Products and Related Definitions</u>. The following provisions and definitions shall apply with respect to Power Transactions:

   a. If the parties agree to a service level defined by a different agreement (i.e., the WSPP agreement, the ERCOT agreement, etc.) for a particular Transaction, then, unless the parties expressly state and agree that all the terms

57

and conditions of such other agreement will apply, such reference to a service level/product defined by such other agreement means that the service level for that Transaction is subject to the applicable regional independent system operator and/or utility reliability requirements and guidelines as well as the permitted excuses for performance, Force Majeure, Uncontrollable Forces, or other such excuses applicable to performance under such other agreement, to the extent inconsistent with the terms of this Agreement, but all other terms and conditions of this Agreement remain applicable.

b.     "West Firm" means with respect to a Transaction, a Product that is or will be scheduled as firm energy consistent with the most recent rules adopted by the WECC for which the only excuses for failure to deliver or receive are if an interruption is (i) due to an Uncontrollable Force as provided in Section 10 of the WSPP Agreement; or (ii) where applicable, to meet Seller's public utility or statutory obligations to its customers.  Notwithstanding any other provision in this Agreement, if Seller exercises its right to interrupt to meet its public utility or statutory obligations, Seller shall be responsible for payment of damages for failure to deliver firm energy as provided in Part 6(c) of this Agreement.

c.     "CAISO Energy" means with respect to a Transaction, a Product under which the Seller shall sell and the Buyer shall purchase a quantity of energy equal to the hourly quantity without Ancillary Services (as defined in the Tariff) that is or will be scheduled as a schedule coordinator to schedule coordinator transaction pursuant to the applicable tariff and protocol provisions of the California Independent System Operator ("CAISO") (as amended from time to time, the "Tariff") for which the only excuse for failure to deliver or receive is an Uncontrollable Force (as defined in the Tariff).

19.    <u>Adequate Assurance of Performance</u>.  With respect to any Power Transaction entered into under this Agreement, if either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Agreement (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y or its Guarantor, if applicable), X may demand Adequate Assurance of Performance.  "Adequate Assurance of Performance" shall mean sufficient security in the form, amount, for a term, and from an issuer, all as reasonably acceptable to X, including, but not limited to cash, a standby irrevocable Letter of Credit, a prepayment, a security interest in an asset or guaranty.  Y hereby grants to X a continuing first priority security interest in, lien on, and right of setoff against all Adequate Assurance of Performance in the form of cash transferred by Y to X pursuant to this section.  Upon the return by X to Y of such Adequate Assurance of Performance, the security interest and lien granted hereunder on that Adequate Assurance of Performance shall be released automatically and, to the extent possible, without any further action by either party.  Notwithstanding any other provision contained herein, it shall constitute an Event of Default under Section 5(a)(i) of this Agreement if a party fails to provide Adequate Assurance of Performance under this section within forty-eight (48) hours but at least one (1) Local Business Day of a written request by the other party.

## Part 7. ISDA North American Gas Annex

(a) **ISDA North American Gas Annex.** The North American Gas Annex to the ISDA Master Agreement published by ISDA (attached hereto as <u>Attachment B</u>), as amended, supplemented, replaced or modified from time to time, (the "Gas Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physical gas, except as otherwise specifically provided in the relevant Confirmation. The Commodity Definitions and the provisions of Part 7 are incorporated in this Gas Annex for all purposes. All terms used in this Part 7 that are not otherwise defined shall have the meanings given to them in the Gas Annex.

(b) The following shall amend and replace clause (l) of the Gas Annex:

**(l)    Elective Provisions**

1.    **(a)(ii) – Outstanding Gas Transactions.** This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

  _X_ Option A:  All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

  ___ Option B:  The Gas Transactions listed in Schedule 1 to this Gas Annex.

  ___ Option C:  None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

  If none of the above options is selected, Option A shall apply.

2.    **(a)(iii) – Outstanding Gas Credit Support**

  _X_ Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).

  If not checked, not applicable.

3.    **(b)(ii) – Performance Obligation** (remedy for breach of Firm obligation)

  _X_ Option A:  Cover Standard

  ___ Option B:  Spot Price Standard

  If neither option is selected, Option A shall apply.

4.    **(e) – Taxes**

  _X_ Option A: Buyer Pays At and After Delivery Point

  ___ Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

5.    **(f)(ii) – Payment Date**

 X  Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option B: the later of the ___ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6.    **(k)(xxii) – Alternative to Spot Price Index.**  The parties have selected the following alternative index as the Spot Price Index: _____.  If no index is specified, the Spot Price Index specified in clause (k)(xxii) applies.

(c)    The following shall amend and replace clause (m) of the Gas Annex:

**(m)    Notices for Gas Transactions**

| PARTY A | AGERA |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
|  |  |
| Address:  P.O. Box 3092<br>            Houston, TX  77253-3092 | Address: 555 Pleasantville Rd<br>Suite 107 Briarcliff Manor NY 10510 |
| Attn:  Gas Accounting | Attn:  Sariah Rodriquez |
| Phone:  (713) 323-2000 | Phone: 914-236-1423 |

| Facsimile: (713) 323-5313 | Facsimile: 888-721-5019 |
|---|---|
| **Nominations:** | **Nominations:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn: Gas Scheduling | Attn: Sariah Rodriquez |
| Phone: (713) 323-2000 | Phone: 914-236-1423 |
| | Facsimile: 888-721-5019 |
| | |
| **Confirmations:** | **Confirmations:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Address: BP Energy Company P.O. Box 3092 Houston, Texas 77253-3092 | Address: |
| Attn: Confirmations Dept. | Attn: Sariah Rodriquez |
| Phone: (713) 323-2000 | Phone: 914-236-1423 |
| Facsimile: (281) 227-8470 | Facsimile: 888-721-5019 |

| **Option Exercise:** | **Option Exercise:** |
|---|---|
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn: | Attn: Andrew Luscz |
| Phone: | Phone: 914-205-5851 |
| Facsimile: | Facsimile:888-721-5019 |

| **☐Wire Transfer - or - ☐ACH (check one box):** | **☐Wire Transfer - or - ☐ACH (check one box):** |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below: Bank: JP Morgan Chase Bank, NY ABA: 021000021 Account: 910-2-548097 Other Details: For the account of BP Energy Company | As set forth in Part 4 of the Schedule unless otherwise set forth below: Bank:First National Bank of Central Texas ABA:111903245 Account: 40038762 Other Details:_Agera Energy |

| **PARTY A** | **ENERGY.ME** |
|---|---|
| **Invoices:** | **Invoices:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |

| | |
|---|---|
| Address: P.O. Box 3092<br>Houston, TX  77253-3092 | Address: 555 Pleasantville Rd<br>Suite 107 Briarcliff Manor NY 10510 |
| Attn: Gas Accounting | Attn: Sariah Rodriquez |
| Phone: (713) 323-2000 | Phone: 914-236-1423 |
| Facsimile: (713) 323-5313 | Facsimile: 888-721-5019 |
| | |
| **Nominations:** | **Nominations:** |
| | |
| As set forth in Part 4 of the Schedule  unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn: Gas Scheduling | Attn: Sariah Rodriquez |
| Phone: (713) 323-2000 | Phone: 914-236-1423 |
| | Facsimile: 888-721-5019 |
| | |
| **Confirmations:** | **Confirmations:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Address: BP Energy Company<br>P.O. Box 3092<br>Houston, Texas 77253-3092 | Address: |
| Attn: Confirmations Dept. | Attn: Sariah Rodriquez |
| Phone: (713) 323-2000 | Phone: 914-236-1423 |
| Facsimile: (281) 227-8470 | Facsimile: 888-721-5019 |

| | |
|---|---|
| **Option Exercise:** | **Option Exercise:** |
| | |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| | |
| Attn: | Attn: Andrew Luscz |
| Phone: | Phone: 914-205-5851 |
| Facsimile: | Facsimile:888-721-5019 |

| | |
|---|---|
| ☐**Wire Transfer - or - ☐ACH (check one box):** | ☐**Wire Transfer - or  - ☐ACH (check one box):** |
| | |
| As set forth in Part 4 of the Schedule unless set forth below:<br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account:  910-2-548097<br>Other Details: For the account of BP Energy Company | As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: JPMorgan Chase Bank, N.A.<br>ABA: 021000021<br>Account: 139511500<br>Other Details: energy.me midwest llc |

| PARTY A | AEQUITAS |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Address:  P.O. Box 3092<br>           Houston, TX  77253-3092 | Address: 555 Pleasantville Rd<br>Suite 107 Briarcliff Manor NY 10510 |
| Attn:  Gas Accounting | Attn:  Sariah Rodriquez |
| Phone:  (713) 323-2000 | Phone: 914-236-1423 |
| Facsimile:  (713) 323-5313 | Facsimile: 888-721-5019 |
| **Nominations:** | **Nominations:** |
| As set forth in Part 4 of the Schedule  unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn:  Gas Scheduling | Attn:  Sariah Rodriquez |
| Phone:  (713) 323-2000 | Phone: 914-236-1423 |
|  | Facsimile: 888-721-5019 |
| **Confirmations:** | **Confirmations:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Address:  BP Energy Company<br>P.O. Box 3092<br>Houston, Texas 77253-3092 | Address: |
| Attn: Confirmations Dept. | Attn:  Sariah Rodriquez |
| Phone: (713) 323-2000 | Phone: 914-236-1423 |
| Facsimile: (281) 227-8470 | Facsimile: 888-721-5019 |

| Option Exercise: | Option Exercise: |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: | Attn:  Andrew Luscz |
| Phone: | Phone: 914-205-5851 |
| Facsimile: | Facsimile:888-721-5019 |

63

| □Wire Transfer - or - □ACH (check one box): | □Wire Transfer - or - □ACH (check one box): |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy Company | As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank:First National Bank of Central Texas<br>ABA:111903245<br>Account: 40038739<br>Other Details: Aequitas Energy Inc. |

(d)    The following shall amend and replace clause (n) of the Gas Annex:

**(n)    Other Provisions/Modifications to this Gas Annex.**

1.    Clause (a)(i) is amended by deleting the phrase "North America" in the first (1st) sentence therein and replacing it with the phrase "the United States".

2.    Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (1st) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement. If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.    Clause (b)(i) is amended by adding the following at the end thereof:

"Unless expressly agreed to by the parties under a Confirmation, Seller is under no obligation to source the Gas being sold to Buyer from storage."

4.    Clause (b) is amended by adding the following provision as a new clause (b)(iv):

"(iv)    In the event that the Contract Price for a Transaction is a Fixed Price (as defined below), and such Transaction (a) has a Firm performance obligation, and (b) a Delivery Period of at least one Month, then, notwithstanding anything to the contrary in this Contract, including, without limitation, anything in clause (b)(ii) or clause (h) of this Gas Annex:

(i)    if, upon the occurrence of an event of Force Majeure, and as a result of the event of Force Majeure (a) Seller is unable to sell and deliver or (b) Buyer is unable to purchase and receive, the Contract Quantity of Fixed Price Gas, either in whole or in part, for such Transaction,

64

(ii)     then, for the duration of the event of Force Majeure, for each Day that Seller is unable to sell and deliver, or Buyer is unable to purchase and receive, such Fixed Price Gas, as set out in clause (b)(iv)(i) above, the following settlement obligations between the parties shall apply:

a.      if the FOM Price (as defined below) exceeds the Fixed Price, Seller shall pay Buyer the difference between the FOM Price and the Fixed Price for each MMBtu of such Gas not delivered and/or received on that Day, or

b.      if the Fixed Price exceeds the FOM Price, Buyer shall pay Seller the difference between the Fixed Price and the FOM Price for each MMBtu of such Gas not delivered and/or received on that Day.

For the purpose of this clause (b)(iv):

"Fixed Price" means, a Contract Price for a Gas Transaction that is expressed as a flat dollar amount for the Month of delivery, excluding any Gas Transactions that have been entered into after the last trading day (as defined by the NYMEX) for the applicable Month.  Subject to the foregoing exclusion, "Fixed Price" also includes any Gas Transaction containing a Contract Price or a component of a Contract Price that has been converted from a floating price mechanism (i.e., a NYMEX/first of the month index basis component and a fixed price or floating price component, or a NYMEX/first of the month index priced component with a fixed basis component) to a flat dollar amount for any Month of delivery, either upon the mutual agreement of the parties or as a result of a party exercising a pricing "trigger" option in the relevant Gas Transaction.

"FOM Price" means the price per MMBtu, stated in the same currency as the Gas Transaction subject to such event of Force Majeure, for the first of the Month delivery, either as the NYMEX settlement price or as an index price published in the first issue of a publication commonly accepted by the natural gas industry (selected by the Seller in a commercially reasonable manner) for the Month of such event of Force Majeure for the geographic location closest in proximity to the Delivery Point(s) for the relevant Day, adjusted for the basis differential between the Delivery Point(s) and the NYMEX or such published geographic location as determined by the Seller in a commercially reasonable manner."

5.    Clause (h)(iii) is amended by deleting the word "or" located between the semicolon (";") and "(C)" on the fifth (5th) line therein, and inserting the word "or" between the semicolon (";") and "(E)" on the eleventh (11th) line therein.

6.    Clause (h)(iv) is hereby deleted in its entirety and replaced with the following provision:

"Notwithstanding anything to the contrary in this clause (h), the parties agree that the settlement of strikes, lockouts, or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance, and further

65

agree that upon the occurrence and continuance of any event of Force Majeure, neither party shall be obligated to purchase or sell Gas hereunder if such purchase or sale would result in material economic impact to such party under this Gas Annex to the Agreement."

7.   Clause (h) is amended by adding the following provision as a new clause (h)(vii):

"Without restricting the generality of Section 9(f) of the Agreement, if an event of Force Majeure occurs, the party affected may, in its sole discretion and without notice to the other party, determine not to make a claim of Force Majeure and to waive its rights hereunder as they would apply to such event. Such determination or waiver shall not preclude the affected party from claiming Force Majeure in respect of any subsequent event, including any event that is substantially similar to the event in respect of which such determination or waiver is made."

8.   Clause (i) is deleted in its entirety.

9.   Clause (k)(i) is amended by inserting the phrase "that there is an unexcused failure of" between the words "event" and "either" therein and deleting the word "fails" after the word "Buyer".

10.   <u>Illegality and Tax Event</u>.  With respect to any Gas Transaction, Sections 5(b)(i) and 5(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Gas Transaction.

11.   <u>Additional Representations</u>.  With respect to Gas Transactions entered into under this Agreement, the following representations shall apply with respect to each party:

<u>Utility Disclaimer</u>.  Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Bankruptcy Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and further agrees that the other party is not a provider of last resort.

12.   <u>Mobile-Sierra</u>.  To the extent, if any, that a transaction does not qualify as a "first sale" as defined by the Natural Gas Act and §§ 2 and 601 of the Natural Gas Policy Act, each party irrevocably waives its rights, including its rights under §§ 4-5 of the Natural Gas Act, unilaterally to seek or support a change to any terms and conditions of the Contract, including but not limited to the rate(s), charges, or classifications set forth therein.  By this provision, each party expressly waives its right to seek or support, either directly or indirectly, and by whatever means: (i) an order from the U.S. Federal Energy Regulatory Commission ("FERC") seeking to change any of the terms and conditions of the Contract agreed to by the parties; and (ii) any refund from the other party with respect to the Contract. Each party further agrees that this waiver and covenant shall be binding upon it notwithstanding any regulatory or market changes that may occur after the date of the Base Contract or any transaction entered into between the parties.  Absent

the agreement of both parties to the proposed change, the standard of review for changes to any terms and conditions of the Contract proposed by (a) a party, to the extent that the waiver set forth in this Section 12 is unenforceable or ineffective as to such party due to a final determination being made under applicable law that precludes the party from waiving its rights to seek or support changes from the FERC to the terms and conditions of this Contract, (b) a non-party, or (c) the FERC acting <u>sua sponte</u>, shall solely be the "public interest" application of the "just and reasonable" standard of review set forth in <u>United Gas Pipe Line Co. v. Mobile Gas Service Corp.</u>, 350 U.S. 332 (1956) and <u>Federal Power Commission v. Sierra Pacific Power Co.</u>, 350 U.S. 348 (1956) (the "Mobile-Sierra Doctrine"), as such Mobile-Sierra Doctrine has been clarified by <u>Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish</u> 128 S.Ct. 2733 (2008).

13.   <u>Adequate Assurance of Performance</u>.   With respect to any Gas Transaction entered into under this Agreement, if either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Agreement (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y or its Guarantor, if applicable), X may demand Adequate Assurance of Performance. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount, for a term, and from an issuer, all as reasonably acceptable to X, including, but not limited to cash, a standby irrevocable Letter of Credit, a prepayment, a security interest in an asset or guaranty. Y hereby grants to X a continuing first priority security interest in, lien on, and right of setoff against all Adequate Assurance of Performance in the form of cash transferred by Y to X pursuant to this section. Upon the return by X to Y of such Adequate Assurance of Performance, the security interest and lien granted hereunder on that Adequate Assurance of Performance shall be released automatically and, to the extent possible, without any further action by either party. Notwithstanding any other provision contained herein, it shall constitute an Event of Default under Section 5(a)(i) of this Agreement if a party fails to provide Adequate Assurance of Performance under this section within forty-eight (48) hours but at least one (1) Local Business Day of a written request by the other party.

Part 8.  Renewable Energy Certificates Annex

Part 8 is added to the ISDA Master Agreement to add a Renewable Energy Certificates Annex in the form attached hereto as Attachment C, and is hereby incorporated and made a part of the Master Agreement.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BP Energy Company
("Party A")**

By: _Kirk Resewch_

Name: _Kirk Resewch_

Title: _Attorney-in-Fact_

Date: _10-2-2015_

**Agera Energy LLC**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

**energy.me midwest llc**

By: _____

Name:  Kerry Cassidy

Title:  Chief Executive Officer

Date:  October 2, 2015

**Aequitas Energy Inc.**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

*Signature Page to Amended and Restated ISDA Schedule*

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| **BP Energy Company**<br>(**"Party A"**) | **Agera Energy LLC** |
| By: _____ | By: _____ |
| Name:_____ | Name:  Michael Nordlicht |
| Title:_____ | Title:  General Counsel |
| Date:_____ | Date:  October 2, 2015 |

**energy.me midwest llc**

By: _____

Name:  Kerry Cassidy

Title:  Chief Executive Officer

Date:  October 2, 2015

**Aequitas Energy Inc.**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

*Signature Page to Amended and Restated ISDA Schedule*

**Attachment A**
North American Power Annex to the
ISDA Master Agreement published by ISDA

**Attachment B**
North American Gas Annex to the
ISDA Master Agreement published by ISDA

**ATTACHMENT C**
**RENEWABLE ENERGY CERTIFICATES ANNEX**
**TO THE SCHEDULE TO THE MASTER AGREEMENT**

Part 8

Renewable Energy Certificates Annex

ARTICLE 1: GENERAL TERMS

1.1        Scope of Agreement. The parties enter into this Renewable Energy Certificates ("RECs") Annex (this "RECs Annex") in order to provide for the terms and conditions pursuant to which they may enter into transactions relating to the sale, assignment and transfer of RECs (each such transaction a "RECs Transaction"). This RECs Annex supplements, forms a part of, and is incorporated into, the Master Agreement.

1.2        RECs Transactions. The terms set forth in the Master Agreement and this RECs Annex apply to RECs Transactions. Unless otherwise expressly amended by this RECs Annex, all of the terms and conditions set forth in the Master Agreement apply to RECs Transactions.

1.3        Inconsistency. In the event of any inconsistency between the provisions of this RECs Annex and the other provisions of the Master Agreement, this RECs Annex shall prevail with respect to RECs Transactions only. In the event of any inconsistency between the provisions of any RECs Transactions and the Master Agreement, such RECs Transactions shall prevail for the purpose of the relevant RECs Transactions.

1.4        Applicability to Outstanding RECs Transactions. Upon effectiveness of this RECs Annex, all RECs Transactions then outstanding between the Parties (the "Prior Agreements") shall be RECs Transactions for purposes of the Master Agreement and shall be governed by and subject to the terms and conditions of the Master Agreement. All Prior Agreements shall constitute "Confirmations" within the meaning of the Master Agreement that supplement, form a part of and are subject to the Master Agreement. The terms of this Master Agreement shall supersede any non-economic substantive provisions such as those relating to default and termination rights contained in the Prior Agreements.

1.5        Credit Support Documents / Posted Collateral. Party A and Party B agree that:

(a)        the payment obligations of Party A under the Prior Agreements shall continue to be guaranteed by Party A's Credit Support Provider;

(b)        the payment obligations of Party B under the Prior Agreements shall continue to be guaranteed by Party B's Credit Support Provider;

(c)        to the extent any letter of credit is held by Party A in connection with the obligations of Party B under any Prior Agreement, then such letter of credit shall be deemed to constitute Posted Collateral provided under the Credit Support Annex to the Master Agreement; and

(c)        to the extent any letter of credit is held by Party B in connection with the obligations of Party A under any Prior Agreement, then such letter of credit shall be deemed to constitute Posted Collateral provided under the Credit Support Annex to the Master Agreement.

ARTICLE 2: DEFINITIONS

Definitions. Each of the following capitalized terms has the respective meaning set forth below when used in this RECs Annex. Terms used but not defined herein shall have the meaning given to such terms in the Master Agreement.

"Administrator" means an administrator, Certifier, Governmental Authority or other body with jurisdiction over Certification or transfer of RECs in the Applicable Program.

"Alternative Compliance Payment Rate" means a monetary amount under Applicable Law for an Applicable Program the payment of which is in lieu of compliance.

"Applicable Law" means all legally binding constitutions, treaties, statutes, laws, ordinances, rules, regulations, orders, interpretations, permits, judgments, decrees, injunctions, writs and orders of any Governmental Authority or arbitrator that apply to the Applicable Program or any one or both of the parties or the terms hereof.

"Applicable Program" shall have the meaning specified in a RECs Transaction.

"Applicable Tracking System" means a generation information system or generation attribute tracking system operated by an Independent System Operator or a Regional Transmission Organization, or any other system that records generation from Certified Renewable Energy Facilities, as specified in a RECs Transaction.

"Business Day" means a day on which a majority of Federal Reserve member banks in New York City are open for business; and a Business Day shall open at 8:00 a.m. and close at 5:00 p.m. Eastern Prevailing Time.

"Buyer" means the party to a RECs Transaction that is obligated to purchase and confirm the RECs, as specified in a RECs Transaction.

"Certification" means, if applicable, the certification by the Certifier of the Applicable Program of (i) the creation and characteristics of a REC, (ii) the qualification of a Certified Renewable Energy Facility under the Applicable Program, (iii) Delivery of a REC or (iv) other compliance with the requirements of the Applicable Program.

"Certifier" means an entity that certifies the generation, characteristics or Delivery of a REC, or the qualification of a Renewable Energy Facility under the Applicable Program, and may include the Administrator, Applicable Tracking System, a Governmental Authority, one or both of the parties, an independent auditor or other third party, and should include (i) absent an Applicable Program, the Seller, or the generator of the RECs if the Seller is not the generator, (ii) if the RECs are to be Delivered pursuant to the Applicable Program, the Administrator of the Applicable Program, or such other person or entity specified by the Applicable Program to perform Certification or (iii) such other person or entity specified by the parties.

"Certified Renewable Energy Facility" means an electric generation unit or other facility or installation that produces Energy qualifying under the Applicable Program.

"Change in Laws" shall have the meaning ascribed to such term in Section 4.7 herein.

"Claiming Party" means the party claiming Force Majeure.

"Confirmation" or "Confirm" means Buyer's electronic confirmation in the Applicable Tracking System of the Transfer of the RECs in its account, in accordance with the operating rules and procedures of the Applicable Tracking System.

"Contract Price" means the price per REC to be paid by Buyer to Seller for the purchase of the RECs, as specified in a RECs Transaction.

"Contract Quantity" the quantity of RECs that Seller agrees to sell, assign and Transfer to the Buyer, and that Buyer agrees to purchase and Confirm from Seller, as specified in a RECs Transaction.

"Delivered" or "Delivery" means the transfer from Seller to Buyer of the Contract Quantity of the RECs in accordance with the Applicable Program and recognition by any applicable Administrator, Certifier, or the Applicable Tracking System that such transfer has completed.

"Energy" means physical electric energy expressed in MWh of the character that passes through transformers and transmission wires, where it eventually becomes alternating current three-phase, sixty (60) hertz electric energy delivered at nominal voltage.

"Firm" shall mean that Seller is obligated to Deliver the Contract Quantity of Product by the Transfer Deadline unless excused by Force Majeure.

"Force Majeure" means an event or circumstance which materially prevents the Claiming Party from performing its obligations under one or more RECs Transactions, which event or circumstance was not anticipated as of the Trade Date of the RECs Transaction, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which by the exercise of due diligence, the Claiming Party is unable to overcome or avoid or cause to be avoided. Force Majeure shall not be based on (i) the loss of Buyer's markets; (ii) Buyer's inability economically to use or resell the RECs purchased hereunder; (iii) Seller's ability to sell the RECs at a price greater than the Contract Price hereunder; or (iv) Buyer's ability to purchase product similar to the RECs at a price less than the Contract Price. Notwithstanding the foregoing, Force Majeure shall not include the financial inability of the parties, whether or not caused by any of the foregoing factors. With respect to a Party's obligation to make payments hereunder, Force Majeure will be only an event or act of a governmental authority that on any day disables the banking system through which a Party makes such payments.

"Generation Period" means the calendar year, quarter, or other specified period of time in which the Energy associated with the RECs is or will be generated.

"Governmental Authority" means any international, national, federal, provincial, state, municipal, county, regional or local government, administrative, judicial or regulatory entity operating under any Applicable Laws and includes any department, commission, bureau, board, administrative agency or regulatory body of any government.

"Interest Rate" means, for any date, the lesser of (a) the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under "Money Rates" on such day (or if not published on such day on the most recent preceding day on which published), plus two percent (2%) and (b) the maximum rate permitted by Applicable Law.

"MWh" means Megawatt-hour.

"Non-Claiming Party" shall have the meaning ascribed to such term in Section 4.6 herein.

"Product" means the renewable energy certificates specified in a RECs Transaction.

"RECs Confirmation" means the confirmation of a RECs Transaction substantially in the form set forth in Exhibit "B".

"Regulatory Event" means a change in the Applicable Standard that has the effect of: (i) materially changing the definition of the RECs set forth in the Confirmation; (ii) materially altering or discontinuing the transferability and deliverability of such RECs; or (iii) materially impairing the commercial value of a Transaction.

"Renewable Energy Certificate" or "REC" means a certificate, credit, allowance, green tag or other transferable indicia, howsoever entitled, created by or pursuant to the Applicable Program or Certifier indicating generation of a particular quantity of Energy, or RECs Product associated with the generation of a specified quantity of Energy from a renewable energy source by a Certified Renewable Energy Facility, separate from the Energy produced.

"Renewable Portfolio Standard" or "RPS" means a domestic, international, or foreign state, provincial or federal law, rule or regulation that requires a stated amount or minimum proportion or quantity of electricity that is sold or used by specified entities to be generated from renewable energy.

"Replacement Price" means the price at which the Buyer, acting in a commercially reasonable manner, purchases substitute Product not transferred by the Seller, plus any out-of-pocket charges or costs reasonably incurred by the Buyer (including any brokerage fees incurred by the Buyer) in purchasing such substitute Product; or, absent any such purchase, the market price for the Product not delivered, as determined by Buyer in a commercially reasonable manner, provided however, that the market price shall not be greater than the product of (x) the undelivered Contract Quantity and (y) the Alternative Compliance Payment Rate.

"Sales Price" means the price at which Seller, acting in a commercially reasonable manner, resells the Product, reduced by any out-of-pocket charges or costs reasonably incurred by the Seller (including any brokerage fees incurred by Seller) in selling such Product. If after using commercially reasonable efforts the Seller is unable to sell all or a portion of the Contract Quantity of the Product then the Sales Price with respect to such unsold Contract Quantity of the Product shall be deemed equal to zero (0).

"Seller" means the party to a RECs Transaction that is obligated to sell, assign and Transfer the RECs, as specified in a RECs Confirmation.

"Trade Date" means the date a RECs Transaction is entered into by the parties.

"Transfer" means Seller's electronic delivery in the Applicable Tracking System of the RECs to Buyer's account, in accordance with the operating rules and procedures of the Applicable Tracking System.

"Transfer Deadline" shall have the meaning set forth in a RECs Transaction.

"Unit Contingent" shall mean that Seller's obligation to Deliver the Contract Quantity of Product shall be excused to the extent that the parties have specified a particular Certified Renewable Energy Facility(ies) as the generator of the Product, and the Product has not been generated within the relevant Vintage or other time frame agreed to by the Parties due to a Force Majeure event affecting such Certified Renewable Energy Facility(ies) or such other disruptions in supply from such Certified Renewable Energy Facility(ies) as may be further specified and conditioned in a RECs Confirmation.

"Vintage" means the period beginning January 1 of the period year and continuing until December 31 of the subject year (*e.g., Vintage 2012 means January 1, 2012 through December 31, 2012*) unless otherwise specified in the Confirmation.

Rules of Interpretation. Unless otherwise required by the context in which any term appears, (i) the singular includes the plural and vice versa; (ii) all references to a particular entity or market price index include a reference to such entity's or index's successors and (if applicable) permitted assigns; and (iii) a reference to a statute or to a regulation issued by a Governmental Authority includes the statute or regulation in force as of the Transfer Deadline; and (iv) the word "or" is not necessarily exclusive.

## ARTICLE 3: AMENDMENT TO THE MASTER AGREEMENT

3.1        Events of Default; Section 5(a)(ii).
With respect to all RECs Transactions, the words "(or to sell, assign and Transfer RECs, the exclusive remedy for which is provided in Section 4.10 of the Renewable Energy Certificates Annex or purchase and Confirm RECs, the exclusive remedy for which is provided in Section 4.11 of the Renewable Energy Certificates Annex)" are hereby added at the end of the parenthetical of Section 5(a)(ii) of the Master Agreement.

## ARTICLE 4: SALE OF RECs

The following provisions apply to RECs Transactions only.

4.1        Seller's and Buyer's Obligations. With respect to each RECs Transaction, Seller shall sell, assign and Transfer, the Contract Quantity of RECs to the Buyer no later than the Transfer Deadline.  Upon receiving written, facsimile or electronic confirmation from the Applicable Tracking System that a transfer order has been initiated by Seller, Buyer shall purchase and Confirm such Transfer in the Applicable Tracking System within five (5) Business Days.

4.2        Invoicing / Payment. Within ten (10) Business Days after the Confirmation of the RECs, Seller shall send to Buyer an invoice for the payment obligations incurred by Buyer. Such invoice shall be due and payable by Buyer on or before the fifth (5th) Business Day following Buyer's receipt of the invoice. Payment of the invoice by Buyer shall be made by wire transfer in immediately available funds to the Seller account specified in the invoice.

4.3        Taxes. Each party shall pay any taxes or other fees associated with its respective purchase and sale hereunder. As used herein "taxes" means, but is not limited to, any or all ad valorem, property, occupation, severance, first use, conservation, gross receipts, privilege, sales, use, consumption, excise, lease, transaction and other taxes, governmental charges, licenses, fees,

permits and assessments or increases therein, other than taxes based on net income or net worth. A tax is not a penalty or a fine.

4.4        Interest. Any amount not paid when due shall be deemed delinquent and accrues interest at a rate per annum equal to the Interest Rate from the due date until paid in full.

4.5        RECs Confirmation of a RECs Transaction. The form of Confirmation for any RECs Transaction shall be in substantially the form attached hereto as Exhibit B, as modified to support the specific Product.

4.6        Force Majeure. To the extent either party is prevented by Force Majeure from carrying out, in whole or part, its performance obligations under any RECs Transaction and such party (the "Claiming Party") gives notice and details of the Force Majeure to the other party (the "Non-Claiming Party") as soon as practicable, then the Claiming Party may suspend the performance of its obligations with respect to such RECs Transaction (other than the obligation to make payments then due or becoming due with respect to performance prior to the Force Majeure) to the extent of such Force Majeure and provided that such suspension shall be of no greater scope and of no longer duration than is required to remedy the Force Majeure. The Non-Claiming Party shall not be required to perform or resume performance of its obligations to the Claiming Party corresponding to the obligations of the Claiming Party excused by Force Majeure.

4.7        Change in Laws. The parties agree that if any Governmental Authority enacts, promulgates or otherwise makes effective any new Applicable Law or amends, modifies or changes in any way the text, interpretation or application of any existing Applicable Law, including, but not limited to any changes in the Applicable Program (collectively referred to herein as "Change in Laws"), whether such Change in Laws is anticipated by the parties or not, in such a way that makes performance of a Party's obligations hereunder illegal or impossible, then the parties agree to use commercially reasonable efforts to reform each REC Transaction in order to restore the original intent of each REC Transaction to the Parties, including transferring the Contract Quantity to another equivalent program under a governmental authority or any other entity promulgating a RPS, if possible.  If the Parties are unable, despite such commercially reasonable efforts to reform a REC Transaction or transfer the Contract Quantity within thirty (30) Business Days following notice of the Change in Laws, Buyer or Seller may terminate such REC Transaction with no further payment or performance obligation except for any such obligations that have accrued prior to such termination.

4.8        Occurrence of Regulatory Event.  Upon the occurrence of a Regulatory Event, the Parties will use commercially reasonable efforts to reform each Transaction in order to give effect to the original intention of the Parties or transfer the Contract Quantity to another equivalent program under a governmental authority or any other entity promulgating a RPS, if possible.  If the Parties are unable, despite such commercially reasonable efforts, to reform a Transaction or transfer the Contract Quantity within fifteen (15) Business Days following notice of the Regulatory Event, Buyer or Seller may terminate such Transaction with no further payment or performance obligation except for any such obligations that have accrued prior to such termination.

4.9        Seller Representations. In addition to other representations made under the Master Agreement, the Seller represents to the Buyer as of each applicable Transfer Date that:

(a)        The Seller shall convey title to the Product to the Buyer free and clear of any liens or other encumbrances or title defects;

76

(b)          The RECs have never been used to satisfy obligations in or outside the relevant jurisdiction;

(c)          It has the right to sell the Product; and

(d)          The Product was generated during the Vintage specified in the RECs Transaction.

(e)          All RECs Delivered hereunder shall meet the requirements of the Applicable Program.

(f)          The RECs Delivered hereunder will vest in Buyer, and Buyer will (a) have the exclusive rights to make all claims as to the RECs, and (b) have the right to report and register, as applicable, the exclusive ownership of the RECs with any registry, system, agency, authority, or other party, either voluntarily or in compliance with any present or future domestic, international, or foreign law, regulation, registry or program.

If the Applicable Program is the Green-e Standard, Seller agrees, represents, and warrants to Buyer that the Energy generated with the RECs was not and will not be separately sold, retired, marketed, or otherwise represented as renewable energy, clean energy, zero emission energy, or in any similar manner by Seller.

**EXCEPT AS EXPRESSLY SET FORTH IN THIS RECs ANNEX, THE SELLER EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER WRITTEN OR ORAL, AND WHETHER EXPRESS OR IMPLIED. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING.**

4.10        Seller and <u>Buyer Representation</u>. In addition to other representations made under the Master Agreement and, in the case of Seller, the representations made under Section 4.8 above, each Party represents to the other Party (which representation shall be deemed to be repeated by such Party on each date on which a RECs Transaction is entered into) that it is a "forward contract merchant" within the meaning of the United States Bankruptcy Code.

4.11        <u>Remedies for Seller Failure</u>. If the Seller fails to sell, assign and Transfer, all or part of the Contract Quantity of RECs to the Buyer by the Transfer Deadline pursuant to a RECs Transaction, and such failure is not excused by Force Majeure or by the RECs Buyer failure to perform, then the Seller shall pay to the Buyer within five (5) Business Days of a request in writing by the Buyer an amount equal to the product of:

(a)          the Contract Quantity of RECs that have not been transferred by the Seller as of the Transfer Deadline; and

(b)          the positive difference, if any, obtained by subtracting the Contract Price from the Replacement Price.

4.12        <u>Remedies for Buyer Failure</u>. If the Buyer fails to purchase and Confirm, by the Confirmation Deadline, the Transfer of all or part of the Contract Quantity of RECs pursuant to a RECs Transaction, and such failure is not excused by Force Majeure or by the RECs Seller failure to perform, then the Buyer shall pay to the Seller within five (5) Business Days of a request in writing by the Seller an amount equal to the product of:

(a)          the Contract Quantity that have not been Confirmed by the Buyer as of the Confirmation Deadline; and

(b)          the positive difference, if any, obtained by subtracting the Sale Price from the Contract Price.

**4.13**         **Limitation Remedies, Liability and Damages.**
NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CLAUSE 4.12, THE FOLLOWING PROVISION SHALL APPLY SOLELY TO RECs TRANSACTIONS, AND NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6 OF THE MASTER AGREEMENT WITH RESPECT TO RECs TRANSACTION OR OTHERWISE. THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS RECs ANNEX SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY, INCLUDING, WITHOUT LIMITATION, ANY OF ITS EMPLOYEES OR AGENTS, SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

4.14         Transfer of Title. None of the Seller's applicable property and other right, title and interests in the RECs will pass to the Buyer until the Transfer of the RECs has been Confirmed and upon such Confirmation, all rights, title and interest in and to the RECs, to the full extent the same is property, shall transfer to the Buyer.

ARTICLE 5: ADDITIONAL TERMS

The following provisions apply to RECs Transactions only.

5.1    Not a Penalty.  Buyer and Seller intend that no remedy or amount due hereunder represents a penalty to the Defaulting Party.

**Exhibit "A"**
**Sample RECs Confirmation**

**RENEWABLE ENERGY CERTIFICATES CONFIRMATION**

This Renewable Energy Certificates Confirmation ("RECs Confirmation") confirms the terms and conditions of the RECs Transaction entered into between BP Energy Company and ▒▒▒▒▒▒▒▒▒▒▒ effective on the Trade Date. This RECs Transaction shall supplement, form a part of and be subject to the terms and conditions of the ISDA Master Agreement between BP Energy Company and ▒▒▒▒▒▒▒▒▒▒▒▒▒ dated ▒▒▒▒▒▒▒▒, as amended from time to time (collectively, the "Master Agreement"). Any capitalized terms that are not defined herein shall have the meanings ascribed thereto in the Master Agreement or in the Applicable Program.

**Terms of the RECs Transaction**

The terms of the RECs Transaction to which this RECs Confirmation relates are as follows:

| | |
|---|---|
| Trade Date: | |
| Seller: | |
| Buyer: | |
| Product: | |
| Applicable Program: | |
| Vintage: | |
| Start of Generation Period: | |
| End of Generation Period: | |
| Delivery Obligation: | [Firm] / [Unit Contingent] |
| Contract Quantity: | RECs |
| Contract Price: | $       /REC |
| Total Price: | |
| Transfer Deadline: | |
| Applicable Tracking System: | |
| Special Conditions: | |

The parties agree to the RECs Transaction set forth herein.

BP Energy Company

**By:** _____
**Name:** _____
**Title:** _____

**ACKNOWLEDGED AND AGREED:**

[COUNTERPARTY NAME]

**By:** _____
**Name:** _____

**(Bilateral Form)**                              **(ISDA Agreements Subject to New York Law Only)**



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

### to the Schedule to the

### ISDA MASTER AGREEMENT

...............................................................................................................

May 5, 2015

dated as of...............................................

between

**BP ENERGY COMPAY**              **AGERA ENERGY LLC**

..................................................    and    ..........................................

("Party A")                                         ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

## Paragraph 1. Interpretation

(a)      *Definitions and Inconsistency*. Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

## Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    ***Delivery Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Delivery Amount"*** applicable to the Pledgor for any Valuation Date will equal the amount by which:

>   (i) the Credit Support Amount
>
>   exceeds
>
>   (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    ***Return Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Return Amount"*** applicable to the Secured Party for any Valuation Date will equal the amount by which:

>   (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party
>
>   exceeds
>
>   (ii) the Credit Support Amount.

***"Credit Support Amount"***  means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    ***Conditions Precedent.***  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

>   (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and
>
>   (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    ***Transfer Timing.***  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    ***Calculations.***  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

**ISDA®1994**

**(d)**    *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

3                                                                                              ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)    *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA®1994

(ii) **Interest Amount.** Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    **Secured Party's Rights and Remedies.** If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

**ISDA®1994**

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**ISDA®1994**

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA®1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

**ISDA®1994**

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b). 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

> (i) Eligible Collateral or Posted Collateral that is:
>
>> (A) Cash, the amount thereof; and
>>
>> (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable **Valuation Percentage**, if any;
>
> (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and
>
> (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

10                                                            **ISDA®1994**

EXECUTION COPY

**Amended & Restated Paragraph 13. Elections and Variables**

(a)    **Security Interest for "Obligations".**    The term **"Obligations"** as used in this Annex includes the following additional obligations:

With respect to Party A:    Not Applicable
With respect to Party B:    Not Applicable

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount.**

        (A)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a), unless otherwise specified here:  NO CHANGE

        (B)    **"Return Amount"** has the meaning specified in Paragraph 3(b), unless otherwise specified here:  NO CHANGE

        (C)    **"Credit Support Amount"** has the meaning specified in Paragraph 3, unless otherwise specified here:  NO CHANGE

    (ii)    **Eligible Collateral.** The following item will qualify as **"Eligible Collateral"** for Party A and for Party B:  Cash, with a Valuation Percentage of 100%.

    (iii)    **Other Eligible Support**.  The following item will qualify as **"Other Eligible Support".**

        (A)    For Party A and for Party B:  an Eligible Letter of Credit, as defined herein.  The Valuation Percentage of an Eligible Letter of Credit shall be 100% of the available balance thereof, unless an Eligible Letter of Credit Default shall occur and be continuing with respect to such Eligible Letter of Credit, in which case, the Valuation Percentage shall be zero.

        (B)    For Party B: at any time after the termination of the PSA, any amounts in the "Controlled Accounts" as such term is defined in the PSA.  The Valuation Percentage of amounts in the Controlled Accounts shall be 100% of the available balance thereof.

    (iv)    **Thresholds.**

        (A) **"Independent Amount"** means:

          (i) For Party Party A:  Not Applicable.

          (ii) For Party B:  $250,000.

        (B) **"Threshold"** means with respect to Party A on any day the amount set forth below opposite the Credit Rating assigned by S&P on such day to Party A's Credit Support Provider, provided, however, that the Threshold for a party shall be zero upon the occurrence and during the continuance of an Event of Default, Potential Event of Default, or Specified Condition with respect to such party

| S&P Rating | Threshold Party A |
|---|---|
| AA and above | $ 60,000,000 |

| AA- | $ 50,000,000 |
| A to A+ | $ 35,000,000 |
| A- | $ 20,000,000 |
| BBB+ | $ 10,000,000 |
| BBB | $  5,000,000 |
| BBB- and below | $   0  (zero) |

and "**Threshold**" means with respect to Party B, prior to the termination of the PSA, the amount determined in accordance with Section 2.3 of the PSA,  provided, however, that the Threshold for a party shall be zero for Party B upon (i) the termination of the PSA by its terms or (ii) the occurrence and during the continuance of an "Event of Default" under the PSA that, after giving effect to Section 18.1(c) thereof if applicable, gives the Seller the right to take action under Section 18.1(i), 18.1(ii) or 18.1(iii) of the PSA.

(C) **"Minimum Transfer Amount"** means with respect to Party A and Party B:  (i) $1 or (ii) if an Event of Default, Potential Event of Default, or Specified Condition has occurred and is continuing with respect to a party, then in respect of such party the Minimum Transfer Amount shall be zero.

(D) **Rounding.**  The Delivery Amount will be rounded up to the nearest integral multiple of $100,000, and the Return Amount will be rounded down to the nearest integral multiple of $100,000, unless the Return Amount is less than $100,000, in which case, the Return Amount will not be rounded.

(c)    **Valuation and Timing**

(i)    **"Valuation Agent"** means, for purposes of Paragraph 3, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amounts as applicable.  In addition, the Secured Party will be the Valuation Agent for purposes of calculating Value in connection with substitutions pursuant to Paragraph 4(d).  Notwithstanding the foregoing, if an Event of Default or Potential Event of Default has occurred and is continuing with respect to a party, the Valuation Agent shall be the other party.

(ii)    **"Valuation Date"** means: each Local Business Day.

(iii)    **"Valuation Time"** means:  the close of business on the Valuation Date or date of calculation, as applicable; *provided that* the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    **"Notification Time"** means 10:00 a.m., New York time, on a Local Business Day.

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.**  The following Termination Event(s) will be a **"Specified Condition"** for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party A | Party B |
| --- | --- | --- |
| Illegality | X | X |
| Tax Event | X | X |
| Tax Event Upon Merger | X | X |
| Credit Event Upon Merger | X | X |
| Additional Termination Event |  |  |

(e)    **Substitution.**

12

(i)  **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here:  The second Local Business Day following the date on which the Secured Party receives the Substitute Credit Support.

(ii)  **Consent.**  If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): Not Applicable

(iii)  **Notice.**  For purposes of Paragraph 4(d)(i), the phrase "upon notice" shall be amended to read "upon two Local Business Days' prior written notice".

(f)  **Dispute Resolution.** The provisions of Paragraph 5 will not apply, and if a dispute as to a Delivery Amount, Return Amount or Value arises, the Secured Party's calculation, made in good faith and in a commercially reasonable manner, shall be controlling.

(g)  **Holding and Using Posted Collateral.**

(i)  **Eligibility to Hold Posted Collateral; Custodians.**

Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), subject to the following conditions:

(1)  Posted Collateral may be held only in one or more accounts in any jurisdiction in the United States.

(2)  If Posted Collateral is held by a Custodian, the Custodian shall be a Qualified Institution.

(3)  If Posted Collateral is held by Party A, Party A's Credit Support Provider's Credit Rating by S&P shall be no less than BBB and Party A shall not be a Defaulting Party.

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), subject to the following conditions:

(1)  Posted Collateral may be held only in one or more accounts in any jurisdiction in the United States.

(2)  If Posted Collateral is held by a Custodian, the Custodian shall be a Qualified Institution.

(3)  If Posted Collateral is held by Party B, Party B's (or Party B's Credit Support Provider's, if applicable) Credit Rating by S&P shall be no less than BBB and Party B shall not be a Defaulting Party.

Initially, the Custodian for Party A and Party B is:  To be designated by Party A or Party B, as appropriate, in the first demand, which shall be in writing, for Eligible Credit Support hereunder.

(ii)  **Use of Posted Collateral.**  The provisions of Paragraph 6(c) will apply to the parties; provided, however, if a party is a Defaulting Party, the provisions of Paragraph 6(c) shall not apply to such party and all Posted Collateral in such party's possession shall be delivered to a Custodian (that is a Qualified Institution) within 2 Business Days of such party becoming a Defaulting Party.

(h)  **Distributions and Interest Amount.**

(i)  **Interest Rate.**  The **"Interest Rate"** will be:  (i) with respect to Cash held by a party, for any day, the "Federal Funds (Effective)" rate in effect for such day, as published in the most recent weekly

13

statistical release designated as H.15(519), or any successor publication, published by the Board of Governors of the Federal Reserve System, and (ii) with respect to Cash held by the Custodian of a party, the Interest Rate will not apply but the provisions of Paragraph 13(h)(iii) shall apply.

(ii)     **Transfer of Interest Amount.**  The Transfer of the Interest Amount will be made on or before three Local Business Days after the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii)    **Alternative to Interest Amount.**  The provision of Paragraph 6(d)(ii) will apply; provided, however, that with respect to Cash held by the Custodian of a party, the "**Interest Amount**" shall mean the earnings, from time to time, of the investment and reinvestment of Eligible Collateral constituting Cash by the Custodian of a party in an interest-bearing account selected by the Secured Party and consented to by the Pledgor, such consent not to be unreasonably withheld, conditioned, or delayed.

(i)    **Additional Representation(s).**  None.

(j)    **Other Eligible Support and Other Posted Support.**

(i)     "**Value**" with respect to Other Eligible Support and Other Posted Support means:  In respect of an Eligible Letter of Credit on a date, the maximum stated amount remaining available for payment to the beneficiary thereunder on such date multiplied by the Valuation Percentage.

(ii)    "**Transfer**" with respect to Other Eligible Support and Other Posted Support means:

(1)     For purposes of Paragraph 3(a), delivery of an Eligible Letter of Credit by the Pledgor or issuer of the Eligible Letter of Credit to the Secured Party at the address of the Secured Party specified in the Notices Section of this Agreement, or delivery of an executed amendment to such Eligible Letter of Credit (extending the term or increasing the amount available to the Secured Party thereunder) by the Pledgor or the issuer of the Eligible Letter of Credit to the Secured Party at the address of the Secured Party specified in the Notices Section of this Agreement; and

(2)     For purposes of Paragraph 3(b), by the return of an outstanding Eligible Letter of Credit by the Secured Party to the Pledgor, at the address of the Pledgor specified in the Notices Section of this Agreement, or delivery of an executed amendment to the Eligible Letter of Credit in form and substance satisfactory to the Pledgor (reducing the amount available to the Secured Party thereunder) by the Pledgor or the issuer of the Eligible Letter of Credit to the Secured Party at the Secured Party's address specified in the Notices Section of this Agreement.  If a Transfer is to be effected by a reduction in the amount of an outstanding Eligible Letter of Credit previously issued for the benefit of the Secured Party, the Secured Party shall not unreasonably withhold its consent to a commensurate reduction in the amount of such Eligible Letter of Credit and shall take such action as is reasonably necessary to effectuate such reduction.

(iii)    "**Eligible Letter of Credit Provisions**".

Other Eligible Support and Other Posted Support in the form of an Eligible Letter of Credit shall be subject to the following provisions:

(1)     Unless otherwise agreed in writing by the parties, each Eligible Letter of Credit shall be Transferred in accordance with the provisions of this Annex, and the Secured Party shall be the named beneficiary under each Eligible Letter of Credit.  The Pledgor shall (i) cause

14

the renewal of each Transferred Eligible Letter of Credit on a timely basis as provided in the relevant Eligible Letter of Credit in order to maintain the then-applicable Credit Support Amount requirements, (ii) if the issuer of an Eligible Letter of Credit previously Transferred to the Secured Party has indicated its intent not to renew such Eligible Letter of Credit, Transfer a substitute Eligible Letter of Credit, and (iii) if the issuer of an Eligible Letter of Credit shall commit an Eligible Letter of Credit Default of the type specified in clause (ii) or (iii) of the definition thereof (including but not limited to such issuer's failure to honor the Secured Party's properly documented request to draw thereon), Transfer for the benefit of the Secured Party Eligible Credit Support within one (1) Local Business Day after the Pledgor receives notice of such dishonor, provided that, at the time the Pledgor is required to perform in accordance with (i), (ii), or (iii) immediately above, the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount.

(2)     The Pledgor may, at its option, Transfer an Eligible Letter of Credit by (A) causing the issuing bank to execute an amendment increasing the outstanding amount available for drawing under a previously Transferred Eligible Letter of Credit or (B) establishing one or more additional Eligible Letters of Credit.  If (i) the Pledgor shall fail to cause the issuing bank to renew, substitute, or sufficiently increase the amount of a Transferred Eligible Letter of Credit, Transfer one or more additional Eligible Letters of Credit, or otherwise Transfer sufficient Eligible Credit Support as required by this Agreement (including this Annex), and (ii) the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount as a result of such failure, then the Secured Party may draw on the entire available balance of any Transferred Eligible Letter of Credit in accordance with the stated requirements of the Eligible Letter of Credit. The Pledgor shall remain liable for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(3)     Upon the occurrence of an Eligible Letter of Credit Default solely of the type specified in clause (i) of the definition thereof, the Pledgor agrees to deliver a substitute Eligible Letter of Credit or other Eligible Credit Support to the Secured Party in an amount at least equal to that of the Eligible Letter of Credit to be substituted on or before the first (lst) Business Day after written demand by the Secured Party.  In the case of an Eligible Letter of Credit Default of the types specified in clauses (iv) and (v) of the definition thereof, the Pledgor shall deliver any such substitute Eligible Letter of Credit or other Eligible Credit Support within three (3) Business Days after written demand by the Secured Party. Notwithstanding any provision in this Agreement or this Annex, the issuer of an Eligible Letter of Credit shall not be relieved of any liability it may have to any party resulting from the occurrence of an Eligible Letter of Credit Default with respect to it.

(iv)     **"Certain Rights and Remedies"**.

(1)     **Secured Party's Rights and Remedies.** For purposes of Paragraph 8(a)(ii), the Secured Party may draw on any Transferred Eligible Letter of Credit in an aggregate amount equal to any amounts payable by the Pledgor with respect to any Obligations.

(2)     **Pledgor's Rights and Remedies.** For purposes of Paragraph 8(b)(ii), (i) the Secured Party will be obligated immediately to Transfer any Eligible Letter of Credit to the Pledgor and (ii) the Pledgor may, to the extent that any such Eligible Letter of Credit is not Transferred to the Pledgor as required pursuant to (i) immediately above, Set-off any amounts payable by the Pledgor with respect to any Obligations against any such Eligible Letter of Credit up to the full amount drawable thereunder and to the extent its rights to Set-off are not exercised, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the sum of the Value of any remaining

15

Posted Collateral and Eligible Letters of Credit held by the Secured Party, until any such Posted Collateral and Eligible Letters of Credit are Transferred to the Pledgor.

(k)   **Demands and Notices.**  All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

Party A:  Not Applicable

Party B:  Not Applicable

(l)   **Addresses for Transfers.**
Party A: Attention: Collateral Department, Telephone No.:  (713) 323-4821, (713) 323-3201 or (713) 323-5840; Fax No:  (713) 354-0996; email to: CollateralGroup@bp.com, or such address as Party A shall notify Party B, in writing.

Party B: Such address as Party B shall notify Party A, in writing.

(m)   **Other Provisions.**

(i)   **Duty of the Secured Party to Preserve Collateral.**  Without limiting the generality of the final sentence of Paragraph 6(a), the Secured Party will have no responsibility (A) to inquire or give the Pledgor notice about any decline in the value of, or default under or in respect of, any item of Posted Collateral, or to give the Pledgor notice that any right with respect to any such item may expire or (B) to take any action to seek to sell, to collect payments due under or to enforce or preserve rights relating to any item of Posted Collateral, including conversion, exchange and similar rights that, if not exercised, may expire or adversely affect the value of the item of Posted Collateral.

(ii)   **Costs.**  Without limiting any other provision of the Agreement, the Pledgor shall pay all costs involved in obtaining and maintaining in effect any Eligible Letter of Credit.  The Pledgor shall be responsible for, and shall reimburse the Secured Party for, all transfer taxes and other costs involved in the transfer of Eligible Collateral from the Pledgor to the Secured Party or any agent for safekeeping of the Secured Party.  If the Secured Party shall incur any loss by reason of the Pledgor's failure to pay any such taxes and costs, the Secured Party shall have the right, in accordance with Paragraph 8(a) hereof, to draw under any Eligible Letter of Credit or liquidate any Posted Collateral and apply the proceeds thereof to satisfy its claim against the Pledgor for such taxes and costs.

(iii)   **Rights and Remedies Under Paragraph 8(a).**  The Secured Party will be entitled to exercise the rights and remedies provided for in Paragraph 8(a) if the Pledgor fails to pay when due any amount payable by it under Section 6 of this Agreement in connection with a Termination Event, even if the Pledgor is not the Affected Party.

(iv)   **Events of Default.**  Delete and replace Paragraph 7(i) with the following:

"(i)  that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Credit Support, Posted Credit Support or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;"

(v)   **Additional Definitions.**  Paragraph 12 is hereby amended by adding the following:

"**Credit Rating**" means, with respect to a party (or its Credit Support Provider, as the case may be) or entity on any date of determination, the lower of the respective rating then assigned by S&P

or Moody's, as the case may be, to the lower of either the issuer rating or the unsecured, senior long-term debt obligations, as the case may be (in either case, not supported by third-party credit enhancement).

**"Eligible Letter of Credit"** shall mean a standby, transferable, irrevocable letter of credit, in a form substantially similar to Schedule 1 attached hereto and incorporated herein by reference, issued in favor of the Secured Party by a Qualified Institution (other than a party hereto or any of its Affiliates); provided, however, that at such time as there shall be an Eligible Letter of Credit Default, any Eligible Letter of Credit affected by such Eligible Letter of Credit Default shall cease to constitute an Eligible Letter of Credit and Eligible Credit Support for purposes of satisfying the Pledgor's obligations hereunder.

**"Eligible Letter of Credit Default"** shall mean with respect to an outstanding Eligible Letter of Credit, the occurrence of any of the following events: (i) the issuer of such Eligible Letter of Credit shall cease to be a Qualified Institution; (ii) the issuer of the Eligible Letter of Credit shall fail to comply with or perform its obligations under such Eligible Letter of Credit if such failure shall be continuing after the lapse of any applicable grace period; (iii) the issuer of such Eligible Letter of Credit shall disaffirm, disclaim, repudiate or reject, in whole or in part, or challenge the validity of, such Eligible Letter of Credit; (iv) such Eligible Letter of Credit shall expire or terminate, or there shall be 30 or less days remaining until the expiration of such Eligible Letter of Credit, or such Eligible Letter of Credit shall fail or cease to be in full force and effect at any time during the term of the Agreement; or (v) any event analogous to an event specified in Section 5(a)(vii) of this Agreement shall occur with respect to the issuer of such Eligible Letter of Credit provided, however, that no Eligible Letter of Credit Default shall occur in any event with respect to an Eligible Letter of Credit after the time such Eligible Letter of Credit is required to be canceled or returned to the Pledgor in accordance with the terms of this Annex.

**"Moody's"** means Moody's Investors Service (or any successor thereto).

**"Qualified Institution"** shall mean the United States office of a commercial bank or trust company organized under the laws of the United States of America or a political subdivision thereof or a foreign bank with a branch office located in the United States and, in either case, having a Credit Rating of "A-" or higher by S&P or "A3" or higher by Moody's.

**"S&P"** means Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor thereto.

*[Signatures on following page(s)]*

17

EXECUTED on the dates specified below but effective as of the date first written above.

**BP Energy Company**
**("Party A")**

By: _____

Name: _Kirk Resewehr_

Title: _Attorney-in-fact_

Date: _10-2-2015_

**Agera Energy LLC**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

**energy.me midwest llc**

By: _____

Name:  Kerry Cassidy

Title:  Chief Executive Officer

Date:  October 2, 2015

**Aequitas Energy Inc.**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

*Signature Page to Amended and Restated Paragraph 13 to the ISDA CSA*

EXECUTED on the dates specified below but effective as of the date first written above.

**BP Energy Company**
**("Party A")**

By: _____

Name: _____

Title: _____

Date: _____

**Agera Energy LLC**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

**energy.me midwest llc**

By: _____

Name:  Kerry Cassidy

Title:  Chief Executive Officer

Date:  October 2, 2015

**Aequitas Energy Inc.**

By: _____

Name:  Michael Nordlicht

Title:  General Counsel

Date:  October 2, 2015

*Signature Page to Amended and Restated Paragraph 13 to the ISDA CSA*

## SCHEDULE 1 TO CREDIT SUPPORT ANNEX

IRREVOCABLE TRANSFERABLE STANDBY LETTER OF CREDIT FORMAT
DATE OF ISSUANCE:  _____

[Address]

      Re:  Credit No. _____

      We (the "Issuing Bank") hereby establish our Irrevocable Transferable Standby Letter of Credit (this "Letter of Credit) in your favor for the account of _____ (the "Account Party"), for the aggregate amount not exceeding _____ United States Dollars ($_____), available to you at sight upon demand at our counters at (Location) on or before the expiration hereof against presentation to us of one or more of the following statements, dated and signed by [Party A] [Party B]:

1.  "Either (i) an Event of Default (as defined in the ISDA Master Agreement dated as of _____ among _____, as the same may be amended (the "Master Agreement")) or (ii) a Specified Condition (as defined in the Master Agreement) with respect to the Account Party has occurred and is continuing; and the Account Party has not paid in full all of its Obligations (as defined in the Master Agreement) that are due as of the date of this statement. Wherefore, the undersigned does hereby demand payment of [the entire available balance] [or] [$_____] of the Letter of Credit"; and/or

2.  "An Early Termination Date (as defined in the Master Agreement) has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Account Party; and the Account Party has not paid in full all of its Obligations (as defined in the Master Agreement) that are due as of the date of this statement. Wherefore, the undersigned does hereby demand payment of [the entire available balance] [or] [$_____] of the Letter of Credit"; and/or

3.  "An Eligible Letter of Credit Default (as defined in the Master Agreement) has occurred and is continuing with respect to this Letter of Credit. Wherefore, the undersigned does hereby demand payment of [the entire available balance] [or] [$_____] of the Letter of Credit"; and/or

4.  "The Account Party has failed to cause the issuing bank to renew, substitute, or sufficiently increase the amount of a Transferred (as defined in the Master Agreement) Eligible Letter of Credit, Transfer (as defined in the Master Agreement) one or more additional Eligible Letters of Credit, or otherwise Transfer sufficient Eligible Credit Support (as defined in the Master Agreement) as required by the Master Agreement; and the Delivery Amount (as defined in the Master Agreement) applicable to the Account Party equals or exceeds the Account Party's Minimum Transfer Amount (as defined in the Master Agreement) as a result of such failure. Wherefore, the undersigned does hereby demand payment of [the entire available balance] [or] [$_____] of the Letter of Credit."

      Terms defined in the Master Agreement shall have the same meanings when used in this Letter of Credit.

      The amount which may be drawn by you under this Letter of Credit shall be automatically reduced by the amount of any drawings paid through the Issuing Bank referencing this Letter of Credit No. ____. Partial and multiple drawings are permitted hereunder.

      We hereby agree with you that documents drawn under and in compliance with the terms of this Letter of Credit shall be duly honored upon presentation as specified.

      If monies duly paid by us under this Letter of Credit are not immediately applied against amounts that are due and payable by the Account Party under the Master Agreement, then the monies must be held in accordance with the Master Agreement, and any Return Amounts involving such monies that arise on any subsequent Valuation Dates shall be promptly repaid by you to us.

1

This Letter of Credit shall be governed by the Uniform Customs and Practice for Documentary Credits, 2007 Revision, International Chamber of Commerce Publication No. 600 (the "UCP"), except to the extent that the terms hereof are inconsistent with the provisions of the UCP, including but not limited to Articles 14(b) and 36 of the UCP, in which case the terms of this Letter of Credit shall govern.

With respect to Article 14(b) of the UCP, the Issuing Bank shall have a reasonable amount of time, not to exceed three (3) banking days following the date of its receipt of documents from the beneficiary, to examine the documents and determine whether to take up or refuse the documents and to inform the beneficiary accordingly.

In the event of an Act of God, riot, civil commotion, insurrection, war or any other cause beyond our control that interrupts our business (collectively, an "Interruption Event") and causes the place for presentation of this Letter of Credit to be closed for business on the last day for presentation, the expiry date of this Letter of Credit will be automatically extended without amendment to a date thirty (30) calendar days after the place for presentation reopens for business.

This Letter of Credit is transferable, and we hereby consent to such transfer, but otherwise may not be amended, changed or modified without the express written consent of the beneficiary, the Issuing Bank and the Account Party.

[BANK SIGNATURE]

*Execution Version*

# SECOND AMENDED AND RESTATED SCHEDULE

## to the

## 2002 Master Agreement

### dated as of October 4, 2019

by and among

| | |
|---|---|
| BP Energy Company ("Party A"), a corporation incorporated under the State laws of Delaware | Agera Energy LLC ("Agera"), a limited liability incorporated under the State laws of Delaware; |
| | energy.me midwest llc ("energy.me"), a limited liability incorporated under the State laws of Illinois; and |
| | Aequitas Energy Inc. ("Aequitas"), a corporation incorporated under the State laws of Connecticut (Agera, energy.me and Aequitas are individually and collectively referred to as "Party B") |

## Part 1 - Termination Provisions

Party A and Agera entered into a 2002 ISDA Master Agreement ("Master Agreement") including the Schedule thereto, the Credit Support Annex thereto, the Power Annex thereto, the Natural Gas Annex thereto, and the Renewable Energy Certificates Annex thereto, each dated May 5, 2015, as amended by that certain Amendment to the ISDA Master Agreement, dated as of October 2, 2015, (collectively, with all other schedules, annexes and exhibits thereto and all Transaction Confirmations thereunder, the "Original Agreement").  Prior to the date of execution of this second amended and restated Schedule to the Original Agreement as set forth herein (such amendment, the "Second Amended and Restated Schedule"), Party A intends to terminate all outstanding transactions under the Original Agreement (the "Original Transactions") and calculate an Early Termination Amount owing under the Original Agreement in an amount no less than the estimated Pre-Petition ISDA Amount (as defined in the hereinafter defined PSA (the "Pre-Petition Amount").  This Second Amended and Restated Schedule is effective immediately upon the later of the effectiveness of the termination of the Original Transactions or the Bankruptcy Court's entry of the Cash Collateral Order, assuming no notice of termination has been delivered thereunder at such time (the "Second Amended and Restated Schedule Effective Date").  The Original Agreement, once amended by the Second Amended and Restated Schedule, together with all other schedules, annexes, attachments and exhibits thereto and all Confirmations thereunder, including the Base Confirmation, dated as of the date of the Second Amended and Restated Schedule, by and between Party A and Party B (the "Base Confirmation"), is referred to herein as the

"Agreement". Each of Party A and Party B may be referred to herein individually as a "party" or collectively as "parties". The parties acknowledge and agree that the Second Amended and Restated Schedule constitutes an amendment of the Original Agreement and not a new agreement or novation of the Original Agreement. The Original Agreement, as amended by the Second Amended and Restated Schedule and the Base Confirmation, shall remain in full force and effect, and the Second Amended and Restated Schedule and Base Confirmation shall not terminate the Original Agreement or any obligations thereunder (except with respect to the Original Transactions), including the obligation of Party B to pay the Pre-Petition ISDA Amount to Party A. To the extent that any Transactions are entered after the Original Transactions are terminated but before entry of the Cash Collateral Order, the Second Amended and Restated Schedule will retroactively govern such Transactions from such termination date. If the Cash Collateral Order is never entered, such Transactions will be governed by the Original Agreement without giving effect to this Second Amended and Restated Schedule.

In this Agreement:

(a)    **"Specified Entity"** means:

in relation to Party A and in relation to Party B, for the purpose of:

| | |
|---|---|
| Section 5(a)(v): | Not Applicable |
| Section 5(a)(vi): | Not Applicable |
| Section 5(a)(vii): | Not Applicable |
| Section 5(b)(v): | Not Applicable |

(b)    **"Specified Transaction"** has the meaning given to it in Section 14 of the Agreement; provided, however, that "**Specified Transaction**" shall not include any Original Transaction.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(d)    The **"Credit Event Upon Merger"** provisions of Section 5(b)(v) will apply to Party A and will apply to Party B.

(e)    The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)    **"Termination Currency"** means United States Dollars.

(g)    **" Events of Default"**

(1)    Section 5(a)(vii) shall be deleted in its entirety from the Agreement.

(2)    **Additional Events of Default**. Section 5(a) shall be amended by adding the following, which shall each constitute an Additional Event of Default under Section 5(a) with respect to Party B:

"(ix)    The occurrence of any BP Termination Event other than a BP Termination Event Exception.

(x)    The Supply Termination Date shall have occurred.

2

(xi)     Any Milestone (as defined in the RSA Term Sheet) fails to occur other than a BP Termination Event Exception.

(xii)    The RSA Term Sheet terminates or ceases to be effective.

(xiii)   Party B challenges, or supports any other Person in challenging, the Cash Collateral Order (once entered) or the RSA Order (once entered).

(xiv)    Once entered, the Bankruptcy Court order approving the Cash Collateral Order or the RSA Order (a) shall cease to be in full force and effect or (b) shall have been reversed, stayed, vacated or subjected to a stay pending appeal or, without the prior written consent of Party A in its sole discretion, amended, supplemented or otherwise modified.

(xv)     Any of the representations stated in Part 4(n) of this Agreement proves to have been incorrect or misleading in any respect when made or repeated or deemed to have been made or repeated.

(xvi)    Party B enters into any new contracts with any retail, commercial, residential, governmental or industrial customer for the purchase and sale of energy, capacity, ancillary services or similar products relating to the production or delivery of electric power or natural gas, in each case without Party A's prior written consent, which such consent may be withheld at Party A's sole discretion.

(xvii)   Party B is in breach of any of its obligations under Section 5 or Schedule 5.4 of the PSA.

(xviii)  Party B is in breach of any of the covenants set forth in the Covenant Schedule and such failure, if susceptible to cure, is not remedied within 3 Local Business Days of Party B' receiving notice or having knowledge thereof."

### Part 2 - Tax Representations

(a)    **Payer Tax Representation:** For the purpose of Section 3(e), Party A and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice, application or official interpretation of any relevant governmental revenue authority, of any Relevant Jurisdiction or under any applicable tax treaty between the Relevant Jurisdictions to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

(i)      the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)     the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)    the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)     ***Payee Tax Representations:*** For the purpose of Section 3(f) of this Agreement, Party A and Party Beach make the representation(s) specified below:

(1)  For the purpose of Section 3(f) of this Agreement, Party A represents that (i) it is a corporation organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 36-3421804.

(2)  For the purpose of Section 3(f) of this Agreement, Agera represents that (i) it is a Limited Liability Company organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 770 I of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 46-5028122;

(3)  For the purpose of Section 3(f) of this Agreement, energy.me represents that (i) it is a Limited Liability Company organized and existing under the laws of the State of Illinois, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 45-1599484;

(4)  For the purpose of Section 3(f) of this Agreement, Aequitas represents that (i) it is a corporation organized and existing under the laws of the State of Connecticut, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 45-5257988;

### Part 3 - Agreement to Deliver Documents

Each party agrees to deliver the following documents as applicable:

(a)     For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | Applicable tax withholding documentation as required per Section 4(a). | Upon execution of this Agreement. |

(b)     For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | | |

4

| Party A | A certified copy of the resolution of the Board of Directors of Party A of its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement. | Yes |
|---------|-----|-----|-----|
| Party A | Certification of the authenticity of the signature of Party A's signatory certified by Party A's Company Secretary. | Upon execution of this Agreement. | Yes |
| Party A | Most recent annual audited financial statements of Party A's Credit Support Provider. | Upon written request, unless publicly available through EDGAR or some other source. | Yes |
| Party B | Certification of the authenticity of the signature of Party B's signatory certified by Party B's authorized representative. | Upon execution of this Agreement. | Yes |
| Party B | Budget Variance Reports. | Weekly on each Thursday beginning on the first Thursday after execution of the RSA Term Sheet. | Yes |

| Party B | 13 week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis. | Every five (5) weeks on the fourth Local Business Day of such week, beginning with the fifth full week after execution of the RSA Term Sheet. | No |
|---|---|---|---|
| Party B | Copies of all notices of non-compliance and other notices received by Party B or any of its Affiliates relating to the failure of Party B to comply with any State renewable portfolio standards requirements or similar requirements. | Promptly upon receipt by Party B | No |
| Party B | AR Reports, in form reasonably acceptable to BP and with such supporting information as is reasonably requested by Party A. | Weekly, on Monday, Wednesday and Friday of each week, beginning on the first of such days following execution of the RSA Term Sheet. | Yes |

## Part 4 - Miscellaneous

(a)      *Addresses for Notices.* For the purpose of Section 12(a) of this Agreement:

Address for **Confirmations** to Party A:

|  |  |
|---|---|
| Address: | BP Energy Company |
|  | 201 Helios Way |
|  | Houston, Texas 77079 |
|  |  |
| Attention: | Confirmation Department |

Facsimile No.: 281-227-8470

Email:        nagpconfirmations@bp.com

Address for other **notices** or communications to Party A (other than Confirmations):

Address:      BP Energy Company
              201 Helios Way
              Houston, Texas 77079

Attention:    Contract Services
Telephone No.: 713-323-2000
Email:        FinancialContractsExternal@uk.bp.com

Address for **Invoices** to Party A:

Address:      BP Energy Company
              201 Helios Way
              Houston, Texas 77079

Attention:    Financial Settlements

Telephone No.: 713-323-2000
Email:        nagpfs1@bp.com

**Wire Payment Instructions**:

For the Account of: BP Energy Company JP Morgan Chase Bank, NY
ABA: 021-000021
Acct No.: 910-2-548097
New York, NY 10081-6000

Address for **Complaints** to Party A:

Email:        BPEnergyNotice@bp.com
Telephone No.: 713-323-0911

Address for **Confirmations** to Party B:

Address:      Agera Energy LLC, energy.me midwest llc, or Aequitas Energy Inc. (as
              applicable)
              555 Pleasantville Rd, S107
              Briarcliff Manor, NY 10510

Attention:    Juan Padron, Supply (Jpadron@ageraenergy.com)
              Todd Sandford, COO (Tsandford@ageraenergy.com)

With Additional Copies to: finance@ageraenergy.com; supply@ageraenergy.com

Address for other **notices** or communications to Party B (other than Confirmations):

7

| | |
|---|---|
| Address: | 555 Pleasantville Rd, S107<br>Briarcliff Manor, NY 10510 |
| Attention: | Raima Jamal, Legal (Rjamal@ageraenergy.com)<br>Todd Sandford, COO (Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO (Mlinzenbold@ageraenergy.com) |

With Additional Copies to: legal@ageraenergy.com; supply@ageraenergy.com

Address for **Gas Notices** to Party B:

| | |
|---|---|
| Address: | 555 Pleasantville Rd, S107<br>Briarcliff Manor, NY 10510 |
| Attention: | Jodi Brown (Jbronw@ageraenergy.com)<br>Todd Sandford, COO (Tsandford@ageraenergy.com) |

Addresses for **Invoices** to Party B:

| | |
|---|---|
| Address: | 555 Pleasantville Rd, S107<br>Briarcliff Manor, NY 10510 |
| Attention: | Steve Jakab, Treasurer (Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO (Mlinzenbold@ageraenergy.com) |

With Additional Copies to: finance@ageraenergy.com; supply@ageraenergy.com

Wire Payment Instructions for Party B:

| | |
|---|---|
| Bank: | First National Bank of Central Texas |
| ABA: | 111903245 |
| Acct. No.: | 40038762 |
| City/State/Sip: | Waco, TX 76710 |

Party B consents to notice by e-mail for all purposes as set forth in this Section 4(a).

(b)  ***Process Agent.*** For the purpose of Section 13(c) of this Agreement: Party A appoints as its Process

Agent: Not Applicable

Party B appoints as its Process Agent: Not Applicable

(c)  ***Offices.*** The provisions of Section 10(a) will apply to this Agreement.

(d)  ***Multibranch Party.*** For the purpose of Section 10(b) of this Agreement:

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e)     ***Calculation Agent.*** The Calculation Agent is Party A, with any calculation or determination made by Party A in such capacity to be binding and conclusive absent manifest error.

(f)     ***Credit Support Document.*** Details of any Credit Support Document:

With respect to Party A, the guaranty of its Credit Support Provider.

With respect to Party B, each of the Security Documents, each Guarantee and the Intercreditor Agreement.

(g)     ***Credit Support Provider.***

Credit Support Provider means in relation to Party A, BP Corporation North America Inc., an Indiana corporation.

Credit Support Provider means in relation to Party B, each of Agera Holdings, Briarcliff Property Group, LLC, and each other pledgor, grantor or guarantor under any Credit Support Document of Party B.

(h)     ***Governing Law.*** This Agreement will be governed by and construed in accordance with New York law, without reference to its choice of law doctrine other than Section 5-1401 of the New York General Obligations Law.

(i)     ***Jurisdiction.*** Section 13(b) of the Agreement is hereby amended by deleting (b)(i)(1) and (2) and replacing with the following: "submits to the exclusive jurisdiction of (i) the Bankruptcy Court and any court with jurisdiction to hear appeals from the Bankruptcy Court, and (ii) in the event that the Chapter 11 Cases have been dismissed by the Bankruptcy Court or by such appellate court, the courts of the State of New York sitting in New York County and the United States District Court of the Southern District of New York, and any appellate court from any thereof. Each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Bankruptcy Court or such appellate court, or in the event that the Chapter 11 Cases are dismissed, such New York State court or, to the fullest extent permitted by applicable law, the United States District Court of the Southern District of New York, and in each case any appellate court thereof. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this provision shall prohibit any Party from bringing an action to enforce a judgment in any other jurisdiction;"

Section 13(b)(iii) shall be deleted in its entirety."

(j)     ***Netting of Payments.*** "Multiple Transaction Payment Netting" will apply for the purpose of Section 2(c) of this Agreement to all Transactions.

(k)     ***"Affiliate"*** will have the meaning specified in Section 14 of this Agreement.

(l)     ***"Absence of Litigation".***

(a)  Section 3(c) is amended by the inclusion of the word "adversely" before the word "affect" in the third line.

(b)  For the purpose of Section 3(c):

***"Specified Entity"*** means in relation to Party A, Not Applicable.
***"Specified Entity"*** means in relation to Party B, Not Applicable.

(m)    ***No Agency.*** The provisions of Section 3(g) will apply to Party A and will apply to Party B.

(n)    ***Additional Representation.*** Will apply. For the purpose of Section 3 of this Agreement, the following will each constitute an Additional Representation (which representations will be deemed to be repeated by each party, as appropriate, on each date on which a Transaction is entered into):

(i)    ***Eligible Commercial Entity.*** It constitutes an "eligible commercial entity" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(ii)    ***Eligible Contract Participant.*** It constitutes an "eligible contract participant" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(iii)    ***Swap Agreement.*** This Agreement and any Transaction entered into hereunder constitutes a "swap agreement" within the meaning of the United States Bankruptcy Code (11 USC Sec. 101(53B) (2000)).

(iv)    ***Line of Business.*** It has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(v)    ***Relationship Between the Parties.*** In connection with the negotiation of, the entering into, and the confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, and each Transaction: (i) it is acting as principal (and not as agent or in any other capacity, fiduciary or otherwise); (ii) the other party is not acting as a fiduciary or financial or investment advisor for it; (iii) it is not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth in this Agreement and in such Credit Support Document; (iv) the other party has not given to it (directly or indirectly through any other person) any advice, counsel, assurance, guaranty, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document, or such Transaction; (v) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary, and not upon any view expressed by the other party; (vi) all trading decisions have been the result of arm's length negotiations between the parties; and (vii) it is entering into this Agreement, such Credit Support Document, and such Transaction with a full understanding of all of the risks hereof and thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(vi)    Party B is in continuing possession of its property and is operating and managing its business, as debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(vii)   The Postpetition Obligations (as defined in the Cash Collateral Order) constitute administrative expenses under Section 503(b) of the Bankruptcy Code and are entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code.

(viii)   The execution, delivery, and performance by Party B of this Agreement and each Transaction hereunder will be in the ordinary course of business of Party B for purposes of meeting its post-petition supply needs and managing exposure to commodity price risks and not for speculative purposes.

(o)   ***Recording of Telephone Conversations.*** To the extent permitted by applicable law, each party: (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain prior to entering into any Transaction any necessary consent of, and give any necessary notice of such recording to, its relevant personnel, (iii) agrees that recordings may be submitted in evidence in any Proceedings, and (iv) acknowledges to the other party and consents that such other party may from time to time and without further notice (A) retain electronic transmissions (including telephone conversations, email and instant messaging between the parties' respective representatives in connection with the Agreement, any potential Transaction and any Transaction or other commercial matters between the parties) on central and local databases for their respective legitimate purposes, and (B) monitor electronic transmissions through their internal and external networks for purposes of security and compliance with applicable laws, regulations and internal policies for their legitimate business purposes. Each party further agrees that it will indemnify, defend and hold the other party harmless from any and all damages, losses, claims, liabilities, judgments, costs and expenses, including but not limited to reasonable attorney's fees and costs of court arising directly or indirectly from or out of such party's failure to obtain any consent necessary from a party's trading, marketing and other relevant personnel, agents or representatives or such party's failure to give any notice required to such individuals.

(p)   ***Credit Support Annex.*** From and after the date of this Amended and Restated Schedule, the Credit Support Annex forming part of the Original Agreement shall be deleted in its entirety and shall no longer be in force and effect, and from and after such date, neither party shall have any obligations thereunder; provided, however, that the parties agree that any amounts posted to Party A by Party B under the Credit Support Annex immediately prior to the effectiveness of this Amended and Restated Schedule shall be permitted to be applied by Party A to the Pre-Petition ISDA Amount (as defined in the PSA) that is owing by Party B to Party A.

(q)   ***Renewable Energy Certificates Annex.*** From and after the date of this Amended and Restated Schedule, the Renewable Energy Certificates Annex forming part of and set forth in Part 8 of the Amended and Restated Schedule to the Original Agreement is hereby deleted in its entirety and shall no longer be in force and effect.

(r)   ***Pre-Petition ISDA Amount.*** Calculation of the Pre-Petition ISDA Amount shall not prejudice any rights of Party A to terminate any new Transactions entered into under this Agreement in accordance with the terms of this Agreement, including upon an Event of Default or Termination Event with respect to Party B as the Defaulting Party or Affected Party.

(s)   ***Conditions Precedent.*** Any obligation of Party A to enter into any Transactions under the Agreement, including the Base Confirmation, shall be subject to satisfaction of the following conditions:

(i)      the representations and warranties contained in the Agreement shall be true and correct in all respects as of such date (and any request by Party B for the entering into of any such Transaction shall be deemed to be a restatement, representation, and additional warranty of the representations and warranties of Buyer contained in each Transaction Document as of such date);

(ii)     there shall exist no Potential Event of Default, Event of Default or Termination Event with respect to Party B and the entering into of such Transaction would not cause or be reasonably expected to cause a Potential Event of Default, Event of Default or Termination Event with respect to Party B;

(iii)    on or before the Petition Date, provide to the applicable ISO executed copies of all documentation and take all other actions (including the posting of required credit support) required to transfer BP's obligations as the FRP in each of ERCOT, NYISO, ISO-NE, MISO and CAISO in respect of the Agera Parties' load to the Agera Parties, (ii) use commercial best efforts to provide to PJM as soon as practicable after request from PJM or BP executed copies of all documentation and take all other actions that PJM requires to transfer BP's obligations as an FRP in respect of the Agera Parties' load to the Agera Parties, and (iii) on or before the Petition Date, provide to BP or the applicable ISO executed copies of all documentation requested by BP in connection with the maintenance by BP of any scheduling or other functions (including payment of ISO invoices on the applicable Agera Parties' behalf in BP's capacity as agent of the applicable Agera Parties) in respect of any of the Agera Parties' load in any of ERCOT, NYISO, ISO-NE, PJM, MISO or CAISO; and

(iv)    use commercially reasonable efforts to sell all remaining renewable energy credit inventory held by Party B.

## Part 5 - Other Provisions

(a)     ***General Conditions.*** Section 2(a)(ii) shall be amended by the deletion of the final sentence thereof and the addition of the following in substitution therefor: "The parties agree that all payments under this Agreement shall be made by wire transfer of immediately available funds to the party receiving payment, at the account specified by such party."

(b)     ***Limitation on Condition Precedent.*** With respect to any Transaction entered into under this Agreement, Section 2(a)(iii) of this Agreement is hereby amended by adding the following phrase at the end of clause (I) immediately before the last comma of such phrase:

"(provided, however, that in relation to any Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than ten (10) days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i))."

(c)     ***Change of Account.*** Section 2(b) of this Agreement is hereby amended by the insertion of the following at the end thereof after the word "change":

", provided that if such new account shall not be in the same jurisdiction having the same power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amounts and shall not receive less as a result of such change than would have been the

case if such change had not taken place."

(d)   ***Deduction or Withholding for Tax.*** Section 2(d)(i)(4) is amended by the addition of"; or" at the end of sub-paragraph (B) and the addition of a new sub-paragraph (C) as follows:

"(C) Y refusing to supply any form or document under Section 4(a)(iii) on grounds of material prejudice to its legal or commercial position."

(e)   ***Representations.*** The opening paragraph of Section 3 is amended by replacing "in the case of the representations in Section 3(f)" with "in the case of the representations in Sections 3(f) and 3(h)(iv)" and adding the following new sub-section 3(h) and 3(i):

"(h) ***Dodd Frank Representations.***

(i)   ***Hedging Transactions.*** Unless otherwise noted in the applicable Confirmation for any Transaction, such Transaction constitutes for Party B a bona fide hedging transaction as defined in CFTC Regulation 1.3(z) (17 C.F.R. § 1.3(z)).

(ii)   ***End User Clearing Exemption.*** If with respect to any Transaction Party B has elected an exemption from the clearing requirement under Section 2(h)(7)(A) of the CEA, then as of the date of the execution of such Transaction (and not as of the date of this Agreement) (1) it is not a "financial entity" as defined in Section 2(h)(7)(C)(i) of the CEA, subject to certain exceptions in Sections 2(h)(7)(C)(ii), 2(h)(7)(C)(iii) and 2(h)(7)(D) of the CEA; (2) it is using such Transaction to hedge or mitigate commercial risk; (3) it has reported the information required to be submitted under 17 C.F.R. § 50.SO(b)(l)(iii) in an annual filing made no more than 365 days prior to the Trade Date of such Transaction, pursuant to 17 C.F.R. § 50.50(b)(2), and (4) to the extent it is required to do so under Section 2(i) of the CEA and 17 C.F.R. § 50.50(b)(l)(iii)(D)(2), it has obtained all necessary approvals by the appropriate committee (or equivalent body) of its board of directors to rely on the exception to the clearing requirement under Section 2(h)(7)(A) of the CEA.

(iii)   ***Special Entity Status.*** Party B is not a federal agency, state agency, city, county, municipality or other political subdivision of a state, or any instrumentality, department or entity established thereby, or any other Special Entity as defined by the CFTC Regulation 23.40l(c).

(iv)   ***DF Protocols.*** Each of the parties hereby agrees to enter into additional reasonable documentation or modify existing documentation between the parties to satisfy the requirements imposed upon one or both of the parties by the Dodd- Frank Wall Street Reform and Consumer Protection Act, the CEA and/or CFTC Regulations thereunder, including, upon reasonable request, adhering to or entering into such other protocols, suggested amendments, market conventions and other contractual provisions published by ISDA from time to time and intended to enhance one or both party's compliance with the CEA, the Dodd- Frank Wall Street Reform and Consumer Protection Act, CFTC Regulations and other applicable laws, or to facilitate the orderly processing of Transactions."

(i)   ***Variation and Initial Margin Requirements Representations***. Party B represents that it is not a Financial End User, Swap Dealer or Major Swap Participant as set forth in

CFTC Regulation 23.151."

(f)     ***Covenant Schedule***.  The covenant schedule attached as <u>Attachment C</u> hereto (the "***Covenant Schedule***") is hereby incorporated by reference herein as a term of this Agreement.

(g)     ***Tax Event.*** Section 5(b)(iii) shall be amended by the addition of "or (C)" after the words "or (B)" at the end of the last line.

(h)     ***Set off.*** Section 6(t) is deleted in its entirety and replaced with the following:

"**Set-off.** Without affecting or prejudicing the provisions of this Agreement requiring the calculation and payment of certain net payment amounts on Scheduled Settlement Dates, all payments will be made without Set-off or counterclaim; provided, however, that any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer") in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the sole option of the Non-defaulting Party or the Non- affected Party, as the case may be ("X") (and without prior Notice to the Defaulting Party or the Affected Party, as the case may be), will be reduced by its setoff against any other amounts payable by the Payee to the Payer (whether arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation (collectively "Other Amounts"). Additionally, the set-off rights under this section include but are not limited to the following: (i) any Early Termination Amount against any Posted Credit Support held by a party relating to the Agreement; (ii) any Early Termination Amount against any amount(s) (including any excess collateral, security or credit support) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Early Termination Amount owed to the Non- defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Non-defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; (iv) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party to the Non-defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party or its Affiliates to the Non-defaulting Party under any other agreement or arrangement.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate subject to the relevant party accounting to the other when the obligation is ascertained.

To the extent that Other Amounts or any other sums otherwise owed by the Non-defaulting Party's Affiliate to the Defaulting Party, have been setoff by the Non- defaulting Party pursuant to this Section 6(f), the Non-defaulting Party's Affiliate shall not be liable to, and shall be released by, the Defaulting Party; provided further that the Defaulting Party shall be forever estopped from asserting that the Non-defaulting Party's Affiliate owes the Other Amounts or other sums to the Defaulting Party. The obligations of the Non-defaulting Party, the Non-defaulting Party's Affiliates, the Defaulting Party and the Defaulting Party's Affiliates under this Agreement or otherwise in respect of such Other Amounts or other sums shall be deemed satisfied and discharged to the extent of any such setoff. For this purpose, the Other Amounts or other sums

subject to the setoff may be converted at the applicable prevailing exchange rate into U.S. Dollars by the Non-defaulting Party. The Non-defaulting Party will give the Defaulting Party notice of any setoff effected under this section provided that failure to give such notice shall not affect the validity of the setoff. Nothing in this paragraph shall be deemed to create a charge or other security interest. "Setoff as used herein means setoff, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the Non-defaulting Party is entitled or subject to (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, the Non-defaulting Party."

(i)    *Transfer*. Section 7 shall be amended by adding the following as Section 7(c) "Party B shall in no event be entitled to transfer or assign all or any part of this Agreement or any Transaction to any other entity."

(j)    ***Counterparts and Confirmations.***

(i)    Section 9(e)(i) shall be amended by deleting the words "and by electronic messaging system"; and

(ii)    The second and third sentences of Section 9(e)(ii) shall be deleted and replaced by the following:

"Any Transaction may be effectuated in an EDI transmission or telephone conversation or other electronic means of communication with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such Transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Party A (the ***"Confirming Party")*** will promptly send a Confirmation to Party B to confirm a telephonic transaction by any reasonable means, including, without limitation, by facsimile, hand delivery, courier, or certified United States mail (return receipt requested) within three Business Days of a Transaction, provided that the failure to send a Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Confirmation as the identification and authentication of Confirming Party. If the Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation/transmission conditions), which modify or supplement the Transaction or the terms of this Master Agreement (e.g., Force Majeure, arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to this Section 9(e)(ii) but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any Transaction agreed to by the parties. If Party A's Confirmation is materially different from Party B's understanding of the Transaction, Party B shall notify the Confirming Party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless Party B has previously sent a Confirmation to the Confirming Party. The failure of Party B to so notify the Confirming Party in writing by the Confirm Deadline constitutes Party B's agreement to the terms of the Transaction described in the Confirming Party's Confirmation. If there are any material differences between timely sent Confirmations governing the same Transaction, or if Party B has timely objected to the terms of the Confirming Party's Confirmation, such Transaction remains valid and the parties remain legally bound thereby, however, both parties shall in good faith attempt to resolve such differences. Once such material differences are resolved, the Confirming Party shall transmit a written Confirmation to Party B, and such written

Confirmation shall be accepted (or disputed) pursuant to the provisions of this Section 9(e)(ii). The provisions of this Section 9(e)(ii) may be repeated as many times as necessary to produce a written Confirmation that is accepted or deemed accepted by Party B. In the event of a conflict among the terms of (i) a binding Confirmation pursuant to this Section 9(e)(ii), (ii) the oral agreement of the parties (which may be evidenced by a recording of such transaction, oral testimony, data in a computer system, trade tickets, and/or notes), and (iii) this Master Agreement, the terms of the items shall govern in the priority listed in this sentence.

> *"Confirm Deadline"* shall mean the earlier of (1) 5:00 p.m. in Party B's time zone on the fifth New York Business Day following the New York Business Day a Confirmation is received by Party B; provided, if the Confirmation is received after 5:00 p.m. in Party B's time zone, it shall be deemed received at the opening of the next New York Business Day, or (2) on and after the effective date of the confirmation rules set forth in CFTC Regulation 23.501, such earlier time as is set forth in the compliance schedule in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c). *"New York Business Day"* shall mean any day except for a Saturday, Sunday or a day on which the Federal Reserve Bank of New York is closed.

> Notwithstanding the provisions of Section 12(a)(iii) of the Agreement, a written Confirmation and any other writing related to or in response to a written Confirmation shall be deemed delivered to the receiving party (i) when actually received by the receiving party or (ii) with respect to a written Confirmation and other writing delivered by facsimile, when the sending party's facsimile machine indicates by an electronic or written facsimile log that the receiving party's facsimile machine received such written Confirmation.

> Party A shall not be required to maintain or retain a paper-based version of the written Confirmation delivered to Party B. In addition to a paper-based version of the written Confirmation delivered to Party B, the following shall constitute a "written Confirmation" for all purposes of this Agreement: (i) an electronic image of a paper-based version of the written Confirmation, and (ii) data in Party A's computer system.

> Any document generated by the parties with respect to a Transaction, including this Agreement, may be imaged and stored electronically *("Imaged Documents").* Imaged Documents may be introduced as evidence in any proceeding as if such were original business records and neither party shall contest the admissibility of Imaged Documents as evidence in any proceeding."

(iii)    Notwithstanding the foregoing, the Confirming Party will endeavour to send the Confirmation to the other Party as soon as technologically practicable, but in any event will endeavour to do so in accordance with the compliance schedule set forth in CFTC Regulation 23.50l(a), as modified by CFTC Regulation 23.SOl(c)."

(k)    *Notices.* The wording of Section 12(a)(iii) shall be replaced in its entirety by the following:

"if sent by facsimile transmission, on receipt by the sender of a valid transmission report."

(l)    *ISDA Definitions and Inconsistency.*

(i)    This Agreement, each Confirmation and each Transaction between the parties are subject

to the 2005 ISDA Commodity Definitions as published by the International Swaps and Derivatives Association, Inc., ("the Definitions"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof. The provisions of the Definitions are incorporated by reference and shall be deemed a part of this Agreement, except that sub-annexes B to I inclusive shall not apply.

(ii)    In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of any Credit Support Document and the Definitions, the Credit Support Document will prevail. Subject to Section I(b) of this Agreement, in the event of any inconsistency between the provisions of any Confirmation and this Agreement or the Definitions, the Confirmation will prevail for the purpose of the relevant Transaction.

(m)    *Market Disruption Events; Additional Market Disruption Events.*

(i)    The "Market Disruption Events" specified in, Section 7.4(c) of the Definitions shall apply; and

(ii)    "Additional Market Disruption Events" shall apply only if specified in the relevant Confirmation.

(n)    *Disruption Fallbacks.*

The "Disruption Fallbacks" specified in Section 7.5(c) of the Definitions shall apply, except that:

(i)    "Fallback Reference Price" shall not apply;

(ii)    for the purposes of Section 7.6 of the Definitions, the Maximum Days of Disruption will be five (5) Commodity Business Days; and

(iii)    "Reference Dealers" means, with respect to any transaction for which the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four independent leading dealers selected in good faith and jointly agreed upon by the parties satisfying all the criteria that the parties apply generally at the time of deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to this Transaction. Such dealers will be appointed to make a determination of the Commodity-Reference Price, taking into consideration the latest available quotation for the Commodity-Reference Price and any other information that in good faith they deem relevant. If the parties have not agreed upon the appointment of the dealers on or before the sixth Commodity Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, or if a determination of the relevant Commodity-Reference Price cannot be obtained from at least four dealers, the next applicable Disruption Fallback will apply to the Transaction.

(o)    *Severability.* In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavour, in good faith negotiations, to replace the invalid, illegal or

unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(p)   ***Payment Date During Transfer Period.*** If the parties are required by Section 6(b)(ii) to make efforts to transfer certain obligations under this Agreement in connection with a Termination Event, and a Payment Date (as defined in the related Confirmation) will occur under the relevant Affected Transaction during the period specified in Section 6(b) for those efforts, then the payment(s) due to be made on that Payment Date shall be postponed until the earlier of (i) the Local Business Day following the day on which a transfer is effected in consequence of such efforts; (ii) the Local Business Day following the day on which such period ends, if an Early Termination Date is not designated by a party on such day; and (iii) the Early Termination Date for the relevant Affected Transaction, with such postponed payment(s) then being treated as Unpaid Amounts. In either case, the postponed payment(s) shall bear interest (before as well as after judgment) at the Applicable Deferral Rate from (and including) such Payment Date to (but excluding) the date of actual payment.

(q)   ***Termination Payments.*** The parties acknowledge and agree that notwithstanding anything in the Agreement to the contrary, Party B will not be entitled to any payments or other amounts in respect of any termination of any Transaction entered into under the Agreement on or after the date of the Second Amended and Restated Schedule other than in respect of Unpaid Amounts. To the extent a Close-out Amount would otherwise show an amount due to Party B, it will be deemed to be zero for purposes of calculating any Early Termination Amount.

(r)   ***Confidentiality.*** The contents of this Agreement and all other documents relating to this Agreement, and any information (including any financial information) made available by one party or its Credit Support Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either party) without the prior written consent of the other party, except for such information (i) as may become generally available to the public, (ii) as may be necessary to enforce this Agreement or implement any Transaction hereunder, (iii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iv) as may be necessary to comply with a regulatory agency's reporting requirements, including but not limited to gas cost recovery proceedings, (v) as may be delivered to such third party for the sole purpose of calculating a published index, (vi) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing party or its Credit Support Provider in making such disclosure, or (vii) as may be furnished to the disclosing party's Affiliates, and to each of such person's auditors, attorneys, advisors, lenders, monitors or prospective purchasers of all or any portion of a party's assets or any of its rights under this Agreement, provided such persons are required to keep the information that is disclosed in confidence. Notwithstanding the foregoing, (i) if information would be permitted to be disclosed pursuant to DF Supplement Section 2.13, then such disclosure shall be permitted under any other applicable confidentiality provision or agreement, (ii) information may be disclosed to any regulatory agency (including any governmental authority, swap data repository or other like agency or entity) as a party may determine is advisable in accordance with such party's reporting policies and procedures, and (iii) this Agreement (including all schedules, annexes and exhibits hereto) may be filed with the Bankruptcy Court in connection with the Chapter 11

Cases as part of the Cash Collateral Order. Any confidential information received by a party may be used by such party and, to the extent disclosure is not restricted hereunder, may be disclosed and used by such permitted recipients, including in each case use by persons acting in a structuring, sales or trading capacity. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the expiration or termination of this Agreement, provided, however, that with respect to information provided with respect to a Transaction, this obligation shall only survive for a period of one (1) year following the expiration or termination of such Transaction.

(s)      ***LIMITATION OF LIABILITY.* NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR PUNITIVE, EXEMPLARY, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE OR STRICT LIABILITY) TO ANY OTHER PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT OR THE OBLIGATION TO PAY ANY AMOUNT REQUIRED PURSUANT TO SECTION 6(e) OF THIS AGREEMENT. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.**

(t)      *Definitions.* Section 14 shall be amended to add the following definitions:

"*Agera Holdings*" means Agera Holdings, LLC.

"*Agera Termination Event*" has the meaning set forth in the RSA Term Sheet.

"*Approved Budget*" has the meaning set forth in the RSA Term Sheet.

"*Bankruptcy Code*" means the United States Code, 11 U.S.C. Sections 101 *et seq*., as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or such other successor bankruptcy court to which the Chapter 11 Cases are transferred.

"*BP Termination Event*" has the meaning set forth in the RSA Term Sheet.

"*BP Termination Event Exception*" means that certain Milestone (as defined in the RSA Term Sheet) that requires entry of the RSA Order within seventeen (17) days of the Petition Date (as defined in the RSA Term Sheet).

"*Budget Variance Report*" has the meaning set forth in the RSA Term Sheet.

"*Chapter 11 Cases*" means the jointly administered cases under Chapter 11 of the Bankruptcy Code, captioned as *In re: Agera Energy LLC, et al.*, pending in the Bankruptcy Court.

"*Cash Collateral*" has the meaning set forth in the RSA Term Sheet.

"*Cash Collateral Order*" means the interim or final order of the Bankruptcy Court, as applicable, entered in the Chapter 11 Cases authorizing, among other things, the Debtors' use of Cash Collateral,

the PSA and this Agreement.

"***Debtor***" means Agera Energy LLC, energy.me Midwest llc, Aequitas Energy Inc., Agera Holdings, Utility Recovery LLC, or Agera Solutions LLC, and "Debtors" means each of them collectively.

"*EDI*" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of a Transaction.

"***Guarantee***" means each of (i) that certain Personal Guaranty Agreement, dated January 25, 2019, made by Greg Lindberg in favor of Party A, and (ii) that certain Guaranty Agreement, dated January 25, 2019, made by Global Health Technology Group, LLC in favor of BP.

"***Intercreditor Agreement***" means that certain Second Amended and Restated Intercreditor Agreement dated as of February 9, 2018, by and among, Party A, the Subordinated Lienholders (as defined therein), Party B and Agera Holdings.

"***Permitted Variance***" has the meaning set forth in the RSA Term Sheet.

"***PSA***" means the fully executed Preferred Supplier Agreement dated October 2, 2015, between Party A and Party B, as amended by that certain First Amendment to Preferred Supplier Agreement, dated as of May 10, 2017, and that certain Waiver and Second Amendment to Preferred Supplier Agreement dated as of February 9, 2018, and as further amended by that certain Third Amendment to Preferred Supplier Agreement dated as of October 4, 2019 (as further amended, restated, amended and restated, supplemented, or as otherwise modified).

"***RSA Order***" means a Bankruptcy Court order approving the Debtors' assumption of the RSA Term Sheet pursuant to section 365 of the Bankruptcy Code.

"***RSA Term Sheet***" means the RSA Term Sheet between Party A, the Debtors, Briarcliff Property Group, LLC ("Briarcliff"), Utility Recovery LLC and Agera Solutions LLC, dated October 3, 2019. Any reference to the RSA Term Sheet applies whether or not the Bankruptcy Court has approved the RSA Term Sheet.

"***Security Documents***" means the term as defined in the PSA.

"***Supply Termination Date***" means the term defined in the RSA Term Sheet.

(u)    ***2002 Master Agreement Protocol.*** The parties agree that, with effect from the date of this Agreement, the terms of each Annex to the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association Inc. on July 15, 2003, (the "Protocol") shall apply to this Agreement as if the parties had adhered to the Protocol without amendment.

(v)    **WAIVER OF RIGHT TO TRIAL BY JURY. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(w)    ***Right to Clear and Choose DCO.*** Notwithstanding anything in DF Supplement Section 2.24, if a Transaction is subject to mandatory clearing requirements under Section 2(h) of the CEA, and the party other than BP Energy Company fails to designate a DCO in connection with the execution of the Transaction, then BP Energy Company may select a DCO to which the other

party has transaction rights to be the DCO for such Transaction on behalf of such other party.

(x)    Agera's CFTC Interim Compliant Identifier ("CICI") is 549300IEC1BRJMR5LR84.

(y)    energy.me's CICI is 549300QQZTUEL8GAA162.

(z)    Aequitas Energy Inc.'s CICI is 5493001DR8JDUWZBE084.

(aa)   ***Withholding Tax Imposed on Payments to Non-US Counterparties Under the United States Foreign Account Tax Compliance Act.*** "Tax" as used in Part 2(a) of this Schedule (Payer Tax Representation) and "Indemnifiable Tax" as defined in Section 14 of this Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section I47l(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a ***"FATCA With/to/ding Tax").*** For the avoidance of doubt, a FATCA.

Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of this Agreement.

(bb)   ***Partial Termination.*** Periodically, and no less often than monthly, BP will elect a permanent partial termination of the portion of each Transaction that relates to accounts under Sales Contracts that are no longer scheduled to be supplied to Party B, other than those accounts that have or will be transferred to Exelon Generation Company, LLC ("Exelon"), for the remainder of such term of such Transaction (a "Partial Unwind"), as calculated by BP in its sole discretion based on accounts that are scheduled to be transferred to the applicable utility or local distribution company or other third party, other than Exelon, by providing written notice of such Partial Unwind election to Party B (the "Partial Unwind Notice").

In connection with any Partial Unwind, the notional quantities and other related provisions of each applicable Transaction shall be proportionally adjusted consistent with the reduction in volumes for the remainder of the term of the Transaction. A Partial Unwind shall be treated as a Termination Event with respect to the terminated portion of each applicable Transaction, in respect of which Party B shall be the sole Affected Party. A Partial Unwind shall not be treated as a Termination Event under this Agreement with respect to the non-terminated portion of any Transaction, and except as otherwise expressly set forth herein, the occurrence of a Partial Unwind shall have no effect on the non-terminated portion of the Transactions, which shall continue in full force and effect without regard to any such Partial Unwind. The Early Termination Date in respect of any Partial Unwind shall (i) be set forth in the Partial Unwind Notice, (ii) may vary for portions of the Partial Unwind to reflect dates upon which accounts will cease to be served, and (iii) may be prior to the date upon which such notice is sent. Notwithstanding anything in the Agreement to the contrary, Party A may elect to pay any Unpaid Amounts due to Party B in respect of a Partial Unwind on the payment due date that would have otherwise applied to the Affected Transaction.

(cc)   ***Actions Binding.*** Any action of Agera, energy.me, or Aequitas, as the case may be, shall bind the other.

(dd)   ***Payment Deferrals.*** Notwithstanding anything herein or in any Transaction to the contrary,

Buyer may elect to defer amounts that would otherwise be due and payable on any due date under any Transactions entered into hereunder on or after the Effective Date, until up to the second due date (each, a "Due Date") following the Due Date on which such amounts were originally due by making a written election delivered to Party A not less than three (3) Local Business Days prior to the original Due Date; provided, that (i) after giving pro forma effect to such deferral, the Net AP Value (as defined in the RSA Term Sheet) is not higher than the Maximum Amount (as defined in the RSA Term Sheet), (iii) all amounts deferred under such Transactions must be paid on or prior to the second Due Date following the Due Date on which such deferred amounts were originally due (or such earlier date as is required under the ISDA Master Agreement, but in any event no later than sixty (60) days from the original Due Date) and (iv) immediately prior to and after giving pro forma effect to such deferrals, there is no Event of Default, Termination Event or Potential Event of Default existing. All payments deferred under any Transaction shall accrue interest at a rate equal to the lesser of (a) LIBOR (as defined in the PSA) plus 750 basis points or (b) the maximum lawful rate until paid in full (together with accrued interest).

**Part 6. Physically Settled Power Transactions**

(a)    **ISDA North American Power Annex.** The North American Power Annex to the ISDA Master Agreement published by ISDA (attached hereto as <u>Attachment A</u>), as amended, supplemented, replaced or modified from time to time, (the "Power Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physically settled power, except as otherwise specifically provided in the relevant Confirmation. The Commodity Definitions are incorporated in this Power Annex for all purposes. All terms used in this Part 6 that are not otherwise defined shall have the meanings given to them in the Power Annex.

(b)    The following shall amend and replace clause (i) of the Power Annex:

**(j)    Elective Provisions**

1.    (a)(ii) __ Applicability of Part 6 to Outstanding Power Transactions. If not checked, not applicable.

2.    (a)(iii) __ Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions. If not checked, not applicable.

3.    (c) _X_ Accelerated Payment Damages. If not checked, not applicable.

4.    (d)(ii): **Timeliness of Payment**
        ___ Option A
        _X_ Option B

    If neither is checked, Option B shall be deemed to apply.

5.(h)(i): **Wholesale Power Tariffs**
        _x_    Party A Electric Tariff. FERC Electric Tariff Accepted by FERC: 02/18/14 Effective Date: 12/21/2013  Docket Number ER14-779

_x_    **Agera Energy LLC:** FERC Electric Tariff. Tariff/Date/Docket: Agera Energy LLC - Docket Nos.    ER14-2472-000 and ER14-2472-001/September 30, 2014; **energy.me midwest lie:** FERC Electric Tariff: Docket No. ER15-1721-000, Effective Date July 15, 2015 and **Aequitas Energy Inc.:** FERC Electric Tariff: Accepted by FERC: 06/20/12 Effective Date: 08/07/12 Docket Number ER12-2065-001

If not checked, not applicable.

6.(h)(ii) __ Applicability of Severability provision. If not checked, not applicable.

7.(h)(iii) _x_ Applicability of FERC Standard of Review and Certain Covenants and

Waivers. If not checked, not applicable.

(c)    **Notice Information for Power Transactions.**

| Name: *("BP Energy Company"* or *"Party A")* | Name: *("Agera Energy LLC', "energy.me midwest llc", or "Aequitas Energy, Inc."* or *"Party B")* |
|---|---|
| **All Notices:**<br>Street: 201 Helios Way<br>City:    Houston, Texas<br>Zip:    77079<br>Attn:    Contract Services - Power<br>Phone:    713-323-2000<br><br><br>Email:    FinancialContractsExternal@uk.bp.com<br>Duns:    62-527-5755<br>Federal Tax ID Number: 36-3421804 | **All Notices:** As set forth in Part 4 of the Schedule. pursuant to Part 4(a). |
| **Invoices:**<br>Attn:    Power Accounting<br>Phone:    713-323-1041<br>Facsimile: 713-323-7457 | **Invoices:** As set forth in Part 4 of the Schedule. |
| **Confirmations:**<br>Attn:    Confirmations - Power<br>Phone:    713-323-3806<br>Facsimile:    281-227-8470 | **Confirmations: ATTN POWER SUPPLY** As set forth in Part 4 of the Schedule. |
| **Scheduling:**<br>Attn:    Scheduling<br>Phone:    713-323-5262<br>Facsimile: 713-323-7909 | **Scheduling:** As set forth in Part 4 of the Schedule. |
| **Payments:**<br>Attn:    Power Accounting<br>Phone:    713-323-1041<br>Facsimile: 713-323-7457 | **Payments:** As set forth in Part 4 of the Schedule. |

23

| **Wire Transfer:** | **Wire Transfer:** |
| BNK:   JPMorgan Chase Bank, NA<br>New York, NY 10081-6000<br>ABA:   021-000021<br>ACCT: 826078354 | BNK: First National Bank of Central Texas<br>ABA: 111903245<br>ACCT: 40038762 |
| **Credit and Collections:**<br>Attn:       Griffin Keller<br>Phone:      832-664-2400<br>Facsimile: 713-323-7459<br><br>**With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:**<br><br>Attn:       Griffin Keller<br>Phone:      832-664-2400<br>Facsimile: 713-323-7459; and<br><br>Attn:       Legal-Power<br>Phone:      713-323-3735<br>Facsimile: 713-323-7472 | **Credit and Collections:** As set forth in Part 4 of the Schedule.<br><br>**With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:** As set forth in Part 4 of the Schedule. |

(d)    **Additional Provisions to this Power Annex.**

1.    Clause (a)(ii) is amended by inserting the phrase "under any EEI Master Power Purchase and Sale Agreement or WSPP Agreement" immediately after the word "outstanding" and before the parenthetical in the first (1st) sentence therein.

2.    Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (1st) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement. If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.    Clause (b)(ii) shall be amended by adding the following at the end thereof:

"With respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in the Electric Reliability Council of Texas ("ERCOT") region, the following shall apply, notwithstanding any other Scheduling deadlines in the ERCOT Nodal Protocols:

(A)    <u>Definitions</u>: "DRUC Schedule Deadline" means the time at which ERCOT is

24

required to start the DRUC process relating to such day of delivery.

"HRUC Schedule Deadline" means the time at which ERCOT is required to start an HRUC process relating to such hour of delivery.

"First HRUC Schedule Deadline" means the HRUC Schedule Deadline which immediately follows the time at which the parties entered into the Transaction and which occurs after the start of the next clock hour.

(B)      HRUC Scheduling Requirement: Buyer and Seller shall Schedule each hour's deliveries of the Product with ERCOT prior to the First HRUC Schedule Deadline unless the time at which the Transaction was entered into is less than thirty (30) minutes prior to the start of the next clock hour, in which case the HRUC Schedule Deadline immediately following the First HRUC Schedule Deadline shall be the applicable scheduling deadline."

(C)      DRUC Scheduling Requirement: If a Transaction is entered into prior to that day's DRUC Schedule Deadline, Buyer and Seller shall Schedule such day's deliveries of the Product with ERCOT prior to that day's DRUC Schedule Deadline."

4.      Clause (c)(i) shall be relabelled (c)(i)(a) and a new clause (c)(i)(b) shall be added to deal with Seller Failure with respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in ERCOT:

"(c)(i)(b) Seller Failure in ERCOT for Firm (LD) Transactions and Firm (No Force Majeure) Transactions. If Seller fails to schedule and/or deliver all or part of the Product pursuant to a Transaction, and such failure is not excused under the terms of the Product or by Buyer's failure to perform, then Seller shall pay Buyer, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in the Elective Provisions of the ISDA Power Annex, within five (5) Business Days of invoice receipt, (i) an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Contract Price from the Replacement Price and (ii) an amount equal to the ERCOT charges incurred by Buyer, if any, as a result of Seller's failure to Schedule a Firm (LD) or Firm (No Force Majeure) Transaction in the ERCOT region prior to any applicable DRUC Schedule Deadline or HRUC Schedule Deadline under clause (b)(ii). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount."

5.      Clause (c)(ii) shall be relabelled (c)(ii)(a) and a new clause (c)(ii)(b) shall be added to deal with Buyer Failure with respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in ERCOT:

"(c)(ii)(b) Buyer Failure in ERCOT for Firm (LD) Transactions and Firm (No Force Majeure) Transactions. If Buyer fails to schedule and/or receive all or part of the Product pursuant to a Transaction and such failure is not excused under the terms of the Product or by Seller's failure to perform, then Buyer

shall pay Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in the Elective Provisions of the ISDA Power Annex, within five (5) Business Days of invoice receipt, (i) an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Sales Price from the Contract Price; and (ii) an amount equal to the ERCOT charges incurred by Seller, if any, as a result of Buyer's failure to Schedule a Finn (LD) or Firm (No Force Majeure) Transaction prior to any applicable DRUC Schedule Deadline or HRUC Schedule Deadline\ under clause (b)(ii). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount."

6.    The following provisions shall be added as new clauses (c)(iv) and (c)(v) herein:

**(iv)** *Mitigation.* Each party has a duty to mitigate damages provided under this Power Annex and will use commercially reasonable efforts to minimize any damages it may incur resulting from the other party's performance or nonperformance under any Power Transaction.

**(v)** *Exclusivity.* So long as any failure of Seller to schedule or deliver, or any failure of Buyer to schedule or receive, the Product hereunder does not constitute or result in an Event of Default under this Agreement, the remedies specified in this clause (c) of the Power Annex shall be the exclusive remedies available to Buyer to schedule or receive the Product hereunder, and no other liability under any theory of law or equity shall attach in connection with such failure."

7.    Clause (d)(iv) is amended by deleting the word "outstanding" in the second (2nd) line therein and replacing it with the word "Outstanding".

8.    Clause (e) is amended by deleting from the second paragraph the second sentence and all those sentences following in such paragraph.

9.    Clause (h)(iii) is deleted in its entirety and replaced with the following provision:

"(iii) *FERC Standard of Review; Certain Covenants and Waivers.* If elected under G) as being applicable:

(a)    Absent the agreement of all parties to the proposed change, the standard of review for changes to any rate, charge, classification, term or condition of this Agreement, whether proposed by a party (to the extent that any waiver in clause (h)(iii) below is unenforceable or ineffective as to such party), a non-party or FERC acting *sua sponte,* shall solely be the "public interest" application of the 'just and reasonable" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) and clarified by Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish 128 S.Ct. 2733 (2008) (the "Mobile-Sierra doctrine").

26

(b)    Standard of Review for ERCOT Transactions. Absent the agreement of all parties to the proposed change, the standard of review for changes to any portion of this Agreement with respect to any Transaction entered into hereunder having a Delivery Point in the Electric Reliability Council of Texas, whether proposed by a party (to the extent that any waiver in clause (h)(iii)(c) below is unenforceable or ineffective as to such Party), a non-party, or the Public Utility Commission of Texas ("PUC") acting *sua sponte,* shall be the "public interest" standard of review set fo1ih in High Plains Natural Gas Co. v. Railroad Commission, Tex. Civ. App. - Austin 1971, writ refd n.r.e.

(c)    In addition, and notwithstanding the foregoing (h)(iii)(a) and (b), to the fullest extent permitted by applicable law, each party, for itself and its successors and assigns, hereby expressly and irrevocably waives any rights it can or may have, now or in the future, whether under §§ 205 and/or 206 of the Federal Power Act or otherwise, to seek to obtain from FERC or PUC by any means, directly or indirectly (through complaint, investigation or otherwise), and each hereby covenants and agrees not at any time to seek to so obtain, an order from FERC or PUC changing any section of this Agreement specifying the rate, charge, classification, or other term or condition agreed to by the parties, it being the express intent of the parties that, to the fullest extent permitted by applicable law, neither party shall unilaterally seek to obtain from FERC or PUC any relief changing the rate, charge, classification, or other term or condition of this Agreement, notwithstanding any subsequent changes in applicable law or market conditions that may occur. In the event it were to be determined that applicable law precludes the parties from waiving their rights to seek changes from FERC to their market-based power sales contracts (including entering into covenants not to do so) then this clause (h)(iii)(c) shall not apply, provided that, consistent with the foregoing clauses (h)(iii)(a) and (b), neither party shall seek any such changes except solely under the "public interest" application of the 'just and reasonable" standard of review and otherwise as set forth in the foregoing clauses (h)(iii)(a) and (b).

(d)    The parties agree that in the event that any portion of this clause (h)(iii) is determined to be invalid, illegal or unenforceable for any reason, the provisions of clauses (h)(iii)(a) and (b) shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law."

10.    Clause (i)(ii) of this Power Annex is deleted in its entirety and replaced with the following provision:

"(ii)  Events of Default: Sections 5(a)(i) and 5(a)(ii).

(A)    Section 5(a)(i). With respect to all Power Transactions, the words "or delivery" in the second line of Section 5(a)(i) of this Agreement are hereby deleted.

(B)    Section 5(a)(ii)(l). With respect to all Power Transactions, (i) the words "or delivery" in the second line of Section 5(a)(ii)(l) are

hereby deleted, and (ii) the words "or to deliver or receive the Product, the exclusive remedy for which is provided for in clause (c) of the Power Annex" are hereby added at the end of the parenthetical of Section 5(a)(ii)(l) of this Agreement.

11. Clause (i)(iii) is deleted in its entirety and shall not otherwise apply to any Power Transactions under this Agreement.

12. The following definition shall be added to clause (i)(iv):

""Claims" means with respect to Power Transactions all third party claims or actions, threatened or filed and, whether groundless, false, fraudulent or otherwise, that directly or indirectly relate to the subject matter of an indemnity, and the resulting losses, damages, expenses, attorneys' fees and court costs, whether incurred by settlement or otherwise, and whether such claims or actions are threatened or filed prior to or after the termination of this Agreement."

13. The definition of "Force Majeure" in clause (i)(iv) herein is amended as follows:

a. The following provision is inserted after the word "hereunder" in subsection (ii) therein:

"or to obtain the Product at a more advantageous price or under more advantageous terms and conditions."

b. The following provision is inserted after the phrase "Contract Price" in subsection (iv) therein:

"or under more advantageous terms to a third party purchaser."

14. The definition of "Replacement Price" in clause (i)(iv) herein is amended by inserting "for delivery" in the second line after the text "at the Delivery Point".

15. The definition of "Sales price" is amended to delete the phrase "at the Delivery Point" from the second line.

16. <u>Illegality and Tax Event</u>. With respect to any Power Transaction entered into under this Agreement, Sections 5(b)(i) and S(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Power Transaction.

17. <u>Additional Representations</u>. With respect to any Power Transaction entered into under this Agreement, the following representations shall apply with respect to each party:

a. <u>UCC Applicable</u>. Notwithstanding the laws of the State of New York to the contrary, the parties represent and agree that (i) each Product is a "good"

as such term is defined in the Uniform Commercial Code of the State of New York, and (ii) all of the provisions of the Uniform Commercial Code of the State of New York shall apply to this Agreement and all Transactions.

b.      Utility Disclaimer. Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and further agrees that the other party is not a provider of last resort.

18.    Other Products and Related Definitions. The following provisions and definitions shall apply with respect to Power Transactions:

a.      If the parties agree to a service level defined by a different agreement (i.e., the WSPP agreement, the ERCOT agreement, etc.) for a particular Transaction, then, unless the parties expressly state and agree that all the terms and conditions of such other agreement will apply, such reference to a service level/product defined by such other agreement means that the service level for that Transaction is subject to the applicable regional independent system operator and/or utility reliability requirements and guidelines as well as the permitted excuses for performance, Force Majeure, Uncontrollable Forces, or other such excuses applicable to performance under such other agreement, to the extent inconsistent with the terms of this Agreement, but all other terms and conditions of this Agreement remain applicable.

b.      "West Firm" means with respect to a Transaction, a Product that is or will be scheduled as firm energy consistent with the most recent rules adopted by the WECC for which the only excuses for failure to deliver or receive are if an interruption is (i) due to an Uncontrollable Force as provided in Section 10 of the WSPP Agreement; or (ii) where applicable, to meet Seller's public utility or statutory obligations to its customers. Notwithstanding any other provision in this Agreement, if Seller exercises its right to interrupt to meet its public utility or statutory obligations, Seller shall be responsible for payment of damages for failure to deliver firm energy as provided in Part 6(c) of this Agreement.

c.      "CAISO Energy" means with respect to a Transaction, a Product under which the Seller shall sell and the Buyer shall purchase a quantity of energy equal to the hourly quantity without Ancillary Services (as defined in the Tariff) that is or will be scheduled as a schedule coordinator to schedule coordinator transaction pursuant to the applicable tariff and protocol provisions of the California Independent

System Operator ("CAISO") (as amended from time to time, the "Tariff') for which the only excuse for failure to deliver or receive is an Uncontrollable Force (as defined in the Tariff).

### Part 7. ISDA North American Gas Annex

(a)  **ISDA North American Gas Annex.** The North American Gas Annex to the ISDA Master Agreement published by ISDA (attached hereto as <u>Attachment B</u>), as amended, supplemented, replaced or modified from time to time, (the "Gas Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physical gas, except as otherwise specifically provided in the relevant Confirmation. The Commodity Definitions and the provisions of Part 7 are incorporated in this Gas Annex for all purposes. All terms used in this Part 7 that are not otherwise defined shall have the meanings given to them in the Gas Annex.

(b)  The following shall amend and replace clause (I) of the Gas Annex:

(I)  **Elective Provisions**

**1.  (a)(ii) - Outstanding Gas Transactions.** This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

__ Option A: All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

_ Option B: The Gas Transactions listed in Schedule 1 to this Gas Annex.

_x  Option C: None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

**2.  (a)(iii) - Outstanding Gas Credit Support**

_ _ Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).

If not checked, not applicable.

**3.  (b)(ii) -Performance Obligation** (remedy for breach of Firm obligation)

_X_ Option A: Cover Standard

_ Option B: Spot Price Standard

If neither option is selected, Option A shall apply.

30

4.        **(e) -Taxes**

_x_ Option A: Buyer Pays At and After Delivery Point Option B:

Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

5.        **(f)(ii) - Payment Date**

_X Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_ Option B: the later of the _ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6.        **(k)(xxii) - Alternative to Spot Price Index.** The parties have selected the following alternative index as the Spot Price Index:         . If no index is specified, the Spot Price Index specified in clause (k)(xxii) applies.

(c)        The following shall amend and replace clause (m) of the Gas Annex:

**(m)        Notices for Gas Transactions**

| PARTY A | AGERA |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless | As set forth in Part 4 of the Schedule |

| | |
|---|---|
| otherwise set forth below:<br><br>Address: BP Energy Company<br>        P.O. Box 3092<br>        Houston, TX 77253-3092<br>Attn: Gas Accounting<br>Phone: (713) 323-2000<br>Facsimile: (713) 323-5313 | unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>        Briarcliff Manor NY 10510<br>Attn: Steve Jakab, Treasurer<br>(Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com)<br><br>Phone: 914-236-1423<br>Facsimile: 888-721-5019 |
| **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Gas Scheduling<br>Phone: (713) 323-2000 | **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Jodi Brown<br>(Jbrown@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: BP Energy Company<br>        P.O. Box 3092<br>        Houston, Texas 77253-3092<br>Attn: Confirmations Dept.<br>Phone: (713) 323-2000<br>Facsimile: (281) 227-8470 | **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>        Briarcliff Manor NY 10510<br>Attn: Juan Padron, Supply<br>(Jpadron@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn:<br>Phone:<br>Facsimile: | **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Raima Jamal, Legal<br>(Rjamal@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |

| □**Wire Transfer - or - □ ACH (check one box):** | □**Wire Transfer - or - □ACH (check one box):** |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br><br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy Company | As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: First National Bank of Central Texas<br>ABA:111903245<br>Account: 40038762<br>Other Details: Agera Energy |
| **PARTY A** | **ENERGY.ME** |
| **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: BP Energy Company<br>         P.O. Box 3092<br>         Houston, Texas 77253-3092<br>Attn: Gas Account<br>Phone: (713) 323-2000<br>Facsimile: (713) 323-5313 | **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>         Briarcliff Manor NY 10510<br>Attn: Steve Jakab, Treasurer<br>(Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |
| **Nominations:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Gas Scheduling<br>Phone: (713) 323-2000 | **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Jodi Brown<br>(Jbrown@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Confirmations:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address:  BP Energy Company<br>          P.O. Box 3092<br>          Houston, Texas 77253-3092<br>Attn: Confirmations Dept.<br>Phone:(713)323-2000<br>Facsimile: (281) 227-8470 | **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>         Briarcliff Manor NY 10510<br>Attn: Juan Padron, Supply<br>(Jpadron@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |

| **Option Exercise:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn:<br>Phone:<br>Facsimile: | **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Raima Jamal, Legal (Rjamal@ageraenergy.com)<br>Todd Sandford, COO (Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO (Mlinzenbold@ageraenergy.com) |
|---|---|
| **□Wire Transfer - or - □ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy Company | **□Wire Transfer - or - □ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless<br>otherwise set forth below:<br>Bank: JPMorgan Chase Bank, N.A.<br>ABA: 021000021<br>Account: 139511500<br>Other Details: energy.me midwest lle |
| **PARTY A** | **AEQUITAS** |
| **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: P.O. Box 3092<br>          Houston, TX 77253-3092<br>Attn: Gas Accounting<br>Phone: (713) 323-2000<br>Facsimile: (713) 323-5313 | **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>          Briarcliff Manor NY 10510<br>Attn: Steve Jakab, Treasurer (Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO (Mlinzenbold@ageraenergy.com) |
| **Nominations:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Gas Scheduling<br>Phone: (713) 323-2000 | **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Jodi Brown (Jbrown@ageraenergy.com)<br>Todd Sandford, COO (Tsandford@ageraenergy.com) |

| Confirmations: | Confirmations: |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: BP Energy Company<br>P.O. Box 3092<br>Houston, Texas 77253-3092<br><br>Attn: Confirmations Dept.<br>Phone: (713) 323-2000<br>Facsimile: (281) 227-8470 | As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>        Briarcliff Manor NY 10510<br>Attn: Juan Padron, Supply<br>(Jpadron@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn:<br>Phone:<br>Facsimile: | **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Raima Jamal, Legal<br>(Rjamal@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |
| **☐Wire Transfer - or - ☐ ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy<br>Company | **☐Wire Transfer - or - ☐ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless<br>otherwise set forth below:<br><br>Bank: First National Bank of Central Texas<br>ABA:111903245<br>Account:40038739<br>Other Details: Aequitas Energy Inc. |

(d)     The following shall amend and replace clause (n) of the Gas Annex:

**(n)     Other Provisions/Modifications to this Gas Annex.**

1.     Clause (a)(i) is amended by deleting the phrase "North America" in the first (1st) sentence therein and replacing it with the phrase "the United States".

2.     Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (lst) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the

other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement. If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.      Clause (b)(i) is amended by adding the following at the end thereof:

"Unless expressly agreed to by the parties under a Confirmation, Seller is under no obligation to source the Gas being sold to Buyer from storage."

4.      Clause (b) is amended by adding the following provision as a new clause (b)(iv):

"(iv) In the event that the Contract Price for a Transaction is a Fixed Price (as defined below), and such Transaction (a) has a Firm performance obligation, and (b)a Delivery Period of at least one Month, then, notwithstanding anything to the contrary in this Contract, including, without limitation, anything in clause (b)(ii) or clause (h) of this Gas Annex:

> (i)      if, upon the occurrence of an event of Force Majeure, and as a result of the event of Force Majeure (a) Seller is unable to sell and deliver or (b) Buyer is unable to purchase and receive, the Contract Quantity of Fixed Price Gas, either in whole or in part, for such Transaction,

> (ii)                    then, for the duration of the event of Force Majeure, for each Day that Seller is unable to sell and deliver, or Buyer is unable to purchase and receive, such Fixed Price Gas, as set out in clause (b)(iv)(i) above, the following settlement obligations between the parties shall apply:

>> a.      if the FOM Price (as defined below) exceeds the Fixed Price, Seller shall pay Buyer the difference between the FOM Price and the Fixed Price for each MMBtu of such Gas not delivered and/or received on that Day, or

>> b.      if the Fixed Price exceeds the FOM Price, Buyer shall pay Seller the difference between the Fixed Price and the FOM Price for each MMBtu of such Gas not delivered and/or received on that Day.

>> For the purpose of this clause (b)(iv):

> "Fixed Price" means, a Contract Price for a Gas Transaction that is expressed as a flat dollar amount for the Month of delivery, excluding any Gas Transactions that have been entered into after the last trading day (as defined by the NYMEX) for the applicable Month. Subject to the foregoing exclusion, "Fixed Price" also includes any Gas Transaction containing a Contract Price or a component of a Contract Price that has been converted (i.e., from a floating price mechanism (i.e., a NYMEX/first of the month index basis component and a fixed price or floating price component, or a NYMEX/first of the month index priced component with a fixed basis component) to a flat dollar amount for any Month of delivery, either upon the mutual agreement of the patties or as

36

a result of a party exercising a pricing "trigger" option in the relevant Gas Transaction.

"FOM Price" means the price per MMBtu, stated in the same currency as the Gas Transaction subject to such event of Force Majeure, for the first of the Month delivery, either as the NYMEX settlement price or as an index price published in the first issue of a publication commonly accepted by the natural gas industry (selected by the Seller in a commercially reasonable manner) for the Month of such event of Force Majeure for the geographic location closest in proximity to the Delivery Point(s) for the relevant Day, adjusted for the basis differential between the Delivery Point(s) and the NYMEX or such published geographic location as determined by the Seller in a commercially reasonable manner."

5.      Clause (h)(iii) is amended by deleting the word "or" located between the semicolon (";") and "(C)" on the fifth (5th) line therein, and inserting the word "or" between the semicolon (";") and "(E)" on the eleventh (11th) line therein.

6.      Clause (h)(iv) is hereby deleted in its entirety and replaced with the following provision:

"Notwithstanding anything to the contrary in this clause (h), the parties agree that the settlement of strikes, lockouts, or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance, and further agree that upon the occurrence and continuance of any event of Force Majeure, neither party shall be obligated to purchase or sell Gas hereunder if such purchase or sale would result in material economic impact to such party under this Gas Annex to the Agreement."

7.      Clause (h) is amended by adding the following provision as a new clause (h)(vii):

"Without restricting the generality of Section 9(f) of the Agreement, if an event of Force Majeure occurs, the party affected may, in its sole discretion and without notice to the other party, determine not to make a claim of Force Majeure and to waive its rights hereunder as they would apply to such event. Such determination or waiver shall not preclude the affected party from claiming Force Majeure in respect of any subsequent event, including any event that is substantially similar to the event in respect of which such determination or waiver is made."

8.      Clause (i) is deleted in its entirety.

9.      Clause (k)(i) is amended by inserting the phrase "that there is an unexcused failure of" between the words "event" and "either" therein and deleting the word "fails" after the word "Buyer".

10.     <u>Illegality and Tax Event</u>. With respect to any Gas Transaction, Sections 5(b)(i) and 5(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Gas Transaction.

11.    <u>Additional Representations</u>. With respect to Gas Transactions entered into under this Agreement, the following representations shall apply with respect to each party:

>    <u>Utility Disclaimer</u>. Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Bankruptcy Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and fu1ther agrees that the other party is not a provider of last resort.

12.    <u>Mobile-Sierra</u>. To the extent, if any, that a transaction does not qualify as a "first sale" as defined by the Natural Gas Act and §§ 2 and 601 of the Natural Gas Policy Act, each party irrevalately waives its rights, including its rights under §§ 4-5 of the Natural Gas Act, unilaterally to seek or support a change to any terms and conditions of the Contract, including but not limited to the rate(s), charges, or classifications set forth therein. By this provision, each party expressly waives its right to seek or support, either directly or indirectly, and by whatever means:

(i)  an order from the U.S. Federal Energy Regulatory Commission ("FERC") seeking to change any of the terms and conditions of the Contract agreed to by the parties; and (ii) any refund from the other party with respect to the Contract. Each party further agrees that this waiver and covenant shall be binding upon it notwithstanding any regulatory or market changes that may occur after the date of the Base Contract or any transaction entered into between the parties. Absent the agreement of both parties to the proposed change, the standard of review for changes to any terms and conditions of the Contract proposed by (a) a party, to the extent that the waiver set forth in this Section 12 is unenforceable or ineffective as to such party due to a final determination being made under applicable law that precludes the party from waiving its rights to seek or support changes from the FERC to the terms and conditions of this Contract, (b) a non- party, or (c) the FERC acting sua <u>sponte,</u> shall solely be the "public interest" application of the "just and reasonable" standard of review set forth in <u>United Gas Pipe Line Co. v. Mobile Gas Service Corp.,</u> 350 U.S. 332 (1956) and <u>Federal Power Commission v. Sierra Pacific Power Co.,</u> 350 U.S. 348 (1956) (the "Mobile-Sierra Doctrine"), as such Mobile-Sierra Doctrine has been clarified by <u>Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish</u> 128 S. Ct. 2733 (2008).

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| **Party A:**<br>**BP Energy Company** | **"Agera"**<br>**Agera Energy LLC** |

By: _____

Name: *Rob Gorski*
Title: *BPEC VP*
Date:

By: _____

Name:
Title:
Date:

**"energy.me"**
**energy.me midwest llc**

By: _____

Name:
Title:
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____

Name:
Title:
Date:

*[Signature Page to Amended Restated ISDA]*

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| **Party A:** | **"Agera"** |
| **BP Energy Company** | **Agera Energy LLC** |
| | |
| By: | By: |
| _____ | _____ |
| Name: | Name: Mark Linzenbold |
| Title: | Title: Chief Financial Officer |
| Date: | Date: |

**"energy.me"**
**energy.me midwest llc**

By: _____

Name: Mark Linzenbold
Title: Chief Financial Officer
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____

Name: Mark Linzenbold
Title: Chief Financial Officer
Date:

*[Signature Page Amended/Restated ISDA]*

**Attachment A**
North American Power Annex to the ISDA Master Agreement published by ISDA

**Attachment B**
North American Gas Annex to the ISDA Master Agreement published by ISDA

**Attachment C**

**Covenant Schedule**

Party B shall comply with the following requirements of this Attachment C as follows (capitalized terms used and not otherwise defined in the Agreement shall have the meanings ascribed to them in the RSA Term Sheet):

(i)   Party B shall conduct and finalize a CAISO audit acceptable to Party A by October 31, 2019.

(ii)  Party B shall, and shall cause the other Agera Parties (as defined in the RSA Term Sheet) or Briarcliff, to comply with all of the obligations set forth in the RSA Term Sheet section entitled "The Agera Parties' and Briarcliff's Obligations," regardless of whether the RSA Term Sheet or the RSA Order is in effect, but without limiting any rights of Party A under the Agreement in respect of any Event of Default or Additional Event of Default with respect to Party B.

(iii) Party B shall and shall cause the other Agera Parties to comply with all of the affirmative covenants as set forth in the RSA Term Sheet section entitled "Affirmative Covenants," regardless of whether the RSA Term Sheet or the RSA Order is in effect, but without limiting any rights of Party A under the Agreement in respect of any Event of Default or Additional Event of Default with respect to Party B.

(iv)  Party B shall not, and shall ensure that no other Agera Party shall, take any action, or fail to take any action, that would result in (or that with the giving of notice or the passage of time, or both, would result in) a breach of any negative covenant as set forth in the RSA Term Sheet section entitled "Negative Covenants," regardless of whether the RSA Term Sheet or the RSA Order is in effect, but without limiting any rights of Party A under the Agreement in respect of any Event of Default or Additional Event of Default with respect to Party B.

*Execution Version*

BASE CONFIRMATION

Effective Date: October 4, 2019

To: Agera Energy LLC                                 From: BP Energy Company
    energy.me midwest llc                                  201 Helios Way
    Aequitas Energy Inc.                                   Houston, Texas 77079
    555 Pleasantville Rd, S107
    Briarcliff Manor, NY 10510

Dear Sir/Madam:

The purpose of this base confirmation (this "Base Confirmation") is to confirm the terms and conditions of Transactions entered into under this base confirmation, which for the avoidance of doubt shall be all Transactions entered into under that certain ISDA 2002 Master Agreement, dated as of May 5, 2015, together with the Schedule, Credit Support Annex, Power Annex, the Gas Annex and the Renewable Energy Certificates Annex thereto and all confirmations thereunder, by and between BP Energy Company, a Delaware corporation ("BP") and Agera Energy LLC, a Delaware limited liability company ("AE"), as amended by that certain Amendment dated effective as of October 2, 2015 to the ISDA Master Agreement, dated as of May 5, 2015, by and among BP, Agera, energy.me midwest llc, an Illinois limited liability company ("Energy.Me"), and Aequitas Energy Inc., a Connecticut corporation ("Aequitas" and together with AE and Energy.Me, "Agera"), and as further amended by that certain Second Amended and Restated Schedule to the 2002 Master Agreement dated as of October 4, 2019, by and among BP and Agera (as further amended, restated, supplemented or otherwise modified, the "ISDA Master Agreement"), other than the Transactions described on Annex A hereto). Notwithstanding anything to the contrary herein, this Base Confirmation (i) shall not apply to any Original Transactions, and (ii) is not effective until the Second Amended and Restated Schedule Effective Date, as defined in the ISDA Master Agreement. To the extent that any Transactions are entered after the Old Transactions are terminated but before entry of the Cash Collateral Order, this Base Confirmation will retroactively govern from such termination date. If the Cash Collateral Order is never entered, such Transactions will be governed by the Original Agreement without giving effect to this Base Confirmation.

This Base Confirmation forms a part of, and is subject to, the ISDA Master Agreement. All provisions contained in the ISDA Master Agreement govern this Base Confirmation except as expressly modified below. BP and Agera may each be referred to individually as a "Party" or collectively as the "Parties". Capitalized terms used in this Base Confirmation without further definition have the meanings ascribed to such terms in the ISDA Master Agreement, unless otherwise noted herein.

In the event of any conflict between the provisions of this Base Confirmation and the provisions of the PSA, the provisions of this Base Confirmation shall govern and control.

The terms of the Transactions to which this Base Confirmation relates are as follows:

| | | |
|---|---|---|
| **I.** | **Seller:** | BP |
| **II.** | **Buyer:** | Agera |
| **III.** | **Term:** | Term. The term of this Base Confirmation shall commence on the Effective Date and continue until the earlier to occur of (i) the transfer of all accounts associated with Agera's customer contracts to the successful bidder or other or other third party supplier or the return of such accounts to the applicable utility, (ii) the termination of the Support Period (as defined in the RSA Term Sheet) or Agera's authorization to use Cash Collateral (as defined in the RSA Term Sheet) in accordance with the Cash Collateral Orders (as defined in the RSA Term Sheet), or (iii) the Final Assignment Date (as defined in the Stalking Horse APA (as defined in the RSA Term Sheet)) (the "Term"); provided, that expiration or termination of this Base |

Confirmation shall not affect or excuse the performance by either Party of obligations that by their nature survive such expiration or termination; provided further, that this Base Confirmation shall continue in effect following termination or expiration of the PSA, or the acceleration of any obligations thereunder, with respect to any Transaction entered into hereunder prior to the end of the Term until the Parties have fulfilled all obligations with respect to all such Transactions unless terminated earlier in accordance with the ISDA Master Agreement.

| | | |
|---|---|---|
| **IV.** | **Transactions:** | (a) <u>Commitment to Enter into Transactions.</u> |

During the Term and subject to the terms and conditions hereof, Buyer and Seller agree to enter into Transactions under this Base Confirmation to supply or repurchase electricity and natural gas to Buyer from time to time for delivery during the period extending through the end of the Term in a manner sufficient to supply and manage Buyer's Forecasted Load, whether such Transactions are physically- or financially-settled. All settlements and other payments and charges due to an ISO (as defined in the PSA) that Seller incurs in connection with any Transaction shall be for the account of Buyer and paid pursuant to the terms of the PSA.

Buyer and Seller will be deemed to have entered into Transactions with respect to all Energy (as defined in the PSA) scheduled pursuant to Article 5 of the PSA, and such Transactions need not be separately confirmed.

(b) <u>Limitations on Commitment</u>. Seller shall have no obligations to enter into any Transaction under this Base Confirmation or otherwise schedule any Energy (as defined in the PSA) pursuant to Article 5 of the PSA if any of the Conditions Precedents under Section IX of this Base Confirmation are not satisfied.

| | | |
|---|---|---|
| **V.** | **Interface** | During the Term, Seller shall provide Buyer with scheduling services in accordance with Article 5 of the PSA in a manner consistent with the Approved Budget (as defined in the Cash Collateral Order) and Buyer's ordinary course of business. |
| **VI.** | **Other Seller Supply Arrangements:** | Seller and Seller's affiliates may sell physical and financial products and related services to any other purchaser at any prices, whether higher or lower, than the prices made available to Buyer. Seller and Seller's affiliates may compete in Buyer's and its affiliates' markets and for their customers without restriction based upon Seller's contractual relationship with Buyer and Buyer's affiliates. Seller's contractual relationship with Buyer is not intended and shall not be construed to create any fiduciary relationship, partnership, or other similar relationship with Buyer or any of its affiliates. |
| **VII.** | **Supply Fees:** | Buyer shall pay Seller the Supply Premium (as defined in the PSA) in accordance with the provisions set forth in the PSA, including Section 10.1(b) thereof. |
| **VIII.** | **Payments:** | (a)    <u>Invoices</u>.  As soon as practicable after the end of each calendar month, Seller shall render to Buyer an invoice for the payment obligations accrued by Buyer in respect of all Transactions hereunder, as well as any other amounts accrued by Buyer during such month (and any previous months to the extent not already invoiced). |

(b)    <u>Payment Method</u>. Buyer shall pay the amounts due under an invoice provided hereunder on or before the next occurring Applicable Payment Date; provided that the foregoing shall not affect the payment dates of any amounts that are expressly stated herein to be due on an earlier date. All payments to Seller shall be made in immediately available funds by wire transfer to the Seller Payment Account on the Applicable Payment Date.

IX. **Conditions Precedent:**    Seller's obligation to enter into each Transaction under this Base Confirmation, shall each be subject to the following "Conditions Precedent" that on such date:

(a)    There shall not exist any Event of Default or Termination Event under the ISDA Master Agreement with respect to Buyer and the entering into of such Transaction would not cause or be reasonably expected to cause an Event of Default or Termination Event with respect to Buyer.

(b)    There shall not exist any Potential Event of Default under the ISDA Master Agreement with respect to Buyer and the entering into of such Transaction would not cause or be reasonably expected to cause a Potential Event of Default, unless Seller determines in its sole discretion that (i) such Potential Event of Default is reasonably subject to cure by Buyer and (ii) Buyer is taking steps to cure such Potential Event of Default.

X. **Definitions:**    As used herein the following terms shall have the following meanings:

"Applicable Payment Date" means (i) for physically-settled Energy (as defined in the PSA) Transactions, the twentieth (20th) day of each month or, if such date is not a Local Business Day, then on the next Local Business Day, (ii) for physically-settled natural gas Transactions, the twenty-fifth (25th) day of the month following the month of delivery, or, if such date is not a Local Business Day, then on the next Local Business Day, (iii) for financially-settled Energy (as defined in the PSA) Transactions, the twentieth (20th) day of each month or, if such date is not a Local Business Day, then on the next Local Business Day, and (iv) for financially-settled gas Transactions, the twenty-fifth (25th) day of the month following the month of delivery or, if such date is not a Local Business Day, then on the next Local Business Day.

"Buyer's Forecasted Load" means as of any date and with respect to a given period, the total volume of electricity or natural gas estimated by Buyer (and approved by Seller in its reasonable discretion) as necessary to serve 100% of Buyer's Load existing as of such date.

"Buyer's Load" means the volume of electricity or natural gas that must be or has been delivered to fulfill the demand of Buyer's customers under its Sale Contracts (as defined in the PSA).

"Seller Payment Account" means:
Beneficiary: BP Energy Company
Bank: JP Morgan Chase Bank, NY
ABA: 021000021
Account: 910-2-548097

XI. **Default Interest:**    If Buyer fails to pay when due any amount payable under this Base Confirmation, the amount not paid when due shall bear interest beginning on the date due until paid in full at the Interest Rate (as defined in the PSA (as that term is defined in the ISDA Master Agreement). Notwithstanding the foregoing or any other term in the ISDA Master Agreement or PSA to the contrary, it is the intention of Seller and Buyer to conform strictly to any applicable usury laws. Accordingly, if Seller contracts for, charges, or receives any consideration which constitutes interest more than the highest rate permitted by applicable law, then any such excess shall be canceled automatically and, if previously paid, shall at the Seller's option be applied to the

-3-

outstanding amount of obligations owing by Buyer under the ISDA Master Agreement or be refunded to Buyer. In determining whether any interest exceeds the maximum rate permitted by applicable law, such interest shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread in equal parts throughout the Term.

[Signatures follow.]

Please sign below to confirm that the terms stated herein accurately reflect the agreement reached between the Parties on the Effective Date

**Party A:**
**BP Energy Company**

By: _____

Name: *Rob Gorski*
Title: *BPEC VP*
Date:

**"Agera"**
**Agera Energy LLC**

By: _____

Name:
Title:
Date:

**"energy.me"**
**energy.me midwest llc**

By: _____

Name:
Title:
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____
Name:
Title:
Date:

*[Signature Page to Base Confirm]*

Please sign below to confirm that the terms stated herein accurately reflect the agreement reached between the Parties on the Effective Dale

**Party A:**
**BP Energy Company**

By:

Name:
Title:
Date:

**"Agera"**
**Agera Energy LLC**

By:

Name: Mark Linzenbold
Title: Chief Financial Officer
Date:

**"energy.me"**
**energy.me midwest llc**

By:

Name: Mark Linzenbold
Title: Chief Financial Officer
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By:

Name: Mark Linzenbold
Title: Chief Financial Officer
Date:

*[Signature Page to Base Confirm]*

*Execution Version*

# THIRD AMENDED AND RESTATED SCHEDULE

## to the

## 2002 Master Agreement

**dated as of November 5, 2019**

by and among

| | |
|---|---|
| BP Energy Company ("Party A"), a corporation incorporated under the State laws of Delaware | Agera Energy LLC ("Agera"), a limited liability incorporated under the State laws of Delaware; |
| | energy.me midwest llc ("energy.me"), a limited liability incorporated under the State laws of Illinois; and |
| | Aequitas Energy Inc. ("Aequitas"), a corporation incorporated under the State laws of Connecticut (Agera, energy.me and Aequitas are individually and collectively referred to as "Party B") |

## Part 1 – Amendment Provisions

Party A and Agera entered into a 2002 ISDA Master Agreement ("Master Agreement") including the Schedule thereto, the Credit Support Annex thereto, the Power Annex thereto, the Natural Gas Annex thereto, and the Renewable Energy Certificates Annex thereto, each dated May 5, 2015, as amended by that certain Amendment to the ISDA Master Agreement, dated as of October 2, 2015, and as further amended by that certain Second Amended and Restated Schedule to the 2002 Master Agreement, dated as of October 4, 2019 (the "Second Amended and Restated Schedule") and that certain Base Confirmation, dated as of October 4, 2019  (collectively, with all other schedules, annexes and exhibits thereto and all Transaction Confirmations thereunder, the "Original Agreement"). This Third Amended and Restated Schedule (the "Third Amended and Restated Schedule") is effective immediately upon the effectiveness of the Bankruptcy Court's entry of the Cash Collateral Order, assuming no notice of termination has been delivered thereunder at such time (the "Third Amended and Restated Schedule Effective Date"). The Original Agreement, once amended by the Third Amended and Restated Schedule, together with all other schedules, annexes, attachments and exhibits thereto and all Confirmations thereunder, is referred to herein as the "Agreement".  Each of Party A and Party B may be referred to herein individually as a "party" or collectively as "parties".  The parties acknowledge and agree that the Third Amended and Restated Schedule constitutes an amendment of the Original Agreement and not a new agreement or novation of the Original Agreement.  The Original Agreement, as amended by the Third Amended and Restated Schedule, shall remain in full force and effect, and the

Third Amended and Restated Schedule shall not terminate the Original Agreement or any obligations thereunder, including Party B's obligations to pay the Early Termination Amount in respect of all Transactions terminated by Party A prior to Party B's filing of the Chapter 11 Cases. If the Cash Collateral Order is never entered, such Transactions will be governed by the Original Agreement without giving effect to this Third Amended and Restated Schedule.

In this Agreement:

(a)     ***"Specified Entity"*** means:

in relation to Party A and in relation to Party B, for the purpose of:

| | |
|---|---|
| Section 5(a)(v): | Not Applicable |
| Section 5(a)(vi): | Not Applicable |
| Section 5(a)(vii): | Not Applicable |
| Section 5(b)(v): | Not Applicable |

(b)     ***"Specified Transaction"*** has the meaning given to it in Section 14 of the Agreement; provided, however, that "***Specified Transaction***" shall not include any Original Transaction.

(c)     The ***"Cross Default"*** provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(d)     The ***"Credit Event Upon Merger"*** provisions of Section 5(b)(v) will apply to Party A and will apply to Party B.

(e)     The ***"Automatic Early Termination"*** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     ***"Termination Currency"*** means United States Dollars.

(g)     **"*Events of Default*"**

(1)     Section 5(a)(vii) shall be deleted in its entirety from the Agreement.

(2)     ***Additional Events of Default***.  Section 5(a) shall be amended by adding the following, which shall each constitute an Additional Event of Default under Section 5(a) with respect to Party B:

"(ix)    The occurrence of any Event of Default as defined in the Cash Collateral Order.

(x)     The occurrence of the Supply Termination Date.

(xi)    Party B challenges, or supports any other Person in challenging, the Cash Collateral Order (once entered)

(xii)    Once entered, the Bankruptcy Court order approving the Cash Collateral Order (a) shall cease to be in full force and effect or (b) shall have been reversed, stayed, vacated or subjected to a stay pending appeal or, without the prior written consent of Party A in its sole discretion, amended, supplemented or otherwise modified.

(xiii)   Any of the representations stated in Part 4(n) of this Agreement proves to have been incorrect or misleading in any respect when made or repeated or deemed to have been made or repeated.

(xiv)   Party B enters into any new contracts with any retail, commercial, residential, governmental or industrial customer for the purchase and sale of energy, capacity, ancillary services or similar products relating to the production or delivery of electric power or natural gas, in each case without Party A's prior written consent, which such consent may be withheld at Party A's sole discretion.

(xv)   Party B is in breach of any of its obligations under Section 5 or Schedule 5.4 of the PSA.

(xvi)   Party B is in breach of any of the covenants set forth in the Covenant Schedule and such failure, if susceptible to cure, is not remedied within 3 Local Business Days of Party B' receiving notice or having knowledge thereof.

(xvii)   Briarcliff files a petition for relief under the Bankruptcy Code without Party A's prior written consent.

**Part 2 - Tax Representations**

(a)   ***Payer Tax Representation:*** For the purpose of Section 3(e), Party A and Party B will make the following representation:

It is not required by any applicable law, as modified by the practice, application or official interpretation of any relevant governmental revenue authority, of any Relevant Jurisdiction or under any applicable tax treaty between the Relevant Jurisdictions to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

(i)   the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)   the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)   the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   ***Payee Tax Representations:*** For the purpose of Section 3(f) of this Agreement, Party A and Party Beach make the representation(s) specified below:

(1) For the purpose of Section 3(f) of this Agreement, Party A represents that (i) it is a corporation organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 36-3421804.

3

(2) For the purpose of Section 3(f) of this Agreement, Agera represents that (i) it is a Limited Liability Company organized and existing under the laws of the State of Delaware, (ii) it is a U.S. person within the meaning of Section 770 I of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 46-5028122;

(3) For the purpose of Section 3(f) of this Agreement, energy.me represents that (i) it is a Limited Liability Company organized and existing under the laws of the State of Illinois, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 45-1599484;

(4) For the purpose of Section 3(f) of this Agreement, Aequitas represents that (i) it is a corporation organized and existing under the laws of the State of Connecticut, (ii) it is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code, and (iii) its U.S. taxpayer identification number is 45-5257988;

### Part 3 - Agreement to Deliver Documents

Each party agrees to deliver the following documents as applicable:

(a)     For the purpose of Section 4(a)(i) of this Agreement, tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
| --- | --- | --- |
| Party B | Applicable tax withholding documentation as required per Section 4(a). | Upon execution of this Agreement. |

(b)     For the purpose of Section 4(a)(ii) of this Agreement, other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
| --- | --- | --- | --- |
| Party A | A certified copy of the resolution of the Board of Directors of Party A of its relevant committee, authorizing such party to enter into this Agreement and each Transaction, and an incumbency certificate. | Upon execution of this Agreement. | Yes |
| Party A | Certification of the authenticity of the signature of Party A's signatory certified by Party A's Company Secretary. | Upon execution of this Agreement. | Yes |

4

| Party A | Most recent annual audited financial statements of Party A's Credit Support Provider. | Upon written request, unless publicly available through EDGAR or some other source. | Yes |
|---|---|---|---|
| Party B | Certification of the authenticity of the signature of Party B's signatory certified by Party B's authorized representative. | Upon execution of this Agreement. | Yes |
| Party B | Budget Variance Reports. | Weekly on each Thursday beginning on the first Thursday after October 8, 2019. | Yes |
| Party B | 13 week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis. | Every five (5) weeks on the fourth Local Business Day of such week, beginning with the fifth full week after October 8, 2019. | No |
| Party B | Copies of all notices of non-compliance and other notices received by Party B or any of its Affiliates relating to the failure of Party B to comply with any State renewable portfolio standards requirements or similar requirements. | Promptly upon receipt by Party B. | No |

| Party B | AR Reports, in form reasonably acceptable to BP and with such supporting information as is reasonably requested by Party A. | Weekly, on Monday, Wednesday and Friday of each week, beginning on the first of such days following October 8, 2019. | Yes |
|---------|---|---|------|

**Part 4 - Miscellaneous**

(a)　　　*Addresses for Notices.* For the purpose of Section 12(a) of this Agreement:

Address for **Confirmations** to Party A:

　　Address:　　BP Energy Company
　　　　　　　201 Helios Way
　　　　　　　Houston, Texas 77079

　　Attention:　　Confirmation Department

　　Facsimile No.:　281-227-8470

　　Email:　　nagpconfirmations@bp.com

Address for other **notices** or communications to Party A (other than Confirmations):

　　Address:　　BP Energy Company
　　　　　　　201 Helios Way
　　　　　　　Houston, Texas 77079

　　Attention:　　Contract Services
　　Telephone No.: 713-323-2000
　　Email:　　　FinancialContractsExternal@uk.bp.com

Address for **Invoices** to Party A:

　　Address:　　BP Energy Company
　　　　　　　201 Helios Way
　　　　　　　Houston, Texas 77079

　　Attention:　　Financial Settlements

　　Telephone No.: 713-323-2000
　　Email:　　　nagpfs1@bp.com

6

**Wire Payment Instructions**:

> For the Account of: BP Energy Company JP Morgan Chase Bank, NY
> ABA: 021-000021
> Acct No.: 910-2-548097
> New York, NY 10081-6000

Address for **Complaints** to Party A:

> Email:            BPEnergyNotice@bp.com
> Telephone No.: 713-323-0911

Address for **Confirmations** to Party B:

> Address:    Agera Energy LLC, energy.me midwest llc, or Aequitas Energy Inc. (as applicable)
> 555 Pleasantville Rd, S107
> Briarcliff Manor, NY 10510

> Attention:    Juan Padron, Supply (Jpadron@ageraenergy.com)
> Todd Sandford, COO (Tsandford@ageraenergy.com)

> With Additional Copies to: finance@ageraenergy.com; supply@ageraenergy.com

Address for other **notices** or communications to Party B (other than Confirmations):

> Address:    555 Pleasantville Rd, S107
> Briarcliff Manor, NY 10510

> Attention:    Raima Jamal, Legal (Rjamal@ageraenergy.com)
> Todd Sandford, COO (Tsandford@ageraenergy.com)
> Mark Linzenbold, CFO (Mlinzenbold@ageraenergy.com)

> With Additional Copies to: legal@ageraenergy.com; supply@ageraenergy.com

Address for **Gas Notices** to Party B:

> Address:    555 Pleasantville Rd, S107
> Briarcliff Manor, NY 10510

> Attention:    Jodi Brown (Jbronw@ageraenergy.com)
> Todd Sandford, COO (Tsandford@ageraenergy.com)

Addresses for **Invoices** to Party B:

> Address:    555 Pleasantville Rd, S107
> Briarcliff Manor, NY 10510

Attention:      Steve Jakab, Treasurer (Sjakab@ageraenergy.com)
                Mark Linzenbold, CFO (Mlinzenbold@ageraenergy.com)


With Additional Copies to: finance@ageraenergy.com; supply@ageraenergy.com

Wire Payment Instructions for Party B:

Bank:            First National Bank of Central Texas
ABA:             111903245
Acct. No.:       40038762
City/State/Sip:  Waco, TX 76710

Party B consents to notice by e-mail for all purposes as set forth in this Section 4(a).

(b)     ***Process Agent.*** For the purpose of Section 13(c) of this Agreement: Party A appoints as its Process

Agent: Not Applicable

Party B appoints as its Process Agent: Not Applicable

(c)     ***Offices.*** The provisions of Section 10(a) will apply to this Agreement.

(d)     ***Multibranch Party.*** For the purpose of Section 10(b) of this Agreement:

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e)     ***Calculation Agent.*** The Calculation Agent is Party A, with any calculation or determination made by Party A in such capacity to be binding and conclusive absent manifest error.

(f)     ***Credit Support Document.*** Details of any Credit Support Document:

With respect to Party A, the guaranty of its Credit Support Provider.

With respect to Party B, each of the Security Documents, each Guarantee and the Intercreditor Agreement.

(g)     ***Credit Support Provider.***

Credit Support Provider means in relation to Party A, BP Corporation North America Inc., an Indiana corporation.

Credit Support Provider means in relation to Party B, each of Agera Holdings, Briarcliff and each other pledgor, grantor or guarantor under any Credit Support Document of Party B.

(h)     ***Governing Law.*** This Agreement will be governed by and construed in accordance with New York law, without reference to its choice of law doctrine other than Section 5-1401 of the New York General Obligations Law.

(i)   *Jurisdiction.* Section 13(b) of the Agreement is hereby amended by deleting (b)(i)(1) and (2) and replacing with the following: "submits to the exclusive jurisdiction of (i) the Bankruptcy Court and any court with jurisdiction to hear appeals from the Bankruptcy Court, and (ii) in the event that the Chapter 11 Cases have been dismissed by the Bankruptcy Court or by such appellate court, the courts of the State of New York sitting in New York County and the United States District Court of the Southern District of New York, and any appellate court from any thereof. Each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Bankruptcy Court or such appellate court, or in the event that the Chapter 11 Cases are dismissed or closed, such New York State court or, to the fullest extent permitted by applicable law, the United States District Court of the Southern District of New York, and in each case any appellate court thereof. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this provision shall prohibit any Party from bringing an action to enforce a judgment in any other jurisdiction;"

Section 13(b)(iii) shall be deleted in its entirety."

(j)   *Netting of Payments.* "Multiple Transaction Payment Netting" will apply for the purpose of Section 2(c) of this Agreement to all Transactions.

(k)   *"Affiliate"* will have the meaning specified in Section 14 of this Agreement.

(l)   *"Absence of Litigation".*

(a)  Section 3(c) is amended by the inclusion of the word "adversely" before the word "affect" in the third line.

(b)  For the purpose of Section 3(c):

*"Specified Entity"* means in relation to Party A, Not Applicable.
*"Specified Entity"* means in relation to Party B, Not Applicable.

(m)   *No Agency.* The provisions of Section 3(g) will apply to Party A and will apply to Party B.

(n)   *Additional Representation.* Will apply. For the purpose of Section 3 of this Agreement, the following will each constitute an Additional Representation (which representations will be deemed to be repeated by each party, as appropriate, on each date on which a Transaction is entered into):

(i)   *Eligible Commercial Entity.* It constitutes an "eligible commercial entity" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(ii)   *Eligible Contract Participant.* It constitutes an "eligible contract participant" as such term is defined in the U.S. Commodity Exchange Act, as amended.

(iii)   *Swap Agreement.* This Agreement and any Transaction entered into hereunder constitutes a "swap agreement" within the meaning of the United States Bankruptcy Code (11 USC Sec. 101(53B) (2000)).

9

(iv)    *Line of Business.* It has entered into this Agreement (including each Transaction) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(v)    *Relationship Between the Parties.* In connection with the negotiation of, the entering into, and the confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, and each Transaction: (i) it is acting as principal (and not as agent or in any other capacity, fiduciary or otherwise); (ii) the other party is not acting as a fiduciary or financial or investment advisor for it; (iii) it is not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth in this Agreement and in such Credit Support Document; (iv) the other party has not given to it (directly or indirectly through any other person) any advice, counsel, assurance, guaranty, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (either legal, regulatory, tax, financial, accounting, or otherwise) of this Agreement, such Credit Support Document, or such Transaction; (v) it has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any advice from such advisors as it has deemed necessary, and not upon any view expressed by the other party; (vi) all trading decisions have been the result of arm's length negotiations between the parties; and (vii) it is entering into this Agreement, such Credit Support Document, and such Transaction with a full understanding of all of the risks hereof and thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(vi)    Party B is in continuing possession of its property and is operating and managing its business, as debtor in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(vii)    The Postpetition Obligations (as defined in the Cash Collateral Order) constitute administrative expenses under Section 503(b) of the Bankruptcy Code and are entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code.

(viii)    The execution, delivery, and performance by Party B of this Agreement and each Transaction hereunder will be in the ordinary course of business of Party B for purposes of meeting its post-petition supply needs and managing exposure to commodity price risks and not for speculative purposes.

(o)    *Recording of Telephone Conversations.* To the extent permitted by applicable law, each party: (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain prior to entering into any Transaction any necessary consent of, and give any necessary notice of such recording to, its relevant personnel, (iii) agrees that recordings may be submitted in evidence in any Proceedings, and (iv) acknowledges to the other party and consents that such other party may from time to time and without further notice (A) retain electronic transmissions (including telephone conversations, email and instant messaging between the parties' respective representatives in connection with the Agreement, any potential Transaction and any Transaction or other commercial matters between the parties) on central and local databases for their respective legitimate purposes, and (B) monitor electronic transmissions through their internal and external networks for purposes of security and compliance with applicable laws, regulations and internal policies for their legitimate business purposes. Each

party further agrees that it will indemnify, defend and hold the other party harmless from any and all damages, losses, claims, liabilities, judgments, costs and expenses, including but not limited to reasonable attorney's fees and costs of court arising directly or indirectly from or out of such party's failure to obtain any consent necessary from a party's trading, marketing and other relevant personnel, agents or representatives or such party's failure to give any notice required to such individuals.

(p)    **_Credit Support Annex_**.  The Credit Support Annex forming part of the Original Agreement (as defined in the Second Amended and Restated Schedule) has been deleted in its entirety in accordance with the terms of the Second Amended and Restated Schedule and is no longer in force and effect, and neither party has any obligations thereunder; provided, however, that the parties agree that any amounts posted to Party A by Party B under the Credit Support Annex forming part of the Original Agreement (as defined in the Second Amended and Restated Schedule) immediately prior to the effectiveness of the Second Amended and Restated Schedule shall be permitted to be applied by Party A to any amounts owing by Party B under the Agreement in respect of the Transactions terminated prior to the effectiveness of the Second Amended and Restated Schedule.

(q)    **_Pre-Petition ISDA Amount_**.  Calculation of the Early Termination Amount in respect of the Early Termination Date designated by Party A by notice to Party B delivered on October 3, 2019, shall not prejudice any rights of Party A to terminate any new Transactions entered into under this Agreement on or after such Early Termination Date in accordance with the terms of this Agreement, including upon an Event of Default or Termination Event with respect to Party B as the Defaulting Party or Affected Party.

(r)    **_Conditions Precedent_**.  Any obligation of Party A to enter into any Transactions under the Agreement, including the Base Confirmation, shall be subject to satisfaction of the following conditions:

(i)    the representations and warranties contained in the Agreement shall be true and correct in all respects as of such date (and any request by Party B for the entering into of any such Transaction shall be deemed to be a restatement, representation, and additional warranty of the representations and warranties of Buyer contained in each Transaction Document as of such date);

(ii)    there shall exist no Potential Event of Default, Event of Default or Termination Event with respect to Party B and the entering into of such Transaction would not cause or be reasonably expected to cause a Potential Event of Default, Event of Default or Termination Event with respect to Party B;

(iii)    Party B shall have provided (i) to the applicable ISO executed copies of all documentation and take all other actions (including the posting of required credit support) required to transfer BP's obligations as the FRP in each of ERCOT, NYISO, ISO-NE and MISO in respect of the Agera Parties' load to the Agera Parties, and (ii) to BP or the applicable ISO executed copies of all documentation requested by BP in connection with the maintenance by BP of any scheduling or other functions (including payment of ISO invoices on the applicable Agera Parties' behalf in BP's capacity as agent of the applicable Agera Parties) in respect of any of the Agera Parties' load in any of ERCOT, NYISO, ISO-NE, PJM, MISO or CAISO;

(iv)    Subject to the provisions of the Cash Collateral Order governing adequate protection, Party B shall have transferred all funds currently held in the bank account ending in 8804 at FNBCT to an existing Deposit Account (as defined in the PSA) or Collateral Account (as defined in the PSA); and

(vi)    Party B shall have used commercially reasonable efforts to sell all remaining renewable energy credit inventory held by Party B.

### Part 5 - Other Provisions

(a)    ***General Conditions.*** Section 2(a)(ii) shall be amended by the deletion of the final sentence thereof and the addition of the following in substitution therefor: "The parties agree that all payments under this Agreement shall be made by wire transfer of immediately available funds to the party receiving payment, at the account specified by such party."

(b)    ***Limitation on Condition Precedent.*** With respect to any Transaction entered into under this Agreement, Section 2(a)(iii) of this Agreement is hereby amended by adding the following phrase at the end of clause (I) immediately before the last comma of such phrase:

"(provided, however, that in relation to any Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than ten (10) days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i))."

(c)    ***Change of Account.*** Section 2(b) of this Agreement is hereby amended by the insertion of the following at the end thereof after the word "change":

", provided that if such new account shall not be in the same jurisdiction having the same power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amounts and shall not receive less as a result of such change than would have been the case if such change had not taken place."

(d)    ***Deduction or Withholding for Tax.*** Section 2(d)(i)(4) is amended by the addition of"; or" at the end of sub-paragraph (B) and the addition of a new sub-paragraph (C) as follows:

"(C) Y refusing to supply any form or document under Section 4(a)(iii) on grounds of material prejudice to its legal or commercial position."

(e)    ***Representations.*** The opening paragraph of Section 3 is amended by replacing "in the case of the representations in Section 3(f)" with "in the case of the representations in Sections 3(f) and 3(h)(iv)" and adding the following new sub-section 3(h) and 3(i):

"(h) ***Dodd Frank Representations.***

(i)    ***Hedging Transactions.*** Unless otherwise noted in the applicable Confirmation for any Transaction, such Transaction constitutes for Party B a bona fide hedging transaction as defined in CFTC Regulation 1.3(z) (17 C.F.R. § 1.3(z)).

(ii)    ***End User Clearing Exemption.*** If with respect to any Transaction Party B has elected an exemption from the clearing requirement under Section 2(h)(7)(A) of the CEA,

12

then as of the date of the execution of such Transaction (and not as of the date of this Agreement) (1) it is not a "financial entity" as defined in Section 2(h)(7)(C)(i) of the CEA, subject to certain exceptions in Sections 2(h)(7)(C)(ii), 2(h)(7)(C)(iii) and 2(h)(7)(D) of the CEA; (2) it is using such Transaction to hedge or mitigate commercial risk; (3) it has reported the information required to be submitted under 17 C.F.R. § 50.SO(b)(l)(iii) in an annual filing made no more than 365 days prior to the Trade Date of such Transaction, pursuant to 17 C.F.R. § 50.50(b)(2), and (4) to the extent it is required to do so under Section 2(i) of the CEA and 17 C.F.R. § 50.50(b)(l)(iii)(D)(2), it has obtained all necessary approvals by the appropriate committee (or equivalent body) of its board of directors to rely on the exception to the clearing requirement under Section 2(h)(7)(A) of the CEA.

(iii)     *Special Entity Status.* Party B is not a federal agency, state agency, city, county, municipality or other political subdivision of a state, or any instrumentality, department or entity established thereby, or any other Special Entity as defined by the CFTC Regulation 23.40l(c).

(iv)     *DF Protocols.* Each of the parties hereby agrees to enter into additional reasonable documentation or modify existing documentation between the parties to satisfy the requirements imposed upon one or both of the parties by the Dodd- Frank Wall Street Reform and Consumer Protection Act, the CEA and/or CFTC Regulations thereunder, including, upon reasonable request, adhering to or entering into such other protocols, suggested amendments, market conventions and other contractual provisions published by ISDA from time to time and intended to enhance one or both party's compliance with the CEA, the Dodd- Frank Wall Street Reform and Consumer Protection Act, CFTC Regulations and other applicable laws, or to facilitate the orderly processing of Transactions."

(i)     *Variation and Initial Margin Requirements Representations*. Party B represents that it is not a Financial End User, Swap Dealer or Major Swap Participant as set forth in CFTC Regulation 23.151."

(f)     *Covenant Schedule*.  The covenant schedule attached as <u>Attachment C</u> hereto (the "*Covenant Schedule*") is hereby incorporated by reference herein as a term of this Agreement.

(g)     *Tax Event.* Section 5(b)(iii) shall be amended by the addition of "or (C)" after the words "or (B)" at the end of the last line.

(h)     *Set off.* Section 6(t) is deleted in its entirety and replaced with the following:

*"Set-off.* Without affecting or prejudicing the provisions of this Agreement requiring the calculation and payment of certain net payment amounts on Scheduled Settlement Dates, all payments will be made without Set-off or counterclaim; provided, however, that any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer") in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the sole option of the Non-defaulting Party or the Non- affected Party, as the case may be ("X") (and without prior Notice to the Defaulting Party or the Affected Party, as the case may be), will be reduced by its setoff against any other amounts payable by the Payee to the Payer (whether arising

13

under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation (collectively "Other Amounts")). Additionally, the set-off rights under this section include but are not limited to the following: (i) any Early Termination Amount against any Posted Credit Support held by a party relating to the Agreement; (ii) any Early Termination Amount against any amount(s) (including any excess collateral, security or credit support) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Early Termination Amount owed to the Non- defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Non-defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement; (iv) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party to the Non-defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Early Termination Amount owed to the Defaulting Party against any amount(s) (including any excess collateral, security or credit support) owed by the Defaulting Party or its Affiliates to the Non-defaulting Party under any other agreement or arrangement.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate subject to the relevant party accounting to the other when the obligation is ascertained.

To the extent that Other Amounts or any other sums otherwise owed by the Non-defaulting Party's Affiliate to the Defaulting Party, have been setoff by the Non- defaulting Party pursuant to this Section 6(f), the Non-defaulting Party's Affiliate shall not be liable to, and shall be released by, the Defaulting Party; provided further that the Defaulting Party shall be forever estopped from asserting that the Non-defaulting Party's Affiliate owes the Other Amounts or other sums to the Defaulting Party. The obligations of the Non-defaulting Party, the Non-defaulting Party's Affiliates, the Defaulting Party and the Defaulting Party's Affiliates under this Agreement or otherwise in respect of such Other Amounts or other sums shall be deemed satisfied and discharged to the extent of any such setoff. For this purpose, the Other Amounts or other sums subject to the setoff may be converted at the applicable prevailing exchange rate into U.S. Dollars by the Non-defaulting Party. The Non-defaulting Party will give the Defaulting Party notice of any setoff effected under this section provided that failure to give such notice shall not affect the validity of the setoff. Nothing in this paragraph shall be deemed to create a charge or other security interest. "Setoff" as used herein means setoff, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the Non-defaulting Party is entitled or subject to (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, the Non-defaulting Party."

(i)     *Transfer*. Section 7 shall be amended by adding the following as Section 7(c) "Party B shall in no event be entitled to transfer or assign all or any part of this Agreement or any Transaction to any other entity."

(j)     *Counterparts and Confirmations.*

(i)     Section 9(e)(i) shall be amended by deleting the words "and by electronic messaging system"; and

(ii)     The second and third sentences of Section 9(e)(ii) shall be deleted and replaced by the following:

14

"Any Transaction may be effectuated in an EDI transmission or telephone conversation or other electronic means of communication with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such Transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Party A (the ***"Confirming Party")*** will promptly send a Confirmation to Party B to confirm a telephonic transaction by any reasonable means, including, without limitation, by facsimile, hand delivery, courier, or certified United States mail (return receipt requested) within three Business Days of a Transaction, provided that the failure to send a Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Confirmation as the identification and authentication of Confirming Party. If the Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation/transmission conditions), which modify or supplement the Transaction or the terms of this Master Agreement (e.g., Force Majeure, arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to this Section 9(e)(ii) but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any Transaction agreed to by the parties. If Party A's Confirmation is materially different from Party B's understanding of the Transaction, Party B shall notify the Confirming Party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless Party B has previously sent a Confirmation to the Confirming Party. The failure of Party B to so notify the Confirming Party in writing by the Confirm Deadline constitutes Party B's agreement to the terms of the Transaction described in the Confirming Party's Confirmation. If there are any material differences between timely sent Confirmations governing the same Transaction, or if Party B has timely objected to the terms of the Confirming Party's Confirmation, such Transaction remains valid and the parties remain legally bound thereby, however, both parties shall in good faith attempt to resolve such differences. Once such material differences are resolved, the Confirming Party shall transmit a written Confirmation to Party B, and such written Confirmation shall be accepted (or disputed) pursuant to the provisions of this Section 9(e)(ii). The provisions of this Section 9(e)(ii) may be repeated as many times as necessary to produce a written Confirmation that is accepted or deemed accepted by Party B. In the event of a conflict among the terms of (i) a binding Confirmation pursuant to this Section 9(e)(ii), (ii) the oral agreement of the parties (which may be evidenced by a recording of such transaction, oral testimony, data in a computer system, trade tickets, and/or notes), and (iii) this Master Agreement, the terms of the items shall govern in the priority listed in this sentence.

> ***"Confirm Deadline"*** shall mean the earlier of (1) 5:00 p.m. in Party B's time zone on the fifth New York Business Day following the New York Business Day a Confirmation is received by Party B; provided, if the Confirmation is received after 5:00 p.m. in Party B's time zone, it shall be deemed received at the opening of the next New York Business Day, or (2) on and after the effective date of the confirmation rules set forth in CFTC Regulation 23.501, such earlier time as is set forth in the compliance schedule in CFTC Regulation 23.501(a), as modified by CFTC Regulation 23.501(c). ***"New York Business Day"*** shall mean any day except for a Saturday, Sunday or a day on which the Federal Reserve Bank of New York is closed.

> Notwithstanding the provisions of Section 12(a)(iii) of the Agreement, a written Confirmation and any other writing related to or in response to a written Confirmation

shall be deemed delivered to the receiving party (i) when actually received by the receiving party or (ii) with respect to a written Confirmation and other writing delivered by facsimile, when the sending party's facsimile machine indicates by an electronic or written facsimile log that the receiving party's facsimile machine received such written Confirmation.

Party A shall not be required to maintain or retain a paper-based version of the written Confirmation delivered to Party B. In addition to a paper-based version of the written Confirmation delivered to Party B, the following shall constitute a "written Confirmation" for all purposes of this Agreement: (i) an electronic image of a paper-based version of the written Confirmation, and (ii) data in Party A's computer system.

Any document generated by the parties with respect to a Transaction, including this Agreement, may be imaged and stored electronically *("Imaged Documents").* Imaged Documents may be introduced as evidence in any proceeding as if such were original business records and neither party shall contest the admissibility of Imaged Documents as evidence in any proceeding."

(iii)    Notwithstanding the foregoing, the Confirming Party will endeavour to send the Confirmation to the other Party as soon as technologically practicable, but in any event will endeavour to do so in accordance with the compliance schedule set forth in CFTC Regulation 23.50l(a), as modified by CFTC Regulation 23.SOl(c)."

(k)    *Notices.* The wording of Section 12(a)(iii) shall be replaced in its entirety by the following:

"if sent by facsimile transmission, on receipt by the sender of a valid transmission report."

(l)    *ISDA Definitions and Inconsistency.*

(i)    This Agreement, each Confirmation and each Transaction between the parties are subject to the 2005 ISDA Commodity Definitions as published by the International Swaps and Derivatives Association, Inc., ("the Definitions"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof. The provisions of the Definitions are incorporated by reference and shall be deemed a part of this Agreement, except that sub-annexes B to I inclusive shall not apply.

(ii)    In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of any Credit Support Document and the Definitions, the Credit Support Document will prevail. Subject to Section I(b) of this Agreement, in the event of any inconsistency between the provisions of any Confirmation and this Agreement or the Definitions, the Confirmation will prevail for the purpose of the relevant Transaction.

(m)    *Market Disruption Events; Additional Market Disruption Events.*

(i)    The "Market Disruption Events" specified in, Section 7.4(c) of the Definitions shall apply; and

(ii)    "Additional Market Disruption Events" shall apply only if specified in the relevant

Confirmation.

(n)   ***Disruption Fallbacks.***

The "Disruption Fallbacks" specified in Section 7.5(c) of the Definitions shall apply, except that:

(i)    "Fallback Reference Price" shall not apply;

(ii)   for the purposes of Section 7.6 of the Definitions, the Maximum Days of Disruption will be five (5) Commodity Business Days; and

(iii)   "Reference Dealers" means, with respect to any transaction for which the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four independent leading dealers selected in good faith and jointly agreed upon by the parties satisfying all the criteria that the parties apply generally at the time of deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to this Transaction. Such dealers will be appointed to make a determination of the Commodity-Reference Price, taking into consideration the latest available quotation for the Commodity-Reference Price and any other information that in good faith they deem relevant. If the parties have not agreed upon the appointment of the dealers on or before the sixth Commodity Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, or if a determination of the relevant Commodity-Reference Price cannot be obtained from at least four dealers, the next applicable Disruption Fallback will apply to the Transaction.

(o)   ***Severability.*** In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The parties shall endeavour, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(p)   ***Payment Date During Transfer Period.*** If the parties are required by Section 6(b)(ii) to make efforts to transfer certain obligations under this Agreement in connection with a Termination Event, and a Payment Date (as defined in the related Confirmation) will occur under the relevant Affected Transaction during the period specified in Section 6(b) for those efforts, then the payment(s) due to be made on that Payment Date shall be postponed until the earlier of (i) the Local Business Day following the day on which a transfer is effected in consequence of such efforts; (ii) the Local Business Day following the day on which such period ends, if an Early Termination Date is not designated by a party on such day; and (iii) the Early Termination Date for the relevant Affected Transaction, with such postponed payment(s) then being treated as Unpaid Amounts. In either case, the postponed payment(s) shall bear interest (before as well as after judgment) at the Applicable Deferral Rate from (and including) such Payment Date to (but excluding) the date of actual payment.

(q)   ***Termination Payments.*** The parties acknowledge and agree that notwithstanding anything in the Agreement to the contrary, Party B will not be entitled to any payments or other amounts in respect of any termination of any Transaction entered into under the Agreement on or after the date of the Second Amended and Restated Schedule other than in respect of Unpaid Amounts.

17

To the extent a Close-out Amount would otherwise show an amount due to Party B, it will be deemed to be zero for purposes of calculating any Early Termination Amount.

(r)     *Confidentiality.* The contents of this Agreement and all other documents relating to this Agreement, and any information (including any financial information) made available by one party or its Credit Support: Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement: relating to this Agreement be made by either party) without the prior written consent of the other party, except for such information (i) as may become generally available to the public, (ii) as may be necessary to enforce this Agreement or implement any Transaction hereunder, (iii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iv) as may be necessary to comply with a regulatory agency's reporting requirements, including but not limited to gas cost recovery proceedings, (v) as may be delivered to such third party for the sole purpose of calculating a published index, (vi) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the non-disclosing party or its Credit Support Provider in making such disclosure, or (vii) as may be furnished to the disclosing party's Affiliates, and to each of such person's auditors, attorneys, advisors, lenders, monitors or prospective purchasers of all or any portion of a party's assets or any of its rights under this Agreement, provided such persons are required to keep the information that is disclosed in confidence. Notwithstanding the foregoing, (i) if information would be permitted to be disclosed pursuant to DF Supplement Section 2.13, then such disclosure shall be permitted under any other applicable confidentiality provision or agreement, (ii) information may be disclosed to any regulatory agency (including any governmental authority, swap data repository or other like agency or entity) as a party may determine is advisable in accordance with such party's reporting policies and procedures, and (iii) this Agreement (including all schedules, annexes and exhibits hereto) may be filed with the Bankruptcy Court in connection with the Chapter 11 Cases as part of the Cash Collateral Order. Any confidential information received by a party may be used by such party and, to the extent disclosure is not restricted hereunder, may be disclosed and used by such permitted recipients, including in each case use by persons acting in a structuring, sales or trading capacity. With respect to information provided with respect to this Agreement, this obligation shall survive for a period of one (1) year following the expiration or termination of this Agreement, provided, however, that with respect to information provided with respect to a Transaction, this obligation shall only survive for a period of one (1) year following the expiration or termination of such Transaction.

(s)     ***LIMITATION OF LIABILITY. NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR PUNITIVE, EXEMPLARY, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE OR STRICT LIABILITY) TO ANY OTHER PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT OR THE OBLIGATION TO PAY ANY AMOUNT REQUIRED PURSUANT TO SECTION 6(e) OF THIS AGREEMENT. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF***

**THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.**

(t)     *Definitions.* Section 14 shall be amended to add the following definitions:

"*Agera Holdings*" means Agera Holdings, LLC.

"*Agera Parties*" means Agera Solutions, LLC, Utility Recovery LLC, Agera Holdings, and Briarcliff Property Group, LLC, together with Party B.

"*Bankruptcy Code*" means the United States Code, 11 U.S.C. Sections 101 *et seq*., as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or such other successor bankruptcy court to which the Chapter 11 Cases are transferred.

"*Briarcliff*" means Briarcliff Property Group, LLC.

"*Budget Variance Report*" has the meaning set forth in the Cash Collateral Order.

"*Chapter 11 Cases*" means the jointly administered cases under Chapter 11 of the Bankruptcy Code, captioned as *In re: Agera Energy LLC*, *et al*., pending in the Bankruptcy Court.

"*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"*Cash Collateral Order*" means the final order of the Bankruptcy Court entered in the Chapter 11 Cases authorizing, among other things, the Debtors' use of Cash Collateral, the PSA and this Agreement.

"*Customer Transfer Schedule*" means the document attached hereto as Annex A and incorporated by reference herein, relating to the transfer of the accounts associated with Party B's Sales Contracts to the purchaser of such Sales Contracts or to default service with the applicable utility or local distribution company, as applicable.

"*Debtor*" means Agera Energy LLC, energy.me Midwest llc, Aequitas Energy Inc., Agera Holdings, Utility Recovery LLC, or Agera Solutions LLC, and "Debtors" means each of them collectively.

"*EDI*" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of a Transaction.

"*FNBCT*" means First National Bank of Central Texas.

"*FRP*" means financially responsible party.

"*Guarantee*" means each of (i) that certain Personal Guaranty Agreement, dated January 25, 2019, made by Greg Lindberg in favor of Party A, and (ii) that certain Guaranty Agreement, dated January 25, 2019, made by Global Health Technology Group, LLC in favor of BP.

"*Intercreditor Agreement*" means that certain Second Amended and Restated Intercreditor Agreement dated as of February 9, 2018, by and among, Party A, the Subordinated Lienholders (as defined therein), Party B and Agera Holdings.

"*Maximum Amount*" has the meaning set forth in the Cash Collateral Order.

19

"***Mortgaged Property***" means the real property located at 555 Pleasantville Road, Briarcliff Manor, NY, 10510.

"***Net AP Value***" has the meaning set forth in the Cash Collateral Order.

"***Original Transaction***" has the meaning set forth in the Original Agreement.

"***PSA***" means the fully executed Preferred Supplier Agreement dated October 2, 2015, between Party A and Party B, as amended by that certain First Amendment to Preferred Supplier Agreement, dated as of May 10, 2017, and that certain Waiver and Second Amendment to Preferred Supplier Agreement dated as of February 9, 2018, as further amended by that certain Third Amendment to Preferred Supplier Agreement dated as of October 4, 2019, and as further amended by that certain Fourth Amendment to Preferred Supplier Agreement dated as of November 5, 2019 (as further amended, restated, amended and restated, supplemented, or as otherwise modified).

"***Sales Contracts***" has the meaning set forth in the PSA.

"***Security Documents***" means the term as defined in the PSA.

"***Supply Termination Date***" has the meaning given to the term "Postpetition Termination Date" under and as defined in the Cash Collateral Order.

(u)     ***2002 Master Agreement Protocol.*** The parties agree that, with effect from the date of this Agreement, the terms of each Annex to the 2002 Master Agreement Protocol published by the International Swaps and Derivatives Association Inc. on July 15, 2003, (the "Protocol") shall apply to this Agreement as if the parties had adhered to the Protocol without amendment.

(v)     **WAIVER OF RIGHT TO TRIAL BY JURY. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(w)     ***Right to Clear and Choose DCO.*** Notwithstanding anything in DF Supplement Section 2.24, if a Transaction is subject to mandatory clearing requirements under Section 2(h) of the CEA, and the party other than BP Energy Company fails to designate a DCO in connection with the execution of the Transaction, then BP Energy Company may select a DCO to which the other party has transaction rights to be the DCO for such Transaction on behalf of such other party.

(x)     Agera's CFTC Interim Compliant Identifier ("CICI") is 549300IEC1BRJMR5LR84.

(y)     energy.me's CICI is 549300QQZTUEL8GAA162.

(z)     Aequitas Energy Inc.'s CICI is 5493001DR8JDUWZBE084.

(aa)    ***Withholding Tax Imposed on Payments to Non-US Counterparties Under the United States Foreign Account Tax Compliance Act.*** "Tax" as used in Part 2(a) of this Schedule (Payer Tax Representation) and "Indemnifiable Tax" as defined in Section 14 of this Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section

20

I47l(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a **"FATCA With/to/ding Tax").** For the avoidance of doubt, a FATCA.

Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of this Agreement.

(bb)   ***Partial Termination.*** Periodically, and no less often than monthly, BP will elect a permanent partial termination of the portion of each Transaction that relates to accounts under Sales Contracts that are no longer scheduled to be supplied to Party B, other than those accounts that have or will be transferred to Exelon Generation Company, LLC ("***Exelon***"), for the remainder of such term of such Transaction (a "Partial Unwind"), as calculated by BP in its sole discretion based on accounts that are scheduled to be transferred to the applicable utility or local distribution company or other third party, other than Exelon, by providing written notice of such Partial Unwind election to Party B (the "Partial Unwind Notice").

In connection with any Partial Unwind, the notional quantities and other related provisions of each applicable Transaction shall be proportionally adjusted consistent with the reduction in volumes for the remainder of the term of the Transaction. A Partial Unwind shall be treated as a Termination Event with respect to the terminated portion of each applicable Transaction, in respect of which Party B shall be the sole Affected Party. A Partial Unwind shall not be treated as a Termination Event under this Agreement with respect to the non-terminated portion of any Transaction, and except as otherwise expressly set forth herein, the occurrence of a Partial Unwind shall have no effect on the non-terminated portion of the Transactions, which shall continue in full force and effect without regard to any such Partial Unwind. The Early Termination Date in respect of any Partial Unwind shall (i) be set forth in the Partial Unwind Notice, (ii) may vary for portions of the Partial Unwind to reflect dates upon which accounts will cease to be served, and (iii) may be prior to the date upon which such notice is sent. Notwithstanding anything in the Agreement to the contrary, Party A may elect to pay any Unpaid Amounts due to Party B in respect of a Partial Unwind on the payment due date that would have otherwise applied to the Affected Transaction.

(cc)   ***Actions Binding.*** Any action of Agera, energy.me, or Aequitas, as the case may be, shall bind the other.

### Part 6. Physically Settled Power Transactions

(a)   **ISDA North American Power Annex.** The North American Power Annex to the ISDA Master Agreement published by ISDA (attached hereto as <u>Attachment A</u>), as amended, supplemented, replaced or modified from time to time, (the "Power Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physically settled power, except as otherwise specifically provided in the relevant Confirmation. The Commodity Definitions are incorporated in this Power Annex for all purposes. All terms used in this Part 6 that are not otherwise defined shall have the meanings given to them in the Power Annex.

(b)   The following shall amend and replace clause (i) of the Power Annex:

**(j)   Elective Provisions**

1.     (a)(ii) __ Applicability of Part 6 to Outstanding Power Transactions. If not checked, not applicable.

2.     (a)(iii) __ Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions. If not checked, not applicable.

3.     (c)  X  Accelerated Payment Damages. If not checked, not applicable.

4.     (d)(ii): **Timeliness of Payment**
　　　　　　 ___ Option A
　　　　　　  X  Option B

　　　 If neither is checked, Option B shall be deemed to apply.

5.(h)(i): **Wholesale Power Tariffs**
　　　　　　 _x_     Party A Electric Tariff. FERC Electric Tariff Accepted by FERC: 02/18/14 Effective Date: 12/21/2013 Docket Number ER14-779
　　　　　　 _x_     **Agera Energy LLC:** FERC Electric Tariff. Tariff/Date/Docket: Agera Energy LLC - Docket Nos.   ER14-2472-000 and ER14-2472-001/September 30, 2014; **energy.me midwest lie:** FERC Electric Tariff: Docket No. ER15-1721-000, Effective Date July 15, 2015 and **Aequitas Energy Inc.:** FERC Electric Tariff: Accepted by FERC: 06/20/12 Effective Date: 08/07/12 Docket Number ER12-2065-001

If not checked, not applicable.

6.(h)(ii) ___ Applicability of Severability provision. If not checked, not applicable.

7.(h)(iii) _x_ Applicability of FERC Standard of Review and Certain Covenants and

　　　 Waivers. If not checked, not applicable.

(c)      **Notice Information for Power Transactions.**

| Name: (*"BP Energy Company"* or *"Party A"*) | Name: (*"Agera Energy LLC', "energy.me midwest llc", or "Aequitas Energy, Inc."* or *"Party B"*) |
|---|---|
| **All Notices:**<br>Street: 201 Helios Way<br>City:    Houston, Texas<br>Zip:     77079<br>Attn:     Contract Services - Power<br>Phone:     713-323-2000<br><br><br>Email:      FinancialContractsExternal@uk.bp.com<br>Duns:      62-527-5755<br>Federal Tax ID Number: 36-3421804 | **All Notices:** As set forth in Part 4 of the Schedule. pursuant to Part 4(a). |

| | |
|---|---|
| **Invoices:**<br>Attn:       Power Accounting<br>Phone:      713-323-1041<br>Facsimile: 713-323-7457 | **Invoices:** As set forth in Part 4 of the Schedule. |
| **Confirmations:**<br>Attn:       Confirmations - Power<br>Phone:      713-323-3806<br>Facsimile:   281-227-8470 | **Confirmations: ATTN POWER SUPPLY** As set forth in Part 4 of the Schedule. |
| **Scheduling:**<br>Attn:       Scheduling<br>Phone:      713-323-5262<br>Facsimile: 713-323-7909 | **Scheduling:** As set forth in Part 4 of the Schedule. |
| **Payments:**<br>Attn:       Power Accounting<br>Phone:      713-323-1041<br>Facsimile: 713-323-7457 | **Payments:** As set forth in Part 4 of the Schedule. |
| **Wire Transfer:**<br>BNK:   JPMorgan Chase Bank, NA<br>New York, NY 10081-6000<br>ABA:   021-000021<br>ACCT: 826078354 | **Wire Transfer:**<br>BNK: First National Bank of Central Texas<br>ABA: 111903245<br>ACCT: 40038762 |
| **Credit and Collections:**<br>Attn:       Griffin Keller<br>Phone:      832-664-2400<br>Facsimile: 713-323-7459<br><br>**With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:**<br><br>Attn:       Griffin Keller<br>Phone:      832-664-2400<br>Facsimile: 713-323-7459; and<br><br>Attn:       Legal-Power<br>Phone:      713-323-3735<br>Facsimile: 713-323-7472 | **Credit and Collections:** As set forth in Part 4 of the Schedule.<br><br>**With additional Notices of an Event of Default, Potential Event of Default or Notices of Early Termination to:** As set forth in Part 4 of the Schedule. |

(d)     **Additional Provisions to this Power Annex.**

1.     Clause (a)(ii) is amended by inserting the phrase "under any EEI Master Power Purchase and Sale Agreement or WSPP Agreement" immediately after the word "outstanding" and before the parenthetical in the first (1st) sentence therein.

2.     Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (1st) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party

23

arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement. If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.    Clause (b)(ii) shall be amended by adding the following at the end thereof:

"With respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in the Electric Reliability Council of Texas ("ERCOT") region, the following shall apply, notwithstanding any other Scheduling deadlines in the ERCOT Nodal Protocols:

(A)    Definitions: "DRUC Schedule Deadline" means the time at which ERCOT is required to start the DRUC process relating to such day of delivery.

"HRUC Schedule Deadline" means the time at which ERCOT is required to start an HRUC process relating to such hour of delivery.

"First HRUC Schedule Deadline" means the HRUC Schedule Deadline which immediately follows the time at which the parties entered into the Transaction and which occurs after the start of the next clock hour.

(B)    HRUC Scheduling Requirement: Buyer and Seller shall Schedule each hour's deliveries of the Product with ERCOT prior to the First HRUC Schedule Deadline unless the time at which the Transaction was entered into is less than thirty (30) minutes prior to the start of the next clock hour, in which case the HRUC Schedule Deadline immediately following the First HRUC Schedule Deadline shall be the applicable scheduling deadline."

(C)    DRUC Scheduling Requirement: If a Transaction is entered into prior to that day's DRUC Schedule Deadline, Buyer and Seller shall Schedule such day's deliveries of the Product with ERCOT prior to that day's DRUC Schedule Deadline."

4.    Clause (c)(i) shall be relabelled (c)(i)(a) and a new clause (c)(i)(b) shall be added to deal with Seller Failure with respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in ERCOT:

"(c)(i)(b) Seller Failure in ERCOT for Firm (LD) Transactions and Firm (No Force Majeure) Transactions. If Seller fails to schedule and/or deliver all or part of the Product pursuant to a Transaction, and such failure is not excused under the terms of the Product or by Buyer's failure to perform, then Seller shall pay Buyer, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in the Elective Provisions of the ISDA Power Annex, within five (5) Business Days of invoice receipt, (i) an amount for such deficiency equal

24

to the positive difference, if any, obtained by subtracting the Contract Price from the Replacement Price and (ii) an amount equal to the ERCOT charges incurred by Buyer, if any, as a result of Seller's failure to Schedule a Firm (LD) or Firm (No Force Majeure) Transaction in the ERCOT region prior to any applicable DRUC Schedule Deadline or HRUC Schedule Deadline under clause (b)(ii). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount."

5.    Clause (c)(ii) shall be relabelled (c)(ii)(a) and a new clause (c)(ii)(b) shall be added to deal with Buyer Failure with respect to Firm (LD) Transactions and Firm (No Force Majeure) Transactions in ERCOT:

"(c)(ii)(b) Buyer Failure in ERCOT for Firm (LD) Transactions and Firm (No Force Majeure) Transactions. If Buyer fails to schedule and/or receive all or part of the Product pursuant to a Transaction and such failure is not excused under the terms of the Product or by Seller's failure to perform, then Buyer shall pay Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in the Elective Provisions of the ISDA Power Annex, within five (5) Business Days of invoice receipt, (i) an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Sales Price from the Contract Price; and (ii) an amount equal to the ERCOT charges incurred by Seller, if any, as a result of Buyer's failure to Schedule a Finn (LD) or Firm (No Force Majeure) Transaction prior to any applicable DRUC Schedule Deadline or HRUC Schedule Deadline\ under clause (b)(ii). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount."

6.    The following provisions shall be added as new clauses (c)(iv) and (c)(v) herein:

"(iv) *Mitigation.* Each party has a duty to mitigate damages provided under this Power Annex and will use commercially reasonable efforts to minimize any damages it may incur resulting from the other party's performance or nonperformance under any Power Transaction.

(v) *Exclusivity.* So long as any failure of Seller to schedule or deliver, or any failure of Buyer to schedule or receive, the Product hereunder does not constitute or result in an Event of Default under this Agreement, the remedies specified in this clause (c) of the Power Annex shall be the exclusive remedies available to Buyer to schedule or receive the Product hereunder, and no other liability under any theory of law or equity shall attach in connection with such failure."

7.    Clause (d)(iv) is amended by deleting the word "outstanding" in the second (2nd) line therein and replacing it with the word "Outstanding".

8.    Clause (e) is amended by deleting from the second paragraph the second sentence and all those sentences following in such paragraph.

9.    Clause (h)(iii) is deleted in its entirety and replaced with the following provision:

"(iii) *FERC Standard of Review; Certain Covenants and Waivers.* If elected under G) as being applicable:

(a)    Absent the agreement of all parties to the proposed change, the standard of review for changes to any rate, charge, classification, term or condition of this Agreement, whether proposed by a party (to the extent that any waiver in clause (h)(iii) below is unenforceable or ineffective as to such party), a non-party or FERC acting *sua sponte,* shall solely be the "public interest" application of the 'just and reasonable" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) and clarified by Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish 128 S.Ct. 2733 (2008) (the "Mobile-Sierra doctrine").

(b)    Standard of Review for ERCOT Transactions. Absent the agreement of all parties to the proposed change, the standard of review for changes to any portion of this Agreement with respect to any Transaction entered into hereunder having a Delivery Point in the Electric Reliability Council of Texas, whether proposed by a party (to the extent that any waiver in clause (h)(iii)(c) below is unenforceable or ineffective as to such Party), a non-party, or the Public Utility Commission of Texas ("PUC") acting *sua sponte,* shall be the "public interest" standard of review set fo1ih in High Plains Natural Gas Co. v. Railroad Commission, Tex. Civ. App. - Austin 1971, writ refd n.r.e.

(c)    In addition, and notwithstanding the foregoing (h)(iii)(a) and (b), to the fullest extent permitted by applicable law, each party, for itself and its successors and assigns, hereby expressly and irrevocably waives any rights it can or may have, now or in the future, whether under §§ 205 and/or 206 of the Federal Power Act or otherwise, to seek to obtain from FERC or PUC by any means, directly or indirectly (through complaint, investigation or otherwise), and each hereby covenants and agrees not at any time to seek to so obtain, an order from FERC or PUC changing any section of this Agreement specifying the rate, charge, classification, or other term or condition agreed to by the parties, it being the express intent of the parties that, to the fullest extent permitted by applicable law, neither party shall unilaterally seek to obtain from FERC or PUC any relief changing the rate, charge, classification, or other term or condition of this Agreement, notwithstanding any subsequent changes in applicable law or market conditions that may occur. In the event it were to be determined that applicable law precludes the parties from waiving their rights to seek changes from FERC to their market-based power sales contracts (including entering into covenants not to do so) then this clause (h)(iii)(c) shall not apply, provided that, consistent with the foregoing clauses (h)(iii)(a) and (b), neither party shall seek any such changes except solely under the "public interest" application of the 'just and reasonable" standard of review and otherwise as set forth in the foregoing clauses (h)(iii)(a) and (b).

(d)     The parties agree that in the event that any portion of this clause (h)(iii) is determined to be invalid, illegal or unenforceable for any reason, the provisions of clauses (h)(iii)(a) and (b) shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law."

10.   Clause (i)(ii) of this Power Annex is deleted in its entirety and replaced with the following provision:

"(ii)  Events of Default: Sections 5(a)(i) and 5(a)(ii).

(A)     Section 5(a)(i). With respect to all Power Transactions, the words "or delivery" in the second line of Section 5(a)(i) of this Agreement are hereby deleted.

(B)     Section 5(a)(ii)(l). With respect to all Power Transactions, (i) the words "or delivery" in the second line of Section 5(a)(ii)(l) are hereby deleted, and (ii) the words "or to deliver or receive the Product, the exclusive remedy for which is provided for in clause (c) of the Power Annex" are hereby added at the end of the parenthetical of Section 5(a)(ii)(l) of this Agreement.

11.   Clause (i)(iii) is deleted in its entirety and shall not otherwise apply to any Power Transactions under this Agreement.

12.   The following definition shall be added to clause (i)(iv):

""Claims" means with respect to Power Transactions all third party claims or actions, threatened or filed and, whether groundless, false, fraudulent or otherwise, that directly or indirectly relate to the subject matter of an indemnity, and the resulting losses, damages, expenses, attorneys' fees and court costs, whether incurred by settlement or otherwise, and whether such claims or actions are threatened or filed prior to or after the termination of this Agreement."

13.   The definition of "Force Majeure" in clause (i)(iv) herein is amended as follows:

a.     The following provision is inserted after the word "hereunder" in subsection (ii) therein:

"or to obtain the Product at a more advantageous price or under more advantageous terms and conditions."

b.     The following provision is inserted after the phrase "Contract Price" in subsection (iv) therein:

"or under more advantageous terms to a third party purchaser."

14.     The definition of "Replacement Price" in clause (i)(iv) herein is amended by inserting "for delivery" in the second line after the text "at the Delivery Point".

15.     The definition of "Sales price" is amended to delete the phrase "at the Delivery Point" from the second line.

16.     <u>Illegality and Tax Event</u>. With respect to any Power Transaction entered into under this Agreement, Sections 5(b)(i) and S(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Power Transaction.

17.     <u>Additional Representations</u>. With respect to any Power Transaction entered into under this Agreement, the following representations shall apply with respect to each party:

    a.     <u>UCC Applicable</u>. Notwithstanding the laws of the State of New York to the contrary, the parties represent and agree that (i) each Product is a "good" as such term is defined in the Uniform Commercial Code of the State of New York, and (ii) all of the provisions of the Uniform Commercial Code of the State of New York shall apply to this Agreement and all Transactions.

    b.     <u>Utility Disclaimer</u>. Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and further agrees that the other party is not a provider of last resort.

18.     <u>Other Products and Related Definitions</u>. The following provisions and definitions shall apply with respect to Power Transactions:

        a.     If the parties agree to a service level defined by a different agreement (i.e., the WSPP agreement, the ERCOT agreement, etc.) for a particular Transaction, then, unless the parties expressly state and agree that all the terms and conditions of such other agreement will apply, such reference to a service level/product defined by such other agreement means that the service level for that Transaction is subject to the applicable regional independent system operator and/or utility reliability requirements and guidelines as well as the permitted excuses for performance, Force Majeure, Uncontrollable Forces, or other such excuses applicable to performance under such other agreement, to the extent inconsistent with the terms of this Agreement, but all other terms and conditions of this Agreement remain applicable.

        b.     "West Firm" means with respect to a Transaction, a Product that is or will be scheduled as firm energy consistent with the most recent rules adopted by the WECC for which the only excuses for failure to deliver or receive are if an

interruption is (i) due to an Uncontrollable Force as provided in Section 10 of the WSPP Agreement; or (ii) where applicable, to meet Seller's public utility or statutory obligations to its customers. Notwithstanding any other provision in this Agreement, if Seller exercises its right to interrupt to meet its public utility or statutory obligations, Seller shall be responsible for payment of damages for failure to deliver firm energy as provided in Part 6(c) of this Agreement.

c.     "CAISO Energy" means with respect to a Transaction, a Product under which the Seller shall sell and the Buyer shall purchase a quantity of energy equal to the hourly quantity without Ancillary Services (as defined in the Tariff) that is or will be scheduled as a schedule coordinator to schedule coordinator transaction pursuant to the applicable tariff and protocol provisions of the California Independent System Operator ("CAISO") (as amended from time to time, the "Tariff") for which the only excuse for failure to deliver or receive is an Uncontrollable Force (as defined in the Tariff).

## Part 7. ISDA North American Gas Annex

(a)     **ISDA North American Gas Annex.** The North American Gas Annex to the ISDA Master Agreement published by ISDA (attached hereto as <u>Attachment B</u>), as amended, supplemented, replaced or modified from time to time, (the "Gas Annex") is incorporated by reference in this Agreement and in the relevant Confirmations with respect to "Transactions," as defined by the Commodity Definitions, in physical gas, except as otherwise specifically provided in the relevant Confirmation. The Commodity Definitions and the provisions of Part 7 are incorporated in this Gas Annex for all purposes. All terms used in this Part 7 that are not otherwise defined shall have the meanings given to them in the Gas Annex.

(b)     The following shall amend and replace clause (I) of the Gas Annex:

(I)     **Elective Provisions**

**1.     (a)(ii) - Outstanding Gas Transactions.** This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

__ Option A: All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

_ Option B: The Gas Transactions listed in Schedule 1 to this Gas Annex.

_x     Option C: None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

**2.      (a)(iii) - Outstanding Gas Credit Support**

_ _ Outstanding Gas Credit Support held by a party in connection with Outstanding Gas
Transactions shall be deemed to have been delivered under and in connection
with this Agreement pursuant to clause (a)(iii).

If not checked, not applicable.

**3.      (b)(ii) -Performance Obligation** (remedy for breach of Firm obligation)

_X_ Option A: Cover Standard

_ Option B: Spot Price Standard

If neither option is selected, Option A shall apply.

**4.      (e) -Taxes**

_x_ Option A: Buyer Pays At and After Delivery Point Option B:

Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

**5.      (f)(ii) - Payment Date**

_X Option A: the later of the 25th Day of Month following Month of delivery or 10 Days
after receipt of the invoice by Buyer (provided that if the Payment Date is not a
Local Business Day, payment is due on the next Local Business Day following
that date).

_ Option B: the later of the _ Day of Month following Month of delivery or 10 Days
after receipt of the invoice by Buyer (provided that if the Payment Date is not a
Local Business Day, payment is due on the next Local Business Day following
that date).

_ Option C: Notwithstanding anything to the contrary in the Schedule, payments with
respect to both Gas Transactions and Power Transactions (as defined separately
in the Schedule) will be netted and payable on or before the later of the 20th
Day of Month following Month of delivery or 10 Days after receipt of the
invoice by Buyer (provided that if the Payment Date is not a Local Business
Day, payment is due on the next Local Business Day following that date).

_ Option D: Notwithstanding anything to the contrary in the Schedule, payments with
respect to both Gas Transactions and Power Transactions (as defined separately
in the Schedule) will be netted and payable on or before the later of the 25th
Day of Month following Month of delivery or 10 Days after receipt of the
invoice by Buyer (provided that if the Payment Date is not a Local Business

Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6.        **(k)(xxii) - Alternative to Spot Price Index.** The parties have selected the following alternative index as the Spot Price Index:    . If no index is specified, the Spot Price Index specified in clause (k)(xxii) applies.

(c)       The following shall amend and replace clause (m) of the Gas Annex:

**(m)      Notices for Gas Transactions**

| PARTY A | AGERA |
|---|---|
| **Invoices:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address:  BP Energy Company<br>          P.O. Box 3092<br>          Houston, TX 77253-3092<br>Attn: Gas Accounting<br>Phone: (713) 323-2000<br>Facsimile: (713) 323-5313 | **Invoices:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>          Briarcliff Manor NY 10510<br>Attn: Steve Jakab, Treasurer<br>(Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com)<br><br>Phone: 914-236-1423<br>Facsimile: 888-721-5019 |
| **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Gas Scheduling<br>Phone: (713) 323-2000 | **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Jodi Brown (Jbrown@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: BP Energy Company<br>          P.O. Box 3092<br>          Houston, Texas 77253-3092<br>Attn: Confirmations Dept.<br>Phone: (713) 323-2000<br>Facsimile: (281) 227-8470 | **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>          Briarcliff Manor NY 10510<br>Attn: Juan Padron, Supply<br>(Jpadron@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |

| **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn:<br>Phone:<br>Facsimile: | **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Raima Jamal, Legal<br>(Rjamal@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |
|---|---|
| **☐Wire Transfer - or - ☐ ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy Company | **☐Wire Transfer - or - ☐ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: First National Bank of Central Texas<br>ABA:111903245<br>Account: 40038762<br>Other Details: Agera Energy |
| **PARTY A** | **ENERGY.ME** |
| **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: BP Energy Company<br>          P.O. Box 3092<br>          Houston, Texas 77253-3092<br>Attn: Gas Account<br>Phone: (713) 323-2000<br>Facsimile: (713) 323-5313 | **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>          Briarcliff Manor NY 10510<br>Attn: Steve Jakab, Treasurer<br>(Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |
| **Nominations:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Gas Scheduling<br>Phone: (713) 323-2000 | **Nominations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Jodi Brown (Jbrown@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |

| | |
|---|---|
| **Confirmations:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address:  BP Energy Company<br>            P.O. Box 3092<br>            Houston, Texas 77253-3092<br>Attn: Confirmations Dept.<br>Phone:(713)323-2000<br>Facsimile: (281) 227-8470 | **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>            Briarcliff Manor NY 10510<br>Attn: Juan Padron, Supply<br>(Jpadron@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Option Exercise:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn:<br>Phone:<br>Facsimile: | **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Attn: Raima Jamal, Legal<br>(Rjamal@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |
| **□Wire Transfer - or - □ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy Company | **□Wire Transfer - or - □ACH (check one box):**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br>Bank: JPMorgan Chase Bank, N.A.<br>ABA: 021000021<br>Account: 139511500<br>Other Details: energy.me midwest lle |
| **PARTY A** | **AEQUITAS** |
| **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: P.O. Box 3092<br>            Houston, TX 77253-3092<br>Attn: Gas Accounting<br>Phone: (713) 323-2000<br>Facsimile: (713) 323-5313 | **Invoices:**<br><br>As set forth in Part 4 of the Schedule unless otherwise set forth below:<br><br>Address: 555 Pleasantville Rd Suite 107<br>            Briarcliff Manor NY 10510<br>Attn: Steve Jakab, Treasurer<br>(Sjakab@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |

| **Nominations:** | **Nominations:** |
|---|---|
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: Gas Scheduling<br>Phone: (713) 323-2000 | Attn: Jodi Brown (Jbrown@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| **Confirmations:** | **Confirmations:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | |
| Address: BP Energy Company<br>P.O. Box 3092<br>Houston, Texas 77253-3092 | Address: 555 Pleasantville Rd Suite 107<br>          Briarcliff Manor NY 10510<br>Attn: Juan Padron, Supply<br>(Jpadron@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com) |
| Attn: Confirmations Dept.<br>Phone: (713) 323-2000<br>Facsimile: (281) 227-8470 | |
| **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below: | **Option Exercise:**<br>As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn:<br>Phone:<br>Facsimile: | Attn: Raima Jamal, Legal<br>(Rjamal@ageraenergy.com)<br>Todd Sandford, COO<br>(Tsandford@ageraenergy.com)<br>Mark Linzenbold, CFO<br>(Mlinzenbold@ageraenergy.com) |
| ☐**Wire Transfer - or - ☐ ACH (check one box):** | ☐**Wire Transfer - or - ☐ACH (check one box):** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Bank: JP Morgan Chase Bank, NY<br>ABA: 021000021<br>Account: 910-2-548097<br>Other Details: For the account of BP Energy Company | Bank: First National Bank of Central Texas<br>ABA:111903245<br>Account:40038739<br>Other Details: Aequitas Energy Inc. |

(d)     The following shall amend and replace clause (n) of the Gas Annex:

**(n)     Other Provisions/Modifications to this Gas Annex.**

1.     Clause (a)(i) is amended by deleting the phrase "North America" in the first (1st) sentence therein and replacing it with the phrase "the United States".

34

2.      Clause (a)(iii)(A) is amended by adding the following language immediately at the end of the first (lst) paragraph thereof:

"Concurrently with the execution of this Agreement, to the extent that any Outstanding Credit Support is in the form of a letter of credit, the party arranging the letter of credit shall have a new letter of credit issued by the issuing bank in a form acceptable to the other party that references the obligations of the arranging party under the terms of this Agreement effective as of the effective date of this Agreement. If the arranging party fails to have a letter of credit issued pursuant to the terms and conditions of this clause (a)(iii)(A), such failure shall constitute an Event of Default under Section 5(a)(iii) of this Agreement."

3.      Clause (b)(i) is amended by adding the following at the end thereof:

"Unless expressly agreed to by the parties under a Confirmation, Seller is under no obligation to source the Gas being sold to Buyer from storage."

4.      Clause (b) is amended by adding the following provision as a new clause (b)(iv):

"(iv) In the event that the Contract Price for a Transaction is a Fixed Price (as defined below), and such Transaction (a) has a Firm performance obligation, and (b)a Delivery Period of at least one Month, then, notwithstanding anything to the contrary in this Contract, including, without limitation, anything in clause (b)(ii) or clause (h) of this Gas Annex:

        (i)       if, upon the occurrence of an event of Force Majeure, and as a result of the event of Force Majeure (a) Seller is unable to sell and deliver or (b) Buyer is unable to purchase and receive, the Contract Quantity of Fixed Price Gas, either in whole or in part, for such Transaction,

        (ii)                     then, for the duration of the event of Force Majeure, for each Day that Seller is unable to sell and deliver, or Buyer is unable to purchase and receive, such Fixed Price Gas, as set out in clause (b)(iv)(i) above, the following settlement obligations between the parties shall apply:

                a.      if the FOM Price (as defined below) exceeds the Fixed Price, Seller shall pay Buyer the difference between the FOM Price and the Fixed Price for each MMBtu of such Gas not delivered and/or received on that Day, or

                b.      if the Fixed Price exceeds the FOM Price, Buyer shall pay Seller the difference between the Fixed Price and the FOM Price for each MMBtu of such Gas not delivered and/or received on that Day.

        For the purpose of this clause (b)(iv):

        "Fixed Price" means, a Contract Price for a Gas Transaction that is expressed as a flat dollar amount for the Month of delivery, excluding any Gas Transactions that have been entered into after the last trading day (as defined by the NYMEX) for the applicable Month. Subject to

the foregoing exclusion, "Fixed Price" also includes any Gas Transaction containing a Contract Price or a component of a Contract Price that has been converted from a floating price mechanism (i.e., a NYMEX/first of the month index basis component and a fixed price or floating price component, or a NYMEX/first of the month index priced component with a fixed basis component) to a flat dollar amount for any Month of delivery, either upon the mutual agreement of the patties or as a result of a party exercising a pricing "trigger" option in the relevant Gas Transaction.

"FOM Price" means the price per MMBtu, stated in the same currency as the Gas Transaction subject to such event of Force Majeure, for the first of the Month delivery, either as the NYMEX settlement price or as an index price published in the first issue of a publication commonly accepted by the natural gas industry (selected by the Seller in a commercially reasonable manner) for the Month of such event of Force Majeure for the geographic location closest in proximity to the Delivery Point(s) for the relevant Day, adjusted for the basis differential between the Delivery Point(s) and the NYMEX or such published geographic location as determined by the Seller in a commercially reasonable manner."

5.      Clause (h)(iii) is amended by deleting the word "or" located between the semicolon (";") and "(C)" on the fifth (5th) line therein, and inserting the word "or" between the semicolon (";") and "(E)" on the eleventh (11th) line therein.

6.      Clause (h)(iv) is hereby deleted in its entirety and replaced with the following provision:

"Notwithstanding anything to the contrary in this clause (h), the parties agree that the settlement of strikes, lockouts, or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance, and further agree that upon the occurrence and continuance of any event of Force Majeure, neither party shall be obligated to purchase or sell Gas hereunder if such purchase or sale would result in material economic impact to such party under this Gas Annex to the Agreement."

7.      Clause (h) is amended by adding the following provision as a new clause (h)(vii):

"Without restricting the generality of Section 9(f) of the Agreement, if an event of Force Majeure occurs, the party affected may, in its sole discretion and without notice to the other party, determine not to make a claim of Force Majeure and to waive its rights hereunder as they would apply to such event. Such determination or waiver shall not preclude the affected party from claiming Force Majeure in respect of any subsequent event, including any event that is substantially similar to the event in respect of which such determination or waiver is made."

8.      Clause (i) is deleted in its entirety.

36

9.      Clause (k)(i) is amended by inserting the phrase "that there is an unexcused failure of" between the words "event" and "either" therein and deleting the word "fails" after the word "Buyer".

10.     <u>Illegality and Tax Event</u>. With respect to any Gas Transaction, Sections 5(b)(i) and 5(b)(iii) of this Agreement are of no force and effect, and the concepts of "Illegality" and "Tax Event" as used elsewhere in this Agreement shall not apply to any Gas Transaction.

11.     <u>Additional Representations</u>. With respect to Gas Transactions entered into under this Agreement, the following representations shall apply with respect to each party:

> <u>Utility Disclaimer</u>. Each party represents and agrees that it is not a "utility" as such term is used in 11 U.S.C. Section 366 of the Bankruptcy Code, and each party agrees to waive and not to assert the applicability of the provisions of 11 U.S.C. Section 366 in any bankruptcy proceeding involving such party, and fu1ther agrees that the other party is not a provider of last resort.

12.     <u>Mobile-Sierra</u>. To the extent, if any, that a transaction does not qualify as a "first sale" as defined by the Natural Gas Act and §§ 2 and 601 of the Natural Gas Policy Act, each party irrevocably waives its rights, including its rights under §§ 4-5 of the Natural Gas Act, unilaterally to seek or support a change to any terms and conditions of the Contract, including but not limited to the rate(s), charges, or classifications set forth therein. By this provision, each party expressly waives its right to seek or support, either directly or indirectly, and by whatever means:
(i) an order from the U.S. Federal Energy Regulatory Commission ("FERC") seeking to change any of the terms and conditions of the Contract agreed to by the parties; and (ii) any refund from the other party with respect to the Contract. Each party further agrees that this waiver and covenant shall be binding upon it notwithstanding any regulatory or market changes that may occur after the date of the Base Contract or any transaction entered into between the parties. Absent the agreement of both parties to the proposed change, the standard of review for changes to any terms and conditions of the Contract proposed by (a) a party, to the extent that the waiver set forth in this Section 12 is unenforceable or ineffective as to such party due to a final determination being made under applicable law that precludes the party from waiving its rights to seek or support changes from the FERC to the terms and conditions of this Contract, (b) a non- party, or (c) the FERC acting sua <u>sponte,</u> shall solely be the "public interest" application of the "just and reasonable" standard of review set forth in <u>United Gas Pipe Line Co. v. Mobile Gas Service Corp.,</u> 350 U.S. 332 (1956) and <u>Federal Power Commission v. Sierra Pacific Power Co.,</u> 350 U.S. 348 (1956) (the "Mobile-Sierra Doctrine"), as such Mobile-Sierra Doctrine has been clarified by <u>Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish</u> 128 S. Ct. 2733 (2008).

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**Party A:**
**BP Energy Company**

By: _____
Name: *Rob Gorski*
Title: *BPEC VP*
Date:

**"Agera"**
**Agera Energy LLC**

By: _____
Name:
Title:
Date:

**"energy.me"**
**energy.me midwest llc**

By: _____
Name:
Title:
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____
Name:
Title:
Date:

*[Signature Page to Amended/Restated ISDA]*

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**Party A:**
**BP Energy Company**

By: _____
Name:
Title:
Date:

**"Agera"**
**Agera Energy LLC**

By: _____
Name: MArk Linzenbold
Title: CFO
Date:

**"energy.me".**
**energy.me midwest llc**

By: _____
Name: MArk Linzenbold
Title: CFO
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____
Name: MArk Linzenbold
Title: CFO
Date:

*[Signature Page to Amended/Restated ISDA]*

**Attachment A**
North American Power Annex to the ISDA Master Agreement published by ISDA

**Attachment B**
North American Gas Annex to the ISDA Master Agreement published by ISDA

**Attachment C**

**Covenant Schedule**

Party B shall comply with the following requirements of this Attachment C as follows:

(i) Party B shall and shall cause the other Agera Parties to comply with Paragraphs 4(f)(vii) and 4(f)(viii) (Budget and Reporting) and Paragraph 9 (Postpetition Payments) of the Cash Collateral Order.

(ii) Party B shall pay in cash in full all of Party A's reasonable, documented professional fees and expenses.

(iii) Party B shall ensure that Briarcliff grants a mortgage on the Mortgaged Property in favor of Party A, in form and substance reasonably acceptable to Party A, subordinate only to existing mortgages in favor of FNBCT, by November 30, 2019.

(iv) Party B shall ensure that Briarcliff consummates the sale of the Mortgaged Property by March 31, 2020.

(v) Party B shall comply in all material respects with the Customer Transfer Schedule.

**ANNEX A**

**Customer Transfer Schedule**

**[Attached]**

*Updated 11.11.19*

**AGERA CUSTOMER TRANSFER SCHEDULE**

The schedule set forth below is designed to accomplish transfer of all customer accounts assigned under the Asset Purchase Agreement (APA) and return of all other accounts to utilities on the timelines set forth below and no later than the Final Assignment Date (as defined in the APA as no later than 120 days after APA Closing).[1]  This schedule may be modified from time to time as required on mutual agreement of Agera and BP.

The applicable responsible parties will complete the following tasks on the timeline set forth below (1) to return to default utility service all accounts that are not purchased by the Buyer (Initial Return Accounts) under the APA, and (2) to transfer all accounts corresponding to Assigned Contracts purchased by the Buyer under the APA (Transfer Accounts) following filing of a Chapter 11 Bankruptcy Petition. The timelines below prioritize EDI transaction timeframes and are designed to provide reasonable notice to the extent practicable, while complying with certain state and contractual notice requirements. Highlighted tasks pertain to bankruptcy hearings or bankruptcy-related milestones. Capitalized terms not defined herein have the meaning given to such term in the APA or RSA Term Sheet, in each case regardless of whether the APA or RSA Term Sheet has been terminated or approved or is effective.

If Closing does not occur under the APA or any Transfer Accounts have not been transferred by termination or the Final Assignment Date under the APA, the Parties will establish further timelines and tasks to return to default service all remaining Transfer Accounts that have not been transferred to the Buyer (Failed Transfer Accounts), which will be similar to the tasks and timelines for returns of the Initial Return Accounts.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 1. | **End of Week 1[2] (Oct. 4, 2019)** | **Bankruptcy Filing Date** | - | -- | -- |
| 2. | **Week 1-2** | **Determine Initial Return Accounts** | Parties to discuss which accounts will be returned to default utility service immediately (Initial Return Accounts) and which accounts are Transfer Accounts and to finalize the list of Assigned Contracts to be filed with the Bidding Procedures. Parties to determine which non- | BP, Agera, MWE, HB | Complete |

---

[1] Final Assignment Date to be confirmed upon Closing under the APA.

[2] For purposes of this Customer Transfer Schedule, a "Week" refers to a work week. Week 1 is the week of Oct. 1 ending on October 4, 2019.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| | | | Transfer Accounts will not be returned to default service immediately as Initial Return Accounts and will be returned in the first meter read date in the month of December (Secondary Return Accounts). | | |
| **3.** | **Week 2** | **Motion to Reject Contracts** | Agera[3] to file omnibus rejection motion to reject customer contracts associated with the Initial Return Accounts and Secondary Return Accounts. | | Complete |
| **4.** | **Week 2** | **Broker Contract Termination** | Motions to reject broker contracts. | | Complete |
| 5. | Weeks 2-3 | **Utility Confirmatory Calls** | Informal calls and/or emails to utilities on a best efforts basis to coordinate and provide an overview of the intended drop and transfer process and timelines for utilities and to confirm no other utility requirements beyond timely EDI transactions; *provided* that notwithstanding the above, Agera shall email or place a call during business hours (with at least two follow up calls if unable to reach) to an appropriate contact by the end of Week 2 at each Pennsylvania utility and by the end of Week 3 for each New Jersey utility, and *further provided* after communications to Pennsylvania utilities, Agera shall give appropriate consideration to comparatively larger load size and the timing of drops when allocating its best efforts resources. In calls with utilities, determine any manual drop requirements or volume limitations. Calls should prioritize communications in the following order: (1) Pennsylvania utilities in Week 2 and NJ power utilities in Week 3 to confirm process of returning customers to default service to the extent they will not be transferred; (2) utilities in states where EDI Drops are occurring in Month 1; and (4) other utilities. | [Agera utilities liaison] | Complete. Agera is providing further information requested by utilities regarding the accounts to be returned when such information is available and courtesy copies of customer drop notices to utilities that requested it. |

---

[3] Unless otherwise stated, references to Agera include all Agera Opco Entities.

| Task Num ber | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| | | | Following initial confirmatory calls in this task, Agera to continue to coordinate in the following weeks with utilities as reasonably necessary to complete the drops and transfers of accounts and other tasks related to utilities that are described herein. | | |
| 6. | **Weeks 2-3** | **Preparation of Form Utility and Customer Notices** | Parties to draft and revise form utility and customer notices and to discuss means of notification to PUCs. By end of Week 2, finalize the sample form of customer drop notice to be provided to NY PSC and NJ BPU and to any other PUCs that request courtesy copies of such notices in informal communications under Task No. 8. Finalize all forms of notices by the end of Week 3. | BP, Agera, MWE, HB | Complete. |
| 7. | **Weeks 2-3** | **Determine Notices of Abandonment** | Parties to discuss and determine when advance notice of abandonment and cessation of services (CT, ME, NH, OH[4]) will be provided to applicable PUCs. | BP, Agera, MWE, HB | Continue discussion once all or most load (both gas and electric) is returned in a state.

Glass Ratner to confirm in which states, if any, there are no contracts being assigned to Buyer and all accounts being returned. |
| 8. | **Week 2-3 (Informal calls/emails)**

**Day 1 of Week 3** | **PUC Informal Communications and Courtesy Copies of Customer Drop Notices** | Informal calls and/or emails to Agera's PUC contacts in all states explaining circumstances and expected timing in light of the inability to continue serving customers in the state and that Agera is working closely with utilities to ensure a smooth transition to utility service. Agera to confirm if any other PUCs besides NY, NJ and PA have | Raima Jamal | Complete |

---

[4]    Ohio application process includes separate forms for abandoning electric and natural gas competitive service and takes 90 days (subject to automatic approval, unless that process is suspended).  If there are no Ohio customers left, multiple notifications are avoided.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| | (courtesy customer notices) | | stated preferences to receive advance copies of customer notice for returns of utility service.<br><br>**By Day 1 of Week 3, provide sample customer notices of returns to utility service to NY PSC, NJ BPU, and any PUCs that request courtesy copies of customer notices in the informal calls or emails as described above.** If applicable, emails should notify PUC/BPU that the attached notice will be mailed to customers as soon as possible, and that Agera will be returning accounts to utility service in connection with its bankruptcy. | | |
| 9. | Oct. 22, 2019 | Notice of Assignment and Assumption | Notice provided to customers with Transfer Accounts of potential assumption and assignment pursuant to Bankruptcy court proceedings. Notice must be given by the Assignment Notice Date under the APA. | Agera | Complete |
| 10. | Ongoing | **Preparation of EDI** | Agera to begin preparing EDI so that returns of Initial Return Accounts scheduled in Week 5 may occur as soon as possible after Bankruptcy Court ruling on contract rejection motions. | Tom Frederiksen Lakeisha John | Complete |
| 11. | Week 4 (ongoing) | **Coordination with APA Buyer on Notices** | Agera to discuss with APA Buyer any individual or joint notices that will be provided for transfer and applicable timing. | Agera/MWE | Complete |
| 12. | Ongoing | **Determination of EDI deadlines for Secondary Return Account** | Parties to determine timing of return for Secondary Return Accounts and EDI submission deadlines to ensure drops for Secondary Return Accounts will occur in the applicable meter read dates in Month 3 (or on another timeline if mutually agreed by the parties). Parties to discuss returning all Secondary Return Accounts for gas together with all Initial Return Accounts for gas, which are already expected to be returned to utilities in Month 3. | Tom Frederiksen Lakeisha John | Ongoing |

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 13. | [Week 3] | **Filing of Assigned Contracts List** | List of Assigned Contracts attached to the Stalking Horse APA filed with Bankruptcy Court within seven (7) Business Days after Petition Date. | | Parties to discuss status |
| 14. | Week 5 | **Order on Contract Rejection Motions** | Darren Azman/MWE to notify Lakeisha John and Tom Frederiksen upon Bankruptcy Court ruling on motion to reject customer contracts so that tasks occurring in Week 5 can begin as soon as possible. | | Complete |
| 15. | Week 5 | **PUC Notices** | Provide any written notices to PUCs if further notice is requested by PUCs in calls/email correspondence. Any PUC notices to state that Agera will transfer certain accounts on the same terms as under the existing contract and return to default service other accounts, and to the extent accounts cannot be transferred they will be returned to default service. | Raima Jamal | Complete (no written notices requested) |
| 16. | Week 5[5] | **Customer Drop Notices** | Send written notices to customers with Initial Return Accounts and Secondary Return Accounts of contract termination and return to default service. With respect to TX customers, Agera to provide courtesy copy to Texas PUC. | Agera | Complete; Agera to confirm status for TX customer drop notices |
| 17. | Week 5 | **Notices to Utilities (All States except TX)** | Except for TX utilities, Agera to provide written notices to utilities that Agera intends to transfer some accounts to a third party supplier and return some accounts to default service, and that in the event Transfer Accounts are not transferred they may be returned to default service. These notices should use addresses and methods (e.g. overnight and/or certified mail) identified in utility contracts. | [Agera utilities liaison] | Complete for NJ utilities |

---

[5]   Notice will only include customer accounts subject to the rejection hearing in Item 14. To the extent that there is a second or third hearing to reject additional customer contracts not approved in the initial rejection hearing in Item 14, notices to such additional customers will be provided the day after such second and third hearing, as applicable, and parties to discuss whether such additional accounts will be returned to default service as Secondary Return Accounts. If not, parties to discuss timing of returns of any such additional accounts, to be no later than returns of Secondary Return Accounts.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 18. | **Week 1, Month 2 (Week of Nov. 4)** | **EDI Drops Round 1[6]** | For Initial Return Accounts, submit all EDI drop transactions for CA, CT, DC (power only), DE, IL (power), RI (power), and NY (both except Central Hudson and NIMO). | Tom Frederiksen Lakeisha John | |
| 19. | **Week 1, Month 2** | **EDI Drops Round 2** | Submit EDI drops of Initial Return Accounts for DC (gas), MA (gas), OH (power), PA (power), VA (gas) as soon as possible and no later than the 15th of Month 2. | Tom Frederiksen Lakeisha John | |
| 20. | **Week 1, Month 2** | **EDI Drops Round 3** | Submit EDI drops of Initial Return Accounts for IL (gas), OH (gas), PA (gas), and RI (gas) as soon as possible and no later than applicable November cutoffs for gas EDI. | Tom Frederiksen Lakeisha John | |
| 21. | **Week 4-5** | **Ohio Change in Operations Filing** | Within 30 days of filing the bankruptcy, each Agera entity with an Ohio certificate to file notice of change in business operations in their respective certification dockets. | Agera/MWE/Ohio local counsel | Complete |
| 22. | **Week 5** | **Bid and Objection Deadline** | | | |
| 23. | **[Week 5]** | **Auction (if necessary)** | | | |
| 24. | **Week 1, Month 2** | **Sale Hearing** | | | |
| 25. | **[Week 1, Month 2]** | **Transfer Notices** | Parties to discuss timing for and finalize forms of transfer notices | Agera, Exelon, BP and respective counsel | Complete |

---

[6] With respect to all EDI drops referenced in this Customer Transfer Schedule, for any utilities that do not use EDI for returns of customers to utility service, such returns will be completed by email or other means required by the utility, in each case to be submitted by the date that EDI drops are specified to be submitted for such state under this Customer Transfer Schedule.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 26. | **[Week 1, Month 2] [After Sale Hearing]** | **Call with Texas PUC** | Following Sale Hearing, Agera to coordinate conference between Agera, the Texas PUC and the assignee of the Transfer Accounts in Texas. | Agera, local counsel | |
| 27. | **Week 1, Month 2 (Ongoing)** | **Confirm EDI Transactions** | Confirm with utilities that EDI were successfully processed by utilities and that applicable accounts were actually dropped to utility service on expected timelines. | Tom Frederiksen Lakeisha John | |
| 28. | **Week 1, Month 2** | **EDI Drops Round 4 (MA power)** | Drops for MA (power) Initial Return Accounts to be submitted no sooner than 8 days after notice is sent to customers. | | |
| 29. | **Week 1-2, Month 2** | **EDI Drops Round 5 (NY CenHud/ NIMO)** | Submit all EDI drops for all Initial Return Accounts in NY (Central Hudson and NIMO) by the end of Week 1 or early Week 2 of Month 2, and no sooner than 10 days after notice is sent to customers. | Tom Frederiksen Lakeisha John | |
| 30. | **Week 1, Month 2** | **EDI Drops Round 6 (NJ gas)** | Submit all EDI drops for all Initial Return Accounts in NJ (gas) no later than the 8th of the Month 2. | Tom Frederiksen Lakeisha John | |
| 31. | **Week 2, Month 2** | **EDI Drops Round 7 (NH Gas)** | Submit all EDI drops for all Initial Return Accounts in NH (gas) no later than the 14th of Month 2 (at least 10 bus. Days before Nov. 1). | Tom Frederiksen Lakeisha John | |
| 32. | **Week 2, Month 2** | **EDI Drops Round 8 (MD)** | Submit all EDI drops for all Initial Return Accounts in Maryland (power) as soon as possible during Week 2 but no sooner than 18 days after notice was sent to customers. Maryland (gas) EDI drops for Initial Return Accounts must be submitted no later than the 18th of the month. | Tom Frederiksen Lakeisha John | |

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 33. | <u>Week 2, Month 2</u> | **EDI Drops Round 9 (NJ power)** | Submit all EDI drops for all Initial Return Accounts in NJ (power) as soon as possible in Week 2 but <u>no sooner than 17 days after notice was sent to customers.</u> | Tom Frederiksen Lakeisha John | |
| 34. | <u>Ongoing (beginning in Month 2)</u> | **EDI Drops for Secondary Return Accounts** | Beginning in Month 2, Agera to begin submitting EDI drops for Secondary Return Accounts to be effective in the first meter read date in the month of December. [Note: EDI drops for Secondary Return Accounts for gas are expected to be on the same timeline as Initial Return Accounts.] | Tom Frederiksen Lakeisha John | |
| 35. | <u>Week 3, Month 2</u> | **EDI Drops Round 10 (ME)** | Submit all EDI drops for Initial Return Accounts in Maine as soon as possible during Week 4 of Month 2 but <u>no sooner than 28 days after notice was sent to customers.</u> | Tom Frederiksen Lakeisha John | |
| 36. | **<u>[Week 3, Month 2]</u>** | **Closing** | Estimated Closing Date to be adjusted subject to final Closing Date under APA. | | |
| 37. | **<u>[Week 3, Month 2] [After Closing]</u>** | **Provide Any Notices of Transfer if Required by APA** | Agera and assignee of customer contracts to provide individual or joint notices of transfer to the extent required by APA.<br><br>Notices to include PAPUC filing of form customer transfer notice and provision of customer notices. | Agera and assignee under APA | |
| 38. | **<u>[Week 3, Month 2]</u>** | **Enrollments** | After Item 36, Buyer starts scheduling enrollments for Transfer Accounts. | | |
| 39. | **<u>[Week 3, Month 2]</u>** | **Assignment List** | After Item 36, final list of contracts to be assigned filed with Bankruptcy court Parties to confirm this list will be filed as an update to the list of Assigned Contracts filed with the Stalking Horse APA | | |

8

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 40. | **Week 3, Month 2 (ongoing)** | **Discuss Failed Transfer (if applicable)** | If APA has been terminated before transfer of all Transfer Accounts, Parties to determine new timelines and task list applicable to Failed Transfer Accounts. | BP, Agera, MWE, HB | |
| 41. | **Week 3-4, Month 2** | **Capacity Release Preparation** | Determine whether any additional steps are required beyond returning accounts to the utility for Agera to return interstate gas pipeline capacity that Agera will no longer be using, or if such return of capacity is automatic upon dropping accounts. To the extent this process is not automatic, coordinate release process with overall effort to terminate/transfer gas customer accounts so that Agera can continue to schedule gas during the wind down process to the extent of remaining accounts that have not yet been returned or transferred. | [Agera utilities liaison] | |
| 42. | **Weeks 3-4, Month 2** | **Capacity Transfer Preparation** | Determine process to move inventory to Buyer concurrently with transfer of storage capacity. We anticipate for each utility that Buyer's allocated storage and transportation capacity will be increased as accounts are transferred to Buyer. | [Agera utilities liaison] | |
| 43. | **Week 4, Month 2** | **EDI Drops Round 11 (NH Power)** | Submit all EDI drops for all Initial Return Accounts in NH (power) <u>by the end of Month 2 and no sooner than 2 business days before Nov. 1 (30 days after notice was sent to NH customers)</u>. | Tom Frederiksen Lakeisha John | |
| 44. | **Week 4/5, Month 2** | **Last EDI for Secondary Return Accounts** | Except for TX, complete final EDI drop transactions for Secondary Return Accounts (unless parties have mutually agreed on a later timeline for return of Secondary Return Accounts on Jan. 1, 2020 for gas and late December to early January for power).<br><br>Secondary Return Accounts for TX to be completed in Task No. 46 with Initial Return Accounts in TX. | | |
| 45. | **Week 1, Month 3 (ongoing)** | **Confirm Returns of** | Confirm with utilities that EDI were successfully processed by utilities and that applicable accounts were actually dropped to utility service on | Tom Frederiksen Lakeisha John | |

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| | | **Accounts (most states)** | expected timelines. Returns of Initial Return Accounts expected to be complete in most states (CA, CT, DC, DE, IL, MA, ME, NY, OH, PA). | | |
| 46. | **Week 2, Month 3** | **TX Transition to POLR** | After completion of transfer of all TX accounts, Agera to coordinate with ERCOT, PUCT and POLR regarding transition of remaining accounts, if any, to POLR service and to initiate return by ERCOT of the transition to POLR service. Parties to discuss any further steps required in connection with return to POLR. Agera is taking steps to have customers transfer to another supplier and avoid going to POLR if possible. | Agera, MWE, TX local counsel | |
| 47. | **Rolling Basis[7]** | **PJM Collateral Return Process** | In the event that collateral is posted with PJM, Agera to begin PJM collateral return process promptly upon completion of returns of Initial Return Accounts and any Failed Transfer Accounts and completion of transfers of Transfer Accounts in all applicable states. Upon utility confirmation that all accounts have been transferred to Buyer or dropped to default service in PJM, Agera to contact PJM staff [if no other contact, use membership at (866) 400-8980 or (610) 666-8980] to determine if return of collateral should be requested in eCredit system prior to Agera transmitting its withdrawal notice. Agera may need to complete collateral return process on eCredit system prior to delivering withdrawal notice. Initiate withdrawal from PJM by sending letter electronically to PJM Membership and pursuant to PJM operating agreement indicating credit should be returned. See instructions: https://www.pjm.com/about-pjm/member-services.aspx | [Agera credit team] | |

---

[7]   All tasks identified as occurring on a rolling basis are to be completed reasonably promptly upon completion of all transfers of Transfer Accounts and returns to default service of Initial Return Accounts and Failed Transfer Accounts. The parties will coordinate with the applicable RTO/ISO or utility to meet any other identified conditions for return of collateral.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| | | | See 18.18.1 of PJM Operating Agreement<br>https://pjm.com/directory/merged-tariffs/oa.pdf | | |
| 48. | **Rolling Basis** | **NYISO, CAISO, MISO and ERCOT Collateral Return Process** | To the extent cash or other collateral is posted with any ISOs, Agera to begin ISO/RTO collateral return process promptly upon completion of returns of Initial Return Accounts and any Failed Transfer Accounts and completion of transfers for Transfer Accounts in all applicable states. Upon utility confirmation that all accounts have been transferred to Buyer or dropped to default service in NYISO, CAISO, MISO or ERCOT, Agera to contact each ISO to obtain return of cash or credit support as applicable. | [Agera credit team] | |
| 49. | **Week 2, Month 3** | **Termination of REP Licenses** | Parties to discuss any further steps expected to be necessary for ceasing operations and terminating licenses with states where all drops and transfers have completed. | BP, Agera, MWE, HB | |
| 50. | **[Week 2, Month 4]** | **Expected End Date under APA** | APA is terminable if Closing has not occurred 100 days after the Petition Date. Task no. 40 applies upon any APA termination. | | |
| 51. | **Week 3, Month 4 (ongoing)** | **Confirm Returns of Accounts (NJ/NH)** | Substantially all EDI drops expected to be complete for Initial Return Accounts in NJ (by week 1) and NH (by week 3) of month 4.<br><br>All Initial Return Accounts and Secondary Return Accounts are expected to have been returned to utility service by this date absent a utility delay in meter reading. | Tom Frederiksen Lakeisha John | |
| 52. | **Week 3, Month 4** | **Confirm Final Interstate Capacity Returns** | Confirm completion of returns of interstate pipeline capacity to utilities | [Agera utilities liaison] | |
| 53. | **Week 3, Month 4** | **Termination of REP Licenses** | Parties to discuss any further steps expected to be necessary for ceasing operations and terminating licenses with states where all drops and transfers have completed. In Ohio, parties to determine any trailing | BP, Agera, MWE, HB | |

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| | | | obligations that will remain in place after licenses are terminated to the extent impacting return of credit support returns. | | |
| 54. | **Rolling Basis** | **ISO-NE LC Return Process** | Upon completion of returns to default service for all Initial Return Accounts and any Failed Transfer Accounts and completed transfers to the Buyer for Transfer Accounts, Agera to contact ISO-NE to obtain return of cash and initiate collateral return process. | [Agera credit and legal team] | |
| 55. | **Rolling Basis (Expected to begin Week 3, Month 4)[8]** | **Settle POR Account Balances** | Contact all utilities for which returns and transfers are complete to obtain return of remaining balances in POR accounts. | [Agera utilities liaison] | |
| 56. | **[Week 3, Month 4][9]** | **Terminate Utility Agreements** | Terminate utility agreements. Timing of termination is subject to adjustment to account for communications with utilities to ensure return of remaining balances in POR accounts | Agera counsel Outside counsel | |
| 57. | **[Week 3, Month 4][10]** | **Obtain Return of Credit Support** | Contact utilities, interstate pipelines, and any remaining ISOs with which credit support has been posted to obtain return of LCs, cash, guarantees, and surety bonds. | [Agera credit and legal team] | |
| 58. | **Rolling Basis** | **Termination of Credit Support** | BP to terminate guarantees posted and communicate with LC issuers on termination of LCs where applicable. | BP, HB | |

---

[8] Timing for each utility to be adjusted to the extent that Transfer Accounts with such utility are enrolled on a later timeline due to Chapter 11 Bankruptcy filing occurring after return of Initial Return Accounts or to the extent there are any Failed Transfer Accounts with such utility.

[9] Timing to be adjusted to the extent set forth in note 7 above.

[10] Timing to be adjusted to the extent set forth in note 7 above.

12

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 59. | **[Month 4]** | **Reject any Contracts not yet Rejected** | Parties to discuss timing for Agera to file motion to reject remaining contracts not yet rejected. | BP, Agera, MWE, HB | |
| 60. | **By no later than 120 days after APA Closing** | **Final Assignment Date** | All Transfer Accounts must be transferred to the Buyer under the APA and all other accounts returned to utility service no later than the Final Assignment Date (as defined in the APA as no later than 120 days after APA Closing).[11] | | |
| 61. | **Rolling Basis** | **PJM Withdrawal Complete** | Confirm withdrawal from PJM, which should be effective approximately 90 days after notice being sent to PJM. If Agera has not received notice from PJM that withdrawal is complete by 90 days after notice sent, follow up with PJM to ensure withdrawal is effective. | [Agera credit and legal team] | |
| 62. | **Rolling Basis** | **NYISO Return of LC** | Confirm NYISO return of credit support, which is expected to be complete upon settlement of true-up invoices. | [Agera credit and legal team] | |
| 63. | **Rolling Basis** | **ISO-NE Return of LC** | Confirm ISO-NE return of credit support, which is expected to be complete upon settlement of true-up invoices. | [Agera credit and legal team] | |
| 64. | **Rolling Basis** | **CAISO, MISO, and ERCOT Return of Cash/Credit Support** | Confirm return by all ISOs of any remaining posted cash or credit support | [Agera credit and legal team] | |
| 65. | **Rolling Basis** | **Sell Gas in Storage** | Sell any gas in storage that is not related to Transfer Accounts in a commercially reasonable time and manner | Agera | |

---

[11] Final Assignment Date to be confirmed upon Closing under the APA.

| Task Number | Date | Task | Description | Responsible Party | Notes/Status |
|---|---|---|---|---|---|
| 66. | **Rolling Basis for all states/ regions** | **Terminate MBR Authorizations & Withdrawals** | Following completion of all tasks in each state/region, terminate market-based rate authorizations and complete withdrawal from all states and regions. | Agera legal team | |

*Execution Version*

AMENDED AND RESTATED
BASE CONFIRMATION

Effective Date: November 5, 2019

To: Agera Energy LLC
    energy.me midwest llc
    Aequitas Energy Inc.
    555 Pleasantville Rd, S107
    Briarcliff Manor, NY 10510

From: BP Energy Company
    201 Helios Way
    Houston, Texas 77079

Dear Sir/Madam:

The purpose of this amended and restated base confirmation (this "Base Confirmation") is to confirm the terms and conditions of Transactions entered into hereunder, which for the avoidance of doubt shall be all Transactions entered into under that certain ISDA 2002 Master Agreement, dated as of May 5, 2015, together with the Schedule, Power Annex and the Gas Annex thereto and all confirmations thereunder, by and between BP Energy Company, a Delaware corporation ("BP") and Agera Energy LLC, a Delaware limited liability company ("AE"), as amended by that certain Amendment dated effective as of October 2, 2015 to the ISDA Master Agreement, dated as of May 5, 2015, by and among BP, Agera, energy.me midwest llc, an Illinois limited liability company ("Energy.Me"), and Aequitas Energy Inc., a Connecticut corporation ("Aequitas" and together with AE and Energy.Me, "Agera"), as further amended by that certain Second Amended and Restated Schedule to the 2002 Master Agreement dated as of October 4, 2019, by and among BP and Agera and that certain Base Confirmation, dated as of October 4, 2019, by and among BP and Agera (the "Original Base Confirmation"), and as further amended by that certain Third Amended and Restated Schedule to the 2002 Master Agreement dated as of November 5, 2019, by and among BP and Agera (as further amended, restated, supplemented or otherwise modified, the "ISDA Master Agreement")). This Base Confirmation amends and restates the Original Base Confirmation in its entirety.  Notwithstanding anything to the contrary herein, this Base Confirmation (i) shall not apply to any Original Transactions, and (ii) is not effective until the Third Amended and Restated Schedule Effective Date, as defined in the ISDA Master Agreement. If the Cash Collateral Order is never entered, all Transactions entered into after the termination of the Original Transactions will be governed by the Original Agreement.

This Base Confirmation forms a part of, and is subject to, the ISDA Master Agreement. All provisions contained in the ISDA Master Agreement govern this Base Confirmation except as expressly modified below. BP and Agera may each be referred to individually as a "Party" or collectively as the "Parties". Capitalized terms used in this Base Confirmation without further definition have the meanings ascribed to such terms in the ISDA Master Agreement, unless otherwise noted herein.

In the event of any conflict between the provisions of this Base Confirmation and the provisions of the PSA, the provisions of this Base Confirmation shall govern and control.

The terms of the Transactions to which this Base Confirmation relates are as follows:

| I. | **Seller:** | BP |
|----|----|----|

| II. | **Buyer:** | Agera |
|----|----|----|

**III.  Term:**    Term. The term of this Base Confirmation shall commence on the Effective Date and continue until the Supply Termination Date (the "Term"); provided, that expiration or termination of this Base Confirmation shall not affect or excuse the performance by either Party of obligations that by their nature survive such expiration or termination; provided further, that this Base Confirmation shall continue in effect following termination or expiration of the PSA, or the acceleration of any obligations thereunder, with respect to any Transaction entered into hereunder

prior to the end of the Term until the Parties have fulfilled all obligations with respect to all such Transactions unless terminated earlier in accordance with the ISDA Master Agreement.

| IV. | Transactions: | (a) <u>Commitment to Enter into Transactions.</u> |
|---|---|---|

During the Term and subject to the terms and conditions hereof, Buyer and Seller agree to enter into Transactions under this Base Confirmation to supply or repurchase electricity and natural gas to Buyer from time to time for delivery during the period extending through the end of the Term in a manner sufficient to supply and manage Buyer's Forecasted Load, whether such Transactions are physically- or financially-settled. All settlements and other payments and charges due to an ISO (as defined in the PSA) that Seller incurs in connection with any Transaction shall be for the account of Buyer and paid pursuant to the terms of the PSA.

Buyer and Seller will be deemed to have entered into Transactions with respect to all Energy (as defined in the PSA) scheduled pursuant to Article 5 of the PSA, and such Transactions need not be separately confirmed.

(b) <u>Limitations on Commitment.</u> Seller shall have no obligations to enter into any Transaction under this Base Confirmation or otherwise schedule any Energy (as defined in the PSA) pursuant to Article 5 of the PSA if any of the Conditions Precedents under Section IX of this Base Confirmation are not satisfied.

| V. | Interface | During the Term, Seller shall provide Buyer with scheduling services in accordance with Article 5 of the PSA in a manner consistent with the Approved Budget (as defined in the Cash Collateral Order) and Buyer's ordinary course of business. |
|---|---|---|
| VI. | Other Seller Supply Arrangements: | Seller and Seller's affiliates may sell physical and financial products and related services to any other purchaser at any prices, whether higher or lower, than the prices made available to Buyer. Seller and Seller's affiliates may compete in Buyer's and its affiliates' markets and for their customers without restriction based upon Seller's contractual relationship with Buyer and Seller's affiliates. Seller's contractual relationship with Buyer is not intended and shall not be construed to create any fiduciary relationship, partnership, or other similar relationship with Buyer or any of its affiliates. |
| VII. | Supply Fees: | Buyer shall pay Seller the Supply Premium (as defined in the PSA) in accordance with the provisions set forth in the PSA, including Section 10.1(b) thereof. |
| VIII. | Payments: | (a)    <u>Invoices.</u>  As soon as practicable after the end of each calendar month, Seller shall render to Buyer an invoice for the payment obligations accrued by Buyer in respect of all Transactions hereunder, as well as any other amounts accrued by Buyer during such month (and any previous months to the extent not already invoiced). |

(b)    <u>Payment Method.</u> Buyer shall pay the amounts due under an invoice provided hereunder on or before the next occurring Applicable Payment Date; provided that the foregoing shall not affect the payment dates of any amounts that are expressly stated herein to be due on an earlier date. All payments to Seller shall be made in immediately available funds by wire transfer to the Seller Payment Account on the Applicable Payment Date.

| IX. | Conditions Precedent: | Seller's obligation to enter into each Transaction under this Base Confirmation, shall |
|---|---|---|

-2-

each be subject to the following "Conditions Precedent" that on such date:

(a)     There shall not exist any Event of Default or Termination Event under the ISDA Master Agreement with respect to Buyer and the entering into of such Transaction would not cause or be reasonably expected to cause an Event of Default or Termination Event with respect to Buyer.

(b)     There shall not exist any Potential Event of Default under the ISDA Master Agreement with respect to Buyer and the entering into of such Transaction would not cause or be reasonably expected to cause a Potential Event of Default, unless Seller determines in its sole discretion that (i) such Potential Event of Default is reasonably subject to cure by Buyer and (ii) Buyer is taking steps to cure such Potential Event of Default.

**X.     Definitions:**     As used herein the following terms shall have the following meanings:

"<u>Applicable Payment Date</u>" means (i) for physically-settled Energy (as defined in the PSA) Transactions, the twentieth (20th) day of each month or, if such date is not a Local Business Day, then on the next Local Business Day, (ii) for physically-settled natural gas Transactions, the twenty-fifth (25th) day of the month following the month of delivery, or, if such date is not a Local Business Day, then on the next Local Business Day, (iii) for financially-settled Energy (as defined in the PSA) Transactions, the twentieth (20th) day of each month or, if such date is not a Local Business Day, then on the next Local Business Day, and (iv) for financially-settled gas Transactions, the twenty-fifth (25th) day of the month following the month of delivery or, if such date is not a Local Business Day, then on the next Local Business Day.

"<u>Buyer's Forecasted Load</u>" means as of any date and with respect to a given period, the total volume of electricity or natural gas estimated by Buyer (and approved by Seller in its reasonable discretion) as necessary to serve 100% of Buyer's Load existing as of such date.

"<u>Buyer's Load</u>" means the volume of electricity or natural gas that must be or has been delivered to fulfill the demand of Buyer's customers under its Sale Contracts (as defined in the PSA).

"<u>Seller Payment Account</u>" means:
Beneficiary: BP Energy Company
Bank: JP Morgan Chase Bank, NY
ABA: 021000021
Account:  910-2-548097

**XI.     Default Interest:**     If Buyer fails to pay when due any amount payable under this Base Confirmation, the amount not paid when due shall bear interest beginning on the date due until paid in full at the Interest Rate (as defined in the PSA (as that term is defined in the ISDA Master Agreement).  Notwithstanding the foregoing or any other term in the ISDA Master Agreement or PSA to the contrary, it is the intention of Seller and Buyer to conform strictly to any applicable usury laws. Accordingly, if Seller contracts for, charges, or receives any consideration which constitutes interest more than the highest rate permitted by applicable law, then any such excess shall be canceled automatically and, if previously paid, shall at the Seller's option be applied to the outstanding amount of obligations owing by Buyer under the ISDA Master Agreement or be refunded to Buyer. In determining whether any interest exceeds the maximum rate permitted by applicable law, such interest shall, to the extent

permitted by applicable law, be amortized, prorated, allocated, and spread in equal parts throughout the Term.

[Signatures follow.]

Please sign below to confirm that the terms stated herein accurately reflect the agreement reached between the Parties on the Effective Date

**Party A:**
**BP Energy Company**

By: _____
Name: *Rob Gorski*
Title: *BPEC VP*
Date:

**"Agera"**
**Agera Energy LLC**

By: _____
Name:
Title:
Date:

**"energy.me"**
**energy.me midwest llc**

By: _____
Name:
Title:
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____
Name:
Title:
Date:

*[Signature Page to Base Confirm]*

-5-

Please sign below to confirm that the terms stated herein accurately reflect the agreement reached between the Parties on the Effective Date.

**Party A:**
**BP Energy Company**

By: _____
Name:
Title:
Date:

**"Agera"**
**Agera Energy LLC**

By: _____
Name: Mark Linzenbold
Title: CFO
Date:

**"energy.me"**
**energy.me midwest llc**

By: _____
Name: Mark Linzenbold
Title: CFO
Date:

**"Aequitas"**
**Aequitas Energy Inc.**

By: _____
Name: Mark Linzenbold
Title: CFO
Date:

*[Signature Page to Base Confirm]*

-5-